FILED

2013 Sep-26  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **GINA KAY RAY, et. al, individually and for a class of similarly situated persons or entities,** } } } } | |
| } | |
| **Plaintiffs,** } } | |
| **v.** } } | **Case No.:  2:12-CV-02819-RDP** |
| **JUDICIAL CORRECTIONS SERVICES, et. al,** } } } | |
| **Defendants.** } } | |

## <u>MEMORANDUM OPINION</u>

"I fight authority / Authority always wins."  Throughout his hit-making career, John Mellencamp (a.k.a., Johnny Cougar, John Cougar, and John Cougar Mellencamp) has struck a chord with the American public, garnering acclaim for his revealing insights on everyday life. However, the above lyric, from one of Mellcamp's most enduring songs,[1] fails to ring true in the present case.  Here, Plaintiffs assert that the Town of Childersburg, Alabama ("Childersburg") and Judicial Corrections Services, Inc./Correctional Healthcare Companies, Inc. (collectively "JCS")[2] have abused their *authority* over municipal criminal defendants.  Childersburg and JCS counter, in part, that this court lacks the *authority* to entertain Plaintiffs' claims.  Contrary to Mellencamp's chorus line, authority doesn't always win.  Indeed, in this case, the arguments of Childersburg and JCS substantially fail.

---

[1] JOHN COUGAR MELLENCAMP, AUTHORITY SONG (Island/Mercury 1983).

[2] Plaintiffs allege that Correctional Healthcare Companies, Inc. shares the same corporate officers at the same address as JCS and appears to be the successor of JCS, having purchased or otherwise acquired it and continues to do business as JCS. (Doc. #50 at ¶ 11).  For purposes of this memorandum opinion, "JCS" shall refer to both JCS and CHC collectively, and references to the collective parties will be made in the singular form.

Before the court is Defendant Town of Childersburg's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. #51), filed on May 28, 2013.  The Motion (Doc. #51) has been fully briefed.  (Docs. #52, #61, #64).  For the reasons outlines below, the Motion (Doc. #51) is due to be granted in part and denied in part.[3]

## I.    Procedural History

Plaintiffs Gina Kay Ray, Kalus K. Johnson, and Deuante T. Jews initiated this lawsuit by filing a Complaint (Doc. #1) on behalf of themselves and those similarly situated against JCS, Childersburg, and B.J. Meeks, in his official capacity as Mayor of Childersburg, Alabama.  After a status conference on November 20, 2012, the court terminated the then-pending motions to dismiss (Docs. #6, #12) and directed Plaintiffs to file an Amended Complaint to correct "shotgun" pleading deficiencies. (Doc. #28).   Plaintiffs filed an Amended Complaint on December 20, 2012 and dropped Defendant B.J. Meeks as a party. (Doc. #29).  After a hearing on April 4, 2013, the court instructed Plaintiffs to file a Second Amended Complaint to yet again correct "shotgun" pleading deficiencies. (Doc. #43).  At that time, the court also terminated the motions to dismiss Plaintiffs' Amended Complaint. (Doc. #43).

Plaintiffs[4] filed a Second Amended and Restated Complaint (Doc. #50) against JCS and Childersburg on April 26, 2013 on behalf of themselves and those similarly situated.[5]   The

---

[3] To be clear, this memorandum opinion only addresses the Town of Childersburg's Motion to Dismiss.  Any findings or conclusions reached herein do not apply to Defendant Judicial Correction Services ("JCS"), which has filed a separate Motion to Dismiss.  Defendant JCS's Motion to Dismiss (Doc. #55) will be considered in a separate memorandum opinion and order.

[4] The court notes that Kalus K. Johnson is no longer listed as a named plaintiff, while Kathy and Timothy Fugatt have been added as named plaintiffs.  Gina Kay Ray and Deunate T. Jews remain named plaintiffs.

[5] Plaintiffs seek to represent the following classes:

> All individuals who have in the past, or may in the future, receive only fines and no jail sentence for charges before the Alabama municipal courts which employ JCS and whose fines were, or may be in the future, converted to a probation under JCS; a subclass of this class which would include

Second Amended Complaint asserts the following claims against Childersburg: (1) a Section 1983 claim for denial of due process under the Fourteenth Amendment (Count Two); (2) a Section 1983 claim for unlawful seizure in violation of the Fourth Amendment (Count Four); (3) a Section 1983 claim for violation of the Sixth Amendment right to counsel (Count Six); (4) a Section 1983 claim for excessive fines and cruel and unusual punishment in violation of the Eighth Amendment (Count Eight); (5) a Section 1983 claim for denial of equal protection under the Fourteenth Amendment (Count Ten); and (6) a claim for declaratory and injunctive relief (Count Eleven).

## II.   Factual Allegations

### A.   General Background

Defendant Childersburg, with the approval of its Mayor and Town Council, contracted with Defendant JCS to provide probation and fee collecting services for Childersburg's Municipal Court. (Doc. #50 at ¶¶ 12, 18-19).[6]  Childersburg was also responsible for the hiring of its municipal court judge, Larry Ward. (Doc. #50 at ¶ 19).  Pursuant to the agreement between Childersburg and JCS, any time a person appearing before the court is unable to pay the court costs and/or fines associated with the charges at issue, that person is automatically placed on

---

those individuals within the above class who received, or may receive in the future, such treatment before the Childersburg Municipal Court.

AND

All individuals who, despite their indigency, were incarcerated, or may be subject to incarceration, without consideration of their indigency for failure to pay charges and fees for services allegedly rendered by JCS to Alabama governments with which it contracts; a subclass of this class which would include those individuals within the above class who received, or may receive in the future, such treatment before the Childersburg Municipal Court.

(Doc. #50 at ¶ 9).  This memorandum opinion does not address Plaintiffs' purported class allegations.  These matters will be heard when and if Plaintiffs move for certification of this matter as a class action.

[6] Plaintiffs assert that the operative agreement was drafted by JCS and signed by the Mayor of Childersburg. (Doc. #50 at ¶ 18).  However, Plaintiffs did not attach a copy of the agreement to the Second Amended Complaint.

probation using forms provided by JCS, regardless of whether a jail sentence was imposed. (Doc. #50 at ¶ 21).  As part of this arrangement, the municipal court is to include in each of its orders a probation supervision fee of $35 per month[7] and a probation account set-up fee of $10, both payable to JCS. (Doc. #50 at ¶ 20).  Payment of these fees is ordered even if adjudication is withheld. (Doc. #50 at ¶ 21).

JCS employees attend each municipal court session, carry badges, and are referred to as "parole officers." (Doc. #50 at ¶ 24).  The probation orders provided by JCS to Childersburg municipal court require individuals to make payments directly to JCS. (Doc. #50 at ¶¶ 21, 24). JCS controls what payments are made and determines how much each individual must pay each month, how much is credited to JCS, and how much is rebated to Childersburg. (Doc. #50 at ¶ 25).  After a sentence of probation is ordered, JCS sends letters to individuals indicating that failure to appear for an assigned court date "will result in a warrant being issued" for the individual's arrest and that their "court date cannot and will not be reset." (Doc. #50 at ¶ 22; Doc. #50, Ex. F).  Some JCS forms instruct probationers that they may avoid their court date if they pay a monetary amount determined by JCS. (Doc. #50 at ¶ 22; Doc. #50, Ex. G).  JCS permits individuals placed on probation who live more than thirty (30) miles from the JCS office to mail in their payments.  (Doc. #50 at ¶ 22).

If an individual fails to pay a satisfactory amount, JCS then determines whether to revoke the individual's probation (in which case the individual is jailed) or whether to impose additional fines and costs. (Doc. #50 at ¶¶ 27, 29).  Childersburg personnel follow JCS's recommendations regarding whether to incarcerate an individual or impose other bond requirements without conducting hearings to determine why an individual has not made payments, whether the individual may be indigent, or whether the individual is entitled to counsel. (Doc. #50 at ¶ 27).

[7] This fee has since been increased to $45 per month. (Doc. #50 at ¶ 20).

JCS takes no action to determine indigency and has denied that it has any responsibility to make that determination.  On the contrary, Childersburg's municipal judge contends that under the agreement with JCS, it is JCS that should determine whether an individual is unable to pay due to indigency, and, if so, abate appropriate fees in the probation order. (Doc. #50 at ¶ 31).

JCS trains its employees on the issuance of warrants for arrest and provides forms for that purpose. (Doc. #50 at ¶ 22; Doc. #50, Ex. E).  JCS also provides forms for warrant dismissal if the individual subsequently complies with payment of fees and costs. (Doc. #50 at ¶ 22; Doc. #50, Ex. I).  If an individual is arrested, JCS monitors jail statuses as part of case management reports. (Doc. #50 at ¶ 22; Doc. #50, Ex. J).

Under the agreement between Childersburg and JCS, individuals are often responsible for fines that exceed the statutory maximum of $500.00 that municipal courts may impose. (Doc. #50 at ¶ 28).  In addition, the periods of probation imposed in order to collect fines and fees for JCS often exceed the two year statutory maximum. (Doc. #50 at ¶ 28).

### B.    Plaintiff Gina Kay Ray

Plaintiff Gina Kay Ray is a resident of Vincent, Alabama. (Doc. #50 at ¶ 34).  She appeared before the Childersburg Municipal Court on August 12, 2010 on charges of "no insurance" and "driving while license suspended." (Doc. #50 at ¶34).  She was fined a total of $1146, but did not receive a jail sentence. (Doc. #50 at ¶ 34).  JCS set her monthly payments on these amounts at $145. (Doc. #50 at ¶ 34).

Ms. Ray appeared before the Childersburg Municipal Court again on July 14, 2011, having been charged with "expired tag" and "driving while license suspended." (Doc. #50 at ¶ 35).  She was fined $248 in connection with the "expired tag" charge and $598 in connection with the "driving while license suspended" charge, but did not receive a jail sentence. (Doc. #50

at ¶ 35).  Because she could not pay the fines, she was again placed on probation with JCS and ordered to pay JCS an additional $45 per month and $10 account set-up fee. (Doc. #50 at ¶ 35). JCS set her monthly payments on these amounts at $145. (Doc. #50 at ¶ 35).  JCS treated this period of probation as separate from her August 2010 probation. (Doc. #50 at ¶ 35).

Ms. Ray maintains that she was and has been indigent, and, therefore, unable to pay her fines and fees. (Doc. #50 at ¶ 36).  Despite these assertions, neither Childersburg nor JCS inquired into her ability to pay at any time during the process. (*Id.*).  Because she was unable to pay as instructed, Ms. Ray was jailed at the discretion of JCS for "failure to obey a court order." (Doc. #50 at ¶ 37).  She spent four days in the Talladega County Jail in 2010 and an additional twenty-one days in 2011. (Doc. #50 at ¶ 37).  Ms. Ray also spent time in the Talladega County Jail in April and May 2012. (Doc. #50 at ¶37).  In each instance, Ms. Ray was jailed without a probation revocation hearing and without the assistance of counsel. (Doc. #50 at ¶ 43).

Ms. Ray was released on May 1, 2012, after a friend came forward with the $300 required by JCS for her release. (Doc. #50 at ¶ 38).  At that time, JCS authorized the release of the previous charge of "failure to obey court order" and directed Ms. Ray to appear in "Judicial Corrections Municipal Court." (Doc. #50 at ¶ 39).

### C.     Plaintiff Kristy Fugatt

Plaintiff Kristy Fugatt is a resident of Sylacauga, Alabama. (Doc. #50 at ¶ 7).  Mrs. Fugatt was scheduled to appear in Childersburg Municipal Court on January 13, 2011 on charges of driving with an expired license tag and an expired driver's license, but her case was *nol prossed* upon payment of the charges' court costs, which amounted to $346. (Doc. #50 at ¶¶ 45-47).  Mrs. Fugatt was unable to pay the attendant traffic fines at that time and was placed on probation by JCS. (Doc. #50 at ¶ 48).  Mrs. Fugatt was charged $45 per month for the probation

services of JCS. (*Id.*).  Mrs. Fugatt was unable to make regular payments in accordance with the JCS schedule, and was threatened with incarceration by JCS. (Doc. #50 at ¶¶ 49-50).  She was fined an additional $317 on September 26, 2011 for "Failure to Obey Court Order." (Doc. #50 at ¶ 51).

After failing to appear at a scheduled meeting at JCS's office, a warrant was issued for Mrs. Fugatt's arrest. (Doc. #50 at ¶ 53).  The arrest warrant was executed on February 26, 2012, at which time Mrs. Fugatt was placed in custody at the Childersburg City Jail. (Doc. #50 at ¶ 54).  Mrs. Fugatt was jailed without a probation revocation hearing and without the assistance of counsel. (Doc. #50 at ¶ 62).  At the time of her arrest, Mrs. Fugatt was fined another $317 for "Failure to Appear." (Doc. #50 at ¶ 57).  Mrs. Fugatt was released from jail after payment of $500 was made to the Childersburg Police Department. (Doc. #50, Ex. K).

As of October 11, 2012, Mrs. Fugatt still owed $557.  Mrs. Fugatt asserts that she was indigent throughout the relevant period of time, and that she repeatedly attempted to inform JCS of that fact. (Doc. #50 at ¶¶ 50, 59).  JCS did not attempt to independently determine or verify whether she was indigent, but rather pursued its collection efforts without regard to her economic status. (Doc. #50 at ¶¶ 59-61).

### D.    Plaintiff Timothy Fugatt

Plaintiff Timothy Fugatt is a resident of Sylacauga, Alabama. (Doc. #50 at ¶ 8).  On December 3, 2010, Mr. Fugatt was stopped and ticketed for driving with an expired license tag. (Doc. #50 at ¶ 46).  He was due to appear in court on January 13, 2011, but his case was *nol prossed* after he paid $148 in court costs. (Doc. #50 at ¶ 47).  However, Mr. Fugatt was unable to pay the concomitant fine and was placed on probation with JCS. (Doc. #50 at ¶ 48).  Under the JCS program, Mr. Fugatt was required to pay $45 a month in administration costs, in addition to

monthly payments related to the traffic fine. (*Id.*).  Mr. Fugatt was irregular in both his payments and appearances at JCS's offices, and that resulted in him being fined an additional $317 on September 26, 2011 for "Failure to Obey Court Order." (Doc. #50 at ¶¶ 49-51).

After a subsequent failure to attend a scheduled meeting at JCS's office, an arrest warrant was issued for Mr. Fugatt.  He was arrested on February 26, 2012. (Doc. #50 at ¶¶ 53-54).  Mr. Fugatt was incarcerated without a revocation hearing or the assistance of counsel. (Doc. #50 at ¶ 62).  At this time, Mr. Fugatt was once again fined $317, this time for "Failure to Appear." (Doc. #50 at ¶ 57).  He was released from jail after the payment of $400 to the Childersburg Police Department. (Doc. #50, Ex. K).

As of October 11, 2012, Mr. Fugatt still owed $517. (Doc. #50 at ¶ 63).  Mr. Fugatt informed JCS that he was indigent throughout the relevant time period (Doc. #50 at ¶59-60), but JCS made no determination as to Mr. Fugatt's indigence (Doc. #50 at ¶ 62).

### E.    Plaintiff Deunate T. Jews

Plaintiff Deunate Jews is a resident of Harpersville, Alabama. (Doc. #50 at ¶ 64).  In 2008, Mr. Jews was charged with harassment. (Doc. #50 at ¶ 64).  Although the charge was subsequently dismissed, Mr. Jews was assessed $166 in court costs on October 22, 2009. (Doc. #50 at ¶ 64).  Unable to pay the court costs, Mr. Jews was placed on probation for two years, during which he was required to pay a $10 set-up fee, $45 per month in probation administration costs, and his court costs. (Doc. #50 at ¶ 64).  Mr. Jews failed to make the required payments, and that resulted in the issuance of a warrant for his arrest for "failure to obey a court order." (Doc. #50 at ¶ 64).  At that time, JCS added an additional $317 to Mr. Jews' balance, a charge that JCS categorized as "restitution." (Doc. #50 at ¶ 65).

Mr. Jews was arrested on September 22, 2009 and was incarcerated in the Childersburg City Jail for thirty days. (Doc. # 50 at ¶ 66).  Mr. Jews' was released after securing a $582 "cash bond," but found himself back in jail in May 2010, serving another thirty days for failure to pay his JCS fees. (Doc. #50 at ¶ 67-68).  In February 2011, Mr. Jews avoided additional jail time by paying $500 to JCS. (Doc. #50 at ¶ 69).  However, Mr. Jews was jailed again in February 2012 and was released on March 9, 2012. (Doc. #50 at ¶ 71).  From that date, he was assigned an additional two year probation period, which is scheduled to end on March 9, 2014. (*Id.*).  In September 2012, Mr. Jews was placed in jail for another thirty days for failure to pay his JCS fees. (Doc. #50 at ¶ 72).  In every instance, Mr. Jews was incarcerated without a formal revocation hearing and without the assistance of counsel. (Doc. #50 at ¶ 77).

As of May 25, 2012, Mr. Jews owed the following amounts to JCS: $295 for "fees in arrears," $343 for "Pay off not including Probation fees," $45 in "Monthly Probation Fees," and $1,807 in "Court Money Due from other Probations." (Doc. #50 at ¶ 71).  Throughout the relevant period, Mr. Jews was unable to make payments to JCS as a result of his indigence. (Doc. #50 at ¶ 75).  JCS has made no attempt to gauge Mr. Jews' financial ability to pay a fine, costs, or fees, nor did it account for Mr. Jews' indigency in its collection practices. (Doc. #50 at ¶ 76).

## III.   Standard of Review

The Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That being said, the complaint must include enough facts "to raise a right to belief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Pleadings that contain nothing more than a "formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and

conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.  In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*.  A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

The Supreme Court has recently identified "two working principles" for a district court to use in applying the facial plausibility standard.  First, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions when they are "couched as [] factual allegation[s]." *Iqbal*, 556 U.S. at 68.  Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*.  Application of the facial plausibility standard involves two steps.  Under prong one, the court must determine the scope and nature of the factual allegations that are well-pleaded and assume their veracity; and under prong two, the court must proceed to determine the claim's plausibility given the well-pleaded facts.  That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id*.  If the court determines that

well-pleaded facts, accepted as true, do not state claim that is plausible, the claims are due to be dismissed. *Id*.

## IV.   Discussion

After careful review, the court concludes that Defendant's motion should be granted in part and denied in part.

### A.   Overview of Defendant's Arguments in Support of the Motion to Dismiss

Defendant's Motion to Dismiss advances a number of arguments.  Indeed, rather than address each of Plaintiffs' claims individually, the motion seeks to cut Plaintiffs' Second Amended Complaint off at the knees, primarily arguing that "[a]ll of the actions complained of in the Second Amended Complaint are judicial acts, and the Complaint fails to address the factual allegations necessary to proceed with a claim against Childersburg, as opposed to the State of Alabama, for acts of its courts." (Doc. #52 at 1).  In essence, Defendant's challenge is one rooted in the second prong of the facial plausibility standard promulgated in *Twombly* and *Iqbal*.  That is, Defendant asserts that even if all of Plaintiffs' factual allegations are taken as true, no legally plausible claims can be maintained against the Town, and dismissal of this suit is required.

Defendant devotes significant space to an examination of the Alabama court system and the § 1983 liability of municipalities, concluding that, in the present circumstances, Childersburg cannot be subjected to claims under § 1983.  In doing so, Defendant essentially seeks dismissal of five of Plaintiffs' six claims: (1) Plaintiffs' §1983 claim for denial of due process under the 14th Amendment (Count Two); (2) Plaintiffs' § 1983 claim for violation of the Fourth Amendment (Count Four); (3) Plaintiffs' § 1983 claim for violation of the Sixth Amendment (Count Six); (4) Plaintiffs' § 1983 claim for violation of the Eighth Amendment (Count Eight);

and (5) Plaintiffs' § 1983 claim for denial of equal protection under the Fourteenth Amendment (Count Ten).

Additionally, Defendant's Motion asserts a number of alternative foundations for dismissal, invoking the *Rooker-Feldman* doctrine, absolute judicial immunity, federalism and comity concerns, and *O'Shea v. Littleton*'s bar on prospective injunctive relief.[8]   All of Defendant's arguments are addressed below.

### B.        Defendant Childersburg is Subject to § 1983 Liability

The Town argues initially that it is not subject to § 1983 municipal liability in this case. A claim is actionable under 42 U.S.C. § 1983 if a litigant suffers a deprivation of federal rights at the hand of a person acting under the color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). However, municipal liability under § 1983 is somewhat circumscribed; indeed, municipalities are only liable when a municipal employee's allegedly unconstitutional actions are undertaken "in execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  A plaintiff may sufficiently establish the existence of a "policy" by identifying "(1) an officially promulgated [municipal] policy or (2) an official custom or practice of the [municipality] shown through the repeated acts of a final policymaker." *Grech v. Clayton Cnty*, 335 F.3d 1326, 1329 (11th Cir. 2003).  In both instances, a plaintiff must illustrate that the governmental entity has "authority and responsibility over the governmental function in issue." *Id.* at 1330.  Furthermore, the policy or custom must be the "moving force" behind the constitutional deprivations complained of. *Monell*, 436 U.S. at 694.

---

[8] Through these various theories, Defendant effectively seeks dismissal of Plaintiffs' sixth and final claim against Childersburg for declaratory and injunctive relief (Count 11).

Defendant argues that the Town of Childersburg does not possess the authority necessary for § 1983 liability to attach, pointing to the organization of the Alabama court system and the Childersburg Municipal Court's position within it. (Doc. #52 at 9-10).  Under Alabama Code § 12-1-2, "[t]he judicial power of the state is vested exclusively in a unified judicial system which shall consist of . . . such municipal courts as may be provided by law."  As such, the Alabama Supreme Court, not Childersburg, has authority over the Childersburg Municipal Court. Likewise, under Alabama Code § 12-14-13, municipal courts themselves are bestowed with control over the application and implementation of probation. Defendant seizes upon this distribution of power, contending that Childersburg cannot be liable under § 1983 if it has neither policymaking authority over the Childersburg Municipal Court, nor control over the probationary process. (Doc. #52 at 9-10).

However, municipalities like Childersburg are responsible for furnishing "appropriate facilities and necessary supportive personnel" to municipal courts. Alabama Code § 12-14-2 (1975).  "Necessarily implied" by that assignment of responsibility is "[t]he power to contract with a private firm to aid in the collection of delinquent municipal court fines . . . " *Wilkins v. Dan Haggerty & Associates, Inc.*, 672 So.2d 507, 510 (Ala. 1995).  In failing to address head on its own authority to appoint a probationary services provider such as JCS, the Town misses the theoretical crux of Plaintiffs' case.  Plaintiffs contend that, in carrying out its duty to assist and support the Childersburg Municipal Court, Childersburg entered into a contract that handcuffed the autonomy of the municipal court and imbued JCS with a power unchecked by procedural safeguards. (*See* Doc. #50 at ¶¶ 23, 27, 28, 30-32).  Indeed, Plaintiffs plausibly allege that the policy (contracting out probation services) of a state actor (Childersburg) was the "moving

force" behind their constitutional deprivations.  The court concludes that these allegations are sufficient to satisfy the pleading requirements for claims under § 1983.

### C.    The *Rooker-Feldman* Doctrine Does Not Preclude Subject-Matter Jurisdiction in Present Case

Defendant also seeks dismissal of Plaintiffs' case on the basis of a lack of subject-matter jurisdiction, invoking the *Rooker-Feldman* doctrine to assert that consideration of Plaintiffs' suit would constitute impermissible "interference with valid state court judgments." (Doc. #52 at 15). The *Rooker-Feldman* doctrine stands for the proposition that "federal courts, other than the Supreme Court [of the United States], have no authority to review the final judgments of state courts." *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc).  Indeed, *Rooker-Feldman* reinforces notions of federalism generally, and the statutory scheme of federal jurisdiction in particular, which "does not authorize district courts to exercise appellate jurisdiction over state-court judgments." *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 644 n.3 (2002).  The *Rooker-Feldman* doctrine has its most direct application in instances where an unsuccessful state court litigant chooses not to pursue an appeal at the state level, instead resolving to challenge the state court decision in a lower federal court. *Exxon*, 544 U.S. at 284 (describing *Rooker-Feldman* as largely applicable to "cases brought by state-court losers . . . inviting district court review and rejection of [the state court's] judgments"). To be sure, such attempts to invoke the jurisdiction of the federal courts are clearly misguided.  But this case is not one of them.  Here, Plaintiffs do not seek to overturn their convictions,[9] but rather ask the court for various types of legal and equitable relief flowing from post-conviction events. (*See, e.g.*, Doc. #50 at ¶ 284).

---

[9] Substantive judgments were not even entered in three of the four plaintiffs' cases, as Mr. and Mrs. Fugatt's cases were *nol prossed* and Mr. Jews' case was dismissed.

The *Rooker-Feldman* doctrine also applies to cases that have the potential to besmirch or void related state court judgments. *See, e.g.*, *Goodman v. Sipos*, 259 F.3d 1327 (11th Cir. 2011). It is within this line of precedent that Defendant apparently attempts to couch the present case. The Town implies that, like *Goodman*, this case represents an indirect challenge to the judgments of a state court, i.e., the Childersburg Municipal Court. (Doc. #52 at 15).   In *Goodman*, the Eleventh Circuit concluded that the district court did not have subject matter jurisdiction over a § 1983 suit seeking damages for the submission of a fraudulent affidavit in a previously-litigated, child custody case.   The *Goodman* court held that the affidavit in question was too central to the state court's judgment to later be challenged in federal court. *Goodman*, 259 F.3d at 1334. Properly understood, *Goodman* acts to preserve the spirit of *Rooker-Feldman* by shielding state court judgments from collateral attacks; however, its reasoning is inapplicable to this case. Plaintiffs' suit does not amount to a collateral attack on any judgment of the Childersburg Municipal Court.   Indeed, the present scenario is readily distinguishable from that in *Goodman* in that Plaintiffs' suit in this court does not address the judgments of the Childersburg Municipal Court in the least.   Not only does Plaintiffs' suit not challenge the merits of the municipal court's decisions, but it also does not call into question any of the bases on which those judgments were reached.   Rather, Plaintiffs appear only to challenge the post-judgment probationary program.

In actuality, the instant case much more closely resembles *Powers v. Hamilton County Public Defender Commission*, a Sixth Circuit case in which a former prisoner brought a § 1983 action, alleging that the Public Defender's policy of not pursuing indigency hearings for defendant due to be placed in jail for unpaid fines had resulted in the deprivation of his constitutional rights. 501 F.3d 592, 597 (6th Cir. 2007).   On appeal, the Public Defender argued that the prisoner's suit should be summarily dismissed, as it called into question a previous state

court judgment, *i.e.*, the underlying conviction. *Id.* at 598-99.  The Sixth Circuit rebuffed this line of argument, holding, "A conclusion that procedures, or rather the lack of procedures, that culminated in Power's incarceration violated his constitutional rights has nothing to do with the propriety of his underlying convictions." *Id.* at 604.   Likewise here, because it is the administration of the municipal court's sentences that is the focus of the Plaintiffs' suit, the *Rooker-Feldman* doctrine does not preclude this court's exercise of subject matter jurisdiction in the present case.

### D.    Absolute Judicial Immunity Is Inapplicable to Childersburg

The Town also asserts that it is protected from suit by absolute judicial immunity. (Doc. #52 at 16).  Judicial immunity shields judges from liability as long as they do not act in "clear absence of all jurisdiction" and their acts are judicial in nature. *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).  "Nonjudicial officials are encompassed by a judge's absolute immunity when their official duties 'have an integral relationship with the judicial process.'" *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994) (quoting *Ashbrook v. Hoffman*, 617 F.2d 474, 476 (7th Cir. 1980)).  Indeed, judicial immunity is extended to "those officials with discretionary power similar to that exercised by a judge" in order to "ensure courageous exercise of that discretionary power." *Scott v. Dixon*, 720 F.2d 1542, 1546 (11th Cir. 1983) (citing *McCray v. Maryland*, 456 F.2d 1, 3 (4th Cir. 1972)).  The operative question in evaluating whether judicial immunity extends to a given party is whether the party was exercising the discretion or performing a function normally associated with the judiciary. *Id.*

Because an act of a nonjudicial party is only protected by judicial immunity if that act is in fact a judicial one, Childersburg's actions in the present situation must have been of a judicial character in order for the Town to fall under the protective umbrella of judicial immunity.

Defendant's bare assertion that "the Town [of Childersburg] is entitled to the same absolute immunity enjoyed by the judges" is unpersuasive. (Doc. #52 at 17).  Here, Childersburg's action —contracting with JCS for the provision of probationary services—amounts to an administrative act, one that is statutorily delegated to the Town of Childersburg, not the Childersburg Municipal Court.  Alabama Code § 12-14-2 (1975).  As such, it is not an act normally reserved for the judiciary; in fact, it is a job expressly reserved for a branch of government other than the judiciary.  Consequently, Childersburg cannot claim the protection of judicial immunity and is free to be the target of the present suit.

### E.      Federalism and Comity Concerns Do Not Counsel in Favor of Dismissal

Although Defendant Childersburg does not expressly or individually address issues of federalism and comity in its supporting brief (Doc. #52), it does incorporate those arguments made by Defendant JCS in its own brief in support of dismissal (Doc. #55).   Invoking "longstanding and well-established principles of federalism and comity," Defendant JCS argues (and the argument is, in turn, adopted by Childersburg) that Plaintiffs' request for injunctive relief is barred by both the exclusive federal remedy of habeas corpus and the *Younger* abstention doctrine.  The court will address these arguments below.

### 1.      Habeas Corpus Is Not the Exclusive Remedy for Redressing Plaintiffs' Alleged Deprivations

The federal habeas corpus statute limits its availability to those persons who are "in custody." 28 U.S.C. § 2241.  This makes sense, as "[t]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and [] the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  A writ of habeas corpus is the "sole federal remedy" available to a person in custody seeking release or reduction. *Id.* at 486.  As a result, "[a] prisoner in state custody cannot use a § 1983 action to

17

challenge the 'fact or duration of his confinement,'" or seek an "immediate release from prison" or a reduction in the length of confinement. *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005) (quoting *Preiser*, 411 U.S. at 489).

Alleging that Plaintiffs, by way of their probation sentences, are "in custody" "within the meaning of the federal habeas corpus statute," Defendant JCS concludes that Plaintiffs' only method of injunctive vindication is the writ of habeas corpus (*i.e.*, Plaintiffs' current suit, rooted primarily in § 1983, is improper). (Doc. #56 at 11). In support of this creative construction of the term "custody," Defendant relies on *Jones v. Cunningham*, a 1963 Supreme Court decision that addressed the bounds of custody for purposes of habeas applicability. 371 U.S. 236 (1963). In *Jones*, the Court held that Petitioner, a parolee, was entitled to seek a writ of habeas corpus, as the requirements of his parole program were so restrictive and confining that he was effectively in custody. *Id.* at 242-43. The Eleventh Circuit has subsequently incorporated the reasoning of *Jones*, finding that a former prisoner, who remained "subject to the terms of his sex offender probation," was "in custody" for purposes of the federal habeas statute. *Hamner v. Deputy Sec. of the Fl. Dept. of Corrections*, 438 F. App'x 875, n.1 (11th Cir. 2011) (citing *Jones*, 371 U.S. at 242-43).

But, while it seems well-established that custody means "something less than close physical confinement" in the habeas context, *Jones*, 371 U.S. at 239, Plaintiffs' probationary sentences in the present case do not exhibit the severe restraint or liberty necessary to constitute "custody." *See Hensley v. Municipal Court, San Jose Milpitas Judicial Dist., Santa Clara County, California*, 411 U.S. 345, 351 (1973) ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty . . . its use has been limited to cases of special urgency, leaving more

conventional remedies for cases in which the restraints on liberty are neither severe nor immediate."). Plaintiffs' probationary program—which consists of monthly payments, occasional visits to JCS's office, and various appearances in municipal court—appears considerably less stringent than that faced by the petitioner in *Jones*, who was confined to "a particular community, house, and job," could not "drive a car without permission," and had to allow his parole officer "to visit his home and job at any time." *Jones*, 371 U.S. at 242. Likewise, it is safe to understand at this, the pleading stage, that Plaintiffs' probation is less restrictive than was the *Hamner* Petitioner's, a sex offender who was subjected to a heightened form of probation, including restrictions as to where he could live and work. *See* Florida Statute § 775.21—"The Florida Sexual Predators Act." Rather, Plaintiffs' level of restraint more closely resembles that of the appellant in *Duvallon v. Florida*, who was fined after being convicted of a misdemeanor, but was later threatened with incarceration for failure to make payments on the fine. 691 F.2d 483 (11th Cir. 1982). In that case, the Eleventh Circuit held that "where, as here, the judgment of the state court imposes only a fine with no provision for incarceration, appellant's liberty is not restrained, she is not 'in custody' and her bare assertion of constitutional deprivation will not support federal court jurisdiction for § 2254 relief." *Id*. at 485. Like the *Duvallon* appellant, Plaintiffs' are not so restrained that they are "in custody," preventing their use of a writ of habeas corpus.[10] As a result, the writ of habeas corpus is not Plaintiffs' exclusive federal remedy; in fact, it is not a remedy available to Plaintiffs at all.

In any event, even if the court concluded that they were "in custody" (and thus entitled to bring suit under the federal habeas corpus statute), Plaintiffs would still be entitled to pursue other remedial avenues. A writ of habeas corpus is the exclusive remedy *only* in those actions

---

[10] At this stage, the court's "custody" determination is made on the limited factual allegations of the pleadings. However, further development of the factual record, particularly as it relates to the nature of Plaintiffs' probationary requirements, may warrant reconsideration of this issue.

that "would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 81-82.  Indeed, "§ 1983 remains available for *procedural challenges* where success in the action would not necessarily spell immediate or speedier release for the prisoner." *Id*. at 81 (emphasis added).

Here, Plaintiffs essentially advance procedural challenges to the Town's conduct—*e.g.*, the lack of an indigency hearing after failure to pay fines and/or the lack of providing counsel prior to incarceration—rather than attacking the propriety of their confinement or probation. (*See, e.g.*, Doc. #50 at ¶¶ 131, 208).  Indeed, the thrust of their claim is Plaintiffs' assertion that certain procedural aspects of Childersburg's probation program are wrongful and they primarily pursue injunctive relief that seeks to render those procedures invalid. (Doc. #50 at ¶ 284).  The Supreme Court has recognized as cognizable similar actions by habeas-eligible plaintiffs. *Wilkinson*, 544 U.S. at 82 ("We conclude that respondents' claims are cognizable under §1983 . . . [Respondents] seek relief that will render invalid [] state procedures . . . Neither respondent seeks an injunction ordering his immediate or speedier release into the community.").  However, to the extent that Plaintiffs seek "release of any currently incarcerated indigent persons who were jailed for these reasons," (Doc. #50 at ¶ 284(g)), their only federal remedy is a writ of habeas corpus.

For these reasons, Plaintiffs' request for an injunction against the continued incarceration of similarly situated persons is due to be dismissed, but Plaintiffs' remaining injunctive demands may proceed.

> ## 2.      The *Younger* Abstention Doctrine Does Not Work to Bar Plaintiffs' Claims

Defendant additionally claims (by incorporating JCS' arguments) that Plaintiffs' demands for injunctive relief violate the *Younger* abstention doctrine, which prevents federal

courts from "stay[ing] or enjoin[ing] pending state court proceedings except under special circumstances." *Younger v. Harris*, 401 U.S. 37, 41 (1971).  Although federal courts generally have an obligation to exercise the jurisdiction given them, "in exceptional cases federal courts may and should withhold equitable relief to avoid interference with state proceedings." *31 Foster Children v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003).  Such abstention should be exercised when 1) state judicial proceedings are ongoing, 2) the proceedings implicate important state interests, and 3) there is an adequate opportunity to raise constitutional challenges in the state proceedings. *Id.* (citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

Right off the bat, Defendant's abstention argument runs aground and founders upon the first *Younger* prong—none of the Plaintiffs are currently involved in ongoing state judicial proceedings.  Indeed, all of Plaintiffs' state cases have long been resolved—Ray's most recent case was adjudicated in July 2011, the Fugatts had their cases *nol prossed* in January 2011, and Jews' case was apparently dismissed in October 2009. (Doc. #50 at ¶¶ 35, 46, 64).  Furthermore, the declaratory and injunctive relief sought by Plaintiffs is not intended to contradict or overturn the substance of the prior state court proceedings, but instead targets Childersburg's post-judgment procedure, removing the very concern that animates the *Younger* doctrine's concern with improper interference with a pending state proceeding.  Because "the relevant principles of equity, comity, and federalism 'have little force in the absence of a pending state proceeding,'" *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (quoting *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 509 (1972)), no *Younger*-style concerns prevent this court from hearing Plaintiffs' suit.

**F.**     ***O'Shea v. Littleton*'s Bar on Injunctive Relief Does Not Apply to Plaintiffs' Equitable Claims**

Defendant Childersburg also incorporates JCS's argument with respect to *O'Shea v. Littleton*, a 1974 Supreme Court decision that cautions against the use of injunctive relief by lower federal courts in certain circumstances. 414 U.S. 488 (1974).  In *O'Shea*, the Supreme Court rejected the relief requested by a class of citizens who alleged that law enforcement officials were applying state criminal law and procedures in a racially discriminatory manner. The Court held that 1) the named plaintiffs, none of whom was identified as having specifically suffered an injury, did not have standing to bring the suit, and 2) plaintiffs' requested injunctive relief would constitute an improper and impractical intrusion on the state court system. *Id*. at 504.  Defendant asserts that "[t]he same two grounds require dismissal of Plaintiffs' request for prospective injunctive relief." (Doc. #56 at 14).  The court addresses these arguments in turn.

**1.**     **Plaintiffs Have Standing to Pursue Claims for Prospective Injunctive Relief**

Defendant attempts to draw an analogy between the *O'Shea* respondents and the Plaintiffs here, alleging that the latter have "failed to satisfy the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy." (Doc. #56 at 14 (quoting *O'Shea,* 414 U.S. at 493)).  It was clear in *O'Shea* that respondents lacked standing; indeed, "neither the complaint nor respondents' counsel suggested that any of the named plaintiffs at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial before petitioners." *O'Shea*, 414 U.S. at 496.  As there was no indication of an imminent threat of injury, the *O'Shea* Court declined to entertain the suit, avoiding the "speculation and conjecture" that accompany an undeveloped case or controversy. *Id*. at 497.

22

However, unlike the class members in *O'Shea*, Plaintiffs' allegations of future injury evince "sufficient immediacy and reality" to establish standing in the present case. *Id*.  Although "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," it seems clear, accepting Plaintiffs' allegations as true, that Plaintiffs are experiencing "continuing, present adverse effects." *Id*. at 496.  Apparently, all of the Plaintiffs are still on probation and still owe various fines and fees. (Doc. #50 at ¶¶ 41, 63, 74).  As such, they are under the present and constant threat of being subjected to the allegedly illegal methods and procedures utilized by JCS to collect municipal fines and assessments.  Plaintiffs face the prospect of a return to jail at any time, imbuing them with the standing necessary to make claims for prospective injunctive relief.

> ## 2.   Management and Execution of Plaintiffs' Requested Injunctive Relief Does Not Present the Same Risks and Challenges as Those Present in *O'Shea v. Littleton*

Defendant also argues that Plaintiffs' requested injunctive relief raises the same issues of manageability and comity as the proposed injunction in *O'Shea*. (Doc. #56 at 15-17).  In *O'Shea*, respondents did not challenge any state laws or procedures as illegal, only the individual actions of law enforcement officials. *O'Shea*, 414 U.S. at 500.  As a result, their proposed injunctive relief lacked a tangible target, seeking instead to monitor the behavior of law enforcement officials in the course of criminal prosecutions and generally ferret out racial discrimination at the state court level. *Id*.  Because it "contemplated interruption of state proceedings to adjudicate assertions of noncompliance by petitioners," the *O'Shea* Court worried that such an injunction would amount to "an ongoing federal audit of state criminal proceedings."  Ultimately, the Court declined to permit an "abrasive and unmanageable intercession." *Id*. at 500, 504.

While the complexities associated with administering injunctions have long caused federal courts to view such relief with wariness and caution, *see, e.g.*, *Younger*, 401 U.S. at 46, these concerns are simply not present in the present case.  In essence, Plaintiffs seek to enjoin the current procedures, or lack thereof, associated with the collection of municipal fees in Childersburg. (Doc. #50 at ¶ 284).   Unlike the individual behavior targeted in *O'Shea*, reformation of the procedures complained of here would not require constant, painstaking determinations.  Rather, a comprehensive injunction, if granted, would be effective in halting the challenged procedures, establishing new procedures, and providing guidance in the areas of their implementation and execution.   Because Plaintiffs' requested injunctive relief does not fall within that proscribed by *O'Shea* and its progeny, the court will continue to entertain Plaintiffs' equitable claims moving forward.

### 3. Childersburg Is Entitled to Contract With a Private Company for the Provision of Probationary Services to the Childersburg Municipal Court

Plaintiffs' theory of liability regarding Defendant Childersburg centers on the contract that it executed with Defendant JCS.  For reasons explained above, Plaintiffs' claim that Childersburg engaged in constitutional deprivations by entering into an unwieldy contract with JCS is cognizable, satisfying the basic pleading requirements for an action under § 1983. However, to the extent Plaintiffs suggest that Childersburg lacked the authority to enter into a contract with JCS, or that it is illegal for a municipality to make a contract, any contract, with a private provider of probationary services,[11] Plaintiffs misunderstand the prevailing law in

---

[11] *See* Doc. # 50 at ¶ 17 ("[B]y agreement with municipalities such as Childersburg, many administrative and judicial functions of the municipal court have been unlawfully delegated to JCS…"); Doc. #50 at ¶ 268 ("Plaintiffs request the Court to declare that the JCS contract with Childersburg was void *ab initio* because Childersburg had no authority to contractually bind its municipal court."); Doc. #50 at ¶ 271 ("…neither the Mayor nor the Council has the power to invade the administration of [Childersburg's] judiciary.").

Alabama.  Indeed, it is clear that Alabama municipalities are statutorily vested with the power to provide assistance to their municipal court system, Alabama Code § 12-14-2 (1975), and a permissible implication based upon this statutory grant is "the power to contract with a private firm to aid in the collection of delinquent municipal court fines…." *Wilkins*, 672 So.2d at 510.

That being said, contrary to Defendant's argument, Plaintiffs' request that the Childersburg/JCS contract be voided[12] is not due to be dismissed at this time.[13]  Consideration of Defendant's arguments about this issue would be more proper at the summary judgment stage, after discovery has shed light on the contents and nature of the contract.

## V.   Conclusion

For the reasons stated above, Defendant's Motion to Dismiss (Doc. #51) is due to be granted in part and denied in part.

**DONE** and **ORDERED** on September 26, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[12] Doc. #50 at ¶ 284(c) (asking the court to "[e]nter an injunction and other declaratory relief which declares the JCS contract with municipalities such as Childersburg to be void and in violation of the statutory and constitutional limitations on municipalities.").

[13] Doc. #52 at 20.