FILED

2016 Aug-11  PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GINA KAY RAY, KRISTY FUGATT, TIMOTHY FUGATT and DEUNATE T. JEWS,** Individually and for a class of similarly situated persons or entities, | ) ) ) ) ) | |
| **Plaintiffs;** | ) ) | **CIVIL ACTION NO.:** |
| **v.** | ) ) | **2:12-cv-02819-RDP** |
| **JUDICIAL CORRECTION SERVICES, INC.;** et. al. | ) ) ) ) | |
| **Defendants.** | ) | |

## PLAINTIFFS'
## MEMORANDUM IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
D. Patrick Evans
ASB-3209-R67G
Maurine C. Evans
ASB-4168-P16T
Attorneys for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com
E-Mail: dpevans@evanslawpc.com

# TABLE OF CONTENTS

OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

    A.    All the prerequisites to certification under Rule 23 are met.. . . . . . . . . .  17
          1.    Plaintiffs Have Standing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    B.    The Class Is Ascertainable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
          1.    Rule 23(a) Is Satisfied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
               i.    Numerosity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
               ii.    Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
               iii.    Typicality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
               iv.    Adequacy of Representation. . . . . . . . . . . . . . . . . . . . . . . .  38
          2.    Certification is Warranted Under Rule 23(b)(2). . . . . . . . . . . . . .  40
          3.    Certification is Warranted under Rule 23(b)(3).. . . . . . . . . . . . . .  43
               i.    Common Issues Predominate. . . . . . . . . . . . . . . . . . . . . . .  44
               ii.    A Class Action is the superior form of prosecution. . . . . .  46

    C.    Separate Classes Can Also Be Certified Under Rule 23(c)(4) With Respect
        To Particular Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

## MEMORANDUM IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

### OVERVIEW

The Plaintiffs seek a state-wide class certification for persons assigned to Judicial Correction Services, Inc. for the collection of fines, fees and costs to include the JCS affiliate companies.[1] (hereinafter 'JCS').  A subclass of those individuals would include persons assigned to JCS by the defendant Childersburg.  When the Plaintiffs began this litigation on August 28, 2012, JCS was operating in approximately 112 cities within the state of Alabama under a no-bid contract form developed by JCS which was used in virtually all of those cities. JCS operated in the City of Childersburg from June 21, 2005 until the City, after being sued, terminated its relationship with JCS effective June 20, 2015. After the institution of this litigation and other lawsuits against JCS, JCS announced it was withdrawing from the state of Alabama effective November, 2015.

### FACTS

From August 28, 2010, until JCS left Alabama in November 2015[2] (the class period), well over 100,000 individuals in Alabama were subjected to the JCS system for the collection of fines, fees and costs (Exh. 1; Doc. 382 p.6).  In the small town of Childersburg alone, over 900 individuals were assigned to JCS. (Exh. 1; Doc. 382-10).

JCS marketed itself to the cities offering its services "free of charge" stating that JCS

---

[1] JCS and Correctional Healthcare Companies, Inc. were fully integrated into the operations of CHC Companies, Inc. on September 30, 2011. CHC Companies, Inc. in turn entered into a Management Services Agreement with Correct Care Solutions ('CCS') in which it allowed CCS to control its operations.  On July 23, 2014, CHC formally merged with CCS while maintaining the names of all the companies. In fact, since January 2015 CCS employs and directs the employees of the JCS operations in Alabama. See Docs. 293, 294. (Doc. 392-12, pp. 60-63 at Depo pp. 439-442)

[2] http://www.selmatimesjournal.com/2015/10/23/private-probation-company-stops-state-operations-after-splc-lawsuit/ (last visited December 28, 2015)

will be "offender paid." (Doc. 392-11, p. 50 at Depo p. 193) Like other cities throughout the state, in 2005, the City of Childersburg accepted the JCS proposal and entered into a contract signed by its mayor and approved by its council for JCS to collect city fines. (Doc. 392-16)  Under these no bid contracts, the mayor and city council bound the city *and its court* to the exclusive use of JCS. (Doc. 392-9, p. 13 at Depo p. 48; Doc. 392-16; Doc. 273-1, pp. 13-14 at Depo pp. 52-53) The contract requires that each court order used to send someone to JCS "probation" must also require payment to JCS of a "probation" fee of $35.00 per month (later increased to $45.00 per month), together with a setup fee of $10.00. (Doc. 392-16) Those orders themselves are preprinted and provided by JCS but the fees required are not authorized by any statute or ordinance as fines or court costs. These orders are used when a person appearing before the city courts cannot pay the fines or costs levied in full and is then assigned to JCS for collection of those fines, and costs to which is then added fees for JCS.  Those who pay are never assigned to JCS "probation" or charged those fees.  Once assigned to JCS, its collection approach with all the cities is very uniform. And, once the fines, fees and costs are collected, the "probation" ends.

The JCS system and its application at the various Alabama cities is highly systemized.  During the course of discovery in this case, Colleen Ray, the JCS Alabama state director, testified as the JCS 30(b)(6) representative.  Ms. Ray testified that the JCS manual was central to its system along with the JCS software known as Probation Tracker. Each employee is trained on the manual, a copy of which is kept at every office, and each has access to and training on Probation Tracker. (Doc. 392-11, pp. 18, 21, 28 at Depo pp. 65-66, 77,107-08) The manual is replete with forms which are generated by Probation

2

Tracker.  Those JCS form documents include, among others, letters threatening arrest (Exh. 2 - Bates 93-95); delinquency letters (Exh. 3); failure to report letters (Exh. 4); Notices to Show Cause threatening arrest (Exh. 5); Violation or Probation Letters threatening arrest (Exh. 6); Petitions for Revocations requesting the arrest of the person (Exh. 7); warrants for arrest Exh. 8); and recall of warrants (Exh. 9).  Probation Tracker also provides case files for each person from whom collection is sought with a narrative input page chronicling the collection efforts and information gathered by the JCS employees.  (Exh. 10)  Though Ms. Ray acknowledged the financial interest of JCS in this process, she denied any responsibility to investigate indigency of the persons assigned there. (Doc. 392-11, pp. 41-42, 62 at Depo pp.160-61, 242-43). Ms. Ray stated that once the fines, fees and costs are collected the "probation" terminates, (Doc. 392-11, p. 67 at Depo p. 262; Doc. 195-1, p. 28 at Depo p. 109) but also admitted that JCS uses no civil tools of collection in its system. (Doc. 392-11 p. 86 at Depo pp. 339-40)  Finally, Ms. Ray testified that she was not aware of anything in the operation of JCS at Childersburg which was not typical of JCS operations in other cities statewide. (Doc. 392-11, p. 68 at Depo p. 267)

Once trained, the JCS employees are then referred to as "Probation officers."  The training and system is so uniform that employees can easily serve several cities and are easily relocated to different city courts as the need arises. (Doc. 392-11, p. 19  at Depo p. 70) However, none is required to be trained as a real probation officer and none has any certification or qualification as would be required in the federal or state system. (Doc. 392-11, p. 19 at Depo p. 69).   The JCS system is essentially a paperless system which generates court forms, demand letters, various reports. Any hard documents actually generated by the city court itself are scanned into Probation Tracker and linked to the

3

individual concerned. (Doc. 392-11, pp. 170-172; Doc. 195-1, p. 108; Exh. 1) JCS then shredded the hard copy. (Doc. 195-1, p. 28 at Depo p. 109)

The process begins when an individual at the municipal court cannot pay a fine or cost in full and is assigned to JCS for its collection. (Exh. 11)[3] That inability to pay is typically not investigated and once that person is assigned to JCS, JCS denies any responsibility to investigate indigency as well. (Doc. 392-11, p. 42 at Depo p. 161; Doc. 195-1, p. 58 at Depo p. 232) Instead, the person unable to pay the fine is then given the additional burden of monthly fees to JCS. The focus of the JCS system is the collection of fines with JCS jointly acting with the cities to use the city court, police force, jails and the appearance of official authority to extort the collections rather than normal civil tools of collection.  This uniform system was applied at Childersburg and throughout the cities in which JCS operated in Alabama in substantially the same manner and under substantially the same contractual terms. (Exh. 1; Doc. 382)  Reports and the extensive data collected in Probation Tracker on each person provide detailed ascertainability of the class members, the fees charged them and the actions taken to extort money from them. (Exh. 1; Doc. 382 pp. 33-36) Probation Tracker can generate a number of reports which allow the data to be easily searched and organized.  The underlying SQL database for Probation Tracker provides even more capability in the data analysis.  That database shows that once a person is assigned to JCS, this system is applied in a nearly identical fashion throughout the state, including Childersburg, with repetitive patterns.  The named Plaintiffs

---

[3]This is a memo from Colleen Ray the JCS state director for Alabama (and its to her boss Karen Lloyd suggesting charging for alcohol monitoring.)  In it she writes " Most defendants in Alabama get placed on probation with JCS because they can't pay their fine in full and once they do pay their fine in full they are terminated as far as the case with JCS." (Exh. 11 - CHC CCS 0346) See also, testimony by Misty Hepp (Doc. 392-13, pp. 224-225)

are typical examples of such probationers and their common treatment in this system is typical for both Childersburg and statewide. (Exh. 1; Doc. 382) Similarly, Childersburg is a typical application of the JCS system at other cities. (Doc. 392-11, p. 68 at Depo p. 267)

JCS "probation orders" are used when a person is sent to JCS for collection. Those forms are a preprinted three-part form provided by JCS for use in its customer cities. (Doc. 195-1, p. 37 at Depo p.146) The JCS form requires a "waiver of counsel" in small print for all the "probationers," so no one is represented. At Childersburg, not even a public defender is involved. (Doc. 195-1, p. 30 at Depo p. 120) Those forms also have preprinted "conditions of probation" and are filled out by JCS employees, not the court. (Exh. 2, Bates p. 78) At Childersburg, Columbiana and other cities, these JCS probation order forms were routinely signed in advance by the city judge with the blank signed forms then being filled out completely by JCS, but not reviewed in any fashion by the city. (Doc. 195-1 p. 48, Depo pp. 191-92) Other JCS forms, such as petitions for revocation, notices to show cause, violation of probation and others, *despite their official appearance*, were not even filed with the city clerk. (Doc. 195-1, pp. 49-50 at Depo pp. 194-198)

The accounting between JCS and its city customers is also systematic and includes a bi-monthly remittance from JCS to the city treasurer for the money collected. The accounting office of CCS in Atlanta sends the cities the collected money (Docs. 392-11, p. 48 at Depo p. 188; 392-12, p. 55 at Depo p. 434; Doc. 194-1, pp. 17-18, Depo pp. 68-9) Those remittance forms include the name of the person assigned to JCS and the amount being remitted toward that person's city fine. (Doc. 194-1, p. 72 at Depo pp. 286-88) The cities are not informed how much money JCS has collected for itself and thus have no idea of the total amount paid by the individual. (Doc. 194-1, p. 72 at Depo p. 288; Doc. 392-11,

5

p. 56 at Depo p. 220)  Probation Tracker, however, provides payment codes within the system from which types of payments and totals are easily calculated.  That data shows that JCS collected fees for itself in the amount of $29,828,076.39 from Alabama "probationers" since August 28, 2010. (Exh. 1; Exh. 12; Doc. 382)  The payment of those JCS fees was imposed on the entire putative class.[4]

Though the JCS contract requires JCS to abide by the law, its system applied throughout Alabama, using JCS documents routinely extended, modified or reinstated "probation" extending it well beyond the two-year statutory limit for municipal probations. (Doc. 187-3; Doc. 183-4) Similarly, it was routine for JCS to retroactively add to a current "probation" any old fines or tickets found to be existing on the City's books, thus inflating the balance claimed of a "probationer" and greatly increasing their financial burden. (Doc. 195-1, pp. 53-57 at Depo pp. 210-226; Exh. 13)

The JCS fees added each month to a "probationer's" balance are set by contract between JCS and the City and range from $35-$45 per month.  Those fees are not part of any fine schedule at the cities or state and are not legitimate court costs, but merely a matter of agreement between the cities and JCS.  Typically, the cities do not monitor or audit the activities of JCS and often, like in Childersburg, have no listing or any way to determine the individuals actually assigned to JCS for collection or how long they have been so assigned. (Doc. 194-1, pp. 18-19 at Depo pp. 69-70; Doc. 195-1, p. 24 at Depo p. 93) For these reasons, in cities including Childersburg, this combination of factors results in persons paying much more than the original fine, being required to pay fines along with

---

[4]While a some persons were assigned to JCS for CRO or community service, those persons are not included in the putative class and again are easily identified for exclusion from a class of persons assigned to JCS for collection of fines. (Exh. 1; Doc. 382)

JCS fees, often for a "probation" period extending many years beyond the two-year statutory limitation - all while being threatened and jailed. (Doc. 392-13, pp. 180-194, 196-206; Exh. 14) Only after this litigation did Childersburg terminate existing probations and recall its warrants for persons who were still on JCS well after the two-year limitation.  (Doc. 194-1, p. 27 at 106; Docs. 187-3; 187-4)

Under the JCS system, its computer program generated form letters and notices which routinely threatened arrest, jail, imprisonment, increased fines and other threats during the process of extorting payment. (Exhs. 3, 4, 5, 6) These are used in a sequence dictated by the manual. The manual even has a flow chart for "Working a Typical Case" showing the JCS collection system progressing to "warrant." (Exh. 2 - p.  65):



Under the system, when progressive form threats were unsuccessful, the JCS "officer" signs a Petition for Revocation on a JCS form, selects the hearing date and requests that the person be arrested. (Exhs. 7, 8) The notice of such action, if any, was mailed by JCS.[5]  Returned mail is ignored as the "Typical Case" example shows (Exh. 2 - p. 65) and as the treatment of the Plaintiffs' attest. (Exh. 15) The petition is followed either by payment or the issuance of an arrest warrant.  There are no examples of true probation revocation hearings with required fact findings in the JCS data.  As the extensive data collected by JCS shows, its arrest recommendations are routinely followed by the cities and warrants are issued - often on JCS warrant forms. (Exh. 8)  After the warrants are issued, the JCS employee changes the computer status of the individual being pursued to "warrant" showing again the systematic use of this tool.  (Exhs. 1, 2, p. 128) The city magistrate at Childersburg on issuing the warrant even presets a cash bond before the arrest takes place in an amount of the entire debt balance claimed of the individual. (Docs. 194-1, pp. 53-33 at Depo pp. 212-17, Exh. 18)[6]  Often these individuals were previously charged on traffic tickets that resulted in only fines to begin with and no jail sentence. (Doc. 392-66, pp. 11, 14, 15; Exhs. 19, 20).  As a result, the "probation" had no underlying adjudicated suspended jail sentence leaving the period of incarceration on a "revocation" undetermined and often lengthy until family members or friends could acquire funds to satisfy the city and JCS. (Exhs. 21 - 27)

---

[5]This "notice" by JCS was only changed in March 2014 after this litigation.(Doc. 195-1, p. 32 at 126; Exh.16)

[6]Childersburg, until recently, maintained this approach, but even now still maintains a bond schedule requiring a specific bond amount for specific charges with no consideration of the person's financial situation, risk to the community or other appropriate factors. (Doc. 194-1, p. 19 at Depo p. 75)

Similarly, at Childersburg, once the arrest warrant is requested by JCS and issued by the City, ***until this litigation brought this to light***, the City would tack on additional "warrant fees" for every warrant issued, even though no such fee is authorized by statute, the fine schedule or court costs. (Doc. 194-1, p. 52 at Depo pp. 206-07; Doc. 392-4, pp. 38-39 at Depo pp. 522-23; Exhs. 21, 23)

Alabama statutes concerning contempt of court require specific findings of willfulness before jailing a person for failure to pay a court fine, but even those statutes provide credit for each day served against the fine. *See Ala. Code* § 15-18-62(2)[7]. These statutes, like others, were ignored in the JCS process and cities like Childersburg.

**STATEWIDE**

The putative statewide class against JCS pertains to its operation in all Alabama cities. The operative class period is August 28, 2010 to date for persons who were either on JCS at that time or thereafter assigned to JCS for the collection of fines and/or costs. Because JCS announced it was ceasing operations within the state of Alabama, this group is easily defined[8]. During the class period **well over 100,000** individuals in Alabama were subjected to the identical JCS system for the collection of fines, fees and cost.[9] (Exh. 1;

---

[7]Lisha Kidd, the JCS manager for Childersburg, Columbiana and Harpersville, testified that the petitions for revocation, despite the written request for a warrant, never alleged that the probationers failure to pay was willful. (Doc. 195-1, p. 35 at Depo pp. 138-39)

[8] http://www.al.com/news/birmingham/index.ssf/2015/10/judicial_correction_services_i.html (last visited December 21, 2015)

[9]The exact number can be determined from the SQL database however the database copy provided to plaintiffs ended in April 2015 while JCS continued operations until November 2015. Further, those assigned for CRO or other non collection issues are not to be included in the putative plaintiff class and can also be identified from the SQL database for exclusion. (Plaintiffs' Exh. 1; Doc. 382)

Doc. 382 p. 37)  All were subjected to the JCS systemized collection efforts under Probation Tracker and its unified training system and manual.  All were charged fees because they could not pay their fines in full when levied.  Probation Tracker was JCS's core repository for all data, for all cities and all persons involved.  (Doc. 392-11, p. 28 at Depo p. 107, Doc. 392-12, p. 18  at Depo p. 397)  All the city contracts produced between JCS and the cities (including the JCS "specimen") use the same JCS form for all cities except at Birmingham and Leeds.  (Doc. 392-11, pp. 54-55 at Depo pp. 211-14) Even in those contracts which were not on the JCS form, the pertinent substance of the JCS "services" at "no cost" to the city being paid for by the "offender" was substantially the same with the JCS fees charged to the probationer set at the same amount.  There is no meaningful differences in how JCS operated its system among Alabama cities statewide. (Exh. 1; Doc. 382)  In all Alabama cities, JCS also used the same form letters and notices, the same status codes and required actions and substantially the same "Probation order" forms which it preprinted. (Exh. 1; Doc. 382; Exhs. 3-9) Similarly, the JCS "probation officers" assigned to each court were all trained under the same system, same manual using the same software and same procedures. (Doc. 392-11, p. 18 at Depo pp. 65-66) Analysis of the Probation Tracker data and its underlying SQL database also attests to the systematic consistency of JCS operations at all Alabama cities and in its treatment of "probationers" of the putative class.  (Exh. 1; Doc. 382)  While there may be differences in sentencing patterns of the various judges, ***once a person is assigned to JCS***, the post sentence collection process is then mechanical.  Data collected by JCS also shows a complete absence of any investigation or consideration of indigency even after the person has disclosed their inability to pay resulting in the assignment to JCS and despite JCS's

10

documentation of persons on disability, social security, without employment, juvenile, and/or hospitalized. (Exh. 2 - p. 14)

Due to the robust data in Probation Tracker, the probations and individuals assigned to JCS within any time period, at any city, is easily ascertainable. (Exh. 1; Doc. 382 pp. 5-10) Similarly, the fees, fines and costs paid by each such persons, warrants issued to them, jail imposed, and credit for time served are all documented in Probation Tracker for each city in the state. (Exh. 1; Doc. 382 pp. 15-32).

The data bases underlying the Probation Tracker are also relational and provide precise tools to identify and connect individual class members, their payments, treatment and detailed personal information on each. As a result, the fees paid, the warrants issued and credit given for jail time by individuals, in which city, and during what time frame - are all easily determined from this data.  Manageability is also greatly enhanced. (Exh. 1; Doc. 382 pp. 17, 26-36)

As the JCS manual requires,  its computer system keeps track of probationers through the use of Status codes and this information is documented for the statewide operation:

> Throughout the management of a case, a defendant's status may change many times. The status refers to the "current" stage of a case and it should be as close to real time as possible. Statuses require an "action" to be associated with it. If there is not an appropriate action for a particular situation, choose one. Make sure to place detailed notes in the appointments screen as to the reason for the status change. Listed below are various statuses and how they should be used.
>
> • **Jail** - should be used when a defendant *is in jail due to a petition of the court due to non-compliance of a court order on behalf of JCS*…
>
> • **Warrant-** *should be used when a warrant has been issued by the court for the defendant*. Do not put the case in warrant status until the warrant

has been signed by the Judge and taken back to the court clerk, as the
warrant is not active before this point.
(**Emphasis added**)

(Exh. 2, pp. 127, 128)

As a result of the relational data collected, the class-wide effect from this collection

system can be identified, quantified and sorted by individual, city, time and/or multiple other

fields.

**CHILDERSBURG**

In the small town of Childersburg, a subclass of at least over 900 individuals were

assigned to JCS - many of these individuals had multiple "probations." (Exh. 1; Doc. 382-

10)  Here, like in all Alabama cities, the relationship between the City and JCS began by

the same JCS contract form used virtually statewide. (Doc. 392-16; Exh. 1) Those who

could not pay the fines and costs were assigned to JCS, but the "probation" ends once the

bill is paid[10]. (Doc. 195-1, p. 28 at Depo p. 109).  Once on JCS, each person was then

required to pay an additional monthly fee to JCS which served as the collection agent for

the City.  Like in all Alabama cities, Probation Tracker collected the data and documents

on all these individuals through JCS "officers" trained and applying the same manual, the

same approach, and the same computer-generated threatening letters and forms.  For

those who did not pay, JCS initiated a Petition for Revocation, including a request for

arrests which the City then carried out.  Lisha Kidd, the JCS manager for Childersburg,

---

[10] 10 Q.   Now, once a person is placed on probation,
11 in talking with Ms. Ray Friday, if the fine is
12 paid off early, the probation will be terminated?
13 A.   That is correct.
14 Q.   So once that fine is collected, in that
15 circumstance JCS's job is done?
16 A.   That is correct. (Doc. 195-1, p. 109)

Columbiana and Harpersville, testified that these petitions, despite the written request for a warrant, never alleged that the probationers failure to pay was willful. (Doc. 195-1, p. 35 at Depo pp. 138-39; Exh. 29)

In Childersburg alone, of those on JCS during the class period, the city records indicate that Childersburg issued over 350 warrants for persons on JCS, and with hundreds arrested, and jailed when they could not post the cash bond demanded. The arrests and jailing was done pursuant to JCS's request. (Doc. 382-11 pp. 46, 54; Doc. 224-3, p. 16; Exhs. 29, 30) In fact, over 200 outstanding warrants were recalled after this lawsuit was filed challenging the City's practice of keeping people on "probation" longer than the statutory limit of 24 months. (Doc. 183-4)  The Childersburg jail log and documents show the consistent use of FTOCO -- "failure to obey a court order" – as its tool of choice to arrest and jail JCS "probationers" for failure to pay. (Exh. 17)  No such charge exists under state law or city ordinance.  (Exh. 31)  Nonetheless, using this "charge," Childersburg issued and executed arrest warrants after presetting cash bond amounts to equate the amount it claimed was owed. (Doc. 194-1, p. 54 at Depo pp. 213-14)  Partial payments after being jailed just returned the person to "JCS Municipal Court" (Exhs. 21, 30)  This pattern of failure to pay leading to arrest is endemic to the JCS system and its operations in Alabama cities including Childersburg.   The data JCS collected shows a consistent pattern in status code changes leading to warrant. (Exh. 1,Doc. 382 p. 28)  Further, Probation Tracker documents multiple instances of "paid to get out of jail" or "credit for time served," as well as many instances of family members paying to help avoid the threatened arrests. (Docs. 382-6, 382-7)  Childersburg itself clearly adopted this extortion approach even using its own stationary to threaten arrest for "failure to pay." (Doc. 195-1, p. 67-68

at Depo pp.  265-69; Doc. 187-6)

During discovery, Lisha Kidd, the JCS  "probation officer" working at Childersburg, Columbiana and Harpersville, was deposed as was Misty Hepp, the current Childersburg magistrate and previous police clerk.  Sandra Donahoo (Doc. 273-1), the city clerk, Aimee Burnette, (Doc. 274-1) the city treasurer were also deposed. The JCS system was so systemized in Childersburg that the judge literally pre-signed the printed form probation orders provided by JCS for those to be later filled in by the JCS employees.  That judge, Larry Ward, testified in the *Harpersville* state action[11] that he was aware that the JCS contract required the persons to pay JCS between $35 and $45 a month for probation fees. (Exh. 32 p. 16 at depo. p. 58)  According to Ward, in Harpersville, much like Childersburg, it was an administrative decision made by the City to use probation with JCS which was decided when the city contracted with JCS.[12] (Exh. 32 pg. 20 at depo. p. 76).

As with other JCS cities in Alabama, failure to pay lead to arrest in Childersburg. Status codes listed in each person's Probation Tracker file for Childersburg identify over 500 probationers on warrant status, nine probationers were identified as being credited with "time served" using the Status Action T, and there were over 70 scanned JCS reports requesting that people be jailed until money was paid. (Exh. 29) Additionally, JCS routinely

---

[11]*Burdette, et al v. Harpersville, et al, Shelby County*, CV 2010-900183

[12]     Q      What reason is there that you
   9  could not set people up on a payment
  10  schedule without putting them on probation?
  11  A       That was an administrative
  12  decision that Harpersville make.
  13  Q      When did they make that?
  14  A       I don't know.  They decided to
  15  contract with JCS to do that for that
  16  service.

changed people's status from warrant to active within the time frame from August 28, 2010 until JCS was terminated there showing the coercion of using arrests to promote payment. These very ascertainable numbers are further confirmed by city jail logs and arrest warrants showing FTOCO as the most favored tool for arrest. (Exh. 18)

## CLASS CLAIMS

Plaintiffs' claims under Title 42 U.S.C. §1983 present the "paradigmatic" and "classic" case for class certification under Rule 23(b)(2).   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). This class also meets all of the requirements for certification under Rule 23(b)(3) and Rule 23(b)(4).

## CLASS DEFINITION

Plaintiffs seek certification of a class of:

> All individuals who, as of August 28, 2010 or thereafter, were assigned by municipal courts in Alabama to "probation" with JCS for the collection of fines, fees and costs. A subclass of this class which would include those individuals within the above class who received, such treatment before the Childersburg Municipal Court.

> AND

> All individuals who, after being assigned to JCS by August 28, 2010 or thereafter, were incarcerated, without consideration of their indigency for failure to pay fines, fees and costs. A subclass of this class which would include those individuals within the above class who received such treatment in Childersburg.

## Named Plaintiffs' Allegations - FUGATTS/RAY/JEWS

The Plaintiffs are all typical of individuals in Alabama subjected to the JCS system and share common issues of fact and law with similarly situated persons. Each of the named Plaintiffs was unable to immediately pay in full fines or costs on city charges and

15

each was assigned to JCS by the Childersburg City court operating under the JCS form contract signed by the mayor. (Doc. 392-16) Each was charged fees by JCS. Each received the form threats of arrest generated in Probation Tracker and each was arrested upon the request of JCS working with its city partner. (Exhs. 24 - 27)

The Fugatts' charges were *nolle prossed* but they were unable to pay the court cost. (Doc. 224-1 pg. 91; Doc. 224-2 pp.1-2)  Jews charges were dismissed but he, too, was unable to pay court costs assessed against him. (Doc. 224-3 pg. 15; Doc. 392-33) Though all stated they could not pay, there was no inquiry into the indigency of any of the Plaintiffs by either the City or JCS and each was required to pay JCS $45 per month under JCS preprinted (and at Childersburg, presigned) "probation orders." (Exh. 28; Doc. 224-1 p.92; 224-2 p. 2; Doc. 392-30) JCS entered each of the Plaintiffs in its Probation Tracker and applied its system to collecting their fines.  (Docs. 392-18, 392-19, 392-33; Exh. 33)  All of the named Plaintiffs were threatened with arrest by JCS form letters and notices (Exhs. 3 - 7) and each was arrested by Childersburg police when they could not pay as demanded by JCS. (Doc. 382-11)  All of the named Plaintiffs had warrant fees added to their balance for each arrest warrant issued by Childersburg and each warrant included a demand for cash bond set by Childersburg as Ms. Hepp described. (Doc. 392-13, pp. 206-11, at Depo pp. 207-210) The cash bond amount for release was set by the City before the arrest warrant was served on the Plaintiffs at an amount equal to the balance claimed to be owed. (Doc. 392-14, pp. 84-90 at Depo pp. 379-90)  None of the Plaintiffs were given any credit against their fine balance for the days they spent in jail and none was provided counsel at the point jail was in jeopardy. (Exhs. 24 -27)

Childersburg's 30(b)(6) representative Aimee Burnette, after speaking with a number

of people at the city in preparation for her testimony, stated the city had no knowledge that the Plaintiffs were treated "any differently than anybody else that received a fine in Childersburg?"(Doc. 274-1, p. 45 at Depo 177)   Similarly, Childersburg police chief McClelland stated he had reviewed the arrest reports on the Plaintiffs and testified they looked the same as anybody else. (Exh. 34, p. 150)  He could not testify that they were treated any differently. (Exh. 34, pp. 148-150)

The unlawful and unconstitutional deprivations suffered by Plaintiffs are sadly typical of the practices challenged by this class action in the JCS system throughout Alabama and in its application at Childersburg.

**ARGUMENT**

**A.      All the prerequisites to certification under Rule 23 are met.**

For purposes of class certification, substantive allegations in the complaint are accepted as true. *Winston v. Jefferson County, Ala.,* 2006 WL 6916381, at *6 (N.D. Ala. 2006)(citing *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1033 (N. Miss. 1993)). Specifically, the class certification stage concerns whether the requirements of Rule 23 are met – not whether Plaintiffs will prevail on the merits. *Winston*, 2006 WL 6916381 at *6; *Miller v. Mackey International, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971).  "...Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,* 133 S. Ct. 1184, 1194-95 (2013). Here, all of the prerequisites to certification under Fed. R. Civ. P. 23 are met.

Title 42 U.S.C. § 1983 cases such as this are especially suited for class treatment.

17

Plaintiffs have specifically limited their claims to post conviction collection practices which extort money and have refined the class definition to include only those who were harmed by those practices. Certification is appropriate under both Rule 23(b)(2) and (b)(3). Additionally, a Rule 23(c)(4) class would also be appropriate with respect to certain issues presented in this litigation. These points are discussed in detail below.

### 1.    Plaintiffs Have Standing.

To establish standing, a plaintiff must have sustained an injury-in-fact that would be corrected by a decision in his or her favor. *Church v. City of Huntsville*, 30 F.3d 1332, 1335 (11th Cir. 1994); *see Pettco Enterprises, Inc. v. White*, 162 F.R.D. 151, 156 (M.D. Ala. 1995)("The core of the standing doctrine is a requirement that a plaintiff allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Named Plaintiffs and putative class members satisfy the standing requirement. All have been charged fees on JCS probation for the collection of fines and many were jailed in that process.


**GINA KAY RAY**

Gina Kay Ray was before the Childersburg Municipal Court on August 12, 2010, on for two tickets: "no insurance" and "driving while license suspended." She was assessed fines and court costs of $548 and $598 for these charges. Ms. Ray could not pay these fines when levied so she was placed on probation with JCS which required her to pay JCS an additional $45 per month and $10 charge to set up her file.[13] JCS set Ms. Ray's

---

[13]JCS inflated the amount owed to $548 and $598 rather than the court-ordered amount of $398 and $498 for a total of $250 extra. These inflated amounts were filled in by JCS employees on a probation order presigned in blank by Judge Larry Ward.

18

monthly payment at $145 per month.

On July 14, 2011, Ms. Ray was at Childersburg on charges of "expired tag" and "driving while license suspended" and was fined $248 and $598 respectively. Since she could not pay these fines either she was again placed on "probation" with JCS and ordered to pay JCS $45 per month and $10 file set up fee.[14] (Exh. 35) Again, Ms. Ray's monthly payment was set by JCS at $145 per month.

Ms. Ray, who has an eighth-grade education, was, and has been, indigent and was not able to pay for her insurance, tag or license, much less the fines and fees for JCS. In accordance with the policy and practice of Childersburg and JCS, neither the Childersburg Municipal Court nor JCS made any inquiry into her inability to pay nor was she offered alternative sentencing. Since she could not pay as directed by JCS, and as part of its system, JCS increased the frequency of appointments it required of Ms. Ray to nearly every week. (Doc. 392-8, p. 96 at Depo p. 95; Exh. 33) JCS also sent its form FTR letters and delinquency letters threatening her arrest for failure to pay. (Exhs. 36-38) When she was unable to make those appointments and payments, JCS asked that her "probation" be revoked and that she be arrested. (Doc. 382-11, p. 29) Childersburg complied and Ms. Ray was arrested and jailed at the request of JCS on the charge of FTOCO "failure to obey a court order." The warrant was issued and executed by Childersburg. Ms. Ray was placed in the Talladega County jail for a period of four days in 2010 and then an additional 21 days in 2011, and further time in April and May of 2012. She was given no credit on her fine for the days she was jailed. (Doc. 382-11 pp. 27-38)

---

[14]JCS again inflated the amount owed on its pre-signed probation order as $248 and $598 rather than the court-ordered amount of $168 and $498 (total of $180 extra).

Due to her inability to pay, she remained in jail throughout these periods of time. On May 1, 2012, a friend of Ms. Ray was able to acquire $300.00 to secure her release from jail.  At the point of Ms. Ray's release in May 2012, employees of JCS and the City authorized the release on the previous charge of "failure to obey court order" and she was directed to appear in "Judicial Corrections Municipal Court." (Doc. 382-11 pp. 37,38) Though she got credit for the $300 paid, the city added $357 as a warrant fee.

On June 14, 2012, Ms. Ray was again brought before the Municipal Court in Childersburg on charges of "attempt to evade," "expired tag," and "driving while revoked." Once again, she was fined $548, $248, $598 on these charges respectively.  She could not pay these fines and once again placed on "probation" with JCS and ordered to pay JCS $45 per month for 24 months and a $10 file set up fee. (Exh. 38)

On each of her arrests, Childersburg added "warrant fees," though none is authorized as court cost or under any city ordinance or state statute. (Doc. 382 pp. 20-21) These fees range from $317 to $357 depending on the time frame.[15] (Doc.392-13, p. 208 at Depo pp. 207; Doc. 392-14, pp. 81-84 at Depo pp. 376-79)

While Ms. Ray has made some small payments, she at all times has been indigent and unable to pay the full amounts and the additional probation fees charged by JCS and Childersburg. (Exh. 24) Throughout this period of time, JCS has provided no services to Ms. Ray and has acted merely as a collection agency charging additional fees. On each of her incarcerations, Ms. Ray was incarcerated without the benefit of legal counsel,

---

[15]JCS inflated the amount owed on its pre-signed probation order as  $698 rather than the court-ordered amount of $248 for the offense of "attempt to evade"  ($450 extra).  Her monthly payment on these amounts was set by JCS at $145 per month. Like the prior cases, JCS entered this probation as a 'Hold status' so that the period would then extend well beyond 24 months and result in monthly fees to JCS for both cases.

without notice of any hearing, without any formal probation revocation hearing, or any hearing on the issue of her indigency. (Exh. 24) These actions were jointly taken with the approval and participation of Childersburg pursuant to its policy and practice with JCS. JCS continued to demand the court-assessed fines and fees as well as the extra amounts it added to the pre-signed probation orders and its own monthly fees until this suit was filed. Only then did the City of Childersburg Municipal Court order JCS to terminate as a matter of law all people like Ms. Ray who were on probation in excess of the statutory maximum 24 months and recall warrants based thereon. (Docs. 183-4, 187-3)

**KRISTY AND TIMOTHY FUGATT**

The Fugatts have twin children and had a third child who was born with serious medical conditions which required constant medical care in Birmingham for two years until his death in June 2011.   As a result, both parents had extended stays at the hospital with their child and made numerous trips to and from Birmingham to their home in Sylacauga. On one trip on November 13, 2010, Kristy Fugatt was stopped and ticketed by the Childersburg Police Department for having an expired license tag and an expired driver's license.   Timothy Fugatt was stopped and ticketed on or about December 3, 2010, by Childersburg Police for having an expired license tag on the same vehicle.  Both of the Fugatts on January 13, 2011 went to the Childersburg Municipal Court where records reflect the Fugatt cases were *nolle prossed* upon payment of the court costs. (Doc. 392-66 pp. 11, 14, 15) Mr. Fugatt's court costs for the expired tag totaled $148 and Mrs. Fugatt was assessed $198.00 for the expired license and $148.00 for the expired tag.  Due to their financial situation, the Fugatts were unable to immediately pay the court costs so they were placed on "probation" under JCS.  Under the preprinted terms of the probation order,

21

they were each charged an additional $10 set up fee and a $45.00 per month for JCS's probation "service."[16] Despite the fact that Mr. Fugatt could not immediately pay the $148 assessed court costs, JCS set both of the Fugatts' monthly payments at $145.

The Fugatts paid as best they could, but when they were unable to make payments as were ordered by JCS employees, they were threatened with FTR letters and were required to drive to Childersburg and explain why they could not pay. JCS set the dates upon which the Fugatts were to report to the JCS office and the Fugatts were told that they would be arrested and jailed if they did not come. (Exhs. 26, 27) The Fugatts told JCS employees about their inability to pay as demanded and even provided medical records of their sick child. Instead of assistance from JCS or the City, the Fugatts were called liars by the Childersburg magistrate and continually threatened with arrest and incarceration for nonpayment by JCS. (Doc. 392-7, pp. 122-24 at Depo pp. 121-23; p. 228 -31 at depo pp. 227-30; Doc. 392-6, pp. 164-5 at Depo pp. 163-4) Despite their difficult financial and personal situations, Mr. Fugatt routinely made payments to JCS and completely paid off his court costs to the City, as shown by City records on May 18, 2011. (Doc. 224-3, pg. 1) However, since JCS had inflated Mr. Fugatt's costs balance in its pre-signed probation order, JCS claimed that Mr. Fugatt still owed $38 rather than showing that he had made a $62 overpayment as the City records reflect. (Doc. 224-1 pp. 91, 92) Based on its false records, JCS continued to demand payments from Mr. Fugatt despite the fact that he had completely paid off his balance with the City of Childersburg and in fact overpaid.(Doc.

---

[16] JCS inflated the amount owed on the pre-signed probation order for Mr. Fugatt to $248 rather than the court-ordered amount of $148 ($100 extra) and incorrectly stated Mrs. Fugatt's expired driver's license court costs as $248 rather than $198 ($50 extra).

22

392-19) By May 2011, Mrs. Fugatt had paid in full the court costs for her expired tag, and had paid down the court costs assessed for her expired driver's license. (Doc. 392-21, pg. 3)

The City kept no records of who was on JCS, did not audit the JCS figures and simply accepted the JCS position. (Doc. 392-13, pp. 180-85 at Depo pp. 179-84; Doc. 392-14, pp. 57-61 at Depo pp. 352-56)   JCS continued to send threatening notices to the Fugatts demanding that the Fugatts either pay or be arrested.  JCS, not the court, sent a letter to the Fugatts to appear in court on a date selected by JCS for a JCS docket.  This notice was not sent by the Childersburg court and was not filed with the city clerk as was the joint practice.  (Doc. 392-2, pp. 20 at Depo p. 75-76; p. 33 at Depo pp. 126-27) The Fugatts did not appear at the hearing set by JCS for  August 11, 2011, and JCS requested that the Childersburg Municipal Court arrest the Fugatts, representing to the court that they had not paid their fines. (Doc. 382-11, pp. 46, 54) The City of Childersburg, as was its practice, routinely accepted the JCS claims and did not check its records which disclose that the bill was overpaid almost three months earlier (May 18, 2011). (Doc. 392-13, pp. 180-13 at Depo pp. 179-82; pp. 242-45 at Depo pp. 241-46; Doc. 392-15, pp. 41-43 at Depo pp. 40-42; Doc. 392-10, pp. 21-24 at Depo pp. 20-23; 46-49 at Depo pp. 45-48; Doc. 382-11, pg. 50)

Childersburg relied exclusively upon the JCS requests and issued arrest warrants for both Fugatts adding an additional charge of $317.00 to each as warrant fees for "Failure to Obey Court Order." (Doc. 382-11, pp. 44, 50, 52, 55)  On Sunday afternoon, February 26, 2012, a Childersburg police officer came to the Fugatts' home in Sylacauga, threatened Mr. Fugatt with a taser and arrested them both in front of their young children.

23

The police took the Fugatts to the Childersburg jail after instructing them that DHR would be called to take care of their kids. (Exhs. 25, 26) This was avoided only by relatives arriving in time to take care of the young children.   Only after relatives collectively brought $900.00 to the Childersburg jail were the Fugatts released from jail, even though this amount far exceeded any amount owed for the nolle prossed tickets.

On February 26, 2012, the date of their arrest, each of the Fugatts was charged an additional $317 warrant fee for "Failure to Appear," though there was no judge present that Sunday and no judicial order was signed.  These additional charges totaled $1,268, plus the $90 monthly JCS fee, all resulting from court cost on an the expired tag and expired driver's license tickets.

While Plaintiff Timothy Fugatt has maintained some employment, the hours he was able to work were quite limited by his son's terminal illness and his family responsibilities. As a result, both the Fugatts were indigent. Throughout this period of time, JCS provided no services to the Fugatts and acted merely as a collection agency charging additional fees, and despite knowledge that the Fugatts were unable to pay these fines and were indigent.[17]   (Exhs. 25, 26) The Fugatts were jailed without the benefit of legal counsel, without any notice of charges, without any formal probation revocation hearing, and without any hearing on the issue of their indigency, but simply incarcerated and later released based upon a payment demanded by the city. (Exhs. 25,  26) The City also preset the cash

---

[17]Even after their arrests, JCS continued to demand payments from Mrs. Fugatt in excess of the City recorded balance and even claimed Mrs. Fugatt was on probation for someone else's speeding ticket and the balance owed on it. (Doc. 224-3, pp. 2-14) Childersburg's court records show that Mrs. Fugatt was never charged with speeding, yet it allowed JCS to put her on probation for someone else's speeding ticket. JCS put both the speeder and Mrs. Fugatt on probation for the same offense and charged them both monthly "probation" fees for the same ticket.

amount needed to be released at the total claimed to be owed.[18]  (Doc. 392-14, pp. 80-88 at Depo pp. 375-83;  Doc. 382-11, pp. 41, 49, 53, 58, 59)

**DEUNATE T. JEWS**

Deunate T. Jews is a resident of Childersburg, Alabama, and was charged in 2008 in the Childersburg Municipal Court on the charge of harassment.   Mr. Jews pled not guilty and the charges against him were dismissed, but on January 15, 2009, he was nonetheless charged court costs of $166. (Doc. 224-3, p. 15) He was unemployed and because he could not pay the costs, Mr. Jews was placed on "probation" with JCS for 24 months so that JCS could collect the $166 court cost. The "probation" required that he pay JCS $45 per month and $10 file set up fee. (Doc. 392-30) A few weeks later, on February 3, 2009, JCS petitioned to have his "probation" revoked and set a hearing on its petition for February 12, 2009 and recommended that Mr. Jews "be jailed until $221 is paid in full." (Doc. 224-3, p. 16)

Mr. Jews did not receive JCS's notice to appear in court on February 12, 2009, which JCS claims it sent. (Doc. 392-1, pp. 63-65 at Depo pp. 62-64; Doc. 392-34) When he did not show for the hearing, a warrant for his arrest was issued and Childersburg added an additional $317 "warrant fee" to Mr. Jews' bill which brought the total to $538, which Childersburg set as a cash bond to release Mr. Jews from jail even before the warrant was served. (Doc. 392-35; Doc. 382-11, p. 62)

On September 11, 2009, Mr. Jews was arrested by Childersburg police at a license

---

[18]In July 2012, JCS charged Mr. Fugatt an additional $234 "restitution," though none had been ordered and though he had paid off the court costs he owed over a year earlier, all of which went unchallenged by the City of Childersburg.  No restitution was ever ordered of Mr. Fugatt or involved in the cost of his nolle prossed ticket.

checkpoint in Childersburg on a warrant for "Failure to Obey Court Order" ('FTOCO') on Mr. Jews.  He was then taken to Talladega jail where Childersburg demanded a cash bond for his release. Since neither he nor his family and friends could pay the cash demanded for his release, Mr. Jews stayed in the Talladega jail 41 days until Childersburg had court on October 22, 2009. (Doc. 382-11, pp. 62-65)

Mr. Jews was not given credit for the 41 days he spent in jail. Rather, JCS classified the $317 warrant fee as restitution in its records and put him back on "probation" for the bogus offense of FTOCO and with a claimed balance of $538, which consisted of the $221 originally demanded plus the $317 warrant fee. (Doc. 382-12, p. 16) When Mr. Jews was unable to pay the ever growing JCS fees, JCS issued another violation report dated December 22, 2009, now demanding $618 and setting a hearing date for January 14, 2010. (Doc. 382-12, p. 19)  Once again, on January 15, 2010, Childersburg issued a warrant for Mr. Jews' arrest and added an additional $317 "warrant fee" to Mr. Jews' bill, bringing his total to $935, which Childersburg demanded as a cash bond to release Mr. Jews from jail. (Doc. 382-11, p. 66)

Mr. Jews was again arrested on August 18, 2010, by Childersburg police for the charge of "FTOCO" and a $935 cash bond was then demanded for his release.  Mr. Jews was again taken to the Talladega County jail where he stayed until September 9, 2010. (Doc. 382-11, p. 66-72)   Mr. Jews was not given credit for the twenty-two (22) days he spent in jail. Instead, JCS continued to demand money from Mr. Jews which was $718 as of November 3, 2010. JCS petitioned again for his "probation" to be revoked, setting another hearing for December 9, 2010. (Doc. 382-12, p. 1) Because this third warrant was issued, Childersburg added an additional $317 "warrant fee" to Mr. Jews' bill which brought

the total to $1,035 ($718 + $317), which Childersburg demanded as a cash bond to release Mr. Jews from jail. (Doc. 382-11, p. 73)

On January 13, 2011, Childersburg police officer Luke Benefield arrested Mr. Jews on the FTOCO charge. (Doc. 382-11, p. 74-75) Although the arrest warrant lists a $1,035 cash only bond, Childersburg released Mr. Jews when family members paid $500 the next day. (Doc. 382-12, pp. 3,4) JCS records show that his "probation [was] reinstated with $317 warrant fee."

By March 18, 2011, Mr. Jews had been arrested three times, spent sixty-four (64) days in jail and paid $580, but JCS still demanded $773 and Childersburg claims a balance due of $617 from Mr. Jews – all emanating from a dismissed case from 2008.

Mr. Jews was unable to pay the escalating costs JCS demanded, so JCS once again petitioned to have his "probation" revoked and set a hearing on its petition for June 9, 2011. (Doc. 382-12, p. 9) This time JCS demands $773 to close his case. By this point, the original two year probation period had expired, but based upon JCS's request another warrant was issued .  Because this warrant was issued, Childersburg added an additional $317 "warrant fee" to Mr. Jews' bill which brought the total to $1,090, which Childersburg demanded as a cash bond to release Mr. Jews from jail. (Doc. 382-12, pp. 8, 10)

On February 21, 2012, Childersburg police officers stopped Mr. Jews arrested him again for the FTOCO warrant from 2011. This was the fourth arrest stemming from the $166 court cost that was Mr. Jews' punishment for the dismissed case in January 2009. On March 8, 2012, Mr. Jews was released from the Talladega County jail when he appeared in court and a family member paid JCS $200. (Doc. 382-12, pp. 13-15) He was not given credit for the time he spent in jail against the claimed balance.

27

Though his "probation" started on October 22, 2009 for 24 months, it continued until after this litigation was filed.   JCS finally terminated him from probation on December 17, 2014 pursuant to Childersburg's standing order (Doc. 128-1) which was issued as a result of this lawsuit.

On each of his incarcerations, Mr. Jews was incarcerated without the benefit of legal counsel, without notice of charges, and without any formal probation revocation hearing, or any hearing on the issue of his indigency, but simply incarcerated with bail set at the amount of the ever increasing balance claimed by JCS.  These actions were taken with the approval and participation of Childersburg pursuant to its policy and practice with JCS. (Exh. 27)

**B.     The Class Is Ascertainable.**

"Ascertainability depends on the class definition, and a successful definition is one that is 'precise, objective, and presently ascertainable . . . by reference to objective criteria." *Moore v. Walter Coke, Inc.,* 294 F.R.D. 620, 625 (N.D. Ala. 2013). Specifically, "[c]lass members need not actually be ascertained prior to certification, but each individual's class membership must be ascertainable at some stage in the proceeding, meaning it must be administratively feasible for the court to determine whether a particular individual is a member." *Moore v. Walter Coke, Inc.,* 294 F.R.D. 620, 625 (N.D. Ala. 2013). "All courts essentially focus on the question of whether the class can be ascertained by objective criteria. . . However, the court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." William B. Rubenstein *et al.*, *Newburg on Class Actions* § 3:3, at p. 163 (5th ed. 2011) [hereinafter "*Newburg*"].

28

The Class and subclass here are highly ascertainable. The computerized system of JCS, the collected data within Probation Tracker and its underlying SQL databases allow identification of each class member, in each Alabama city and on each probation with many details about them.  The collected data shows as to each individual, the fines collected, JCS fees, warrants, jail status and credit for time served with linked documents pertaining to such individual which were scanned to the system.  The data also contains a running narrative chronologically documenting the JCS employees entries and actions.  Thus, not only are the class members ascertainable, extensive data about each is already documented.  (Exh. 1; Doc. 382 pp. 5-7, 10, 26-28)  Very few class actions have such abundant and consistent data about the entire class.

As to the subclass for individuals on JCS at Childersburg, those too are easily ascertainable from Probation Tracker since each city is given a unique city code in the software.  The underlying database tables for Probation Tracker are relational allowing the user to quickly filter out the JCS "probationers" for any particular city and for any particular time frame. (Exh. 1; Doc. 382 pp. 13, 27-28 and exhibits thereto)

Finally, those persons statewide and at Childersburg for whom warrants were issued in this collection process are also ascertainable.  ***After*** a warrant is issued the status in Probation tracker is changed to "warrant."[19] Similarly, the computer system provides status codes for "jail" when a person is jailed due to non compliance on behalf of JCS.[20]

---

[19] **• Warrant- should be used when a warrant has been issued by the court for the defendant**. Do not put the case in warrant status until the warrant has been signed by the Judge and taken back to the court clerk, as the warrant is not active before this point.
     (***Emphasis added***) (Exh. 2, p. 128)

[20] **Jail** - should be used when a defendant **is in jail due to a petition of the court due to non-compliance of a court order on behalf of JCS…**

Additionally, categories for persons released on "time served" allow easy calculation of the days in jail. This abundant data from JCS's own database should provide ample assurance of ascertainability.  This data is further verified and refined by the cities own jail logs and records.  For instance, at Childersburg and Columbiana jail records of those on JCS provide further tools for verifying by independent data those who were jailed. Seldom would a court have such abundant data available to it not only to identify the class members, and assist in the management of the class but also in documenting the systematic similar treatment of each person within the class.

1.      **Rule 23(a) Is Satisfied.**

Rule 23(a) outlines four requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  As outlined below, Plaintiffs satisfy each of the Rule 23(a) requirements.

i.      **Numerosity.**

Under Rule 23(a)(1), a class action may be maintained only if the class is so numerous that joinder of all Class Members is impracticable.  *Dujanovic v. Mortgage America, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999); *Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 553 (S.D.Fla. 2001).  Whether joinder is practicable depends on many factors including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.  *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) If the Court can draw reasonable inferences from the facts before it as the

approximate size of the class and the infeasibility of joinder, the numerosity requirement is satisfied. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) ("Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class. Furthermore, the relevance of the numerosity requirement to class certification may in appropriate cases be less significant where in fact class wide discrimination has been alleged . . . "); *Dujanovic*, 185 F.R.D. at 666 ("this court may 'make common sense assumptions' to support a finding of numerosity"). *Winston,* 2006 WL 6916381 at *6; *Roundtree v. Bush Ross, P.A.,* 304 F.R.D. 644, 659 (M.D. Fla. 2015) Here, the size of the putative class makes joinder impracticable. The JCS statewide class pertains to over 100,000 individuals statewide. The Childersburg subclass pertains to over 900 individuals. Because the proposed Class is undeniably large, numerosity is satisfied. *See, e.g., Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); [21] *Napoles-Arcila v. Pero Family Farms, LLC* 2009 WL 1585970 at *6 (S.D. Fla. June 4, 2009) ("this Court concludes that Plaintiffs' putative general class of one hundred fifty (150) or more, and Plaintiffs' putative subclass of fifty (50) meets the numerosity requirement of Rule 23(a)."); *Kreuzfield A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991) (finding that a class of 130 satisfied the numerosity prerequisite). Further, the counsel for JCS at hearing before this Court on January 7, 2015 agreed that numerosity is satisfied.

---

[21]See also, *Terazosin*, 203 F.R.D. at 553 ("finding that a class of over one thousand satisfied the numerosity prerequisite); *In re Consolidated "Non-Filing Insurance" Fee Litig.*, 195 F.R.D. 684, 693 (M.D. Ala. 2000) (finding that a class of thousands of policyholders satisfied the numerosity prerequisite); *Kreuzfield A.G. v. Carnehammar*, 138 F.R.D., 138 F.R.D. 594, 599 (S.D. Fla. 1991) (finding that a class of 130 satisfied the numerosity prerequisite).

12 THE COURT: Give me a little bit of trailer on what
13 may be forthcoming. It seems to me numerosity isn't going to
14 be an issue?
15 MR. EZELLE: No, Your Honor.
16 THE COURT: Adequacy?
17 MR. EZELLE: No.
(Jan. 7, 2015 Hearing at p. 56).

## ii.  Commonality.

Commonality requires that the grievances of Plaintiffs and the Class Members share a common question of law or of fact.  Fed. R. Civ. P. 23(a)(2).  The threshold for satisfying the commonality prerequisite is "not high." *Dujanovic*, 185 F.R.D. at 667.  Simply put, "the commonality requirement is not usually a contentious one: the requirement is generally satisfied by the existence of a single issue of law or fact that is common across all class members and is thus easily met in most cases." *Newburg, supra,* § 3:18, at p. 228. Commonality requires only that there be one issue that affects all or a significant number of proposed Class Members. *Winston,* 2006 WL 6916381 at *6; *see also Anderson v. Garner*, 22 F.Supp. 2d 1379, 1385 (N. Ga. 1997) (a common question is defined as "one which arises from a 'nucleus of operative facts,' regardless of whether the underlying facts fluctuate over a class period and vary as to individual claimants."); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)("[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do.").[22]  Indeed, a "single plaintiff can use the discrimination he or she has suffered as a basis for a company-wide class action if that discrimination stems from an identifiable corporate policy that affects all." *General Tel. Co. of Southwest v. Falcon*, 457

---

[22]See also *Dujanovic*, 185 F.R.D. at 667 (commonality can be found where the class allegations arise from "a common nucleus of operative facts"); *Cox*, 784 F.2d at 1567 (The commonality element is satisfied whenever "[t]he claims actually litigated in the suit [are] fairly represented by the named plaintiffs."); *Walmart Stores, Inc. v. Dukes*, 131 S Ct. 2541 (2011)("[Plaintiffs'] claims must depend upon a common contention.").

U.S. 147, 159 n.15 (1982). Further "[b]ecause not *all* questions need be common, the fact that class members must individually demonstrate their right to recover, or that they may suffer varying degrees of injury, will not bar a finding of commonality." *Newburg, supra,* § 3:20, at p. 244; *see also Roundtree v. Bush Ross, P.A.*, 304 F.R.D. 644, 659-60 (M.D. Fla. 2015)("Though Bush Ross contends that the determination of the nature of each putative class member's debt (residential or commercial), the potential awards of damages for each putative class member, and the issue of whether a putative class member entered into a settlement or release or filed for bankruptcy defeat the commonality and typicality inquiries, such an argument is unavailing in light of the overarching commonalities of law and fact. Accordingly, *Roundtree* has established the commonality requirement.").

Here, the JCS collection system was a common practice affecting all class members and which it applied throughout its city customers in Alabama -- including Childersburg – and which provides the nucleus of operative facts from which common questions arise. The testimony and documents of the JCS support this.  The factual issues raised by the complaint are common to all JCS "probationers" who were assigned to JCS. Among the questions of law and fact common to the Class are:

> 1.      Whether a policy and practice of placing those persons on "probation" for the collection of fines who cannot immediately pay fines and costs, is legal;

> 2.      Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability to pay, is legal;

> 3.      Whether the policy and practice of requiring each "probation"order for

the collection of fines to require additional fees for JCS is legal;

4.      Whether the policy and practice of incarcerating individuals for failure to pay fines and costs with no finding of willfulness is legal.

5.      Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal;

6.      Whether, after being informed of the inability to pay, is a policy and practice which fails to make any inquiry into indigency before imposing fines and costs is legal;

7.      Whether the policy and practice of failing to give adequate notice of the charge and nature of a probation revocation hearing, failing to provide a probation revocation hearing, failing to make written findings concerning the reasons for revoking probation and the evidence relied upon, failing to hold a hearing to determine indigency before revoking probation and otherwise imposing incarceration, failing to make written findings concerning an individual's willful nonpayment of fines and costs before imposing incarceration for nonpayment are legal;

8.      Whether the policy and practice of imposing fines and court costs that exceed that statutory maximum for municipal is legal;

9.      Whether the policy and practice of extending "probation" for municipal offenses beyond 24 months is legal;

10.     Whether the policy and practice which fails to give any credit for time spent incarcerated is legal;

11.     Whether the policy and practice of hiring private probation companies

34

who are financially interested in the collection process is legal;

12.     Whether a municipality can legally enter a contract binding upon its municipal court.

13.     Whether a municipality can enter into a no bid contract to grant an exclusive franchise to a private probation company to operate in its municipal court.

14.     Whether setting bond based upon a fine balance owed the city is legal.

These common questions of law and fact exist as to members of the Class all of whom were subjected to the same system, and predominate over any questions affecting solely members of the Class. Because the JCS system is highly automated and systemized, it provides an underlying pattern of common unlawful behavior.

### iii.    Typicality

The typicality requirement is met when each class member's claim arises "from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *Winston*, 2006 WL 6916381 at *8. "The typicality requirement seeks to ensure that the class representative's claims are similar to those of the class members so that the interests of the class representatives are closely aligned with those of the class." *Newburg, supra*, § 3:31, at p. 271. The typicality threshold is not high and is to be permissively construed. *Buford v. H&R Block Tax Servs.*, 168 F.R.D. 340, 351 (S.D.Ga. 1996); *Dujanovic*, 185 F.R.D. at 667 ("The typicality requirement of Rule 23 often is considered to require no more than that there exist no antagonism between the claims of the class representative and the

other members of the class."). The test for typicality is "not demanding." *Newburg, supra,* § 3:29, at p. 267.

Further, "[t]ypicality ... does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg,* 741 F2d at 1337; *see also Newburg, supra,* § 3:29, at p. 267 ("[T]he plaintiffs' claims need not be identical to those of the class; typicality will be satisfied so long as 'the named representatives' claims share the same essential characteristics as the claims of the class at large."); *In re Piedmont Office Trust, Inc. v. Securities Litigation*, 264 F.R.D. 693, 698 (N.D. Ga. 2010). Further, "[d]ifferences in the amount of damages between the class representative and other class members does not affect typicality." *Kornberg,* 741 F.2d at 1337 (citation omitted); *see also Roundtree v. Bush Ross, P.A.,* 304 F.R.D. 644, 660 (M.D. Fla. 2015). *Newburg, supra,* § 3:43, at p. 292  ("Courts routinely find that the proposed class representative's claims are typical even if the amount of damages sought differ from those of the class or if there are differences among class members in the amount of damages each is claiming.")

Here, the typicality requirement is easily satisfied.[23]  The named Plaintiffs make the same legal and factual arguments that all Class Members will make.  Plaintiffs were unable to immediately pay city fines and were then assigned to JCS operating in the city under

---

[23]As noted by many courts, the commonality and typicality requirements involve similar considerations and "tend to merge." *Falcon,* 457 U.S. at 158 n.13.  Both requirements "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence."  Id.  Typicality is thus satisfied here for substantially the same reasons the commonality requirement is satisfied.

contract to collect the fines. The contract required each person like the Plaintiffs to then pay JCS monthly fees.  These fees, along with the highly computerized system, used systematic threats, form letters, and processes leading to arrests of all the named plaintiffs and many other proposed Class Members "in the same general fashion," such that their claims are indeed typical of the claims of the entire Class.  *Kornberg*, 741 F.2d at 1337; *see Dujanovic*, 185 F.R.D. at 660 (finding that the typicality prerequisite was satisfied where the plaintiff alleged a harm that was caused by defendant's policies and practices); *Ingram*, 200 F.R.D. at 698 (finding typicality where plaintiffs alleged a harm caused by defendant's company-wide policies and practices); *J.W. v. Birmingham Bd. of* Educ., 2012 WL 3849032 (N.D. Ala. 2012)(finding typicality requirement was satisfied as "the proposed class and Plaintiffs' claims arise from the same allegedly unconstitutional practices. . . Thus, the court finds the typicality requirement is satisfied because the class representatives and members' claims are premised around the same injury or threat of injury and the same legal theory of the unconstitutionality of Chief Roper's polices, practices and training.")

In fact, the JCS State Director Colleen Ray, as JCS's 30(b)(6) representative, testified that JCS's treatment of the named Plaintiffs was consistent with its policies and procedures for treating "probationers." (Doc. 392-11, pp. 86-87 at Depo pp. 340:23-341:23) Additionally, Ms. Ray testified that the JCS training manual listed specific steps that each JCS employee would use in working a "typical case":

```
    23      Q.  And that's what you're telling
00110
     1  your people here in this document, this is the
     2  way we do this within the system, right?
     3      A.  Correct.
```

37

4      Q.   Go with me, if you would, to page
5  65 of the document.  What is this?
6      A.  **This is an example of just working**
7  **a typical case and the actual steps in a**
8  **typical case that a probation officer might**
9  **use in following the steps.**
(Doc. 392-11, p. 29 at Depo pp. 109:23-110-9)

Ms. Ray's testimony is further supported by the JCS flowchart of its "Typical Case" depicted in its training manual. (Exh. 2)  The actions of JCS are detailed by status changes, linked form letters, and detailed notes that are documented in each probationer's case file. The systematic application of "working a typical case" is shown by examining the current status table and the notes table as well. (Exh. 1; Doc. 382 pp. 15-28) Examination of JCS's data reveals that the named Plaintiffs were processed similarly to other putative class members and that JCS uniformly used the procedures listed above throughout its Alabama operations. (Exh. 1; Doc. 382 pp. 23-29) The "working a typical case" flowchart is a clear representation of the typical JCS process of extorting money from its probationers.  Finally, Ms. Ray as the JCS 30(b)(6) representative also testified that Childersburg itself is a typical application of the JCS system at other cities. (Doc. 392-11, p. 68 at Depo p. 267; Exh. 2 p. 65)

### iv.      Adequacy of Representation

The final Rule 23(a) certification prerequisite is adequacy of representation.  To meet this requirement, Plaintiffs must show (1) that Plaintiff's counsel is competent to handle the case and (2) that there are no disabling conflicts of interest among the Class Members.  *Griffin v. Carlin*, 755 F.2d 1516, 1532-33 (11th Cir. 1985); *see also Winston,* 2006 WL 6916381 at *8; *Camp v. City of Pelham,* 2012 WL 7008393 at * 4 (N.D. Ala.

38

2012); *J.W. Birmingham Bd. Of Educ.,* 2012 WL 3849032 (N.D. Ala. Aug. 31, 2012). Both requirements are met here. See also J.W. v. Birmingham Bd. Of Educ., 2012 WL 3849032, at *9 (N.D. Ala. Aug. 31, 2012)("Counsel will be deemed adequate if they are shown to be qualified, adequately financed, and possess sufficient experience in the subject matter of the class action.")

On several occasions, Plaintiffs' counsel has successfully litigated major consumer class actions against numerous banks, financial institutions, government entities and others (See Exh. 39 - Affidavit of Evans).  This Court has also had many months to observe the efforts and perseverance of Plaintiffs' counsel in this litigation. (Exh. 40 - Affidavit of Parrish)  There is no reason to believe that Plaintiffs' counsel will not continue to prosecute this case with a high degree of diligence and vigor.

Second, there are no conflicts among the proposed Class Members that undermine adequate representation. *See J.W. v. Birmingham Bd. Of Educ,* 2012 WL 3849032, *10 (N.D. Ala. 2012)("... '[t]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy. . .  A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class.'"). Further, the counsel for JCS at hearing before this Court on January 7, 2015 agreed that adequacy is satisfied.

> 12 THE COURT: Give me a little bit of trailer on what
> 13 may be forthcoming. It seems to me numerosity isn't going to
> 14 be an issue?
> 15 MR. EZELLE: No, Your Honor.
> 16 THE COURT: Adequacy?
> 17 MR. EZELLE: No.

(Jan. 7, 2015 Hearing at p. 56).

39

## 2.    Certification is Warranted Under Rule 23(b)(2)

This class action, which seeks to end years of illegal extortion under the guise of "private probation," is exactly the type of case for which Rule 23(b)(2) was designed.  JCS with its city customers such as Childersburg has carried out a uniform practice of extortion using the police power of the cities to back its threats.  Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  JCS's conduct along with Childersburg and other cities  is directed against and uniformly harms a specific class of poverty stricken people and thus, falls squarely within the ambit of Rule 23(b)(2). After this case was filed, Childersburg fired JCS and JCS has since left the state of Alabama. Nevertheless, a declaratory judgment and injunction will be necessary to prevent the recurrence of these problems in the future.

Rule 23(b)(2) contains two basic requirements: (1) the class members must have been harmed in essentially the same way by the Defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)("[T]he claims contemplated in a (b)(2) action are *class* claims, claims resting on the same grounds and applying more or less equally to all members of the class.")(emphasis in original).  *see also Winston,* 2006 WL 6916381, *9.  Where these requirements are met, the class members' interests are sufficiently cohesive that absent members will be adequately represented. *Holmes*, 706 F.2d at 1155 n.8 ("[T]he (b)(2) class is distinguished from the (b)(3) class by class

cohesiveness . . . [i]njuries remedied through (b)(2) actions are really group, as opposed to individual injuries."); *see Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000)("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members.").*Winston,* 2006 WL 6916381, *9   This case thus falls squarely within the ambit of Rule 23(b)(2)."). Rule 23(b)(2)'s requirements are met here.

### Class Members Have Been Harmed in the Same Way

Cohesiveness exists in this case because all Class Members have been harmed in the same way by JCS's systematic and uniform practices in the Alabama cities such as Childersburg.  All have been charged fees because they could not pay fines.  Within that group is a subgroup who were also arrested and jailed for their failure to pay.  Both of these damages arise from the same system imposed on all putative class members.

### Plaintiffs Seek Class-Wide Injunctive Relief and Equitable Remedies

Cohesiveness also exits because the injunctive and equitable "make whole" remedies sought by Plaintiffs will provide appropriate relief for the Class Members' common injury.[24] *See Winston,* 2006 WL 6916381, *10 (N.D. Ala. June 26, 2006).  This relief includes, but is not limited to, the return to the class members of the fees paid JCS

---

[24]Notice and opt-out rights protect the interests of those persons, if any, who might wish to pursue an individual claim for compensatory damages.  Plaintiffs request that the Court order such a procedure under the plenary powers granted by Rule 23(d)(2) and 23(d)(5).  *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 418 n.13.  ("Indeed, we have long-required notice in (b)(2) class actions in which equitable monetary claims are at stake.").

under this illegal system.

These forms of relief are appropriate for Rule 23(b)(2) certification.  Injunctive relief forcing defendants to end their illegal practices and the disgorgement of the funds wrongfully gained is the predominant remedy sought by Plaintiffs.  The Court has broad equitable authority under 42 U.S.C. § 1983 to enjoin such long-standing, systemic conduct *and* grant restitution to its victims.

While an injunction prohibiting Childersburg and JCS from engaging in these practices in the future is predominant, other equitable relief such as restitution are properly be sought under Rule 23(b)(2) without destroying the cohesiveness of the Class. "Monetary relief is appropriate provided that the awards are either equitable in nature or secondary to the general scheme of injunctive relief. Moreover, this Circuit holds that equitable remedies in no way conflict with the limitations of Rule 23(b)(2) where the defendants' liability for the equitable relief 'is rooted in grounds applicable to all members of the defined class.'" *Winston*, 2006 WL 691381 at *10 (citing *Holmes*, 706 F.2d at 1155). Also see *Carnegie,* slip op. at 23 (*citing* Newberg, 1 *Newberg on Class Actions* § 4.14 at 4-46 to 47 (1992)).  In *Carnegie*, the court found that the restitutionary relief for the same racially discriminatory conduct was equitable in nature and appropriate for (b)(2) certification.  *Id*. at 27 (distinguishing *Great-West Life & Annuity Ins. Co. v. Knudsen*, 534 U.S. 204, 122 S.Ct. 708 (2002) which involved a breach of contract claim).

Here, Plaintiffs seek the return of the fees paid JCS much like a "make whole" equitable group remedies, similar to back pay, which flow directly from a finding of liability to the Class as a whole for the imposition of this illegal system.

42

In order to vindicate the unconstitutional practice in this case, the Court can and should establish a constructive trust over the property which the JCS illegally took from the Plaintiff Class.   Title 42 U.S.C. §1988(a) clearly gives this Court full power to fashion effective equitable remedies.  *Jones v. Alfred H. Mayer*, 392 U.S. 409, 88 S.Ct. 2186 (1968).  A review of the JCS's records shows that JCS collected fees for itself in the amount of $29,828,076.39 from Alabama "probationers" since August 28, 2010. (Exh. 1 - Coons Affidavit; Plaintiffs' Exh. 12 - JCS Amended Response to Plaintiffs Fourth Interrogatories # 1)  A constructive trust is a relationship with respect to property subjecting the person holding legal title to the property to an equitable duty to convey it to another on the grounds that his acquisition and/or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.  *See* Restatement of Restitution, § 160; Restatement 2d Trust, § 1, 1959 WL 16228; *see also, Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250-251 (2000);  *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 (1919); Pound, *The Progress of the Law, Equity*, 33 Harv.L.Rev. 420 (1920); Restatement (Third) of Restitution, § 4.

### 3.   Certification is Warranted under Rule 23(b)(3).

This putative class should also properly be certified under Rule 23(b)(3) because common questions of law or fact predominate and adjudication by class action is superior to other available methods.  Fed.R.Civ.P 23(b)(3); *see also Newburg, supra,* § 4:47, at pp. 186-87 ("Specifically, '[s]ubdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision

as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"). Here, both requirements are readily met.

Subdivisions (b)(3) and (b)(2) both require the existence of common questions of law or fact. However, (b)(3) contains the additional requirement that common issues must "predominate" over individual issues. Also, it adds "superiority" to Rule 23's list of qualifications for certification.

> In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' . . . Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Report for the 1966 amendments cautioned: 'The new provision invites a close look at the case before it is accepted as a class action . . .'
> *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citations omitted).

Significantly, "Rule 23(a)(2) does *not* require that *all* . . . questions of law and fact raised by the dispute be common. Instead, the commonality requirement is qualitative rather than quantitative – that is, there need be only a single issue common to all members of the class." *Winston*, 2006 WL 6916381 at *11 (citing *Cox, 784 F.2d at 1557 and Newberg, supra* § 3.10, at p 3-50).

### i.    Common Issues Predominate

Predominance exists when the issues subject to general proof and thus applicable to the class as a whole predominate over those issues susceptible only to individualized proof. *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. Unit B 1982). "The common issues, however, need not be dispositive of the entire litigation. Those

questions peculiar to individual class members may remain after resolution of common issues does not preclude class certification." *Winston*, 2006 WL 6916381 at *11 (citing *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1378-79 (11th Cir. 1984)). Stated differently, "[c]ommon issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Williams v. Mohawk Industries, Inc.,* 568 F.3d 1350, 1357 (11th Cir. 2009).

Rule 23(b)(3)'s predominance inquiry is designed to test "whether proposed classes are sufficiently *cohesive* to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623 & n. 19 (emphasis supplied).  For example, Rule 23(b)(3)(A) instructs courts to consider "the interest of members of the class in individually controlling the prosecution . . . of separate actions."  In other words, "[p]redominance ... asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Newburg, supra,* § 4:49 p. 195-96.[25]  Here, proof of the common system used statewide, under a common contractual basis, using an identical structure to impose added fees on those who have disclosed their inability to pay fines -- pose, common factual and legal issues.

Predominance exists here because 1) the placement on "probation" for collection of fines after an inability to pay is disclosed, 2) the illegal requirement of additional JCS fees from only those who cannot pay their fines, 3) the systematic application of the

---

[25]It is also worth noting that "[c]ommon issues will predominate if individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus rendering unnecessary an evidentiary hearing on each claim." *Newburg, supra, §* 4:50, at p. 197 (internal citations omitted).

process, 4) the absence of consideration of factors other than failure to pay— all show these common factors predominate. The consistency in the amount of the fees, the arrests and jailing is proven by the extensive data collected by JCS. (Exh. 1; Doc. 382 pp. 30-37) Proof of each Class Members' claim against JCS and/or Childersburg therefore does not require the resolution of case-specific individualized issues because those were not considered in the JCS system. Payment or non payment was the scale which determined treatment.   Further, if JCS's practice with cities like Childersburg is found to be unconstitutional, it is liable to all Class Members for restitution of the fees paid and for the same injury from their arrest and incarceration.   Predominance is further supported because there are no counterclaims, no reliance issues and a defined statute of limitation for common claims all arising in this jurisdiction.

##### ii.   A Class Action is the superior form of prosecution.

Four factors are considered in determining whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *Newburg, supra,* § 4:64, at p. 249.   The first factor is "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). The question is whether the interest of most class members in conducting separate lawsuits is so strong as to require denial of class certification. *McClendon v. Continental Group, Inc*., 113 F.R.D. 39, 45 (D.N.J. 1986).

For a number of reasons, the overwhelming majority of Class Members have little ability to prosecute their claims against JCS and Childersburg through individual actions. Individuals face the impossible combination of pursuing a wealthy entity as a defendant with substantial resources with relatively low value claims requiring significant resources

to prove.  Such a combination would make the retention of legal representation all but impossible.  Nor could the Class Members, who are unable to pay simple court fines, be expected to take on a large corporations and a city government by themselves.  *See Winston v. Jefferson County, Ala.* 2006 WL 691381, at *12*; Sala v. National R.R. Passenger Corp.*, 120 F.R.D. 494, 500 (E.D. Pa. 1988); 7A Wright & Miller, *Federal Practice and Procedure*, § 1779 at 557 ("a group composed of consumers . . . typically will be unable to pursue their claims on an individual basis because the cost of doing so exceed any recovery they might secure").[26] "When potential class members have little understanding of the law . . . individual suits become more difficult and class certification more likely. . ." *Newburg, supra,* § 4:65, at p. 258. Significantly "the class action device is especially pertinent to vulnerable population..." such as the poverty-stricken plaintiffs here. *Newburg, supra,* § 4:65, at p. 260.

The second factor under Rule 23(b)(3) concerns "the extent and nature of any litigation concerning the controversy already begun by or against class members." While there are a handful of putative class actions pending in Alabama presenting similar issues including other JCS cities, class certification has not yet been granted for a damage class. Further, there is only one federal case filed before this one and its does not include all the same parties or claims (Thurman et. al. v. JCS 2:12-cv-00724-MHT-TFM). This case is by

---

[26]See, also *In re Copely Pharmaceutical Inc.*, 158 F.R.D. 485, 492 (D. Wyo. 1994) ("persuasive" case for certification made by attorney representing six plaintiffs with small claims who "argued that without class certification neither he nor his clients had the resources to have their day in court against a large defendant"); *In re Badger Mountain Irrigation Dist. Sec. Litig.*, 143 F.R.D. 693, 701 (W.D. Wash. 1992) (average individual claim of $15,000 too small to justify individual lawsuits); *Cumberland Farms, Inc. v. Browning-Ferris Indus.*, 120 F.R.D. 642, 648 (E.D. Pa. 1988) (class action superior as there were a large number of individuals injured, although no one person may have been damaged to degree which would have induced him to institute litigation on his own).

47

far the most advanced.

Another superiority factor set forth on Rule 23(b)(3) is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." This Court over the course of this litigation has gained a great deal of knowledge concerning this matter such that judicial economy weighs in favor of this forum.

Finally, the fourth factor concerns "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). "The manageability inquiry is not whether there will be any manageability problems at all, but whether reasonably foreseeable difficulties render some other method of adjudication superior to class certification." *Winston,* 2006 WL 6916381, at *12 (citing *In re Coordinated Proceedings in Antibiotic Antitrust Actions*, 333 F. Supp. 278, 287-83 (D.N.Y. 1971)(" . . . defendants, after reciting potential manageability problems, seem to conclude that no remedy is better than an imperfect one"); *see generally*, 1 Newberg § 4.3 at 4-125 ("It is only when such difficulties made a class action less fair and efficient than some other method, such as individual interactions or consolidation of individual lawsuits, that a class action is improper.")).[27] Further, "[t]here exists a strong presumption against denying class certification for management reasons."

---

[27]The Eleventh Circuit has addressed these points, stating:

...[W]e have explained two reasons that the factor of manageability is ordinarily satisfied so long as common issues predominate over individual issues: First, we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives .... Second, where a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions. If a district court determines that issues common to all class members predominate over individual issues, then a class action will likely be more manageable than and superior to individual actions.

*Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009)(citations omitted)

48

*Winston,* 2006 WL 6916381, at *12 (citing *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 363 (S. Ga. 1996), aff'd 117 F.3d 1443 (11th Cir. 1997)).

This case presents no significant manageability concerns.  The Class as defined is objectively ascertainable from the computer database of Probation Tracker.  Further, the extensive data collected by JCS provides a wealth of information about each "probationer," including addresses, family members, social security numbers and more which would undoubtedly assist in the management of the class. Accordingly, certification is appropriate under Rule 23(b)(3).

**C.   Separate Classes Can Also Be Certified Under Rule 23(c)(4) With Respect To Particular Issues.**

Fed. R. Civ. P. 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." Issue classes under (c)(4) serve the distinct purpose of affording "the courts discretion to realize the advantages and efficiencies of class wide adjudication of common issues when there also exist individual issues that must be tried separately." *Newburg, supra,* § 4:89, at p. 375.; *see also* Rules Advisory Committee Notes, 39 F.R.D. 69, 106 (1966)("This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.").

Certification is appropriate under the provisions of Rule 23(c)(4) because particular issues are of common importance.  Those include:

1.   Whether using a "private probation" company which is financially

49

interested in extending the process for collecting city fines, violates Due Process;

2.      Whether requiring additional collection fees to be paid only by those who cannot pay their fines in full, violates Equal Protection;

3.      Whether a no bid contract under which a city binds its court is valid under Alabama law;

4.      Whether incarcerating individuals for failure to pay fines, costs and fees with no finding of willful contempt, violates due process and the fourth amendment;

5.      Whether charging a person for being in jail due to their failure to pay, fines, fees and costs, violates due process and the eighth amendment;

6.      Whether a private probation company requiring the waiver of counsel as part of its collection of fines and costs, violates the sixth amendment.

Each of these issues are clearly presented here and as 23(c)(4) classes would materially advance the resolution of multiple claims and actions.

## CONCLUSION

For the foregoing reasons, certification of the proposed Class and Subclasses is entirely appropriate and warranted, and Plaintiffs' Motion should therefore be granted.

RESPECTFULLY SUBMITTED,

/s G. Daniel Evans
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
D. Patrick Evans
Maurine C. Evans
ASB-4168-P16T
ASB-3209-R67G
Attorneys for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101

Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com
E-Mail: dpevans@evanslawpc.com

Erwin Chemerinsky
University of California Irvine
401 East Peltason Drive
Irvine, CA 92697
E-Mail: echemerinsky@law.uci.edu

## CERTIFICATE OF SERVICE

I hereby certify that on this the 11th day of August, 2016, I electronically filed the foregoing Plaintiffs' Memorandum in Support of  Motion for Class Certification with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Will Hill Tankersly, Esquire
Gregory C. Cook, Esquire
L. Conrad Anderson, IV, Esquire
Ginny Willcox Leavens, Esquire
Adam K. Israel, Esquire
Chase T. Espy, Esquire
Ed R. Haden, Esquire
David R. Boyd, Esquire
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203

Timothy P. Donahue, Esquire
DONAHUE & ASSOCIATES, LLC
1020 22nd Street South
Birmingham, Alabama 35205

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
WALLACE, JORDAN, RATLIFF & BRANDT, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253

F. Lane Finch, Jr., Esquire
Brian C. Richardson, Esquire

51

Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203

Wilson F. Green, Esquire
Fleenor & Green LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406

                                  s/G. Daniel Evans
                                  G. Daniel Evans