FILED

2016 Sep-20  PM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **GINA KAY RAY, KRISTY FUGATT,** | ) | |
| **TIMOTHY FUGATT and DEUNATE T.** | ) | |
| **JEWS, individually and for a class of** | ) | |
| **similarly situated persons or entities,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **2:12-cv-02819-RDP** |
| | ) | |
| **JUDICIAL CORRECTIONS** | ) | |
| **SERVICES, INC., CORRECTIONAL** | ) | |
| **HEALTHCARE COMPANIES, INC.,** | ) | |
| **and THE CITY OF CHILDERSBURG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT THE CITY OF CHILDERSBURG'S
## OPPOSITION TO CLASS CERTIFICATION

# TABLE OF CONTENTS

**Contents**

INTRODUCTION ............................................................................................1

LEGAL STANDARD......................................................................................3

ANALYSIS......................................................................................................4

    I.      Plaintiffs fail to carry their burden of demonstrating predominance under Rule 23(b)(3)............................................................................4

        A.     Determining whether the members of either class were indigent is a central part of each class member's claim and will predominate over any common issues. ..................................................................6

            1.     Indigency is an inherently individualized inquiry. ..........................8

            2.     Determining indigency will predominate. ....................................10

        B.     Individualized inquiry will be needed to determine, among other things, (1) which class members were incarcerated because they failed to pay fines, fees and costs, (2) without consideration of their indigency, (3) which class members received adequate notice, and (4) which class members were willful in nonpayment. ..................................12

            1.     Because most warrants were for failing to attend noticed court hearings (not because of probation revocation), a minitrial will be required to determine the reason for each warrant...................12

            2.     The question of whether each class member received adequate notice of the revocation hearing is inherently individualized.......13

            3.     Determining whether a class member asserted indigency in some way before the Court will be yet another individual inquiry. ........................................................................................15

            4.     It is impossible to know whether the Childersburg Municipal Court considered any particular class member's indigency because it is impossible to know what happened in the courtroom. ..............................................................................16

            5.     Willfulness will be an individualized inquiry...............................18

             6.     There is no common evidence that will show (1) which class members went to jail for charges related to JCS, and (2) whether a particular day in jail was related to a JCS charge. ........19

C.    Establishing that a particular person (even if indigent) was denied counsel will require individualized inquiry as to whether each was represented or knowingly waived their right to counsel (or were even revoked). ................................................................................22

D.    Determining whether class members received suspended jail sentences and whether they were placed on probation for the purpose of collection of fines, fees, and costs will devolve into individualized inquires.................................................................................24

E.    Determining if indigent persons were charged fees for probation, in defiance of the terms of the contract, will be an individualized issue. .......27

F.    More individual issues that will defeat predominance: .............................28

    1.    "Badges" and "Threats" are individual issues. .............................28

    2.    Determining whether probation exceeded the two year statutory limit would be an individual issue due to tolling. ...........28

    3.    Determining whether the statutory maximum fine has been exceeded will be an individual issue...............................................30

    4.    The statute of limitations creates yet another individual issue. .....30

    5.    Determining bond amounts and reasonableness will be an individualized issue......................................................................31

G.    The policies and procedures of the Childersburg Municipal Court changed many times and in many different ways during the class period. .....................................................................................31

H.    Predominance fails because of the need for individual inquiry into damages for each putative class member for each of the myriad of alleged wrongs. ..........................................................................33

I.    Alleged "common" questions which are not pled or do not constitute actionable constitutional violations are not relevant to the predominance determination...................................................................36

II.    The definitions for Plaintiffs' proposed classes impermissibly expand the definitions pled in their Fourth Amended Complaint and, in any event, are not administratively feasible to ascertain..................................................37

    A.    Plaintiffs' proposed class definitions are larger than those plead in their complaint and in direct contradiction to this Court's order denying Plaintiffs' leave to amend their complaint (Doc. 230)................37

B.    The class definitions proposed in Plaintiffs' Motion fail the ascertainability requirement because they include people who could not have been harmed and because there is no administratively feasible way to determine class membership. .............................................40

III.    Plaintiffs have not affirmatively shown that a class action is manageable or superior to other proceedings. .................................................................42

IV.    Plaintiffs are not adequate to represent the class. ...................................................45

V.    Plaintiffs cannot seek certification under Rule(b)(2) because the Childersburg Municipal Court no longer uses JCS, operates under different policies and procedures, and because Plaintiffs primarily seek monetary relief. .....................46

VI.    Issue certification under Rule 23(c)(4) is inappropriate. .......................................48

CONCLUSION .................................................................................................................................50

## <u>INTRODUCTION</u>

This is a classic example of a case that should proceed, if at all, on an individual rather than a class basis. First, this action fails predominance. Plaintiffs spend less than two pages of their brief on the most important Rule 23 factor—predominance (buried on pages 45–46)—and spend only one paragraph explaining their analysis of predominance. They simply wish to ignore the thousands of person-to-person interactions involved in their claims. A central component of each class member's claim—indigency—will require individualized inquiry. Further, this is now a damages case, and determining both what occurred in the courtroom many years ago for many different people, and what damage might have occurred will be highly individualized. And this process will be even more difficult because the policies and procedures of the Childersburg Municipal Court have changed during the class period.

There are so many different claims pled (with competing elements) with so many different factual wrongs alleged (from badges to bonds), allegedly done by so many different people, that whatever commonality might have existed will be swamped. Plaintiffs have not even identified which alleged wrongs support which counts. *See Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (predominance analysis requires court to "first identify the parties' claims and defenses and their elements.") Worse, Plaintiffs have not identified which class is asserting which counts (or which wrongs within those counts).

Plaintiffs have tried to mask these individualized issues in their Motion. For instance, they have radically changed both of their class definitions (attempting to substantially enlarge both, and instructing their expert not to provide any opinion on the two classes which were pled). Likewise, throughout the brief, Plaintiffs make blanket assertions of facts (and assumptions of facts) that are just not true class-wide—for instance: assuming that every person on probation is indigent; asserting that all Plaintiffs "received . . . only fines with no jail sentence"; assuming that probationers were actually revoked and arrested for failing to pay—rather than being arrested after failing to attend a noticed court hearing; assuming that there were no hearings on ability to pay and no indigency determinations and no counsel provided or voluntary waivers;

assuming that no failure to pay was willful; asserting that "Any hard document generated by the city court itself are scanned into Probation Tracker".

Most telling, however, is Plaintiffs' failure to include a trial plan—which is now commonplace in federal court class action practice. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 n.20 (11th Cir. 2009) ("[C]ourts must consider how a case will be tried . . . . [T]here is a direct correlation between the importance of a realistic, clear, detailed, and specific trial plan and the magnitude of the manageability problems a putative class action presents. **We therefore recommend that district courts make it a usual practice to direct plaintiffs to present feasible trial plans, which should include proposed jury instructions, as early as practicable when seeking class certification**.") (internal citations omitted) (emphasis added). In other words, Plaintiffs themselves don't know how this case could be tried because of the need for the thousands of individual inquiries—minitrials—even in Childersburg. Plaintiffs' apparent plan—certify now and figure it out later—is clearly not the law now in the Eleventh Circuit (if it was ever the law).

It is the Plaintiffs' burden to demonstrate compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (party seeking certification must "affirmatively demonstrate his compliance with the rule"); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003) ("The burden of proof to establish the propriety of class certification rests with the advocate of the class.") (citations omitted). Plaintiffs have failed utterly to carry their burden, especially on predominance. Plaintiffs rely heavily upon their expert, Peter Coons, and his analysis of JCS's database (Probation Tracker). However, as explained in the City's *Daubert* motion, Probation Tracker is missing virtually all of the key information for Childersburg and has essentially no information on what occurred in the courtroom for any city.

In addition to predominance, Plaintiffs have not shown that the two classes pled in the current complaint are ascertainable. Likewise, this action fails (at least) superiority, typicality, and adequacy (and may even fail numerosity). Finally, Plaintiffs' claim for a Rule 23(b)(2) class is wholly meritless in light of the massive changes in the Childersburg court and personnel,

Childersburg's termination of JCS and JCS's leaving the State of Alabama.  Accordingly, class certification is inappropriate here.

## LEGAL STANDARD

"[W]ith great power comes great responsibility; the awesome power of a district court [to certify a class action] must be exercised within the framework of rule 23." *Brown.*, 817 F.3d at 1233 (reversing class certification) (internal quotation marks omitted). "All else being equal, the **presumption is against class certification**. . . . A district court that has doubts about whether 'the requirements of Rule 23 have been met should refuse certification until they have been met.'" *Id.* at 1233–34 (emphasis added). This is because a "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Rule 23(a) establishes four preliminary requirements that must be met before any case may proceed as a class action (numerosity, commonality, typicality and adequacy). The Eleventh Circuit and most other courts recognize a fifth implicit Rule 23(a) requirement: ascertainability. *See Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 947 (11th Cir. 2015).

Plaintiffs are fundamentally mistaken in asserting that "For purposes of class certification, substantive allegations in the complaint are accepted as true." (Mot. at 17.) If this was ever the law, it certainly is not the law today, especially after *Dukes. Brown* 817 F.3d at 1232 ("The district court also misstated the law when it said that it 'accepts the allegations in the complaint as true.' . . . [the] party seeking class certification has a burden of **proof**, not a burden of **pleading**")) (emphases added). Instead, before certifying a class, the district court must conduct a rigorous analysis and determine, based on record evidence, that the requirements of Rule 23(b)(3) are satisfied. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009); *Brown*, 817 F.3d at 1232 (must "prov[e] that the requirement are 'in fact' satisfied").

## ANALYSIS

I. **Plaintiffs fail to carry their burden of demonstrating predominance under Rule 23(b)(3).**

This is a damages case that must certified, if at all, under Rule 23(b)(3). To use this rule, Plaintiffs must affirmatively show that common questions of law or fact predominate over individualized questions. *See Brown,* 817 F.3d at 1234. "[T]he predominance criterion is far more demanding" than Rule 23(a)'s commonality requirement. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). In analyzing predominance, this Court must "examine the cause[ ] of action asserted in the complaint on behalf of the putative class," *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000), and then "classify [the claims and defenses] as common questions or individual questions by predicting how the parties will prove them at trial," *Brown*, 817 F.3d at 1234. "Common questions are ones where 'the same evidence will suffice for each member,' and individual questions are ones where the evidence will 'var[y] from member to member.'" *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir.2005)); *Rutstein*, 211 F.3d at 1234 ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.").

The reasons that predominance fails are legion. First, a central component of each class member's claims—indigency—will require individualized inquiries. Second, there is no common evidence that will show what occurred in court or why, why warrants were issued, whether the class member willfully failed to comply with a probation order, whether the court considered indigency, whether the class member asserted indigency, whether they were arrested, why they were arrested, whether they were jailed after the arrest, why did they remain in jail (for each day), whether they had counsel (or waived counsel), or whether they received constitutionally adequate notice. Third, determining whether class members had a suspended jail sentence (and the reason for their probation) will require this Court to examine multiple sources as well as each putative class member. Fourth, the procedures of the Childersburg Municipal

Court changed over time, adding a temporal component to each class member's claim. Further, this is now a damages class action and because no damages can be presumed under §1983 (especially mental anguish, harm to reputation etc.), there will be a need for individual minitrials for their particular damage (if any). And this does not even begin to consider a long list of other issues—badges, alleged threats, statute of limitations, allegedly excessive fines/costs/fees, allegedly excessive bonds, alleged clerical mistakes—all of which raise even more individual issues.

Even beyond the many different legal theories and the myriad of different wrongs alleged, neither the Fourth Amended Complaint nor the Motion for Class Certification identify a single common policy that affected all class members in the same way. Given these varying facts and legal standards, there is no common answer that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Although plaintiffs spend only one paragraph analyzing predominance, they list 14 alleged common questions in their commonality (23(a)(2)) section. Ironically, these questions demonstrate just how individualized a trial of this matter would be.

Plaintiffs fail to even identify which class is claiming under which counts—or which counts include which wrongs. Further, Plaintiffs lump together different actions by different individuals in different factual situations in an effort to try the City (and JCS) in a single, up or down vote (subject to different legal standards). The rigorous analysis required by Rule 23 will not allow such haphazard trial by anecdote or association.

These claims bear a resemblance to *Alkire v. Irving*, 330 F.3d 802, 821 (6th Cir. 2003)— but present vastly more individual issues. There, a plaintiff brought a class action for damages under § 1983 for his repeated jailings in connection with failure to pay fines and court costs pursuant to an installment plan. *Id.* 807–08. The District Court denied class certification and the Sixth Circuit affirmed that finding (remanding other issues) and wrote: "The district court's finding that **numerous factual issues, such as varying reasons for arrest, varying lengths of**

**stay, and varying financial situations** 'do not warrant class treatment' is even stronger when reviewed under the type III [(b)(3)] requirements." *Id*. at 821 (emphasis added).

### A. Determining whether the members of either class were indigent is a central part of each class member's claim and will predominate over any common issues.

The central problem with Plaintiffs' argument is that it assumes that every person placed on probation with JCS was indigent. This is simply untrue and is not even what their complaint alleges. According to Plaintiffs' own expert, almost half of the persons placed on probation with JCS statewide paid their fines and fees without incident. (Ex. A, Coons Dep.[1] at 165:18–168:11 (agreeing that 161,685 people went directly from active to completed status with no reported problems and testifying: "**I'm not aware of that, any damages or injury**" for those persons) (emphasis added).) A substantial percentage of the putative subclass members have employment listed in Probation Tracker[2] or in other documents. (*See* Doc. 391 at 26; Coons Dep., Ex. 12 (excerpt from spreadsheet produced by Talladega County on October 10, 2015 listing employment).) And Municipal Judge Brad Bishop testified that many persons—even persons with counsel—**request** JCS probation, not because they are indigent but because they wanted to pay over time. (*See* Doc. 406-1, Bishop Rep. at 5. (also noting "JCS did not monitor only those with lower incomes. . . . it was not uncommon for both defendants and (in cases where defendants have retained counsel) their lawyers to request that the defendant be put on JCS").)

---

[1] Contemporaneous with this Opposition to Class Certification, the City has filed a Motion to Exclude the Testimony of Peter Coons under Rule 702. In support of these motions, the City has filed a single evidentiary submission. Thus, the exhibit designations in this opposition are not continuous.

Further, the City has adopted the following citation format. For all documents, the first citation will list the exhibit number or docket number. For Bates labeled documents, the first citation will also list the Bates number printed on the first page of the exhibit. If the document was obtained directly from Probation Tracker, then the anagram "PTR" for Probation Tracker record will appear in place of the Bates number. Finally, each citation will use a descriptive name for the exhibit. Each subsequent citation will refer to the exhibit by its descriptive name.

[2] For example, JCS Intake Forms show that Mr. Abernathy, Ms. Cannon, and Ms. Mitchell, like many others, were employed at the time they were put on JCS probation (Icons Hair Salon, Talladega Health Dept., and Cheesecake Factory, respectively).   (Ex. E, PTR, Intake Forms; Ex. F, PTR, Employment Changes; *see, e.g.*, Doc. 402-16 at 2.)

Plaintiffs are well aware that their constitutional claims require **more** than just showing contact with JCS. In their Fourth Amended Complaint, Plaintiffs repeatedly allege that the City's conduct was wrongful because putative class members were indigent. A few examples include:

- "the Childersburg policy and contract to include probation in every court order mandates a judicial practice that continually deprives **indigent** misdemeanants of their constitutional rights." (Doc. 305, ¶ 130) (emphasis added)

- "None of the Plaintiffs were accorded any hearing or consideration of their **indigency** before being jailed." (Doc. 305, ¶ 132) (emphasis added)

- "This system, as a matter of routine, violates the rights of persons such as the Plaintiffs and the classes they seek to represent by imposing fines and charging fees to **indigent** persons with no hearing or consideration of their indigency." (Doc. 305, ¶ 140) (emphasis added).

- "Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an **indigent** defendant cannot be required to serve jail." (Doc. 305, ¶ 173) (emphasis added).

Moreover, Plaintiffs tied every single count of their Complaint to the class members' indigency:

- [**Due Process**] "As a proximate consequence of this deprivation of due process, the Plaintiffs and class members suffered injuries . . . all while being **indigent**." (Doc. 305, ¶ 157) (emphasis added).

- [**Fourth Amendment**] "As a proximate consequence of this unlawful seizure, the Plaintiffs and Class members suffered injuries . . . all while being **indigent**." (Doc. 305, ¶ 178) (emphasis added).

- [**Sixth Amendment**] "As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiffs and Class members suffered injuries . . . all while being **indigent**." (Doc. 305, ¶ 210) (emphasis added).

- [**Eighth Amendment**] "As a proximate consequence of this violation of their Eighth Amendment rights, the Plaintiffs suffered injuries . . . all while being **indigent**." (Doc. 305, ¶ 241) (emphasis added).

- [**Equal Protection**] "As a proximate consequence of this denial of the right to Equal Protection under the Fourteenth Amendment, the Plaintiffs and Class members suffered injuries . . . all while being **indigent**." (Doc. 305, ¶ 266) (emphasis added).[3]

---

[3] Even Plaintiffs' claimed "common" questions demonstrate that indigency is a necessary determination. A few examples include **question 5** ("Whether the policy of failing to appoint counsel for

Plaintiffs' Motion attempts to mask the indigency issue and even deletes some of the indigency wording from their second class definition. *See* Section II.A *infra* (comparing class definitions). However, ignoring a problem doesn't make it go away. Instead, their last minute effort to change the class definition merely emphasizes what a key role indigency plays. Plaintiffs cannot change the substantive allegations in their complaint or the required elements of their claims. For both classes, indigent status is a central element of all claims—Equal Protection, Sixth Amendment, Eighth Amendment, Fourth Amendment, Due Process. And the need to determine indigent status for each class member is enough by itself to defeat predominance here.

### 1.    Indigency is an inherently individualized inquiry.

Indigency is an amorphous concept that lacks an objective definition. Federal law recognizes the individualized, case-by-case nature of determining indigency. For instance, the Supreme Court has explained that whether counsel should be appointed under the Sixth Amendment "must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system." *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973) ("We thus find no justification for a new inflexible constitutional rule with respect to the requirement of counsel. . . . Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel **for indigent probationers** or parolees.") (emphasis added).

---

indigent defendants . . . is legal?");. **question 6** ("Whether . . . a policy . . . [that] fails to make any inquiry into indigency . . . is legal?"), **question 7** ("Whether the policy . . . of failing to hold a hearing to determine indigency before revoking probation . . . is legal?"). (Mot. at 34.) Likewise, indigency is raised by implication in other "common" questions listed by the plaintiffs: **question 4** ("Whether the policy . . . of incarcerating individual for failure to pay . . . with no finding of willfulness is legal?"); **question 1** ("Whether a policy . . . of placing those persons on 'probation' . . . who cannot immediately pay fines and costs is legal?"). (Mot. at 33–34.) Further, **question 14** ("Whether setting bond based upon a fine balance owed the city is legal?") appears to be a claim under the 8th Amendment for "unreasonable bond requirements" (Doc. 305, ¶ 110) which would require an individualized review of several similar factors.

Under Alabama law, the standard for indigency is largely within the discretion of the trial judge. *See, e.g.*, *Warren v. City of Enterprise*, 641 So. 2d 1312, 1315 (Ala. Crim. App. 1994) ("The determination of indigency sufficient to require the appointment of trial counsel rests within the discretion of the trial judge."); *Harris v. State*, 549 So. 2d 520, 522 (Ala. Crim. App. 1989) (upholding the trial court's probation revocation because it "made a diligent inquiry into the reasons for appellant's nonpayment . . . ."). The Alabama Code does not contain a single objective definition for "indigent defendant," but instead establishes a set of guidelines to assist judges in determining indigency.[4] Under these guidelines, a person is indigent when (1) he or she states "under oath or affirmation . . . that he or she is unable to pay for his or her representation," **and** (2) the court finds the person is "financially unable to pay for his or her representation." Ala. Code § 15-12-1(4). A court should consider not just the defendant's present ability to pay but also whether he has reasonable means of procuring needed funds. *See Minniefield v. State*, 260 So. 2d 607, 613 (Ala. Crim. App. 1972) (to find indigency, "the trial judge must be satisfied not only that the defendant is without funds but that he has No [sic] reasonable way to procure them").

The expert report of Brad Bishop further illustrates that "there is no bright-line test for determining indigency." (Bishop Rep. at 10.) Instead,

> the ability or inability of a defendant to afford counsel is to be determined, not simply by a superficial examination of a standard [substantial hardship] form, but by a thorough and wide-ranging examination of the defendant's total financial picture and a determination of the amount of disposable income or other resources reasonably available to the defendant after the payment of his or her fixed or certain obligations weighed against the actual cost of employing defense counsel.

---

[4] Alabama Code § 15-12-1(4) creates presumptions—all tied to the federal adjusted poverty level—that function as the starting point in the indigency inquiry. For example, a person who has an income that is below 125% of the federal poverty line is presumed to be indigent unless the judge finds they are able to pay. *See* Ala. Code § 15-12-1(4)(a). A person with an income above 125% of the federal poverty line but below 200% may be indigent if, among other things, the judge finds the expense would result in a substantial hardship. *See* Ala. Code § 15-12-1(4)(b). All of this information will be individualized and is just the starting point of the indigency inquiry.

(Bishop Rep. at 11 (citing *Minniefield v. State*, 260 So. 2d 607, 613 (Ala. Crim. App. 1972)).) This "wide-ranging examination" often involves multiple steps. (*Id.* at 11–13.) In Judge Bishop's court, the offender must complete a "substantial hardship" form. (*Id.* at 12.) After that, Judge Bishop may simply accept the claim or may require substantiating documentation. (*Id.*) Judge Bishop also asks questions of the applicants. As Judge Bishop explained: "It is not uncommon that I examine a form which, by itself, would look to qualify the applicant for indigency status, but after asking questions and evaluating the applicant's demeanor and presentation, I may deny status or require further substantiation." (*Id.* at 12–13.) However, judges are not required to follow the procedure outlined by Judge Bishop and he is personally aware that some municipal judges employ less formal procedures, such as merely asking questions of the defendant regarding their ability to pay. (*Id.* at 13.)

## 2. Determining indigency will predominate.

In this case, Plaintiffs have not identified any common evidence that could be used to determine which members of the putative class are indigent and which are not. Plaintiffs spend a large portion of their brief discussing the "abundant" data available from the JCS Probation Tracker software. But, **Plaintiffs do not even argue that they can determine whether a plaintiff was indigent from Probation Tracker**. Though Probation Tracker has a field for indigency status, there are only 85 people in the entire, state-wide database that are coded as indigent. (Coons Dep. at 176:4–177:7). Of those 85 people, only five are associated with the City of Childersburg. (*Id.* at 177:8–10.) Indeed, Plaintiffs' expert did not even attempt to determine which class members were indigent. (*Id.*. at 172:21–24 ("Going specifically to the indigency field, I don't have an opinion on whether or not that particular field was complete or incomplete one way or the other.") 170:4–23), 178:2–180:22 ("no data field that says what their assets are"; "not that I am aware of").)

Potential class members' incomes will also have changed over time, rendering them potentially indigent at certain times during their probations and not indigent during other times.

Plaintiffs Timothy and Kristy Fugatt are examples. In reviewing the Fugatts' tax returns, it appears that between 2009 and 2011, the Fugatt's annual income was below 125% of the federal poverty line. Between 2012 and 2013, the Fugatt's income exceeded 125% of the federal poverty line. (Doc. 390 at 7.) This information is not available in Probation Tracker or the Municipal Court's paper files. The only way to obtain it is to ask each individual class member. Further, reviewing tax returns would only be the first step in each class member's minitrial. Each person would have to testify and present additional documentation beyond tax returns because the 125% figure is merely a presumption that can be overcome based on the particular facts. As their Response to the City's Motion for Summary Judgment as to the Fugatts demonstrates, Plaintiffs appear to agree that indigency is an individualized determination to be made by the trial judge. *See* Doc. 419 at 9 ("To the extent the City contends in this paragraph that Kristy and Tim were not indigent in 2012 and 2013, Plaintiffs point out that the indigency determination is one to be made by the Court.").

In addition to income, employment statuses changed over time. (Coons Dep. at 180:4–12 ("sure" "common sense" "employment changes over time"; but admitting that he had made no inquiry into changes over time for employment in Probation Tracker); Employment Changes).) For example, probationer Byron McCrimmon's 11/29/11 JCS Intake Form lists Hilltop Daycare as his employer and his 2/9/12 JCS Intake Form lists Southern Cal, but visit notes in Probation Tracker from 3/5/12 suggest that he is unemployed.[5] (Ex. G, PTR, McCrimmon documents.) Plaintiffs' Motion never explains why these important and individualized questions do not predominate here.

---

[5] While Probation Tracker includes some employment information, it may be wrong or incomplete, especially as employment changes over time. (*See generally* Coons Dep. 180-86; *id.*, Exs.10–12; Ex. E, PTR, Intake Forms; Ex. F, PTR, Employment Changes.)

**B.**    **Individualized inquiry will be needed to determine, among other things, (1) which class members were incarcerated because they failed to pay fines, fees and costs, (2) without consideration of their indigency, (3) which class members received adequate notice, and (4) which class members were willful in nonpayment.**

**1.**    **Because most warrants were for failing to attend noticed court hearings (not because of probation revocation), a minitrial will be required to determine the reason for each warrant.**

Plaintiffs contend that the putative class members were often arrested and jailed "for failure to pay." (Mot. at 13.)  Again, this is simply untrue. In Childersburg, Plaintiffs have not identified a single person who was arrested on a charge of failure pay their fines. Instead, the facts show that most warrants were issued after probationers failed to appear for a hearing in front of the Childersburg Municipal Court. Neither Tim Fugatt or Kristy Fugatt were arrested when they appeared for their probation revocation hearings. (*See* Doc. 392-7, T. Fugatt Dep. at 120:17–23 ("I was told that I was arrested for failure to appear, not for failure to obey a court order); Doc. 392-2, Kidd Dep. (Vol. 1) at 312:16–313:5 (testifying that the Court issued warrants for "Failure to Obey a Court Order" when a  probationer failed "to come to court for an established hearing."); Doc. 392-18 at 3, 392-19 at 2.) However, when the Fugatts failed to appear for noticed hearings, the magistrate (not JCS) issued a capias warrant to compel their attendance.[6] Ms. Ray likewise was not arrested and was not revoked when she apparently appeared for an October 2010 hearing. However, when she failed to appear at a later hearing, the magistrate issued a capias warrant to compel her attendance. (*See, e.g.* Docs. 423-1 at 111:18–112:1, 118:14–16, 120:7–15; 423-11 at 7; 423-16; 423-17; *see also* Doc. 422 at 21.) Even for Mr. Jews—who never appeared voluntarily for a probation revocation hearing—the magistrate issued capias warrants after his failure to appear.

Further, no court record indicates that **any** of the named plaintiffs had their probation revoked. In fact, Probation Tracker indicates that virtually nobody had their probation revoked in Childersburg. Plaintiffs' expert ran a report during his deposition and determined that only two

---

[6] As explained in Section I.B.6 below, the Fugatts were arrested but not incarcerated.

(2) persons had the revoked "status code" in Childersburg during the class period and none had the revoked "action code" during that period. (Coons Dep. at 283:3–287:21 & Ex. 25–26.) Plaintiffs' expert testified:

> Q.     Do you know if there was **anybody in the state of Alabama** that actually appeared at a revocation hearing and then were revoked and jailed after that?

> A.     In the entire state?  **I couldn't answer that question, no**.

(Coons Dep. at 196:9–14 (emphasis added).) While it is impossible to prove at this point that no one in Childersburg was ever arrested because they failed to pay, this will certainly require a person-by-person inquiry to determine if someone was arrested and/or jailed because of their failure to pay.

> ### 2.     The question of whether each class member received adequate notice of the revocation hearing is inherently individualized.

Plaintiffs' claim that putative class members never received notice of their probation revocation hearings and that this is a common question and a violation of due process. (Mot. at 33 (**question 7**).) Plaintiffs are again mistaken. This issue will require an individualized inquiry because notice only need be "reasonably calculated, **under all the circumstances**, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See Hammack v. Moxcey*, No. 2150163, 2016 WL 3568810, at *5 (Ala. Civ. App. July 1, 2016) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)) (emphasis added).[7] "Due process does not require that an interested party **actually receive notice** of the proceedings, nor does it demand that the Government employ the best or most reliable means of ensuring notice." *United States v. Davenport*, 668 F.3d 1316, 1323 (11th Cir. 2012 (emphasis added).); *Thompson v. United States*, 368 F. App'x 930, 934 (11th Cir. 2010) (no due process violation because clerk mailed notice of court order to last known address).

---

[7] *See also Reams v. Irvin*, 561 F.3d 1258, 1265 (11th Cir. 2009) (same); *United States v. Simon*, 609 F. App'x 1002, 1006 (11th Cir. 2015) (same); *U.S. v. Davenport*, 668 F. 3d 1316, 1322–23 (11th Cir. 2012) (same); 16B Am. Jur. 2d Constitutional Law § 986 ("Whether a particular method of notice is reasonable, for due process purposes, depends on the particular circumstances.")

Further, "[t]here is no specific time requirement for notice [of a revocation hearing], only that [the notice] must be served well enough in advance so that the defendant has a reasonable opportunity to prepare." *See Grace v. State*, 727 So. 2d 881, 883 (Ala. Crim. App. 1998).

The experience of just two of the named plaintiffs—Deunate Jews and Gina Ray—demonstrates the individualized nature of this inquiry. Under Alabama law, "notice of any hearing at which the defendant's presence is required . . . shall be accomplished by delivering or by mailing copies to [the defendant's] last known addresses, or, if no address is known, by leaving copies with the clerk of the court." Ala. R. Crim. P. 34.4. During his initial intake Mr. Jews intentionally provided JCS an incorrect mailing address so that JCS would be unable to find him. (*See* Doc. 392-1, Jews Dep. at 58:10–16, 60:18–61:3, 87:18–19 (provided a false address "because I wasn't planning on paying [any fines, fees, or court costs] . . . I ain't never gave it to them . . . ."). On numerous occasions thereafter, Mr. Jews provided false addresses to JCS. (*See* Jews Dep. at 60:10–17, 89:5–18; Doc. 382, Coons Rep. at 113). Though JCS and the Municipal Court tried to contact Mr. Jews at these addresses, their efforts were, not surprisingly, unsuccessful. (*See* Jews Dep. at 60:2–61:3, 63:21–64:3, 65:8–13, 79:13–20, 81:8–14, 82:1–8, 89:5–18, 94:23–95:5, 102:6–13; Doc. 392-33 at 3–6). In Plaintiffs' Response to the City's Motion for Summary Judgment as to Mr. Jews, they dispute that Mr. Jews gave a false address and also argue that there is no evidence that the City ever sent notice to Mr. Jews. (Doc. 420 at 2, 7–10, 18, 25–26.) Regardless of whether there is a disputed issue of material fact, Plaintiffs' Response confirms that numerous questions related to notice (whether it was sent, whether it was received, whether it was constitutionally adequate), have to be addressed on an individual basis.

Likewise, notices to Gina Ray regarding her probation revocation hearings were returned to JCS with a handwritten note that the addressee was no longer at that address. (Doc. 392-8, Ray Dep. at 253:2–257:21.) Still, Ms. Ray testified that the address on the envelope was the correct address. (*Id.* at 252:13–18, 256:8–22.) A jury could find that Ms. Ray intentionally avoided the notice or, at the very least, that the notice was constitutionally sufficient under the circumstances because it was sent to the right address. Because there is no common evidence that will show

who received constitutionally adequate notice of their revocation hearings, predominance is lacking here. (*See* Coons Dep. at 195:6–17 (cannot determine whether probationers received notices of the hearings or whether JCS or the court mailed them).)[8]

### 3. Determining whether a class member asserted indigency in some way before the Court will be yet another individual inquiry.

Even if the Court could determine whether a particular class member was indigent at a particular time, more individual analysis would be required because the existence of indigency is not enough to establish a constitutional violation. The class member must have brought his or her ability to pay to the court's attention before a violation can arise. *See, e.g, Garcia v. City of Abilene*, 890 F.2d 773, 776 (5th Cir. 1989) ("Mrs. Garcia contends that the City of Abilene violated the principles established in *Tate* and *Bearden* by attempting to jail her solely because she could not pay her fines. However, these cases rest on the assumption that the indigent appears before the court to assert his inability to pay. Even assuming an individual who is fined is too poor to pay, **if he does not appear and assert his indigency**, the court cannot inquire into his reasons for not paying and offer alternatives.") (emphasis added); *Sorrells v. Warner*, 21 F.3d 1109 at *3 (5th Cir. 1994) (table opinion). Here, there is no common evidence of what occurred at any particular court hearing. Even if there were transcripts from Municipal Court (and there are none), this would still require yet another person-by-person inquiry.

---

[8] As mentioned elsewhere, the notice procedures were changed over time by JCS and the Childersburg Municipal Court. Before October 2012, the Childersburg Court relied on JCS to send notices of probation revocation hearings. JCS employee Lisha Kidd testified that JCS mailed probationers the following documents to notify them of a revocation hearing: (1) a Notice to Show cause, (2) the Petition for Revocation, and (3) a Violation of Probation letter. (Doc. 392-2, Kidd Dep. (Vol. I) at 180:9–183:1, 197:8–23, 236:2–11; *see also* Ex. H, JCS Notice Letters.) However, JCS's notice mailings appear to have varied over time and/or by probationer. (*See, e.g.*, Coons Dep. at 194:8-196:8 & Ex. 7 (indicating that a VOP letter was mailed in advance of K. Fugatt's 10/2012 revocation hearing but not for her 8/2011 hearing).)  Also, after October 2012, the Court began issuing subpoenas. (*See* Ex. I, Childersburg 25753, Subpoena Log and Exemplars). For a period of time, both the Court and JCS were sending out notices of hearings. Then, in 2014, JCS stopped sending notices and the Court continued sending subpoenas. (Kidd Dep. (Vol. 1) at 236:10–239:15.)

> **4.    It is impossible to know whether the Childersburg Municipal Court considered any particular class member's indigency because it is impossible to know what happened in the courtroom.**

Even if there were evidence that some class members were incarcerated after actually appearing at a hearing, it is simply impossible to know what occurred in the courtroom without speaking to each class member. In other words, it would be necessary to ask each class member whether they were "incarcerated without consideration of their indigency." (Mot. at 15.) Plaintiffs' expert recognized this problem and agreed that he does not know how judges handled probationers in their original hearings/sentencing/setting of probation—or in any subsequent hearing on probation revocation. (Coons Dep. at 159:7–10 ("don't know the procedures that any particular court had").) Coons also readily admits that he cannot tell what occurred in the courtroom. (*Id.* at 163:8–25 ("I wouldn't have an opinion of what a judge [] would do in a courtroom").) Thus neither Plaintiffs' expert (nor anyone else) can tell what Judge Ward, Judge Price or Judge Woodruff said to particular probationers in any particular hearings. Nor can Coons (or anyone) tell what individual probationer's told these judges. (*Id.* at 157:8–18; 191:21–194:7 (admitting that he cannot determine what occurred at revocation hearings or what people were told or what the judge heard or what findings were made by the judge).) Plaintiffs' expert also acknowledged that he cannot determine the reasons a judge had for revoking (or not revoking) anyone's probation. (*Id.* at 193:8–14.)  Plaintiffs' expert frankly stated:

> Q.    **You're not expressing an opinion the judges treated these people in a common way?**
>
> A.    **I wouldn't know how any one particular judge may treat any one person**. So I'm not commenting on a judge's actions, I'm just commenting on looking at the data the way these people, A, got into the system and the way it was handled in a typical case.

(*Id.* at 164:5–13 (objections omitted) (emphasis added).) Coons also conceded that he cannot even determine if a judge held a hearing on whether someone could pay the probation amounts (or why they weren't paying). (*Id.* at 193:4–7.)

Plaintiffs contend that "proof of each class member's claim against . . . Childersburg . . . does not require the resolution of case-specific individualized issues because those were not considered in the JCS system." (Mot. at 46.) Merely saying individualized issues were not considered does not make it so, especially in the light of record evidence to the contrary. First, the facts indicate that nobody (or virtually nobody) was revoked in Childersburg and therefore, regardless of procedure, there is no class-wide evidence that the court in Childersburg was issuing arrest warrants for failing to pay fines, fees, and costs. Second, Aimee Burnette, the treasurer and a Rule 30(b)(6) representative for the City, testified that she personally witnessed several hearings in the Childersburg Municipal Court in front of Judge Woodruff.[9] She also testified that Judge Woodruff makes an announcement about indigency at the beginning of every court session. (Doc. 392-10, Burnette Dep. at 132:10–133:16 (recounting judge's announcement that "if there is any individual that is in need of counsel due to indigency to notify the court"); Ex. J, EMANN 0032, Childersburg Court Transcript[10] for March 13, 2014, at 11:3–12:16, 16:25–27:25 (Judge Woodruff conducting indigency inquiry, offering appointed counsel, and granting affidavit of substantial hardship).) Gina Ray testified that Judge Ward announced that people had a right to a lawyer but then stated that she could not really remember what he said. (Ray Dep. at 139:15–140:1.) In addition to this testimony, there are paper records that show that some members of the putative class submitted affidavits of substantial hardship. (Ex. K, Childersburg 036707, Substantial Hardship Affidavits.) Some were found to be indigent. (*Id.* at -722; Coons Dep. 30:12–20 ("There are some individuals in the JCS system who were in community service programs or court-ordered programs who were not levied fines or fees. . That is my opinion based on reviewing the data.").) There are other documents which prove the

---

[9] Ms. Burnette stated that she did not personally observe this conduct when Judge Ward was on the bench. This is not surprising because it does not appear that Ms. Burnette normally went to court during this time. (Burnette Dep. at 60:1–8 (started going to court during the prior Magistrate's absence (Brenda Wyers)); Doc. 392-13, Hepp Dep. (Vol. 1) at 29:12–30:15 (explaining that Ms. Wyers absence began around May 2014, which is after Judge Woodruff went on the bench).)

[10] The proceedings before the Childersburg Municipal Court were not regularly transcribed. A court reporter was present on March 13, 2014 at the request of a party to the proceedings.

judges inquired about and found people to be indigent. (*See* Coons Dep. 289:17–291:22 & Ex. 27 (showing Childersburg probationers that were given community service).) Others were represented by counsel. (Ex. L, Childersburg 48063, Fair Trial Account Records.)[11] Still others waived their right to counsel. (Ex. O, Childersburg 30792, Waiver of Consent Forms.)  And others never told the judge anything about their ability to pay. (Ray Dep. at 57:8–23 (never told judge that she was unemployed, never disclosed her other debts, never told him how much money she had, and never told him that she was unable to pay the fines).) Further, as Judge Bishop explained, indigency determinations may be made verbally without documentation. (Bishop Rep. at 12–13.)

### 5.       Willfulness will be an individualized inquiry.

This is now a damages case under Rule 23(b)(3). Therefore, even if a class member had their probation revoked after actually appearing at a hearing and even if the judge failed to consider their indigency (if they were indigent)[12] and even if the judge's reason for incarcerating the person was their failure to pay, it would be necessary to have an individual inquiry into whether the failure to pay really was willful to determine if damages were proximately caused. As explained fully in the Jews Motion for Summary Judgment, there is certainly evidence that some class members willfully refused to pay their fines or appear at noticed JCS meetings. (*See* Doc. 391 at 14.) For example, Deunate Jews conceded under oath that he was not making bona

---

[11] (*See* Burnette Dep. at 133:1–22.) William E. Hollingsworth, IV has been the appointed Public Defender since July 2012 on a flat fee basis. (Ex. M, Childersburg 29730, Hollingsworth Appointment; Burnette Dep. at 134:18–15) If the judge determined that a defendant was indigent, Mr. Hollingsworth was available to step in and represent that offender. (*Id.*; Ray Dep. at 38:13–14 ("Q: Was there a public defender there? A: Yes, sir.").) Before that, attorneys were present in the court room and would be appointed by the judge if counsel was requested. (*Id.* at 133:12–16; Ex. L, Childersburg 48063, Fair Trial Account Records.) The court also appears, on occasion, to have appointed counsel for defendants even if they had purported to waive their right to counsel. (Ex. N, Childersburg 36149, Waiver of Consent Forms.) The Fair Trial account is an account from which Childersburg pays its public defenders for representing indigent people and is funded from the fines collected by the Court. (Burnette Dep. 133:19-22; 181:10-14; Doc. 392-15, Donahoo Dep. 70:1-22.)

[12] Plaintiffs list **question 4** as "Whether the policy . . . of incarcerating individual for failure to pay . . . with no finding of willfulness is legal?"

fide efforts to pay his court-ordered fees and court costs (*See e.g.*, Jews Dep. at 92:2–3 (**"[N]o . . . I wasn't going to pay them, no**.") (emphasis added); *id.* at 75:4–13 ("I ain't going to pay y'all nothing, because my case been dismissed [sic].").) In their Response to Mr. Jews Summary Judgment Motion, Plaintiffs argue that Mr. Jews did not provide false addresses and, therefore, could not have been found to have willfully avoided paying his court costs. (Doc. 420 at 24–26.) Alternatively, they say that JCS never alleged (and the court never found) that Mr. Jews had willfully failed to pay his fines.[13] (*Id.*) Regardless, Plaintiffs' Response confirms that determining willfulness for each class member would require individualized inquiry. (Coons Dep. at 196:15–18 (admitting that he does not know if the failure to comply with probation was willful).)

> **6.** **There is no common evidence that will show (1) which class members went to jail for charges related to JCS, and (2) whether a particular day in jail was related to a JCS charge.**

Even if it could be determined that a jail sentence or warrant was issued because of a failure to pay (rather than a failure to appear), it would still be necessary to determine, for any days spent in jail, that the class member was (1) actually arrested, (2) actually jailed, (3) because of such warrant/sentence. Plaintiffs claim that "**the computer system [Probation Tracker] provides status codes for 'jail' when a person is jailed due to noncompliance on behalf of JCS**". (Mot. at 29) (emphasis added). This is simply untrue in Childersburg (and many other cities). There are no jail status codes in Probation Tracker for any of the named plaintiffs. (Coons Dep. at 250:15–20 ("confirm for me that there are no jail [status] codes or arrest [action] codes for any of these four plaintiffs on any of their probations?"; "I could not see a jail code or an arrest code or status").) During this deposition, Plaintiffs' expert ran a report for the jail status code for Childersburg during the class period (after August 28, 2010) and determined that there

---

[13] This is not surprising because Mr. Jews' probation was never revoked. *See* Section I.B.1 *supra*.

were **only four (4) persons with jail codes for Childersburg** and only three (3) for Columbiana in Probation Tracker. (Coons Dep. at 257:9–24 & Ex. 18.)[14]

Plaintiffs also argue that any documents necessary to determine such things (such as court, police or jail records) are available in Probation Tracker. Plaintiffs claim, "**Any hard documents actually generated by the city court itself are scanned into Probation Tracker** and linked to the individual concerned."  (Mot. at 3) (emphasis added).) Again, this is simply untrue. Plaintiffs' expert admitted that he did not know of any way to determine if Probation Tracker has all scanned court documents or what percentage, and confirmed that he made no effort to determine if particular types of documents were present for particular courts. (Coons Dep. at 141:3–15). In fact, Probation Tracker is missing the following documents for each of the named plaintiffs: (1) all tickets/adjudications, (2) all arrest reports, (3) all jail logs and (4) all warrants. (Coons Dep. at 143:1–153:14, 240:1–250:20 & Ex. 5–8.)

As explained in Appendix I, if it is even possible to make these determinations, they would be highly individualized, requiring the review of multiple documents (some of which are handwritten, illegible or missing). When Coons attempted to determine whether the four named plaintiffs were (1) actually arrested, and (2) actually jailed (the Fugatts, for example, were only arrested, not jailed) for JCS related charges, and (3) for how long, he had to rely on multiple separate paper documents from Childersburg's document production (not Probation Tracker), including: Alabama Uniform Arrest Report (x3), Capias Warrant of Arrest (x3), Municipal Inmate Release Authorizations & Records (x3), Daily Jail Report/Log (x2), and Payment

---

[14] Not surprisingly, Coons admits that he does not know whether the jail code or arrest code information for Childersburg is complete. (Coons Dep. at 250:21–251:4 ("Q: [D]o you know whether the jail code or arrest codes were used consistently in the City of Childersburg by JCS? . . . A: I do not know that."); *id.* at 257:17–22 ("Q: Does that make you doubt the completeness of that data for Childersburg and Columbiana? . . . A: I don't know"); *id.* at 258:10–22 ("Q: You think four people were jailed in Childersburg because of JCS-related-probation issues after August of 2010? A: I think the data that I reviewed shows that information. . . . so that's the only conclusion I can come to."); *id.* at 259:14–16 ("Look, I don't know the number beyond what was in [Probation Tracker] . . . .")). He also admits that he does not even know if JCS was told about arrests and jail and therefore whether anyone would have known to input that data.  (*Id.* at 233:19 ("I don't know if they were told or not"); Kidd Dep. at 240:3–8 (JCS probation officer explaining that JCS not always told about arrests or timely told).)

Receipts. (Coons Rep. at 21–25 & Ex. 11; Coons Dep. 240:1–250:5 (stating that review of Childersburg paper documents unavailable in Probation Tracker was required); *see also* Doc. 392-13, Hepp Dep. (Vol. 1) 52:3–53:7, 163:1–164:1, 220:11–21 (testifying that Childersburg has no electronic jail booking records).)

While this universe of paper documents (not Probation Tracker) was sufficient for these four named plaintiffs, they would not be for others in the putative class. One key problem is that arrests are often made because of multiple offenses or warrants. A few examples—among many—are: Auburn Weaver (theft of property); Daniel Crowder (disorderly conduct); Albert Hayes (disorderly conduct, DUI controlled substance, assaulting officer, pistol without permit, resisting arrest); Franklin Jones (criminal trespass, assault), Justin Hartley (driving while revoked, DUI), Jeffery Harrison (unlawful possession of marijuana); Curtis Swain, Jr. (domestic violence, resisting arrest, criminal mischief); Derrell Harris (DUI, open container); Robert Stone, Jr. (DUI, driving while revoked); Ronald Lewis  Keith (Theft of Property), Michael Wilson (DV Harassment); Courtney Stephens (theft of property); Alicia Wesley (possession of marijuana). (Ex. P, Childersburg 30128, Multiple Reasons for Arrest, at -132, -9001; *see also, e.g.*, Ex. Q, Childersburg 47949, Arrest Logs.)

Beyond the question of why someone was arrested is the question why someone is in jail (for each day they are in jail). As explained in Appendix I to the City's Opposition to Class Certification, some putative class members sat in jail for long periods of time on Talladega County charges, and were released without serving a single day on the Childersburg charge (or serving very few such days).[15]

| Name | Date Arrested for FTOCO | Date Released | Days in Jail | Days in Jail for FTOCO |
|---|---|---|---|---|
| George Waldrop | 9/22/2012 | 11/30/2012 | 70 | 4 |
| Marquette Felder | 12/15/2011 | 5/1/2012 | 139 | 0 |
| Ricky Garrett Jr. | 2/22/2012 | 3/7/2012 | 15 | 0 |

---

[15] Citations for the information contained in the chart are located in Appendix I to the City's Opposition to Class Certification.

| Jennifer Harris | 3/15/11 | 4/22/11 | 39 | 0 |

In short, to answer questions related to jail time, one would have to review thousands of pages of documents by hand[16] (many of which are not sorted by name) looking for the proverbial needle in a haystack, if it were even possible. In Childersburg, alone, the above-referenced information needed to make these determinations is often missing or unclear. The paper records and the incredibly time consuming (if not impossible) nature of this inquiry is the rule, not the exception. (*See* Docs. 341, 358, 350–353, 355, 361, 368, 369, 371, 374 (Numerous cities' Motions to Quash subpoenas for jail records (and supporting affidavits) explaining the impossible/extremely difficult nature of producing arrest and jail records).)

C. **Establishing that a particular person (even if indigent) was denied counsel will require individualized inquiry as to whether each was represented or knowingly waived their right to counsel (or were even revoked).**

Plaintiffs claim the City denied the members of the putative class counsel in violation of the Sixth Amendment, while indigent.[17] The Sixth Amendment prohibits incarcerating an uncounseled defendant unless an exception applies (*e.g.*, waiver). *See Scott v. Illinois*, 440 U.S. 367, 373–74, (1979) (the Sixth Amendment requires "only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel for his defense") (emphasis added). Further, a Sixth Amendment claim is only cognizable (if at all) for the Plaintiffs' Incarceration Class because they have expressly stated that they are not claiming for their initial conviction and sentence. (Mot. at 6, 18.) Even beyond the individualized nature of the indigency inquiry, Plaintiffs cannot make this showing with common proof. It is well settled that the right to counsel can be waived. *See, e.g., Montejo v.*

---

[16] Inmate names were handwritten on the Release forms and jail logs, and therefore are not searchable electronically.

[17] Alleged common **question 5** also addresses the appointment of counsel: "Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal?" (Mot. at 33.) While the phrasing of this question would seem to cover both the original sentencing and any revocation hearing, the plaintiffs elsewhere seem to indicate that they are attacking the revocation hearing and not the original sentencing, claiming that they have "specifically limited their claims to post conviction collection practices which extort money". (Mot. at 18.) In other words, the Sixth Amendment claim appears to be brought for the incarceration class only.

*Louisiana*, 556 U.S. 778, 786 (2009). This waiver can be oral or written. *See, e.g., North Carolina v. Butler*, 441 U.S. 369, 373 (1979). While a waiver must be voluntary, knowing, and intelligent, and the "validity of [the] waiver depends on the particular facts and circumstances of a case." *U.S. v. Morris*, 489 F. App'x 407, 413 (11th Cir. 2012). A written, express waiver of a right to counsel is "usually strong proof of that waiver, but it is not inevitably . . . sufficient to establish that waiver." *Butler*, 441 U.S. at 373. Rather, a reviewing court must examine the "unique circumstances of each case" to determine whether the particular defendant understood the consequences of their waiver of counsel, and signed the waiver absent duress. *Carter v. Newkirk*, 6 F. App'x 461, 463 (7th Cir. 2001); *see Ex parte State*, 27 So. 3d 582, 588–89 (Ala. 2008) (explaining that legal standards for indigent versus non-indigent defendants can be different depending on the situation).

In this case, this Court would have to examine a host of individualized factors to determine whether a Sixth Amendment violation occurred. What is more, this inquiry would be needed multiple times for each class member because each appearance before the Childersburg Municipal Court must be treated separately. Ms. Ray's experience demonstrates this need since she appeared at least six different times before Judge Ward. Five times she signed Probation Orders which stated, directly above her signature: "**I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this order.**" (*See* Docs. 423-5; 423-17; 423-25; 423-29; 423-30; 423-32) (emphasis added). While Ms. Ray agrees that she signed these documents, she testified that she did not read it until after she left the courthouse. (Ray Dep. at 54:12–55:11.) On one occasion, Ms. Ray did not sign the order of probation. (Doc. 423-17.) However, even this failure does not mean that Ms. Ray did not agree to waive counsel on that date. It merely shows that yet another individual inquiry would be needed.

Timothy and Kristy Fugatt signed a probation order and represented that they either had counsel or that they had waived counsel. Timothy Fugatt testified that he was never given the opportunity to read and review the Order of Probation and that he thought he was going to jail if

he did not sign right away. (T. Fugatt Dep. at 169:21–170:10; 83:2–4.) But no one ever told Mr. Fugatt he could not read the form before signing it, and no one told him he was going to jail. (T. Fugatt Dep. at 79:7–11; 83:2–19.) Deunate Jews, on the other hand, testified that he read the waiver provision but Judge Ward told him he was going to jail if he did not sign the Order of Probation (no other plaintiff made such an allegation). (Jews Dep. at 73:1–23.) Each of the named plaintiffs, then, gave a different reason that their written waivers are ineffective. The Childersburg Municipal Court had a separate waiver of counsel form, which was signed by many probationers, that would also have to be considered. (*See* Ex. O, Childersburg 30792, Waiver of Consent Forms.) Thus, just as this Court will have to examine individually each of the named plaintiffs to determine whether they are being truthful and understood that they were waiving their right to counsel, it would have to do the same for each class member.

Nor is there common evidence that will even show which class members were actually represented by counsel and which were not. Coons testified that this information is not contained in Probation Tracker. (Coons Dep. at 187:6–18, 195:14–17; *id.* at 156:16–22 ("And you don't know whether a particular probationer had a lawyer or not when they appeared in court, do you? . . . A. I do not know that."); *id.* at 195:14–17 ("I cannot" "tell whether people had counsel appointed for them when they were doing a revocation hearing").) Further, Coons admits that he cannot even determine if probationers were offered lawyers or what information they had about the availability of counsel. (*Id.* at 187:6–18 ("I wouldn't know that").)

### D.  Determining whether class members received suspended jail sentences and whether they were placed on probation for the purpose of collection of fines, fees, and costs will devolve into individualized inquires.

Plaintiffs assert that they and the entire class had no jail sentences. Doc. 305 at ¶ 34 ("Plaintiffs . . . are individuals **who received . . . only fines with no jail sentence**") (emphasis added). Plaintiffs appear to claim a due process violation on behalf of their first proposed class (the Assignment Class) because class members were placed on probation for the collection of fines, fees, and costs when they had no underlying jail sentence. (*See*, *e.g.*, Doc. 305 at ¶¶ 130,

147 (Count 2 – Due Process Violation).)[18] Plaintiffs then appear to make a claim for their second class (the Incarceration Class) for persons having their fine-only sentence "converted to jail sentences". *Id.* at ¶ 157. [19]

It is simply untrue that the putative class members "received . . . only fines with no jail sentence". In fact, **every probation** for Gina Ray included at least one offense for which a jail sentence was entered and then suspended. (Docs. 423-4; 423-27; 423-28; 423-31; *compare* (Doc. 305 at ¶¶ 35, 36, 41 (directly contrary allegation in complaint as to Gina Ray).) As with indigency, there is no common evidence that would allow this Court to determine which class members has a suspended sentence and which did not; or which probationers requested probation and which did not; or why they were placed on probation. Probation Tracker does not have this information, as Plaintiffs' expert testified. (Coons Dep. at 165:9–14 ("You don't know if the judge assessed them a jail sentence or not when they were adjudicated, that's not something that's in Probation Tracker, is it? . . . A. Not to my knowledge.").)

---

[18] The Fourth Amended Complaint asserts in the Due Process count:

130. **Probation is only appropriate when an individual has been sentenced to jail time** and not when only a fine has been assessed as is the case with the Plaintiffs and Class members. As a result, the Childersburg policy and contract to include probation in every court order mandates a judicial practice that continually deprives indigent misdemeanants of their constitutional rights.

. . .

147. Under this system at Childersburg, each of the Plaintiffs was first only fined, but then automatically placed on "probation" **though no jail sentence was adjudicated**. Though each of the Plaintiffs was indigent, Childersburg made no investigation of that matter.

(Doc. 305 (emphasis added).)

[19]Every count in the complaint against Childersburg includes a paragraph which states "As a proximate cause of this [wrong], the Plaintiffs and class members **suffered injuries including having fines converted to jail sentences** . . . ." Doc. 305, at ¶¶ 157 (count 2- due process), 178 (count 4 - fourth amendment), 210 (count 6 - 6th amendment), 241 (count 8 - 8th amendment), 266 (count 10 - equal protection) (emphasis added). Like each count in the complaint, many of the alleged common questions include these issues. For instance, common **question 1** is "Whether a policy . . . of placing those persons on 'probation' **for the collection of fines** . . . ." and common **question 2** is "Whether the policy and practice of **converting unpaid fines** . . . to days of incarceration" and common **question 3** is "Whether the policy and practice of requiring each "probation" order **for the collection of fines** to require additional fees for JCS is legal?" (Mot. at 33) (emphasis added).

In fact, the process would be quite a bit more complicated than even Coons suggests. To determine the reason a particular Plaintiff was placed on probation, this Court would have to examine paper records from multiple sources (if they still exist) and even then it would still have to examine a significant number of the class members individually. For example, the Childersburg Municipal Court (under Judge Ward and for at least a portion of the time under Judge Woodruff) was not consistent in how it recorded a suspended sentence. For example, adjudications were sometimes recorded on the ticket, sometimes on the docket sheet, and sometimes on the order of probation. (Ex. R, Childersburg 00023, Suspended Sentence – Tickets; Ex. S, Childersburg 25224, Suspended Sentence – Docket Sheets; Ex. T, Childersburg 35317, Suspended Sentence – Probation Orders.)  The fact that one of these sources records a suspended sentence does not mean it was recorded on either of the other two, which means this Court would have to review all three sources to determine if any particular plaintiff received a suspended sentence.[20]

Like indigency, Plaintiffs have tried to camouflage this problem by vastly enlarging their class definition. Although the Fourth Amended Complaint defines the Assignment Class as "All individuals who have in the past, or may in the future, **receive only fines and no jail sentence** . . . " (Doc. 305 at ¶ 79), this wording has been deleted in the Motion for Class Certification. *See* Section II. A. *infra.*

Tied together with the problem of suspended jail sentences is the individual issue of why probation was ordered in the first place. There is no transcript of the municipal court proceedings. The only way to know what happened for any particular class member is to ask that person what happened—both as to whether there was a suspended sentence and whether he asked to be placed on JCS probation. (Bishop Rep. at 5) ("In fact, my experience has been that it

---

[20] To the extent that this Court requires Plaintiffs to stick to the class which they pled (those with suspended sentences), it is likely that numerosity fails for a Childersburg's Assignment subclass. Plaintiffs have not shown that 50 or more persons were subjected to probation in Childersburg without an underlying suspended jail sentence.

was not uncommon for both defendants and (in cases where the defendants have retained counsel) their lawyers to request that the defendant be put on JCS probation.").

### E. Determining if indigent persons were charged fees for probation, in defiance of the terms of the contract, will be an individualized issue.

Plaintiffs' Motion insists that the "**contract requires** that each court order used to send someone to JCS 'probation' must also require payment to JCS of a 'probation' fee" (Mot. at 2) (emphasis added). It also contends that probation fees were charged to indigent probationers and that this is a constitutional violation (presumably of the Eighth Amendment for both classes).[21] In fact, Plaintiffs' common question 3 asks "Whether the policy and practice of requiring each probation order for the collection of fines to require additional fees for JCS is legal?" (Mot. at 33–34) (emphasis added). However, the contract does not "require[] each" probation order to include fees for JCS. Instead, the contract expressly stated that JCS was to supervise indigent cases "when determined by the Court" and that those cases "**will not be charged** the standard probation fee . . . ." (Doc. 392-16 at 4). (emphasis added). JCS records indicate fees were sometimes waived. For example, Plaintiff Kristy Fugatt had her JCS fees waived.

| | |
|---|---|
| 10/12/2012 LKIDD | C/C: DEF IN COURT. TO PAY $100.00 ON/BEFORE 10/31/12. ALL FURTURE JCS FEES TO BE WAIVED. EE ALREADY ACCRUED WILL BE PAID. UPON PAYMENT OF $100.00 IN OCTOBER, CASE WILL THEN BE TRANSFERRED TO THE SYLACAUGA OFFICE. IF THE DEFENDANT FAILS TO REPORT FOR ANY SCHEDULED APPOINTMENT AT THE SYLACAUGA OFFICE, CASE WILL BE TRANSFERRED BACK TO THE CHILDERSBURG OFFICE. NEXT APPT 10/31/12 |

(Coons Rep. at 82.) In other words, at the very least, it will be necessary to determine for each alleged class member whether they were indigent, whether the court found them indigent and whether they were charged such fees in spite of this direct contract clause.

---

[21] Alabama law authorizes municipalities like the City to contract with private companies for probation services. *See Wilkins v. Dan Haggerty & Associates, Inc.*, 672 So. 2d 507, 510 (Ala. 1995) ("The power to contract with a private firm to aid in the collection of delinquent municipal court fines can and must be "necessarily implied" from the power granted to cities and the obligation imposed on cities in § 12–14–2(a) to adequately support their municipal courts."); Ala. Op. Att'y Gen. No. 98-00043 (1997), 1997 WL 35271245 ("[A] municipality may enter into a contract with a private probation service to fulfill the needs of the municipal court."). Alabama law also allows a municipal judge to order a probationer to pay an administrative fee as a condition of their probation. *See* Ala. Op. Att'y Gen. No. 98-00043 (1997), 1997 WL 35271245 ("[I]t is the opinion of this Office that a municipal judge can assess a supervision fee upon each probationer as a condition of probation.").

**F.      More individual issues that will defeat predominance:**

**1.      "Badges" and "Threats" are individual issues.**

The Fourth Amended Complaint and the Motion for Class Certification include multiple allegations that "threats" were used by JCS and Childersburg—both in letter form and apparently verbally—including allegations in the Due Process count (¶156), the Fourth Amendment count (¶175), the Sixth Amendment count (¶ 203), the Eighth Amendment count (¶ 235), the Equal Protection count (¶ 258).[22] Determining if these statements were received, whether anyone perceived them as a threat, was emotionally harmed as a result, or acted as resulted, will be an individual by individual issue. For instance, Mr. Jews insists that he never received any JCS documents because he intentionally provided a false address. (*See* Jews Dep. at 58:10–16, 60:18–61:3, 87:18–19). Likewise, Ms. Ray insists that she never received any JCS documents. (*See* Doc. 423-1 at 10–16 ("I never received nothing in the mail from them."); *see also* Ray Dep. at 127:2–4, 252:12–257:21.)

The Fourth Amended Complaint also includes allegations about use of badges by JCS at Childersburg: "carried badges and regularly represented themselves as acting 'on behalf of the City of Childersburg.'" (Doc. 305 at ¶ 244; *id.* at ¶¶ 17, 25, 92, 135, 244, including the Due Process count (¶ 130, 135).) Individual, person-by-person minitrials would be necessary to determine if anyone saw a badge, or to determine if anyone was representing themselves as "acting on behalf of the City of Childersburg." For instance, Gina Ray directly denies having ever seen a badge. (Ray Dep. at 77:16–17 ("I never seen one").)

**2.      Determining whether probation exceeded the two year statutory limit would be an individual issue due to tolling.**

Both in their Motion for Class Certification and the Fourth Amended Complaint, Plaintiffs allege that it was a constitutional violation to extend the probation "beyond the two

---

[22] (*E.g.*, Doc. 305 at ¶¶ 28, 110, 141, ("JCS . . . at its discretion, uses threats . . . "), 118, 156 ("pursued through threats . . . "), 175 ("JCS . . . to threaten arrest"); 186, 203 ("threats of jail"), 220, 235, 247, 258 ("threats of arrest"), 55 ("officer came to their home . . . threatened them"); Mot. At 3,7 ("all while being threatened"; "form letters . . . routinely threatened jail . . . and other threats"), 22 ("Fugatts were called liars . . . and continually threatened with arrest"), 23 ("threatened Mr. Fugatt").)

year statutory limit". (Mot at 6; *id.* at 7 ("often" "many years beyond the two-year statutory limitation – all while being threatened and jailed"); Doc. 305 at ¶ 144 (Fourth Amended Complaint – Count 2 – Due Process allegation: "Childersburg routinely exceeded the two-year statutory maximum").) Alleged common question 9 also asks whether "policy of "extending 'probation' . . . beyond 24 months is legal." Plaintiffs' expert claims that probation duration is simple to calculate by "subtracting the Termination date . . . from the ProbationDate". (Coons Rep. at 30.) However, this calculation ignores many individualized issues. First, the probationary period can be tolled for many reasons including, for example, a petition to revoke probation. Under Alabama law, the issuance of an arrest warrant, or the initiation of probation revocation proceedings, is sufficient to toll the running of the probationary period. *Young v. State*, 552 So. 2d 879, 882 (Ala. Crim. App. 1989) (probationary term tolled when probation officer sent court a delinquency report); *Owens v. State*, 728 So. 2d 673, 678 (Ala. Crim. App. 1998) (probationary term tolled by issuance of arrest warrant). Likewise, tolling could occur because of a court order, (*see, e.g.*, Doc. 423-14 at 2, Signed Petition to Revoke Probation ("Consider this order suspending time on this case until a resolution is decided."); Ex. U, Childersburg 53109, Examples of Tolling), sickness, time spent in state or federal prison, or still other reasons. (Coons Dep. at 200:13–203:18 (does not know if he could determine whether it was tolled during the petition period or during any state prison time or during sickness).) Coons also did not determine how to account for the practice of JCS of placing a probation on hold (with no fees or actions by JCS) because of an existing probation. (Coons Rep. at 32 (probationer would be in class if terminated during the class period); *see id.* at 56 (showing that Ms. Ray had probation placed on "hold"); Ray Dep. at 243:8–22 (paid no fees to JCS for probation with Mountain Brook).) Finally, this simplistic calculation ignores the substantial group of probationers placed on warrant status before August 28, 2010, stayed on warrant status in Probation Tracker, but who never had any contact with JCS during the class period. (Ex. V, PTR, Examples of Continuous Warrant Status.)

### 3. Determining whether the statutory maximum fine has been exceeded will be an individual issue.

Plaintiffs claim that the statutory maximum fine of $500 has been exceeded for some class members and specifically include this allegation in their Due Process count (Doc. 305 at ¶ 144) and their Eighth Amendment count (*id.* at ¶¶ 230, 232). (*See also id.* at 29, 111.) Plaintiffs also list this as their common question No. 8. However, Plaintiffs' expert admits that there is no common evidence available to answer this question because JCS lumped the fines data together with the court costs data in Probation Tracker for Childersburg probationers. (Coons Dep. at 208:9–216:24.)[23]

### 4. The statute of limitations creates yet another individual issue.

In addition to the many other individual issues, the statute of limitations will be a necessary inquiry for many persons (and for portions of other class members claims). In its Order on the City's Motion to Dismiss opinion, this Court agreed that two of the named plaintiffs (Jews & Ray) had claims which originated outside of the two year statute of limitation ("both cases originated outside of the limitations period"). Doc. 67 at 16. However, this Court held that it was necessary to determine when "the plaintiff is aware or should have been aware who has inflicted the injury" and "knows or has reason to know of the injury." *Id.* at 17. Because "the time at which Ray and Jews became aware of their alleged injuries or realized who had allegedly inflicted such injuries" was not clear, this Court denied the Motion to Dismiss. Thus, this statute of limitation issue will require individual minitrials to determine the time at which each class member "became aware" of "the injury" and "who had allegedly inflicted such injuries. *See LaBauve v. Olin Corp.*, 231 F.R.D. 632, 675 (S.D. Ala. 2005) ("Courts have found that disparate,

---

[23] Likewise, Plaintiffs' Motion alleges on page 6 that "it was **routine** for JCS to retroactively add to a current 'probation' any old fines or tickets found to be existing on the City's books . . . ." (Mot. at 6) (emphasis added). Notably, there is no allegation that this practice ever occurred to the named plaintiffs (who would therefore have no standing to claim for it). In fact, the testimony from the JCS witness was to the opposite and stated that "I would not do that [without a specific court order]." (Kidd Dep. (Vol. I) at 208:8.) Certainly this will also require yet another individual inquiry. Even the documents cited by plaintiffs in their Motion relate to only two probationers and would appear to relate to actions taken a decade ago in 2006 for one person (that is, the alleged action of adding occurred in 2006) and 2008 for the other person and, at best, are not sufficient without individual inquiry.

individualized assessment of the statute of limitations issue itself may cause individual considerations to predominate for purposes of a Rule 23(b)(3) inquiry.").

> **5.   Determining bond amounts and reasonableness will be an individualized issue.**

Plaintiffs' Fourth Amended Complaint appears to claim that the bond amounts violated the Eighth Amendment. (Doc. 305 at ¶¶ 28, 110 ("unreasonable bond requirements).) Determining the reasonableness of any particular bond will be an individual issue. *United States v. James*, 674 F.2d 886, 891 (11th Cir. 1982) (standard is "whether the amount is higher than reasonably necessary to assure the accused's presence"). Further, Plaintiffs' expert testified that he does not know whether he could determine what bond amount (or bond type) was set for a particular probationer who was arrested unless the warrant was scanned into Probation Tracker (something which clearly did not occur in Childersburg or Columbiana). (Coons Dep. at 218:10–24 ("can't tell what the bond amounts were set"; "I don't know"); Ex. B, Childersburg 12449, Ray Bond; Ex. C, Childersburg 14576, Bond Reduced – Waived.)   Further, there is record evidence that the magistrates for Judge Ward and Judge Woodruff would meet with those jailed and reduce their bond. (Ray Bond; Bond Reduced–Waived; Ex. D, Childersburg 54750, Bond Hearings; Childersburg Court Transcript for March 13, 2014, at 13:17–21 (Magistrate Brenda Wyers met with offender to conduct 72-hour hearing).) Coons also agrees that he cannot determine whether what bond amount (or type) was ultimately allowed for a probationer because Probation Tracker would not have that information (that is, whether the bond amount was reduced or even eliminated). (Coons Dep. at 227:13–24 ("can't tell from Probation Tracker what type of bond" "I don't believe so").)

> **G.   The policies and procedures of the Childersburg Municipal Court changed many times and in many different ways during the class period.**

Courts have consistently held that class certification is inappropriate when the challenged policy or procedure changes in a substantial and material way over the duration of the class period. *Corley v. Google, Inc.*, No. 16-CV-00473-LHK, 2016 WL 4411820, at *8 (N.D. Cal.

Aug. 19, 2016) (noting, among other things, that changes in privacy policies over time would have defeated predominance finding); *Rosen v. Fid. Fixed Income Trust*, 169 F.R.D. 295, 299–300 (E.D. Pa. 1995) (denying class certification as to some securities claims because the challenged misrepresentations changed over time).

Plaintiffs seek a class that spans from August 28, 2010 to present. But during that time the Childersburg Municipal Court underwent a number of changes, each of which would have a material impact on the claims of the putative class. These changes include:

- **Different judges**. Judge Larry Ward was on the bench from August 2010 to November 2013. Judge Price was on the bench from December 2013 until January 2014. Judge Woodruff was on the bench from January 2014 to present. Each judge had his own way of conducting court, own way of making indigency determinations, own way of imposing sentences, own way of record keeping, etc. (*See* Childersburg Court Transcript for March 13, 2014, at 33:6–12) (Judge Woodruff terminating probation older than two years); *id.* at 11:3–12:16, 16:25–27:25 (Judge Woodruff conducting indigency inquiry, offering appointed counsel, and granting affidavit of substantial hardship).) Gina Ray acknowledged that the Childersburg Municipal Court under Judge Woodruff was different than under Judge Ward. (Ray Dep. at 178:6–10.)

- **Different magistrates**. Magistrate Brenda Wyers served as the full time magistrate/court clerk until approximately May 2014, when she went on sick leave. (Hepp Dep. (Vol. I) at 29:12–30:4.) Ms. Wyers worked sporadically between May 2014 through September 2014, until the current magistrate/court clerk Misty Hepp was appointed in September 2014. (*Id.* at 30:5–12).

- **Different notice procedures**. Before November 2012, the Childersburg Municipal Court would rely on JCS to send notices of probation revocation hearings. (*See* JCS Notice Letters.) After that date, the Court began issuing subpoenas in addition to the JCS notices. (*See* Ex. I, Childersburg 25753, Subpoena Log and Exemplars.)

- **Different probation administration procedures including bonds and warrants**. The Childersburg Municipal Court adopted different written procedures on August 29, 2014. (Ex. W, Childersburg 46708, Standing Order on Procedures.) Among many things, the changes concerned the bond procedures so that cash bonds are no longer used and persons can use a simple procedure of personal recognizance for bonding out of jail, even if arrested. Further, these procedures set a bond schedule and provided authority for the Magistrate or the Judge to move downward below the schedule. (Hepp Dep. (Vol. I) at 74:4–76:2; Doc. 392-14, Hepp Dep. (Vol. II) at 401:15–19; 405:10–17; 408:13–409:14; 414:2–21.) The procedures also included rules substantially limiting the

circumstances for warrants. JCS was terminated in May 2015 and has not been involved with the Childersburg Municipal Court since that date. (Ex. X, Childersburg 049750, Resolution 2015-17.)

- **Appointment of a Public Defender**. In July 2012, the Childersburg Municipal Court hired a public defender who was present in the courtroom and available to assist indigent defendants at no charge. (*See* Hollingsworth Appointment.) While the Childersburg Municipal Court appointed private attorneys on a case-by-case basis before that date, the evidence of private appointments versus representation by a flat-fee public defender will necessarily be different.

These material variations will necessarily require different evidence and different legal analysis for unique to each time period.[24]

### H.    Predominance fails because of the need for individual inquiry into damages for each putative class member for each of the myriad of alleged wrongs.

In addition to all of the other problems with predominance, individualized damages assessments would substantially predominate over the common question. These determination of whether any damage actually occurred (and then the amount) would be necessary (1) for **each** putative class member, (2) for **each** of the myriad allegations were actual constitutional violations. Damage calculations—by themselves—are sometimes not sufficient to destroy predominance, but when the damages are individualized—especially emotional harm and personal injury (requiring minitrials both for the existence and amount for each class member), they can defeat predominance—particularly combined with the staggering number of other individual issues identified above. *Brown*, 817 F.3d at 1239–40 (explaining that the "individual nature of the plaintiffs' damages is still relevant to whether predominance is satisfied" and that "individual damages defeat predominance if computing them 'will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable.'") (citation omitted).

---

[24] In addition, there is evidence that Judge Woodruff provided jail credit (Burnette Dep. at 143:13–19) and that Woodruff and Price sometimes setup probation to have a regularly schedule compliance hearing with the Court. (Ex. Y, Childersburg 52631, Compliance Hearings; Doc. 392-2, Kidd Dep. (Vol. I) at 121:16–122:12.)

Among the many individual issues driving the variation in damages would be: (1) Was the class member only arrested and released (Fugatts) or arrested and jailed (Ray & Jews), (2) How long was the Plaintiff in jail? (3) What were the conditions? (4) Had the class member been in jail before?  How many times? Can they recall this jail time? (5) Would they have been in jail for other charges also? (6) How was the arrest conducted? (Fugatt allegations), (7) Did others know of the arrest? Did it affect the class member's reputation or their job or personal relationships? Did they lose wages? (8) How did the jailing affect the class member's mental state?  Did they miss sleep? Did they need counseling or medical or drug treatment? Did they experience depression? Is the effect permanent or temporary (for how long)?  *See Amador v. Baca*, 299 F.R.D. 618, 626–28 (C.D. Cal. 2014) (rejecting class certification for a 1983 action regarding strip searches because of the individual nature of damages).[25]

In fact, the Eleventh Circuit has spoken directly to the difficulties of certifying any class action involving subjective, individualized damages like emotional harm, loss of reputation and other compensatory damages. For instance in *Rutstein*, 211 F.3d at 1240, the court rejected (b)(3) certification in the similar §1981 context because (among many reasons) of the individualized damages ("impossible to calculate the sum of damages [including "mental and emotional

---

[25] *See Wrightsell v. Sheriff of Cook Cty.* No. 08 cv 5451, 2009 WL 482370 (N.D. Ill. Feb. 19, 2009) (section 1983 class cert denied: "the issues of individual causation and damages would likely encompass the vast majority of the time and resources necessary to judge inmates' claims . . . therefore, certification of the narrow issue of the jail's reduction of dental staff would not satisfy the predominance requirement"); *Rattray v. Woodbury Cty.*, 253 F.R.D. 444, 464 (N.D. Iowa 2008) (denying class certification for § 1983 strip search case because of need to determine reasonable suspicion for each class member and their facts even if policy was "uniform" and therefore damages); *see also Reynolds v. New Orleans City*, 272 F. App'x 331, 342 (5th Cir. 2008) (denying class certification of § 1983 action because, among many reasons, "individual issues of class members, such as damages, causation, and liability, would predominate over the common ones"); *Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 195 (E.D. Pa. 2009) (denying class certification in § 1983 race discrimination claim against SEPTA because "most of the requested damages are not subject to across-the-board relief, but rather require individualized inquiries to determine, not only the proper method for computing front pay, back pay, and fringe and pension benefits . . . but also the humiliation and mental anguish compensatory damages"); *Atwell v. Gabow*, 248 F.R.D. 588, 590 (D. Colo. 2008), *judgment entered*, No. CIVA 06CV02262CMAMJW, 2009 WL 112492 (D. Colo. Jan. 15, 2009) *aff'd*, 311 F. App'x 122 (10th Cir. 2009) (denying class certification in race discrimination action against hospital because the individual claims of the eight representatives had already been consolidated and because the individualized questions—emotional distress, lost wages, and damage to reputation—predominated).

distress"]"; any damage award would be less than a "guess"; "profoundly individualistic nature of each plaintiff's claim for damages").[26] Although in the (b)(2) context, the Eleventh Circuit made virtually the same statement in *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001), observing that the plaintiffs were seeking damages "for their alleged individual 'pain and suffering, mental anguish and humiliation'" and concluded that "assessing damages for these inherently individual injuries compels an inquiry into each class member's individual circumstances."

Nor can the Plaintiffs avoid the force of these cases by arguing that some sort of presumption of damages is appropriate. The Supreme Court has made clear that the value of damages under § 1983 cannot be determined in the abstract, but must be based on "proof of actual injury." *Memphis Cmty Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986). This is because "[t]he basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). "[D]amages for violations of constitutional rights are determined according to principles derived from the common law of torts." *Cummings v. Connell*, 402 F.3d 936, 942 (9th Cir. 2005). Thus, compensatory damages for constitutional torts "may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering." *Stachura*, 477 U.S. at 307 (citation and internal quotation marks omitted); *Carey*, 435 U.S. at 263–64 (recognizing possibility of emotional distress damages for constitutional torts).

---

[26] *See also Gilliam v. HBE Corp.*, 204 F.R.D. 493, 498 (M.D. Fla. 2000) ("Earlier this year, the Court of Appeals for the Eleventh Circuit decided *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 (11th Cir. 2000); **that case illustrates the virtual impossibility of certifying a class in a non-employment civil rights case where class members seek compensatory and punitive damages**.") (emphasis added); *Heng v. Donald*, No. 7:08-cv-5(HL), 2010 WL 497347, at * 5 (M.D. Ga. Feb. 4, 2010) (rejecting class certification in a § 1983 action and noting the Eleventh Circuit's position that excessive use of force claims are "especially unsuited to class disposition"; "Eighth Amendment law requires the separate examination of the facts of each class member's claim, along with an individualized determination of liability. In addition, a separate damages trial will be required for every class member").

Importantly, the Supreme Court has directly rejected the argument that "injury fairly may be 'presumed' to flow from every denial of procedural due process." *Carey*, 435 U.S. at 261. "[T]he abstract value of a constitutional right may not form the basis for § 1983 damages." *Stachura*, 477 U.S. at 308; *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000) (injuries cannot be presumed, nor may they be "based on the abstract value of the constitutional rights").[27]

## I.   Alleged "common" questions which are not pled or do not constitute actionable constitutional violations are not relevant to the predominance determination.

Several of the questions listed as "common" by Plaintiffs are simply not part of this lawsuit and therefore not relevant. For instance, **question 13** asks about whether Childersburg "can enter into a no bid contract". The Fourth Amended Complaint has no such claim. Plaintiffs attempted to file a Third Amended Complaint to add these claims on July 10, 2015. (Doc. 226.) The City opposed this amendment. (Doc. 230.) This Court denied Plaintiffs' effort to amend and add new theories of the case, saying "**I think that would be a prejudice to the defendants at**

---

[27] Although not even mentioned in Plaintiffs' brief, there is some authority in other Circuits allowing a § 1983 class where "dignity" damages can be presumed. However, each and every case located which allows class certification for "dignity" damages involves a **single "policy"** which allegedly violated § 1983 (for instance, strip searches, which are typically done at the same place, for the same reasons, using the same methods). *See, e.g., Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 157 (E.D.N.Y. 2011) ("injury to human dignity was necessarily entailed in being strip searched and thus was common to each member of the class to its cause and the resulting general, or presumed—as distinct from the special—damages"). Here, Plaintiffs have still not identified a single policy but instead have alleged (1) many different wrongs, (2) done to many different people, (3) at many different times, (4) by many different people.

Further, the law in the Eleventh Circuit does not allow for presumed damages in a § 1983 action, unlike the law in the Second Circuit where *Augustin* was decided. *See, e.g., Slicker v. Jackson*, 215 F. 3d 1225, 1229–30 (11th Cir. 2000) (stating that under § 1983 damages may only be awarded "based on actual injuries caused by the defendant and cannot be presumed or based on the abstract value of the constitutional rights that the defendant violated."); *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985) ("compensable damage may not be presumed but must be proven."). As the Eleventh Circuit has explained, a plaintiff may prove emotional distress damages through his own testimony but that "testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; **neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award for compensatory damages**." *Akouri v. State of Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) (emphasis added). Instead, such damages are "customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Id.*

**this point if new theories or claims are added**." (Doc. 251, Transcript of July 2, 2015 Hearing, at 22:6–8 (emphasis added).) Likewise, **question 11** ("hiring private probation companies who are financially interested . . . is legal") is not part of an alleged cause of action in the Fourth Amended Complaint. Plaintiffs should not be allowed to circumvent this Court's decision by adding new claims that were previously disallowed.

## II.   The definitions for Plaintiffs' proposed classes impermissibly expand the definitions pled in their Fourth Amended Complaint and, in any event, are not administratively feasible to ascertain.

An implicit requirement of Rule 23(a) is that the class be ascertainable. *See Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012). A class is not ascertainable unless the class definition contains **objective criteria** that allow for class members to be identified in **an administratively feasible way**. Identifying class members is administratively feasible when it is a manageable process **that does not require much, if any, individual inquiry**." *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 946 (11th Cir. 2015) (emphases added) (internal quotation marks omitted); *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014). Plaintiffs have the burden to show that the class is ascertainable. *Carrera v. Bayer Corp.*, 727 F.3d 300, 306–07 (3d Cir. 2013) ("A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.").

### A.   Plaintiffs' proposed class definitions are larger than those plead in their complaint and in direct contradiction to this Court's order denying Plaintiffs' leave to amend their complaint (Doc. 230).

Generally, a plaintiff is stuck with the class definition plead in their complaint. *See, e.g.*, *Costelo v. Chertoff*, 258 F.R.D. 600, 604–05 (C.D. Cal. 2009). Some courts have allowed a plaintiff **to narrow** the class definition at the class certification stage, but this is the exception rather than the rule. *See, e.g.*, *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015). Indeed, numerous courts have concluded that **expanding** the class definition at the certification stage would prejudice the defendant. *See, e.g.*, *Bee, Denning, Inc. v. Capital All.*

*Grp.*, 310 F.R.D. 614, 621 (S.D. Cal. 2015) (disallowing change to class definition at certification stage to add claims regarding "residential" as well as "cellular" telephones); *Zapata v. IBP, Inc.*, 175 F.R.D. 578, 579, n.1 (D. Kan. 1997) (disallowing change to class definition at certification stage that broadened class by deleting phrase "who have or will have been subjected to a hostile or abusive work environment because their ethnicity or ancestry").

Plaintiffs' proposed class definitions are much more expansive than the class definitions alleged in their Fourth Amended Complaint. Indeed, Plaintiffs' expert did not even attempt to render an opinion on the classes as pled. (Coons Dep. at 305:20–22 ("Q: Now, you have not rendered an opinion on [the Assignment] class [as pled in the Fourth Amended Complaint], have you? A: No."); *id.* at 306:6–8 (same for Incarceration Class); *id.* at 308:4–7 ("Q: Why did you render an opinion on the class that was different from the class in the complaint? A: That was discussion with counsel. I don't have another answer than that.").)

While Plaintiffs state that they "**have refined** the class definition," (Mot. at 20) (emphasis added), that is simply not true. As shown by the below chart, the class definitions in Plaintiffs' Motion for Certification deletes key limiting language so that the proposed classes would include hundreds of people who, until now, were not part of this case.

| Class in the Fourth Amended Complaint (Doc. 305) | Class in Motion for Certification (Doc. 401) |
|---|---|
| **Assignment Class** | **Assignment Class** |
| All individuals who have in the past, or may in the future, receive only fines **and no jail sentence for charges** before the Alabama municipal courts which employ JCS and whose fines were, or may be in the future, converted to a probation under JCS;<br><br>(Doc. 305, ¶ 9.) | All individuals who, as of August 28, 2010 or thereafter, **were assigned by municipal courts in Alabama to "probation" with JCS for the collection of fines, fees and costs**.<br><br>(Mot. at 15.) |

| Incarceration Class | Incarceration Class |
|---|---|
| All individuals who, **despite their indigency,** were incarcerated, or may be subject to incarceration, without consideration of their indigency for failure to pay charges and fees **for services allegedly rendered by JCS to Alabama governments with which it contracts**.<br><br>(Doc. 305, ¶ 9.) | All individuals who, **after being assigned to JCS by August 28, 2010 or thereafter**, were incarcerated, **without consideration of their indigency** for failure to pay fines, fees and costs.<br><br>(Mot. at 15.) |

For example, the Assignment Class, as pled, is limited to persons who "**receive only fines and no jail sentence**." The Motion for Class Certification removes this limitation so that the class now includes anyone assigned to probation with JCS. By dropping the "no jail sentence" limitation, Plaintiffs have dramatically expanded the class from a small subset of persons assigned to JCS to everyone listed in Probation Tracker. This change is even broader than the change Plaintiffs attempted to make in their Third Amended Complaint—the one this Court rejected. (Doc. 244; Transcript of July 2, 2015 hearing, page 22:6–8) (emphasis added.))

| Fourth Amended Complaint (Doc. 305.) | Rejected Third Amended Complaint (Doc. 224-1) | Motion for Class Certification (Doc. 401.) |
|---|---|---|
| All individuals who have in the past, or may in the future, receive only fines **and no jail sentence for charges** before the Alabama municipal courts which employ JCS and whose fines were, or may be in the future, converted to a probation under JCS . . .<br><br>(Doc. 305, ¶ 9.) | All individuals who have in the past, or may in the future, **be charged fines for charges before the Alabama municipal courts** which employ JCS and whose fines were, or may be in the future, converted to a probation under JCS . . . .<br><br>(Doc. 224-1 at 2.) | All individuals who, as of August 28, 2010 or thereafter, **were assigned by municipal courts in Alabama to "probation" with JCS for the collection of fines, fees and costs**. . . .<br><br>(Mot. at 15.) |
| | **Reason that the change expands the class** | |
| Limits class to persons who received a fine but no jail sentence. This class would not include someone like Gina Ray who received a suspended sentence for at least five of her six offenses. | Expands class to include anyone who was charged fines and fees and who was placed on JCS probation. | Expands class to everyone assigned to JCS probation who was assessed fines and fees as well as costs. |

In proposing an even broader class definition here than they did in the rejected Third Amended Complaint (without even asking for permission to amend), Plaintiffs are attempting an end run around this Court's order.

Likewise, the Incarceration Class, as pled, limits the class to people who were actually indigent. There is good reason for this limitation—namely, there can be no constitutional violation unless an offender is actually indigent. The Motion for Class Certification, however, eliminates the phrase "despite their indigency" in an effort to avoid the need for individualized indigency inquiries. In so doing, Plaintiffs attempt to sweep many people into the class who could not have been injured by a failure to consider their indigency. For that reason, ascertainability is not satisfied here. *See* Section II.B *infra*. Further, the Incarceration Class, as pled, limited the class to persons who were jailed "for failure to pay charges and fees **for services allegedly rendered by JCS to Alabama governments**." The Motion for Class Certification expands this class beyond persons who were jailed for failing to pay fees and charges to JCS to include persons who were jailed for failure to pay any kind of fine, fee, or costs. These are material changes and allowing them at this stage of the litigation would prejudice the City.

> **B.     The class definitions proposed in Plaintiffs' Motion fail the ascertainability requirement because they include people who could not have been harmed and because there is no administratively feasible way to determine class membership.**

Here, Plaintiffs' proposed classes would still fail for at least two reasons: (1) the proposed classes contain hundreds of persons who have could not have been injured, and (2) the proposed classes would require individualized and subjective inquiries. Numerous courts have concluded that a class definition that includes people who could not have been injured is too broad. *See Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012) (affirming denial of class certification because class definition included persons who had never been injured and excluded persons who could had been injured); *C.C. ex rel. A.C. v. Sch. Bd. of Broward Cty.*, No. 10-60032-CIV, 2014 WL 4771751, at *8 (S.D. Fla. Sept. 24, 2014) (class not ascertainable

when it included every student with particular medical condition even though many would not have a claim); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant.").

Again, Plaintiffs claim that their new class definitions "include only those who were harmed by" "post conviction collection practices which extort money." (Mot. at 20.) The new class definitions, however, would include thousands of persons who were never harmed by any post-conviction collection practices. It will also include persons who have no damages because they successfully paid off their fines and fees without incident. Plaintiffs' expert is not aware of any damages for these persons, (Coons Dep. at 168:4–11) and the same could be said for those persons who asked to be assigned to JCS probation. Further, many people who were assigned to probation "as of August 28, 2010"—and therefore would be part of the Assignment Class—had no interaction with JCS after August 28, 2010 (for instance, those on warrant status before that date but were not terminated from Probation Tracker). (Coons Dep. at 312:2–317:22; Kidd Dep., (Vol I) at 240:3–23.) To the extent they ever had a claim, it is clearly barred by the statute of limitations. Likewise, the Incarceration Class now includes anyone who was incarcerated "without consideration of their indigency." But there is no constititutional violation for failing to consider indigency if the person is not indigent. *See* Section I.A *supra*. Similarly, the Assignment Class now includes anyone who was on probation, regardless of whether they had a suspended sentence. But it is not per se unlawful to put someone on probation when they have a suspended jail sentence. *See* Ala. Code § 12-14-13(a).

Along the same lines, both proposed classes are not ascertainable because they will require subjective or individualized inquiry. *See Inetianbor v. Cashcall, Inc.*, 314 F.R.D. 535, 537 (S.D. Fla. 2016). As explained above, determining indigency, whether the class member had a suspended sentence, whether they were arrested, and whether they went to jail and why are just a few of the inquiries that will be required in this case. Other than Probation Tracker, Plaintiffs have not proposed a way to answer these questions. This is not surprising because answering

them would involve reviewing multiple records from multiple sources and could even require individualized testimony from any particular class member.

### III.   Plaintiffs have not affirmatively shown that a class action is manageable or superior to other proceedings.

"[A] class action [must be] superior to other available methods for **fairly and efficiently** adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). "The focus of this analysis is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183–84 (11th Cir. 2010) (internal quotation marks omitted). The primary purpose of a Rule 23(b)(3) class action is "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

Additionally, "the predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Id.* at 1184. *"*The converse is also true: the less common the issues, the less desirable a class action will be as a vehicle for resolving them." *Id.* Thus, when a significant number of individualized issues must be resolved in later proceedings, the judicial efficiencies that can be achieved through class treatment often disappear. *See Norwood v. Raytheon Co.*, 237 F.R.D. 581, 604 (W.D. Tex. 2006); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.), a*mended by* 273 F.3d 1266 (9th Cir. 2001) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'").

In this case, the primary justification for class treatment—the negative value suit—is missing. Section 1983 allows plaintiffs to recover actual damages such as mental anguish.

Verdicts in other § 1983 actions can number in the hundreds of thousands of dollars.[28] Presumably, Plaintiffs would argue that the highly individualized claims of Kristy and Timothy Fugatt meet those standards. For instance, their Motion includes a lengthy factual section of the Fugatt's claims which alleges (1) that Fugatts were placed on probation while indigent for charges that were *nolle prossed,* (2) that they were then "threatened" even though they told JCS they could not pay because of their son's terminal illness (3) that the threats continued even after Mr. Fugatt paid off his fine because his payments were improperly recorded the amounts of his payments, (4) that they were eventually arrested at their home in front of their young children, threatened with a "taser" and told that the Department of Human Resources would take custody of the children while they were incarcerated, and (5) even after their arrest, JCS continued to demand money from Ms. Fugatt for someone else's probation. (Mot. at 21–24.) Plaintiffs have presented no evidence that the costs of litigating these claims would outweigh any potential recovery. Moreover, § 1983 allows each plaintiff to recover attorneys fees, which means class members will can still be made whole even if their claims are relatively small.

Individual actions will also be more manageable and efficient than a class action. The lack of common proof means that critical issues of liability—indigency status, the fact of arrest, the reason for the arrest, the reason for any jail time, whether the offender was represented by counsel, etc.—will dominate any trial. Plaintiffs cannot merely assume these issues away, they must prove them. Defendants must also have the chance to present individualized defenses.[29] As noted above, Plaintiffs lack of a trial plan underscores this point. Plaintiffs, of course, do not want to talk about how a trial on the merits would occur because it would highlight the variation

---

[28] *See Graham v. City of New York*, 128 F. Supp. 3d 681, 715 (E.D.N.Y. 2015) (jury award of $150,000 for person wrongfully detained for one hour); *Ellison v. Balinski*, 625 F.3d 953, 959 (6th Cir. 2010) (jury award of $100,000 for wrongful search because plaintiff was required to stand in driveway while police searched his home and neighbors and family members watched); *Young v. City of Little Rock*, 249 F.3d 730, 736 (8th Cir. 2001) (plaintiff awarded $100,000—$135,000 in 2016 dollars—for spending two days in jail after wrongful arrest and strip search).

[29] Additionally, because Plaintiffs will need to prove many of the same issues in the follow-on proceedings, these proceedings risk running afoul of the Seventh Amendment. *See Castano v. Am. Tobacco Co.,*, 84 F.3d 734, 750 (5th Cir. 1996).

in the elements of their claims as well as the need for individualized proof. But without some idea of what evidence will establish which elements (or an understanding of how the court will charge the jury), it is impossible to analyze whether this case could be manageably tried as a class action. Thus, superiority is lacking here.

At the very least, a joint trial involving the City and JCS would pose grave concerns of jury confusion and about imposing respondeat superior liability on the City. It is well settled that the City can only be liable if **the City's** official policies or customs violated the Constitution and proximately caused the Plaintiffs (and the class) to suffer actual damages; there is no respondeat superior liability under § 1983. *See Hippele v. Palm Beach Cty. Bd. of Cty. Comm'rs*, No. 09-80089-CIV, 2010 WL 3123258, at *4 (S.D. Fla. Aug. 9, 2010). While the touchstone for § 1983 liability for a municipal corporation or a private one is the presence of unconstitutional policy or procedure, *see Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999), the policies and procedures of JCS and the Childersburg Municipal Court are not the policies and procedures of the City. *See Harris v. City of Austin*, No. A-15-CA-956-SS, 2016 WL 1070863, at *7 (W.D. Tex. Mar. 16, 2016) ("[A] municipal judge's failure to follow state law or federal constitutional law by neglecting to inform criminal defendants of their right to counsel [at either a pre-conviction or post-conviction hearing] did not transform that failure into municipal policymaking.") (internal quotations omitted). This Court indicated at the Motion to Dismiss stage that the adoption of the contract with JCS might be the relevant policy. Determining whether this contract proximately harmed the plaintiffs will be completely different than the analysis of JCS's conduct. Indeed, the City's contract with JCS expressly prohibits the conduct that Plaintiffs contend violates the Constitution. *See Section I.E supra*. For that reason, a class action trial with multiple defendants subject to different legal standards for liability with different facts fails superiority. Even if any class is certified, this Court should at the least sever that trial of JCS and the City.

**IV.     Plaintiffs are not adequate to represent the class.**

If a plaintiff lacks standing to bring a claim or his claim fails a matter of law, then he is not an adequate class representative. *See Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987). Moreover, even if a plaintiff has standing to assert a claim—violation of due process for example—they do not have standing to challenge those practices that they did not encounter. ("[I]njury requirement is not met by alleging that injury has been suffered by other, unidentified members of the class to which the plaintiff belongs and which he purports to represent.") (internal alterations omitted).

Here, none of the named Plaintiffs have standing to represent the incarceration class. To be a member of this class, a person must (1) have been incarcerated, (2) without consideration of his indigency, and (3) for the failure to pay fines, fees, and costs. As noted above, each of the named plaintiffs were arrested on capias warrants after they failed to appear at noticed hearings rather than for failing to pay.

It is also clear that Plaintiffs Gina Ray and Deunate Jews[30] are inadequate to represent the Assignment Class because their claims are time barred under § 1983's two year statute of limitations for claims brought in Alabama federal courts. *See e.g., Lufkin v. McCallum*, 956 F.2d 1104, 1106-08 (11th Cir. 1992).

Finally, as explained in the City's Motions for Summary Judgment, which are incorporated herein by reference, (*see* Docs. 390, 391, 422), the claims of each named plaintiff fail as a matter of law. For all these reasons, none of the named plaintiffs are adequate to represent the class.[31]

---

[30] Mr. Jews is also inadequate to represent the putative class because he is currently in Alabama State Prison. (Ex. Z, AlaCourt Docs, Jews Prison Documentation.) It seems likely that Mr. Jews will remain in state prison through the trial of this matter. (*Id.* at 7 (indicating sixty months confinement).)

[31] For many of the same reasons, Plaintiffs cannot meet the typicality requirement of Rule 23(a). Typicality requires that a "class representative [] possess the same interest and suffer the same injury as the class members." *Shepherd v. Vintage Pharm.*, LLC, 310 F.R.D. 691, 698 (N.D. Ga. 2015) (quoting *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).) In *Shepherd*, the plaintiff claimed she was injured by allegedly defective birth control pills because she became pregnant and delivered a baby to term. The Court concluded that her claim was not typical of class members who did not become pregnant

**V.    Plaintiffs cannot seek certification under Rule(b)(2) because the Childersburg Municipal Court no longer uses JCS, operates under different policies and procedures, and because Plaintiffs primarily seek monetary relief.**

There is no dispute that the City has "fired JCS and [that] JCS has . . . left the state of Alabama." [32] (Mot. at 40.) Nor is there any dispute that Childersburg Municipal Court adopted new procedures in August 2014. (*See* Doc. 128-1.) Nonetheless, Plaintiffs move for certification under Rule 23(b)(2), claiming that "a declaratory judgment and injunction will be necessary to prevent the recurrence of these problems in the future." (Mot. at 40.)

This argument is misguided for at least three reasons. First, it is well settled that a request for injunctive relief is moot when the Plaintiff is unlikely to encounter the offending conduct in the future. *See Sierra Club v. Tenn. Valley Auth.*, 592 F. Supp. 2d 1357, 1375–76 (N.D. Ala. 2009) ("Equitable relief is a prospective remedy, intended to prevent future injuries" and "[w]hen the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury.") (quoting *Adler v. Duval Cty School Bd.,* 112 F.3d 1475, 1477 (11th Cir.1997)). A government actor like the City is entitled to "rebuttable presumption that the objectionable behavior will *not* recur." *See Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004). "When government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit." *Id.* Courts only reject a mootness

---

or who did not carry a baby to term. *Id.* Here, the named plaintiffs claims are not typical because their factual situations differ from the majority of other class members. For example, the Fugatts claim they were arrested after they had paid their fines in full or were erroneously assessed fines belonging to another probationer. (Mot. at 22–23.) Similarly, Mr. Jews' charges were *nolle prossed* whereas the majority of class members either pled guilty or were found guilty and given a suspended sentence.

[32] Plaintiffs' counsel is well aware that injunctive relief is inappropriate here.

THE COURT: "So we're not dealing with any injunctive relief claims as to JCS at this point?

MR. EVANS: As long as they never come back, yes, sir, that's right.

THE COURT: Well, at this point they're not here, so I don't know how I could enjoin them. It would be, basically, if you come back, follow the law injunction, wouldn't it?

MR. EVANS: I suppose so.

(Doc. 378, Transcript of June 7, 2016 Hearing, at 14:1–8.)

challenge "when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated." *Id.* at 1284.

In June 2015, the City terminated its contract with JCS and in November 2015, JCS left the state of Alabama entirely. Moreover, the Childersburg Municipal Court has adopted new procedures governing bail, sentencing, probation revocations, etc., that largely track the language of the Alabama Rules of Criminal Procedure. Accordingly, Plaintiffs' claims for injunctive relief are moot and Rule 23(b)(2) certification is inappropriate on this basis alone.

Second, the procedural safeguards of Rule 23(b)(3) dictate that a class seeking primarily monetary relief must be certified under Rule 23(b)(3). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–62 (2011) ("[Rule 23(b)(2) does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."); *id.* at 360-62.[33] Even before *Wal-mart*, monetary relief was only appropriate for a Rule 23(b)(2) class when it was incidental and flowed directly to the class as a whole. *See Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001). Here, Plaintiffs attempt an end-run around Rule 23(b)(3) by calling the monetary relief they seek "restitution." Numerous post-*Wal-mart* courts have concluded that restitution is not relief appropriate for a Rule 23(b)(2) class. *Janes v. Triborough Bridge & Tunnel Auth.*, No. 06 CIV. 1427 BSJ HBP, 2011 WL 10885430, at *5 (S.D.N.Y. Oct. 5, 2011) (restitution inappropriate for (b)(2) class); *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 286 (E.D. Pa. 2013) (same). Restitution is especially inappropriate here because Plaintiffs' claims for injunctive relief are moot and thus, there is no need for injunctive relief. Further, restitution will not function as a "group remedy" incidental to injunctive relief, but would require individualized analysis of each Plaintiff to determine (a) were they were lawfully on probation, (b) did they pay JCS fees, (c) if so, how much, (d) what (if any) was remitted to the City, etc. For this additional reason, Rule 23(b)(2) certification is inappropriate here.[34]

---

[33] Tellingly, Plaintiffs cite only to pre-*Wal-mart* decisions for the proposition that monetary relief can be equitable in nature.

[34] Plaintiffs' Motion for Class Certification also request a constructive trust. (Mot. at 43.) However, Plaintiffs never mentioned that they might seek a constructive trust in their Fourth Amended

Here, Plaintiffs have not articulated what practices this Court should enjoin. Thus, it is impossible to analyze whether a single injunction will provide relief to each class member.[35] Even so, it is obvious that a single class-wide injunction is unworkable given the variations in the elements of Plaintiffs' five causes of action, the different practices that Plaintiffs claim amount to a constitutional violation, and the many different factors bearing on liability for the alleged violations. In short, Plaintiffs appear to want this Court to conclude that "the JCS system" is "bad" and enjoin the City from using that system. At this high level of abstraction, any injunction would be nothing more than a command to "obey the law." Because it is impractical to devise a single injunction that will provide relief to the entire class, Rule 23(b)(2) certification is inappropriate here.

## VI.    Issue certification under Rule 23(c)(4) is inappropriate.

Plaintiffs assert, without analysis or case law, that this Court should certify issue classes under Rule 23(c)(4). (Mot. At 49-50.) "[C]ourts have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 316 (S.D. Ala. 2006) (Steele, J.); *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 651–52 (M.D. Fla.

---

Complaint. In any event, the "property" that Plaintiffs seek a trust over—the allegedly unlawful JCS fees—are in the possession of JCS, not the City. Accordingly, Plaintiffs cannot obtain a constructive trust against the City. *See* Restatement (Third) of Restitution and Unjust Enrichment § 55 cmt. f (2011) ("A claimant who can show unjust enrichment, but who cannot identify such property in the hands of the defendant, is not entitled to the remedy of constructive trust.")

[35] Rule 23(b)(2) certification is only appropriate when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014) ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted. Thus, **Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.**") (internal quotation marks and citation omitted) (emphasis added). According to the Eleventh Circuit, it is inappropriate to certify a Rule 23(b)(2) class when relief "will not automatically flow to the class as a whole." *See Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1345 (11th Cir. 2006) (internal quotation marks omitted). Moreover, any injunction entered on behalf of a Rule 23(b)(2) class must comply with the requirements of Rule 65. That means that the terms of the injunction must contain an operable command capable of enforcement; an injunction that is as general as the terms of the governing law itself is nothing more than a command to obey the law. *See Burton v. Cty of Belle Glade*, 178 F.3d 1175, 1200–01 (11th Cir. 1999).

2001) (refusing to certify issue class on whether the defendant's product was defective because any subsequent proceedings on causation and damages would involve the same facts as the first trial).[36]

Even more importantly, Plaintiffs have presented no trial plan to explain how a (c)(4) certification would be tried (and what might happen afterwards). Further, Plaintiffs seek certification of six issues none of which will materially advance the claims of individual class members. (Mot. at 49.) They are framed at the highest level of abstraction and are largely divorced from the facts. At this high level, it will be impossible to adjudicate some of these issues and others will not advance the litigation for any class member. For example, whether a private probation company can "require" a waiver of counsel ignores the relevant legal standard, which requires asks whether a particular offender knowingly and voluntarily waived their right to counsel.

Moreover, even if any of these issues could be tried on a class-wide basis, there would be little if any efficiency realized. In each subsequent proceeding, the Plaintiff would have to introduce the same evidence about the City and JCS' conduct in order to establish causation and damages. In *Fisher v. Ciba Specialty Chemicals Corp.*, Judge William Steele rejected this approach, saying: "[t]o the extent that plaintiffs are asking the Court to bifurcate the issues of [the defendant's] conduct from all other issues, the result would be chaotic, inefficient and at odds with the principles animating bifurcation in the first place." 238 F.R.D. 273, 315 (S.D. Ala. 2006). The same is true here. In any separate follow-on proceedings, Plaintiffs will have to establish causation and damages, highly individualized issues that will require testimony from each class member. Moreover, these separate, follow-on proceedings would require an enormous expenditure of judicial resources. Here, Plaintiffs claim there are approximately 900 people in the class applicable to the City. (Mot. at 1.) If one person's claim was tried every day (excluding

---

[36] Courts have also recognized that piecemeal certification of some issues under Rule 23(c)(4) is "results in unfairness to all because of the increased uncertainties in what is at stake in the litigation and in whether the litigation will ever resolve any significant part of the dispute." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 422 n.17 (5th Cir. 1998); *see also Castano*, 84 F.3d at 745 n.21.

weekends and federal holidays) and each person's trial took only a single day, it would still take over 3.5 years to finish. And if a separate six-person jury was chosen for each proceeding, over 5,400 people would have to serve.[37] And that is just for the 900 plaintiffs related to the City.[38] Accordingly, issue certification under Rule 23(c)(4) is inappropriate here.

## CONCLUSION

As explained above, this case involves a myriad of individualized issues that defeat predominance. Illustrations of the many different individualized inquires that would be required are depicted in Appendix II to the City's Opposition to Class Certification. Further, Plaintiffs have not shown that the other requirements of Rule 23 are met here. For all these reasons, Plaintiffs' Motion for Class Certification should be denied.[39]

---

[37] On a related note, using separate follow-on proceedings in this case would violate the re-examination clause of the Seventh Amendment. *See Castano*, 84 F.3d at 750.

[38] It is worth mentioning that Exhibit 10 to the report of Plaintiffs' expert purports to identify over 2000 members of the putative Childersburg subclass—not the 900 claimed in Plaintiffs Motion for Class Certification.

[39] The Fourth Amended Complaint (and Motion for Class Certification) includes other assertions which are simply untrue but which plaintiffs do not appear to argue are common questions.  Because these issues are not germane to the class certification decision, the City is not currently responding to each of the many assertions with which it disagrees. However, the City notes its disagreement with much of the Facts Section in the Plaintiffs' Fourth Amended Complaint and their Motion for Class Certification. For example, the Fourth Amended Complaint alleges that Childersburg "**routinely** . . . imposed additional '**jail fees**' determined by the city clerk for the costs of any incarceration."   Doc. 305 at ¶¶ 29, 144 (emphasis added).  This is false and there is no evidence of any "jail fees" at Childersburg.  Notably, this allegation is absent from Plaintiffs' Motion for Class Certification.

Respectfully submitted on 20th day of September, 2016.

/s/      *Gregory C. Cook*
One of the Attorneys for City of
Childersburg

**OF COUNSEL**

Will Hill Tankersley
Gregory C. Cook
Ed R. Haden
L. Conrad Anderson IV
Ginny B. Willcox
Chase T. Espy
Christopher Friedman
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203

Timothy P. Donahue
DONAHUE & ASSOCIATES, LLC
1020 22nd Street South
Birmingham, AL  35205

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 20th day of September, 2016, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

G. Daniel Evans
Alexandria Parrish
D. Patrick Evans
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209

Robert L. Wiggins, Jr
Wiggins, Childs, Quinn & Pantazis, LLC
301 North 19th Street
Birmingham, Alabama 35203-3204

Erwin Chemerinsky
401 East Peltason Drive
Irvine, California 92697-8000

Larry S. Logsdon
Michael L. Jackson
Wallace, Jordan, Ratliff, & Brandt, LLC
P.O. Box 530910
Birmingham, AL 35253

F. Lane Finch, Jr.
Brian C. Richardson
Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203

Wilson F Green
FLEENOR & GREEN LLP
1657 McFarland Blvd N
Suite G2A
Tuscaloosa, AL 35406

_____*Gregorgy C. Cook*_____
OF COUNSEL
