FILED

2016 Oct-04  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GINA KAY RAY, KRISTY FUGATT,** | ) | |
| **TIMOTHY FUGATT and DEUNATE T.** | ) | |
| **JEWS, Individually and for a class of** | ) | |
| **similarly situated persons or entities,** | ) | |
| | ) | |
| **Plaintiffs;** | ) | **CIVIL ACTION NO.:** |
| | ) | |
| **v.** | ) | **2:12-cv-02819-RDP** |
| | ) | |
| **JUDICIAL CORRECTION SERVICES, INC.,** | ) | |
| **et al** | ) | |
| | ) | |
| **Defendants** | ) | |

**PLAINTIFFS' MEMORANDUM BRIEF IN OPPOSITION TO CHILDERSBURG'S
MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF GINA RAY**

G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
D. Patrick Evans
ASB-3209-R67G
Maurine C. Evans
ASB-4168-P16T
Attorneys for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      RESPONSE TO CHILDERSBURG'S STATEMENT OF UNDISPUTED FACTS. . . . . 1

II.     PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS. . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      WHETHER A MUNICIPAL POLICY, CUSTOM OR PRACTICE EXISTS FOR
        PURPOSES OF 42 U.S.C. § 1983 IS A QUESTION OF FACT. . . . . . . . . . . . . . . . . 18

        1.      Ms. Ray was arrested and jailed pursuant to the City's
                practice and scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.      No Notice of Hearings Violates Due Process . . . . . . . . . . . . . . . . . . . . . 23

II.     THE CITY OF CHILDERSBURG IS LIABLE FOR ITS POLICY AND PRACTICE
        INVOLVING ITS MUNICIPAL COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.      Ms. Ray was threatened by JCS and arrested several times . . . . . . . . . . 25

        2.      The City and JCS worked together to extend Ms. Ray's "probation. . . . . 26

III.    ROOKER-FELDMEN AND *HECK V. HUMPHREY* ARE INAPPLICABLE . . . . . . . . 27

IV.     THE CITY'S FOOTNOTE ARGUMENTS LACK MERIT . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## INTRODUCTION

Childersburg's arguments rely on very selective use and the omission of material facts and, as a result, cannot support the City's motion. The inclusion below of additional facts shows, at worst, there are multiple questions of fact preventing summary judgment. More correctly, the full facts and applicable law confirm Ms. Ray's entitlement to relief.[1] Because many of the issues presented herein touch upon those previously briefed, Plaintiffs incorporate here their responses in opposition to Childersburg's motions for summary judgment on the claims of the Fugatts and Deunate Jews, along with Plaintiffs' evidentiary submission. (Docs. 419-421, *et seq*). The City's Motion for Summary Judgment on the claims of Gina Ray is due to be denied for the many reasons discussed below.

## I.     RESPONSE TO CHILDERSBURG'S STATEMENT OF UNDISPUTED FACTS:

1.     Disputed in part & immaterial. These events in Harpersville are not related to Gina Ray's JCS probation in Childersburg or the claims in this suit.  Also, the citations listed do not provide support for all of the City's propositions. Specifically, there is no citation to show that Ms. Ray was required to submit to drug testing with a Court Referral Officer or attend Alcohol Anonymous meetings. Regarding Footnote 2, Ms. Ray stated unequivocally that she is not driving. (Doc. 423-1 p. 69 at depo p. 272).

2.     Disputed & immaterial. These events in Harpersville are not related to Ms. Ray's JCS probation in Childersburg or the claims in this suit. Also, the Probation Tracker report cited does not start until April of 2009    not February 2009. Further, that report shows that Ms. Ray reported on numerous occasions and made many payments to JCS, including the following dates and payments: April 22, 2009 and paid $200; May 20, 2009 and paid $345; June 16, 2009 and paid $660; July 17,

---

[1] The City claims that Ms. Ray's main complaint is that Judge Ward refused to give her community service. Please refer to Section III below, which addresses Ms. Ray's allegations and this testimony in further detail.

2009 and paid $45; September 8, 2009 and paid $45; reported on September 21, 2009; October 21, 2009 and paid $45; November 16, 2009; November 20, 2009; November 24, 2009; December 14, 2009; December 18, 2009 and paid $20; December 28, 2009 and paid $25; January 15, 2010; January 22, 2010; February 5, 2010 and paid $30; February 15, 2010; and February 19, 2010 and paid $20. (Doc. 423-2, pp. 3-6 & 8). By February 19, 2010, Ms. Ray had paid JCS $1,435 and been thrown in jail for five days for which she received no credit. (Doc. 423-2, p. 6 at 8/14/09 entry). While Probation Tracker indicates that Ms. Ray's CRO sent a fax to JCS regarding her court-referral program, there is no evidence that JCS mailed a petition for revocation of probation and the notice to show cause to Ms. Ray. In fact, the petition and notice are unsigned. (Exhibits A & B). Nevertheless, Ms. Ray did appear at the August 14, 2009 hearing and at that time the court ordered her to serve five days in jail though there is no written findings of the reason. She did not get credit for those five days, and there is no allegation or finding of willfulness.  (Doc. 423-2, p. 6 at 8/14/09 entry). It is not disputed that **_after_** the Court sentenced Ms. Ray to five days in jail, she was justifiably upset. (Doc. 423-2, p. 22 at depo p. 84:20-22).

3.      Disputed in part & immaterial. These events in Harpersville are not related to Ms. Ray's JCS probation in Childersburg or the claims in this suit.  Also, the citation provided does not support the proposition that Ms. Ray "failed to report to her CRO on several occasions" and that she "tested positive for marijuana." Further, there is no indication that the reason JCS generated a petition for revocation of probation was because of the CRO report. Nor is there any indication that petition was mailed, as it is unsigned.  (Exhibit C). Moreover, several days earlier   February 19, 2010   Ms. Ray had paid her case in full. (Doc. 423-2, p. 5 at entry 2/26/2010). Ms. Ray did appear before the judge on March 12, 2010, and even though her case had been paid in full, she was kept on JCS and

2

required to continue paying JCS' fees. (*See* Doc. 423-2, p. 4).

4.      Disputed in part. Judge Ward assessed Ms. Ray $800 in fines and $346 in court costs and gave her a *suspended* sentence of three days for each charge. (Doc. 423-4, p. 3) While Ms. Ray testified that she knew a public defender was present in the courtroom, she testified: "I didn't think I could get attorneys to help me because it was just a traffic ticket and I didn't think I could get in this much trouble for it and not be able to pay for it." (Doc. 423-1, p. 11 depo p. 39). At no point was Ms. Ray "sentenced to three days in jail for each charge," as shown by the court order which clearly states her sentence was suspended from the beginning. (Doc. 423-4, p. 3). Further, there is no evidence that Ms. Ray's sentence was suspended "in favor of probation with JCS." Regardless, Ms. Ray was placed on JCS probation for collection of the fines and costs.

5.      Disputed. Ms. Ray testified that she was ordered to be on probation. (Doc. 423-1, p. 13 at depo p. 46:6-8). Further, she has testified that after her experience with JCS, she would have chosen to go to jail:

> Q. Okay. Would you have preferred going to jail or having probation that day?
> A. I think I would have went to jail. If I knew this was going to happen, I would have chose to go to jail.

(Doc. 423-1, p. 13 at depo p. 47:13-17).

6.      The probation order speaks for itself. Ms. Ray testified that she was ordered to be on probation with JCS and that she cannot read very well:

> Q. Can you read and write?
> A. Not that good. It's not that great.
> Q. Can you read a newspaper?
> A. Not big words. I have trouble with big words

(Doc. 423-1, pp. 6-7 depo pp. 20:21-21:3(testifying the only books she reads are for her one year old daughter);  Doc. 423-1, p. 13 at depo p. 46:6-8). At the time she was ordered onto probation, no one

went over the order with her and she did not read the order at the time she signed it. (Doc. 423-1, p.
15 at depo pp. 54:12-17; Doc. 423-1, p. 16 at depo p. 57:4-7). Further, Ms. Ray testified that she did
not think she needed an attorney for a traffic ticket and that she did not believe she could get
attorneys to help her. (Doc. 423-1, p. 11 at depo p. 39:1- 7).

7.      Disputed. The deposition testimony cited does not reference the August 12, 2010 intake form,
but rather a different exhibit. Regardless, Ms. Ray testified that she used her grandmother's address
on her JCS intake form because she knew it was a reliable address where she could get mail. (Doc.
423-1, p. 61 depo pp. 238-239).  It is undisputed that Ms. Ray never received any mail from JCS,
although she consistently received all of her non-JCS mail at the address provided to JCS.

8.      Disputed. The vast majority of the letters returned to JCS contained no handwriting
whatsoever and simply bore the U.S. Post sticker stating either "Not Deliverable" or "Return to
Sender." (Doc. 423-11, p. 3-8 at entries for 11/19/10 & 12/14/10 & 12/15/11 & 8/30/12; Exhibit D).
For the two letters that did contain handwriting, there is no evidence to support the insinuation that
Ms. Ray purposefully had someone write "return to sender" on the JCS mail so as to avoid notice.
In fact, Ms. Ray testified that she would not have sent the mail back. (Doc. 423-1, p. 65 at depo p.
255:10-11). She did not recognize the writing and did not believe it was her grandmother's. (Doc.
423-1, p. 65 at depo p. 254). Nevertheless, it is undisputed    as shown by the numerous returned
envelopes    Ms. Ray did not receive mail from JCS and that JCS was aware of that fact. (Doc. 423-
11, p. 3-8 at entries for 11/19/10 & 12/14/10 & 12/15/11 & 8/30/12).

9.      While it is undisputed that Ms. Ray missed some meetings JCS set in August and September
of 2010, she never received the petition for revocation dated September 20, 2010 or the notice to
show cause. (Doc. 423-1 pp. 17-18, 19 at depo pp. 64-65, 66:23-67:3, 69:10-22). Further, there is

no indication whatsoever that the petition for revocation and notice to show cause were mailed, as both are unsigned. (Docs. 423-8 & 423-10). Finally, none were on file in the clerk's office.

10.     Disputed in part. It is undisputed that Ms. Ray appeared at the October 2010 hearing, but her only violation was non-payment. There is no citation or support provided for the proposition that "Ray never appeared again voluntarily at a noticed revocation hearing." Thus, that sentence is due to be stricken.

11.     Disputed in part. While it is undisputed that Ms. Ray missed some appointments set by JCS, Ms. Ray could not testify as to which appointments she missed. (Doc. 423-1, p. 28 at depo p. 106:17-20).  Further, there is no evidence that the JCS petition to revoke Ms. Ray's probation and the notice to show cause were ever mailed, and JCS' last two failure to report letters dated December 7, 2010 and November 19, 2010 had been returned to JCS stamped as "Not Deliverable As Addressed." (Doc. 423-11, pp. 7-8).

12.     It is undisputed that having no notice, Ms. Ray did not appear at the January 13, 2011 hearing and that Brenda Wyers issued a warrant for Ms. Ray's arrest stating she had been "convicted" on the bogus charge of "FTOCO." (Doc. 423-15). Ms. Ray's bond was a preset cash bond of $1,353. (Doc. 423-15). Ms. Ray was arrested on the "FTOCO" warrant on January 19, 2011 and put in the Talladega County Jail where she sat in jail for 22 days because she could not pay the cash bond as demanded. (Exhibit E).

13.     Disputed in part. Ms. Ray sat in jail for 22 days until her court hearing on February 10, 2011. (Exhibit E). At no point was she given credit for her time in jail. (Doc. 423-11, p. 7 entries at 2/16/2011). At the hearing, there was no finding of willfulness. Instead, the court simply reinstated Ms. Ray onto JCS probation, added $317 for a "warrant fee," and pushed her probation term beyond

the two-year limit prescribed by Alabama law and into February 2013. (Doc. 423-17). The probation order speaks for itself, but it makes no "indication" that Ms. Ray was represented or waived her right to counsel. In fact, as is plainly shown on the order, Ms. Ray did not sign the waiver of counsel. (Doc. 432-17).

14.     Disputed in part. The City fails to provide citations to support all of the propositions in this paragraph. Regardless, it is undisputed that Ms. Ray totaled her car and received money from her insurance company. However, as shown by the testimony quoted, Ms. Ray used that money to repay debts *and* for food and a place to live. (Doc. 423-1, p. 295).

15.     Disputed in part. The probation order speaks for itself and was presigned in blank by Ward. (Doc. 392-2 p. 49 at depo. p 191; Doc. 392-3 p. 81 at depo. p. 447; Doc. 392-4 p. 30 at depo. p. 514). Ms. Ray was never represented by counsel and the JCS form is no waiver.

16.     Disputed in part. The probation order speaks for itself and was signed in blank by Ward. (Doc. 392-2 p. 49 at depo. p 191; Doc. 392-3 p. 81 at depo. p. 447; Doc. 392-4 p. 30 at depo. p. 514) Gina was never represented by counsel and the JCS form is no waiver.

17.     The phrase "Ray continued to miss JCS appointments" is disputed, as is the premise that JCS properly had the authority to demand Ms. Ray to report frequently throughout the month. (Doc. 423-11, pp. 9 & 10 at Appointment Detail Chart). Moreover, as shown by the document cited, Ms. Ray had attended over 20 JCS appointments and by January 2012 Ms. Ray had paid JCS a total of $792 on ProbationID 384562 (Doc. 423-11, p. 10) and $2,935 on ProbationID 243608 (Doc. 423-2, p. 8) There is no evidence that JCS mailed the notice to show cause or violation report to Ms. Ray, as both are unsigned. (Docs. 423-20 & 423-22). Also, the delinquency letter mailed by JCS was returned, stamped "not deliverable as addressed." (Doc. 423-11 at entry 1/17/12 ("Returned Delinquency

Letter); Exhibit F).

18.     Ms. Ray never received notice of the February 9, 2012 hearing, and therefore she did not

appear. See paragraph 17, above.  However, it is undisputed that Brenda Wyers did issue a warrant

for her arrest, stating Ms. Ray had been "convicted" on the bogus charge of "FTOCO." (Doc. 423-

23). The City demanded a preset cash bond of $3,173. (*Id.*)

19.     Plaintiffs do not dispute that this is Ms. Ray's testimony or that the arrest report contains that

account.

20.     From the time of her arrest on April 21, 2012 until her court date on May 1, 2012, Ms. Ray

remained in jail because she could not pay the cash bond as demanded by the City.  (Exhibit G; Doc.

423-26) It is undisputed that when Ms. Ray appeared before Ward on April 26th, he reinstated her

probation, but tacked on an additional $317 "warrant fee" to her balance and kept her in jail until

someone paid $300. (Doc 423-25).The JCS preprinted orders of probation were presigned by Ward

and the document speaks for itself. It is undisputed that Childersburg demanded $300 to secure her

release. (Doc. 423-1, p. 35 at depo pp. 135:18-136:7). Ms. Ray did not have the money, but her

babysitter was able to come up with $150. (*Id.*) This was not enough to secure her release.  (*Id.*) It

was not until her babysitter was able to pay another $150 on May 1, 2012 that Ms. Ray was released.

(Doc. 423-1, p. 37-38 at depo p. 141-142; Doc. 423-26; Doc. 382, p. 62). Ms. Ray did not get any

credit for the time she spent in jail. (Doc. 423-26; Doc. 423-11 at entries 5/2/2012).

21.     Disputed in part. Ms. Ray was assessed a combined total of $1,394 in court costs and fines

and received five days suspended sentences for each of the three charges. (Doc. 423-27). There is

no indication that Ms. Ray received the five-day suspended sentences "in favor of a fourth JCS

probation."  Further, Ms. Ray was never sentenced to jail but given *suspended* sentences from the

beginning. Nevertheless, Ms. Ray was put back on JCS probation for collection of these sums. Again, the JCS preprinted probation order was signed in blank by Ward and speaks for itself. (Doc. 392-2 p. 49 at depo. p 191; Doc. 392-3 p. 81 at depo. p. 447; Doc. 392-4 p. 30 at depo. p. 514)

22.     Disputed in part. By May 21, 2014, Ms. Ray's lawsuit against the City had been pending for almost two years. While it is true that Ms. Ray appeared before Woodruff on May 21, 2014, the court's order shows that    for the very first time    she was represented at that hearing by counsel, specifically one of her attorneys in this case. (Doc. 423-37, p. 3). With able counsel present and this litigation on-going and well underway, it is unsurprising that Ms. Ray found the City Court to be "nicer" to her. It is also unsurprising that the City court    again for the very first time    considered Ms. Ray's indigency and granted her indigency status and community service. (Doc. 423-37, p. 3). At no other point in her dealings with the City was Ms. Ray provided counsel or her indigency ever considered by the City's court or JCS.[2]

23.     Undisputed.

24.     Disputed. Judge Ward and Brenda Wyers are both City employees. (Doc. 392-10, pp. 27-28 at depo pp. 26:22-27:3 (testifying Brenda Wyers, a former Childersburg magistrate, was an employee of the City as magistrate); Doc. 421-1, p. 5 Section 9-14 at Bates 48598 (stating the city judge is hired by the city council)).  Ms. Ray testified at length about the wrongs committed by the City's employees. Some of that testimony includes the following:

> Q. Have you told me everything today that you think that the Childersburg judge did wrong? ....
>
> A. Well, I could tell you things the way he acted in the courtroom towards everybody and things like that, people that can't pay money he does this to, puts them on

---

[2]Childersburg cites to "Exhibit RR." However, no such exhibit was included in the City's evidentiary submission. (Doc. 423).

probation. Everybody don't have money to walk in there and give them five, six hundred dollars nowadays. I mean, people that -- on low income, they can't do that. They've got kids. They've got bills to pay. They've got other things to worry about as well as a fine on the side and going to jail. If that's the case, he should have said, hey, here is some community service, do it or something to help everybody. And I don't think it's fair for him to put everybody in jail because they cannot pay. I mean, we can't help that we don't have that much money, and we can't help that we don't have that much help out there to help us get where we need to go. And some people have to drive without a license. I've learned my lesson. I tried not to. I don't nowadays because I don't want no more tickets. But, I mean, the least they could do is help people, offer community services, say, hey, look, I know you ain't got it. Here is you some community service. You can do this, you can do that. Work your fine off. I mean, that's the only thing I ask is them to start helping people. All of us don't have that money out there to be spending. I mean, if you got a ticket, you wouldn't go to JCS because you'd go pay your ticket off. We can't do that. I mean, that's -- if people just help people a little more, that would help out a lot.

(Doc. 423-1, p. 55 at depo pp. 214-216).

25.     It is undisputed that Ms. Ray testified to this.

26.     Disputed. First, the City's statement is far-reaching and vague. Regardless, the City's statement Ms. Ray "committed all of the acts that led to her probation revocation petitions" is in no way supported by the citation provided or any testimony, for that matter. In the cite provided, Ms. Ray simply testified that she agreed that she owed the underlying fines and court costs assessed to her by the court and was unable to pay:

> Q. You would agree with me that you owe the fines and court costs the judge assessed to you, though, right? You're not asking for that?
>      MR. DANNY EVANS: Object to the form of the question. Do you know?
> A. I don't because I don't -- I don't agree only because I -- yes, I did the crime, but at least say, hey, you can do community service, or we'll work with you, or we'll help you out. They didn't do none of that.

(Doc. 423-1, p. 50 at depo p. 196:5-15).

27.     It is undisputed that Ms. Ray missed some of the appointments JCS set. It is also undisputed that she attended many of them, and JCS increased the frequency of these requirements.[3] (Doc. 423-

---

[3]It is unclear what the City is attempting to accomplish through Footnote 5 in its brief. However, it is undisputed that Plaintiffs are only challenging post-conviction collection practices.

11, pp. 9-10).

28.     It is undisputed that JCS worked in tandem with the City of Childersburg in a joint scheme. This scheme is described in detail in Plaintiffs' Response in Opposition to the City's Motion for Summary Judgment on the Fugatts' claims. That Response and Statement of Undisputed Facts therein is incorporated here. Ms. Ray testified:

> Q. JCS didn't order you to probation, right?
> A. No, sir.
> Q. Okay. JCS didn't issue any warrants to you, right?
> A. No, sir.
> Q. And JCS never threw you in jail, did they?
> A. JCS would help throw me in jail.
> Q. Well, they would report to the court that you missed your meetings,
> right?
> A. Yes, sir.
> Q. They'd report to the court you didn't pay your fines and fees?
> A. Yes, sir

(Doc. 423-1, pp. 83-84 at depo pp. 328:16-329:7). The evidence shows that these acts were committed by the City at JCS' behest. It was the City that agreed to have its court order persons like Ms. Ray to pay fees for JCS "probation" when they could not pay their fines, and then following JCS' recommendation, the City employees issued the warrants, arrested her, and threw her in jail. (Docs. 392-16, 423-15, 423-16, 423-23, 423-24, 423-26)

29.     Undisputed.

30.     While it is undisputed that Ms. Ray has been employed since 2011, at no point has she been above the poverty level for herself and her child. For instance, in 2013, Ms. Ray's adjusted gross income was $10,992. (Exhibits H & I). Before this lawsuit was initiated, at no point did any from the City or JCS ever attempt to evaluate Ms. Ray's indigency.

## II.     PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS

31.     For Ms. Ray's June 25, 2010 driving while suspended and no insurance tickets, she was

assessed $1,543 in costs and fines and given a three-day suspended sentence for each charge. (Doc. 423-4, p. 3). She was unable to pay the $1,543 demanded and was sent to JCS for its collection. (Doc. 423-5; Doc. 423-1, p. 11 at depo p. 37:1-10).

32.   Ms. Ray was arrested by Childersburg two times under warrants stating that she had been "convicted" of Failure To Obey Court Order (FTOCO) and assessed $317 in warrant fees for each warrant. (Doc. 423-15 & 423-23, 423-24, 423-16)

33.   Warrant # 2011-00017 was issued by Childersburg pursuant to JCS' request on January 18, 2011 for FTOCO and required a cash bond of $1,353. (Doc. 423-15, p. 2; Doc. 423-11, p. 7 at entry 1/14/2011; Doc. 423-14). On January 19, 2011, Ms. Ray was arrested by Childersburg police officers Luke Benefield and Kevin Koss for this warrant (Doc. 423-16, p. 2-3). Ms. Ray was transported to the Talladega County Jail where she stayed until February 10, 2011   22 days   as she was unable to post the cash bond demanded for his release. (Doc. 382-11, p. 32). It is undisputed that 22 days exceeds the original sentence of her six-day suspended sentence. See Paragraph 31, above.

34.   Warrant # 2012-00066 was issued by Childersburg pursuant to JCS' request on February 10, 2012 for FTOCO, requiring a cash bond of $3,173. (Doc. 423-23; Doc. 423-11, p. 4 at entry 2/10/2012). On April 21, 2012, Ms. Ray was arrested by Childersburg police officers Matthew Johnson and Tony Tomlin for this warrant. (Doc. 423-24). She  was transported to the Talladega County Jail where she stayed until May 1, 2012   10 days   as she was unable to post the cash bond demanded for her release. (Doc. 423-26). It is undisputed that 10 days exceeds the original sentence of her six-day suspended sentences. See Paragraph 31, above.

35.   On each of the FTOCO charges, Ms. Ray was arrested and jailed by Childersburg police officers and ultimately spent 32 days in jail all arising from her unpaid JCS fees and court costs and

fines. (Doc. 423-23, 423-24, 423-26, 423-15, 423-16; Exhibit E). It is undisputed that 32 days exceeds the length of her original suspended sentence. Please see paragraph 31, above.

36.     At the point Ms. Ray was arrested for FTOCO and jailed, she was never offered an attorney and was never represented. (Doc. 402-26) Neither JCS nor the City court made any inquiry into her indigency. (Doc. 392-2, p. 59 at depo pp. 213-32; Doc. 392-11, pp. 41-41 at depo pp. 160-161).

37.     On each arrest and jailing by Childersburg, Ms. Ray had a preset cash bond required to secure her release. (Docs. 423-23, 423-15).

38.     Ms. Ray was given no credit by Childersburg for the days she served in jail.  (Doc. 423-11, p. 4 & 7 at entries 2/16/11 and 5/2/12).

39.     No charge of FTOCO exists under state law or city ordinance. (Doc. 402-35). Nonetheless, the Childersburg police executed these warrants which state she had already been "convicted" of that charge. (Doc. 423-23, 423-24, 423-15, 423-16).

40.     There was no hearing or trial on any of the charges of FTOCO against Ms. Ray and she was never alleged to be or found guilty of contempt.

41.     The City never gave any notice to Ms. Ray of any hearing after her initial tickets. (*See* Doc. 392-2 pp. 33-36 at depo. pp. 126-137).

42.     The city clerk records have no probation orders, petitions for probation violation, contempt of court charges or findings, or notice to show cause concerning Ms. Ray, as none were filed there. In fact, the evidence shows that JCS    not the court    provided whatever notice was given of the dates JCS set for hearings. (Doc. 392-2, p. 33 at Depo p. 126-27).   There is no evidence here that Ms. Ray ever received any such notice.  Further, it is undisputed that at the time these FTOCO warrants were issued, additional warrant fees were charged to her, though none are authorized. (Doc.

423-17 & 423-25)

43.     The record contains no findings of contempt nor any determination that Ms. Ray willfully failed to appear after valid notice.

44.     After being sent to JCS probation for collection, Ms. Ray made many payments to JCS, totaling over $800 (Doc. 423-11, pp. 10-12) plus $300 to secure her release from jail. (Doc. 423-26).

45.     Ms. Ray was initially placed on JCS "probation" for collection of fines and court cost on August 12, 2010 (Doc. 423-5). She received a series of other traffic tickets for which the court again placed on her JCS probation. Those later probations, however, were placed on "hold" until the her initial probation for payment of her fines and costs was paid which continued over five years until terminated in November 2014. (Doc. 423-40, p. 2.; Doc. 423-41, p. 3; Doc. 423-42, p. 3). The termination was after this litigation and exceeded the maximum two (2) year term for legitimate probations. (Doc. 187-3, p. 11)

46.     The Childersburg police chief has never seen any ordinance supporting a charge of FTOCO and has never seen such a charge tried, even though many FTOCO charges were listed on the court docket and all police officers come to court.  (Doc. 402-38, p.  14 at Depo pp. 54-56; Doc. 402-39, p. 22 starting on page 4). Further, the Childersburg police chief has been the arresting officer on a number of FTOCO charges, though he does not know what "court order" the person is accused of failing to obey. (Doc. 402-38, pp.16, 19 at Depo pp. 63-64, 75-76).

47.     If the person arrested on FTOCO can pay the preset cash bond, they are released without being processed at the Metro Jail.  (Doc. 408-38, p. 24, at Depo pp. 94-95). If the person arrested on FTOCO can pay the full amount of their debt to the City, they do not have to return to court. (Doc. 392-13, pp. 224-25 at Depo pp. 223-24)

48.     The police chief has also been the arresting officer on a number of charges listed as failure to "appear/comply/pay." (Doc. 402-38, p. 17 at Depo p. 66-67; Doc. 402-40, pp. 5, 7, 11, Bates pages 39257, 02321, and 2839)

49.     Childersburg jail logs show multiple people jailed for days on FTOCO charges with different preset cash bond amounts. (Doc. 402-41) Some are jailed for 10, 20 or 30 days on this charge. (Doc. 402-38, p. 29, Depo pp. 113-14)

50.     Chief McClelland is shown as the arresting officer for FTOCO charges against persons such as Stanley Twyman who is shown as in "Jail/JCS." (Doc. 402-39, p. 29 at Bates p. 25502)

51.     Though the police chief knows the charge of contempt of court, he has never seen a contempt hearing with Larry Ward. (Doc. 402-38, p. 28, Depo p. 109-110)

52.     The police chief reports directly to the mayor (Doc. 402-38, p. 11, at Depo p. 44) and regularly has contact with the magistrate. (Doc. 402-38, p. 12 at Depo p. 47)

53.     As an arresting officer, Chief McClelland took money from people who were paying fines; he approved the release of people from jail if they made bond. (Doc. 402-38, p. 13 at depo p. 51)

54.     The City police record's clerk signed jail release forms for those who paid to be released and reset their appearance at the "JCS Municipal Court" for those who still owed money (Doc. 402-34).

55.     Before being brought to light by this litigation, the City also added additional "warrant fees" for every warrant issued by the City at JCS' request, even though no such fee was authorized by statute, the fine schedule or court costs. (Doc. 392-13, pp. 207-208 at depo pp. 206-207; Doc. 392-4, pp. 38-39 at Depo pp. 522-23; Docs. 402-23 & 402-25).

56.     JCS sent a bi-monthly remittance from to the city treasurer for the money collected which was deposited into the City's general account.  (Doc. 392-13, pp. 69-70 at Depo pp. 68-69; Doc. 392-

15, p. 90 at Depo p. 89; *see also* Doc. 392-11, p. 48 at Depo p. 188; 392-12, p. 55 at Depo p. 434).

57.     The data JCS collected shows a consistent pattern in status code changes leading to warrant. (Doc. 382 pp. 19-28). Further, Probation Tracker recorded multiple instances of "paid to get out of jail" or "credit for time served," as well as many instances of family members paying to help avoid the threatened arrests. (Docs. 382-6, 382-7)

58.     Childersburg, independent of the JCS system, used threats of jail for failure to pay even on its own stationary.  (Doc. 187-6).

59.     Status codes listed in each person's Probation Tracker file for Childersburg identify over 500 probationers on warrant status, nine probationers were identified as being credited with "time served" using the Status Action T, and there were over 70 scanned JCS reports requesting that people be jailed until money was paid during the putative class period. (Docs. 402-31 to 402-34; Doc. 402-1)

60.     JCS routinely changed people's status from warrant to active in Probation Tracker within the time frame from August 28, 2010 until JCS was terminated in the City, showing the pattern of using arrests to coerce payment. These numbers are further confirmed by City jail logs and arrest warrants showing FTOCO as the most favored tool for arrest. (Docs. 402-40 to 402-47).

## ARGUMENT

The City now claims Ms. Ray's failure to attend JCS probation appointments and revocation hearings was the moving force behind her constitutional violations. This argument conveniently overlooks the scheme in place at Childersburg and relies on the City's unique reinterpretation of the documents.  Ms. Ray was on JCS "probation" only because she could not pay her fines and costs. That "probation" added JCS fees to her balance, and that practice, itself, violated equal protection.

(*See* Docs. 424, 425, 426, 427, 428). This "probation" scheme was the City's collection tool. Under this practice in Childersburg, JCS was allowed to set the time and frequency of appointments which, in Ms. Ray's case, increased as she was unable to meet the payment demands.  None of the official looking orders, petitions, or notices were even filed with the City. (Doc. 392-2 p. 33 & 35 at depo. p. 125-128 & 134-136). Further, the practice in Childersburg allowed JCS to not only set court dates but to provide whatever notice was given. (*Id.*) Here, the JCS records show that several of its "notices" to Ms. Ray were returned undeliverable (Exhibit D), but nevertheless JCS requested   and the City issued   warrants to arrest Ms. Ray on a bogus charge. (Docs. 423-14, 423-16, 423-21 through 423-23). Significantly, there is no finding that Ms. Ray failed to appear after receiving notice. It is undisputed, however, that the City issued warrants   at JCS' request   for Ms. Ray's arrest for her purported "conviction" of "FTOCO." (Docs. 423-14 through 423-16 & 423-21, 423-23, 423-24) Aside from the fact that this charge was created by the City, there is no record of any purported "conviction" of anything but her traffic tickets.  Rather, as was the practice under the scheme at Childersburg, the FTOCO charge was simply the tool used to arrest Ms. Ray and to enforce the extortionate threats of the City's collector, JCS.  There was no finding   or even an allegation   that Ms. Ray was willful or contemptuous.[4] (*See* Doc. 402-38 p. 28 at Depo. pp. 109-10; Doc. 392-2 p. 36 at Depo. pp. 138-9). Now, as a litigation defense, the City attempts to reinterpret its bogus "FTOCO" charge as capias warrants for Ray's failure to attend the hearings.  This desperate stretch is demonstrably false and contrary to its own records and those of JCS, which were kept contemporaneously with the events about which Ms. Ray was questioned. As the uncontested

---

[4] Plaintiffs incorporate by reference their response to the City's Motion for Summary Judgment against the Fugatts, which discusses in detail the collection policies and practice of the City and JCS.  (Doc. 419)

facts show, the City itself has no probation orders, no petitions for revocation, no notices to show cause   all of which JCS generated and none of which were filed with the City.

After Ms. Ray was placed on "probation" for collection of her court costs and fines, JCS demanded escalating fees and increasingly frequent appointments, which served no purpose other than demands for money. (*See* Doc. 423-11 pp. 9-10 at Appointment Details Chart).  The City police arrested her twice on nonexistent charges and she spent 32 days in jail with no credit, even though she and her friends had paid JCS and the City over $1,100.  These uncontested facts are shown by records of the City and JCS   *and conveniently ignored by the City*. After all of this, the City and JCS still claimed she owed them over $1800. (Doc. 423-11, p. 10 at Financial Chart).  This familiar pattern under this extortion practice between the City and JCS repeated itself for many years at Childersburg, as discussed in Plaintiffs' response on the Fugatts' claims.  (Doc. 419)

Despite the City's argument, there is no finding that Ms. Ray failed to appear after receiving notice of a court hearing. Indeed, the City itself never provided any notice at all to her allowing JCS to handle that requirement of due process. Under its reasoning, the City nevertheless concludes without support   that her failure to attend hearings (about which she never got notice) equates with a "willful failure to attend" (though she was never charged with that). So, according to the City, Ms. Rays' 32 days in jail and cash payments were completely unrelated to the collection system at the City with JCS.  There is absolutely no support for this revisionist fantasy. Rather, the undisputed facts show that the City used its power to repeatedly jail Ms. Ray, take her money, and brand her a "criminal," "defendant," and "probationer" because neither she nor her family could pay the money

demanded.[5]

In its brief , the City also argues that it is not liable, as violations of Ms. Ray's rights "were committed by either JCS, the Court or both" from which the City now seeks separation. This alternative argument is thoroughly addressed in Plaintiffs' Response in Opposition to Childersburg's summary judgment motion on the Fugatts' claims, which is incorporated here. For the many reasons discussed herein, Childersburg's motion is due to be denied.

## I.   WHETHER A MUNICIPAL POLICY, CUSTOM OR PRACTICE EXISTS FOR PURPOSES OF 42 U.S.C. § 1983 IS A QUESTION OF FACT.

Unlike determining who is a policymaker, the question of whether there is a municipal policy or custom for purposes of § 1983 is "an ad hoc determination made on a case-by-case basis." Sword & Shield: A Practical Approach to Section 1983 Litigation 4th Edition, p. 292. The Eleventh Circuit Pattern Jury Instructions further confirm that this inquiry is factual. (11th Cir. Patt. Jury Instructions 5.6). Even though determining whether a § 1983 policy or custom is factual, federal case law has set the parameters of a policy, custom and practice for purposes of § 1983. Plaintiffs have briefed these issues in their Response in Opposition to Childersburg's Motion for Summary Judgment on the Fugatts' claims, which the Plaintiffs fully incorporate herein. The unconstitutional practices of the City and JCS in its extortion scheme against Ms. Ray are detailed further below.

### 1.   Ms. Ray was arrested and jailed pursuant to the City's practice and scheme.

It is undisputed that Ms. Ray was given suspended jail sentences at the time she was fined

---

[5]In various places throughout its argument, the City attempts to rely on *Garcia v. City of Abilene*, 890 F.2d 733 (5th Cir. 1989) as shelter for its unconstitutional policies, but its reliance is misplaced. Perhaps most importantly, *Garcia* concerned There, Mrs. Garcia was never arrested or jailed by the City of Abilene. Furthermore, Mrs. Garcia received a jury trial and was assessed only fines and costs totaling $102. In consideration of her inability to immediately pay the $102 the court allowed her to make monthly payments of $25 - not probation and not added fees to a private company. The facts in *Garcia* are remarkably different than the facts here and do not support the City's arguments.

and assessed court costs for her tickets. However, there is no evidence whatsoever that Ms. Ray was

placed on JCS probation *because of* her suspended jail time, as argued for the first time by the City

here. The City attempts to legitimize this collection system as real "probation," but the undisputed

evidence shows that JCS probation was used only when individuals    such as Ms. Ray    could not

pay their fines and costs in full immediately. (Doc. 402-13, p. 1 ("Most defendants in Alabama get

placed on probation with JCS because they can't pay their fine in full and once they do pay their fine

in full they are terminated as far as a case with JCS."); Doc. 428-2 at depo p. 237:20-238-6; Doc.

441-4, p. 27 at depo p. 105:20-106:1("Q.[P]ersons are assigned to JCS usually when they cannot pay

a fine or cost when adjudicated, is that correct? A. That's correct.")).  The "probation" in fact ends

once the fine is paid. (Doc. 402-13; Doc. 392-11 p. 67 at depo. p. 262; Doc. 392-2 p. 29 at depo. p.

109).   JCS personnel are not trained or certified as probation officers and are instead trained as

collectors. (Doc. 392-11, p. 19 at depo p. 69; *see also* Doc. 392-11, pp. 17-19 at depo pp. 65-69).

Adding a "suspended" sentence to a traffic ticket does nothing to change the reality of this practice.

Similarly, although the City tries to recast its FTOCO warrants issued for Ms. Ray's arrest

as warrants for "failure to appear," this does not change the facts or the language of the warrants,

which belies any such contention. Specifically, the warrants issued by the City for Ms. Ray's arrest

plainly state that she "**had been *convicted* for the offense of FTOCO**. . ." (Docs. 423-23, 423-15

(emphasis added)). "FTOCO" is a concocted charge used by the City to enforce the extortion threats

of its confederate, JCS. Significantly, there is no City records of a FTOCO hearing, no findings or

conviction on that charge and no contempt charge or hearing. The City has not produced or cited to

any such record because none exists.

However, even had there been a legitimate probation, it is uncontested that JCS issued a

Petition for Revocation of Probation and Statement of Delinquency Charges dated December 30, 2010, signed by Sheree Fomby for JCS. (Doc. 423-14). This petition stated that Ms. Ray was ordered to probation "on or about 12th day of August, 2010 . . . . for the offense of No Insurance, Suspended License." (Doc. 423-14). The petition also stated that Ms. Ray owed $1,036 and that if she paid that amount her case would be closed, but if she failed to appear, a warrant would be issued for her arrest. The clarity of this practice could hardly be clearer   pay or be arrested.  Childersburg's part time judge, Larry Ward, signed this petition. (Doc. 423-14) JCS also created a Violation Report. (Doc. 423-12). However, Ms. Ray never received any notice of this hearing, and there is no evidence that the documents cited by the City as providing notice (i.e., Docs. 423-12, 13, 14) were ever sent. Further, it is undisputed that *the City* never provided notice to Ms. Ray. (Doc. 392-2 pp. 33 at depo. pp. 125-127). Because Ms. Ray did not get notice of the hearing, she did not appear. Thereafter, an FTOCO warrant was issued for Ms. Ray on January 18, 2011 and a cash bond amount was preset by the City at $1,353. (Doc. 423-15). Significantly, that warrant stated that Ms. Ray had "**been convicted** for the offense of FTOCO. . ." (Doc. 423-15), and a $317 warrant fee was added to her balance though no such fee is authorized. (Doc. 423-17). Childersburg police officers arrested Ms. Ray on January 19, 2011 based on this warrant that JCS requested. Neither Ms. Ray nor her family/friends were able to pay the cash bond demanded, so she stayed in jail until February 10, 2011   22 days. (Doc. 382-11, p. 32) She was not given any credit for the time she spent in jail.[6] (Doc. 423-11, p. 7 entries at 2/16/2011) On February 10th, she appeared before the City municipal judge. At that time, Ms. Ray's JCS probation was extended further into February 2013 on the same

---

[6]If the City had given Ms. Ray the $15/day credit for jail time as required by Alabama statute, she would have been credited $330 (2 days x $15/day). However, no credit was given to Ms. Ray.

traffic tickets   over two years past her original sentencing in August of 2010. (Doc. 423-17).

As previously mentioned and further undermining any legitimacy here, there is no record of a probation revocation hearing, no findings on that charge, no contempt charge or hearing, and the City has not produced or cited to any such record. Furthermore, the Childersburg police chief testified that he had never even participated in a FTOCO  hearing, despite court dockets that listed him as the complainant on FTOCO charges. (*See* Doc. 402-38 pp.14, 19-20 at depo. pp. 54-55, 76-77; Doc. 402-39 pp. 4-43; Doc. 402-40 pp. 1-2) There is no allegation or court finding that Ms. Ray willfully refused to pay the court costs assessed on her charges. Further, JCS admits it makes no claim of willful refusal to pay. (Doc. 392-2 p. 36 at depo pp. 138-39).

Nevertheless, when Ms. Ray was unable to pay the ever growing JCS fees, JCS again petitioned for the revocation of Ms. Ray's probation on January 1, 2012, now demanding $1,441.00 and setting a hearing date for 2/9/2012. (Doc. 423-21) Once again, Ms. Ray did not receive notice of the hearing that JCS set, and she did not appear in Childersburg court on February 9, 2010. And, once again, on February 10, 2012, Childersburg issued a warrant for Ms. Ray's arrest, which stated she had again "been convicted for the offense of FTOCO." (Doc. 423-23). The cash bond demanded by the City was $3,173 and another $317 "warrant fee" was tacked onto Ms. Ray's bill. (Doc. 423-23; Doc. 423-25). Ms. Ray was arrested on April 21, 2012, by Childersburg police officers Matthew Johnson and Tony Tomlin for the charge of "FTOCO" and, again, taken to the Talladega County jail. (Doc. 423-24; Doc. 423-23). On April 26, 2012, Ms. Ray appeared before the municipal court and was reinstated back onto JCS probation, and her probation on the same tickets was extended further beyond the two-year time frame and into April of 2014. (Doc. 423-25). After the hearing, Ms. Ray was returned to the Talladega County jail where she stayed until May 1, 2012, at which point her

babysitter was able to pay $300 on her behalf. (Doc. 423-26; Doc. 423-11, p. 4 at entry 5/2/12) The City did not give Ms. Ray credit for the 10 days she had spent in jail.[7] Instead, JCS continued to demand more money from Ms. Ray for years to come.

By this time, Ms. Ray had attended well over 20 JCS appointments and  paid JCS over $800 (Doc. 423-11, pp. 9-12), not including the $300 paid to secure her release from jail. Yet, Ms. Ray remained on JCS probation for her original 2010 tickets for suspended license and no insurance -- well beyond the two-year probation period had expired. Although she was originally placed on JCS probation in Childersburg on August 12, 2010, her probation was not terminated until the defense counsel in this litigation drafted an order for the City's court terminating all periods of probation more than two years old as of November 1, 2014. (Docs. 423-11, p. 9 & 423-38; Doc. 187-3; Doc. 392-14, p. 45 at depo p. 340:1-18).

Ms. Kidd (the JCS manager in Childersburg) testified that she never alleged a willful refusal to pay in her requests to revoke a JCS 'probation' (Doc. 392-2 p. 36 at depo pp. 138 &139) and Chief McClelland testified that he never appeared at such a hearing. (Doc. 402-38 pp.14, 19-20 at depo. pp. 54-55, 76-77) The undisputed evidence shows that Ms. Ray was repeatedly jailed when she did not pay and was then kept in jail until the sooner of 1) court date or 2) Childersburg getting some money. These are the practices and facts that the City tries to ignore    all of which show violations of the constitutional rights of hundreds.  Childersburg cannot breathe legitimacy to these practices by reinterpreting its documents and actions.  The City's Motion for Summary Judgment is due to be denied.

---

[7] In Footnote 10, the City concludes it cannot be liable for any damages arising from this incarceration because Ms. Ray testified that it was the judge's decision to keep her in jail. As discussed in Plaintiffs' response in opposition to the City's Motion on the Fugatts' claims, the City is liable for the actions of its court here.

## 2.      No Notice of Hearings Violates Due Process.

Even if this collection practice were legitimate probation, due process still requires that a person receive notice of charges against them and to have an opportunity to meaningfully respond to the charges prior to a conviction and punishment. These constitutional niceties were routinely disregarded by Childersburg and JCS. Under the practice there, as discussed above, the City provided no notice of any post adjudication hearing and allowed JCS to set hearing dates and send whatever notice was given. (Doc. 392-2 pp. 33 at depo. pp. 125-127). JCS did not file its notices or petitions with the court clerk or even keep copies of the documents.  Rather, JCS scanned them into its system and then shredded them. (Doc. 177)  The entire joint scheme disregarded Ms. Ray's rights to notice and an opportunity to be heard required under due process. The City's Motion for Summary Judgment is due to be denied on that ground, alone.

Since the City made no efforts itself to provide notice, it hunts for support for its practice allowing JCS that function. By splicing together various attorney general opinions    none of which are not controlling authority    and the Rules of Criminal Procedure, the City strains to meet due process.[8]  **Even if the Attorney General Opinion cited was a correct and binding statement of the law, that same opinion requires notices of hearings to be left with the court clerk if the defendant's address is unknown.** Ala. Opp. Atty. Gen. 2012-027, 2012 WL 679204 at *2.  Here, JCS received numerous returned letters showing that the address used for Ms. Ray was invalid and therefore unknown. (Exhibit D). Yet, despite this, *none* of the notices were on file with the City as

---

[8] Even looking beyond the text concerning the use of mailing addresses for service, the opinion quoted by the City is filled with a blatant violations of constitutional rights. Indeed, the premise of that entire opinion concludes, without mincing words, that "the court may place a nonindigent defendant in jail for failure to pay a fine after the defendant has completed his or her sentence or probation for the underlying sentence." Ala. Opp. Atty. Gen. 2012-027, 2012 WL 679204 at *2. While not relevant for purposes here, this erroneous opinion may be a prime example of why Attorney General opinions are not controlling authority.

required by the opinion relied upon by Childersburg in its brief. No matter how the City wants to paint their actions, Ms. Ray never received notice of hearing as required by Due Process.

Next, the City suggests that its court "attempted to hold willfulness hearing." This claim is made from whole cloth and totally false. In fact, there was no allegation of willfulness[9] and no hearing whatsoever on the FTOCO charges against Ms. Ray. In this argument, the City also seems to misunderstand *Bearden* and the responsibility of the court to inquire about apparent indigency and to provide counsel when jail is potential. Ms. Ray was arrested and jailed several times on bogus charges the City concocted with no adjudication of that charge, no hearing, and no counsel either before or after the jailing. There is no evidence whatsoever that Ms. Ray was ever alleged to be or found in contempt of court. Even had her "probation" been valid, the City cannot avoid these violations.

Childersburg also insinuates the reason Ms. Ray was not getting notice is because an "unidentified individual" was writing "return to sender" on Ms. Ray's mail. This line of argument presupposes that *all* notices were *in fact mailed*. And, although the City is eager to spin its theory that a suspicious "someone" was writing "return to sender" on all of Ms. Ray's mail, many letters were, in fact, returned to JCS without any handwriting and stamped simply by the United States Post Office as undeliverable. (*See, e.g.,* Doc. 423-11, p. 3-8 at entries for 11/19/10 & 12/14/10 & 12/15/11 & 8/30/12; Exhibit D). Bottom line: even setting aside the illegality of this "probation" itself, its is clear from both the City and JCS records that Ms. Ray did not receive notice of the

---

[9]As this Court knows, under Alabama criminal procedure and statutes, the only way an individual can be lawfully jailed for nonpayment is if a written finding of willfulness is made. *See* Ala. R. Crim. P. 26.11.

hearings JCS set before arresting and jailing her.[10]

## II.   THE CITY OF CHILDERSBURG IS LIABLE FOR ITS POLICY AND PRACTICE INVOLVING ITS MUNICIPAL COURT.

Throughout its brief, the City attempts to separate itself from its court, police force, employees, and JCS. The fact remains, however, that the City's administrative decision to contract with JCS for its collection put into place the joint scheme and practice challenged here.  As a joint participant, the City is responsible for this practice. These points are thoroughly addressed in Plaintiffs' response to Childersburg's Motion for Summary Judgment on the Fugatts' claims, incorporated here.

### 1.    Ms. Ray was threatened by JCS and arrested several times.

Ms. Ray testified unequivocally that JCS threatened to throw her in jail if she did not pay as demanded. Indeed, even the deposition testimony cited by the City in its argument states this:

Q. Did [JCS] do anything else?
A. Other than hound me when I would go in there and **threaten me**, things like that, no.

(Doc. 423-1, p. 84 at depo p. 329). In other parts of her deposition testimony, Ms. Ray expanded on these threats:

Q. All right. Was the JCS person you dealt with polite to you at all times?
A. No. They was always rude.
Q. And tell me how they were rude to you.
A. They would -- **they would threaten to lock me up if I couldn't come up with money.** They even did a drug thing from my mouth, a drug test from my mouth, and I passed it. Just little things like that. **They would always threaten me if I didn't have money. The next time I come back I needed to have some money. Figure out a way to get some money.** If you ain't got it, you just ain't got it.

---

[10]In Footnote 14, Childersburg makes a series of bizarre and conclusory statements, mixing the precepts of Due Process with the JCS Contract. Frankly, these sentences do not make sense. The fact that the contract did not mandate JCS to send notices of revocation hearings does not relieve either for a failure to provide notice as required by Due Process.

Q. And I'm trying to make sure I've gotten the whole world here. Are there any other ways that you think that JCS was rude to you?

A. **Rude in the way of threatening people and then locking folks up because they didn't have money to pay, yeah**.

(Doc. 423-1, p. 25 at depo pp. 95-96(emphasis added)). Desperate to avoid the truth, the City refers to JCS' threats of throwing Ms. Ray in jail as simply "reminders" about "her obligations under the court-ordered probation sentences." (Doc. 422, p. 24). Those "reminders," however, quickly took the form or petitions to revoke probation in which JCS requested her arrest. Ms. Ray's testimony speaks for itself and so does the prompt issuance of arrest warrants after the JCS requests. (Docs. 423-14, 423-15, 423-21, 423-23). Undeniably, the City and JCS used the threat of jail to extort money from Ms. Ray, and that fact is not changed by Ms. Ray knowing her "probation" could be "revoked" when she did not pay.[11] Childersburg's entire collection scheme was based upon giving JCS the appearance of authority so its threats would be effective. The City supplied the force of its police and jail to carry them out and, in Ms. Ray's case, repeatedly. This joint system of extortion cannot be viewed in separate parts and redefining threats as "reminders" does not change what occurred. Such jury arguments and semantics do not support summary judgment.

2.    **The City and JCS worked together to extend Ms. Ray's "probation."**

The undisputed evidence shows that Ms. Ray was placed on JCS "probation" for collection

---

[11]The City cites *Edwards v. Gilbert*, 867 F. 2d 1271 (11th Cir. 1989), for the proposition that subjecting individuals to threats does not equate to a constitutional violation. That case is a far cry from the facts presented here. *Edwards* was a § 1983 action brought on behalf of a juvenile who committed suicide while in prison because of verbal abuse and threats from other adult inmates. *Id.* at 1272. His estate brought suit alleging violation of the juvenile's Eighth and Fourteenth Amendment rights through deliberate indifference to his "special needs as a juvenile housed in an adult jail..." *Id.* at 1273. The court there found that the defendants were entitled to immunity as the plaintiff failed to show that the defendants had "deliberate indifference" to the prisoner taking his own life. Addressing the juvenile's exposure to threats, the court limited its analysis to constitutional violations made by jailers and felt the need to address this point only in a footnote. *Id.* at 1273 n.1. Here, Ms. Ray was subject to more than "verbal taunts." She was told that she would be thrown in jail unless she signed onto JCS and paid the fees JCS demanded. Simply, her choices as presented by the defendants were go to jail or pay.

in August of 2010 for her traffic fines pursuant to the City's joint scheme with JCS and that "probation" was not terminated until November 2014 — over four years later. (Doc. 423-11, pp. 3 & 9). The City and JCS continued her probation during that period pursuant to the collection practice developed through its agreement with JCS. Ms. Ray's constitutional violations also continued throughout that time frame. This lawsuit was filed August 28, 2012 and Ms. Ray was still on JCS "probation" at that time. The City nevertheless argues that, even though Ms. Ray's probation was illegally extended, she was not damaged since her last payment to JCS was on October 21, 2011 and her last arrest was in February of 2012 — a few months before the two-year cut off.  In raising this argument, the City is overlooking JCS' Probation Tracker "detailed visit notes," which states another warrant was issued for Ms. Ray's arrest after she had already been on JCS probation over two years. (Doc. 423-11, p. 3 at entry 9/14/2012). Further, regarding the City's contention that these extensions were "lawful," the case law cited by the City is inapposite. Both cases cited concern real state probation — not a collection service labeled as a "probation."

### III.    ROOKER-FELDMEN AND *HECK V. HUMPHREY* ARE INAPPLICABLE.

Ms. Ray is only challenging post-conviction activities. However, the City plays fast and loose with Ms. Ray's deposition testimony, claiming she makes it "abundantly clear" that her dispute is with the judge because she did not receive community service. As defense counsel knows, there is no such claim in the pleadings of this case. Ms. Ray has an eighth grade education, cannot write very well, and the only books she reads are those for her baby. Suffice it to say, the City's attempt here to raise an unpled issue to then deflect it, is a red herring. The question posited to Ms. Ray in the testimony cited by the City did not concern what she was challenging in this litigation, but simply asked: "Have you told me everything that you think the Childersburg judge did wrong?" To be clear,

the wrongs committed by Ward would likely exceed the page limits permitted for this response. However, because Ms. Ray is only challenging post-conviction activities, both the Rooker-Feldman doctrine and *Heck v. Humphrey* are inapposite. Ms. Ray has extensively briefed these issues in her response to the Defendants' first motions to dismiss (Docs. 61 & 62), which she incorporates here.

## IV.    THE CITY'S FOOTNOTE ARGUMENTS LACK MERIT.

In Footnotes 7 and 16 of its brief, the City argues that Ms. Ray's request for declaratory and injunctive relief is due to be dismissed and that her claims are barred by the statute of limitations. In Footnote 7, the City points to changes it has made in its court processes, its new judge, the recall of warrants, and that it has ceased using probation    all to suggest injunctive relief is now moot. Plaintiffs applaud the changes made at Childersburg after this suit put light on its many violations and suggest that **these changes are additional indicia of the City's ability to control its court processes.**  Injunctive relief is nevertheless needed to mandate that the required changes remain in force.  Further declaratory relief sought here is not only prospective, but affects recovery for the remaining claims of Plaintiffs' by determining the validity of the JCS contract with the City, among others. Though the agreement has now been terminated by the parties, the validity of the contract must necessarily be addressed by the Court, as that decision will have effect on many of the Plaintiffs' claims, and on that issue there is a real and actual controversy. *See* 28 U.S.C. § 2201. Further, the effect of declaring that contract a nullity and void *ab initio* gives the Plaintiffs rights of restitution and recovery for the fees they were required to pay to JCS under that contract.[12] Essentially, the contract was the catalyst that began the practice challenged in this litigation and that

---

[12] *See Fabricant v. Sears Roebuck*, 202 F. R. D. 310, 320 (S.D. Fla. 2001)(the court certified a class allowing the class members to "restitution as the innocent party to an illegal contract, void ab initio").

brought JCS into the City.  Under it, the City promised JCS that it would require its court to order

those sent to JCS to also pay the JCS fees in exchange for JCS collecting the fines and costs at no

cost to the City.  Because of that contract, Plaintiffs paid the City's contractual consideration so the

City could acquire the JCS services cost-free.  Unquestionably, Plaintiffs have standing to challenge

the validity of the contract which required their payments. *See Wells v. Willow Lake Estates, Inc.*,

390 F. App'x 956, 958  59 (11th Cir. 2010). Here, the Plaintiffs have suffered actual injury from

being required to pay the JCS fees, which would not have occurred but for the agreement between

JCS and the City.  Standing to challenge the legality of that agreement and its resulting injury to the

Plaintiffs is satisfied.

Likewise, the City's statute of limitation argument lacks merit. The statute of limitations for

a §1983 claim is two years, but federal law has determined that the action does not accrue until the

plaintiff "knows or has reason to know that he has been injured." *Helton v. Clements*, 832 F.2d 332,

334 (5th Cir. 1987). According to the Eleventh Circuit:

> The statute [of limitations] does not begin to run until the facts which would support
> a cause of action are apparent or should be apparent to a person with a reasonably
> prudent regard for his rights.'" (Citations omitted.) Thus Section 1983 actions do not
> accrue until the plaintiff knows or has reason to know that he has been injured.
> (Citations omitted). Nor will a Section 1983 action accrue until the plaintiff is aware
> or should have been aware who has inflicted his injury. (Citations omitted.) Mullinax
> v. McElhenney, 817 F.2d 711, 716 (11th Cir. 1987) (emphasis supplied).  See Corn
> v. Lauderdale Lakes, 904 F.2d 585, 588 (11th Cir. 1990).

*Tedder v. Pace*, 1993 U.S. Dist. LEXIS 5465, 6-7.

Furthermore, the Eleventh Circuit has adopted the continuing violation doctrine.  "In the

context of actions brought pursuant to 42 U.S.C. § 1983, the continuing violation doctrine permits

a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur

within the statutory period." *Kellat v. Douglas County*, 2011 U.S. App. LEXIS 26442 (11th Cir. Ga.

Apr. 7, 2011). Ms. Ray was still on JCS "probation" at the time this lawsuit was filed. (Doc. 423-11).

Indeed, JCS requested a warrant for her arrest in September of 2012. (*Id.*)  That probation was not

terminated until November 2014 with the warrant being recalled thereafter. (Doc. 423-11, pp. 3 &

9; Doc. 183-4). Thus, because the violations of Ms. Ray's rights were continuing, the statute of

limitations is no bar to her claims.

## CONCLUSION

There are multiple genuine questions of material facts that prevent summary judgment for

the City on Ms. Ray's claims. In truth however, under the full uncontested facts, there is no

interpretation of prevailing law that can justify such a request and approve this extortion. Perhaps

tellingly, both the mayor and police chief of Childersburg testified that they did not know it was

illegal to jail someone because they could not pay a fine.  (Doc. 392-9, p. 24 at depo pp. 89-90; Doc.

402-38, p. 30 at depo pp. 117-119). For the many reasons discussed above, Childersburg's Motion

for Summary Judgment on Ms. Ray's claims is due to be denied.

RESPECTFULLY SUBMITTED,

s/ G. Daniel Evans
G. Daniel Evans
ASB-1661-N76G
Alexandria Parrish
ASB-2477-D66P
D. Patrick Evans
ASB-3209-R67G
Maurine C. Evans
ASB-4168-P16T
Attorneys for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone:  (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com

30

E-Mail: ap@evanslawpc.com
E-Mail: dpevans@evanslawpc.com
E-Mail: mevans@evanslawpc.com

Erwin Chemerinsky
University of California Irvine
401 East Peltason Drive
Irvine, CA 92697
E-Mail: echemerinsky@law.uci.edu

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4th day of October, 2016, I electronically filed the foregoing Plaintiffs' Memorandum Brief in Opposition to Childersburg's Motion for Summary Judgement with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Will Hill Tankersly, Esquire
Gregory C. Cook, Esquire
L. Conrad Anderson, IV, Esquire
Ginny Willcox Leavens, Esquire
Christopher K. Friedman, Esquire
Ed R. Haden, Esquire
Chase T. Espy, Esquire
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203

Timothy P. Donahue, Esquire
DONAHUE & ASSOCIATES, LLC
1020 22nd Street South
Birmingham, Alabama 35205

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
WALLACE, JORDAN, RATLIFF & BRANDT, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253

F. Lane Finch, Jr., Esquire
Brian Richardson, Esquire
Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203                     s/ G. Daniel Evans_____
                                         G. Daniel Evans