# Exhibit A

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3         SOUTHERN DIVISION

4

5   CIVIL ACTION NO. 2:12-cv-02819-RDP

6

7   GINA KAY RAY, KRISTY FUGATT, et al.

8        PLAINTIFF(S),

9   VS.

10   JUDICIAL CORRECTION SERVICES,

11   INC., et al.,

12        DEFENDANT(S).

13

14   CIVIL ACTION NO. 2:15-cv-00493-RDP

15

16   KARI WOODS, HALI WOODS, et al.,

17        PLAINTIFF(S),

18   VS.

19   THE CITY OF COLUMBIANA, et al.,

20        DEFENDANT(S).

21

22        DEPOSITION OF

23        DON HOUSTON

---

Page 2

1        S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED, by and

3   between the parties through their respective

4   counsel, that the deposition of DON HOUSTON

5   may be taken before Kerry K. Thames, Commis-

6   sioner, at 600 Marriott Drive, Nashville,

7   Tennessee, on September 12, 2016, commencing

8   at 9:05 A.M.

9        IT IS FURTHER STIPULATED AND AGREED

10   that the signature to and reading of the

11   deposition by the witness is waived, said

12   deposition to have the same force and effect

13   as if full compliance had been had with all

14   laws and rules of court relating to the taking

15   of depositions.

16        IT IS FURTHER STIPULATED AND AGREED

17   that it shall not be necessary for any

18   objections to be made by counsel to any

19   questions except as to form or leading

20   questions, and that counsel for the parties

21   may make objections and assign grounds at the

22   time of the trial, or at the time said

23   deposition is offered in evidence, or prior

---

Page 3

1   thereto.

2        IT IS FURTHER STIPULATED AND AGREED

3   that notice of filing of deposition by

4   commissioner is waived.

5

6              INDEX

7

8   EXAMINATION BY:                    PAGE NO.

9   Mr. Evans                         9; 232

10                      289

11   Mr. Tankersley              182; 294

12   Mr. Finch                   285

13

14           EXHIBITS

15

16   Plaintiff's Exhibit:

17   No. 283    Notice of Deposition-CHC    43

18   No. 284    Notice of Deposition-Houston  43

19   No. 285    Notice of Deposition-Houston  44

20   No. 286    Notice of Deposition-CHC    44

21   No. 287    Large Organization Chart    51

22        (Set Out Separately)

23   No. 288    Chain/Goetz 10-6-11    77

---

Page 4

1   Plaintiff's Exhibit:          Page No.

2   No. 289    CHC/JCS Merger Agreement    80

3   No. 290    Chain/Houston 10-13-11    81

4   No. 291    Email/Houston 7-7-11    82

5   No. 292    Chain/Houston 7-27-11    84

6   No. 293    Email/Goetz 1-31-12    87

7   No. 294    Email/Houston 6-2-12    89

8   No. 295    Email/Ray 10-26-12    92

9   No. 296    12-7-12 Ray Hire Document    95

10   No. 297    Email/Houston 12-13-12    96

11   No. 298    Chain/Goetz 12-31-12    99

12   No. 299    Email/Houston 1-9-13    100

13   No. 300    Chain/Houston 1-23-13    103

14   No. 301    Chain/Goetz 1-30-13    104

15   No. 302    Chain/Goetz 1-5-13    106

16   No. 303    Chain/Houston 1-4-13    108

17   No. 304    Chain/Goetz 1-15-13    109

18   No. 305    Email/Houston 5-17-14    112

19   No. 306    Chain/Goetz 5-14-13    113

20   No. 307    Email/Houston 6-25-13    115

21   No. 308    Email/Goetz 7-29-13    117

22   No. 309    Email/Goetz 8-20-13    118

23   No. 310    Email/Allison 11-6-13    119

Page 5

1  Plaintiff's Exhibit:          Page No.
2  No. 311      Chain/Buss 11-12-13       121
3  No. 312      Chain/Buss 1-13-14        123
4  No. 313      CCS Executive Leadership      127
5          Document for 2014
6  No. 314      CCS Leadership Document for   129
7      2015
8  No. 315      Noncompete for Stan Stevens   148
9  No. 316      Houston 2013 W-2 Forms       154
10 No. 317      Kidd 2013 W-2 Forms          156
11 No. 318      6-13-14 CCS Open Letter      158
12 No. 319      7-23-14 Dominicis Letter     160
13 No. 320      Chain/Buss 2-11-14           168
14 No. 321      Email/Ray 9-11-15            171
15 No. 322      Email/Ray 10-2-15            174
16 No. 323      1-1-15 Management Services   177
17      Agreement Between CHC and CCS
18 No. 324      Chain/Allison 5-15-14        232
19 No. 325      Email/Ray 9-4-14             235
20 No. 326      Email/Lloyd 6-16-14          238
21 No. 327      CHC Integration Project      240
22 No. 328      Chain/McClure 9-11-15        252
23 No. 329      Chain/McClure 9-8-15         254

Page 6

1  Plaintiff's Exhibit:          Page No.
2  No. 330      Chain/McClure 3-16-15        255
3  No. 331      Chain/Houston 12-5-14        257
4  No. 332      Chain/Lloyd 2-11-15          260
5  No. 333      JCS Filed 2015 Annual Report  262
6  No. 334      CHC Filed 2015 Annual Report  264
7  No. 335      3-9-16 State of Georgia       266
8          Filing for JCS
9  No. 336      JCS, etc., Answers to         272
10      First Interrogatories
11
12 Defendant's Exhibit:
13 No. 1      Organizational Chart       284
14
15
16
17
18
19
20
21
22
23

Page 7

1          APPEARANCES
2
3  FOR THE PLAINTIFF(S):
4  Mr. G. Daniel Evans
5  Ms. Alexandria Parrish
6  THE EVANS LAW FIRM
7  1736 Oxmoor Road, Suite 101
8  Birmingham, Alabama 35209
9
10 FOR THE DEFENDANT(S):
11 Mr. F. Lane Finch, Jr.
12 SWIFT, CURRIE, MCGHEE AND HIERS
13 2 North 20th Street
14 Suite 1405
15 Birmingham, Alabama 35203
16
17 Mr. Will Hill Tankersley
18 BALCH & BINGHAM
19 1901 6th Avenue North
20 Suite 1500
21 Birmingham, Alabama 35203
22
23

Page 8

1  FOR THE DEFENDANT(S) CONTINUED:
2  Mr. Michael L. Jackson
3  WALLACE, JORDAN, RATLIFF & BRANDT
4  800 Shades Creek Parkway
5  Suite 400
6  Birmingham, Alabama 35209
7
8  Mr. J. Bentley Owens, III
9  ELLIS, HEAD, OWENS & JUSTICE
10 113 North Main Street
11 Columbiana, Alabama 35051
12
13
14
15
16
17
18
19
20
21
22
23

Page 9

1      I, Kerry K. Thames, acting as
2 Commissioner, certify that on this date as
3 provided by the Federal Rules of Civil
4 Procedure, and the foregoing stipulation of
5 counsel, there came before me DON HOUSTON,
6 witness in the above cause, for oral
7 examination, whereupon the following
8 proceedings were had:
9
10      DON HOUSTON,
11 being first duly sworn, was examined and
12 testified as follows:
13
14      THE COURT REPORTER: Usual
15 stipulations?
16      MR. FINCH: That's fine.
17
18 EXAMINATION BY MR. EVANS:
19    Q. Would you state your name, please,
20 sir?
21    A. Don Houston.
22    Q. Mr. Houston, I'm Danny Evans. We
23 met just a few minutes earlier. I have the

Page 10

1 opportunity to ask you some questions today.
2 Have you given depositions before?
3    A. I have.
4    Q. Okay, well, you know the routine,
5 then, and --
6    A. I do.
7    Q. -- I know you've met with Mr.
8 Finch. Obviously, if you need to take a break
9 or anything like that, please let us know. At
10 different points today I'll mark some
11 documents as exhibits and refer to them as
12 exhibit numbers. I'm sure you've had that
13 done before too --
14    A. I have.
15    Q. -- so we've got a lot of paper
16 that we'll show you. I would like to just
17 start off with a little bit of background
18 information about you if I may. Do you have
19 any connections in Alabama, any relatives,
20 any --
21    A. No, I do not.
22    Q. Have you been to Alabama?
23    A. I've been to Alabama.

Page 11

1    Q. How many times have you been to
2 Alabama?
3    A. Not many. Probably less than five
4 in my life.
5    Q. All right, and what was your
6 business to Alabama?
7    A. Either driving through --
8    Q. Uh-huh.
9    A. -- I actually went there in 1989
10 taking -- I took Soviet inspectors to a
11 facility outside of Birmingham.
12    Q. Outside of Birmingham?
13    A. Yeah, I think that's where it was,
14 but it was during -- I was an interpreter for
15 the Intermediate Nuclear Forces Treaty, and so
16 we took Soviet inspectors to a number of
17 places in the United States wherever they had
18 Pershing 1A and Pershing 2 missiles.
19    Q. Do you speak Russian?
20    A. (Indicating). Yes.
21    Q. I would say yes.
22    A. Yes.
23    Q. That's interesting.

Page 12

1      (Whereupon, an off-the-record
2 discussion was had).
3    Q. (BY MR. EVANS) Other than the
4 time you came there, do you remember any
5 other --
6    A. Yeah, I made a trip there probably
7 in '14 or '15 just to meet with Colleen Ray.
8    Q. I see. And was that your only
9 visit as far as business interests --
10    A. Yes.
11    Q. -- that we're here about?
12    A. Yes.
13    Q. And you met with Mrs. Ray. Where
14 did you meet with her?
15    A. It was outside of -- what is that,
16 Selma. I think it's Selma, yeah.
17    Q. Could have been. And that's at or
18 about the time that JCS was pulling out of
19 Alabama, it sounds like?
20    A. It was prior to that.
21    Q. Was it?
22    A. Yeah.
23    Q. What was the purpose of your

Page 13

1 meeting?
2    A.  It was to discuss whether or not
3 we were going to hire a firm, a lobbying firm.
4    Q.  And did you?
5    A.  No.
6    Q.  Did you hire any lobbying
7 individuals --
8    A.  No.
9    Q.  -- at that time?
10    A.  No.
11    Q.  Had you hired other lobbying
12 individuals prior to that time?
13    A.  No.  In Alabama, no.
14    Q.  And this was in relation to the
15 JCS operation in Alabama, is that right?
16    A.  Yes.
17    Q.  We'll get into that in more
18 detail.
19    A.  Okay.
20    Q.  I would like to know just a brief
21 synopsis of your education.  Can you tell me
22 that?
23    A.  I have a bachelor's degree in

Page 14

1 education and psychology, postgraduate work in
2 psychology.
3    Q.  And when did you get your B.A.
4 degree?
5    A.  1978.
6    Q.  As far as your activity after your
7 school, if you can carry me forward with your
8 work history a little bit, where you worked,
9 what you did, and so forth.
10    A.  Okay.  Seven years in the U.S.
11 Army.
12    Q.  Okay.
13    A.  Seven years with the Department
14 of -- Texas Department of Corrections.
15 Seventeen years with a private prison company.
16    Q.  Which was that?
17    A.  Wackenhut Corrections.
18    Q.  I'm sorry?
19    A.  Wackenhut, W-a-c-k-e-n-h-u-t,
20 Corrections.
21    Q.  And rather than just the years,
22 can we put a date on -- when did you get out
23 of the Army?

Page 15

1    A.  '78.
2    Q.  So you got out of the Army and
3 got your --
4    A.  Then went to school.
5    Q.  I see.  You said you got your B.A.
6 degree in '78 and you got out of the Army --
7    A.  Yeah -- well, actually I started
8 in '78 and got out in '82, so that was
9 incorrect.
10    Q.  I see.  So you got out of the Army
11 in '78 --
12    A.  Correct.
13    Q.  -- and did you go immediately to
14 work --
15    A.  I did.
16    Q.  -- with the Department of
17 Corrections?
18    A.  No, I went to -- went to school,
19 and I taught for two years, and then went to
20 TDCJ right after that.
21    Q.  And I'm not familiar with that
22 acronym.
23    A.  Texas Department of Corrections.

Page 16

1    Q.  Okay.  So you would have taught
2 until '84, and then in '84 you would have gone
3 to the Department of Corrections?
4    A.  Correct.
5    Q.  Until '91 --
6    A.  Correct.
7    Q.  -- I presume?
8       MR. FINCH:  Be sure you let him
9 finish so you don't make it hard on the court
10 reporter trying to get two people at once.
11    A.  Okay.
12       (Whereupon, an off-the-record
13 discussion was had).
14    Q.  (BY MR. EVANS)  What position did
15 you have with the Department of Corrections?
16    A.  I was supervisor over the
17 Diagnostic and Psychological Department.
18    Q.  Okay.  And why did you leave
19 there?
20    A.  Offered a better job.
21    Q.  And that was with Wackenhut
22 Corrections?
23    A.  Wackenhut Corrections.

Page 17

1      Q.  So you went directly from the
2  Department of Corrections to Wackenhut?
3      A.  Yes.
4      Q.  Okay.  And it sounds like that
5  would have been, if you worked with Wackenhut
6  seventeen years, that would have put you up
7  until about 2008, is that right?
8      A.  2009, yes, sir.
9      Q.  2009?
10      A.  Yes.
11      Q.  And what position did you have
12  with Wackenhut?
13      A.  Many.
14      Q.  Well, help me understand what that
15  includes.
16      A.  I started off as an assistant
17  warden.  I became a warden, a regional
18  director, a vice president over programs, vice
19  president over all adult facilities, and my
20  last position with them was a senior regional
21  vice president.
22      Q.  I see.  And where does Wackenhut
23  operate private prisons?

Page 18

1      A.  All over the country and
2  internationally.  They are now called the GEO
3  Group.
4      Q.  The G --
5      A.  They changed their name GEO.
6      Q.  And is this where you first met
7  Mr. Dominicis?
8      A.  I --
9      Q.  Jorge, is that right?
10      A.  Oh, Dominicis.
11      Q.  Okay, I'm sorry, I mispronounced
12  his name.
13      A.  Yes, I did meet him there.
14      Q.  Okay, and in your capacity there
15  at the GEO Group or Wackenhut group, did you
16  have any ownership in the company?
17      A.  Just stock.  I purchased stock and
18  was awarded some stock, but no real ownership.
19      Q.  And during your time up until
20  2009, did you have any other business pursuits
21  or professional pursuits?
22      A.  No.
23      Q.  Why did you leave the GEO Group in

Page 19

1  2009?
2      A.  I had a chance to become president
3  of a small medical company.
4      Q.  And what was that?
5      A.  Physicians Network Association.
6      Q.  PNA?
7      A.  PNA.
8      Q.  And who offered you that position?
9      A.  The owner of the company.
10      Q.  Who was?
11      A.  Dr. Vernon Farley.
12      Q.  And where was that job located?
13      A.  Lubbock, Texas.
14      Q.  And how long did you stay with
15  PNA?
16      A.  I guess I still am with PNA.
17      Q.  Explain that to me, if you would.
18      A.  PNA is one of the companies that
19  is a subsidiary of CHC.
20      MR. FINCH:  And just for every-
21  body's reference, whenever Don refers to CHC,
22  he's referring to CHC Companies, Inc., rather
23  than --

Page 20

1      MR. EVANS:  We'll get into that --
2      MR. FINCH:  -- what sometimes is
3  called CHC when people are referring to
4  Correctional Healthcare Companies, Inc.
5      MR. EVANS:  We'll get into all of
6  that, Lane.
7      MR. FINCH:  All right.
8      Q.  (BY MR. EVANS)  When did PNA
9  become a subsidiary of CHC?
10      A.  Let's see.  I think late 2010, but
11  I don't know the exact date.  But it was in
12  2010.
13      Q.  Up until that point were you
14  solely concerned and functioning under PNA?
15      A.  Correct.
16      Q.  You had no other dual role of any
17  kind?
18      A.  No.
19      Q.  And in 2010, up until 2010, did
20  you have any ownership share in PNA?
21      A.  I did not.
22      Q.  Was your superior Mr. -- or Dr.
23  Vernon Farley the whole time that you were

Page 21

1 there?

2     A. Yes. And I guess his son, his son

3 worked for him.

4     Q. Purchased by CHC in 2010. What

5 part, if any, did you play in that?

6     A. I did some of the due diligence

7 work, responded to due diligence requests on

8 the part of CHC, met with members of the CHC

9 executive team.

10     Q. And who were they?

11     A. Doug Getz and Dr. Larry Wolk.

12     Q. Was, and I'll probably butcher his

13 name, Jorge Dominicis, is that right, was he

14 involved at that time at all?

15     A. No.

16     Q. And when the company PNA was

17 purchased, did the entity itself remain

18 intact?

19     A. It did.

20     Q. And it continues to operate under

21 the name or brand of PNA?

22     A. It does.

23     Q. Do you have any ongoing

Page 22

1 responsibility there?

2     A. I'm the president of PNA.

3     Q. What does it do -- where is it

4 located? Does it have a --

5     A. It really doesn't have a

6 corporate office anymore, but it does have

7 contracts.

8     Q. And what type of service does it

9 provide?

10     A. Health care. It's a health care

11 company.

12     Q. And who does it provide health

13 care services to?

14     A. It provides them to counties, to

15 private operators, to the federal government.

16     Q. Services for inmates or --

17     A. Yes, health care services.

18     Q. But they're all for inmates?

19     A. Correct.

20     Q. As far as CHC, now, it sounds

21 like in 2010 you become an employee of CHC, is

22 that correct?

23     A. Correct.

Page 23

1     Q. And what was your capacity at CHC

2 initially?

3     A. Initially I was executive vice

4 president of operations.

5     Q. Where were you located?

6     A. In Denver -- or Greenwood Village.

7     Q. Who was your superior?

8     A. Doug Goetz.

9     Q. Did you have any ownership in CHC

10 once the purchase was made?

11     A. I don't know if it's ownership. I

12 rolled proceeds into it, so --

13     Q. Can you explain that for me?

14     A. I put money in the company, so I

15 invested.

16     Q. Well, I hope you got something for

17 it. Did they give you some stock?

18     A. It's all restricted stock and --

19     Q. But you have some stock ownership?

20     A. Yes.

21     Q. And once CHC purchased PNA, did

22 you have a directorship in the entity CHC?

23     A. No.

Page 24

1     Q. Well, you said you reported to

2 Doug Goetz. What position did Mr. Goetz have

3 at that time?

4     A. The CEO.

5     Q. So he was the head of the company?

6     A. Yes.

7     Q. Did you have a board chairman or

8 anybody of that nature?

9     A. Yes, we did.

10     Q. Who was the board chairman?

11     A. I think Doug was the board chair

12 at that time.

13     Q. And was he also located in the

14 Denver, Colorado, area?

15     A. Yes, sir.

16     Q. And how long did you remain in

17 that capacity?

18     A. Until 20 -- no, I became the chief

19 operating officer about a year later.

20     Q. So you were initially the

21 executive vice president of operations?

22     A. Yes.

23     Q. And then you became the COO --

Page 25

1    A.  Right.
2    Q.  -- about 2011?
3    A.  About then.  Doug Goetz -- I mean
4  Dr. Wolk left the company, and I took his
5  position.
6    Q.  And did you remain there in
7  Denver?
8    A.  I did.
9    Q.  And were you continuing to report
10 to Mr. Goetz?
11   A.  Yes.
12   Q.  And was he still remaining as the
13 board chairman at that point?
14   A.  Yes.
15   Q.  And I guess your ownership,
16 restricted stock, remained about the same?
17   A.  The same.
18   Q.  Were you continuing to operate
19 under the name of CHC, or did you operate
20 under the name of any other company?
21   A.  CHC.
22   Q.  I have seen, as Lane pointed out,
23 also the name Correctional Healthcare

Page 26

1  Companies.  Did you ever operate as that name?
2    A.  I -- there was some change of name
3  that was done I guess for tax purposes and
4  other things.  I really wasn't involved in
5  that.  As far as I knew, I was CHC, and that's
6  what I operated as is CHC.
7    Q.  We'll go through those documents
8  in a little bit --
9    A.  Okay.
10   Q.  -- but we've seen documents that
11 were filed in Delaware where Correctional
12 Healthcare Companies name was changed to CHC
13 Companies, and CHC Companies was changed to
14 Correctional Healthcare Companies.  Do you
15 know anything about why that happened?
16   A.  No.
17   Q.  Do you know why Mr. Goetz would
18 have done that?
19   A.  I don't know that Mr. Goetz was
20 the one who was doing that.  I think it was
21 the PE firm and the CFO.  I'm sure Doug was
22 involved, but --
23   Q.  Who was the CFO at this time?

Page 27

1    A.  Bruce McDaniel.
2    Q.  But as far as you were concerned,
3  the operation of the entity was continuing to
4  operate as CHC Companies, Inc., is that right?
5    A.  Yeah, as far as I was concerned,
6  nothing changed.
7    Q.  And during this time frame of 2010
8  to 2011, you told me your function was
9  executive vice president and COO.  What
10 services was CHC Companies, Inc., providing?
11   A.  Health care.
12   Q.  Health care.  Again, to inmates?
13   A.  To inmates.  Almost exclusively to
14 inmates.
15   Q.  It sounds like most of this
16 business model is focused on inmate
17 populations and things of that nature, is that
18 correct?
19   A.  Correct.
20   Q.  And when we get to 2011, other
21 than your becoming the COO, did you have any
22 other change in your function, title, anything
23 of that nature?

Page 28

1    A.  No.
2    Q.  Your responsibilities remained
3  essentially the same?
4    A.  They did.
5    Q.  And how many states were you
6  providing these services in at that time?
7    A.  I don't know.  At least a dozen.
8    Q.  Did you have to travel a lot, or
9  were you mostly --
10   A.  I traveled a lot.
11       MR. FINCH:  Be sure to slow down
12 so Kerry doesn't blow a gasket.
13       (Whereupon, an off-the-record
14 discussion was had).
15   Q.  (BY MR. EVANS)  I know at some
16 point in time, we're taking this deposition
17 here in Nashville, at some point in time you
18 moved here, correct, to Nashville?
19   A.  At what --
20   Q.  I'll say it again --
21   A.  My office is here, yes.
22   Q.  You haven't moved?
23   A.  I have not moved.

Page 29

1    Q.  How often are you here in
2 Nashville?
3        A.  All week.
4        Q.  And then you go back to Colorado?
5        A.  No, to Texas.  I live in Texas.
6        Q.  I see.  What part?
7        A.  Just outside of Dallas in
8 Rockwall, Texas.
9        Q.  Did you move from Colorado to
10 Texas?
11       A.  Yes.
12       Q.  And when did you do that?
13       A.  Let's see, July of 2014.
14       Q.  But you were still working at that
15 point in time for CHC?
16       A.  Correct.
17       Q.  Was there any particular reason
18 that you moved?
19       A.  Family.  My family is in Texas.
20       Q.  Okay, so you were able to -- go
21 ahead and drink your water.
22           (Whereupon, an off-the-record
23 discussion was had).

Page 30

1    Q.  (BY MR. EVANS)  But you were able
2 to work from a location in Texas even though
3 your office previously had been in Colorado?
4        A.  I live in Texas.  I fly here on
5 Monday, I leave on Friday.  So I work here --
6 I'm here all week.
7        Q.  And what's the address of your
8 office here?
9        A.  1283 Murfreesboro Pike.
10       Q.  How many other divisions of the
11 company operate from that location?
12       A.  Two divisions operate from that
13 location.
14       Q.  And what are they?
15       A.  They're the State and Federal, and
16 there's Local Detention.
17       MS. PARRISH:  So State and
18 Federal is one division?
19       A.  State and Federal is one division,
20 and Local Detention is another.
21       Q.  (BY MR. EVANS)  I see.  Any other
22 entities or --
23       A.  There's --

Page 31

1        MR. FINCH:  Hold on, hold on.  Let
2 him finish his question.
3        A.  Okay.
4        Q.  (BY MR. EVANS)  Any other entities
5 operate out of that address, that location?
6        A.  Out of that address, no.
7        Q.  Okay, you began to say something
8 before you were interrupted.  What were you
9 going to say?
10       A.  Well, I was going to say that
11 those are the divisions that operate out of
12 Nashville, out of that office.
13       Q.  And when we're talking about
14 divisions, you're talking about divisions of
15 CCS?
16       A.  Yes.
17       Q.  Your office, which division is
18 that?
19       A.  State and Federal.
20       Q.  We'll get into those details, but
21 when did your office, your business office,
22 actually relocate to Nashville?
23       A.  I guess it was -- this is '16, so

Page 32

1 it had to be January of '15.
2        Q.  January of '15.  Was that after
3 the purchase of CCH by CCS --
4        MR. FINCH:  I'm going to let
5 you --
6        Q.  (BY MR. EVANS)  -- CHC by --
7        MR. FINCH:  -- sort of go as long
8 as we have a practical understanding of
9 purchase without getting into the details of
10 exactly how that was accomplished --
11       MR. EVANS:  We'll get into the
12 details.
13       MR. FINCH:  -- and we'll give you
14 more detail on that later.
15       Q.  (BY MR. EVANS)  Was that after the
16 purchase of CHC by CCS?
17       A.  I don't know that there was ever a
18 purchase by CCS, but it was after those two
19 companies have come together and -- yes, it
20 was after that.
21       Q.  And you currently operate from
22 that location?
23       A.  Which location.

Page 33

1    Q.   The Murfreesboro location?

2    A.  Yes.

3    Q.   Backing up a little bit, you were

4 with CHC, I believe, when JCS was acquired, is

5 that correct?

6    A.  I was.

7    Q.   Did you have any part in that

8 acquisition?

9    A.  None whatsoever.

10    Q.   Had you had any function in JCS

11 prior to that time?

12    A.  None whatsoever.

13    Q.   Do you know when that occurred?

14    A.  2011, late 2011, I believe.

15    Q.   The information we have is Septem-

16 ber of 2011.  Does that sound appropriate?

17    A.  Probably about right, yes.

18    Q.   Who handled the acquisition of JCS

19 by CHC Companies?

20    A.  Doug Goetz and Bruce McDaniel.

21    Q.   After it was purchased, did you

22 acquire some responsibility for JCS?

23    A.  What do you mean by responsibi-

Page 34

1 lity?

2    Q.   Did that come under your bailiwick

3 as a person with CHC, the COO?

4    A.  Eventually.

5    Q.   At what point?

6    A.  It was not, really, until Dirk

7 Allison became the CEO of the company.

8    Q.   When what was that?

9    A.  It was 2014.  I don't remember

10 exactly when it was, but it was 2014.

11    Q.   Mr. Allison, what had been his

12 connection with any of that?

13    A.  He replaced Doug Goetz.

14    MR. TANKERSLEY:  Say again,

15 please.

16    A.  He replaced Doug Goetz as the CEO.

17    MR. TANKERSLEY:  Thank you, sir.

18    Q.  (BY MR. EVANS)  Up until 2014 did

19 you have any responsibility for overseeing the

20 operations of JCS?

21    A.  No.

22    Q.   Who did?

23    A.  Doug Goetz and for most of the

Page 35

1 time it was Jarrett Gorlin.

2    Q.   Mr. Gorlin had previously been one

3 of the owners of JCS, is that correct?

4    A.  Correct.

5    Q.   So when it was purchased in

6 September of 2011, he remained with the

7 company, is that correct?

8    A.  Correct.

9    Q.   And Doug Goetz as the CFO -- or

10 CEO of CHC --

11    A.  Right.

12    Q.   -- had responsibility over the new

13 purchased entity too, is that right?

14    A.  I just know that Jarrett reported

15 directly to Doug.

16    Q.   Was there a period of time when

17 the folks at CHC were involved in an

18 integration of JCS into that entity?

19    A.  We had an aspirational integra-

20 tion, yes.

21    Q.   Explain what you mean by that.

22    A.  We talked about integrating, we

23 even tried to integrate some of JCS, but it

Page 36

1 was more of a, like I say, an aspirational

2 integration than an actual integration.

3    Q.   When the JCS entity was purchased

4 by CHC, did the JCS employees become employees

5 of CHC?

6    A.  No.

7    Q.   Were they paid by the CHC payroll

8 people?

9    A.  I think eventually they were.  Not

10 at first, but eventually, yes.

11    Q.   Were they issued W-2s from CHC?

12    A.  I haven't seen them so I couldn't

13 answer that.

14    Q.   We'll try to refresh your

15 recollection with some of these documents.

16    A.  Okay.

17    Q.   Your current position is what?

18    A.  I'm the president of State and

19 Federal.

20    Q.   State and Federal?

21    A.  That's a division.

22    Q.   Of?

23    A.  CCS.

Page 37

1  Q.  Do you have titles with any other

2  entities of?

3  A.  I'm the CEO of CHC and the

4  president of PNA.

5  Q.  Any other entities --

6  A.  No.

7  Q.  -- within the CCS umbrella?

8  A.  No, sir.

9  Q.  By the way, there at the

10  Murfreesboro address do y'all have conference

11  rooms?

12  A.  Yes.

13  Q.  We were told you didn't so that we

14  would have to relocate --

15  MR. FINCH:  Well, that's not what

16  I said.

17  Q.  (BY MR. EVANS)  We were --

18  A.  Available conference rooms --

19  Q.  A different issue, huh?

20  A.  -- probably not.

21  Q.  Okay.

22  MR. FINCH:  That's what I said.

23  Q.  (BY MR. EVANS)  Well, we're happy

Page 38

1  to have you here anyway.

2  In your current position as COO of

3  CHC, president of PNA, president of the State

4  and Federal Division of CCS, who do you report

5  to?

6  A.  Jorge Dominicis.

7  Q.  And his position is what?

8  A.  He's the CEO.

9  Q.  Of what?

10  A.  Of CCS.

11  Q.  CCS, LLC?

12  A.  Yes.

13  Q.  So he's the top of the pyramid, so

14  to speak?

15  A.  Yes --

16  Q.  And would that --

17  A.  -- except for the board.

18  Q.  I'm sorry?

19  A.  Except for the board.

20  Q.  And the board chairman is who?

21  A.  Jerry Boyle.

22  Q.  As I understand, Mr. Boyle was one

23  of the founders of the enterprise?

Page 39

1  A.  That's correct.

2  Q.  Had you worked with Mr. Boyle

3  before coming here to Nashville?

4  A.  No.

5  Q.  When CCS and CHC came together,

6  whatever term you want to use, did you take

7  any part in that joinder?

8  A.  Only in responding to due

9  diligence requests.

10  Q.  And when that joinder occurred,

11  which we believe to be in July of 2014, does

12  that sound about right --

13  A.  About.

14  Q.  -- did you acquire any ownership

15  in any of the remaining entities?

16  A.  No.

17  Q.  For instance, do you own any

18  membership share in CCS?

19  A.  I do not.

20  Q.  You maintain the title of

21  president of a division of CCS?

22  A.  Correct.

23  Q.  And you hold also the title of COO

Page 40

1  of CHC, which is owned by CCS, correct?

2  A.  I don't know that it's owned by

3  CCS.

4  Q.  What do you understand the

5  relationship to be?

6  A.  They are two companies that exist

7  side by side with a holding company that owns

8  them.

9  Q.  As far as the other divisions of

10  CCS, are you familiar with those?

11  A.  I am.

12  Q.  I had seen this title by your name

13  previously, president of the Private Prison

14  Division?

15  A.  That's not an accurate title.

16  Q.  It's not?

17  A.  No.

18  Q.  Well, do you have any idea why it

19  was published as such?

20  A.  I don't know.

21  Q.  Is there a difference in the

22  Private Prison Division and the State and

23  Federal Prison Division?

Page 41

1      A.   It's a subset of -- Private
2  Prisons is a subset of State and Federal.
3      Q.   So you would be president of the
4  larger group that included that?
5      A.   Correct.
6      Q.   And you would be responsible for
7  the operations of the private prisons?
8      A.   I am, yes.
9      Q.   I've seen various files about you,
10 sir, when you were with the GEO Group, that
11 you oversaw twenty-four correctional facili-
12 ties and things of that nature?
13     A.   Correct.
14     Q.   Do you maintain any ongoing
15 ownership or connection with the GEO Group?
16     A.   None whatsoever.
17     Q.   Was Mr. Dominicis' position for
18 the GEO Group?
19     A.   He -- he was the -- I don't know
20 what his title was, I think he was president
21 of GEO Care, which was a division of the GEO
22 Group.
23     Q.   Did you and Mr. Dominicis leave

Page 42

1  there at the same time?
2      A.   No, I left about five years before
3  he did.
4      Q.   What is are your email address?
5      A.   Don.houston@correctcaresolutions.
6  com.
7      Q.   Solutions.com?
8      A.   Uh-huh (Nodding head).
9      Q.   Do you use any other email
10 addresses?
11     A.   I have my private email address.
12     Q.   Well, concerning your company, do
13 you --
14     A.   The -- I'm trying to remember what
15 my CHC one was.  I had a CHC email address,
16 but I don't use that anymore.  I use the
17 Correct Care Solutions.
18     Q.   So all of the email that would be
19 coming to you since the joinder of Correct
20 Care Solutions and CHC would be under this
21 email?
22     A.   Probably.
23     Q.   Any other emails other than your

Page 43

1  private that you would have used within the --
2      A.   No.
3      Q.   -- past three or four years?
4      A.   Not in the last three or four
5  years, no.
6      Q.   We started this process, Mr.
7  Houston, by sending some notices of deposition
8  to your counsel and the counsel for the other
9  parties.  I'm going to mark those.
10     A.   Okay.
11
12         (Plaintiff's Exhibit Numbers 283
13 and 284 were marked for identification and
14 copies of same are attached hereto).
15
16     Q.   (BY MR. EVANS)  We had intended to
17 not only take your deposition personally but
18 also the deposition of the representative of
19 CHC Companies, so I'm showing you the
20 deposition notice of you and of the actual
21 company, CHC, which I've marked as Exhibits
22 283 and 284.
23

Page 44

1         (Plaintiff's Exhibit Numbers 285
2  and 286 were marked for identification and
3  copies of same are attached hereto).
4
5      Q.   (BY MR. EVANS)  And for complete-
6  ness I'll show you 285 and 286, which are the
7  same exhibits, except they have a different
8  case at the top because there's another case
9  involved with the same issue.
10         MR. FINCH:  It's just the same,
11 but remember I mentioned there was Columbiana
12 as --
13     A.   Yeah.
14     Q.   (BY MR. EVANS)  Have you seen
15 those documents before?
16     A.   I have.
17     Q.   In the corporate representative
18 document we've identified certain topics that
19 we would like to talk to a representative of
20 CHC about.  I'll ask you, sir, are you the
21 corporate representative on all of those
22 listed topics, seventeen of them.
23     A.   Seventeen?

Page 45

1      MR. FINCH:  Look at 283.  That's
2 the one we looked at.
3      A.  (Examining documents).  Yes.
4      Q.  (BY MR. EVANS)  So you're the
5 corporate representative for CHC Companies,
6 Inc., on all seventeen topics?
7      A.  Yes.
8      Q.  Okay, you understand that while
9 you're answering questions today you will be
10 answering them both in your individual
11 capacity and as a representative of that
12 company?
13      A.  Yes, sir.
14      Q.  Okay.
15      A.  Okay.
16      Q.  We also had requested certain
17 categories of documents, and your attorney has
18 provided some of those.
19      MR. EVANS:  There were some
20 additional documents that we've had some
21 correspondence about, Lane, the 2015 W-3s, the
22 policies and procedures of CCS that were never
23 provided to us.  Do you have any?

Page 46

1      MR. FINCH:  I believe the 2003
2 W-3, although it looks different, that's what
3 that document says --
4      MR. EVANS:  It's not a W-3 --
5      MS. PARRISH:  It's actually an ADP
6 printout, so I don't --
7      MR. FINCH:  So I don't have that,
8 and I've requested and don't have currently
9 the other two documents.
10      MR. EVANS:  Okay, but you'll get
11 those for us?
12      MR. FINCH:  Yes.
13      MR. EVANS:  And there was a -- we
14 didn't get Mr. Houston's noncompete agreement
15 either.
16      MR. FINCH:  I thought that was --
17      MR. EVANS:  We got a noncompete
18 agreement, but not his.
19      MS. PARRISH:  I think we got
20 Colleen's, I understand --
21      MR. FINCH:  Right, and I think we
22 also provided you with Don's.
23      MR. EVANS:  If you haven't

Page 47

1 provided those, will you provide them?
2      MR. FINCH:  Yeah, there's not a
3 problem with providing it.  It's my
4 understanding we did provide Mr. Houston's
5 noncompete.  Hold on one second.  I should be
6 able to tell you.  I'm not -- I don't have
7 that on my laptop with the other noncompetes,
8 but I thought that we had sent that to you.
9 We will get that to you.
10      MR. EVANS:  Okay.
11      Q.  (BY MR. EVANS)  Do you have a
12 noncompete clause --
13      A.  I do.
14      Q.  -- or noncompete contract?
15      And when did you execute such a
16 document?
17      A.  I think 2010.
18      Q.  2010?
19      A.  Uh-huh (Nodding head).
20      Q.  So that would have been at the
21 time you were still working at CHC?
22      A.  Correct.
23      Q.  When this joinder of CCS and CHC

Page 48

1 came about in the summer of 2014, did you
2 execute a new noncompete clause?
3      A.  No.
4      Q.  So whatever noncompete clause you
5 had would still be back with CHC?
6      A.  Correct.
7      Q.  Do you have any kind of employment
8 or contractual relationship with CCS?
9      A.  I do.
10      Q.  And what is that?
11      A.  As the president of State and
12 Federal.
13      Q.  Do you have a contract, a written
14 document, that establishes that?
15      A.  It's an employment agreement.
16      Q.  Okay, does it have a noncompete
17 provision in it as well?
18      A.  It just retains what I had with
19 CHC.
20      Q.  I see.  And does it pertain to any
21 of the other entities under the CCS umbrella?
22      A.  I don't know.  I would have to
23 review that.

Page 49

1    Q.  All right.  Can you get us a copy
2 of that?
3        MR. FINCH:  I don't have that one,
4 but we'll get it.
5    Q.  (BY MR. EVANS)  Who are you paid
6 by, as we sit here today?
7    A.  CCS.
8    Q.  So the check would come to you
9 from CCS payroll, I suppose?
10    A.  Yes.
11    Q.  And your W-2 would come to you
12 from CCS payroll?
13    A.  I think my last W-2 was CHC.
14    Q.  Do you expect your next one will
15 be CCS?
16    A.  I guess.  I don't . . .
17    Q.  Does the payroll, accounting, and
18 all of that function under the CCS umbrella
19 cover CHC and the various other entities that
20 we've been talking about?
21    A.  I think completely now.
22    Q.  How about the Legal Division under
23 the CCS umbrella?

Page 50

1    A.  Yes.
2    Q.  And the IT Department, do
3 y'all --
4    A.  For the most part.  Not complete-
5 ly.
6    Q.  I've seen a department called
7 Compliance.  Does the Compliance Department
8 cover all of the entities under the CCS
9 umbrella?
10    A.  For the most part, yes.
11    Q.  Do you know how many entities are
12 under that umbrella?
13    A.  No.
14    Q.  But they all funnel up to Mr.
15 Dominicis as the head, is that correct?
16    A.  What do you mean by all?
17    Q.  All of the entities that are under
18 that same CCS, LLC umbrella.
19        MR. FINCH:  Everything below CCS.
20    A.  Everything below CCS, yes.
21    Q.  (BY MR. EVANS)  Let me show you --
22 we were given an organizational chart, and it
23 was so small, you could see me flipping

Page 51

1 glasses back and forth, and so we've blown it
2 up into a size that even I can read now.
3    A.  Okay.
4        MR. EVANS:  We've got copies for
5 everybody.
6
7      (Plaintiff's Exhibit Number 287
8 was marked for identification and copy of same
9 is attached hereto).
10
11    Q.  (BY MR. EVANS)  We've marked this
12 as Exhibit 287.  May I come there beside you,
13 sir?
14    A.  You can.
15    Q.  We've put Exhibit 287 up there on
16 this organizational chart that was provided to
17 us?
18    A.  Okay.
19    Q.  Have you seen there before?
20    A.  I don't know if I've seen this
21 exact one, but I've seen --
22    Q.  Similar documents?
23    A.  -- similar documents, yes.

Page 52

1    Q.  Can you see the indicate date
2 that's under the CCS logo up there?
3    A.  I see it.
4    Q.  It appears to be January 23rd,
5 2015.  Have there been any changes of
6 significance since that time, if you know?
7    A.  Let me look at it.
8    Q.  Okay, sure.
9    A.  (Examining document).
10      (Whereupon, an off-the-record
11 discussion was had).
12    A.  Yeah, there have been.
13    Q.  (BY MR. EVANS)  Can you identify
14 any of those for me?
15    A.  Well, there's now three divisions.
16    Q.  Okay, let's see.  We're looking at
17 that Exhibit 287.  How many divisions does
18 this depict?
19    A.  There's one, two, three -- at
20 least -- one, two, three, four.
21    Q.  So the January 2015 chart depicts
22 four divisions?
23    A.  Uh-huh (Nodding head).

Page 53

1　Q. Is that correct? You have to
2　answer out yes.
3　A. Yes, yes.
4　Q. And in this depiction, in January
5　of 2015, which of the services were shared
6　company-wide? You've told me accounting would
7　have been?
8　A. Yes.
9　Q. Legal would have been, I believe
10　that's what you said?
11　A. Yes.
12　Q. And I believe you said compliance
13　would have been?
14　A. Compliance --
15　　　MR. FINCH: He said for the most
16　part.
17　A. For the most past.
18　Q. (BY MR. EVANS) How about human
19　resources?
20　A. For the most part.
21　Q. And as far as IT --
22　A. IT was not completely --
23　Q. Integrated?

Page 54

1　A. -- integrated.
2　Q. In this chart, this Exhibit 287,
3　where are you?
4　A. I'm here.
5　Q. Okay, you're in the Private
6　Prisons over here to the far right?
7　A. Right.
8　Q. And it's got a parentheses
9　twenty-four by it. What does that indicate?
10　A. That's probably the number of
11　facilities.
12　Q. I see. And under this Private
13　Prison Division, you're, of course, shown as
14　the president of that division, correct?
15　A. Okay.
16　Q. Okay, and under that Ms. Karen
17　Lloyd is the operations manager in Florida, is
18　that right?
19　A. That's what it says.
20　Q. I mean, is that correct?
21　A. That's correct.
22　Q. Okay. Is JCS under this Private
23　Prisons Division?

Page 55

1　A. This is JCS (Indicating).
2　Q. Okay, Stan Stevens shows as JCS
3　IT --
4　A. Yes.
5　Q. -- Jaime Herndon is JCS control-
6　ler, Colleen Ray Alabama State manager, so all
7　of that is JCS?
8　A. Correct.
9　Q. And all of it is under you in the
10　CCS Private Prisons Division, is that correct?
11　A. Yes.
12　Q. And at the point that CCS and CHC
13　and all of these things came together, would
14　these people under the JCS, would they also be
15　paid out of the accounting and finance
16　department?
17　A. Yes.
18　Q. And would they share the legal
19　service division if they needed it?
20　A. For the most part, yes.
21　Q. And would they have compliance
22　looking over their shoulder?
23　A. I don't think that --

Page 56

1　　　MR. FINCH: Hold on, hold on. I'm
2　sorry. Object to the form of the question.
3　What do you mean looking over their shoulder?
4　　　MR. EVANS: Whatever compliance
5　does.
6　Q. (BY MR. EVANS) Would compliance
7　be providing its functions to them or not?
8　A. No.
9　Q. How about IT?
10　A. No.
11　Q. Any other company-wide operations
12　that would also be provided to JCS?
13　A. So we said HR, legal, and Finance
14　and Accounting -- actually at that time I
15　don't know that Finance and Accounting was
16　doing more than just help advising Jaime.
17　Q. As far as the human resources,
18　would it be part of the company policy at that
19　time to try to implement company-wide employee
20　policies and vacations and travel policies and
21　such as that?
22　A. Not necessarily, no.
23　Q. How would human resources apply to

Page 57

1  JCS under the CCS chart here?
2      A.  They would be a -- someone that
3  they could go to for questions, so they would
4  advise them.  They would be a resource more
5  than anything else.  They would do a lot of
6  the back office work.  They would help them in
7  the hiring process.  They would help them
8  complete documents.
9      Q.  So if someone was hired or fired
10  at JCS, those records would go through human
11  resources?
12      A.  Yes.
13      Q.  And payroll for JCS would go
14  through Finance and Accounting?
15      A.  Eventually.  I don't know when
16  that exactly happened, but eventually it
17  happened, yes.
18      Q.  And under your position here,
19  Private Prisons President, you would have had
20  overall responsibility for JCS in addition to
21  other entities, is that correct?
22      A.  Well, I didn't really have -- I
23  don't know what you mean by responsibility.

Page 58

1      Q.  Well, were you their boss?
2      A.  I -- I advised Karen Lloyd --
3      Q.  Could you hire and fire?
4      A.  No, she hired and fired.
5      Q.  Could you fire her?
6      A.  I could.
7      Q.  Okay, and you could direct her
8  actions?
9      A.  I could.
10      Q.  Yes, and responsibility for the
11  performance of that JCS part of the Private
12  Prisons, did that fall on your shoulders?
13      A.  Repeat that.
14      Q.  Yes, sir.  The responsibility for
15  the performance of that JCS part of the
16  Private Prisons, was that on you?
17          MR. FINCH:  Object to form.
18      A.  The financial performance of it,
19  yes.
20      Q.  (BY MR. EVANS)  Well, you make a
21  distinction.  What other part would not have
22  been part of your responsibility?
23      A.  The day-to-day operations.  I had

Page 59

1  no part in the day-to-day operations.
2      Q.  You delegated that to your
3  subordinates, is that correct?
4          MR. FINCH:  Object to form.
5      A.  Well, Karen Lloyd was responsi-
6  ble, and her subordinates were responsible for
7  the day-to-day operations.
8      Q.  (BY MR. EVANS)  And Ms. Lloyd
9  reported to, looks like --
10      A.  Yeah, I see him, and that's not
11  correct.  She didn't report to Dan.
12      Q.  Who did she report to?
13      A.  She reported to me, so this is not
14  correct.
15      Q.  I see.  Now, you mentioned a
16  little earlier when we started this conversa-
17  tion that this chart has changed somewhat,
18  that you only have three divisions?
19      A.  Correct.
20      Q.  Can you explain to me what those
21  are?
22      A.  Yes, State and Federal.  State and
23  Federal takes what's prisons here and combines

Page 60

1  that with this.
2      Q.  Okay.
3      A.  And then Local Detention is
4  this --
5      Q.  Which is now -- or previously
6  indicated as Jails?
7      A.  Jails, that's now Local Detention,
8  and CCRS is its own division.
9      Q.  And what toes that stand for?
10      A.  Correct Care Recovery Solutions.
11      Q.  What is its function?
12      A.  It's psychiatric hospitals.  It's
13  primarily the hospital business.
14      Q.  So the three operating divisions
15  now are the psychiatric, CCRS --
16      A.  Right.
17      Q.  -- private detentions --
18      A.  No, no, no.
19      Q.  Excuse me, what is this --
20      A.  Local Detention.
21      Q.  Local Detention.  And then
22  prisons?
23      A.  State and Federal.

1  Q.  Uh-huh, okay.  As far as the
2  common-shared functions of the enterprise,
3  administrative aspect, are those essentially
4  the same with IT, Legal, Finance and
5  Accounting, Compliance, and Human Resources?
6      MR. FINCH:  Object to form.  As to
7  which companies?
8      MR. EVANS:  Under the CCS umbrel-
9  la.
10     MR. FINCH:  As to all companies?
11     A.  As to all companies, not every bit
12 of it supports every bit of the company.  CCRS
13 has -- not all of it supports every part of
14 the company.
15     Q.  (BY MR. EVANS)  Is JCS still in
16 operation?
17     A.  JCS is still in operation.
18     Q.  And where is it still operating?
19     A.  It functions like this (Indica-
20 cating).  So it reports to me, but it doesn't
21 report to Dan.  So this is not correct.
22     Q.  So as we sit here today, it's
23 still operating, and it still reports to you

1  as it did for some time?
2      A.  Correct.
3      Q.  In what states does it operate
4  now?
5      A.  Florida and Georgia.
6      Q.  And as it operates now, does it
7  still share these other functions that we've
8  talked about, human resources, legal,
9  accounting?
10     MR. FINCH:  Subject to his earlier
11 answer, object to form.
12     A.  Yes.
13     Q.  (BY MR. EVANS)  You can keep that
14 before you.  It may help as we go through some
15 of this.
16     A.  All right.
17     Q.  I wish I could make it smaller,
18 but there's just so much detail.
19     (Whereupon, an off-the-record
20 discussion was had).
21     Q.  (BY MR. EVANS)  You mentioned that
22 there was an error on the chart about Dan
23 being involved in the chain of command --

1      A.  Yeah, he's not whatsoever.
2      Q.  And was he in 2015?
3      A.  Never has been.
4      Q.  So other than that error that you
5  saw in January of 2015 on the chart, was
6  Exhibit 287 substantially correct?
7      A.  It's hard -- there's a lot of
8  names that are wrong --
9      Q.  Okay.
10     A.  -- and there's a lot of reporting
11 that I don't know that it's exactly the way it
12 is, or was.
13     Q.  Those charts, of course, were
14 produced to us by CCS.  Do you know why they
15 would have that many errors in them, if that's
16 a concern to you?
17     A.  I'm not sure who produced this
18 document.
19     MS. PARRISH:  It has a Bates right
20 here, CHC --
21     A.  Okay, I mean, it's probably
22 as accurate as you could have one.  You know,
23 there's been a lot of names -- people have

1  changed positions, titles have changed.
2      Q.  (BY MR. EVANS)  And the company at
3  the top of the structure is shown as CCS, LLC.
4  You saw that, didn't you?
5      A.  Well, I would have to --
6      Q.  Well, please feel free to get up
7  and look.
8      A.  Here we go.  That's what it says
9  for Jorge Dominicis.
10     (Whereupon, an off-the-record
11 discussion was had).
12     Q.  (BY MR. EVANS)  As we were talking
13 about there chart, Mr. Houston, I know you
14 said some of the names have changed --
15     A.  A lot have changed.
16     Q.  -- yeah, and, of course, we're
17 looking back a year, over a year at this
18 point, a year and nine months --
19     A.  Correct.
20     Q.  -- but as you look at this
21 organizational structure, all of those people
22 would have been under the CCS umbrella at some
23 point in time, is that correct?

1     A.  I believe so, yes.  I haven't
2  looked at every person on there.
3     Q.  Okay.  When you were looking at
4  your part over there, did that look correct
5  except for the line from Karen Lloyd?
6     A.  Let me look at it again here.
7         MR. FINCH:  And you also mentioned
8  Dan --
9     A.  Yeah, Dan was definitely not
10 there.
11    Q.  (BY MR. EVANS)  Right.
12    A.  Karen should have been here
13 because she doesn't report to --
14    Q.  Why don't you just take a pen and
15 circle --
16        MR. FINCH:  Hold on a second.
17 Guys, I think Kerry is having a real hard time
18 hearing this --
19        MR. EVANS:  Oh, I'm sorry.
20        MR. FINCH:  -- so y'all need to
21 sort of turn sideways.
22    Q.  (BY MR. EVANS)  Okay, I'm asking
23 him, Kerry, to take a pen and show the correct

1  line of authority from Karen to him.
2     A.  (Marking.)
3     Q.  Okay, other than the change from
4  the line of authority under you at that time,
5  does the rest of this look correct under the
6  Private Prisons Division?
7     A.  Looks like it.
8     Q.  Where is CHC on this chart?
9     A.  This is CHC.
10    Q.  And you're pointing to a part of
11 the Private Prisons break-out?
12    A.  Yes.  All of these are CHC.
13    Q.  Okay.  Can you just put a pencil
14 around those -- or draw a circle around them
15 and we'll . . .
16    A.  (Marking.)
17    Q.  So all of that is CHC, and is
18 there any other part of the chart that would
19 be CHC?
20    A.  Yes.
21    Q.  What would that be?
22    A.  There were parts of CHC that's
23 probably in most of these at that time.

1     Q.  And you're pointing to Legal,
2  Finance and Accounting --
3     A.  Yes.
4     Q.  -- and Human Resources?
5     A.  Yes.
6     Q.  And you would know that because
7  you're the president of that division,
8  correct?
9     A.  Correct.
10    Q.  And the CHC personnel would,
11 again, like JCS, they would report to you?
12        MR. FINCH:  Object to form.
13    A.  Ultimately, yes -- ask that
14 question again.
15    Q.  (BY MR. EVANS)  Yes, sir.  Am I
16 correct that you are the head of the CHC
17 operations --
18    A.  Correct.
19    Q.  -- and those people ultimately
20 would report up the chain to you?
21    A.  These, correct, yes, sir.
22    Q.  Okay, thank you.  I know you told
23 me earlier that your office is at the

1  Murfreesboro address.
2     A.  Yes, sir.
3     Q.  Is the office of CHC at that same
4  address?
5     A.  Yes, and -- there are offices
6  there.  There are still offices in Colorado.
7     Q.  Is there a particular break-out of
8  which are where?
9     A.  Yes.  I think, yes.
10    Q.  Guess what's coming next?
11        MR. FINCH:  I told him not to.
12    Q.  (BY MR. EVANS)  Which are where
13 and why?
14    A.  Pharmacy is still in Colorado.
15 Clinical -- a portion of Clinical is still in
16 Colorado.  Some of Claims Processing is still
17 in Colorado.
18    Q.  And what is in Nashville at
19 Murfreesboro?
20    A.  Most of the rest.
21    Q.  Which would include?
22    A.  Legal, IT, HR.
23        MS. PARRISH:  Finance and

Page 69

1 Accounting?

2    A.  Finance and Accounting, yes.

3    Q.  (BY MR. EVANS)  Is the CCS located

4 there?

5    A.  CCS's office, yes.

6    Q.  So they're located there, and most

7 of the rest of CHC is located there.  Does JCS

8 have an office there?

9    A.  No.

10    Q.  Where are their offices?

11    A.  They have a number of offices.

12    Q.  Do they have a corporate office,

13 a --

14    A.  Yes.

15    Q.  And where is it?

16    A.  It's in Georgia.

17    Q.  But then the Accounting, Human

18 Resources, Legal, are all handled out of

19 Murfreesboro?

20       MR. FINCH:  Object to the form.

21    Q.  (BY MR. EVANS)  Is that correct?

22    A.  Most.

23    Q.  What is the executive team?

Page 70

1    A.  It's the leadership of each one of

2 the divisions.

3    Q.  Of CCS?

4    A.  Of CCS.  And the CEO of the

5 company, CFO of the company --

6    Q.  So that would include --

7    A.  -- and the chief legal officer of

8 the company.

9    Q.  The CEO is Mr. Dominicis?

10    A.  Dominicis.

11    Q.  Okay, thank you.  And the CFO is

12 who?

13    A.  We have an interim CFO right now.

14    Q.  And who is that?

15    A.  It's Juan Perez.

16    Q.  Who was the previous one?

17    A.  David Watson.

18    Q.  And the chief legal officer?

19    A.  David Perry.

20    Q.  And he came on fairly recently

21 too, didn't he?

22    A.  Yes.

23    Q.  Do you remember when?

Page 71

1    A.  Earlier this year.  I don't know

2 the exact date.

3    Q.  Those would be some of the

4 members in addition to the head of the

5 divisions, is that right?

6    A.  Correct.

7    Q.  I'll ask you if you can go back to

8 the board here because I'm going to ask you

9 about a couple of people I had seen --

10    A.  Okay.

11    Q.  -- on the break-out of your

12 executive team.  Are you a member of the

13 executive team?

14    A.  Yes, sir.

15    Q.  And, of course, you've told us

16 that you are president of the State and

17 Federal Division.  You report to whom?

18    A.  Jorge Dominicis.

19    Q.  Is Cary McClure a member of the

20 executive team?

21    A.  He is not.

22    Q.  Was he previously?

23    A.  He may have been at one time.

Page 72

1    Q.  What is his position?

2    A.  He -- I'm not even sure what it

3 is.  He's over -- he's an executive vice

4 president really kind of over support

5 services.

6    Q.  Is it called Ancillary Services?

7    A.  Yes.

8    Q.  And who does he report to?

9    A.  I think Juan Perez now, the CFO.

10    Q.  He previously reported to David

11 Watson, is that correct?

12    A.  Yes, correct.

13    Q.  Marta Prado, is she a member of

14 the executive team?

15    A.  Marta Prado?

16    Q.  Prado, yes, excuse me.

17    A.  She's is a member of the executive

18 team.

19    Q.  And the division she's the head of

20 is CCRS, is that correct?

21    A.  That's correct.

22    Q.  And is that a separate entity, or

23 do you know?

Page 73

1    A.  It is a separate entity.
2    Q.  And who does she report to?
3    A.  Jorge Dominicis.
4    Q.  Patrick Cummiskey, is he a member
5 of the executive team?
6    A.  He is.
7    Q.  And his division is Operations, is
8 that right?
9    A.  No.
10    Q.  What is his position?
11    A.  He is president of CCS Holdings.
12    Q.  And who does he report to?
13    A.  Jorge Dominicis.
14    Q.  Stan Wofford, is he a member of
15 the executive team?
16    A.  He is not.
17    Q.  Was he previously?
18    A.  No.
19    Q.  Randy Marshall, is he a member
20 ever the executive team?
21    A.  No.
22    Q.  Was he previously?
23    A.  I don't believe so.

Page 74

1    Q.  How about Chris Bove --
2    A.  Chris Bove.
3    Q.  -- Bove, is he a member of the
4 executive team?
5    A.  He is.
6    Q.  And what is his title, function?
7    A.  He's the president of Local
8 Detention.
9    Q.  And who does he report to?
10    A.  Jorge Dominicis.
11    Q.  And Craig Jenkins, is he a member
12 of the executive team?
13    A.  No.
14    Q.  Was he previously?
15    A.  No.
16    Q.  How about Damon O'Toole?
17    A.  No.
18    Q.  Is Mr. O'Toole still with the
19 company?
20    A.  No.
21    Q.  He was previously, as I
22 understand, the controller of Conmed, is that
23 right?

Page 75

1    A.  I believe so.
2    Q.  How about Bob Martin, is he a
3 member of the executive team?
4    A.  He is.
5    Q.  And what is his title?
6    A.  He is the CIO.
7    Q.  What does that stand for?
8    A.  Chief information officer.
9    Q.  So he would be over the IT
10 Division?
11    A.  Yes.
12    Q.  And he reports to whom?
13    A.  Mr. Dominicis.
14    Q.  And, of course, you mentioned that
15 Mr. Dominicis would be a member.  Would Mr.
16 Boyle, as chairman of the board, be considered
17 a member?
18    A.  Only as an ad hoc member.  He's
19 not a functioning member.
20    Q.  He would be copied on emails, I
21 suppose, from --
22    A.  (Nodding head).
23    Q.  Okay, well, that helps me, and

Page 76

1 those lines of authority and reporting
2 directions are borne out on these charts, I
3 presume?
4    MR. FINCH:  Object to the form.
5    A.  Well, it's changed.  It's not like
6 this anymore.
7    Q.  (BY MR. EVANS)  Right.
8    A.  But at that time, yes.
9    Q.  Do you have a new chart that would
10 be more current of this?
11    A.  I don't, but I know that we're in
12 three divisions now.
13    Q.  But essentially all still under
14 the CCS, LLC umbrella reporting upwards
15 towards Mr. Dominicis?
16    A.  Three divisions, yes.
17    Q.  Thank you.
18    MR. FINCH:  Let's take a short
19 break.
20    (Recess from 9:58 A.M. until
21    10:09 A.M.)
22    Q.  (BY MR. EVANS)  Mr. Houston, we're
23 back on the record, and, of course, you know

1 from your previous experience that when we
2 take a break you're still under oath.
3     A.  I understand.
4     Q.  Right, just to kind of give you a
5 heads-up, we're going to go through some
6 emails that have been produced by your
7 attorneys, and they all contain you or some
8 correspondence to or from you.  When you look
9 at these documents, in the right lower corner
10 there's a number, a letter number, CHC CCS and
11 then a number, and that will tell you that
12 these are documents that have been produced by
13 your attorneys.
14     A.  Okay.
15
16         (Plaintiff's Exhibit Number 288
17 was marked for identification and copy of same
18 is attached hereto).
19
20     Q.  (BY MR. EVANS)  I'm going to show
21 you now Exhibit 288 from those documents.
22         MR. FINCH:  Look at it, and he's
23 going to pass out copies to everybody, so just

1 take a minute while everybody gets their copy
2 and I get my copy, and then we'll just do that
3 with each of them.
4     A.  (Examining document).
5     Q.  (BY MR. EVANS)  Have you had an
6 opportunity to review it now?
7     A.  I have.
8     Q.  What we'll do, just to kind of set
9 an approach on these emails, you're welcome to
10 review them in full.  Most of the time I'm
11 going to have a specific area that I'll ask
12 you about, but I don't want to dissuade you
13 from looking at them.  On Exhibit 288 do you
14 recognize this to be an email chain in which
15 you were included back on October the 6th,
16 2011?
17     A.  Yes.
18     Q.  And was this an email chain at or
19 about the time that CHC had purchased JCS?
20     A.  Yes.
21     Q.  Part of this email chain includes
22 a letter that was proposed to be sent to the
23 stockholders and JCS team members talking

1 about that actual purchase, isn't it?
2     A.  Yes.
3     Q.  And it references the date of
4 September the 30th, 2011, as the actual sale
5 of the stock to CHC; does that sound
6 appropriate to you?
7     A.  That's what the letter says.
8     Q.  Okay.  Down on the third paragraph
9 of that letter, about halfway down, you'll see
10 the sentence that says, further, the
11 opportunity to cross-sell services within our
12 existing customer bases alone is enormous, you
13 do you see that?
14     A.  I do.
15     Q.  The next sentence, JCS and CHC's
16 joint vision of becoming a full-service,
17 one-stop shop for the provision of probation
18 and healthcare services to the criminal
19 justice system is now complete with the
20 addition of JCS.  Do you see that?
21     A.  I do.
22     Q.  And was that the idea when this
23 was culminating?

1     A.  It was the idea.
2     Q.  Uh-huh.  When we go on down into
3 this letter that was to be sent into paragraph
4 number three on the last page, it indicates
5 instead of reporting to a Board of Directors,
6 JCS Executive Management will now report to
7 CHC, do you see that?
8     A.  I do.
9     Q.  And is that what occurred after
10 the sale.
11     A.  The JCS executive management would
12 report to CHC according to this letter.
13
14         (Plaintiff's Exhibit Number 289
15 was marked for identification and copy of same
16 is attached hereto).
17
18     Q.  (BY MR. EVANS)  Let me now show
19 you, if I may, what we've had marked as
20 Exhibit 289, which has also been produced to
21 us by your attorneys.
22         MR. FINCH:  That was produced by
23 JCS, not me.

1      MR. EVANS:  You're absolutely
2  right.
3      Q.  (BY MR. EVANS)  The purpose of me
4  showing you this, Mr. Houston, is simply to
5  verify that this document is the actual
6  document of merger and does bear that date,
7  September the 30th, 2011.  Had you seen this
8  document before?
9      A.  I have not seen this document.
10     Q.  Okay.  You don't have any reason
11 to question that date, though, do you?
12     A.  I guess it speaks for itself.
13     Q.  After the purchase you mentioned
14 that, and I forgot the exact term you used,
15 but attempted integration or something --
16     A.  Aspirational integration.
17     Q.  Aspirational.  Thank you.  I'm
18 going to show you some emails that talk about
19 that aspiration.
20
21         (Plaintiff's Exhibit Number 290
22 was marked for identification and copy of same
23 is attached hereto).

1      Q.  (BY MR. EVANS)  Let me show you
2  Exhibit 290, if I may.  Do you recognize this
3  as being an email in which you were part of
4  the chain, again, shortly after the purchase
5  in September, of JCS?
6      A.  Yes.
7      Q.  And it's talking about the
8  aspiration to begin the integration into CHC,
9  isn't it?
10     A.  Yes.
11
12         (Plaintiff's Exhibit Number 291
13 was marked for identification and copy of same
14 is attached hereto).
15
16     Q.  (BY MR. EVANS)  As we get a little
17 further into the year 2011, I'm going to show
18 you what we've had marked as Exhibit 291.
19 Again, do you recognize this as an email from
20 you to Doug Goetz back in December of 2011?
21     A.  I do.
22     Q.  And are these things that you had
23 written at that time?

1      A.  Yes.
2      Q.  I don't know exactly all of the
3  things that have been redacted, those were not
4  provided to us, but in the first paragraph you
5  talk of wanting JCS to truly become part of
6  CHC from an operational and financial
7  perspective.  That was the goal, wasn't it?
8      A.  The goal, correct.
9      Q.  What is Justice Services?
10     A.  Justice Services is another
11 company -- it's another company that does
12 outpatient behavioral health.
13     Q.  Is it also under the umbrella of
14 CCS?
15     A.  Here (Indicating)?
16     Q.  Now.
17     A.  Yes.
18     Q.  In your paragraph there you talk
19 about you understand it's a different sales
20 project, many of the operational issues are
21 the same, compliance with contracts, provision
22 of services, et cetera, and then you say last,
23 quote, they are not unique to community

1  services and can be integrated.  What is
2  community services?
3      A.  Community corrections, so it's
4  services outside incarceration, so --
5      Q.  I see, and you include JCS in that
6  category?
7      A.  At this time, yes (Indicating).
8      MR. FINCH:  And when you say at
9  this time, you're pointing to the document?
10     A.  At the time of this document, yes,
11 that's what I mean.
12     Q.  (BY MR. EVANS)  Who is Rich
13 Hegstad?
14     A.  Rich Hegstad was over HR at CHC.
15     Q.  And who is Jeff Tikker?
16     A.  Jeff Tikker was a business
17 director, business analyst.
18     MS. PARRISH:  At CHC?
19     A.  At CHC.
20
21         (Plaintiff's Exhibit Number 292
22 was marked for identification and copy of same
23 is attached hereto).

Page 85

1    Q.   (BY MR. EVANS)  Let me show you a
2  group of emails that we've had marked as
3  Exhibit 292?
4    A.   (Examining document).
5    Q.   Have you had an opportunity to
6  look at those?
7    A.   Yes.
8    Q.   Again, are these a group of emails
9  in which you were part of the chain?
10   A.   Yes.
11   Q.   Do you remember what this was
12 about?
13   A.   I do.
14   Q.   This is in December of 2011,
15 again, a few months after the purchase of JCS
16 by CHC, correct?
17   A.   The time frame, that's correct.
18   Q.   What is the substance of those
19 emails?
20   A.   This is really about a cost
21 reduction initiative at CHC.
22   Q.   I see.  The first email, the one
23 from you to Mr. Hegstad, the one on the top,

Page 86

1  talks about in your opinion all HR decisions,
2  regardless of the subsidiary company, must go
3  through you.  HR is one area in which we must
4  have a single and corporate direction.  You
5  wrote that?
6    A.   I did.
7    Q.   And was that the company policy at
8  that point?
9    A.   It was not the policy.
10   Q.   It was not?
11   A.   No.
12   Q.   Was it a policy that you hoped to
13 instill?
14   A.   It was one that I was hoping to
15 instill, yes.
16   Q.   And as we sit here today, JCS is
17 under the HR provisions at -- on this chart
18 that we've been looking at?
19      MR. FINCH:  Object to form.
20   Q.   (BY MR. EVANS)  That's what you
21 told me earlier, isn't it?
22   A.   They support JCS, yes.
23

Page 87

1      (Plaintiff's Exhibit Number 293
2  was marked for identification and copy of same
3  is attached hereto).
4
5    Q.   (BY MR. EVANS)  Let me show you
6  what we've had marked as Exhibit 293.  Mr.
7  Houston, you can just kind of pile those
8  things up out of your way whenever it gets too
9  full for you.
10   A.   Okay.
11      MR. FINCH:  Hopefully he's saying
12 he's not going to backtrack on anything.
13   A.   He'll have to find them (Examining
14 document).
15   Q.   (BY MR. EVANS)  Again, I'll ask
16 you to confirm, Mr. Houston, that this is an
17 email chain in which you were part?
18   A.   It is.
19   Q.   And we're talking about a time
20 frame now early in 2012, January, right?
21   A.   Correct.
22   Q.   This is an email from the, at that
23 time, the CEO of CHC, Mr. Goetz, correct?

Page 88

1    A.   Correct.
2    Q.   And to a number of individuals, I
3  guess, within CHC?
4    A.   For the most part, yes.
5    Q.   Are there some of them within JCS
6  as well?
7    A.   Yes.
8    Q.   And it says, Team, after finally
9  getting through the eventful 4th quarter of
10 2011, we are ready to kick off the long
11 awaited JCS integration plan.  Did that
12 integration plan ever get completed --
13   A.   No.
14   Q.   -- as far as you know?
15   A.   It did not.
16   Q.   Do you know how the stock of JCS
17 is held?
18   A.   I do not.
19   Q.   Does CCH -- CHC own the stock in
20 JCS?
21   A.   I couldn't answer that.  I don't
22 know.
23   Q.   In this Exhibit 293 it talks about

Page 89

1 a lead in each area, HR, Rich, Finance, Bruce,
2 and so forth?
3    A.  Yes.
4    Q.   Are those individuals who worked
5 for CHC?
6    A.  Yes.
7    Q.   So they were taking the lead in
8 those particular operational areas to -- and
9 administrative areas to integrate JCS, is that
10 what you understood?
11    A.  Correct.
12
13       (Plaintiff's Exhibit Number 294
14 was marked for identification and copy of same
15 is attached hereto).
16
17    Q.  (BY MR. EVANS)  Let me show you
18 what we've had marked as Exhibit 294.
19    A.  (Examining document).
20    Q.   Is this an email which you wrote
21 to Mr. Goetz about this integration process
22 with JCS?
23    A.  Yes.

Page 90

1    Q.   You wrote that it must continue
2 and even accelerate, correct?
3    A.  Yes.
4    Q.   In that 2012 time frame in which
5 this email was written, the JCS employees,
6 were they receiving their checks from CHC?  Do
7 you know?
8    A.  I don't know.
9    Q.   Your overall responsibility there
10 at CHC was -- included JCS's operations, is
11 that correct?
12    A.  No.
13    Q.  Who was over --
14    A.  Doug Goetz.
15    Q.  Doug Goetz was taking care of it
16 at that time?
17    A.  Yes.
18    Q.  When did JCS first come under your
19 responsibility?
20    A.  Not until Doug left.
21    Q.  And that would have been?
22    A.  When Dirk Allison came on.
23    Q.  I'll have to say --

Page 91

1    A.  He was the CEO --
2    Q.  Do you have any idea --
3    A.  He came on, oh gosh, I don't know
4 exactly.  In '13 sometime.
5    Q.  So if from 2013 I guess up until
6 today, JCS has been under your responsibility,
7 correct take out the first comma?
8    A.  Yes.
9    Q.  Colleen Ray, do you know Mrs. Ray?
10    A.  I do.
11    Q.  When did you first come to know
12 her?
13    A.  I probably met her in '12 or '13.
14    Q.   And we've taken her deposition, so
15 I understand she was the state manager of JCS
16 in Alabama, is that right?
17    A.  That's correct.
18    Q.   So you would have met her at some
19 point in time after CHC bought it?
20    A.  Yes, I think they had kind of a
21 meet and greet meeting that I met her at.
22    Q.   Did you go there, or did she come
23 here?

Page 92

1    A.  To Denver.  She came to Denver.
2    Q.   She had told us in her deposition
3 that you were the COO at that time --
4    A.  Probably.
5    Q.   -- that was one of your prior
6 deals?
7    A.  Yes.
8    Q.   And that you actually were signing
9 -- once the purchase of JCS was done by CHC,
10 you were the one who signed the contracts for
11 JCS?
12    A.  I don't know when that happened,
13 but there was a time where I did sign
14 contracts.
15    Q.  On behalf of JCS?
16    A.  Yes.
17
18       (Plaintiff's Exhibit Number 295
19 was marked for identification and copy of same
20 is attached hereto).
21
22    Q.  (BY MR. EVANS)  Let me show you
23 what we're going to mark as Exhibit 295.

Page 93

1      A.  (Examining document).  Yes.

2      Q.  Okay, do you recognize this as an

3  email about that issue?

4      A.  I've never seen this email, but --

5      Q.  The reason I'm showing it to you,

6  it's an email from Mrs. Ray to Kevin Egan, and

7  did you know Mr. Egan?

8      A.  I met him.

9      Q.  Okay, at some point in time he was

10  terminated from his position with JCS, wasn't

11  he?

12      A.  I believe he left, yes.  I don't

13  know that he was terminated.

14      Q.  Well, we can show you the

15  documents on that --

16      A.  Okay.

17      Q.  -- but, in any event, he left the

18  employment of JCS, is that correct?

19          MR. FINCH:  Object to form.

20      A.  Yes.

21      Q.  (BY MR. EVANS)  And after CHC

22  purchased it, at some point you would agree

23  that you became the person who would have to

Page 94

1  sign the contracts?

2          MR. FINCH:  Object to form.

3      A.  I was not the only person that

4  could sign contracts.

5      Q.  (BY MR. EVANS)  Who else signed

6  them?

7      A.  Any officer of the company could

8  sign the contracts.

9      Q.  Any officer of what company?

10      A.  Either JCS or CHC.

11      Q.  And after JCS was purchased, who

12  were the officers of that company?

13      A.  Of which company?

14      Q.  Of JCS?

15      A.  Jarrett Gorlin, Robert McMichael,

16  Doug Goetz.  These are the only ones I

17  remember, that I recall.

18      Q.  So, in your opinion, any of those

19  folks and any of the people who were officers

20  of CHC could also sign contracts?

21      A.  Correct.

22      Q.  Let me show you what was

23  previously marked as Exhibit 118.

Page 95

1          MR. JACKSON:  What number, Danny,

2  118?

3          MS. PARRISH:  118.

4          MR. FINCH:  118.

5      Q.  (BY MR. EVANS)  Do you recognize

6  that as your signature?

7      A.  It is my signature.

8      Q.  What's the date of that document?

9      A.  May of 2014.

10          MS. PARRISH:  There are actually

11  two contracts in there, so you might want

12  to --

13      A.  And June of 2014.

14      Q.  (BY MR. EVANS)  Okay.  So at least

15  by that point you had signed some contracts,

16  you would agree?

17      A.  Yes.

18      Q.  I want to show you a document you

19  may or may not be able to help me with.

20      A.  Okay.

21

22      (Plaintiff's Exhibit Number 296

23  was marked for identification and copy of same

Page 96

1  is attached hereto).

2

3      Q.  (BY MR. EVANS)  This is a document

4  that was produced to us by JCS, and I'll ask

5  you if you recognize that as one of the

6  accounting documents there with your company?

7      A.  (Examining document).  I've never

8  seen it.

9      Q.  Do you know what this document is?

10      A.  No.

11      Q.  The reason I ask you, it appears

12  it's referring to Ms. Colleen Ray, it's an

13  accounting document, and appears to show her

14  entry into the system there in December of

15  2012.  You can't confirm one way or another

16  about that?

17      A.  No, sir.

18          MR. TANKERSLEY:  I'm sorry, what

19  exhibit was that?

20          MR. EVANS:  296.

21          MR. TANKERSLEY:  Thank you, sir.

22

23      (Plaintiff's Exhibit Number 297

1 was marked for identification and copy of same

2 is attached hereto).

3

4     Q.  (BY MR. EVANS)  Let me show you

5 what we've had marked as 297.

6     A.  (Examining document).  Yes.

7     Q.  Again, an email from you to Mr.

8 Goetz back in December of 2012, is that

9 correct?

10    A.  Correct.

11    Q.  You wrote this?

12    A.  I did.

13    Q.  Can you -- again, a lot of it has

14 been redacted, for what reason we don't know,

15 but can you tell me what the purpose of this

16 communication was?

17    A.  This was a conversation -- I mean

18 an email between Doug and I about some

19 frustration that I was having at the time.

20    Q.  What were you being asked to do

21 that was frustrating?

22    A.  It's what I wasn't aware of that

23 was frustrating.

1     Q.  And what was that?

2     A.  Well, it's right here.

3     Q.  Can you explain it to me?

4     A.  It's issues that I found out by

5 accident, and here I had met with the HR team

6 that morning, and they had told me -- it was

7 about things that they were frustrated about

8 and the volume of work that they were dealing

9 with.

10    Q.  And this is the HR team there at

11 CHC?

12    A.  Correct.

13    Q.  And the volume of the work they

14 were dealing with in integrating JCS into the

15 company?

16        MR. FINCH:  Object to the form.

17    A.  It looks like here it was just --

18 I don't remember exactly what all of the

19 issues were at the time, but I do remember

20 that they were complaining about the volume of

21 work they had that was JCS related.  So that

22 was probably HR starting to take on some of

23 the functions of JCS.

1     Q.  (BY MR. EVANS)  I see.  And,

2 again, we're talking about the CHC HR?

3     A.  Correct.

4     Q.  Dennis Moon, did you know Mr.

5 Moon?

6     A.  I did.

7     Q.  And who was he?

8     A.  Dennis was the chief operating

9 officer of JCS.

10    Q.  And after the purchase by CHC, did

11 Mr. Moon remain on board for a while?

12    A.  He did.

13

14        (Plaintiff's Exhibit Number 298

15 was marked for identification and copy of same

16 is attached hereto).

17

18    Q.  (BY MR. EVANS)  I'll show you what

19 we've had marked as Exhibit 298.

20    A.  (Examining document).

21    Q.  Again, is this an email between

22 you, Mr. Goetz, and originating with Mr. Moon

23 about these integration efforts?

1        MR. FINCH:  Object to form.

2     A.  It was really about getting the

3 two entities together for a meeting.

4     Q.  (BY MR. EVANS)  All right, and

5 JCS and CHC you're referring to?

6     A.  Yes.

7     Q.  And was this the meet and greet

8 that you were talking about that ultimately

9 they came to Denver?

10    A.  I don't know if this was the one

11 that we talked about earlier, but this was a

12 meet and greet, yes.

13

14        (Plaintiff's Exhibit Number 299

15 was marked for identification and copy of same

16 is attached hereto).

17

18    Q.  (BY MR. EVANS)  Let me show you

19 Exhibit 299.  Again, an email from you to Mr.

20 Goetz and others in early 2013, is that right?

21    A.  Yes, sir.

22    Q.  And you're suggesting the

23 Community Services titles have consistent --

1 that they be consistent with their responsi-
2 bility?
3     A.   That was my recommendation.
4     Q.   And the Community Services, would
5 that have included JCS at that point?
6     A.   At that time yes.
7     Q.   Did they have joint titles with
8 CHC titles and JCS titles?
9     A.   They only had JCS titles.
10     Q.   Did Mr. Moon, for instance, ever
11 have a CHC title?
12     A.   No.
13     Q.   But did you have joint titles with
14 JCS and CHC?
15     A.   I did -- well, not with JCS. I
16 had joint titles.
17     Q.   Okay.
18     A.   I had a PNA title, and I had a CHC
19 title.
20     Q.   I see. And you had authority to
21 sign contracts and so forth with JCS?
22     A.   Not at this time (Indicating).
23     Q.   When did that occur?

1     A.   It was probably 2014 when --
2     Q.   Dirk Allison?
3     A.   -- Dirk Allison came on board.
4     Q.   At this point in time in 2013, JCS
5 would have still been signing its contracts,
6 but it would have been under your supervision?
7     A.   Well, really at this time
8 (Indicating) they were reporting to Doug
9 Goetz.
10     Q.   I see. And who did Mr. Goetz
11 report to?
12     A.   The board.
13     Q.   The board of what?
14     A.   CHC.
15     (Whereupon, an off-the-record
16 discussion was had).
17     Q.   (BY MR. EVANS) You were talking
18 about 2013 when you mentioned at this time?
19     A.   Yes. I'm sorry.
20     MR. FINCH: I didn't see you
21 point, but rather than saying at this time,
22 use dates if you would.
23     A.   Okay.

1     (Whereupon, an off-the-record
2 discussion was had).
3
4     (Plaintiff's Exhibit Number 300
5 was marked for identification and copy of same
6 is attached hereto).
7
8     Q.   (BY MR. EVANS) I'll show you what
9 we've had marked as Exhibit 300, sir.
10     MR. TANKERSLEY: 300? That's
11 300?
12     MR. EVANS: Yes.
13     MR. TANKERSLEY: Thank you, sir.
14     Q.   (BY MR. EVANS) Tell me what this
15 is.
16     A.   It's an email chain originating
17 from the general counsel.
18     Q.   And, again, this would have been
19 in January of 2013 pertaining to the relation-
20 ships of PNA, JCS, and CHC it looks like, is
21 that right?
22     A.   It's confirming officers for PNA
23 and JCS.

1     Q.   Okay. And you write in your part,
2 in your opinion, officers of PNA and JCS
3 should mirror CHC as much as possible, that's
4 what you wrote?
5     A.   Correct.
6     Q.   So you felt they should be the
7 same?
8     A.   Correct.
9     Q.   And there was a great deal of
10 commonality, it looks like, in the second page
11 of that exhibit. Is that what the proposed
12 officers were?
13     MR. FINCH: Object to form.
14     A.   That's what this document says.
15     Q.   (BY MR. EVANS) And this Shannon
16 -- Shelton Frey is the legal counsel writing
17 about this?
18     A.   In January of 2013, yes.
19     Q.   Good job. Good job.
20
21     (Plaintiff's Exhibit Number 301
22 was marked for identification and copy of same
23 is attached hereto).

Page 105

1     Q.  (BY MR. EVANS) I'll show you
2 Exhibit 301.
3     A.  Okay.
4     Q.  It's an email from Goetz to you
5 and Dennis Moon, isn't it, January 2013?
6     A.  Yes.
7     Q.  Do you remember this?
8     A.  Really I don't.
9     Q.  I wouldn't think you would, but
10 it's a -- am I correct, sir, that it appears
11 to be a complaint from Mr. Moon about CHC's
12 management of the office supply chain for JCS?
13     A.  It appears.
14     Q.  At that point in time were the
15 office contracts and things of that nature
16 going through the CHC organization?
17     A.  It could be some of those were
18 beginning to happen at this time, in January
19 of 2013.
20     Q.  There you go.
21     MR. FINCH: Thank you.
22     Q.  (BY MR. EVANS) Quick study.
23

Page 106

1     (Plaintiff's Exhibit Number 302
2 was marked for identification and copy of same
3 is attached hereto).
4
5     Q.  (BY MR. EVANS) I'll show you
6 what we've marked as Exhibit 302. This,
7 again, Exhibit 302, is an email there in
8 February of 2013 that you were copied on,
9 isn't it?
10     A.  Yes.
11     Q.  Mr. Goetz writes back to Dennis
12 Moon, quote, you are very welcome, Dennis.
13 You play a very important leadership role in
14 the company, and this was following Moon's
15 email that says he's very proud to be part of
16 your team and look forward to continued growth
17 in our division within CHC, correct?
18     A.  That's what it says.
19     Q.  At that time in February of 2013
20 was JCS being operated essentially as a
21 division of CHC?
22     A.  No.
23     Q.  So even though he says proud to be

Page 107

1 part of our division within CHC, and Goetz
2 says we appreciate your leadership role in the
3 company, it wasn't operated as a division as
4 far as you know?
5     A.  It was -- I can't speak for Doug,
6 but in here we're -- we're the two COOs of the
7 company.
8     Q.  You were --
9     A.  JCS is Dennis Moon, and I have
10 CHC, so this is going to the two COOs of --
11 he's the COO of JCS, and I'm the COO of CHC at
12 this time --
13     Q.  And that ultimately changed when
14 the --
15     A.  -- in February of 2013.
16     Q.  At some point in time did you hold
17 joint meetings between CHC and JCS?
18     MR. FINCH: Object to form.
19     A.  There were meetings, yes.
20     Q.  (BY MR. EVANS) Joint between the
21 two?
22     A.  Yes.
23

Page 108

1     (Plaintiff's Exhibit Number 303 was
2 marked for identification and copy of same is
3 attached hereto).
4
5     Q.  (BY MR. EVANS) Let me show you
6 Exhibit 303.
7     A.  Yes.
8     Q.  This is late January, early
9 February 2013 about a proposed joint meeting,
10 isn't it?
11     A.  Yes.
12     Q.  Do you remember that meeting?
13     A.  No.
14     Q.  The second page of Exhibit 303
15 shows an exhibit for it in the Atlantic
16 Station office. Topics II and III show the
17 state of JCS and then the state of CHC. Would
18 you have participated in that joint meeting?
19     A.  I did not participate in this
20 meeting.
21     Q.  Topic VII shows Old Business, CHC
22 Integration/Crossover. You don't remember
23 anything about that?

Page 109

1    A.  I did not attend this meeting.
2    Q.  Were there other similar joint
3 meetings of that nature?
4    A.  There were other meetings, but not
5 one that had an agenda like this that I'm
6 aware of.  It was more meet and greet type
7 meetings.
8    Q.  Do you remember when Mr. Goetz
9 went with Correct Care Solutions?
10   A.  Mr. Goetz never went with Correct
11 Care Solutions.
12   Q.  He never did?  When did he leave
13 CHC?
14   A.  I don't remember the exact date,
15 but it was before the -- had to be in 2014,
16 early 2014.
17
18        (Plaintiff's Exhibit Number 304
19 was marked for identification and copy of same
20 is attached hereto).
21
22   Q.  (BY MR. EVANS)  I'll show you what
23 we've marked as Exhibit 304.

Page 110

1    A.  (Examining document).
2    Q.  Are you ready?
3    A.  Yes.
4    Q.  What is Exhibit 304?
5    A.  It is a memo from Jarrett to Doug,
6 and a copy of a message from Dennis Moon to
7 Jarrett Gorlin.
8    Q.  Mr. Goetz is using the email
9 correctioncare.com.  What is that?
10   A.  I don't -- that was the CHC email
11 system.
12   Q.  So when you see Correction Care --
13   A.  Yeah.
14   Q.  -- that would be --
15   A.  That was CHC.
16   Q.  So you may have had a similar --
17   A.  I did have a Correction Care.
18   Q.  And at that point Mr. Goetz, of
19 course, was with CHC, and Mr. Gorlin was with
20 JCS?
21   A.  Correct.
22   Q.  And they're communicating about a
23 call from the court that was critical of JCS,

Page 111

1 correct?
2    A.  I didn't -- let me read this again
3 because I don't think that was what the issue
4 was (Examining document).  I know what this
5 issue was.
6    Q.  What was the issue?
7    A.  This was one of the struggles with
8 integration.  This was -- payroll was being
9 integrated at the time, and a number of JCS
10 employees were overpaid, and it was trying to
11 correct that.  And that's what was creating
12 the problem, the overpayment issue.
13   Q.  So CHC was beginning to pay the
14 JCS folks, and they were overpaying them?
15   A.  Yes.
16   Q.  I bet they were happy.
17   A.  And they were trying to collect
18 that money back from them --
19        MS. PARRISH:  Right, it wasn't the
20 overpayment, it was the --
21   A.  -- is what this was about.  That's
22 why it's the overpayment concerns and --
23   Q.  (BY MR. EVANS)  At some point in

Page 112

1 time did you learn that there had been an
2 incentive program put in place for the JCS
3 employees?
4    A.  I knew that there was an
5 incentive plan.
6    Q.  What was your understanding of how
7 that worked?
8    A.  I don't know how it worked, but it
9 was always part of JCS prior to us acquiring
10 them and subsequent to that.
11   Q.  Was it a revenue-based judgment?
12   A.  I don't know how it worked, but I
13 know that there was one.
14   Q.  Did it affect the entry level
15 probation officers as well as the managers?
16   A.  I don't know how far down it
17 went.
18
19        (Plaintiff's Exhibit Number 305
20 was marked for identification and copy of same
21 is attached hereto).
22
23   Q.  (BY MR. EVANS)  Let me show you

Page 113

1 what we have marked as Exhibit 305.
2    A.  Okay.
3    Q.  Do you remember this?
4    A.  I do.
5    Q.  What is this?
6    A.  This was just a notice that Ed
7 Buss would no longer be working at JCS.
8    Q.  And he was then working where?
9    A.  Here, when this was written?
10    Q.  Yes.
11    A.  He was at JCS.
12    Q.  Yes, and then where did he go
13 after that?
14    A.  He went to CHC.
15    Q.  Working under you?
16    A.  Correct.
17    Q.  And there was in 2014?
18    A.  Correct.
19
20        (Plaintiff's Exhibit Number 306
21 was marked for identification and copy of same
22 is attached hereto).
23

Page 114

1    Q.  (BY MR. EVANS)  About the
2 incentives, I want to show you what we've had
3 marked as Exhibit 306.
4    A.  Okay (Examining document).  Okay.
5    Q.  Does that refresh your recollec-
6 tion at all about these incentives?
7    A.  Like I said, I knew there were
8 incentives, but I didn't know any -- I still
9 don't know any of the details of the
10 incentives.
11    Q.  This seems to be an email from Mr.
12 Egan on which you were copied, is that right?
13    A.  Yes.
14    Q.  Providing incentives both for the
15 local folks and asking that the individuals
16 leverage their relationship with judges and
17 prosecutors to get meaningful meetings and
18 they get a bonus if they -- depending on the
19 size of the deal?
20        MR. FINCH:  Object to form.
21    Q.  (BY MR. EVANS)  Did you ever --
22 does any of that come back to you about how
23 that was structured?

Page 115

1    A.  No.
2
3        (Plaintiff's Exhibit Number 307
4 was marked for identification and copy of same
5 is attached hereto).
6
7    Q.  (BY MR. EVANS)  After JCS was
8 purchased by CHC, did you or anybody at CHC
9 that you know about undertake to make any
10 changes in the business format, the business
11 plan of JCS?
12    A.  What do you mean?
13    Q.  Well, did you undertake to try to
14 change the way they were doing business?
15    A.  I did not.
16    Q.  Do you know if anybody else did?
17    A.  I don't know.
18    Q.  Let me show you what we've had
19 marked as 307.
20    A.  (Examining document).  Okay.
21    Q.  Again, this appears to be an email
22 from you to Mr. Moon in response to one from
23 him.  Now we're in June of 2013, correct?

Page 116

1    A.  Correct.
2    Q.  And you're asking about what?
3    A.  Just to -- I was courtesy-copied
4 on things at this time, and I just read
5 something in here that peaked my interest, so
6 I just asked a question about it.
7    Q.  Sure.  And you're asking about
8 what?
9    A.  Have the day-care and vacation
10 revenue issues happened in past years.
11    Q.  And those were identified by Mr.
12 Moon by saying their collection money had gone
13 down because they thought people were spending
14 money on daycare and on vacations?
15    A.  Yes.
16    Q.  Were you courtesy-copied on a
17 number of these types of operational issues
18 over the --
19    A.  Yes.
20        MR. FINCH:  Hold on.  Let him
21 finish his question.
22    A.  I'm sorry.  Okay.
23        MR. FINCH:  He may be giving you a

Page 117

1 time frame or something.
2    A.  Okay.
3
4    (Plaintiff's Exhibit Number 308
5 was marked for identification and copy of same
6 is attached hereto).
7
8    Q.  (BY MR. EVANS)  Let me show you
9 Exhibit 308.  Is this another example where
10 you were courtesy-copied about operational
11 issues with Alabama JCS?
12    A.  Yes.
13    Q.  As we go down to the second bullet
14 point it talks about, the second sentence, in
15 Montgomery the clerk informed us Friday they
16 have created digital signatures on the
17 nonpayment cases which would help us to start
18 seeing more cases being placed on probation
19 for nonpayment of fines.  That's what it says,
20 doesn't it?
21    A.  That's what it says.
22    Q.  Did you understand that that was a
23 positive thing in the eyes of JCS, they would

Page 118

1 get more cases for the nonpayment of fines?
2    A.  I don't know -- I don't know what
3 I felt at the time.  I just remember -- I
4 don't even remember seeing this.
5    Q.  You don't know how they operated,
6 how they generated income?
7    A.  Did not.
8    Q.  As you sit here today, you don't
9 know how --
10    A.  No, I do.  I did not at this time,
11 in July of 2013.
12    MR. FINCH:  Also be sure you let
13 him finish because you guys are talking over
14 each other.
15    A.  Okay.
16
17    (Plaintiff's Exhibit Number 309
18 was marked for identification and copy of same
19 is attached hereto).
20
21    Q.  (BY MR. EVANS)  I'll show you
22 another example.  They may be the same.  I'll
23 show you Exhibit 309, sir.

Page 119

1    A.  Yes.
2    Q.  Again, is this an email that you
3 were copied in on concerning operations of JCS
4 in Alabama?
5    A.  Yes.
6    Q.  It talks about case loads continue
7 to grow, an additional thirty-three -- three
8 hundred and thirty-three cases this week, and
9 we are seeing improvements in areas that have
10 been very weak so far this year, such as, and
11 it's blanked out.  Quote, as long as
12 collections continue to track with the
13 remaining two Fridays, we should see the best
14 month to budget we have had in 2013.  Did you
15 understand what that meant in this time frame
16 in August of 2013?
17    A.  Just that the financial perfor-
18 mance was improving.
19    Q.  But you didn't know how they were
20 making their money?
21    A.  Not specifically, no.
22
23    (Plaintiff's Exhibit Number 310

Page 120

1 was marked for identification and copy of same
2 is attached hereto).
3
4    Q.  (BY MR. EVANS)  I'll show you what
5 we've had marked as Exhibit 310, Mr. Houston.
6 Again, is this an email in which you were
7 included in November of 2013?
8    A.  Yes.
9    Q.  It attaches an organization chart,
10 doesn't it?
11    A.  It does.
12    Q.  And it talks about changes in the
13 executive leadership team there at CHC?
14    A.  Yes.
15    Q.  And bullet point number two, it
16 shows that one of the changes would include
17 moving the operations of JCS under Don
18 Houston, our COO?
19    A.  Correct.
20    Q.  And then the last bullet point
21 says the JCS conptroller will now report to
22 Bruce McDaniel, our CFO, correct?
23    A.  Correct.

Page 121

1    Q.   Does this help us pinpoint a date
2  as to when those changes actually occurred?
3    A.   Yes.
4    Q.   So we're talking about November of
5  2013?
6    A.   Correct.
7    Q.   I knew we would get there.
8
9        (Plaintiff's Exhibit Number 311
10 was marked for identification and copy of same
11 is attached hereto).
12
13    Q.   (BY MR. EVANS)  Let me show you
14 Exhibit 311.  Okay, do you recognize there
15 email?
16    A.   I do.
17    Q.   It's an email from you to Ed Buss
18 and others in November of 2013, correct?
19    A.   Correct.
20    Q.   This is close to the time frame
21 that you've now been appointed as the head of
22 JCS, correct?
23    A.   Correct.

Page 122

1    Q.   And you're talking about, quote,
2  gentleman, I believe our CEO will be joining
3  us for our meeting, end quote.  Who were you
4  referring to?
5    A.   Dirk Allison.
6    Q.   So he would have been the CEO you
7  were referring to?
8    A.   Correct.
9    Q.   Was he your CEO at that point in
10 time?
11    A.   He was.
12    Q.   When Mr. Moon came into the
13 picture, did he -- under CHC, did he sign a
14 noncompete clause, if you know?
15    A.   When Mr. Moon did?
16    Q.   Yes, sir.  In other words, when
17 JCS was purchased, did he sign a noncompete
18 clause?
19    A.   I don't know.
20    Q.   Do you know whether Dennis Sanders
21 did?
22    A.   I don't know.
23    Q.   Who made the decision to close the

Page 123

1  Alabama operations of JCS?
2    A.   I participated in that decision.
3    Q.   Who else did?
4    A.   Colleen Ray, myself, Karen Lloyd.
5    Q.   When the operations were being
6  shut down and the leases and so forth were
7  being terminated, were those matters handled
8  by the legal department of CCS?
9    A.   For the most part, yes.
10    Q.   Did you ever review or see any of
11 the marketing information from JCS?
12    A.   Ever?
13    Q.   Yes, sir, ever.
14    A.   Yes.
15    Q.   Did you direct any changes to any
16 of it or --
17    A.   No.
18    Q.   -- as to whether it should be
19 modified or reformatted?
20    A.   No.
21
22        (Plaintiff's Exhibit Number 312
23 was marked for identification and copy of same

Page 124

1  is attached hereto).
2
3    Q.   (BY MR. EVANS)  After you became
4  the responsible for, the head of JCS there in
5  November of 2013, did you change the way it
6  was running in any way?
7    A.   Appointed Karen Lloyd.
8    Q.   Did you --
9    A.   Functionally, no.
10    Q.   Did you begin running it as a
11 division of CHC?
12    A.   No, it always functioned as JCS.
13    Q.   Let me show you what we've had
14 marked as Exhibit 313 -- 312, I'm sorry.
15    A.   312 (Examining document).  Okay.
16    Q.   This is an email from you to Ed
17 Buss in January of 2014, isn't it?
18    A.   It is.
19    Q.   Again, part of it redacted.  Do
20 you know what is under the redacted area?
21    A.   I do not.
22    Q.   After that sentence you put, I'm
23 sure you've had your thoughts on how you want

Page 125

1 to run this Division. JCS will retain its
2 corporate identity, but I want to run it as a
3 Division of CHC. You wrote that?
4       A. Yes.
5       Q. And did you do that?
6       A. Did not.
7       Q. Why not?
8       A. I could never find a way to
9 integrate it fully into the company. It just
10 -- it just didn't fit with health care.
11       Q. As we sit here today, it's paid
12 through the payroll of CCS, that's what we
13 talked about earlier, correct?
14       A. Correct.
15       Q. Does it still maintain some
16 corporate identity?
17       A. Yes.
18       Q. And the officers of that entity
19 are?
20       A. Could you ask that question again?
21       Q. Yes, sir. Does JCS still maintain
22 some corporate identity?
23       A. Yes.

Page 126

1       Q. As I understand it, at some point
2 it changed its format from JCS -- or Judicial
3 Correction Services, Incorporated, to Judicial
4 Correction Services, LLC. Are you aware of
5 that?
6       A. I'm not.
7       Q. Or who did that?
8       A. No.
9       Q. Or the purpose behind it?
10       A. No.
11       Q. Do you know who are the owners of
12 JCS, LLC, or JCS, Incorporated, either one?
13       A. Not really. I would think it's
14 CHC, and that's a supposition on my part.
15       Q. When JCS was purchased by CHC,
16 were all of the assets transferred over to
17 CHC?
18       A. As far as --
19       MR. FINCH: Object to form.
20       A. Yes.
21       Q. (BY MR. EVANS) As far as you
22 know. It appears to be that in that earlier
23 purchase document we looked at. So as we sit

Page 127

1 here, JCS itself would not have any assets
2 separate and apart from those of CHC, is that
3 correct?
4       MR. FINCH: Object to form.
5       Q. (BY MR. EVANS) You can answer.
6       A. I don't know.
7       Q. Who would know that?
8       A. I would think that our legal
9 department would know that.
10       Q. Has it acquired any assets since
11 the sale went through between CHC and JCS?
12       A. It's acquired contracts.
13       Q. And it's closed the Alabama opera-
14 tion and terminated all of those contracts,
15 correct?
16       A. Correct.
17       Q. What states is it currently
18 operating in?
19       A. Currently in Florida and Georgia.
20
21       (Plaintiff's Exhibit Number 313
22 was marked for identification and copy of same
23 is attached hereto).

Page 128

1       Q. (BY MR. EVANS) Let me show you
2 what we've had marked as Exhibit 313.
3       A. (Examining document).
4       Q. Do you recognize this document?
5       A. Yes.
6       Q. What is it?
7       A. It's the leadership of CCS at some
8 point in time.
9       Q. It's dated, the bottom right
10 corner.
11       MR. FINCH: No, that's when it was
12 printed.
13       A. Yes.
14       Q. (BY MR. EVANS) Would that have
15 been correct as far as the leadership in
16 December of 2015?
17       A. Probably.
18       Q. It's from the website there. You
19 see the website address on the top front page?
20       A. Yeah, I just don't know that the
21 website is always kept up.
22       Q. That's fair. Do you recognize all
23 of those persons?

Page 129

1     A.  I do recognize all of the people
2 here, yes.
3     Q.  And they're part of the leadership
4 team of CCS, correct?
5     A.  Correct.
6
7         (Plaintiff's Exhibit Number 314
8 was marked for identification and copy of same
9 is attached hereto).
10
11    Q.  (BY MR. EVANS)  For completeness
12 we've had a more recent one done.  I'll show
13 you Exhibit 314.
14    A.  (Examining document).
15    Q.  Again, do you recognize --
16    A.  I do.
17    Q.  -- those people as the leadership
18 team of CCS?
19    A.  Yes.
20    Q.  We talked about this entity a
21 little earlier, Correctional Healthcare
22 Company.  Have you been involved with that
23 entity at all?

Page 130

1     A.  Yes.
2     Q.  In what way?
3     A.  I was the chief operating officer
4 of Correctional Healthcare Company.
5     Q.  And is that the company that we've
6 been talking about, CHC Companies, Inc.?
7     A.  Yes.
8     Q.  You know that --
9     A.  That's who I refer to it as, yes.
10    Q.  So it does business as
11 Correctional Healthcare Company from time to
12 time?
13        MR. FINCH:  Object to form.  What
14 time frame, Danny?
15    Q.  (BY MR. EVANS)  You can answer.
16        MR. FINCH:  If you can.
17    A.  Yeah, I don't know, I've -- I
18 don't know when there was a change in the
19 company's name.  I've always just gone with
20 CHC as the company that we've been discussing.
21    Q.  (BY MR. EVANS)  And those letters,
22 you understood, stood for Correctional
23 Healthcare Company?

Page 131

1     A.  Correct.
2     Q.  The reason for that question is
3 during our investigation of this case Mr.
4 Goetz was, back in 2011, the president of CHC,
5 wasn't he?
6        MR. FINCH:  Object to form.
7     A.  Mr. Goetz?
8     Q.  (BY MR. EVANS)  Yes, sir.
9     A.  And when?
10    Q.  2011.
11    A.  He was the CEO and president, yes.
12    Q.  And he was also the president of
13 another company called Correctional
14 Healthcare, Incorporated; did you know about
15 that?
16    A.  No.
17    Q.  Or CHC Companies, Limited, did you
18 know about that?
19    A.  No.
20    Q.  Did you have any participation in
21 the operation of those other companies?
22    A.  No.
23    Q.  As far as the company that has had

Page 132

1 ownership participation in the operation of
2 JCS, we're talking about CHC Companies, Inc.,
3 is that correct?
4        MR. FINCH:  Object to form.
5     A.  Correctional Healthcare Companies
6 is the only one that I know that I
7 participated in that managed JCS or had any
8 responsibility for JCS.
9     Q.  (BY MR. EVANS)  Did you understand
10 that the corporate name of that is actually
11 CHC Companies, Inc.?
12    A.  No.
13    Q.  What do you understand the name of
14 the company to be, the actual formal name of
15 the entity?
16    A.  Correctional Healthcare Companies.
17    Q.  Inc.?
18    A.  I don't know.
19    Q.  Well, and that's the problem, see,
20 we've had a bunch of name changes, one to the
21 other and back and forth, and so I'm trying to
22 make sure we have the right people at the
23 table.

Page 133

1     A. Well, there's, you know -- and
2 probably there is someone who can explain that
3 a little bit better in what happens above the
4 operating part of the company, which is -- to
5 me that was always about how to deal with
6 taxes more than anything else and how --
7       MR. FINCH: He's talking now at
8 the -- below the -- he's talking at the CHC
9 Companies level or below --
10     A. Okay.
11       MR. FINCH: -- not up above.
12     A. All right.
13     Q. (BY MR. EVANS) Let me show you
14 what back here, we're looking now at Exhibit
15 289, remember us talking about this being the
16 purchase agreement --
17     A. Yes.
18     Q. -- and merger?
19     A. Yes.
20     Q. See, it shows CHC Companies,
21 Incorporated, as the purchaser, not
22 Correctional Healthcare Companies, but CHC
23 Companies, Incorporated. We have seen

Page 134

1 documents where CHC Companies does business as
2 Correctional Healthcare and where Correctional
3 Healthcare does business as CHC. But as far
4 as the company you work for, is it your
5 understanding that it's CHC Companies, Inc.?
6       MR. FINCH: Object to form.
7     A. Yes.
8     Q. (BY MR. EVANS) Okay. And as far
9 as any of these other entities, you just don't
10 know about those, is that correct?
11     A. Correct.
12       MR. FINCH: We're going to take a
13 break.
14       MR. EVANS: Okay, we'll probably
15 take a break for lunch pretty soon. If you
16 want to do that now, we can.
17       MR. FINCH: Oh, yeah, why don't we
18 just do that now.
19       MR. EVANS: Okay.
20       (Recess from 11:40 A.M. until
21       12:33 P.M.)
22     Q. (BY MR. EVANS) Okay, Mr. Houston,
23 we're back on the record after lunch, and, of

Page 135

1 course, I'll remind you you're still under
2 oath. You understand that?
3     A. I do.
4     Q. I want to make sure that we're
5 clear on some of the things that we were
6 discussing right before lunch. When we set
7 this deposition up we asked to take the
8 corporate representative of CHC Companies,
9 Incorporated, and earlier in the day you told
10 me that's you.
11     A. That's me.
12     Q. Okay. And then right before lunch
13 you suggested you were employed or paid by
14 Correctional Healthcare Companies, that you
15 didn't understand which was which?
16     A. It's Correctional Healthcare
17 Companies, Incorporated.
18     Q. And doing -- is it called CHC
19 Companies, Inc., or is it Correctional
20 Healthcare Companies, Inc.
21     A. CHC, Inc. Correctional Healthcare
22 Companies, Incorporated.
23     Q. Well, let me show you Exhibit 289,

Page 136

1 which again is the purchase agreement -- I'm
2 sorry, you've got a copy of it. This is our
3 copy.
4     A. Yes, sir, right here.
5     Q. Okay, you've got it in front of
6 you there. That's the agreement or plan of
7 merger between CHC Companies, Inc., and
8 Judicial Correction Services, Inc. Do you see
9 that?
10     A. Right.
11     Q. And, of course, we've asked to
12 take the deposition of the rep of CHC
13 Companies, Inc.
14       MR. FINCH: That's what he's here
15 as.
16       MR. EVANS: Okay, I --
17       MR. FINCH: I will represent to
18 you --
19     A. Yes.
20       MR. FINCH: -- that he's here to
21 testify on behalf of CHC Companies, Inc.
22     Q. (BY MR. EVANS) All right, there
23 are other entities we have seen named

¹ Correctional Healthare Company, sounds like
² the same, but it's a different company we're
³ told. Do you know anything about that
⁴ company?
⁵     A. No.
⁶     Q. What other subsidiaries does CHC
⁷ Companies, Inc., have?
⁸     A. PNA, Physicians Network
⁹ Association, Secure Care, Correctional
¹⁰ Healthcare Management, and I guess JCS.
¹¹     Q. Are those all that you know about?
¹²     A. There's JHS.
¹³     Q. What does that stand for?
¹⁴     A. I'm trying to remember what that
¹⁵ stands for. I don't even remember what it
¹⁶ stands for, but it's a small company out in
¹⁷ Phoenix.
¹⁸     Q. Are they all under your --
¹⁹     A. Yes.
²⁰     Q. -- supervision as the president?
²¹     A. Yes.
²²     Q. The notice of deposition had a
²³ number of topics, if I can find mine, and you

¹ can look back at it from earlier. See the
² corporate rep deposition notice?
³     MR. FINCH: It's this one.
⁴     A. Yes.
⁵     Q. (BY MR. EVANS) One of them dealt
⁶ with, if you'll look at paragraph three, if
⁷ you would -- paragraph two, for that matter,
⁸ and we talked about the relationship of JCS to
⁹ CHC Companies, that's what we were talking
¹⁰ about with merger this agreement, wasn't it?
¹¹     A. Right.
¹²     MR. FINCH: Let me see this for a
¹³ second. Okay.
¹⁴     Q. (BY MR. EVANS) Paragraph three,
¹⁵ the relationship of JCS to Correct Care
¹⁶ Solutions, that would be by by virtue of being
¹⁷ under the CCS umbrella as we discussed earlier
¹⁸ today?
¹⁹     A. Correct.
²⁰     Q. What is CCS Group Holdings, LLC?
²¹     A. That is an umbrella group above
²² CHC Companies and CCS.
²³     Q. It's above CCS?

¹     A. It is above CCS.
²     Q. So CCS, LLC, would be within that
³ group?
⁴     A. Yes.
⁵     Q. And CCS-CHC Holdings, LLC --
⁶     A. I don't know what that is.
⁷     Q. Okay. What is Jasmine (sic)
⁸ Healthcare, Incorporated?
⁹     A. Jasmine Healthcare was the
¹⁰ entity --
¹¹     MR. FINCH: Jessamine.
¹²     A. Jessamine, it was the entity that
¹³ the private equity firm used as the vehicle to
¹⁴ acquire CHC.
¹⁵     Q. (BY MR. EVANS) And that happened
¹⁶ when y'all were brought into the CCS umbrella?
¹⁷     A. No, it was prior to that.
¹⁸     Q. I see. And who signed on behalf
¹⁹ of Jessamine?
²⁰     A. It was Dale, Dale Wolf.
²¹     Q. Was Dirk Allison involved with
²² that group?
²³     A. He became involved with that

¹ group.
²     Q. Do you know anything about GTCR?
³     A. Just that they're one of the
⁴ private equity companies that has invested in
⁵ CHC.
⁶     Q. They're one of the owners or
⁷ investors?
⁸     A. Correct.
⁹     Q. As far as the boards of these
¹⁰ various entities, which board meetings, board
¹¹ participations are you involved with?
¹²     A. I'm invited to the CCS board
¹³ meetings at times. I don't attend all of the
¹⁴ board meetings. I attend sporadically.
¹⁵     Q. How often does the board meet?
¹⁶     A. They meet quarterly, at least
¹⁷ quarterly.
¹⁸     Q. What other board meetings do you
¹⁹ attend?
²⁰     A. That's the only board meeting I'm
²¹ attending.
²²     Q. Does CHC Companies, Incorporated,
²³ have a board?

Page 141

1    A.  It does.
2    Q.  And who is on that board?
3    A.  It's the same members that's on
4  the CCS board.
5    Q.  Okay, and does it have separate
6  meetings from the CCS board?
7    A.  Not lately.
8    Q.  When you say not lately --
9    A.  It has had, but I think --
10   Q.  Since July of 2014 when --
11   A.  I don't think so.
12   Q.  How about JCS, does it have a
13 board?
14   A.  It does.
15   Q.  Who's on that board?
16   A.  The same members.
17   Q.  The same members who are members
18 of CCS?
19   A.  Yes.
20   Q.  Does it have meetings separate and
21 apart from those board meetings of CCS?
22   A.  No.
23   Q.  It previously did?

Page 142

1    A.  It did, yes.
2    Q.  And I had asked you about JCS,
3  LLC, and if I understood your answer, you
4  don't know anything about that?
5    A.  No.
6    Q.  And you don't know why it was
7  changed from Judicial Correction Services,
8  Incorporated to an LLC?
9    A.  I do not.
10   Q.  Who would you suggest would be the
11 person to talk to about that?
12   A.  Probably David Perry.
13   Q.  We'll get a chance to do that
14 tomorrow.
15   A.  Okay.
16   Q.  When JCS did have an operating
17 board separate from CCS, when did it meet, do
18 you know?
19   A.  It met quarterly.
20   Q.  Did you meet with that board?
21   A.  I did not.
22   Q.  And other than knowing GTCR is an
23 investor -- and it's your information they're

Page 143

1  an investor in which entity?
2    A.  They are an investor in CHC and
3  CCS.
4    Q.  CCS, LLC, is that correct?
5    A.  Well, I don't know if it's an LLC,
6  but I know that they are invested in both.
7    Q.  Do they have any operational
8  function in the organization?
9    A.  None.
10   Q.  Do they have membership on the
11 board?
12   A.  They do.
13   Q.  How many members would they have
14 on the board, do you know?
15   A.  I believe just one, one member.
16   Q.  And this CCS board, CCS, LLC,
17 board, it's your understanding that that board
18 now is the same board for these sub-entities
19 like CHC and JCS?
20       MR. FINCH:  Object to form.
21   A.  Yes.
22   Q.  (BY MR. EVANS)  Any other entities
23 within that umbrella group that the board

Page 144

1  would also serve as the board of?
2        MR. FINCH:  Same objection.
3    A.  Not that I'm aware of.
4    Q.  (BY MR. EVANS)  When JCS was
5  purchased by CHC, and I hope I'm getting all
6  of these acronyms correct, when they were
7  purchased back in 2011, we looked at that
8  Exhibit 289 --
9    A.  Yes.
10   Q.  -- there are some indemnity
11 provisions in that agreement, and it's got an
12 index in front.  Do you see paragraphs
13 Sections 11.2 and 3?
14   A.  11 --
15   Q.  Yes, sir --
16   A.  Okay.
17   Q.  -- it's on pages forty and forty-
18 one.
19   A.  Okay.
20   Q.  What can you tell me about the
21 indemnification agreements in that purchase?
22   A.  I can't tell you anything about
23 it.

Q. And why not?

A. Well, as I testified, this was the first time I've seen this document.

Q. Yes, sir. Part of the topics that we had asked about is the relationship between these two companies, a representative who would know about these relationships. Did you make any investigation about the way this agreement came about or the terms of the agreement before coming today?

A. In general, but I hadn't seen this, so no.

Q. And you're saying you haven't seen Exhibit 289?

A. This is the first time I've seen it.

Q. Even though it's the purchase agreement where JCS was acquired?

A. Yes.

Q. Do you know from any source what the terms of the indemnification --

A. I do not.

Q. Do you know why it has been

blanked out and obliterated in the copy provided to us?

A. I do not.

Q. Who would have a copy of the unredacted document like this?

A. I'm sure our general counsel would.

Q. And that's Mr. Perry?

A. Yes.

Q. And, of course, this predated his time, this goes back to 2011.

A. Correct.

Q. But when he came on board and CHC purchased JCS, are those documents now kept at the common location there at Murfreesboro?

MR. FINCH: Object to form.

A. Yes, sir.

Q. (BY MR. EVANS) So the legal documents pertaining to JCS and CHC are now at the CCS location?

A. They should be.

Q. They should be, okay. I think we've covered this, and if I've asked you, I

apologize, but the only board meetings that you would now attend would be sporadically attending the CCS board?

A. Correct. That's correct.

Q. How many people are on that board, do you know?

A. Officially, I . . .

Q. If you could name them, that would be great.

A. Well, Jerry Boyle --

Q. He's the chairman?

A. He's the chairman. And then you have the CEO, Jorge Dominicis. Patrick Cummiskey. And then David Perry, and then there are -- I don't know each of the private equity companies, they have members, but I don't know them by name because they can rotate memberships through the board, but --

Q. Who would be the other private equity members other than GTCR?

A. Audex and Frazier.

Q. Anybody else?

A. No.

Q. Are each of those board members also owners in the entity?

MR. FINCH: Object to form.

A. I wouldn't know.

Q. (BY MR. EVANS) Again, that would be something you would expect Mr. Perry to know?

A. Probably.

(Plaintiff's Exhibit Number 315 was marked for identification and copy of same is attached hereto).

Q. (BY MR. EVANS) Let me show you a document that we were provided last week and we've had marked as Exhibit 315. Do you recognize this document?

MR. FINCH: This is actually several documents.

A. It's more than one, yeah.

Q. (BY MR. EVANS) Okay, we've had them clipped together --

MR. FINCH: I don't have a problem

Page 149

1  with that, I just wanted to be clear.
2      A.  (Examining documents).
3      Q.  (BY MR. EVANS)  To be absolutely
4  clear, I believe it's the noncompete agreement
5  with Karen Lloyd, Colleen Ray, and Stanley
6  Stevens?
7      A.  And Stan Stevens, yes.
8      Q.  Feel free to look at them, but
9  they're essentially the same form, aren't
10  they?
11      A.  They appear to be.
12      Q.  And they were all executed in or
13  around February of 2015?
14      A.  No, this looks like 4-9-15.  Looks
15  like April the 9th of '15.
16      Q.  I was looking at the first date,
17  so they must have all been dated the same but
18  signed a little bit later.
19      A.  Yeah, I was just looking at when
20  they were --
21      Q.  Actually signed?
22      A.  -- actually signed.
23      Q.  What do you know about this

Page 150

1  document?
2      A.  I just know that they're
3  noncompete agreements.
4      Q.  Did you sign a similar one?
5      A.  I've signed one.  Not similar to
6  this, a little different.
7      Q.  This would have been prepared by
8  the CCS legal department?
9      A.  Or HR department.
10      Q.  The recitals in the first page, do
11  you see that?
12      A.  Yes.
13      Q.  The first paragraph, can you read
14  that for me?
15      A.  It is Confidentialilty -- oh, for
16  the recitals?
17      Q.  Yes, sir.
18      A.  Whereas, Employer shall collec-
19  tively and individually mean CCS Intermediate
20  Holdings, LLC, a Delaware LLC, and/or any of
21  its current or future affiliates, subsidia-
22  ries, predecessor companies, parent or holding
23  companies or related professional corporations

Page 151

1  or entities, (including, but not included but
2  limited to, Correct Care Solutions, LLC,
3  Correct Care, LLC, Conmed Healthcare
4  Management, Inc., and CHC Companies, Inc.).
5      Q.  So is it your understanding from
6  the terms of this agreement that all of those
7  would be considered the employer under the
8  interpretation of this noncompete?
9          MR. FINCH:  Object to the form.
10      A.  I mean, it speaks for itself.
11      Q.  (BY MR. EVANS)  That's what it
12  says, doesn't it?
13      A.  That's what it says.
14      Q.  Why were these -- Ms. Lloyd used
15  to be the JCS Alabama operational manager or
16  Southeast operational manager, wasn't she?
17      A.  No.
18      Q.  What was her position?
19      A.  Previous to her current position
20  she was the state manager for Florida.
21      Q.  Uh-huh.  We deposed her, and she
22  said she was the regional manager and reported
23  to you.  Was she incorrect about that?

Page 152

1      A.  No, currently.  You said previous-
2  ly, so previously she was the state manager of
3  Florida.
4      Q.  I see, maybe we miscommunicated
5  then.
6      A.  Okay.
7      Q.  Was she at one time the
8  Southeastern operational manager for JCS?
9      A.  I've never used that title.  She
10  was the director of operations for JCS --
11      Q.  Okay.
12      A.  -- which incorporated all of JCS.
13      Q.  And according to her testimony,
14  she reported to you?
15      A.  Correct.
16      Q.  And Mrs. Colleen Ray, we've talked
17  about her, she was the state manager there for
18  Alabama, correct?
19      A.  Correct.
20      Q.  Is she still employed in the
21  company --
22      A.  She is not.
23      Q.  -- in any capacity?

Page 153

1    MR. FINCH:  Make sure you wait
2 until he's done for Kerry's benefit.
3    Q.  (BY MR. EVANS) When did she leave
4 the employment of the company?
5    A.  I don't remember exactly.  It was
6 late last year, in 2015.
7    Q.  The press release said that JCS
8 was leaving the state in November of 2015.
9 Would it have been at that time?
10    A.  Around about that time, yes.
11    Q.  Do you know what she's doing now?
12    A.  I do not.
13    Q.  As far as Stanley Stevens, who is
14 he?  What's his --
15    A.  Stan is over IT for JCS.
16    Q.  And did he come in after Pelts?
17    A.  Yes.
18    Q.  And where does he work physically?
19    A.  In Georgia.
20
21    (Plaintiff's Exhibit Number 316
22 was marked for identification and copy of same
23 is attached hereto).

Page 154

1
2    Q.  (BY MR. EVANS) Mr. Houston, let
3 me show you now what we've had marked as
4 Exhibit 316.
5    A.  Okay.
6    Q.  Can you identify this for me?
7    A.  This one I'm having a hard time
8 reading.  It's a W-2, but I can't tell who
9 it's for.  But the other pages are mine.
10    Q.  They all have your name at the
11 bottom on them --
12    A.  Okay.
13    Q.  -- that's the way they were
14 provided to us.
15    A.  All right.
16    Q.  And they all show, like, the first
17 page is 2013, shows W-2s from CHC Companies,
18 Incorporated, is that correct?
19    A.  That's correct.
20    Q.  And the second page, we're looking
21 at 2014, I believe, W-2s, is that right?
22    A.  I'm looking for the date, but --
23    Q.  It's at the bottom.

Page 155

1    A.  Yes.
2    Q.  And that, again, is for you and
3 shows the W-2s issued to you by CHC Companies,
4 Incorporated?
5    A.  Yes.
6    Q.  And then the last page is 2015,
7 W-2s to you, correct?
8    A.  Correct.
9    Q.  And for some reason this one shows
10 the employer's name is Correctional Healthcare
11 Companies.  That's what we were talking about
12 as the confusion a little earlier.
13    A.  Okay.
14    Q.  Is that one and the same as CHC
15 Companies, Incorporated, as far as you know?
16    A.  As far as I know.
17    Q.  One of the things that might help,
18 looking at that, it's the same address here on
19 Murfreesboro in Nashville, isn't it?
20    A.  Which one?
21    Q.  Well, the 2015, the one that
22 has --
23    A.  Oh, the same --

Page 156

1    MR. FINCH:  He's comparing '15 to
2 '14.
3    A.  Correct.
4    Q.  (BY MR. EVANS) And when you look
5 at the employer ID number, if you compare it
6 back to the 2013 and 2014 employer ID number,
7 it, in fact, is the same, isn't it?
8    A.  It is.
9    Q.  So even though that name is
10 spelled out as Correctional Healthcare
11 Companies, in your judgment it's one and the
12 same entity as CHC Companies, Inc.?
13    A.  Yes.
14
15    (Plaintiff's Exhibit Number 317
16 was marked for identification and copy of same
17 is attached hereto).
18
19    Q.  (BY MR. EVANS) Let me show you
20 similar documents that we've had marked as
21 Exhibit 317.  And you see at the bottom this
22 is for Lisha Kidd?
23    A.  Yes.

Page 157

1    Q.  Do you know Ms. Kidd?

2    A.  I do not.

3    Q.  You never had any contact with

4 her?

5    A.  Never.

6    Q.  This shows that she was given W-2s

7 from CHC Companies, Inc., in 2013, doesn't it?

8    A.  It does.

9    Q.  And in 2014 the same, correct?

10    A.  Yes.

11    Q.  2015, again for some reason the

12 name is changed but the employer ID number is

13 the same, can you confirm that?

14    A.  Yes.

15       MR. EVANS:  We still haven't

16 gotten the W-3 that you talked about.  Are you

17 going to try to get that for us?

18       MR. FINCH:  Yeah.  For --

19       MS. PARRISH:  '15.

20       MR. FINCH:  -- or '13 --

21       MR. EVANS:  '15.

22       MS. PARRISH:  '15.

23       MR. FINCH:  Okay.

Page 158

1    Q.  (BY MR. EVANS)  Is Mr. Boyle

2 actively involved in the business even those

3 he's the board chairman?

4    A.  Yes.

5    Q.  Does he have an office there at

6 Murphreesboro?

7    A.  He does.

8    Q.  And is that where Mr. Jorge

9 Dominicis --

10    A.  Dominicis.

11    Q.  -- Dominicis, he's there at that

12 same address?

13    A.  Yes.

14

15       (Plaintiff's Exhibit Number 318

16 was marked for identification and copy of same

17 is attached hereto).

18

19    Q.  (BY MR. EVANS)  Let me show you

20 what we've had marked as Exhibit 318.  Do you

21 recognize that?

22    A.  I've seen this, yes.

23    Q.  What is it?

Page 159

1    A.  It is a press announcement.

2    Q.  It's dated June the 13th, 2014?

3    A.  Correct.

4    Q.  Over the name of Mr. Boyle, Jerry

5 Boyle, Chairman and Chief Executive Officer,

6 Correct Care Solutions?

7    A.  That's correct.

8    Q.  And it's written as an open letter

9 to all of the employees of CCS, is that right?

10    A.  Correct.

11    Q.  Did you see it at or about the

12 time it was released, then?

13    A.  I did.

14    Q.  He writes in the first paragraph,

15 quote, I am pleased to announce today that CCS

16 has signed a purchase agreement that will

17 initiate a transaction that will merge its

18 operations with Correctional Healthcare

19 Companies, a national provider of correctional

20 healthcare solutions.  CHC employees over

21 2,500 healthcare professionals across

22 twenty-seven states and has provided inmate

23 healthcare services since 1992.  I read that

Page 160

1 correctly, didn't I?

2    A.  You did.

3    Q.  And after that -- by the way, were

4 you aware of that transaction before it

5 occurred?

6    A.  Yes.

7    Q.  And were you aware of when it

8 actually closed, when the transaction --

9    A.  Yes.

10    Q.  Okay.

11

12       (Plaintiff's Exhibit Number 319

13 was marked for identification and copy of same

14 is attached hereto).

15

16    Q.  (BY MR. EVANS)  Let me show you --

17 did you take part in the closing?

18    A.  No.

19    Q.  Even though you were the president

20 of CHC, you didn't have to attend the closing?

21    A.  I didn't have to attend the

22 closing.

23    Q.  You signed some documents on

Page 161

1 behalf of CHC at the time?

2      A. I did have to sign some documents.

3      Q. A lot of documents?

4      A. A number of documents, yes.

5      Q. Where were those signed? Was it

6 done here, was it in Nashville, or was it --

7      A. It was done -- I think I signed

8 mine in Denver.

9      Q. Who would have copies of those

10 documents?

11      A. I guess David Perry would.

12      Q. We've not been provided those, and

13 we've asked for those, but Mr. Perry would

14 have them as far as you know?

15      A. I would -- the secretary of the

16 corporation would have them, I would think.

17      Q. And who is that?

18      A. That's --

19      Q. Mr. Perry?

20      A. -- Mr. Perry.

21      Q. Let me show you Exhibit 319.

22      MR. EVANS: By the way, Lane, is

23 there any reason we can't get those documents?

Page 162

1      MR. FINCH: I don't know off the

2 top of my head one way or the other.

3      MR. EVANS: Well, how about

4 finding out about it because we've been asking

5 for them for a long time.

6      Q. (BY MR. EVANS) And Exhibit 319,

7 can you tell me what this is?

8      A. Yes, it's a letter from Jorge

9 Dominicis to Ms. Lucy Sheftall?

10      Q. Difficult name. He writes -- and

11 the date of the letter is what?

12      A. July 23rd, 2014.

13      Q. Do you recognize Mr. Dominicis'

14 signature?

15      A. I do.

16      Q. He writes, quote, Today, Correc-

17 tional Healthcare Companies has formally

18 merged with Correct Care Solutions, LLC.

19 Since its inception, CCS has developed a

20 reputation for providing the highest quality

21 healthcare services available in the

22 correctional setting. And then he goes down

23 into the second paragraph, second sentence, he

Page 163

1 writes, quote, We do not intend to change

2 names in the foreseeable future as CHC will

3 operate as a division of CCS. However, we

4 will immediately begin referring to ourselves

5 and doing business as Correct Care Solutions.

6 I read that correctly, didn't I?

7      A. You did.

8      Q. And that's the way you proceeded

9 after that point, wasn't it?

10      A. Correct.

11      Q. The last paragraph -- next to last

12 paragraph, quote, As we work to integrate the

13 two companies, we will keep you updated. I am

14 committed to bringing the best of CHC and

15 CCS's capabilities into our combined company,

16 end quote. And that references today, July

17 23rd, 2014, as the date of the formal merger.

18 Does that comport with your memory? Is that

19 when you think it happened?

20      MR. FINCH: Object to form.

21      A. Yes.

22      Q. (BY MR. EVANS) Who else on behalf

23 of CHC would have participated in the formal

Page 164

1 merger documents other than you?

2      A. Dirk Allison --

3      Q. And what position would he have

4 had?

5      A. The CEO.

6      Q. Still at that time?

7      A. At that time. Dale Wolf, who was

8 the chairman at that time. Probably Brad

9 Bickman, who was the chief legal officer at

10 that time. Bruce McDaniel, who was the CFO.

11      Q. At that time?

12      A. At that time.

13      Q. And on behalf of CCS, do you know

14 who would have participated?

15      A. Not -- no.

16      Q. Was this closing done in a formal

17 fashion with a group gathering, or you signed

18 separate documents at separate times?

19      A. I signed documents separately.

20 I'm sure others signed them together.

21      Q. At that point you would have still

22 been in Colorado, correct?

23      A. Correct.

Page 165

1  Q.  After the merger of CHC and CCS,
2  did the employees of CHC become employees of
3  CCS?
4      MR. FINCH:  Object to form.
5  Q.  (BY MR. EVANS)  You can answer.
6  A.  I know they were -- they were paid
7  by CCS, but they still referred to themselves
8  as CHC employees.
9  Q.  After the merger between CCS and
10 CHC, did CCS direct and control the human
11 resource policy for the prior CHC folks?
12      MR. FINCH:  Object to form.
13 A.  Not right away.
14 Q.  (BY MR. EVANS)  Over a period of
15 time?
16 A.  Over a period of time, yes.
17 Q.  That was the goal --
18 A.  Yes.
19 Q.  -- and the intention of the
20 merger?
21 A.  Yes.
22 Q.  And, again, when that transaction
23 occurred, though we've not been provided those

Page 166

1  documents, I assume there were some indemnity
2  provisions in the agreement on the purchase?
3  A.  Yes.
4  Q.  Are you familiar with what those
5  were?
6  A.  No.
7  Q.  The assets of CHC Companies, Inc.,
8  were they, in that transaction, transferred
9  over to CCS?
10     MR. FINCH:  Object to form.
11 A.  I couldn't answer that.
12 Q.  (BY MR. EVANS)  The document would
13 tell us that?
14 A.  Yes, it would.
15 Q.  And as far as any insurance
16 provisions providing indemnity to CCS, that
17 would be something we would get out of the
18 document?
19 A.  That would be in the document.
20 Q.  And as far as the assumption of
21 liabilities of CHC Companies, Inc., in that
22 transaction, that would be something we would
23 have to look to that document for?

Page 167

1  A.  Correct.
2  Q.  Other than I know Ms. Lloyd
3  wasn't, per se, an Alabama employee for JCS,
4  but she did have some operational supervision
5  there according to her --
6  A.  Correct, she did.
7  Q.  -- other than her, is there
8  anybody else that previously was in the
9  Alabama operation for JCS that is still
10 employed in the overall CCS, LLC?
11 A.  I don't think so.  Stan Stevens, I
12 guess.
13 Q.  His assignment was really broader
14 than just Alabama, though, wasn't it?
15 A.  It was.
16 Q.  And actually he was located in
17 Georgia, correct?
18 A.  That's correct.
19 Q.  I asked you a little bit about
20 this earlier, and I don't want to rehash it,
21 but during the time JCS was operating in
22 Alabama, were you aware of the employment of
23 any lobbyists there?

Page 168

1  A.  No.
2  Q.  Did you know you did employ
3  lobbyists, or you just didn't know one way or
4  the other?
5  A.  No, we did not have any that I'm
6  aware of.
7  Q.  Okay.  Have you ever heard the
8  name Susan Fuqua or Brad Bishop?
9  A.  I've heard the name.
10 Q.  Do you remember in what context?
11 A.  (Pause.)
12 Q.  Maybe I didn't hear you,
13 Alexandria says I didn't.  Did you tell us in
14 what context that you've heard those names?
15 A.  No, I've just heard the names.
16 Q.  You don't have any idea of why?
17 A.  No.
18
19     (Plaintiff's Exhibit Number 320
20 was marked for identification and copy of same
21 is attached hereto).
22
23 Q.  (BY MR. EVANS)  Let me show you

Page 169

1  what we've had marked as Exhibit 320.
2      A.  (Examining document).  Okay.
3      Q.  You're copied on some of these --
4  I guess most all of these emails.  Do you
5  remember this email chain?
6      A.  I really don't.  I remember some
7  of it, yes.
8      Q.  Am I correct, sir, that this is an
9  email chain that took place back in February
10  of 2014?
11      A.  You're correct.
12      Q.  And it looks like y'all were
13  trying to review your costs there in Alabama,
14  is that right?
15      A.  I don't think it's just Alabama.
16      Q.  After reviewing these emails here
17  today in Exhibit 320, does that refresh your
18  recollection that you did, in fact, have paid
19  lobbyists there in Alabama?
20      A.  It says so here, but I sure don't
21  remember anyone functioning as a lobbyist in
22  Alabama.
23      Q.  In fact, Mr. Buss writes you on

Page 170

1  February the 7th, 2014, or copies you, rather,
2  I checked below and Susan Suqua, he misspelled
3  her name, is our Alabama lobbyist who is clerk
4  of court.  That's what he wrote, correct?
5      A.  Yes.
6      Q.  And then when we go to the next
7  chain, a couple of chains up, Mr. Herndon
8  writes, again copies to you, we have a few
9  contractors that we pay on a regular monthly
10  basis.  That's what he writes, correct?
11      A.  That's what he writes, yes.
12      Q.  I'm sorry.  In one of those the
13  first one on the list is Susan Fuqua, right?
14      A.  Yes.
15      Q.  And the amount that she's paid
16  each month is blanked out.  Do you know who
17  would know that amount?
18      A.  Probably someone in finance.
19      Q.  CCS Finance?
20      A.  Yes.
21      Q.  Do you know whether Ms. Fuqua is
22  still employed by CCS or anybody in the
23  organization?

Page 171

1      A.  I don't.
2      Q.  You don't know?
3      A.  I don't know.
4
5          (Plaintiff's Exhibit Number 321
6  was marked for identification and copy of same
7  is attached hereto).
8
9      Q.  (BY MR. EVANS)  I asked you a
10  little bit earlier about Brad Bishop as one of
11  the other names --
12      A.  Uh-huh (Nodding head).
13      Q.  -- and you told me you had heard
14  his name too, but weren't certain of the
15  context, correct?
16      A.  Yes.
17      Q.  Let me show you a document that
18  may help you remember.  Exhibit 321, I'll show
19  that to you.
20      A.  (Examining document).  Okay.
21      Q.  Do you recognize this as an email
22  from Colleen Ray to you September 11th, 2015?
23      A.  I do.

Page 172

1      Q.  Do you remember getting this?
2      A.  I do.
3      Q.  What do you remember about it?
4      A.  This is when the decision was
5  being made to shut down Alabama, and Colleen
6  was trying to convince me to retain certain
7  courts.
8      Q.  Right.  The last paragraph, she
9  writes, the second sentence, quote, As you
10  know Susan Fuqua and Judge Bishop are working
11  still on getting the policies and procedures
12  through the next legislative bill and if we
13  could hold on to some of the ones we have now
14  until the bill gets passed I know we could get
15  some of the courts back that we've lost, end
16  quote.  I've read that correctly, haven't I?
17      A.  You did read that correctly.
18      Q.  And she says, As you know, Susan
19  Fuqua and Judge Bishop are working on it.
20  Were you aware of that or just don't remember
21  it now?
22      A.  I don't remember what exactly they
23  were working on.  I know some things that

Page 173

1 Colleen and I had talked about --
2     Q.  What were those?
3     A.  -- and I think that's what she was
4 referencing.  The fact that I would like to
5 see some legislation promulgated in the state
6 that would clarify some issues and make it
7 easier to operate.
8     Q.  Easier for a private probation
9 company to operate?
10     A.  Just in general.  If you're going
11 to -- I like rules, I like a structure, and so
12 I was hoping that Alabama would pass rules
13 that were more structured, a more formalized
14 process.
15     Q.  Did you have any contact directly
16 with Judge Bishop?
17     A.  I wouldn't know him if he walked
18 in the room.
19     Q.  Or Susan Fuqua?
20     A.  No.
21     Q.  Do you know whether or not you
22 were paying Judge Bishop as Susan Fuqua was
23 being paid?

Page 174

1     A.  Not that I'm aware of.
2     Q.  And who would know that, somebody
3 in accounting?
4     A.  Yes.
5
6         (Plaintiff's Exhibit Number 322
7 was marked for identification and copy of same
8 is attached hereto).
9
10     Q.  (BY MR. EVANS)  Let me show you
11 what we've had marked as Exhibit 302 -- I'm
12 sorry, I gave you the wrong number.  322.
13     A.  (Examining document).  Okay.
14     Q.  Okay, have you had an opportunity
15 to see that?
16     A.  Yes.
17     Q.  This is, again, a lengthy email to
18 you back on October the 2nd, 2015, isn't it?
19     A.  It is.
20     Q.  And it's from Colleen Ray
21 referencing other revenue options for Alabama?
22     A.  Yes.
23     Q.  Is this a continuing effort on her

Page 175

1 behalf to try to convince you to stay in
2 Alabama, let things get better?
3     A.  Yes.
4     Q.  What did you do, if anything, in
5 response to this?  Do you remember?
6     A.  Just continued with the shutting
7 down of Alabama.
8     Q.  In this document she writes a
9 suggestion that the collection format of JCS
10 be switched to a thirty percent contingency of
11 collections, do you see that, the second
12 paragraph?
13     A.  The second paragraph?
14     Q.  Second paragraph, this morning I
15 received a phone call from Jan Davis --
16     A.  Okay.
17     Q.  -- asking me, et cetera.
18     A.  Now repeat your question.
19     Q.  Yes, sir.  Is she referencing a
20 suggested thirty percent collection
21 contingency rather than the current format?
22         MR. FINCH:  Object to form.
23     A.  I don't read it that way.

Page 176

1     Q.  (BY MR. EVANS)  You do not?
2     A.  I read it that she is telling us
3 that someone else is suggesting that.
4     Q.  I see.  And in the third paragraph
5 she writes, quote, I know by talking with
6 Susan Fuqua and Judge Bishop that this is
7 something that is in the law that
8 municipalities can call (sic) so called
9 "collection agency."  In the past this was
10 one of the reasons that the City of Montgomery
11 left PPS and went with JCS because it would
12 not cost the City.  I've read that correctly,
13 haven't I?
14         MR. FINCH:  No.  Object to form.
15         MR. EVANS:  Where is it incorrect?
16         MR. FINCH:  You misread after
17 municipalities, but it says what it says.
18     Q.  (BY MR. EVANS)  Did you have any
19 contact with Susan Fuqua or Judge Bishop about
20 this --
21     A.  I've never had contact with
22 either.
23     Q.  She suggests in paragraph number

Page 177

1 four is it a possibility that CCS would let me
2 do the same thing by sending letters to the
3 court and suggesting twenty percent of
4 everything collected and get away from the JCS
5 name and have it fall under CCS. Did you
6 respond to that in any way?
7     A. Yes, and the answer was no.
8     Q. Other than the ones I've shown
9 you, have you had any other context that
10 you're aware of at all with Susan Fuqua and
11 Brad Bishop?
12     MR. FINCH: Object to form.
13     A. No, I have not.
14
15     (Plaintiff's Exhibit Number 323
16 was marked for identification and copy of same
17 is attached hereto).
18
19     Q. (BY MR. EVANS) Mr. Houston, let
20 me show you what we've marked as Exhibit 323.
21 This was produced not by you directly, but
22 through JCS.
23     A. (Examining document). Okay.

Page 178

1     Q. Have you had an opportunity to
2 look at it?
3     A. I have.
4     Q. Have you seen that document
5 before?
6     A. I think I -- yes.
7     Q. What do you recall about it? What
8 was the function or the purpose of it?
9     A. The intent was to have a
10 management services agreement between CCS and
11 CHC to formalize the back office work that was
12 going to be provided.
13     Q. The administrative office?
14     A. Yes.
15     Q. This is dated in January of 2015,
16 and we don't have an executed copy of it, it's
17 just -- but it's an agreement between
18 Correctional Healthcare Companies, Inc., and
19 Correct Care Solutions, LLC. Is that the way
20 you understand the document?
21     A. It's what the document reads.
22     Q. Sure. And at that point in time
23 you would have been, of course, the president

Page 179

1 of CHC Companies, Inc., right, January of
2 2015?
3     A. I would be the president of State
4 and Federal.
5     Q. The division that encompassed
6 that?
7     A. Correct.
8     Q. And if any documents were to be
9 signed during that time on behalf of CHC
10 Companies, Inc., you would have been the
11 person to sign them?
12     MR. FINCH: Object to the form.
13     A. Not necessarily.
14     Q. (BY MR. EVANS) Who else?
15     A. It could have been a board member.
16 It could have been the CEO.
17     Q. Meaning Mr. Dominicis?
18     A. Yes, or Dominicis.
19     Q. Dominicis. I thought sure I would
20 get it right that time.
21     Part of this document -- do you
22 remember reading through it or any part of it?
23     A. No, I remember the discussion

Page 180

1 about it.
2     Q. It shows, for instance, that --
3 well, let me ask you this.
4     Is this a common document among
5 the various entities there under the CCS
6 umbrella?
7     MR. FINCH: Object to form.
8     A. I don't know that it's a common
9 document, no.
10     Q. (BY MR. EVANS) Are there a number
11 of them?
12     MR. FINCH: Same objection.
13     A. There are documents. I don't know
14 if they're like this one.
15     Q. (BY MR. EVANS) Okay. Well, are
16 there management service agreements?
17     A. Yes, there are management service
18 agreements.
19     Q. And is it typical for them to have
20 terms such as h. on page three of this
21 document?
22     MR. FINCH: Same objection.
23     A. (Examining document).

Page 181

1  Q.  (BY MR. EVANS)  Paragraph 3.h.
2  A.  Okay, I couldn't answer that.
3  Q.  How about paragraph 3.l.,
4  Financial Statements and Budgets, quote, CCS
5  shall prepare monthly and annual financial
6  statements concerning a balance sheet and the
7  money -- for the income and statement of
8  income for CHC.  Is that usually part of it?
9  MR. FINCH:  Object to form.
10  A.  I don't know what would be in
11  there.
12  Q.  (BY MR. EVANS)  Who would know
13  those kinds of answers?
14  MR. FINCH:  Object to form.
15  A.  I would think that Mr. Perry
16  would.
17  Q.  (BY MR. EVANS)  Mr. Perry.  And as
18  we look at page -- the next page, paragraph
19  5.d., it shows that at least in this document
20  any notice to CHC would go to the legal
21  department at Murfreesboro, is that right?
22  A.  Correct.
23  Q.  And, similarly, any notice to CCS

Page 182

1  would go to the legal department at
2  Murfreesboro, correct?
3  A.  Correct, that's what it says.
4  MR. EVANS:  I don't want to slow
5  us up, so -- we've got some other documents to
6  go through, but we can pass the witness so you
7  can be asked some other questions.  I think
8  Mr. Tankersley --
9  MR. TANKERSLEY:  Sure.
10  MR. EVANS:  Will Hill, do you
11  mind if we take just a very short break?
12  MR. FINCH:  That's fine.  That
13  would be good.
14  MR. TANKERSLEY:  Sure.
15  (Recess from 1:25 P.M. until
16  1:35 P.M.)
17
18  EXAMINATION BY MR. TANKERSLEY:
19  Q.  All right, Mr. Houston, I'm Will
20  Hill Tankersley, I represent the City of
21  Childersburg, Alabama, and I've got a few
22  questions I need to ask you filling in some of
23  the gaps from your prior testimony.  You

Page 183

1  testified earlier that you had spent some time
2  in the military.  How many years of service
3  did you have?
4  A.  Seven active duty, ten in the
5  Reserves.
6  Q.  Okay, and what was the highest
7  rank you achieved in the Reserves?
8  A.  Lieutenant commander.
9  Q.  (Indicating.)
10  A.  Lieutenant commander.
11  Q.  So you were in the Navy?
12  A.  Army active duty, Navy Reserves.
13  Q.  I see.  Did you have any overseas
14  duty?
15  A.  I did.
16  Q.  Where?
17  A.  Berlin, Germany.  West Germany at
18  the time.
19  Q.  Yes, sir, West Germany at the
20  time, of course.  And did you receive any
21  awards for valor?
22  A.  I did.
23  Q.  What was that award?

Page 184

1  A.  Joint service commendation medal.
2  Q.  Well, when I say awards for valor,
3  I'm talking about the Distinguished Service
4  Cross --
5  A.  No, no.
6  Q.  -- Bronze Star, Silver Star --
7  A.  No.
8  Q.  -- Medal of Honor, all of that.
9  A.  None of that.
10  Q.  So you received a Commendation
11  Medal when you
12  A.  Yeah, I did, several of those.
13  Q.  All right, sir.  I know your
14  lawyer and our able court reporter here have
15  all cautioned you about this, but this
16  interaction that we have, it's important that
17  we not talk over each other.  So even though
18  you know what question I'm going to ask and
19  you know what your answer is going to be, I
20  would just respectfully request that you wait
21  until I finish my question before you begin
22  your answer, okay?
23  A.  Yes, sir.

Page 185

1      Q.  All right, sir, thank you.  All-
2 righty, and when was your last year of service
3 in the Reserves?
4      A.  1993.
5      Q.  All right, sir, I want to
6 understand a little -- I must tell you I'm a
7 little confused about the companies that you
8 work for that have the words correctional and
9 health in them because a lot of these things
10 sound alike and some of the names are similar,
11 so let me just make sure I have it right at
12 this time.  Presently you serve as the chief
13 executive officer of the CCS State and Federal
14 Division, is that correct?
15      A.  No, sir.
16      Q.  Tell me exactly what your duties
17 -- your title is as of today.
18      A.  I'm the Division president for
19 State and Federal for CCS.
20      Q.  And you recall you came up under
21 questioning from plaintiff's counsel and drew
22 a circle around those entities that you
23 believe were still characterized as CHC

Page 186

1 entities; do you recall having done that?
2      MR. FINCH:  Object to form.
3      A.  I do.
4      Q.  (BY MR. TANKERSLEY)  All right,
5 sir, did I get something wrong about what I
6 characterized you as having done?  What did
7 you understand yourself to be doing when you
8 drew circles around these entities?
9      A.  Of the entities that were under
10 Private Prisons which ones were CHC.
11      Q.  All right.  Does CHC still exist
12 today as a part of the division over which you
13 are president?
14      A.  Yes.
15      MR. FINCH:  Object to the form.
16      Q.  (BY MR. TANKERSLEY)  Okay.  Does
17 it exist as a separately incorporated entity?
18      A.  I know it still is a -- an entity
19 that contracts and can sign contracts.
20      Q.  And I believe you testified
21 earlier there was some overlap with the CHC
22 board and some other boards, isn't that
23 correct?

Page 187

1      MR. FINCH:  Object to form.
2      A.  Yes.
3      Q.  (BY MR. TANKERSLEY)  Okay, and
4 remind us what your testimony was about that.
5 As of today, who serves on the CHC board?
6      A.  There are three members that are
7 the same, which is Jorge Dominicis, David
8 Perry, and Cary McClure, I believe.
9      Q.  And Mr. Perry is the lawyer for
10 the company, is that correct?
11      A.  Correct.
12      Q.  All right, sir.  Now, and as of
13 today JCS is a part of CHC, is that correct?
14      A.  That's correct.
15      Q.  All right.  And as of today what
16 title, if any, do you hold with JCS?
17      A.  I do not hold a title with JCS.
18      Q.  Now, Mr. Houston, you testified
19 earlier that you had been called upon to
20 attend board meetings from time to time; do
21 you recall your testimony about that?
22      A.  Yes.
23      Q.  Which board meetings have you been

Page 188

1 called upon to attend, the CHC board meetings,
2 the CCS board meetings, or both?
3      A.  At what time?
4      Q.  Well, we're going to say at any
5 time after September 30th, 2011, and the
6 reason why I'm picking that date is because
7 that's the date of the merger with JCS.  So
8 from that date forward which board meetings
9 have you appeared in?
10      A.  There have been a number of --
11 once I became the chief operating officer, I
12 attended a number of CHC board meetings.
13      Q.  What was your role in these CHC
14 board meetings that you attended as the chief
15 operating officer?
16      A.  To report on the operations, what
17 was going on operationally.
18      Q.  That included, when you say the
19 operations, I take it that included how well
20 that JCS was doing financially?
21      A.  That was usually -- the CFO would
22 do that.
23      Q.  What sort of things would you tell

1 the board about as to JCS when you appeared
2 before the boards from 2011 -- correction,
3 from September 30th, 2011, to present?
4        MR. FINCH: Object to form.
5    A. Very little.
6    Q. (BY MR. TANKERSLEY) Okay, sir.
7 Well, you testified just a minute ago that you
8 would testify about operations. Tell me what
9 you meant when you said that.
10    A. I'm talking about the health care
11 operations of CHC or CCS is what I would
12 report on.
13    Q. Is it your testimony here today
14 that you never made any reports about the
15 operations of JCS before the CHC board or the
16 CCS board from September 30th, 2011, to
17 present?
18    A. I don't know that I ever made it
19 to the board.
20    Q. All right. Sir, at a certain
21 point in time JCS's operations in Alabama were
22 ceased, isn't that correct?
23    A. That's correct.

1    Q. And was that decision presented or
2 proposed to the board?
3    A. No.
4    Q. Walk me through how that decision
5 was made.
6    A. That decision was made primarily
7 by myself in consultation with members of the
8 JCS management team, which at that time was
9 Karen Lloyd, Colleen Ray. I did talk with
10 legal to talk about how we could close down --
11 if we decided to move forward, what would we
12 do about leases and how we would cancel leases
13 and what that would entail.
14        I did talk to someone in finance
15 to see with the financial costs would be for
16 closure. I did talk to HR about how we would
17 handle employees, pay out PTO and those types
18 of things and what those costs would be.
19    Q. So it's your testimony that the
20 board was not made aware of this decision to
21 shut down JCS operations?
22    A. They may have been made aware.
23 They were not consulted, and they did not --

1 we did not -- I did not ask for permission.
2    Q. What's your understanding about
3 how it is the board that presided over the
4 operations of the company that housed JCS was
5 made aware of the decision to cease JCS
6 operations in Alabama?
7    A. I couldn't tell you. It may have
8 been a report from the CEO to them. I did not
9 make a report to the board.
10    Q. I see. To whom did you report
11 your decision to close down JCS operations in
12 Alabama?
13    A. To Mr. Dominicis.
14    Q. Is that in the form of a written
15 report?
16    A. No.
17    Q. Say again. I didn't --
18    A. No, it was not in the form of a
19 written report.
20    Q. How was that decision conveyed to
21 Mr. Dominicis?
22    A. He and I meet on a weekly basis.
23 It was during one of our weekly meetings.

1    Q. The weekly meetings you had with
2 Mr. Dominicis, were these in-person meetings?
3    A. They are.
4    Q. Was it just you and Mr. Dominicis
5 or --
6    A. It was --
7    Q. -- were other people present?
8        MR. FINCH: Slow down.
9    A. Just the two of us.
10    Q. (BY MR. TANKERSLEY) Where does
11 that meeting take place?
12    A. Different places.
13    Q. Where does it typically take
14 place?
15    A. His office or my office.
16    Q. What did you tell Mr. Dominicis as
17 to the reason why you had decided to shut down
18 JCS operations in Alabama?
19    A. There were a number of reasons.
20 One was that the business was contracting,
21 that I did not see what I had hoped to see in
22 Alabama with some legislation passed that
23 would create a more structured environment for

Page 193

1 private probation.  And when I saw that that
2 didn't happen, was not going to happen in the
3 near future, it just didn't make sense for us
4 to be there.  It is not part of our core
5 business, it's not what we do, and it's just
6 too problematic.
7      Q.  When you say you wished there
8 could be some legislation passed in Alabama
9 that would, as you put it, clarify JCS-type
10 operations in Alabama, what do you mean by
11 that?
12      A.  Enabling legislation which lays
13 out a structure for how you operate the
14 business, an entity that has supervision or
15 oversight over whatever entities are
16 participating in that business an accrediting
17 body that would accredit the work that you do.
18 Just a laundry list of things that I would
19 like to have seen.
20      Q.  You're aware, are you not, Mr.
21 Houston, that there was some draft legislation
22 considered by the Alabama legislature?
23      A.  I was aware of that.

Page 194

1      Q.  And did you see that legislation
2 in advance of it being presented to the
3 legislature?
4      A.  I had it briefed to me by Kevin
5 Egan.
6      Q.  What role -- or who is Kevin
7 Egan?
8      A.  Kevin Egan worked for JCS.
9      Q.  Egan is E-g-a-n?
10      A.  E-g-a-n.
11      Q.  Yes, sir.  And what was Mr. Egan's
12 title at JCS, if you remember?
13      A.  I don't remember what his title
14 was.
15      Q.  What were Mr. Egan's job responsi-
16 bilities at JCS?
17      A.  Business development, and he was
18 one of the owners of the company.  He had some
19 shares in JCS.
20      Q.  Is it your understanding that Mr.
21 Egan came up with this draft legislation on
22 his own?
23      A.  No.

Page 195

1      Q.  Where did the draft legislation
2 come from?
3      A.  I don't know, but it's not -- I
4 never felt that he was doing it on his own.
5      Q.  All right.  Tell me about -- you
6 said that Mr. Egan briefed you on this draft
7 legislation.  Tell me what he told you about
8 the draft legislation.
9      A.  Just that he was trying to get
10 legislation passed that would make the -- the
11 business of the business in the state more
12 formalized.
13      Q.  Did Mr. Egan share with you how he
14 was planning to accomplish that?
15      A.  No.
16      Q.  Did Mr. Egan have the responsi-
17 bility to hire or fire lobbyists or government
18 relations consultants?
19      A.  Not that I was aware of, no.
20      Q.  All right, who had that power at
21 the time in your company?
22      MR. FINCH:  Object to form.
23      Q.  (BY MR. TANKERSLEY)  If you know.

Page 196

1      A.  It could have been any of the
2 leaders of JCS at the time.  It could have
3 been Robert McMichael.  It could have been
4 Jarrett Gorlin.  It could have been Dennis
5 Moon.  It could have been Karen Lloyd.
6      Q.  Did they not have to get such
7 expenses approved in advance of incurring them
8 by you or somebody else?
9      A.  Not if it was within their budget.
10      Q.  What budget are you talking about?
11      A.  The budget that they promulgated.
12      Q.  Was there a line item that allowed
13 them to hire whatever lobbyists they wanted to
14 hire?
15      A.  No.
16      Q.  Well, again, how did the -- you've
17 seen the documents that plaintiff's counsel
18 showed you about -- with the blacked-out
19 number about what Ms. Fuqua was being paid.
20 How was that number approved?
21      MR. FINCH:  Object to form.
22      A.  I don't know what the number is.
23 If it was --

1    Q.  (BY MR. TANKERSLEY)  Well, we

2  don't either.  What's your understanding about

3  how it is such a number would be approved in

4  the ordinary course of business at CHC when

5  you were overseeing the operations of JCS?

6      MR. FINCH:  Object to form.

7    A.  In general --

8    Q.  (BY MR. TANKERSLEY)  Yes.

9    A.  -- there is a -- based on your

10  role in the company, your title, so to speak,

11  you have certain things, certain spending

12  limits that you're allowed to approve

13  yourself.  If it's above that, it goes to the

14  next person in your organization.  So it's a

15  matrix, an approval matrix.

16    Q.  What line item would hiring

17  lobbyists fit under?  In other words, what

18  would you call that in your budget?

19    A.  You wouldn't.  There's not a line

20  item for a lobbyist.

21    Q.  Okay.  Well, if you wanted to know

22  how much Ms. Lloyd or anybody else was

23  spending on lobbyists in Alabama, how would

1  you go about finding out about that?

2      MR. FINCH:  Object to form.

3    A.  I would ask them if they have any

4  -- you know, if I was looking to see if there

5  are lobbyists -- we don't hire lobbyists.

6    Q.  (BY MR. TANKERSLEY)  Who is we?

7    A.  CHC, CCS, we rarely if ever hire

8  lobbyists.

9    Q.  Why is that?

10    A.  For what specific reason would you

11  need them?

12    Q.  Mr. Houston, do you have a written

13  job description?

14    A.  I don't know.  It's kind of as it

15  -- whatever my boss wants me to do is my job

16  description.

17    Q.  Do you have a time at one or more

18  times during the year where you meet with your

19  leadership and they tell you how you're doing?

20    A.  They tell me every day how I'm

21  doing.

22    Q.  But you don't have a formal review

23  process?

1    A.  No.

2    Q.  I just want to be sure I got this

3  right because I don't really think I captured

4  it when you were testifying about it earlier.

5  Did you make presentations to both the CCS

6  board and also the CHC board?  Is that

7  correct?

8    A.  Yes, I have.

9    Q.  And sometimes, as I understand it,

10  those boards met at the same time, is that

11  right?

12    A.  They used to.

13    Q.  Okay.

14    A.  Not anymore.  Now it's one -- one

15  board.

16    Q.  Okay.  Now they don't meet at the

17  same time because there is no CHC board, is

18  that right?

19    A.  There's a board, but the board

20  doesn't meet as a CHC board anymore.  They

21  can.  The board still exists.

22    Q.  But the only board that meets

23  presently is the CCS board?

1    A.  Correct.

2    Q.  And when did that happen, that the

3  CHC board ceased to meet and the CCS board had

4  all of the board meetings?

5    A.  Soon after --

6      MR. FINCH:  Object to form.

7    A.  I'm sorry.

8    Q.  (BY MR. TANKERSLEY)  Sir?

9    A.  Soon after the transaction.

10    Q.  What transaction is that?

11    A.  The transaction between CCS and

12  CHC.

13    Q.  All right, and remind us of what

14  the date of that was?

15    A.  Mid 2014.

16    Q.  Okay.  All right, I take it that

17  board minutes were kept prior to mid 2014 of

18  the CHC --

19    A.  Yes.

20    Q.  -- board meetings?

21    A.  Board meetings were kept.

22    Q.  And who was the secretary

23  responsible for keeping those board minutes of

1  the CHC entities prior to mid 2014?
2      A.  It would have been Brad Bickman.
3      Q.  And who was responsible for
4  keeping the board minutes of CCS?
5      A.  It would have been Lori Boulware
6  and now David Perry.
7      Q.  Both lawyers for the company, is
8  that --
9      A.  Yes.
10     Q.  Thank you, sir.  Do you remember
11  being asked about Exhibit Number 290, which
12  should be at the bottom of the stack that's in
13  front of you?
14     A.  Yes.
15     Q.  Sir, this is the exhibit that is
16  an email chain dated on or about October 13th
17  of 2011.  If you look below that redaction in
18  the center of the page it says, Bruce, being
19  Bruce McDaniel, will lead the charge on the
20  JCS integration that we will kick off soon.
21  Did I read that correctly?
22     A.  You read that correctly.
23     Q.  All right, sir.  What did you

1  understand the JCS integration to be comprised
2  of?
3      A.  At this time --
4      Q.  Yes, sir.
5      A.  -- which is in 2011, that would
6  have been the integration of finance.
7      Q.  When you say integration of
8  finance, what do you mean?
9      A.  AP and AR.
10     Q.  Okay, well, accounts payable and
11  accounts receivable?
12     A.  Yes.
13     Q.  So are you talking about from a
14  reporting perspective?  What exactly do you
15  mean when you say AP and AR?
16     A.  Putting the two companies on the
17  same financial reporting system.
18     Q.  Oh, I see.  So recognizing income
19  the same way in both companies, is that right?
20     A.  Well, or using the same software
21  programs.
22     Q.  All right.  Anything other than
23  that that was, in your view, included in this

1  JCS integration in October of 2011?
2      A.  I'm just referring to your
3  sentence there to Bruce --
4      Q.  Yes, sir.
5      A.  -- knowing what Bruce did, what
6  this probably meant for Bruce.
7      Q.  I see, because Bruce had an
8  accounting function, is that right?
9      A.  He was the CFO of the company.
10     Q.  All right.  And because of that,
11  you believe that Bruce would have focused his
12  actions on the financial operations, is that
13  correct?
14     A.  Absolutely.
15     Q.  All right.  Sir, going to Exhibit
16  291, thank you, sir, this is an email, again
17  heavily redacted, dated December 7, 2011, from
18  you to Mr. Goetz, right?
19         MR. FINCH:  Object to form.
20     A.  Yes.
21     Q.  (BY MR. TANKERSLEY)  And Mr. Goetz
22  at this time was your boss?
23     A.  Yes.

1      Q.  And when you say in the first
2  bullet point begin the integration of JCS and
3  complete the integration of Judicial Services,
4  do you see that?
5      A.  Of Justice Services.
6      Q.  I'm sorry, Justice Services, yes,
7  sir.
8      A.  Yes, I do.
9      Q.  Remind me of what Justice Services
10  was?
11     A.  Justice Services is another
12  company that's in Phoenix, Arizona.
13     Q.  What is it that Justice Services
14  does?
15     A.  Outpatient behavioral services.
16     Q.  So you're really talking about two
17  totally separate things here, the integration
18  of JCS and the integration of Justice
19  Services, is that right?
20     A.  That's correct.
21     Q.  You're not talking about making
22  Justice Services part of JCS or vice versa?
23     A.  No.

Page 205

Q. When you say in this email I want to make sure JCS truly becomes part of CHC, especially from an operational and financial perspective, what exactly did you mean by that?

A. Well, it speaks for itself. I wanted to have the same reporting so that if I got a report from JCS it looked like a report that I received from another entity, their financial reporting looked the same as financial reporting of someone else so that you can compare and contrast performance.

Q. Yes, sir, that would be the format of financial reporting, is that correct?

A. Yes.

Q. Well, again, with respect to the operational part of this, what did you mean when you wanted JCS to become part of -- truly become part of JCS from an operational perspective?

A. In 2011 JCS did not report to me. I was getting information second and third and fourthhand, and I wanted to -- and this is

Page 206

just me wanting to get the information coming directly to me in the same format I was getting it from other companies.

Q. What experience, if any, had you had with managing a private probation company as of this time?

A. Zero.

Q. When did you become the co-chief operating officer of JCS?

A. I'm not sure when that happened, but they just -- I remember there was a co-CEO and a co-COO and a co -- I don't know that that was ever truly formally done.

Q. Well, was there some episode or some event that made it sensible for you to become the co-chief operating officer of the company?

A. No.

Q. Sir, if you would turn to Exhibit 292, it looks like this (Indicating).

A. Okay.

Q. All right, thank you, sir. Turn into the interior part of the email, the one

Page 207

from Mr. Goetz to you and others.

MR. FINCH: Which page are you on?

MR. TANKERSLEY: I'm on Bates stamp page 626.

A. Okay.

Q. (BY MR. TANKERSLEY) This is the email dated December 27th of 2011 from Mr. Goetz to you and others. In this email message from Mr. Goetz he says towards the bottom of the first paragraph, We are about to break covenants. Do you see that language?

A. Yes.

Q. What did you understand that to mean when you read it back in December 27 -- on December 27 of '11?

A. Those are financial bank covenants.

Q. Loan covenants?

A. Uh-huh (Nodding head).

Q. You've got to verbalize your response.

MR. FINCH: Say yes or no.

A. Yes.

Page 208

Q. (BY MR. TANKERSLEY) So you're about to go into greater depth than your bank covenants allowed, is that correct?

A. That was my understanding at the time.

Q. All right, and what caused the company to go into greater debt than your bank covenants allowed?

A. I don't remember.

Q. Had there been some problem with sales that caused income to dip at that time?

A. I don't think so, just more expenses than income.

Q. What expenses do you recall the company having incurred that put the company in danger of breaking its bank covenants?

A. Acquisition of other companies.

Q. Like, for example, JCS?

A. And PNA.

Q. All right, sir. Sir, if you would, turn to this document here, it's Exhibit Number 118, looks like this.

A. 118?

Page 209

1  Q.  118, yes, sir.  It's not in order
2  because it's from another deposition.  I think
3  you just passed it.
4        MR. FINCH:  It's right after 294,
5  295.
6        Q.  (BY MR. TANKERSLEY)  Oh, you
7  didn't pass it.  Keep going.
8        A.  After 294 --
9        MR. FINCH:  Here, use this.  Use
10  this one.
11        MR. TANKERSLEY:  You ready to go?
12  Thank you, sir.
13        Q.  (BY MR. TANKERSLEY)  I can read
14  your signature at the bottom here.  What
15  input, if any, did you have about the language
16  that was in this contract?
17        A.  None.
18        Q.  To your knowledge, did CHC legal
19  review this contract before you were asked to
20  sign it?
21        A.  In 2014, yes.
22        Q.  So it would have been your
23  practice to have shown this, a document like

Page 210

1  this, to CHC legal before you decided to sign
2  it --
3        A.  Yes.
4        Q.  -- correct?
5        Q.  Sir, if you would turn to Exhibit
6  297, if you would, please, it's the email from
7  you to Mr. Goetz dated December 13, 2012.
8        MR. FINCH:  297.  That's it.
9        Q.  (BY MR. TANKERSLEY)  All right,
10  sir, I'm focusing on the very last sentence of
11  this -- well, the last sentence that we can
12  read in this exhibit.  The last sentence or
13  two appear to be blacked out.  The one I'm
14  focusing on is, How can a division missing
15  budget so dramatically be giving raises.  Do
16  you see that language?
17        A.  Yes.
18        Q.  Which division are you talking
19  about in this email?
20        A.  It would be JCS.
21        Q.  What do you recall about JCS
22  missing its budget so dramatically as of the
23  end of 2012?

Page 211

1        A.  Well, they were just underper-
2  forming, you know.  JCS didn't report to me at
3  that time, but I saw the financials of the
4  company.  And if one part of the company was
5  underperforming, then, of course, I had an
6  obligation to mention it, and that's what I
7  did here.
8        Q.  Yes, sir.  Underperforming
9  compared to what, what it had done before or
10  its budget goals?
11        A.  Their budget goals.
12        Q.  And who established the budget
13  goals for JCS?
14        A.  JCS.
15        Q.  So JCS is missing its own budget
16  goals?
17        A.  Correct.
18        Q.  Who approved the budget goals that
19  JCS proposed that it meet?
20        A.  JCS would approve their own
21  budget.  Then that would go to, at this time
22  it was Doug Goetz, and the CFO, who would
23  either agree or disagree with that budget.

Page 212

1        Q.  All right, Doug Goetz at the time
2  was the -- what position did he hold?
3        A.  He was the CEO.
4        Q.  Of CHC?
5        A.  Of CHC, yes.
6        Q.  So the CHC CEO and his chief
7  financial officer of --
8        A.  CHC.
9        Q.  -- CHC would have had the role of
10  approving or disapproving the budget goals
11  proposed by JCS, correct?
12        A.  Correct.
13        Q.  Now, in this email you say how can
14  a division missing budget so dramatically be
15  giving raises.  What raises are you talking
16  about?
17        A.  Employee raises.
18        Q.  Well, by raises, are these raises
19  or is some of this incentive pay you testified
20  about earlier?
21        A.  I don't know, but in this case I
22  was referring to raises, not incentive pay.
23        Q.  Well, how did you become aware of

Page 213

1 these raises?

2     A.  I would ask questions about -- if

3 you would see an area that was over budget,

4 you would ask why.

5     Q.  So you were given financial

6 reporting from JCS, and you, in turn, were

7 asking questions of people at JCS as to why it

8 is they were missing their budget?

9     A.  Or in this case I was probably

10 asking questions of my team, the CFO, as to

11 why they were underperforming, and his

12 response would be that there would be areas

13 that they were over, and so I would ask

14 further questions about that.

15     Q.  And I take it that if you thought

16 that the giving of raises was inappropriate

17 that you could tell this to Mr. Goetz and he

18 could intervene?

19     A.  I brought it to his attention with

20 this email.

21     Q.  Yes, sir, but the reason why you

22 brought it to his attention with this email is

23 because -- to give him the option of

Page 214

1 intervening if he chose to do so, right?

2     MR. FINCH:  Objection.  It's been

3 asked and answered.  He already told you why

4 he brought it to Mr. Goetz's attention.

5     Q.  (BY MR. TANKERSLEY)  Well, sir,

6 again, I'm trying to get a clarification.  Is

7 the reason why you brought this issue that you

8 had about the raises to Mr. Goetz's attention

9 so that he could intervene if he chose to do

10 so?

11     MR. FINCH:  Objection.  Asked and

12 answered.

13     Q.  (BY MR. TANKERSLEY)  You can

14 answer it again.

15     A.  I was looking at the performance

16 of the company as a whole, CHC, and if it was

17 not performing where it should, then I start

18 looking where it was underperforming, and then

19 I would ask questions.  And in this case there

20 was an area that I thought was

21 underperforming, so I asked a question.

22     Q.  Sir, with respect, I just don't

23 think you're answering the question I'm

Page 215

1 asking.  Let me try it again.  I'm not asking

2 about why you asked questions or what led to

3 your asking questions.  What I'm raising here

4 is why you chose to put this in an email to

5 Mr. Goetz.  And so the question I'm asking you

6 is the reason why you chose to put this in an

7 email to Mr. Goetz is so that Mr. Goetz could

8 intervene about these raises if he chose to do

9 so?

10     MR. FINCH:  Objection --

11     A.  If he chose to.

12     MR. FINCH:  -- asked and

13 answered.

14     MR. TANKERSLEY:  He can answer it

15 again.

16     MR. FINCH:  No, he can't answer it

17 again.

18     MR. TANKERSLEY:  Sir, are you

19 telling this witness not to answer the

20 question?

21     MR. FINCH:  He's already answered

22 it, so the cat's out of the bag, but you've

23 asked it and you don't like the way he answers

Page 216

1 it, and you want to use your question as the

2 answer.  You can't keep doing that.

3     MR. TANKERSLEY:  Sir, are you

4 acquainted with Rule 30?

5     MR. FINCH:  I'm acquainted with

6 all of the rules.

7     MR. TANKERSLEY:  Sir, I'm insist-

8 ing on getting an answer to this.

9     MR. FINCH:  You got an answer.

10 Move on.

11     MR. TANKERSLEY:  No, sir I'm not.

12 You do not have the authority under Rule 30 to

13 tell this witness not to answer the question

14 when there's a fair question on the table

15 and --

16     MR. FINCH:  If you're going to

17 badger my witness, I can instruct him not to

18 answer.

19     MR. TANKERSLEY:  I am not

20 badgering your witness, sir.

21     Q.  (BY MR. TANKERSLEY)  What's the

22 answer to my question?

23     MR. FINCH:  He's already answered

Page 217

1  answered it, and Mr. Thames can read it back
2  if you would like him to.
3        MR. TANKERSLEY:  Sir, are you
4  instructing this witness not to answer this
5  question?
6        MR. FINCH:  Yes, because he
7  already did.
8     Q.  (BY MR. TANKERSLEY)  Sir, are you
9  taking your lawyer's direction?
10    A.  Yes, I am.
11    Q.  Sir, if you would, take a look at
12  Exhibit 302.  It looks like this.
13    A.  Okay.
14    Q.  All right, sir, in this email,
15  Exhibit 302, Mr. Moon is sending an email to
16  someone, this email, the good morning email,
17  do you see that at the bottom of the exhibit?
18    A.  Good morning, yes.
19    Q.  Who do you understand Mr. Moon to
20  be sending this email to?
21    A.  Mr. Goetz.
22    Q.  Now, Mr. Moon worked at JCS, is
23  that correct?

Page 218

1     A.  That's correct.
2     Q.  And what was his role at JCS?
3     A.  He was the direct -- chief
4  operating officer of JCS.
5     Q.  All right, sir, now, at this time
6  you were the co-chief operating officer of
7  JCS?
8     A.  I don't believe so.
9     Q.  Sir, I would like to refresh your
10  recollection.  I'm showing you what was marked
11  as Exhibit Number 300, this is my copy of
12  it --
13    A.  Okay.
14    Q.  -- and if you look at the second
15  page it says current, JCS current, do you see
16  that?
17    A.  Yes.
18    Q.  And so at this time -- oh, I
19  apologize, I thought you had testified earlier
20  that you were the co-chief operating officer
21  of the company.
22    A.  No.
23    Q.  All right.  This bonus plan that

Page 219

1  Mr. Moon was talking about, he has it in
2  capital letters as though it was a document.
3  Was it?
4     A.  There is a document for the bonus
5  plan, yes.
6     Q.  And the bonus plan that this email
7  refers to, what are the components of the
8  bonus plan?
9     A.  I don't remember what it was at
10  that time.
11    Q.  Yes, sir.  What's your general
12  recollection about what the bonus plan said?
13    A.  In general, a bonus plan is there
14  are -- as an executive you were given certain
15  things that you have to achieve, and if you
16  achieve those there is a potential for a
17  bonus.
18    Q.  So you understood this bonus plan
19  to be a bonus plan for Mr. Moon and not for
20  producers at JCS?
21        MR. FINCH:  Object to the form.
22  What do you mean by producers?
23        MR. TANKERSLEY:  People who --

Page 220

1  that's a fair objection, sir.
2     Q.  (BY MR. TANKERSLEY)  You know,
3  case workers, people who created income for
4  the company at the lowest level.
5        MR. FINCH:  Object to form.
6     A.  This appears to be as an executive
7  of JCS.
8     Q.  (BY MR. TANKERSLEY)  All right.
9  Sir, you testified during the examination by
10  the plaintiff that at one time there was an
11  incentive payment plan at JCS.  Do you
12  remember your testimony about that?
13    A.  I do.
14    Q.  And that incentive payment plan,
15  unlike this bonus plan, that went to the
16  actual employees who were generating income
17  for the company, is that correct?
18        MR. FINCH:  Object to form.
19    A.  I'm not sure how far down that
20  went in the organization.
21    Q.  (BY MR. TANKERSLEY)  Okay, how far
22  down do you believe it went in the
23  organization?

Page 221

1   A.   I knew it went at least to the
2 office managers and those that were running
3 the offices.
4   Q.   And what was your recollection
5 about how this incentive plan worked?
6   A.   I didn't know the details of that
7 plan.
8   Q.   What was your general understand-
9 ing of it at this time?
10   A.   That there would be goals estab-
11 lished and that they would be incentivized if
12 they met those goals.
13   Q.   Were these goals in writing?
14   A.   I don't know.
15   Q.   Sir, turn to Exhibit 306.
16   A.   Okay.
17   Q.   On the second page, that is page
18 Bates-stamp 1050, do you see the part where it
19 says -- this is Mr. Moon recommending this to
20 Mr. Goetz and others -- my suggestion would be
21 we run a mid-month incentive awarding blank to
22 an office in each state that shows the largest
23 percentage movement, and then it goes on. Do

Page 222

1 you see that?
2   A.   I do.
3   Q.   Now, as I understand it, JCS has
4 ceased operations in Alabama, isn't that
5 correct?
6   A.   That's -- now or --
7   Q.   As of today, September of 2016?
8   A.   Correct.
9   Q.   Whatever number this was, that's,
10 given that JCS has ceased operations in the
11 state of Alabama, that's not a number that
12 could affect your business operations in
13 Alabama, right? In other words, that's not a
14 competitively sensitive number in Alabama now
15 because you've ceased operations in Alabama,
16 right?
17   A.   In Alabama?
18   Q.   Yes, sir.
19   A.   It still could be.
20   Q.   How so, sir, since you're not
21 doing business in Alabama?
22   A.   Well, your competitors aren't in
23 just Alabama, your competitors are in multiple

Page 223

1 states, and so --
2   Q.   Sir, is it my understanding that
3 you're still offering this incentive plan?
4   A.   We are not offering an incentive
5 plan.
6   Q.   Well, given that you're not
7 offering an incentive plan, please help me
8 understand how that could be a competitively
9 sensitive number?
10    MR. FINCH: Asked and answered.
11   A.   We have competitors, and I prefer
12 not to give numbers out that could give a
13 competitor information that they could use in
14 other locations.
15   Q.   (BY MR. TANKERSLEY) Is that your
16 testimony about why this number was redacted
17 out?
18   A.   I did not redact this number.
19   Q.   Do you believe that to be a
20 reasonable basis to redact a number --
21   A.   I can tell you that's why I would
22 do it.
23   Q.   All right. What is this reference

Page 224

1 to a -- in the last full paragraph here, the
2 one that begins total cost, in the third line
3 up it says PSP, all in capital letters, PSP
4 program; what's that?
5   A.   I have no idea.
6   Q.   Sir, if you would turn to Exhibit
7 315, it looks like this.
8   A.   Okay.
9    MR. FINCH: I'm sorry, which one?
10   A.   315. Okay.
11   Q.   (BY MR. TANKERSLEY) I'm on the
12 signature page, the first signature page, it's
13 page five, Bates-numbered CCS 001868.
14   A.   Okay.
15   Q.   Whose signature is this (Indica-
16 ting)?
17   A.   Which one?
18   Q.   That one (Indicating).
19   A.   Scott I think.
20   Q.   Could you spell that for the court
21 reporter, please.
22   A.   P-u-s-t-i-z-z-i.
23   Q.   And at the time of the signing of

Page 225

this document, April 9th of 2015, he was the
senior VP of HR for CHC or for some other
company?

A. CCS.

Q. For CCS. Now, as I understand it,
Mr. Houston, if an employee, for example, with
this Exhibit 315, Ms. Lloyd as an example, if
she moves around from Correct Care Solutions
to Correct Care, LLC, or any of the other CCS
or CHC companies, she is not required to sign
a new noncompete agreement, is that right?

A. I don't know that that is correct.

Q. All right. Why do you doubt the
correctness of that?

A. Well, there's -- I'm just saying I
don't know for certain that that is correct.
That probably is, but there may be reasons
that you would have a different noncompete
depending on your status. If you're promoted
into a more senior position, then your
noncompete would be different than this.

Q. Well, if somebody is making a
purely lateral move from one company to

Page 226

another --

A. Then this would probably suffice.

Q. Okay.

MR. EVANS: This meaning Exhibit
315?

A. Yes.

Q. (BY MR. TANKERSLEY) I'm sure you
were asked by plaintiff's counsel about
Exhibit 322. It looks like this.

(Whereupon, an off-the-record
discussion was had.)

Q. (BY MR. TANKERSLEY) Sir, do you
remember your testimony about this, that Mrs.
Ray was attempting to propose to you other
structures, fee structures, for JCS services
in Alabama? Do you recall that?

A. I do.

Q. And your testimony was that when
Mrs. Ray asked you about this you said no?

A. Correct.

Q. Once you received this Exhibit
Number 322 from Mrs. Ray, did you discuss it
with anyone?

Page 227

A. No.

Q. Is that because you didn't feel
like you needed to?

A. Correct.

Q. And is the reason why you did not
feel like you needed to discuss this with
anyone is because the decision had already
been made to leave Alabama?

A. Yes.

Q. And in your view, just the fact
that the fee structure would be different,
that didn't change your view about whether or
not you should reconsider the staying in
Alabama or not, right?

A. Correct.

Q. Did you discuss this with Mrs.
Ray?

A. Yes.

Q. By telephone or in person?

A. By telephone.

Q. Was there one call or more than
one call about this?

A. One call, and it was very simple.

Page 228

No, we're not going to do this.

Q. Did you tell her why you weren't
going to do this?

A. No, I just told her we were not
moving forward with this option.

Q. She references Clay Cox from PPS.
Is that Private Probation Services, or do you
know?

A. Yes, that's it.

Q. Is Clay Cox known to you?

A. I know of him. Don't know him.

Q. Okay. You just know him to be --

A. He's a competitor.

Q. Okay.

A. That's all I know.

Q. We're doing it again. We're
talking over each other. You know Mr. Cox to
be a competitor, right?

A. I do.

Q. That's how you know him?

A. Yes.

Q. Thank you, sir. Was the only
income source for JCS when it was in operation

Page 229

1 in Alabama the fees that it received from the
2 probationers?
3      MR. FINCH: Object to form.
4     A. Yes.
5     Q. (BY MR. TANKERSLEY) As I
6 understand it, that was the ten dollar setup
7 fee, correct? I'm not finished, but that was
8 one of them?
9      MR. FINCH: Just wait till he's
10 done.
11     Q. (BY MR. TANKERSLEY) The ten
12 dollar setup fee and the monthly fee for being
13 on the JCS program, right?
14     A. Yes.
15     Q. Were there any other fees other
16 than those two that probationers paid to JCS?
17     A. To JCS?
18     Q. Yes, sir, to JCS.
19     A. Not to JCS.
20     Q. The way you answered the question
21 makes it sound like probationers would pay
22 other things that would not be paid to JCS?
23     A. They would pay fines.

Page 230

1     Q. All right, sir. Aside from the
2 underlying fines and court costs and the fees
3 that we've just outlined for JCS, was there
4 any other money that was paid to JCS that you
5 know of?
6     MR. FINCH: Object to form.
7     A. No.
8     Q. (BY MR. TANKERSLEY) Have you ever
9 heard of JCS requiring probationers to pay a
10 certain amount of money for insurance
11 associated with that probationer performing
12 community service?
13     A. I didn't know the probationers
14 paid that. I thought the City paid that or
15 the entity paid that.
16     Q. All right. You knew of some
17 payment being made for people serving on --
18 doing community service?
19     A. Yes.
20     Q. What happened to that money?
21 Where did that money go?
22     A. I don't know.
23     Q. I mean, was it paid to JCS and it

Page 231

1 went to JCS's bank account, or did it go to an
2 insurance company? Where did it go?
3     A. It would go to an insurance
4 company.
5     Q. Which insurance company was
6 providing those services?
7     A. I couldn't tell you.
8     Q. If you wanted to find out about
9 that, where would you go to find out about it?
10     A. I don't even know where I would go
11 to find out. I don't know.
12     Q. All right. What was that called,
13 by the way, that community services insurance
14 payment? What did you call that internally?
15     A. I didn't call it anything
16 internally, I just remember hearing something
17 about that and it was to cover the -- if
18 someone was doing community service and they
19 were injured, that it would cover them for
20 that injury.
21     Q. Was the insurance company to which
22 that premium was paid, was that a company that
23 was associated with CHC or CCS?

Page 232

1     A. No.
2     Q. All right.
3     MR. TANKERSLEY: Okay, that's all
4 I have at this time.
5     (Recess from 2:27 P.M. until
6     2:38 P.M.)
7
8 REEXAMINATION BY MR. EVANS:
9     Q. Mr. Houston, we're getting closer,
10 believe it or not?
11     A. Okay.
12     Q. I do have a few other questions
13 for you, though.
14     A. All right.
15
16     (Plaintiff's Exhibit Number 324
17 was marked for identification and copy of same
18 is attached hereto).
19
20     Q. (BY MR. EVANS) I want to show you
21 an email that we've had marked as Exhibit 324,
22 and then I'm going to ask you a couple of
23 questions about that.

Page 233

1    A.  All right.

2         MR. TANKERSLEY:  Which number is

3  this, please, sir?

4         MR. EVANS:  324.

5         MR. TANKERSLEY:  Thank you, sir.

6    A.  Okay.

7    Q.  (BY MR. EVANS)  Do you remember

8  this?

9    A.  I do remember there.

10    Q.  The time frame is in May of 2014,

11  and, as I understand from our previous

12  conversation, this was shortly before the

13  actual merger of CCS and CHC, is that correct?

14    A.  That's correct.

15    Q.  And was this already something you

16  knew that was imminent, that CCS was merging?

17    A.  The discussions were going on.

18    Q.  I see.  And it appears that you

19  were having discussions with Jorge about your

20  position after the merger, is that correct?

21    A.  Correct.

22    Q.  Okay.  And as we get to the last

23  part of the email that you wrote on May 15th,

Page 234

1  you write, I'm struggling a little with the

2  role they want me to play, and then down as

3  you get to the bottom, they want to create a

4  private division, add JCS and Phoenix and have

5  me run that division.  I'm not saying I would

6  not do it, but it is not the next step I

7  wanted in my career.  Was there some modifi-

8  cation of that offer to you before the actual

9  merger came about?

10    A.  No, that's exactly what did

11  happen.

12    Q.  So you did ultimately --

13    A.  I did accept what they asked me to

14  do, and then over time they realized --

15    Q.  What you wanted --

16    A.  -- that I knew what I was doing,

17  and they added what I wanted.

18    Q.  I see.  So ultimately you got what

19  you wanted?

20    A.  Ultimately, yes.

21    Q.  And as we get on into -- of

22  course, we've shown the letters and so forth

23  that you authenticated about the announcement

Page 235

1  of the merger to the employees and so forth,

2  and you remember those being in June and

3  July --

4    A.  I would --

5         MR. FINCH:  Object to form.

6    Q.  (BY MR. EVANS)  I don't want to

7  belabor it, but that's about the time it

8  happened, wasn't it?

9    A.  I would have to look and see, but

10  about then.

11    Q.  Do you remember having ongoing

12  conversations with folks from JCS throughout

13  that merger between CCS and CHC?

14    A.  (Pause).

15

16    (Plaintiff's Exhibit Number 325

17  was marked for identification and copy of same

18  is attached hereto).

19

20    Q.  (BY MR. EVANS)  I'll show you

21  Exhibit 325.  I'm sorry.  325.

22    A.  (Examining document).  Okay.

23    Q.  Do you recognize what Exhibit 325

Page 236

1  is?

2    A.  I do.

3    Q.  What is it?

4    A.  It's a letter from Colleen Ray to

5  Karen Lloyd about --

6    Q.  Copied to you?

7    A.  Yes, I'm copied on it.

8    Q.  Is it fair to say this is some of

9  Ms. Ray's ideas for getting more money in the

10  company?

11    A.  Yes.

12    Q.  Okay.  As we go down to paragraph

13  three, she talks about having JCS offer an

14  interlock system and charging for that on a

15  monthly basis, doesn't she?

16    A.  Yes -- well, let me -- just a

17  second (Examining document).  I don't see

18  where it says on a monthly basis, but I do see

19  a fee.

20    Q.  Do you see about --

21    A.  Oh, I see it.  I see it now down

22  in the next paragraph.  I was looking at the

23  wrong paragraph.

Page 237

1    Q.   Okay.  About halfway through the
2 third paragraph, do you see the sentence that
3 starts most defendants?
4    A.   I do.
5    Q.   Would you read that for me?
6    A.   Most defendants in Alabama get
7 placed on probation with JCS because they
8 can't pay their fine in full and once they do
9 pay their fine in full they are terminated as
10 a case with JCS.
11    Q.   However?
12    A.   However, if we are monitoring the
13 interlock they would be with JCS up to two
14 years.  I'm proposing that after they pay
15 their fine in full if we continue to monitor
16 their interlock we charge a $20.00 interlock
17 monitoring fee.
18    Q.   Uh-huh.
19    A.   Do I continue?
20    Q.   No, sir, that's fine.  The
21 statement about most defendants get placed on
22 probation with JCS because they can't pay
23 their fine in full and once they do their

Page 238

1 probation is terminated, were you aware at
2 that time that that was the way the system
3 operated?
4        MR. FINCH:  Object to form.
5        MR. JACKSON:  Object to the form.
6    A.   Yes.
7
8        (Plaintiff's Exhibit Number 326
9 was marked for identification and copy of same
10 is attached hereto).
11
12    Q.   (BY MR. EVANS)  Let me show you
13 also what we'll mark as Exhibit 326.
14    A.   (Examining document).  Okay.
15    Q.   Do you recognize Exhibit 326 to be
16 an email to you from Karen Lloyd in June of
17 2014?
18    A.   I do.
19    Q.   And is it fair to say that this
20 email follows the announcement that CCS is
21 merging with CHC?
22        MR. FINCH:  Object to form.
23    Q.   (BY MR. EVANS)  You can look at

Page 239

1 paragraph three, if that will help you, the
2 second sentence.
3    A.   Okay.
4    Q.   She references, quote, with the
5 recent announcement of the merger with CCS,
6 and the conversations with Steven Page that
7 Mac has had regarding his interest in selling
8 Georgia Probation Management, we feel this is
9 a good opportunity to look into growing JCS
10 through acquiring companies like GPM.  We hope
11 that CCS will be in support of this growth, as
12 growing our company has always served as a
13 major motivation for our staff.  That's what
14 she was writing to you?
15    A.   That's correct.
16    Q.   Did you understand that she was
17 reaching out to you as one of the executives
18 with CCS to consider this?
19        MR. FINCH:  Object to form.
20    A.   Yes.
21    Q.   (BY MR. EVANS)  After the
22 announcement of the merger between CCS and
23 CHC, did there also begin an integration

Page 240

1 project to blend the two companies together?
2    A.   Blend which two companies
3 together?
4    Q.   CCS and CHC.
5    A.   Yes.
6
7        (Plaintiff's Exhibit Number 327
8 was marked for identification and copy of same
9 is attached hereto).
10
11    Q.   (BY MR. EVANS)  Let me show you
12 what we'll mark as Exhibit 327.  What is this
13 document, sir?
14    A.   This is the integration project.
15    Q.   Referencing what?
16    A.   CHC Integration Project.
17    Q.   Into CCS?
18    A.   This is 2014 -- yes.
19    Q.   Is that correct?
20    A.   Yes.
21    Q.   Just huge amounts of it are
22 redacted for reasons we don't know, but there
23 is some of it that at least we can see the

Page 241

1 status. On the second page, one of the work
2 stream status summaries specifically refers to
3 JCS's current status, do you see that? Right
4 there on your finger.
5    A.  I do see that.
6    Q.  When this integration project was
7 afoot, were you participating in it?
8    A.  I was.
9    Q.  This would have been a document
10 you would received, I suppose?
11    A.  Yes.
12    Q.  Did you help formulate this
13 document, or who did?
14    A.  No, I didn't formulate the
15 document. A number of people formulated the
16 document.
17    Q.  When we go on over to the fourth
18 page in the document, do you see the title at
19 the top, Synergy Targets and Status?
20    A.  I do.
21    Q.  One of the first categories there
22 is -- the second category is Corporate
23 Nonlabor, do you see that?

Page 242

1    A.  I do.
2    Q.  And the second entry there is
3 Lobbyists and Consultants?
4    A.  Yes.
5    Q.  And there was some conversation
6 earlier in questions about that very topic.
7 Was it common for CCS and CHC to hire
8 lobbyists and consultants?
9    A.  More consultants than lobbyists,
10 but yes.
11    Q.  Some of both?
12    A.  Some of both.
13    Q.  And who would have been responsi-
14 ble for filling out the disclosure forms for
15 the lobbyists that had been hired?
16    A.  Legal.
17    Q.  When we go over to -- let's see
18 which page it is. It might be easier to read
19 that Bates number. Do you see the Bates
20 number?
21    A.  I do.
22    Q.  Let's go to page 1823 in that same
23 exhibit?

Page 243

1    A.  Okay.
2    Q.  This page is HR Position Control
3 Executive Summary, that's the title, isn't it?
4    A.  It is the title.
5    Q.  Did you understand this was a
6 document dealing with the transition of these
7 merged companies over to the same HR program?
8    A.  No, I think this was just HR
9 giving their report on position control and an
10 executive summary of that.
11    Q.  When the merger took place, were
12 there a number of terminations or reductions
13 in force, anything of that nature?
14    A.  Well, there were reductions in
15 force, yes.
16    Q.  The reason I ask that is because
17 in the project summary it shows severance
18 pay-out, personnel transition, CHC employee
19 communications, and things of that nature.
20    A.  Correct.
21    Q.  Would that have been referencing
22 those types of concerns?
23    A.  Yes.

Page 244

1    Q.  Let's go to Bates page 1825 in
2 that same exhibit. Here we're talking about
3 Employee Benefits Integration Executive
4 Summary. That's the title, isn't it?
5    A.  Yes.
6    Q.  And it's -- the project name is HR
7 Health & Welfare, 401(k). When you were
8 dealing with this integration project, were
9 the 401(k)s and the health and welfare
10 benefits being integrated between the two
11 companies that merged?
12    A.  It was definitely being looked at
13 to see if you could get, you know, a more cost
14 efficient program by putting the two programs
15 together. You have more employees, so you can
16 get better purchasing power.
17    Q.  Makes sense. All related, though,
18 to the merger?
19    A.  Correct.
20    Q.  And when we go to the next page,
21 1826, it says Finance Project Plan Executive
22 Summary, doesn't it?
23    A.  Yes.

Page 245

Q. And the project name on this is called Project Bronco. Do you know what that is?

A. I do.

Q. What is that?

A. Since CHC was in Colorado, they gave the project plan the name Bronco as you're working on finances. You didn't want to create problems with employees when you're talking about synergies and things like that, so you have a project name, and that's why it was called Bronco.

Q. What did it do? I mean, what was project Bronco about, merging --

A. Finances.

Q. Merging financial --

A. This is AP and AR and finance.

Q. I see. When we go to page 1828 in that same exhibit, this one is entitled CHC Vizion EMR Consolidation to ERMA?

A. Yeah, Vizion to ERMA.

Q. Okay, and what is this about?

A. Those are electronic medical

Page 246

records and electronic claims processing systems. And CHC had one and CCS had another, and it was to see whether or not we could integrate those two and merge them into one system.

Q. So that was, again, as a result of the merger, trying to find some efficient method?

A. Yes, sir.

Q. The next page, 1829 is entitled Legal & Risk Team Executive Summary, Project Legal & Risk Team, and everything here is virtually blanked out. Again, was this a product of the merger between CCS and CHC, bringing them all under the same legal team, legal department?

A. Once again, it was looking to see if there were any efficiencies to doing that.

Q. And ultimately they found those, I suppose?

A. They did.

Q. If you would go with me to 1831 in that document --

Page 247

A. Okay.

Q. -- this one is entitled OPS-Clinical CCS-CHC Process Integration Executive Summary. What can you tell me about this page?

A. This is about operation, which is ops, and the clinical, which is your physicians and your clinical team, your psychiatrists, to see whether or not the processes that were being used by those two entities could be integrated.

Q. And ultimately did you find a way to do that?

A. Some.

Q. When we go to 1833 in the document we see a title of HR and Payroll Systems Migration Executive Summary, do you see that?

A. I do.

Q. Project Name, HR and Payroll Systems Migration. What was this about?

A. This was moving payroll into one platform instead of two different platforms.

Q. So as the migration and

Page 248

integration became complete, CCS -- prior CCS people were being paid through CCS -- I'm sorry, I misspoke. Prior CHC personnel would be paid through CCS?

A. Correct.

Q. The next page is page 1834 in this document entitled Active Directory Exchange and Server MigrationExecutive Summary. Am I correct, sir, that this was the integration of your IT information systems?

A. Yes.

Q. And after the merger and this integration, the data would be consolidated in some form?

MR. FINCH: Object to form.

A. Some of it, yes.

Q. (BY MR. EVANS) Your email servers, would they all become the same?

A. I can't answer that.

Q. Okay. Page 1835 of this document, this one is entitled Finance Systems Migration Executive Summary. What can you tell me about this as far as the integration of these

Page 249

1 companies?

2     A. They were on two different

3 financial systems, two different platforms,

4 and they looked to determine which one was

5 best and tried to migrate to one system.

6     Q. And were they able to substan-

7 tially do that?

8     A. Not completely.

9     Q. Not completely. The next page,

10 page 1836, entitled CHC UM Project Executive

11 Summary. What is the CHC UM Transition

12 Project?

13     A. This is Utilization Management

14 Project, and it is when you have patients who

15 go to hospitals and you have care outside the

16 facility, how you manage that care. And

17 there's, you know, both an IT piece to that

18 and a process piece to that. And this is

19 analyzing and deciding which is the best way

20 to go.

21     Q. Which is the best way to would,

22 CHC's system versus CCS's system?

23     A. In this case they were just

Page 250

1 analyzing -- we were just analyzing CHC's

2 because it was fairly different.

3     Q. I see. So there really wasn't a

4 merger component about that doesn't sound

5 like?

6     A. No.

7     Q. Let's go to the next page, page

8 page 1837. This is titled CIGNA Claims

9 Project Executive Summary?

10     A. Yes.

11     Q. Project Name, CIGNA Claims

12 Management Implementation and CHC Claims

13 Transition. Do you know what this is?

14     A. I do.

15     Q. Can you tell me?

16     A. CIGNA is a third party

17 administrator for claims at CCS, and it was to

18 see whether or not it would work to move CHC

19 under that same claims management system.

20     Q. And did you?

21     A. For the most part, but not

22 completely.

23     Q. The next page, 1838, WAN Executive

Page 251

1 Summary. What are we talking about here?

2     A. Wide area network, IT.

3     Q. Were those merged?

4     A. Not completely, but --

5     Q. Substantially?

6     A. Substantially.

7     Q. The next page, 1839 in this

8 document deals with the CHC Reporting

9 Conversion. What are we talking about here?

10     A. We had a myriad of reports. We

11 wanted to see whether or not we could merge

12 reports so that there was only a report

13 instead of multiple reports. So it was just

14 analysis of the different reports.

15     Q. Were you able to substantially do

16 that so you had similarity of reports?

17     A. For the most part.

18     Q. The next page, 1840 of this same

19 exhibit, it looks like an acronym, CHCFYI Into

20 Sharepoint.

21     A. It's just so you could use

22 Sharepoint was all.

23     Q. I see. I see, so you were able to

Page 252

1 accomplish that?

2     A. Yes. Not very well, though. I

3 still can't use Sharepoint well.

4     Q. Well, I won't quiz you on

5 Sharepoint, then. I'm not sure I could.

6     The next document is the same

7 page, 1841 -- in the same exhibit, I'm sorry,

8 CHC Salesforce.com into CCS Salesforce.com.

9 What are we talking about there?

10     A. Both companies use Salesforce, and

11 just seeing whether or not we could just merge

12 that into one directory.

13     Q. Were you able to substantially do

14 that?

15     A. For the most part, yes.

16

17     (Plaintiff's Exhibit Number 328

18 was marked for identification and copy of same

19 is attached hereto).

20

21     Q. (BY MR. EVANS) Let me show you

22 what I've had marked as Exhibit 328 now, sir.

23 Do you recognize this as a group of emails in

Page 253

1 or around the September 2015 time frame?
2    A.  I do.
3    Q.  And, again, they're substantially
4 redacted, but from what is available it
5 appears that they're dealing with a reduction
6 in force of the JCS Alabama personnel.  Can
7 you discern that?
8    A.  Yes.
9    Q.  Okay.  And the people that are
10 involved, you include the entire executive
11 management team in your email, the second
12 page.  That would have included all of the CCS
13 heads that we talked about earlier today?
14    A.  Right.
15    Q.  And the first page of the document
16 comes from Cary McClure, he's a CCS person,
17 and what would have been his position at that
18 point?
19    A.  He is over support services, and
20 payroll reports to him.
21    Q.  Why would he have been involved in
22 decisions when the JCS people were being
23 discharged?

Page 254

1       MR. FINCH:  Object to form.
2    A.  Well, he is going to make sure
3 that people got their final paycheck, PTO
4 payouts, any of those things.
5    Q.  (BY MR. EVANS)  When we go to the
6 third page of this document, the email from
7 you, it shows that legal also -- you write
8 also legal is researching leases to determine
9 any impact associated with termination of the
10 lease.  That would have been the CCS Legal
11 Department you would have been referring to?
12    A.  Yes.
13
14       (Plaintiff's Exhibit Number 329
15 was marked for identification and copy of same
16 is attached hereto).
17
18    Q.  (BY MR. EVANS)  Let me show you
19 Exhibit 329, if I may, sir.  I believe it's
20 along the same lines, but . . .
21    A.  (Examining document).
22    Q.  Do you recognize these as emails
23 in that same time frame, September 2015?

Page 255

1    A.  I do.
2    Q.  And, again, the discussion is
3 between you and Cary McClure about the list of
4 people impacted when the closures will take
5 place?
6    A.  That's correct.
7    Q.  And Mr. McClure, and Ms. Huffine
8 are copied, and, of course, you are all CCS
9 employees at that time, is that right?
10    A.  Yes.
11
12       (Plaintiff's Exhibit Number 330
13 was marked for identification and copy of same
14 is attached hereto).
15
16    Q.  (BY MR. EVANS)  I want to back up
17 a little bit in time frame and show you an
18 exhibit I've marked as Exhibit 330.
19    A.  (Examining document).  Okay.
20    Q.  Okay, I'm sorry, wake me up.
21 Exhibit 330 that's before you, it's a group of
22 emails and an attachment back in March of
23 2015, isn't it?

Page 256

1    A.  Okay.
2    Q.  Is that correct?
3    A.  Yes.
4    Q.  And attached to the email is a
5 document entitled Payroll Department Executive
6 Update, March 16, 2015.  Would you have
7 received that at that time?
8    A.  Yes.
9    Q.  The third page of that document
10 deals with systemic issues.  Do you see that?
11    A.  I do.
12    Q.  And it talks about JCS employees
13 receiving health and welfare payments and how
14 they're to receive VAC under different
15 schedules.  Is this all part of the
16 integration coming about when CCS bought CHC?
17    A.  Well, it's -- what's the date of
18 this.  This is an integration project for
19 payroll because it wasn't just JCS that's
20 being talked about, but it was a system issue
21 of trying to integrate payroll.
22    Q.  That's what I thought, but it's
23 CCS -- when CCS came on the scene and bought

Page 257

1   CHC, these were some of the issues y'all were
2   dealing with?
3       A.   Payroll was an issue. Integration
4   of payroll was definitely an issue.
5       MR. FINCH: I need to take a
6   little short break for this call.
7       MR. EVANS: Okay.
8       MR. FINCH: Thanks.
9       (Recess from 3:08 P.M. until
10       3:16 P.M.)
11
12       (Plaintiff's Exhibit Number 331
13   was marked for identification and copy of same
14   is attached hereto).
15
16       Q.   (BY MR. EVANS) Mr. Houston, let
17   me show you now what we've marked as Exhibit
18   331. Let me ask you if you can identify that
19   for me?
20       MR. FINCH: Have you passed that
21   out or --
22       MR. EVANS: No.
23       A.   (Examining document). It's a

Page 258

1   series of emails related to a fifty-day plan
2   to improve the financial performance of the
3   company.
4       Q.   (BY MR. EVANS) And part of what's
5   in this group of emails is a discussion of a
6   reduction in force at JCS, isn't it?
7       A.   Correct.
8       Q.   The time frame we're talking about
9   is December of 2014, is that correct?
10       A.   That's correct.
11       Q.   So this would have been approxi-
12   mately five months after the announced merger
13   of CCS an CHC?
14       A.   Correct.
15       Q.   Is that the reason you were
16   including in your emails on the first page
17   communication to Jorge, I'm not going to say
18   his name, Dominicis, Dominicis -- y'all help
19   me again. I don't know why I always have such
20   trouble with that.
21       MS. PARRISH: Call him Jorge.
22       Q.   (BY MR. EVANS) Jorge. That's the
23   reason you're communicating to Jorge?

Page 259

1       A.   Yes.
2       Q.   And you're telling him specifi-
3   cally, Jorge, here's the update on the JCS
4   Improvement Plan, the RIF, reduction in force,
5   of the two JCS headquarters employees has
6   taken place, and so forth, is that --
7       A.   Correct.
8       Q.   And on the third page of the
9   document you see communication between you and
10   Mr. McClure, also a CCS employee, who is
11   asking for the names of the individuals so he
12   can take care of that aspect of it, correct?
13       MR. FINCH: Object to form.
14       A.   (Examining document).
15       Q.   (BY MR. EVANS) You may not be
16   looking at the right page, page 18 --
17       A.   Well, I'm looking at this
18   (Indicating) --
19       Q.   Okay.
20       A.   I'm making sure that it's not more
21   than that because this was a much broader
22   initiative, and so I don't know that this is
23   just JCS that's being discussed here with

Page 260

1   Cary.
2       Q.   The prior email to Cary from you
3   says the RIF at JCS headquarters has taken
4   place. Do you see that?
5       A.   Yeah, I do see that.
6       Q.   Okay.
7       A.   I was just looking at the last
8   part of the sentence too where it's talking
9   about labor cost at other sites, so it could
10   be that there's more than just those two.
11       Q.   But you agree that this exhibit
12   does contain communication between you and
13   Jorge and Cary about reductions in force at
14   the JCS headquarters?
15       A.   Yes.
16
17       (Plaintiff's Exhibit Number 3 was
18   marked for identification and copy of same is
19   attached hereto).
20
21       Q.   (BY MR. EVANS) I'll show you
22   Exhibit 332 now.
23       A.   (Examining document). Okay.

Page 261

1    Q.   Am I correct, sir, that this now
2  is an email in early February of 2015?
3         MS. PARRISH:  Are you on 333 or
4  334?
5         MR. FINCH:  This is document 1579.
6    A.   332.
7         MS. PARRISH:  332?
8    A.   Yes.
9    Q.   (BY MR. EVANS)  Yes, Exhibit 332
10 is a group of emails between Karen Lloyd and
11 Randy Harris copying you in February of 2015,
12 is that correct?
13   A.   That's correct.
14   Q.   And on page 1580 of that exhibit
15 Mr. Harris is writing to Ms. Lloyd and copying
16 you, correct?
17   A.   Correct.
18   Q.   Who was Mr. Harris at that time?
19   A.   Mr. Harris is an HR manager.
20   Q.   With CCS?
21   A.   With CCS.
22   Q.   And he writes, quote, One of our
23 HR goals this year is to standardize our

Page 262

1  policies and procedures across all divisions
2  of the company.  In the next several months,
3  we will be rolling out these policies and
4  procedures to all the former CHC sites.
5  That's what he wrote, isn't it?
6    A.   That's what he wrote.
7    Q.   And that was the goal?
8    A.   This is -- it's a goal, but --
9         MR. FINCH:  It says it was a goal.
10   A.   It was a goal, yes.
11   Q.   (BY MR. EVANS)  And that would
12 have included JCS as one of the CHC sites?
13   A.   This is really limited to time and
14 attendance policy.
15   Q.   Okay.  My question is would that
16 have included JCS?
17   A.   Yes.
18
19        (Plaintiff's Exhibit Number 333
20 was marked for identification and copy of same
21 is attached hereto).
22
23   Q.   (BY MR. EVANS)  I'm going to show

Page 263

1  you some documents that are records from the
2  Secretary of State of Alabama and ask you a
3  few questions about them.  I'm showing you now
4  Exhibit 333.  I'll represent to you, sir, this
5  is a report of JCS, Incorporated, their annual
6  report in 2015 on file with the Secretary of
7  State.  Look with me, if you will, on this
8  first page.  The second page is 2014, and it
9  goes on back.  What I would like for you to do
10 is look at the people who are represented as
11 the officers and verify for me if that's
12 correct or not.  In 2015 was Dirk Allison the
13 president?
14   A.   He was president and CEO.
15   Q.   Was Bradley Bickham the secretary?
16   A.   Yes.
17   Q.   And when we go to 2014 of JCS,
18 Incorporated, was Dirk Allison the president
19 then?
20   A.   Yes.
21   Q.   And Bradley Bickham the secretary?
22   A.   Yes.
23   Q.   And when we go back to 2013, it

Page 264

1  shows Jarrett Gorlin as the president and
2  Shelton Frey as the secretary, is that
3  correct?
4    A.   Correct.
5    Q.   And going back to 2012 it doesn't
6  show a president, but it shows Shelton Frey as
7  the secretary.  Is that what you understand?
8    A.   Yes.
9
10        (Plaintiff's Exhibit Number 334
11 was marked for identification and copy of same
12 is attached hereto).
13
14   Q.   (BY MR. EVANS)  We're going to do
15 the same thing for CHC Companies.  Let me show
16 you now Exhibit 334.  And, again, we have a
17 multi-page document for 2013, '14 and '15.
18 Looking at the first page, it shows -- who
19 does it show as the president?
20   A.   It shows Jorge Dominicis.
21   Q.   Dominicis.  And he would have been
22 the president in 2015, is that correct?
23   A.   Yes.

Page 265

1    Q.  Not you?
2    A.  No.
3    Q.  And it shows David Watson as the
4  secretary, is that correct --
5    A.  Correct.
6    Q.  -- in 2015?
7    A.  Correct.
8    Q.  When we go back to 2014, for CHC
9  Companies, Inc., it shows the president is
10 Dirk Allison, is that correct for 2014?
11   A.  Correct.
12   Q.  And Bradley Bickham as the
13 secretary?
14   A.  Correct.
15   Q.  When we go back to 2013 it shows
16 Doug Goetz as the president for CHC Companies,
17 and Shelton Frey as the secretary, is that
18 correct?
19   A.  That's what it shows, yes.
20   Q.  And is that correct?
21   A.  Yes.
22   Q.  So that document has correct
23 information, not just on file?

Page 266

1    A.  Yes.
2
3      (Plaintiff's Exhibit Number 335 as
4  marked for identification and copy of same is
5  attached hereto).
6
7    Q.  (BY MR. EVANS)  I'm now going to
8  show you some similar documents from the State
9  of Georgia which we've marked as Exhibit 335.
10 I'll represent to you, sir, this is an annual
11 registration again for Judicial Correction
12 Services, Incorporated, filed just a few
13 months ago, March of 2016, showing the
14 officers information.  And it shows Mr. Cary
15 McClure as the secretary, David Watson as the
16 CFO, and Jorge Dominicis --
17      MR. FINCH:  You got the last name
18 right.
19   A.  The last name.
20      MR. EVANS:  Jorge.
21      MR. FINCH:  Jorge.
22      MR. EVANS:  All right, bear with
23 me, guys.

Page 267

1      MR. FINCH:  We are.
2    Q.  (BY MR. EVANS)  My question to
3  you, is that a correct listing of the officers
4  of that entity in March of 2016?
5    A.  I don't know if David Watson was
6  still -- as far as I know, yes.  David Watson
7  left, but I don't remember exactly when.
8    Q.  The next page is a similar
9  document about JCS dated April the 9th, 2015,
10 same exhibit, Exhibit 335.  Do you see that?
11   A.  I do.
12   Q.  And the time frame of this filing
13 in April of 2015 would have been shortly
14 before -- or it would have been after the
15 merger between CHC and CCS, wouldn't it?
16   A.  Correct.
17   Q.  And here we're showing Mr. Boyle
18 as the CEO, Mr. McClure as the CFO and the
19 secretary.  Were those correct indications at
20 that time frame?
21   A.  I believe so.
22   Q.  Flip on over with me to the fourth
23 page of that exhibit, if you would.  And,

Page 268

1  again, it's a report about JCS, this time back
2  in March of 2014.
3    A.  Okay.
4    Q.  And as the officers of JCS are
5  listed here, it's Doug Goetz, the CEO, Bruce
6  McDaniel, CFO, and Shelton Frey as the
7  secretary.  Were those correct at that time?
8    A.  Correct.
9    Q.  And it shows that it's updated to
10 Dirk Allison, Bruce McDaniel, and Bradley
11 Bickham.  Which would have been correct in
12 March of 2014?
13   A.  Correct.
14   Q.  Sir?
15   A.  Yes.
16   Q.  Okay, maybe I didn't ask the
17 question very clearly.  Which grouping of
18 those two would have been correct in March of
19 2014?
20   A.  Oh.  This is updated from this --
21   Q.  Okay.
22   A.  -- so the latter, Dirk Allison,
23 McDaniel, and Bickham.

Page 269

1      Q.   Okay.  The next page in that
2  document is a similar filing with the State of
3  Georgia showing Mr. Goetz as the CFO, Bruce
4  McDaniel, and Shelton Frey in 2013, is that
5  correct?
6      A.   Yes.
7      Q.   And as we go on back to the next
8  page, 2012, Mr. Goetz is the -- CFO, Charlie
9  Farrahar, and Shelton Frey, the secretary, is
10 that correct?
11     A.   Okay, the first one is not
12 correct.  The second one is correct.
13     Q.   The second one showing --
14     A.   This is not correct.
15     MR. FINCH:  NO, I think he's --
16     A.   Down here, this is correct.
17     MS. PARRISH:  The first group or
18 the second group?
19     A.   The first group where it's got
20 Doug as the CEO and CFO and Larry Wolk.
21     MR. FINCH:  That's not correct.
22     A.   Doug was not the CFO --
23     Q.   (BY MR. EVANS)  Yes, sir, it looks

Page 270

1  like it's been updated to show Goetz is the
2  CEO, Charlie Farrahar as the CFO, and Shelton
3  Frey as the secretary --
4      A.   Correct.
5      Q.   -- in 2012, would that be correct?
6      A.   Correct.
7      Q.   So in 2012 when this lawsuit was
8  filed Mr. Goetz would have been the president
9  of the company, Judicial Correction Services,
10 Incorporated, correct?
11     A.   The president of the company was
12 Jarrett Gorlin.
13     Q.   But Goetz would have been the CEO?
14     MR. FINCH:  CEO.
15     A.   Right.
16     Q.   (BY MR. EVANS)  Okay.
17     MR. TANKERSLEY:  You've got to
18 verbalize your response.
19     MR. EVANS:  I'm sorry?
20     MR. TANKERSLEY:  He needs to
21 verbalize the response.
22     MR. EVANS:  I thought he did.
23     Q.   (BY MR. EVANS)  Did you say yes?

Page 271

1      A.   No, I said Goetz -- I mean,
2  Jarrett Gorlin was the president, Goetz was
3  the CEO.
4      Q.   And that would have been true in
5  August of 2012?
6      A.   Yes.
7      Q.   When we filed this lawsuit it was
8  served on Mr. Goetz, and the parties included
9  Correctional Healthcare Companies, Incorpo-
10 rated.  There were sworn answers filed to a
11 set of interrogatories that we had served at
12 that time, and for a number of months it was
13 defended on the basis that Correctional
14 Healthcare Companies, Incorporated, was
15 different from CHC Companies, Incorporated,
16 and we've talked about that today, haven't we?
17     A.   We have.
18     Q.   Mr. Goetz certainly would have
19 known any difference that existed at that
20 time, wouldn't he?
21     MR. FINCH:  Object to the form.
22     A.   I can't speak for him, but I would
23 think so.

Page 272

1      Q.   (BY MR. EVANS)  I want to show
2  you, and I don't have a lot of copies of this,
3  gentlemen, but it's JCS's answers to
4  interrogatories and requests for production
5  that were filed back in February of 2014, and
6  I'll mark it as Exhibit 336.
7
8          (Plaintiff's Exhibit Number 336
9  was marked for identification and copy of same
10 is attached hereto).
11
12     Q.   (BY MR. EVANS)  I'm sure in your
13 experience you've seen interrogatories and
14 requests for production, haven't you?
15     A.   I have, yes.
16     Q.   They're a series of written ques-
17 tions and written responses to them.
18     MR. JACKSON:  Are those JCS's
19 responses or Correctional Healthcare
20 Companies' responses or both?
21     MR. EVANS:  This is JCS and
22 Correctional Healthcare Companies' responses.
23     MR. JACKSON:  Okay.

Page 273

1        MR. FINCH:  What's the date of
2 that?
3        MS. PARRISH:  February of 2014.
4        MR. EVANS:  '14, February 19th.
5        MR. FINCH:  Okay.
6      Q.  (BY MR. EVANS)  I'll step around
7 here beside you, sir.  Of interest to us is
8 this.  Question number two, we asked to
9 identify the officers, directors, owners,
10 board members, et cetera, of JCS, Judicial
11 Correction Services, Inc., and Correctional
12 Healthcare Companies, Inc.  And Correctional
13 Healthcare Companies responds that
14 Correctional Healthcare Companies, Inc. is a
15 wholly-owned subsidiary of CHC Companies,
16 Inc.  Is that true?
17      A.  (Examining document).
18 Correctional Healthcare Companies, Inc.,
19 Correctional Healthcare . . . CHC.  So this is
20 CHCC, Inc., correct?
21        MR. FINCH:  Yeah.
22      A.  Then that's correct.
23      Q.  (BY MR. EVANS)  Is that correct?

Page 274

1      A.  Yes.
2      Q.  Well, what is this entity,
3 Correctional Healthcare Companies, Inc., that
4 we've been talking about and asking about?
5 Does it exist now?
6      A.  It does exist.
7      Q.  What does it do?
8      A.  It is -- it holds contracts for
9 prisons and jails, and it's an entity that,
10 you know, I help manage.
11      Q.  Is it still -- is it owned and
12 controlled by CHC Companies, Inc.?
13        MR. FINCH:  Object to form.
14      A.  I'm not sure how it works above
15 that.
16      Q.  (BY MR. EVANS)  I'm not talking
17 about above it, I'm talking about is it under
18 CHC Companies, Inc.?  This document indicates
19 it's a wholly-owned subsidiary of CHC
20 Companies, Inc.
21      A.  At this time --
22      Q.  2014 is when this was signed.
23      A.  I think that -- yeah, I -- I

Page 275

1 believe that's correct.
2      Q.  You believe that's correct?
3      A.  Yes.
4      Q.  Is that something that's under
5 your supervision in your position here with
6 CCS?
7      A.  This here is, Correctional
8 Healthcare Companies, Inc., which is that
9 there, yes, I do supervise that.
10      Q.  You're pointing to the chart
11 that's on the wall.  What are you pointing to?
12      A.  Well, it's -- it's these facili-
13 ties here.
14      Q.  So on the chart this morning you
15 drew a circle around a number of boxes?
16      A.  Correct.
17      Q.  And you put CHC out here.  Are you
18 now saying that's Correctional Healthcare
19 Companies, Inc., not CHC Companies, Inc.?
20      A.  This is CHC Companies, Inc.
21      Q.  Okay, this is CHC Companies?
22      A.  Correct.
23      Q.  Again, let me ask you on not that,

Page 276

1 but this --
2        MR. FINCH:  He's asking about the
3 subsidiary, not --
4      Q.  (BY MR. EVANS)  This Correctional
5 Healthcare Companies, Inc., which this answer
6 differentiates from CHC Companies, Inc., are
7 we communicating?
8        MR. FINCH:  I think if you show
9 him the org. chart --
10      A.  Really.
11        MR. FINCH:  -- you can get better
12 communication, but you can do it however you
13 want.
14      A.  Yeah, do you have an org. chart?
15      Q.  (BY MR. EVANS)  No, but I've got
16 this answer, though, and we've got a bunch of
17 responses pretending that this company was a
18 different company.
19        MR. JACKSON:  Object to the form.
20        MR. FINCH:  There's no pretension
21 about it.
22      Q.  (BY MR. EVANS)  You can answer,
23 sir.  Do you know anything about this wholly-

1 owned subsidiary of CHC Companies?

2      MR. FINCH:  Objection --

3      A.  It is --

4      MR. FINCH:  -- asked and answered.

5      A.  It is a part of this, so

6 it's . . .

7      Q.  (BY MR. EVANS)  If you don't know,

8 I can understand, but --

9      A.  Okay, all right, just yes.

10      Q.  Okay.  CHC Companies, Inc., we've

11 gone through that --

12      A.  Yes.

13      Q.  -- you're the corporate represen-

14 tative about that here today?

15      A.  Yes.

16      Q.  And we've testified, and that's --

17 and you've circled around the boxes that are

18 CHC Companies, Inc.?

19      A.  Correct.

20      Q.  This answer says that one of the

21 subsidiaries, a wholly-owned subsidiary of CHC

22 Companies, Inc., is Correctional Healthcare

23 Companies, Inc.  Do you know anything about

1 that?

2      A.  No.

3      Q.  That's an honest answer.

4      A.  Okay.

5      Q.  And I believe it.  Do you know why

6 it has been involved at all?  Is it involved

7 at all in JCS, if you know?

8      A.  I don't know.

9      Q.  Do you know who the officers of it

10 are?

11      A.  No.

12      Q.  Well, the reason I ask that is

13 because it says that the president and chief

14 executive officer is Dirk Allison and that

15 you're the executive vice president and COO.

16      MR. JACKSON:  What are you

17 referring to?

18      MR. EVANS:  The answers to

19 interrogatories.

20      MR. JACKSON:  Which one?

21      MR. EVANS:  Number two.

22      MR. JACKSON:  Okay, still number

23 two.

1      MS. PARRISH:  Correctional

2 Healthcare Companies, Inc.

3      MR. FINCH:  Where is that?

4      MS. PARRISH:  Right here (Indi-

5 cating).

6      Q.  (BY MR. EVANS)  (Indicating).

7 We'll go back to this again.

8      A.  See, I thought this was talking

9 about this, Correctional Healthcare Companies,

10 Inc., and the current officers of that --

11      Q.  Yes, sir, go to the next page.

12      A.  Okay.

13      Q.  You see it shows you as the

14 executive VP and COO --

15      A.  Correct.

16      Q.  -- of this entity that you said

17 you don't know anything about.

18      A.  (Examining document).  (Shaking

19 head).

20      Q.  You don't know how that came

21 about?  Is it your understanding --

22      A.  To me -- yeah, I --

23      Q.  You've told me you didn't know

1 anything about that company?

2      A.  Well, to me that was this company.

3 I'm testifying --

4      Q.  You think they're one and the

5 same?

6      A.  I'm testifying to this company

7 here, that's the one that I know about, which

8 is Correctional Healthcare Companies, Inc.

9      Q.  Known as CHC Companies, Inc.?

10      A.  Correct.

11      Q.  You think they're one and the same

12 entity?

13      A.  I can't answer that.

14      Q.  Well, do you know of any separa-

15 tion between the separate legal entities with

16 different names, although those are very

17 similar?

18      A.  No, that would be -- I can't

19 answer that.

20      Q.  So are you -- who could answer it

21 for us?

22      A.  I would think that David Perry

23 could answer that.

1    Q.  I'll give him that opportunity.

2    A.  Okay.

3    Q.  Other than the company we've asked
4 to depose today, CHC Companies, Inc. --

5    A.  Yes.

6    Q.  -- are you aware of any other
7 entity of that similar name, Correctional
8 Healthcare --

9    A.  Yeah, I've heard some confusion
10 about it --

11    Q.  It's confusing, I'll tell you.

12    A.  -- but that's all I've heard, and
13 so --

14    Q.  As far as being a COO of any other
15 company of similar name, you're not?

16    A.  No.

17    Q.  Okay.  You mentioned just a moment
18 ago that when we were trying to figure that
19 out you thought that might be an entity that
20 was holding contracts.  Do you remember that
21 just a moment ago?

22    A.  No, that was not that one.  That
23 was PNA still holds contracts, there's a

1 number of entities that create Correctional
2 Healthcare, Inc., that still hold contracts.

3    Q.  Such as JCS?

4    A.  JCS still holds contracts.  PNA
5 still holds contracts.  Secure Care still
6 holds contracts.  CHM still holds contracts.

7    Q.  And as far as any separate legal
8 entities of similar names, you're just not
9 aware of them or how they're set up?

10    A.  I'm not aware of them or how
11 they're set up.

12    Q.  When did you first become aware of
13 this lawsuit?

14    A.  I heard about it in 2014.

15    Q.  It was filed in 2012 --

16    A.  Okay.

17    Q.  -- so you would have heard about
18 it, you think, the first time in 2014?

19    A.  Yes.

20    Q.  Okay, and I suppose you had
21 conversations with counsel, which I'm not
22 going to ask you the substance, but you did
23 about that?

1    A.  Yes.

2    Q.  You would have been aware that it
3 was alleging problems with the operations of
4 JCS that was under CHC, weren't you?

5    A.  I was, in general, aware of what
6 the allegations were, yes.

7    Q.  Okay.  Do you know why anybody
8 would have taken the position that CHC was
9 Correctional Healthcare Companies, a different
10 entity from CHC?

11    A.  No.

12    Q.  Wouldn't make sense to you, would
13 it?

14    A.  In general terms, no.

15    MR. EVANS:  All right, we're going
16 to continue the deposition because we still
17 don't have the merger documents that we --
18 that you talked about when the actual merger
19 between CCS and CHC occurred --

20    THE WITNESS:  Okay.

21    MR. EVANS:  -- and we're going to
22 have to take up some issues on some of these
23 redactions that we've seen, but -- and there

1 are a number of agreements that we would ask
2 for that have not been produced.  So we, with
3 that caveat, we're done for the day.  I
4 appreciate your patience.

5    THE WITNESS:  All right, thank
6 you.

7    MR. FINCH:  I do want to ask about
8 this organizational chart which I offered to
9 let you ask him about, but . . .

10    (Whereupon, an off-the-record
11 discussion was had).

12

13    (Defendant's Exhibit Number 1 was
14 marked for identification and copy of same is
15 attached hereto).

16

17 EXAMINATION BY MR. FINCH:

18    Q.  All right, Mr. Houston, I will
19 make my own attempt to clear up the confusion
20 over CHC Companies, Inc., versus another
21 entity called Correctional Healthcare
22 Companies, Inc.  I've marked as Exhibit 1 an
23 organizational chart which shows a variety of

Page 285

1 companies that you have been affiliated with,
2 is that correct?
3     MR. TANKERSLEY:  Sir, do you have
4 extra copies of that exhibit?
5     MR. FINCH:  No, I do not.
6     MR. TANKERSLEY:  Do you mind if I
7 look over your shoulder?
8     MR. FINCH:  Come on.
9     Q.  (BY MR. FINCH)  And you see on
10 this organizational chart CHC Companies,
11 Inc.?
12     A.  Yes.
13     Q.  All right, circle that and put
14 your name by it, please?
15     A.  (Marking).
16     Q.  All right, so you have your
17 initials there?
18     A.  Yes.
19     Q.  And is that the entity that you
20 were the president and COO of at various
21 times?
22     A.  I was the COO of that entity, yes.
23     Q.  Okay.  And below that entity are

Page 286

1 five other entities starting on the left,
2 going from left to right, CHC Pharmacy
3 Services, Inc.  Was that a subsidiary of CHC
4 Companies, Inc.?
5     A.  It was.
6     Q.  What services did it provide or
7 what --
8     A.  Pharmacy --
9     Q.  -- kind of contracts did it hold?
10     A.  Pharmacy-related contracts.
11     Q.  For the correctional industry?
12     A.  For -- for medication for inmates.
13     Q.  Okay.  And moving to the right,
14 there's another entity, Health Professionals,
15 Ltd..  Was that also a subsidiary of CHC
16 Companies, Inc.?
17     A.  Yes.
18     Q.  And what function or contracts did
19 it have?
20     A.  It had health care contracts
21 primarily in the Midwest United States.
22     Q.  Okay, again, with correctional
23 facilities?

Page 287

1     A.  Yes.
2     Q.  All right, and then moving to the
3 right again, there's an entity called
4 Correctional Healthcare Companies, Inc.  Was
5 that a subsidiary of CHC Companies, Inc.?
6     A.  Yes.
7     Q.  And what sort of contracts did
8 that company have, or what was its niche?
9     A.  That held a -- correctional health
10 care contracts providing inmate health care in
11 prisons and jails.
12     Q.  All right.  So Correctional
13 Healthcare Companies, Inc., was a subsidiary
14 of CHC Companies, Inc., is that correct?
15     A.  That's correct.
16     Q.  And JCS -- excuse me, Judicial
17 Correction Services, Inc., as we move further
18 to the right on this organizational chart,
19 that's the company we've been talking about,
20 JCS, all day, correct?
21     A.  That's correct.
22     Q.  And then moving further into the
23 last subsidiary on the right, we have

Page 288

1 Physicians Network Associates -- is that
2 plural or not --
3     A.  Association.
4     Q.  -- excuse me, Inc., and what was
5 the industry that company was involved in?
6     A.  Providing health care to inmates.
7     Q.  Okay.  Now, having looked at this
8 organization chart and seeing these two
9 entities that have been talked about, CHC
10 Companies, Inc., and Correctional Healthcare
11 Companies, Inc., are those separate entities?
12     A.  They are separate entities.
13     Q.  One is a parent, and the other is
14 a subsidiary company?
15     A.  Correct.
16     Q.  All right, and the company that
17 you were responsible for running was CHC
18 Companies, Inc.?
19     A.  That's correct.
20     Q.  And in that role you also oversaw
21 these five subsidiaries, including commercial
22 -- excuse me, Correctional Healthcare
23 Companies, Inc.?

Page 289

1    A.  That's correct.
2        MR. FINCH:  All right, that's all
3 I have.  Thank you.
4        THE WITNESS:  That made it so much
5 easier.
6
7 REEXAMINATION BY MR. EVANS:
8    Q.  Mr. Houston, the document that
9 your lawyer pulled out of his stuff over
10 there, had you seen that before?
11   A.  I have seen this -- something
12 similar to this before, yes.
13   Q.  Something similar to it?
14   A.  Yes.
15   Q.  Can you tell me the date of it?
16   A.  July 29th, 2014.
17   Q.  July 29th, 2014.  And how long did
18 that organizational structure remain in place?
19   A.  It's still in place.
20   Q.  You think it's still in place?
21   A.  Uh-huh (Nodding head).
22   Q.  And when did it first become in
23 place?

Page 290

1        MR. FINCH:  With respect to what
2 part of the chart?  He's pointing to a
3 particular part, so I don't want you two to be
4 confused further.
5        MR. EVANS:  I'm sure you wouldn't,
6 no more than a poke in the eye.
7    Q.  (BY MR. EVANS)  As far as the
8 subsidiaries under CHC Companies, Inc., how
9 long were these subsidiaries structured under
10 CHC Companies, Inc.?
11   A.  (Examining document).
12   Q.  Do you know?
13   A.  No.  I know that it happened after
14 the acquisition of PNA, which would have been
15 2010 and 2011 --
16   Q.  2011 was the acquisition of JCS?
17   A.  JCS.
18   Q.  Okay.
19   A.  And Pharmacy, so before that it
20 was this (Indicating).
21   Q.  Before 2011 you had two subsidi-
22 aries?
23   A.  Yeah, before 2010 you just had

Page 291

1 those (Indicating).
2    Q.  You'll have to identify them for
3 the record.
4    A.  Health Professionals, Ltd., and
5 Correctional Healthcare Companies, Inc.
6    Q.  And do you know what function
7 Correctional Healthcare Companies, Inc., as a
8 subsidiary, served?
9    A.  Yeah, it's inmate health care.
10   Q.  And it held contracts?
11   A.  It held contracts.
12   Q.  Essentially it was a shell to hold
13 these contracts, right?
14       MR. FINCH:  Object to form.
15   Q.  (BY MR. EVANS)  You can answer.
16   A.  I don't know what a shell means,
17 but it holds contracts.  The contracts are in
18 that entity's name.
19   Q.  Well, a shell would mean a company
20 that exists legally but doesn't have any
21 assets.  You've not heard that term before?
22   A.  (Shaking head).
23   Q.  As far as the operations of JCS

Page 292

1 from 2010 forward, would Correctional
2 Healthcare Companies, Incorporated, have had
3 any responsibility or contact with it?
4    A.  From 20 --
5    Q.  2012 --
6        MR. FINCH:  2011.
7    A.  From 2011, okay.  I was going to
8 say 2010, no.  2011, it would have been to
9 here.
10   Q.  (BY MR. EVANS)  And you're
11 pointing back up to CHC Companies, Inc.?
12   A.  Yes.
13       MR. FINCH:  So his question is
14 starting in 2011, did Correctional Healthcare
15 Companies, Inc. --
16   Q.  (BY MR. EVANS)  Have any responsi-
17 bility, operations --
18   A.  No.
19   Q.  -- contact, any kind of --
20   A.  No.
21   Q.  -- effect on the operations of
22 JCS?
23   A.  No.

Page 293

1    Q.  All of that would have run to CHC
2  Companies, Inc., which you were the COO of, is
3  that your testimony?
4    A.  That's correct.
5    Q.  And that testimony has now been
6  expanded substantially by your review of
7  Defendant's Exhibit 1?
8    A.  Yes.
9    MR. TANKERSLEY:  Let me take a
10  look at the document.  Thank you, sir.
11    Q.  (BY MR. EVANS)  Do you know that
12  both CHC and Correctional Healthcare
13  Companies, Inc., do business as the opposing
14  names?
15    MR. FINCH:  Object to form.
16    Q.  (BY MR. EVANS)  You didn't know
17  that?
18    A.  No, I don't know that.
19    Q.  Did you know that Mr. Goetz
20  changed the names of those two entities to
21  each other on the same day in 2011?
22    MR. FINCH:  Object to the form.
23    A.  No, I don't know that.

Page 294

1    Q.  (BY MR. EVANS)  You didn't know
2  that?
3    A.  No.
4    Q.  And if that occurred, which the
5  Department of Records in Delaware shows that
6  it did, you wouldn't know the reason that that
7  occurred?
8    MR. FINCH:  Object to the form.
9    A.  I wouldn't know.
10    Q.  (BY MR. EVANS)  It would be pretty
11  confusing, wouldn't it?
12    MR. FINCH:  Object to form.
13    Q.  (BY MR. EVANS)  You can answer.
14    A.  I wouldn't know why Mr. Goetz made
15  that decision, no.
16    Q.  I don't either.  Maybe I'll get a
17  chance to ask him.
18    MR. EVANS:  Okay, I don't have any
19  further questions.
20
21  REEXAMINATION BY MR. TANKERSLEY:
22    Q.  Sir, not to look over your
23  shoulder, but I do have a question about this

Page 295

1  chart, if I could.  Do you know where this
2  came from, this document came from?
3    A.  I've seen this document.  It is --
4  I'm sure it came from our legal department.
5    Q.  But do you know what it was part
6  of?  Was it part of a larger document?
7    A.  I don't know.
8    Q.  What do you remember about having
9  seen this document before?
10    A.  That it was confusing.
11    Q.  Okay, other than that?
12    A.  No, I don't -- it really didn't
13  interest me, and so I didn't pay a whole lot
14  of attention to it, but I've seen it before,
15  okay.
16    Q.  Sure.  Well, as you might imagine,
17  I'm -- this is not a document we've seen
18  before.  It's not Bates-numbered.  It hasn't
19  been produced.
20    MR. FINCH:  I'm going to object to
21  that.
22    MR. JACKSON:  Object to that.  It
23  has been produced.

Page 296

1    MR. TANKERSLEY:  Okay, well, it
2  has been produced?
3    MR. FINCH:  It has been produced.
4    MR. TANKERSLEY:  It does not bear
5  a Bates number?
6    MR. JACKSON:  Well, that copy may
7  not have a Bates number, but it's been
8  produced.
9    MR. TANKERSLEY:  All right.
10    Q.  (BY MR. TANKERSLEY)  What I'm
11  really trying to figure out is the source of
12  the document.  Do you remember what it was
13  from?
14    A.  No, I can't answer what the
15  document was from.
16    Q.  Well, just to keep going here, so
17  you were the chief executive officer of CHC
18  Companies, Inc., which is the holding company
19  for a number of companies which includes
20  Correctional Healthcare Companies, Inc., is
21  that correct?
22    MR. FINCH:  Object to form.
23    A.  Correct.

Page 297

1    MR. FINCH:  You said executive
2 officer.
3    A.  I was the chief operating officer.
4    Q.  (BY MR. TANKERSLEY)  Chief opera-
5 ting officer.  I'm sorry.  And who was the
6 chief executive officer of Correctional
7 Healthcare Holding Company, Inc., the entity
8 that's right above it?
9    A.  I have no idea.
10    Q.  Who was your boss at this time,
11 July 29th, 2014?
12    A.  This was -- I think that may have
13 been when Dirk came on.  So it was either Doug
14 Goetz or Dirk Allison.
15    Q.  All right, and who was Doug
16 Goetz's or Dirk Allison's boss?
17    A.  The board.
18    Q.  Okay.  All right, and what is
19 Jessamine Healthcare, Inc., a Delaware company
20 apparently?
21    A.  Jessamine is a company that was
22 created by one of the PE firms when they
23 acquired CHC.

Page 298

1    Q.  When you say PE you mean private
2 equity?
3    A.  Private equity.
4    Q.  Where does that word come from,
5 Jessamine?
6    A.  The daughter of the chairman.
7    Q.  Of the PE firm?
8    A.  Yes.
9    Q.  All right, and who was that, the
10 chairman?
11    A.  It was Dale Wolf.  It had some-
12 thing to do with something in South Carolina.
13    Q.  Sure.  Would you spell Dale --
14 Dale is D-a-l-e?
15    A.  Why.
16    Q.  And Wolf is W-o-l-f?
17    A.  Correct.
18    Q.  No E at the end?
19    A.  No, no E at the end.
20    Q.  And I believe you had testified
21 about this earlier, your understanding that
22 part of the motivation for the structure was
23 driven by tax considerations?

Page 299

1    A.  That's what I'm told by our --
2 there were just too many entities here --
3    Q.  You're pointing at the bottom, and
4 these are the subsidiary corporations --
5    A.  Correct.
6    Q.  -- for CHC Companies, Inc.?
7    A.  Yes, because there were a number
8 of companies that made this up.
9    Q.  Of what -- made what up?
10    A.  Correctional Healthcare Companies,
11 Inc.
12    Q.  So if the chart was a complete
13 one, there would be a further line below
14 Correctional Healthcare Companies, Inc., and
15 some other entities below that?
16    MR. FINCH:  Object to form.
17    A.  (Nodding head).
18    Q.  (BY MR. TANKERSLEY)  You've got
19 to --
20    A.  Could be, yes.
21    Q.  What companies would they be?
22    A.  Secure Care, CHM, Correctional
23 Healthcare Management.

Page 300

1    Q.  Anything else?
2    A.  That's all I can remember.
3    Q.  And, again, your testimony is that
4 the business of the subsidiary Correctional
5 Healthcare Companies, Inc., was a health care
6 company?
7    A.  Correct.
8    MR. TANKERSLEY:  Okay, nothing
9 further.  Thank you.
10    MR. EVANS:  With the previous
11 statement I made about continuing to get the
12 rest of the documents, when we do, then we're
13 done for the day.
14    THE WITNESS:  Thank you.
15
16    FURTHER THE DEPONENT SAITH NOT
17
18
19
20
21
22
23

1          C E R T I F I C A T E

2

3   STATE OF ALABAMA:

4   JEFFERSON COUNTY:

5

6          I hereby certify that the above

7   and foregoing deposition was taken down by me

8   in stenotype, and the questions and answers

9   thereto were transcribed by means of

10  computer-aided transcription, and that the

11  foregoing represents a true and correct

12  transcript of the testimony given by said

13  witness upon said hearing.

14         I further certify that I am

15  neither of counsel nor kin to the parties to

16  the action, nor am I in any way interested in

17  the result of said cause.

18

19         /s/ Kerry K. Thames

20         KERRY K. THAMES - COMMISSIONER

21         Certificate Number: ACCR 364

22         Expires 9-30-16

23