*1*   FILED
2017 Feb-09  PM 02:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GINA KAY RAY, et al.,          *

      Plaintiffs,          *     2:12-cv-2819-RDP

   vs.                      *     February 2, 2017
                             9:30 a.m.
JUDICIAL CORRECTIONS          *
SERVICES, INC., et al.,               Birmingham, Alabama
                        *

      Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE R. DAVID PROCTOR**
**UNITED STATES DISTRICT JUDGE**

* * * * * * * * * * * * * * * * * * * * * * * *

```
 1   For the Plaintiffs:      G. Daniel Evans
                              Alexandria Parrish
 2                            Maureen C. Evans

 3

 4   For Defendant JCS:       Larry S. Logsdon
                              Wilson F. Green
 5                            Michael L. Jackson

 6

 7   For Defendant           Gregory C. Cook
     City of Childersburg:   Will Hill Tankersley
 8                           L. Conrad Anderson, IV
                             Ginny Willcox Leavens
 9                           Christopher Knox Friedman
                             Chase Tristian Espy
10

11
     For Defendant CHC       Brian C. Richardson
12   Companies and          Frederick Lane Finch, Jr.
     Correct Care Solutions:

13

14
     Court Reporter:         Leah S. Turner, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25
```

1          This cause came to be heard and was heard on the
2  2nd day of February 2017, before the Honorable R. David
   Proctor, United States District Judge, holding court for
   United States District Court, Northern District of Alabama,
3  Southern Division, in Birmingham, Alabama.

4          Proceedings continued as follows:

5              P R O C E E D I N G S

6      THE COURT:  We are here in Ray versus Judicial

7  Correction Services, et al., case 2:12-cv-2819.  We're on

8  motions for summary judgment filed by the City.

9          Counsel, who is going to be arguing for the City?

10     MR. TANKERSLEY:  Your Honor, we have three motions,

11 as you know, Your Honor, one for each of the named plaintiffs,

12 and so we have split the argument up between the three

13 plaintiffs.  Each of them have slightly different facts.  The

14 law is very similar as to each of the three, but there are

15 documents that are unique to each of the three plaintiffs.

16         So I will be arguing Ms. Ray's motion.  My law

17 partner, Conrad Anderson, is arguing the Fugatts, which is

18 going to be very heavy on the law.  And my partner Greg Cook

19 is arguing the Jews motion which has a good bit of testimonial

20 material that we want to present to the Court.

21     THE COURT:  But all three motions start off with

22 really what may be the heart of the matter and that is whether

23 there is a municipal policy or practice for which your client

24 could be held liable in any of the cases, right?

25     MR. TANKERSLEY:  That's correct, Your Honor.  And

1    that is the gist of what Mr. Anderson is going to be

2    presenting to you.  Of course, we are here at the Court's

3    direction about the order.  And if the Court wants that part

4    first, that's okay, of course; but, otherwise, I was going to

5    go ahead and do the Ray motion and then we move to

6    Mr. Anderson and then Mr. Cook.

7            THE COURT:  All right.  Mr. Evans, are you going to

8    be responding on behalf the plaintiffs?

9            MR. EVANS:  Yes, Your Honor.  And I agree with your

10   observation.  I believe the lynchpin is the Monell issue.

11           THE COURT:  Why don't you briefly, you and Mr. Cook

12   briefly discuss with me the things that you think may be

13   unique to either plaintiff Jews or plaintiff Ray, and then we

14   will hear on the Fugatt motion, probably get into the heart of

15   the matter there.

16           My analysis right now -- and you might change my

17   mind today -- is in agreement with what Mr. Evans said, and

18   that is the key issue here is whether there was a municipal

19   policy or practice for which your client can be sued under

20   Section 1983 by any of these three plaintiffs.

21           MR. TANKERSLEY:  Yes, sir.  Judge, what I plan to do

22   with mine is -- we've been living with these documents a good

23   bit for these last two, two and a half years, and what I was

24   hoping to do with the Court, at least in my presentation, was

25   just to show the Court where a few things are that you're

1   going to want to see when you're making the determination.

2          The Court may recall that it made a determination at

3   the motion to dismiss stage because there was -- obviously

4   because it was at the motion to dismiss stage and there were

5   some things that --

6          THE COURT:  Plausibly-alleged pleadings.

7          MR. TANKERSLEY:  Yes, sir.  But there were some

8   things that were just not appropriate for the Court to take a

9   look at because they were factual matters.  And so I was going

10  to show the Court some of that.

11         This won't take very long, Your Honor.  This really

12  is also for the benefit of your clerk so he can find these

13  things as well.  The documents, like I say, are just sometimes

14  a little hard to interpret, so I would like to do that.  It

15  won't take very long, and then Mr. Cook has some materials as

16  well.

17         Judge, I think I would just like to begin by saying

18  here, a much quoted statement by Woody Allen:  80 percent of a

19  successful life is just showing up.  And with Ms. Ray, the

20  plaintiff --

21         THE COURT:  Showing up on time.

22         MR. TANKERSLEY:  Showing up on time or at all, in

23  Ms. Ray's situation.  And what happened with Ms. Ray is that

24  she, undisputedly, did not show up for some hearings and as a

25  result of that she had her probation, which had been ordered

1    by the court, not the City, but the court revoked, and --

2            THE COURT:  So what was the basis -- she had her

3    probation revoked, but each time it seemed that the court

4    characterized that as a failure to obey court order?

5            MR. TANKERSLEY:  Your Honor, let me show you what --

6    that's the argument that the plaintiff makes.  Let me show you

7    what they're talking about with that.  This is a little out of

8    order, so I'm going to stumble around a little bit, Judge.

9            But let me show you what they're talking about with

10   that.  First off, Judge, bear in mind that there's no dispute

11   that for the case that we're here about today, Ms. Ray had

12   four separate sets of tickets.  I say "sets of tickets"

13   because she was arrested and convicted or pled guilty to two

14   things each time.  Mainly these were failure to have a valid

15   license tag and also driving while revoked.  She had suspended

16   licenses.  And so oftentimes these were two offenses for just

17   one thing, for one set of offenses.

18           She had one set of offenses in June of 2010, two in

19   2011, two sets of offenses in 2011, one of which, by the way,

20   was -- and then one in 2012.  The one in 2012 was not only

21   driving with an expired tag --

22           THE COURT:  I'm familiar with all of that.

23           MR. TANKERSLEY:  And she was -- a high speed chase,

24   as you know.  Let me show you the one you're talking about,

25   Judge.  If we could go to Exhibits O and W.  Here is what the

1    plaintiff was talking about, Your Honor.  These are capias

2    warrants.  For those who don't like Latin, that just means a

3    bench warrant.  Capias, I think it comes from the Latin word

4    to take from something.

5          Ms. Ray did not show up for some court appearances

6    that she was sent notice of.  She denies having received the

7    notice, but she was sent notice at the address that she gave.

8    The letters came back undeliverable.  And what happened here

9    is the clerk of the court, Ms. Wyers, put, "You have been

10   convicted of the offense of FTOCO."  That's what the plaintiff

11   is talking about.

12         Really, the underlying offense was not FTOCO.  The

13   underlying offense was driving around with an invalid tag,

14   driving around with an invalid license, and one instance of a

15   high speed chase, evading arrest.

16         To us, Your Honor, and I think it should be to you,

17   this is nothing more than a shorthand.  This is not an order

18   by the court entering the underlying offense.  The underlying

19   offense is not challenged by Ms. Ray, was not appealed by

20   Ms. Ray.  She was, in fact, guilty of the underlying offenses.

21   As a condition of her sentence, she agreed, she says under

22   pressure but nonetheless she agreed, to go into probation

23   managed by JCS and failed to show up at the scheduled

24   meetings.  If I could show the Judge a little bit about that.

25         One of the things, Your Honor, as you may recall,

the cases that you relied upon --

THE COURT:  Let's go back to the beginning with Ms. Ray.  In June 2010 she is ticketed for a suspended license and not having proof of insurance?

MR. TANKERSLEY:  Yes, sir.

THE COURT:  She pleads guilty to both charges at an August 12, 2010, hearing.  She says the public defender was there but she did not believe an attorney would assist her with a traffic ticket so she didn't speak to the public defender, apparently.

MR. TANKERSLEY:  That's right.

THE COURT:  She gets a three-day suspended imprisonment term and 24-month probationary sentence from Judge Ward.

MR. TANKERSLEY:  Yes, sir, and that's signed by Judge Ward on the order.

THE COURT:  She doesn't remember if he mentioned anything about a suspended imprisonment term during the hearing, but he fined her $400 for each traffic offense and imposed $198 in court costs for the suspended license offense and $148 in court costs for the no insurance offense, right?

MR. TANKERSLEY:  Your Honor, you have in front of you the court order.  It's Exhibit D to our motion for Ms. Ray, which is Document No. 422.

THE COURT:  Okay.  I thought it was 423-4.

1          MR. TANKERSLEY:  I have 422, Judge.

2          THE COURT:  I will double check that.  Then in

3     September, JCS prepares a revocation petition against Ray.

4     It's filed with the City but not signed by the probation

5     officer or the municipal judge.  The municipal court holds a

6     revocation hearing on October 14, 2010.  Ray attends that.

7          JCS issues another revocation petition on

8     December 30, 2010, based on her failure to attend probation

9     sessions, pay assessed court fines and fees, and pay

10    probationary fees.

11         The municipal court holds a revocation hearing for

12    Ray on June 13, 2011, but she fails to appear.  So on

13    January 18, 2011, the magistrate issues the bench warrant.

14         Is that the bench warrant we were referring to

15    previously, or is that a different one?

16         MR. TANKERSLEY:  Let's go to capias --

17         THE COURT:  I'm using bench.

18         MR. TANKERSLEY:  We have those capias warrants here

19    for you to take a look at.  It's Exhibit O and W.  Let's take

20    a look at those.  These are the capias warrants, Your Honor.

21    These are bench warrants.  And, again, the plaintiff faults us

22    for putting FTOCO for the offense.

23         THE COURT:  Well, what the plaintiff says is that's

24    an artful dodge to try to get around a revocation hearing or a

25    contempt proceeding which would have certain constitutional

```
 1   protections attached to it.

 2          MR. TANKERSLEY:  Yes, sir.

 3          THE COURT:  Mr. Evans, am I misreading your

 4   argument?

 5          MR. EVANS:  No, sir.

 6          MR. TANKERSLEY:  Your Honor, we understand the

 7   plaintiffs' argument that this is in, in effect, an invalid

 8   proceeding because there was insufficient protections, but

 9   what is undenied, Your Honor, is that these notices were sent

10   to Ms. Ray at the address that she gave us.  She failed to

11   show up at the scheduled hearing.  The Court has identified

12   one of those notice of hearings, which is Exhibit H to our

13   motion, which was not signed.  Exhibits N and U, these are

14   revocation hearing dates, those were signed but, nonetheless,

15   she did not show up.  The magistrate, God bless her, did not

16   put convicted for the offense of --

17          THE COURT:  So where is Ms. Wyers?  Has she ever

18   gotten healthy enough to be deposed?

19          MR. TANKERSLEY:  Your Honor, I don't represent

20   Ms. Wyers, but I understand she is in Childersburg someplace

21   and I don't know what the current state of her health is.

22          MR. COOK:  Your Honor, you ordered a deposition of

23   written questions, and Mr. Evans did that and that was held

24   and that deposition has now been filed, I think, by JCS in

25   their most recent filing.
```

1    THE COURT:  That's not part of your motion?

2    MR. COOK:  It's not part of our motion, but it's in

3  the record if the Court wanted to read it.  It's not very

4  long.

5    THE COURT:  Mr. Evans?

6    MR. EVANS:  Your Honor, that was a very, very brief

7  offer.  We had 10 questions, I think, we could pose to her.

8  It was not at all sufficient as a deposition we would have

9  expected, and she continued to represent herself as being so

10 sick, so this and so that, that she just couldn't sit for a

11 deposition.  We would very much like to depose Ms. Wyers.

12    THE COURT:  Well, the problem is she had a -- if she

13 had just said that, that would have been easy for me.  You

14 would have been deposing her.  The problem is she had a

15 physician who was vouching for her.

16    MR. EVANS:  A psychologist, yes, sir.

17    THE COURT:  A health professional vouching for her?

18    MR. EVANS:  To some degree.  That's true.

19    THE COURT:  All right.  I think I've got -- look, it

20 seems to me that, again, the key question that I have to

21 decide and then I have to give to your argument is whether

22 there's a policy or custom such that your client could be sued

23 in the first place.

24    MR. TANKERSLEY:  All right, sir.  Well, I would like

25 to show you, Your Honor -- it sounds like you have already

```
 1   found it --
 2           THE COURT:  I have a pretty good handle on the
 3   chronology, I think I've demonstrated to you.
 4           MR. TANKERSLEY:  You have.
 5           THE COURT:  On the chronology of events that led
 6   from the beginning to the end.  And, by the way, I have that
 7   for Mr. Jews as well.  And I have it for the Fugatts as well.
 8   I think what happened is you may be -- what is document 422
 9   and 423?
10           MR. COOK:  I think it's the brief versus the
11   evidentiary submission.
12           MR. TANKERSLEY:  That's exactly right, Your Honor.
13   I was looking at the --
14           THE COURT:  Are you looking at the brief and I'm
15   looking at the evidentiary submission?
16           MR. TANKERSLEY:  That's right.
17           THE COURT:  I kind of rely upon the evidentiary
18   submission for evidence as opposed to the brief citation of
19   the evidentiary submission for evidence.  Anybody have a
20   problem with me looking at document 423 for these things as
21   opposed to 422?
22           MR. TANKERSLEY:  No, Your Honor.  I'm looking at the
23   evidentiary submission and it is 423-1, as you stated.
24           Your Honor, again, I wanted to show the Court where
25   things were in the document.  It sounds like you have figured
```

1   that out on your own.  And for that reason, I will just wait

2   until we --

3        THE COURT:  I will accept your representation that

4   it wasn't easy to find, winding our way through all the

5   different submissions and putting together pieces of the

6   puzzle, but I think I've got a handle on that with respect to

7   all three plaintiffs.  And I think the opinion we put out will

8   adequately address the Rule 56 record leading up to it.

9        Of course, I'm cognizant of your characterization of

10   these orders and Mr. Evans' characterization of the orders.

11        MR. TANKERSLEY:  Yes, sir.  I would say also, just

12   for the record, that Exhibit --

13        THE COURT:  It doesn't help your characterization

14   that they put in FTOCO.

15        MR. TANKERSLEY:  No, Your Honor.  It was a

16   shorthand.  It would have been more accurate to have put the

17   actual underlying charge of revoked license, driving without

18   insurance, driving with an expired tag, all that.  But what it

19   was is a court, this Court included, has the right to issue

20   warrants if someone fails to show up for a duly-noticed

21   hearing, and that is what Ms. Ray did.

22        THE COURT:  Okay.

23        MR. COOK:  Your Honor, I will try to be brief.  I

24   planned about 10 minutes, but I will try to get right to the

25   points.

```
 1              THE COURT:  Don't capias your 10 minutes.

 2              MR. COOK:  Your Honor, obviously we think the Monell

 3    issues are dispositive as well.  As to Mr. Jews in particular,

 4    he has some specific facts that I want to be sure the Court --

 5              THE COURT:  On the statute of limitations?

 6              MR. COOK:  On the statute of limitations.  On

 7    causation.  As the Court is aware, the standard is that he

 8    must demonstrate a direct causal link.  It's a very high

 9    standard of causation, Your Honor, between the practice or

10    policy adopted by a final decision-maker of the City, Your

11    Honor.  So that direct causal link is something I want to

12    focus on, and so I try to look at what it is that are his

13    injuries, because there has to be a direct causal link between

14    the pattern and practice or policy and his injuries, and this

15    is really, still, a shotgun pleading, and so I had looked

16    pretty hard to try to figure out which things it is.

17              I have no Bearden hearing, as one injury he claims;

18    no assistance of counsel; that he paid fees to JCS; that there

19    were threats made to him; that he was arrested for failing to

20    pay; that his probation lasted over two years; and he had

21    probation granted to him when he had no underlying conviction.

22              The causation fails on each of these, Your Honor.

23    It really is impossible to hold a hearing, a Bearden hearing

24    or appoint counsel for him, if he does not come to the

25    hearing, Your Honor.
```

1          Likewise, as the Court is aware, his probation was

2    never revoked.  There is no order out there, Your Honor,

3    revoking his probation.

4          Further, if he had shown up at the hearing, whether

5    he had counsel or whether he had a Bearden hearing would be

6    irrelevant because he has admitted in sworn testimony, Your

7    Honor, that he was intentionally not paying the money and

8    intentionally not coming to his probation meetings, things

9    that were issued that were required of him in a signed

10   probation order by the court, Your Honor.

11         He announced very publicly and repeatedly in his

12   deposition, including page 56, "I ain't going to come and pay.

13   Y'all are just going to have to catch me."

14         Page 61, "I wasn't planning on paying."

15         Page 59, "I wasn't going to pay it."

16         Page 75, "I ain't going to pay y'all nothing."

17         Page 75, "I ain't going to pay you.  It's crazy for

18   me to pay you."

19         Page 92, "No, I wasn't going to pay them, no."

20         Likewise, his intentional not coming to the meetings

21   is just as definitive, Your Honor.

22         Page 62, "I ain't never showed up."

23         Page 75, "I told Ms. Fomby --" that's the probation

24   officer "-- I wasn't coming.  Is always tell her that.  I

25   ain't coming."

1          Page 79, "Like I said, I wasn't going to report."

2          Page 80, "I done missed all 13 meetings."

3          Likewise, causation fails, Your Honor for his

4     monetary claims because he testified that he did not pay any

5     money to JCS, Your Honor.

6          If you will put up his deposition, page 91 to 92 for

7     me, please.  Down at the bottom there on line 18, "Did you pay

8     any money to the City of Childersburg in connection with the

9     charges that we're here about today?"

10          Answer, "No, sir."

11          "Do you know anybody that paid any money on your

12     behalf to the City of Childersburg?"

13          Answer, "If they did, I don't recall."

14          Keep going down, please.  Line 12, "How about JCS?"

15          Line 23, "Do you remember paying JCS any money on

16     any of the charges we're here about today?"

17          Answer, "I know -- no.  That's a definite no.  I

18     wasn't going to pay them.  No."

19          He also testifies, Your Honor, on page 120 of his

20     deposition that he does not want any money in this lawsuit.

21          "Do you want money in this lawsuit?"

22          Answer -- this is line 12.  "Do you want money in

23     lawsuit?"

24          Answer, line 13, "No, sir."

25          THE COURT:  I remember when I was a lawyer asking

1   questions like that and realizing they didn't really have much

2   import.  I think Mr. Evans is the one making claims on his

3   behalf.  But I get the import of the rest of your argument.

4          MR. COOK:  Then we look at the threats, Your Honor.

5   There's no direct causal link on the threats either because he

6   testifies that he never got the notices from JCS and he

7   testified he never went to any of the meetings, Your Honor.

8          THE COURT:  And the crowning jewel in your argument,

9   I think, is going to be he was never arrested for failure to

10  comply with any of these orders?

11         MR. COOK:  Your Honor, you're almost quoting my

12  outline directly.  He was arrested not for failure to pay.  He

13  was arrested for not coming to court.  Each of those warrants,

14  Your Honor, for him -- and there are four times he was

15  arrested:  two outside the statute of limitations and two

16  inside the statute of limitations.

17         The two inside the statute of limitations were

18  clearly after -- each of the four, in fact, were immediately

19  after he failed to come to the court hearing.

20         If you look at the Probation Tracker log, which was

21  kept by JCS, they likewise indicate that it's because he

22  didn't come to the hearing.

23         Let's pull up -- I could use our exhibit or I could

24  use their exhibit, because they've complained that I redacted

25  mine, Your Honor, in compliance with your rules, the cm/ecf

1    rules.  So let's use document 382, the clean one, which is

2    where they filed this, page 118, and let's look at the entry

3    for June 10 of 2010.  June 10, 2010, def, meaning defendant --

4              THE COURT:  I think that's December 10.

5              MR. COOK:  You're right, Your Honor.  Def, meaning

6    defendant, failed to report for hearing.  That's the court

7    hearing, Your Honor.  Warrant issued.

8              THE COURT:  What is "SFOMBY"?

9              MR. COOK:  That is Ms. Fomby, Your Honor.  She was

10   the probation officer for JCS.  She was the one putting this

11   in JCS's log here.

12             THE COURT:  All right.

13             MR. COOK:  Now let's look at the second arrest in

14   the statute of limitations for June 10 of 2011.  Again, Your

15   Honor, June 10, 2011, def, meaning defendant, failed to appear

16   at the court hearing, warrant issued.

17             THE COURT:  And this is on page 117 of 128 in

18   document 382?

19             MR. COOK:  Yes, Your Honor.

20             THE COURT:  And Lisha Kidd entered that?

21             MR. COOK:  Yes, Your Honor.

22             THE COURT:  All right.

23             MR. COOK:  Now let's put up the warrant, which is

24   Exhibit HH2R, motion for summary judgment.  And let's blow

25   this up.  Again, we are at another capias warrant, Your Honor.

1  This is like the other.  And I did want to bring a couple

2  things to this Court's attention.  It's very clear there in

3  the highlighting in the middle of the page that the arrest is

4  for having failed to appear before the Court as ordered.

5       And then what does it ask the police to do?  The

6  police are supposed to arrest him and bring him to appear in

7  court to answer for the non-compliance.

8       And then who signs this warrant, Your Honor?  It's

9  not the City that signs this warrant.  It's the magistrate who

10 is acting in their judicial capacity who was signing this

11 warrant, which happens immediately after Mr. Jews fails to

12 come to each of his hearings.

13      THE COURT:  Did Ms. Wyers -- she scratched through

14 magistrate.  I wonder why.

15      MR. COOK:  Your Honor, I compared that to some of

16 the other capias warrants.  I don't think she is scratching.

17 I think her signature is -- I had the same question.

18      THE COURT:  Well, it looks like she is demarking

19 magistrate.  Maybe instead of scratching out, she is checking

20 it or underlining it.  I thought that was interesting.

21      MR. COOK:  And as this Court is aware,

22 municipalities, cities, don't issue warrants.  Courts issue

23 warrants.  And this warrant being a warrant that the City

24 didn't ask for.  This is not one of those warrants where the

25 police come in and say, hey, judge, mister magistrate, issue

1   this warrant.

2          This is a bench warrant issued by the court at the

3   court's request, Your Honor.

4          And this Court decided -- "this court," meaning, I

5   believe, Judge Blackburn decided in the Woodard v. Town of

6   Oakman case that magistrates are expressly delegated the

7   authority to issue warrants and that there was nothing to

8   indicate that the town there, Oakman, had control of the

9   magistrate's issuance of an arrest warrant.

10         And there are other cases as well, Your Honor.  The

11  Foster v. Walsh case from the Sixth Circuit, 864 F.2d 416,

12  very clearly indicating that warrants are a judicial act.

13         This Court itself in the immunity decision, Your

14  Honor, for Judge Ward made it very clear that exercise and

15  control over post-conviction probation matters are judicial in

16  nature.

17         And, of course, it's within the court's power to

18  issue -- it's, of course, within the court's power, Your

19  Honor, to issue arrest warrants for failing to come to court.

20  I'm sure this Court has done it from time to time.

21         Alabama Rule of Criminal Procedure 9.1(c) makes it

22  clear that the court can issue warrants for arrest when a

23  criminal defendant does not appear at court, Your Honor.  And

24  likewise, the Alabama Attorney General has issued opinions

25  dealing with just this thing.

1          Attorney General Opinion 2012-27:  The Court may

2    issue a warrant for the arrest of the defendant for the

3    failure to appear at a hearing to show cause for failure to

4    pay a fine after notice has been mailed to the defendant's

5    last known address.

6          I do want to address a couple things, Your Honor, on

7    the FTOCO as well.  First of all, Your Honor, the police are

8    duty-bound under the Alabama Code to serve arrest warrants

9    that they are given.

10          Alabama Code 12-14-4 is very clear that the

11    police -- and this is a quote -- shall obey the municipal

12    judge having legal authority in faithfully executing the

13    warrants and processes committed to them for service.

14          So the police serving these warrants was not a

15    discretionary task.  It was a mandatory task under Alabama

16    Code.

17          Also, Your Honor, there is no duty on the police to

18    investigate the underlying charge here.  There's a case, Your

19    Honor, from the presplit Fifth Circuit, Turner v. Raynes,

20    611 F.2d 92.  It's a Fifth Circuit case from 1980, Your Honor.

21    And there, Your Honor, there was a charge that the plaintiff

22    claimed was nonexistent.  There the charge instead of being

23    FTOCO, it was violation of peace.  And the trial judge granted

24    summary judgment to the police that were being sued for having

25    served a warrant on a nonexistent charge, and the Fifth

1    Circuit affirmed, Your Honor.  And they have a fantastic

2    quote.  A policeman --

3            THE COURT:  I take it that means fantastic for you?

4            MR. COOK:  A very descriptive quote, Your Honor.

5    And it is directly on point, I would argue.

6            A policeman's lot is not so unhappy that he must

7    choose between being charged with dereliction of duty if he

8    does not arrest when he has probable cause, or, as here, a

9    warrant, and being mulcted -- I've never heard that word

10   before, Your Honor -- in damages if he does.  It would be a

11   strange and unworkable rule that required a sheriff, at his

12   peril, to determine the ultimate legal validity of every

13   warrant, regular on its face and issued by proper authority,

14   before serving it.

15           Your Honor, I also want to talk about the FTOCO

16   charge.  While this capias warrant incorrectly mentions that

17   there's a conviction already, in fact, once this arrest

18   warrant was served and Mr. Jews was brought back to court,

19   Your Honor, there was a hearing on this charge.  It is listed

20   on the docket for Mr. Jews and it's also listed on the court

21   database with a case number beside it.

22           That's not our database, not the City's database.

23   It's the court's database.

24           That's not our docket.  That's the court's docket.

25   The Court generates that docket, Your Honor.

1    So let's look at Exhibit YY.  Blow up the section at

2    the top.  You can see Mr. Jews there and the charge there is

3    FTOCO, Your Honor.  And you can look there that there's a file

4    date for that charge and then there's a court date for that

5    charge, Your Honor.  The court date being the same day as this

6    docket.

7    Can you scroll up?  I think the court date will show

8    up if you scroll up.  You can see, in fact, it is the court

9    date the docket is being run for the court date of March 10th,

10   Your Honor.

11   There is a docket entry and there is a hearing for

12   this charge.  So after he is arrested, either he stays in jail

13   or he bonds out and he comes to this hearing, Your Honor.  And

14   so it is true that the magistrate, not the City, the

15   magistrate put on the warrant incorrectly he had been

16   convicted of this charge, but ultimately the court did have a

17   docket where this charge is listed as the charge, Your Honor.

18   Next, Mr. Jews claimed he was kept on probation for

19   over two years, Your Honor.  Each of his probation orders,

20   because he was given probation -- each time he came back to

21   court, the judge, not the City, the judge gave him a probation

22   order, an order signed by the judge, Your Honor, and each of

23   those orders had a date on which the probation would expire.

24   So let's look at JJ.  So this is a probation order,

25   Your Honor, issued after he has been brought back to court,

1    and it has got the FTOCO charge on it, and you can see there

2    that he is told that his probation is going to last for

3    24 months or until October of 2011.

4            If you will scroll down you will see -- you can see

5    here, Your Honor, this is, in fact, a probation order signed

6    by Judge Ward.

7            Let's look at EEE, if you don't mind.  Again, at the

8    top of it there, you can see that the order of probation says

9    his probation is going to last until March 8 of 2014.  Again,

10   this is something that the judge has set, Your Honor.  It's

11   not something the City has set.  The City has no control over

12   this.  This is an order of probation.  It's an order that's

13   signed by the judge, Your Honor.

14           It also lists FTOCO as one of the charges there on

15   the list, again, something that the court has put on this

16   order or it's an order that the court has signed.  Again, the

17   City didn't put this on there.  The City didn't sign this

18   order.  The City didn't issue this order.  It is a signed

19   order saying that his probation is going to last until that

20   date.

21           If, in fact, it was wrong, if Judge Ward was wrong,

22   it would be the court doing it, not the City, and there would

23   be appeal rights and habeas rights, Your Honor, to set aside

24   this order.  It would not have been the City doing it.

25           Further, Your Honor, there is Alabama case law

1  saying there's a tolling while a petition of revocation is

2  pending, Your Honor.  So I believe Judge Ward probably had the

3  right to do this.  But it's irregardless of the City because

4  it's the court doing this, not the City doing it.

5         Lastly, Your Honor -- if you'll bring up page 50 of

6  his deposition.  Lastly, he argues that he shouldn't have been

7  put on probation the first time, Your Honor, and this really

8  just illustrates the point that this is the court's decision

9  to put him on probation, the court's decision that he is going

10 to have a hearing, and the court's decision that he is going

11 to have a bench warrant put out for him, the court's decision

12 that there's going to be an FTOCO charge.

13        So here, Your Honor, Mr. Jews testified about what

14 happened in his initial hearing before the court, and if you

15 will see there --

16        THE COURT:  Did you want 50 of the deposition or

17 50 of the --

18        MR. COOK:  Page 50 of the deposition, Your Honor.

19        THE COURT:  It's 51 of the record.  51 of document

20 392-1, is what I'm saying, just so when I read over the

21 transcript, I will know what I'm looking for.

22        MR. COOK:  That's exactly right, Your Honor.

23        So on line 21 there I asked did he, the judge,

24 respond, and Mr. Jews explains about what happens.  He says,

25 "Yes.  Either --" and this is Mr. Jews telling what the judge

1   had said.  "Either you're going to sign the paper for JCS or

2   I'm --" the judge "-- going to lock you up."

3           And I asked him, "That's what the judge said?"

4           "Yes, Judge Ward.  Until you -- he said, 'Either

5   you're going to sign the paper, Mr. Jews, or I'm going to lock

6   you up until you decide you're going to sign the paper.'"

7           Question, "Okay.  You understood that paper to be an

8   order of probation?"

9           Answer, "Yes, sir.  That's what he said.  He made me

10  sign it.  Who wants to be locked up?  I know not me."

11          Question, "And that was the judge that did that?"

12          Answer, "Judge Ward, yes, sir."

13          So here we know that it's the judge personally.

14  I've heard lots of discussion about presigned orders, that he

15  presigned every order or presigned some of the orders.  Here

16  we know that the judge is the one that told him in an open

17  courtroom, directly face-to-face, I'm putting you on

18  probation.  Not the City, Your Honor.

19          Furthermore, this happened in 2009.  It's outside

20  the statute of limitations.

21          I will close, Your Honor, with an observation that

22  there are a lot of individual issues about Mr. Jews, some

23  really difficult facts, I think, for the plaintiff to show

24  direct causal links for his case, Your Honor.

25          Today he is in state prison.  Now, of course, that

1   doesn't stop him from having a case in this court if he can

2   avoid summary judgment, but we just don't understand why he is

3   still being pursued as a class representative when his claims

4   seem so different from the other plaintiffs.  Thank you, Your

5   Honor.

6           THE COURT:  All right.  On behalf of the Fugatts and

7   the more general question of custom, policy, or practice.

8           MR. ANDERSON:  Correct, Your Honor.  We will talk

9   about some law, talk about Monell.

10          But even before we get to Monell, I want to take a

11  step back and look at where we are.  These plaintiffs all

12  claim -- their claims against the City are based on the fact

13  that they allege that they were indigent or poor or unable to

14  pay their fines and as a result of that they were placed on

15  probation and deprived of various rights that are guaranteed

16  by the Constitution.

17          But the first question is:  How do we guarantee

18  those rights that are provided by the Constitution to criminal

19  defendants?  And there are several ways that that's done.

20          We have rules of criminal procedure that have to be

21  followed.  We have appellate rights where defendants can seek

22  review when a judge gets it wrong.  And they've cited some of

23  those cases in their brief.  We have in Alabama the Judicial

24  Inquiry Commission and the Court of the Judiciary.  You have

25  seen, I'm sure, some of the supplemental --

1          THE COURT:  The Montgomery judge.

2          MR. ANDERSON:  The Montgomery judge, where we have

3     seen the state judicial system taking action against --

4          THE COURT:  You also have habeas protections.

5          MR. ANDERSON:  That's right.

6          THE COURT:  State and federal.

7          MR. ANDERSON:  That's correct.  And so there are

8     lots of options and different ways to pursue relief.

9          THE COURT:  I've got that.

10         MR. ANDERSON:  One of those ways that we also have

11    is 1983 actions.  Of course, 1983 provides that every person

12    who under color of statute or ordinance and so forth subjects

13    or causes to be subjected any citizen of the United States to

14    the deprivation of any rights secured by the Constitution

15    shall be liable to the party injured in various ways, an

16    action at law, a suit in equity, or other proper proceedings

17    for redress.

18         One of the cases that the plaintiffs have actually

19    cited, a recent case that the plaintiffs cited in their

20    opposition to the summary judgment, talks about that a little

21    bit more.  It's the Oglala Sioux Tribe versus Hunnik.  It's a

22    2016 case from the Western District of South Dakota, 2016 WL

23    697117.

24         And there, the district court said that the state

25    court judge's rule-making functions subjected him to

1   Section 1983 jurisdiction for declaratory and injunctive

2   relief.  The court went on to explain what I think is

3   pertinent here, said that the very purpose of Section 1983 was

4   to interpose the federal courts between the states and the

5   people as guardians of the people's federal rights to protect

6   the people from unconstitutional action under color of state

7   law, whether that action be executive, legislative, or

8   judicial.  In carrying out that purpose, Congress plainly

9   authorized the federal courts to issue injunctions in

10  Section 1983 actions by expressly authorizing a suit in equity

11  as one of the means of redress.

12          And this court long ago recognized that federal

13  injunctive relief against a state court proceeding can in some

14  circumstances be essential to prevent great, immediate, and

15  irreparable loss of a person's constitutional rights.

16          Now, we talked about that, I'm sure you will recall,

17  several months or possibly even years ago now when plaintiffs

18  were seeking deposition testimony from Judge Larry Ward.

19  There was an argument over the extent to which he was entitled

20  to judicial immunity, and the plaintiffs themselves argued

21  there that not even acts or omissions performed in a judicial

22  capacity are immune from prospective declaratory relief and

23  certain forms of prospective injunctive relief under Pulliam

24  and the amendments to 1983.  And they argued that Judge Ward

25  would have no immunity from those forms of prospective

1    declaratory and injunctive relief even if he had been sued for

2    such relief personally and therefore he had no immunity from

3    discovery there.

4            My point in saying all this is they acknowledge

5    there that they did not sue Judge Ward here to try to get

6    relief from the injuries that they claim were suffered.

7    Instead, they have sued -- their claims are against the City

8    of Childersburg under 1983.

9            And so that brings us to Monell.  And, of course, as

10   you know, Monell recognized that persons -- in 1983, that

11   local governing bodies can be considered persons.  There's

12   some other things that the Supreme Court stated in that case

13   that I think we have mentioned in briefs but we sort of

14   glossed over because we've talked about them so many times,

15   and that language that the Court uses there is really the

16   bedrock and the foundation of the extent of municipal

17   liability.  So I think it's worth looking closer.

18           What the Court actually said in 1978 in Monell is

19   that municipalities can be sued under 1983 where the action

20   that is alleged to be unconstitutional implements or executes

21   a policy statement, ordinance, regulation, or decision

22   officially adopted and promulgated by that body's office.

23           The Court went on to say, however, Congress did not

24   intend municipalities to be held liable unless action pursuant

25   to official municipal policy of some nature caused a

1  constitutional tort.

2         If the City does something and something that the

3  City does causes the deprivation of rights, then --

4         THE COURT:  What do I make of the argument that I

5  perceive from plaintiffs that at least part of the custom,

6  policy, or practice here was the adoption and administration

7  of the contract that Judge Ward has, under oath, avowed and

8  said he had nothing to do with the retention of JCS or the

9  formation of the agreement with JCS?  Because even though the

10 minutes of the city council say it's on his recommendation, he

11 says I did not recommend that.

12        MR. ANDERSON:  Well, I don't think that it matters,

13 frankly, whether the judge recommended the contract or whether

14 the City decided to enter the contract on its own.

15        THE COURT:  What if he had nothing to do with the

16 contract?  What if the City on its own imposed the contract on

17 the municipal court?

18        MR. ANDERSON:  I think that's totally fine.  As we

19 talked about when we were briefing -- or we weren't involved,

20 but on briefing on the motion to dismiss the plaintiffs'

21 second amended complaint, this Court recognized that under the

22 Alabama Code, that municipalities when they choose to

23 establish a municipal court they also may choose to provide

24 probation or other services to support that court, and

25 necessarily implied from that is the power to hire third

1   parties to provide services for the court.

2          And so cities can do that on their own regardless of

3   whether or not the judge recommends it or they decide to do

4   it.  But what the Court said at the motion to dismiss stage is

5   that we, the defendants, were missing the theoretical crux of

6   the plaintiffs' case.  You said that the plaintiffs contend

7   that in carrying out its duty to assist and support the

8   Childersburg municipal court, Childersburg entered into a

9   contract that handcuffed the autonomy of the municipal court

10  and imbued JCS with a power unchecked by procedural

11  safeguards.

12          It was on that basis that the Court found that it

13  was adequately or plausibly pled a cause of action against the

14  City of Childersburg based on that contract.  Of course, at

15  that time the contract was not before the Court.  We didn't

16  have testimony from Judge Ward, but we do now.

17          And discovery has shown that both of those things on

18  which the Court found liability may be imposed against the

19  City, both of those things are not supported by the facts and

20  the evidence.

21          THE COURT:  Is Wilkins a key lynchpin in the

22  argument there, the Wilkins decision?

23          MR. ANDERSON:  It's -- remind me what Wilkins says.

24          THE COURT:  That Alabama law permits a city to make

25  private probation services available to its municipal court.

1    MR. ANDERSON:  Sure, that's part of it.  You are

2  certainly allowed to provide that, but there's the Attorney

3  General's opinion, there's Eleventh Circuit opinions that

4  recognize the authority to provide that service.

5    THE COURT:  But I'm still at least asking at this

6  point how do I treat -- there may be a difference between a

7  city providing services to a court and in this situation the

8  court almost seemingly acting as if it doesn't understand how

9  these services came about.

10    It was a very odd deposition of Judge Ward, wasn't

11  it.

12    MR. ANDERSON:  I don't disagree with that.

13    THE COURT:  Now, that may or may not make a

14  difference to your client, but certainly Mr. Evans thinks it

15  does.  And he's going to tell me why in a minute.  Why don't

16  you just go ahead and see if you can't address that now.

17    MR. ANDERSON:  Well, what I would say is -- it was

18  an odd deposition and it's also somewhat an odd contract,

19  because it says --

20    THE COURT:  What was the consideration that the City

21  received for this contract?

22    MR. ANDERSON:  What the City received is -- really,

23  it's what the municipal court received.

24    THE COURT:  That's not what I'm asking.  I'm asking

25  what consideration did the City receive with respect to this

```
1    contract.

2          MR. ANDERSON:  The City is not providing -- is not

3    having to incur any expense for the services to be provided.

4    I don't disagree with that.

5          THE COURT:  Normally those services would be paid

6    for by the City.  In this instance, the City is shifting the

7    cost of providing probationary services directly to JCS, and

8    JCS on the one hand has a provision in the agreement that says

9    we will provide for fees with respect to every probationer.

10          There's another clause in the contract, though, that

11    says we will have a role -- the City has no role in

12    administering the probation services, perhaps, but there's

13    another provision that says that JCS will not collect fees

14    from anyone who is indigent.  Those seem to be irreconcilable

15    in terms of the statements that JCS makes as to what it will

16    provide the City.

17          MR. ANDERSON:  Sure.  And that's why I said it is an

18    odd contract, and we can actually -- will you go to the next

19    slide, Exhibit C to the contract.

20          THE COURT:  Well, I think they want you to address

21    this, perhaps.  Go ahead.

22          MR. ANDERSON:  So this is what you're talking about,

23    Judge.  I think this is what you're talking about, is Exhibit

24    C, provides compensation to JCS.  The court agrees that each

25    court order shall provide for the following:  probation fee of
```

1    $35 per month flat fee.  And I have questions about --

2              THE COURT:  But how can the City contract as to what

3    the court will do with respect to future probation cases?

4              MR. ANDERSON:  I don't know that it can, but what --

5              THE COURT:  Particularly when you add to that the

6    fact that Ward says he doesn't even know about this contract.

7              MR. ANDERSON:  Right.  And I don't think the

8    evidence has shown in the record how it came to be that he

9    knew to put $35.  I'm assuming that JCS told him this is what

10   it is in our contract with the City and that's what's done.

11             But this Court doesn't have to answer that question

12   or decide that question about whether or not the City can do

13   that or the effect of the City having that term in its

14   contract in this case, because these plaintiffs all claim that

15   they were indigent and not able to pay when they came to court

16   and that it was a result of the City's contract that mandated

17   that they be automatically put on probation if they couldn't

18   pay and assessed --

19             THE COURT:  So what you're saying the first is a

20   general statement as to what the contract will do and the

21   second is a specific exception to that that applies when

22   someone's indigent as determined by the court?

23             MR. ANDERSON:  I'm saying that that's correct,

24   that's what it says in the contract, but I'm also saying that

25   regardless of what it says in the contract, the judge -- what

1    you said in the order was that this contract handcuffed his

2    autonomy and told him what to do.  He had never seen it.  He

3    didn't say --

4              THE COURT:  Isn't your best argument this:  The City

5    does not have the authority to commit the judge to $35 --

6              MR. ANDERSON:  That's right.

7              THE COURT:  -- per order as far as a flat fee;

8    that's the judge's job; and whatever commitment is made by the

9    City to JCS or JCS to the City is trumped -- if I can use that

10   term these days -- by the judge's authority to comply with

11   Alabama law with respect to probationers?

12             MR. ANDERSON:  That's exactly right.  And the

13   evidence supports that.  You will see even in the Fugatts'

14   case, they did not -- there were occasions where their

15   probation -- even though he didn't make the determination as

16   to whether or not they were indigent, he waived their fees.

17             THE COURT:  Well, the evidence seems to support that

18   indigency determinations were, as a general course, not made.

19   Fair?

20             MR. ANDERSON:  I think that's fair.

21             THE COURT:  Clearly a violation of someone's rights.

22   Now, who is responsible for it is why we're here on your

23   motion.

24             MR. ANDERSON:  That's right.  And there's nothing in

25   this --

1    THE COURT:  But let me just say this.  A few times

2    in your briefing you lapsed into an argument that went

3    something like this.  No one's rights were violated, but if

4    they were violated, it wasn't us.

5    MR. ANDERSON:  I think the brief said something to

6    that effect.

7    THE COURT:  I'm going to say it's error to say that

8    no one's rights were violated here.  That's why the Montgomery

9    judge gets suspended in Montgomery for similar practices

10   because that judge was violating people's rights.

11   Now, from time to time we make errors.  Sometimes I

12   get reversed by the Eleventh Circuit and from a technical

13   standpoint that may be that I violated someone's rights by not

14   getting the ball right when I interpreted it or the procedure

15   right when I applied it.

16   But that's not this case.  This case involves a

17   court system at best for you, a city at best for Mr. Evans,

18   that continuously and regularly failed to comply with what

19   Alabama law says must be done when dealing with probationers,

20   right?

21   MR. ANDERSON:  Right.

22   THE COURT:  So there's really no argument there

23   wasn't constitutional violations here.  The argument is who is

24   responsible for them.

25   MR. ANDERSON:  Correct.  And that really is the

1   argument.  Is the City responsible; did the City directly

2   cause it; does it have a policy or custom --

3         THE COURT:  And before JCS gets nervous about not

4   having input, I'm not even talking about JCS in this quotient.

5   I'm talking about the City versus the judge or the court.  But

6   I'm going to let them have free reign and a clean slate when

7   they make their arguments on their motions that are not yet

8   under submission.

9         MR. ANDERSON:  Good, because I can't answer any

10  questions that relate to them.

11        THE COURT:  I thought that might make Larry a little

12  more comfortable.

13        MR. LOGSDON:  Yes.

14        MR. ANDERSON:  So that really is the question, is

15  who caused it.  And for the municipal -- if the judge caused

16  it, if the judge is the one who is responsible, we have talked

17  about there are remedies and rights to seek relief from that

18  that you just mentioned.

19        THE COURT:  I think I have your argument.  Anything

20  else you wanted to say?

21        MR. ANDERSON:  Not if you don't want me to.

22        THE COURT:  I think I'm ready to hear from Mr. Evans

23  to address some of these questions.

24        MR. ANDERSON:  Very good.

25        THE COURT:  Mr. Evans, just jump in wherever you

1  think the water is warmest.

2        MR. EVANS:  Well, I've got a lot to say, Judge, and

3  I know you know this case very well, and I'm not going to do a

4  first grade approach on Monell.  You know that case law very

5  well.

6        There are a lot of devils in the details on these

7  things.  There are a lot of devils in the details on some of

8  the documents that Greg was showing part of but not all of,

9  and I will go into some more detail on that.

10       But I think, as we both discussed initially, the

11 ultimate question is:  Is there a City policy that brought

12 this about?

13       THE COURT:  Give me your best argument as to what

14 the City policy is and how it caused the violations.  Let's

15 start there.

16       MR. EVANS:  Sure.  Well, obviously the city council

17 and the mayor are policymakers.  There's not any issue about

18 that, under Alabama law.  Obviously, those were the entities

19 that set this entire process in place.

20       THE COURT:  When you say "this process," you're

21 talking about this contract, this arrangement?

22       MR. EVANS:  And the practice that followed the

23 execution of the contract.  You can't look at just the

24 contract and say that's all that happened because the City

25 continued to renew that for 10 years.  This is not a one-off

 1   kind of situation like some of the cases the defendants have

 2   cited from the Fifth Circuit, which weren't even precedential

 3   value, but this is a situation and a system that lasted for a

 4   full 10 years, affecting hundreds of people, over 2000 --

 5          THE COURT:  But during that entire 10 years, it was

 6   Judge Ward who was the municipal judge?

 7          MR. EVANS:  Yes, sir.

 8          THE COURT:  So he was the municipal judge during all

 9   relevant time periods with respect to your client's claims?

10          MR. EVANS:  And until we sued them.  One of the

11   interesting things, I think, they make this very passionate

12   argument, oh, it's not us; it's the court.

13          THE COURT:  But when they changed judges, the new

14   judge on November 1, 2014, cut loose all the probationers.  Is

15   that what you were about to say?

16          MR. EVANS:  Well, that's part of what I'm about to

17   say.  In their brief, both in the Jews brief and the Ray

18   brief, they offer a footnote, footnote 16, document 391, which

19   I think is, I guess, being charitable to my colleagues on the

20   other side of the courtroom.  It may be a Freudian slip but a

21   correct one nonetheless.  In that they say that all of our

22   requests for injunctive and declaratory relief really ought to

23   be moot now because, quote, Childersburg has appointed a new

24   judge; Childersburg has appointed a new magistrate;

25   Childersburg has adopted extensive new procedures which

1   address all concerns; the court has not placed anyone on

2   probation or issued any probation-related warrants, and the

3   court has recalled all warrants at issue related to probation.

4       THE COURT:  I understand why you would call that a

5   Freudian slip, but I also understand that the City does not

6   have the authority to do those things.  The City does not have

7   the authority to make judicial policy.  It doesn't matter how

8   they characterize it or you characterize it.

9       I think the question may come down to:  Who had the

10  authority to do this and who did not.

11      MR. EVANS:  Well, I think there are many areas where

12  there was no authority, but --

13      THE COURT:  Like which areas?

14      MR. EVANS:  Well, I don't think the City has the

15  authority to bind the court in a true sense, yet the Court

16  adopted that exact procedure blindly.  One of the --

17      THE COURT:  Well, that would be the court's fault,

18  not the City's fault, wouldn't it?

19      MR. EVANS:  If you're looking at it as a true

20  judicial separation, I would agree with you.  But, Judge, we

21  cited to you in the brief.  It's not like Article III of the

22  United States Constitution when you're talking about --

23      THE COURT:  No, I'm talking about Article VI,

24  Section 139(a) of the Alabama Constitution, which says the

25  judicial power of the State is vested exclusively in a unified

```
 1    judicial system that includes such municipal courts as may be
 2    provided by law.
 3            MR. EVANS:  Right, and I'm very aware of when the
 4    Judicial Article came in.  I remember Judge Heflin working on
 5    it.  But the problem with that application here --
 6            THE COURT:  That's an advantage you have over the
 7    rest of us.
 8            MR. EVANS:  And probably a disadvantage in some
 9    other ways.  But the problem with that when you apply it to a
10    municipal situation is that every city does not have to have a
11    court.  Every city can disband the court if it has one.  If it
12    chooses to have one, it hires and contracts with the judge and
13    it hires and contracts with the magistrate and any other
14    personnel that might be attributed to that function.  So
15    you don't have --
16            THE COURT:  But under Wilkins --
17            MR. EVANS:  You don't have the -- excuse me for
18    interrupting you.
19            THE COURT:  Go ahead.  I interrupted you.
20            MR. EVANS:  One of the things I think that was
21    interesting in Judge Ward's deposition is he said I don't hire
22    these people; I don't supervise them; I don't employ them; I
23    have no control over them; I simply work with them.
24            Now, when you take that piece of the puzzle and then
25    you back up and you say what happened after the City said,
```

1   judge, you are going to use JCS -- and if I could digress for

2   just a minute on one of your earlier questions about

3   consideration.  The consideration the City got was we're going

4   to get our fines collected for free.  It's not going to cost

5   us a penny, like in the Wilkins case --

6           THE COURT:  Well, let me ask you this.

7   Hypothetically, if a city ever perceives that a judge is

8   violating someone's constitutional rights, whether it turned a

9   blind eye to it for 10 years or not, wouldn't that be a basis

10  for requiring that city judge if you perceive that that judge

11  was not protecting the civil rights of the people who appear

12  before it, the people of your community?

13          MR. EVANS:  An unrelated issue, but I would agree

14  with you.  It's also a basis for a 1983 action saying the City

15  has adopted that by absolutely understanding it, knowing or

16  should have known about it, and have done --

17          THE COURT:  So it's your theory, really, then, that

18  the City could have stepped in and stopped this all along by

19  firing Judge Ward or putting pressure on him to comply with

20  people's constitutional rights?

21          MR. EVANS:  They could have, but that's not the

22  whole picture.  And if I could show you a little bit more of

23  it, I would like to.

24          THE COURT:  Sure.

25          MR. EVANS:  The way this started was that contract

1   10 years ago.  And the City says this is a great deal; we

2   don't have to pay anybody, like Wilkins who is paying a

3   contingency fee to a bill collector; we get it free.  What do

4   we have to do?  We have to say our city court will in every

5   order of somebody who is sent to JCS require that person to

6   pay the JCS fees.  How do you get on JCS?  Because you can't

7   pay the fines and costs when they are adjudicated.

8          THE COURT:  But it also has language in the contract

9   saying that it's for the judge to determine indigency and no

10  fee would be applied then?

11         MR. EVANS:  Yes, sir.  And guess what.  That was

12  never done.  Why was it not done?  Because JCS would have

13  never gotten anybody.  And we're not talking about a situation

14  where an official determination of indigency is required.

15         THE COURT:  Who has the responsibility for doing an

16  indigency analysis?

17         MR. EVANS:  If you're talking about an indigency

18  analysis such as required for appointment of counsel or

19  remitting some fines or things of that nature, obviously

20  that's the court.  But what we're talking about here, if I may

21  respond, is that simply JCS got people because they couldn't

22  pay the fine.  That was the only lynchpin that got them to

23  JCS.  Not that they had to be determined to be at this level

24  of poverty or this level of poverty.  Only that they were

25  sufficiently poor that they couldn't pay the fine.  That was

1   enough to put them on JCS.

2          THE COURT:  Why isn't the City responsible for that?

3          MR. EVANS:  Because that was the contract they

4   entered into.

5          THE COURT:  The contract they entered into said $35

6   per case unless -- no such fee if someone is indigent as

7   determined by the court.  Isn't that a fair reading of the

8   contract, the only reading you can make of this contract?

9          MR. EVANS:  If you blind all the facts around --

10          THE COURT:  I'm just talking about what the contract

11   provided for.  Let's start there.

12          MR. EVANS:  -- without any of the ensuing practice.

13   The contract speaks for itself.  It says that.  It says

14   that --

15          THE COURT:  Then the practice develops that that

16   isn't followed, is your argument?

17          MR. EVANS:  And that practice is being used --

18          THE COURT:  But whose practice is that?

19          MR. EVANS:  That's the practice that was adopted by

20   Childersburg under the JCS system.

21          THE COURT:  How?  How did Childersburg adopt that?

22          MR. EVANS:  Well, because --

23          THE COURT:  Could Childersburg have said -- I guess

24   they could have said we're not going to put into our city

25   coffers any such payment that we second-guess the judge on and

1    believe is required of an indigent.  But why wouldn't

2    Childersburg be able to rely upon the court to make

3    determinations about that and not be in a position to second-

4    guess a judicial decision?

5           MR. EVANS:  Well, I think if you -- you need to look

6    at this system as a whole.  To suggest this is a legitimate

7    probation is --

8           THE COURT:  I'm not, but my question asks this.  It

9    is not a legitimate probation.  It is a probation which

10   violates your clients' rights; no ifs, ands or buts.  But who

11   was responsible for it?  Was it the court?  Was it the City?

12   Was it JCS?  Was it the court and JCS?  Or was it all three?

13          MR. EVANS:  I think it was all three, Your Honor.

14          THE COURT:  That's what you need to explain to me.

15          MR. EVANS:  And I will be happy to.  Obviously, in

16   our complaint we have alleged repeatedly that this was a joint

17   system.  And certainly the court and the magistrate, if you

18   consider her a court personnel, although she is -- she's

19   probably being an administrative person.  But even given that,

20   those are some of the cogs in this wheel, but they're not the

21   only cogs.

22          What happened in this situation is once a person was

23   placed on JCS, these niceties of probation orders, revocation

24   orders, and findings on that were absolutely immaterial.  It

25   didn't make any difference.  The City didn't even keep any of

1    those.  We had to get what we got out of the JCS Probation

2    Tracker.

3          When we took Ms. Kidd's last deposition, she said

4    after she was fired she spent two weeks entering orders into

5    the JCS Probation Tracker and shredding copies of unsigned

6    orders that she still had in her office.  To suggest this was

7    a judicial action really overlooks the ruse that was simply a

8    collection/extortion scheme.  And the way it happened was once

9    a person was on there, and how did they get on there?  They

10   get on there because they can't pay the fine originally.

11   Every month their burden goes up.  If they miss a meeting, the

12   meetings get more frequent, as they did with Gina.  They

13   didn't tell you she attended 22, but they got to be almost

14   every day.  But the burden gets greater and greater.  And when

15   JCS decides -- and in Mr. Jews' case, it was less than two

16   weeks after he was on probation, they decided he needs to be

17   revoked, Judge.  They use their petition, their form petition,

18   requesting that the person be arrested.

19         Well, Heaven's sake.  Every time that was requested,

20   the Childersburg magistrate said, Fine; here is an FTOCO

21   order.  It didn't matter if she put on there bird watching.

22   They were going to pick the person up and they were going to

23   keep --

24         THE COURT:  How do you square your argument with the

25   language from Wilkins in which the Court said that

1    municipalities may contract with a private firm to aid in the

2    collection of delinquent municipal court fines to fulfill

3    their duties to adequately support municipal courts?

4            The Alabama Supreme Court has recognized that a

5    municipality has a duty to support the court.  It said that it

6    may collect delinquent municipal court fines in support of

7    that duty, and Alabama law recognizes that municipalities hire

8    the personnel for the Court, but that the Court personnel are

9    regulated by state law.  A municipal judge has to have a law

10   license.

11           How do you square this scheme of overview that we

12   have with respect to the municipal court where there's checks

13   and balances within the state system to make sure that

14   municipal courts are complying as they should with things like

15   the Alabama Rules of Criminal Procedure, but at the same time

16   the City is obligated to support and accommodate the municipal

17   courts to allow them to carry out their judiciary functions?

18           MR. EVANS:  That's a broad question.  I will try to

19   answer it.

20           THE COURT:  It is.  Give me as broad an answer as

21   you think you need to.

22           MR. EVANS:  Well, I think a lot of it depends on

23   which piece you're looking at.  With Ward –– everyone knows

24   that there was a JIC complaint made against Judge Ward.  Lisha

25   Kidd testified to that.  Haynes in Montgomery, the

JIC complaint, obviously he deserves to be thrown off whatever
posture he had there.

      If we were to take some improper actions as
attorneys or a member of the Federal Bar, I could be
sanctioned for that.  That doesn't have the same direction,
the same purpose as a 1983 action challenging the City's
participation and establishment of --

      THE COURT:  And the reason you didn't sue the court
or the judge under 1983 is that would have been a nonstarter?

      MR. EVANS:  Well, we could have enjoined it, but by
the time we got the lawsuit up and going, he had retired with
an award from the City for his many years of good service, and
I doubt he is going to step forward to pay the many hundreds
of thousands of dollars that have been taken from these people
out of his own pocket.  So it looked like a nonstarter to me.

      THE COURT:  Probably you couldn't collect money
damages from him, could you?

      MR. EVANS:  I could not.  It would have been an
injunctive relief only, and it would have been moot at that
point because he's gone.

      But when you look at how this happened, it wasn't
like Ward was any real significant judicial figure in the
process.  He was simply an administrative staff signing blank
orders.  The city clerk not even keeping copies of those.  The
petitions for revocation, you won't find there was a

1    finding -- I mean, if you have a hearing here, Judge, and you

2    have someone brought before you on a petition to revoke,

3    you're going to have a hearing, you're going to have findings

4    of fact, you're going to have testimony, you're going to enter

5    an order.  There's not any of that in this case.

6            THE COURT:  But he was obligated to do that, right?

7            MR. EVANS:  He was.

8            THE COURT:  Under Alabama Rules of Criminal

9    Procedure?

10           MR. EVANS:  Absolutely.

11           THE COURT:  And in particular, Rule 26.11?

12           MR. EVANS:  Exactly.  And guess what.  There were

13   none.  And the reason is because it didn't make any

14   difference.  This is a collection system.  All they want is to

15   get the person back in paying more fees; and if they don't,

16   they're going to put them in jail.

17           And in the situation of these arrests, the FTOCO

18   arrests, strain as they might, my friend Greg Cook tries to

19   paint this pig with more lipstick, you can't change a

20   "convicted of FTOCO" to another charge without completely

21   rereading that warrant.

22           Even removing that and saying they're being brought

23   before the court on some kind of contempt charge, there are no

24   findings of contempt.  There are no findings of a petition to

25   revoke.  There's no findings of a -- that you had notice about

1   this hearing and failed to appear without justification.

2          THE COURT:  And I am very sympathetic to your

3   arguments in this respect.  I think you may have a point, that

4   what was going on here was a characterization of what

5   essentially amounts to a probation revocation or some type of

6   contempt charge.  But you would have to admit, I think, that

7   if someone fails to comply with my order, I have a right to

8   bring them back up here and give them some penalty for not

9   complying with my order?

10          MR. EVANS:  Your Honor, if you did that -- and

11   there's no question in my mind that person would have had

12   notice about it, they would have had an opportunity to be

13   heard on it, there would be a finding on it.  We don't have

14   any of those niceties of due process in this case.

15          All we have is:  You can't pay?  You're going to go

16   to jail.  And when you get out of jail, you're going to be

17   back on probation until you pay.

18          THE COURT:  Here is the question:  Does the City

19   have any authority to tell someone that?

20          MR. EVANS:  That's the reason we are here.  Under

21   the constitution --

22          THE COURT:  Does the City have any authority in and

23   of itself to put someone in jail?

24          MR. EVANS:  Well, under certain circumstances if the

25   ordinances are violated, their police can execute a warrant

1   for those ordinances.

2   　　　　　THE COURT:  That's a warrant.  That's an arrest

3   warrant.  The judge is the one that holds the key to having

4   someone arrested or someone hailed before the court.  You're

5   right; the City can arrest someone.  Sometimes you have an

6   arrest that occurs because there's probable cause at the time

7   of the arrest to determine that the law was violated.  But

8   even then, if it's a grand jury matter, it has to go before a

9   grand jury.  If it's not a grand jury matter, it has to go

10  before a court for a determination of whether the arrest was

11  proper; and if the arrest is improper for some reason, there's

12  no charge, right?

13  　　　　　MR. EVANS:  Right.

14  　　　　　THE COURT:  That's the way the court should work.  I

15  realize your point is that's not the way this court worked.

16  　　　　　MR. EVANS:  No.  The court was simply a cog in the

17  wheel.  It didn't matter if it was a court or the city clerk.

18  And those were all involved as well.

19  　　　　　Now, you will recall from the testimony you have

20  seen in the case over the past few months is that once JCS

21  said this guy is not paying quick enough, they determined, and

22  the court and the City promptly went along with --

23  　　　　　THE COURT:  How did the City go along with it?

24  　　　　　MR. EVANS:  Well, they issued the warrant and

25  executed the warrant through its police and jailed the people.

1          THE COURT:  But you heard the quote that Mr. Cook

2     read to me.  Police aren't in a position, when there's a

3     warrant, to ignore it.

4          MR. EVANS:  Well, they're in a position to know that

5     the charge I'm picking someone up on doesn't exist.

6          We took Chief McClelland's deposition.  He alleges

7     to be an attorney.  He and the mayor both could not affirm

8     that it was illegal to put someone in jail because they

9     couldn't pay.  He testified he had never seen an FTOCO, did

10    not know what that meant, never saw any such charge

11    adjudicated; but, nonetheless, he was going to pick them up

12    and put them in jail.

13         THE COURT:  Nevertheless, regardless of whether they

14    proofread the warrants, whether someone has been previously

15    convicted of FTOCO or charged with an FTOCO, whatever in the

16    world FTOCO might mean in this case, it's not for the police

17    to second-guess that, is it?

18         MR. EVANS:  I think it is, to some degree.  You

19    can't just say I'm arresting a person for bird watching and

20    I'm the chief of police of Childersburg.

21         THE COURT:  So if I tell my friend back there in the

22    blue jacket that someone in this courtroom needs to be taken

23    into custody and I direct him to take them into custody, he is

24    supposed to evaluate, well, does the judge really have a good

25    reason for me doing this?

1           I bet if I asked him if he was going to make that

2    evaluation, he might say no, sir.

3           MR. EVANS:  Well, I think your juxtaposition of a

4    federal judge with a great deal of authority and respect to

5    Larry Ward is huge apples and oranges.

6           THE COURT:  Well, I'm just talking about a judicial

7    officer and a law enforcement official who is tasked with

8    carrying out orders of the court.

9           MR. EVANS:  If the law enforcement officer knows the

10   charge doesn't exist, then yes, sir, I think he -- the statute

11   in the state says he is an officer of the state.  I'm an

12   officer --

13          THE COURT:  How do you square that argument with

14   what Mr. Cook tells me is binding Fifth Circuit precedent?

15          MR. EVANS:  He starts off with it's a valid charge.

16   He starts off with it's a valid charge, in the quote he read

17   to you.  This is not a valid charge, Your Honor.

18          But set that aside.  Even if you want to give cover

19   to the court and you want to cover poor, sick Ms. Wyers, which

20   I would love to talk to, and if you want to cover the police

21   chief that says he is just a blind sheep carrying out these

22   presigned orders, then what happens then?  Well, they go to

23   jail.

24          And in the case of Mr. Deunate Jews, on his arrest

25   in 2010, 2009, he sat in jail for 41 days.  Now, you see these

1    documents that --

2          THE COURT:  What do you make of Mr. Cook's argument

3    that he sat in jail for 41 days because he wasn't going to

4    pay?  It wasn't a matter that he was unable to pay; he just

5    wasn't going to give them a penny?

6          MR. EVANS:  He was homeless.  I don't blame him for

7    being mad.  His deposition was taken at the Talladega jail.

8    This is a classic example of a person who had no criminal

9    record and who was criminalized by this system, and he is

10   angry.

11         But the simple fact of it is he did pay, and I can

12   show you the documents about this.

13         THE COURT:  I'm just asking -- I'm juxtaposing his

14   argument with what you're telling me.

15         MR. EVANS:  Yes, sir.  He did pay.  And the records

16   of the City show that he paid.  The particular records of the

17   receipts show that all of the charges after his initial charge

18   for domestic violence, which was dismissed with no jail

19   sentence whatsoever, only to pay court costs of $166, and the

20   fellow couldn't even pay that.  So guess what happens?  He is

21   jailed three times, four times, spends 80 days in jail.  Had

22   the City given him credit at $15 a day, he would have even

23   paid these ridiculous added-on warrant fees that they had no

24   justification or basis for adding on.

25         THE COURT:  Why isn't the City's municipal court

1   judge the final policymaker responsible for the terms and

2   conditions of any probation orders including JCS's probation

3   practices?

4          MR. EVANS:  You would have to presuppose that he was

5   the one that brought JCS in, and he did not.  You would have

6   to presuppose that he was the author of these orders and that

7   they were the result of an adjudicatory process where he made

8   a decision, and they were not.  They were signed in blank,

9   many of which were shredded after this deposition.  They had

10  so many blanks stored up at the JCS office.  You would have to

11  presuppose that this was something that he would have used for

12  some purpose other than collection.  The testimony before the

13  Court is once the fines were collected, the probation was

14  over.  That was part of the process.

15         But one other link I wanted to point out to you, you

16  may remember Ms. Hepp.  You had to sit through part of her

17  deposition in your courtroom.  They instructed her not to

18  answer 17 times.  So we have her deposition here.  And we find

19  out that she was a police clerk for much of her time at

20  Childersburg, and we present to her all these documents where

21  she is signing releases for people to get out of jail and

22  return to the JCS municipal court.  She is establishing

23  payments that they have made, bonds that have been established

24  showing the amount that's claimed owed on them.  They go to

25  jail because they can't pay and they can only get out of jail

1    if they pay the amount they owe.  And she is enforcing every

2    bit of that as a city clerk of the City.  The next thing we

3    see is the money is collected --

4            THE COURT:  Let me ask you this.  The City enters

5    into this same contract, exact same language, and Judge Ward

6    does what he is supposed to do.  He holds an indigency hearing

7    with respect to anybody who can't pay; or at a minimum, when

8    someone doesn't pay, he asks why and evaluates that reason.

9    He tells JCS you cannot collect your fee with respect to any

10   of my probationers who aren't able to pay a fee, and he

11   supervises JCS as he was supposed to have done.  We're not

12   here, are we?

13           MR. EVANS:  He would be fired, to start with.

14           THE COURT:  Well, then we might be here on a

15   different claim or we might have a newspaper headline on a

16   different story, but we wouldn't be here in this case?

17           MR. EVANS:  Well, if there had been no damage to any

18   of the plaintiffs, we wouldn't be here, if that's the ultimate

19   result, what you're saying.

20           But the thing that started this was not Judge Ward,

21   not his action.  The thing that started this was the City

22   policymakers putting in place this system that was applied,

23   essentially, in this fashion throughout the state.

24           THE COURT:  What evidence is there that they put

25   this in place, this system, other than they entered into this

contract without Ward's approval, knowledge, or blessing or recommendation and they received the fruits in their city coffers of any fines that the court required or JCS imposed?

MR. EVANS:  I didn't hear the last part.  What evidence is there of --

THE COURT:  What other evidence is there that they in any way administered this program other than those two things?

MR. EVANS:  Well, I will go through some of it again.  As far as -- let me digress for just a minute.  The mayor testified in his deposition we hired these folks to collect fines.  So they knew they were going to do that.

THE COURT:  Sure.  That is not, in and of itself, improper.  They could be hired to collect lawful fines.

MR. EVANS:  And I want to address Wilkins.  We've gotten down the road from that, but I want to address that for you in just a moment.

THE COURT:  But right now I want you to focus in on this.  You said the City got this all rolling by putting this program in place.  And I'm asking you what they did to put the program in place other than:  A, entering into the contract without Ward's involvement; and, B, continuing to place into their city fisc the fines that were paid in by probationers pursuant to either Judge Ward's order or JCS's alleged misconduct?

1          MR. EVANS:  Well, there are a number of things.

2     We've talked about some of them already.  They used their

3     jails and police force to enforce the petitions to arrest who

4     JCS did.  And when we got into this case, you may recall that

5     the City couldn't even tell us who was on JCS probation.  They

6     kept no records of that.  They simply looked at JCS to

7     administer the entire collection process.

8          THE COURT:  But why is that surprising if they

9     couldn't tell you a record of who Judge Ward had put on

10    probation because if Judge Ward orders them to jail, they go

11    to jail?

12          They have a record of who is in jail at various

13    points, right?

14          MR. EVANS:  To some degree, but not very accurate.

15    But the bottom line is you can't play it both ways, Judge.

16    You can't say, well, this is a judicial finding when you don't

17    have records of that; or this is a court action when the court

18    has no records; or this is a real judicial determination

19    when --

20          THE COURT:  How many cities do you know that go

21    check with their municipal judge and do an audit of his

22    records?  That seems to be kind of a circular argument that

23    they didn't know what records there were about him imposing

24    this.  The police were responding to one of two things, right,

25    either Judge Ward or -- one of three things:  Judge Ward, his

```
1    magistrate, or JCS?

2            MR. EVANS:  And the police chief has testified I

3    collected the fines and I would release people from the jail

4    and, yes, the police --

5            THE COURT:  That's what every -- Birmingham does

6    that.  New York City does that.  Anniston does that.  Mobile

7    does that.  Every city does that with their municipal courts.

8            MR. EVANS:  But it's not on an extorted basis, Your

9    Honor.  It's not like you pay to get out, or you don't and you

10   stay.

11           And let me address one of your earlier questions.

12   I'm not getting to fully respond to some of them.

13           In this case, obviously, the City would want to know

14   what's going on if they were not really worrying about

15   anything other than money.  When we took the depositions of

16   Hepp and these other people there at the City, they did not

17   know who was on JCS, how long they had been on JCS, how much

18   money was owed from them.  But as they collected money from

19   them, they simply put it in their coffers and put it on the

20   top of these persons' names.  Many times it was overpaid.

21           So what we've got is the City participating, feeding

22   at the trough of this process that they started, getting free

23   collection services simply by saying, JCS, welcome to the hen

24   house; we'll let you have $35 on every one of these poor

25   people in this rich community of Childersburg.
```

1              They knew about it.  They participated in it.

2    Virtually every person in the City that was under employment

3    there, from the clerk, from the treasurer, every police

4    officer, all the JCS people, and Ward, attended the court

5    hearings each month.  So to try to separate this and say, oh,

6    the City really didn't know, it's just Judge Ward run a rogue.

7    Really, you would have to ignore the facts of this case.

8              I want to, if I can, at this point, unless you have

9    another question --

10             THE COURT:  Go ahead.  I know I have kind of

11   peppered you.  So let me let you take a breath and just make

12   the arguments you want to make.

13             MR. EVANS:  Well, I enjoy being peppered and I enjoy

14   talking with you.  But the stuff about Wilkins, we have

15   addressed that in briefs several times, and it is such a far

16   different situation.  There's no challenge by the plaintiffs

17   that the cities don't have a right to contract.  Certainly

18   they do.  In this case, it should have been bid.  And you've

19   got before you on motion for summary judgment saying the

20   contract itself is void.

21             THE COURT:  Let me ask you this.  This might clarify

22   something.  No question in my mind here that a municipal judge

23   is a State official under Alabama law and prevailing Eleventh

24   Circuit law.  Fair conclusion?

25             MR. EVANS:  He is an employee of the State.

1          THE COURT:  An official of the State.  He may be

2     employed by the City, but he is a State official.

3          MR. EVANS:  He is an employee of the City, allegedly

4     is governed under AOC, although there has been no involvement

5     of AOC in any aspect of this process of JCS or the contract or

6     any supervision of Larry Ward or Hayes.  And I know that by

7     taking the deposition of Sue Bell Cobb.  So that is not --

8     that may be something that is on paper where you say the

9     Supreme Court Justice could have done something.  There wasn't

10    anything done there.  There wasn't any fallback on the State

11    that brought this about.

12          I want to jump to Wilkins, if I could.  Wilkins was

13    a collection case, a collection company, that the City

14    contracted with.  They didn't pretend, as these folks had

15    pretended to be, some kind of probation officer.  There was no

16    use of this ruse of probation to extract or extort money from

17    them.  They were simply a collection company and represented

18    themselves as that.  They, only on persons who had been

19    arrested and brought before the court after having been given

20    notice, were adding on an additional charge, but the court

21    there much like we think the Court should rule in this case,

22    questioned the legality -- expressed concern about the

23    legality of the contract like the one here noting, quote, the

24    plaintiff class may be correct in arguing that a mayor or city

25    council acting alone cannot legally impose an additional fine

1   on persons who have already been ticketed or given misdemeanor

2   citations.

3          And that's what we have here, is a person can't --

4   they have already been adjudicated, supposedly, for some

5   horrible crime like my tag is expired, and if they can't pay

6   it, an additional charge is imposed upon them.  And that is

7   imposed upon them by the contract of the mayor and the council

8   in this case.  There's no question that is the policy of the

9   City.  There's no question that the practice under that in

10  Childersburg existed for 10 solid years.

11         THE COURT:  How could the City obligate Judge Ward

12  to set certain terms of probation?  Isn't that his job

13  exclusively?  Now, he may have abrogated that.  He may have

14  delegated that to JCS.  He may have completely shirked that

15  duty.  But how can the City, contractually or otherwise, place

16  on Ward an obligation to set certain terms and conditions of

17  probation?

18         MR. EVANS:  I don't think they should be able to but

19  they did in this case, and that constitutional deprivation

20  that came about with the system is what we're here about.  I

21  don't think they contractually ought to be able to bind the

22  city -- bind the city court by its contract.  I don't think

23  that they should be able to get by with hiring a private

24  probation company adding fees only onto those who can't pay.

25         Obviously, you have gone over these briefs very well

1   and I appreciate your study of it, but one of the many, many

2   things that wasn't addressed by Childersburg was equal

3   protection, and there are many other claims that the

4   plaintiffs make in this case that were simply under the radar

5   of whatever they're addressing.

6          But the City in this case did not even have the

7   orders of probation.  The court didn't have the orders of

8   probation.  Those were preprinted by JCS.  And unless you're

9   willing -- unless this Court is willing to simply divorce the

10  joint efforts of JCS with the court and the City, then you

11  have to look at this as a whole process.

12         This -- as you started, I think, our hearing this

13  morning saying this was a system, a city system, and that's

14  exactly --

15         THE COURT:  So how was the city system, then, the

16  moving force behind these constitutional violations?

17         MR. EVANS:  For each of the plaintiffs?  You want me

18  to address that?

19         THE COURT:  Well, just generally.  How could it be

20  the moving force behind the violation of these three or any of

21  the putative class members they seek to represent?

22         MR. EVANS:  I'll be happy to address that.

23  Obviously, the only people who are being charged these

24  additional fees are those who can't pay.  That is a clear

25  violation of equal protection.  If there is no situation in

1   here where the City is giving any notice of hearing, making

2   findings or any appropriate opportunity to be heard on any of

3   the allegations --

4          THE COURT:  But that's not the City's

5   responsibility.  It's the judge's responsibility.

6          MR. EVANS:  But that's part of the system that

7   benefited the City, and that's part of the practice that these

8   city personnel simply sat there, watched, approved of,

9   innocently or not, and got the benefit of it.

10          Monell and the progeny of Monell talk about -- and I

11   think one of the cases that we have cited in the brief is the

12   Pembaur, if I can find my cite on it.

13          THE COURT:  It seems like what you're saying is that

14   by the City entering into this agreement, hiring JCS, setting

15   up this system where there was a potential to charge indigent

16   probationers a fee nonetheless --

17          MR. EVANS:  There was a requirement.

18          THE COURT:  No, actually the contract said that

19   would not happen.

20          MR. EVANS:  But there was a requirement that they

21   charge anyone that went to JCS an additional fee.

22          THE COURT:  But there's also a provision in the

23   contract saying that would not be the case -- the fees

24   referred to above would not be applicable with respect to

25   indigency.  That provision was put up on the screen, right?

1          MR. EVANS:  We addressed that a little earlier, Your

2    Honor.  I think you're thinking about a formal determination

3    of indigency as much as you would for an appointed counsel.

4    The indigency or the poverty required here was of a sufficient

5    degree that they couldn't pay the fines and fees.  Some of

6    those people were in our class certification --

7          THE COURT:  I understand what you're saying, but

8    what I'm saying is how is the City the moving force behind

9    that if it was the judge's responsibility to be the backstop

10   to protect those rights and anything he did could override

11   whatever the City agreed to with JCS?

12         MR. EVANS:  JCS would not have been in Childersburg

13   had the City not accepted them and contracted with them.

14   Those form contracts were used in 112 cities in Alabama.  JCS

15   would not have been presenting its form probation orders

16   already requiring this fee to them to Judge Ward to presign

17   had the City not put in place that, and had the City not

18   agreed that its court would be bound it's very likely that

19   Judge Ward --

20         THE COURT:  Look, I understand your point, but the

21   way, I think, the interpretation that I give of these

22   arguments you're making -- and I know this is not how you

23   characterize them -- but the correct characterization, I

24   think, may be something like this:  What the City did created

25   an environment where the court and JCS could get away with

1    this.

2         I don't think that's enough for purposes of

3    municipal liability to show that the City was the moving force

4    behind the constitutional violations because that -- I don't

5    know that that meets the proximate cause requirement of a

6    municipal custom, policy, or practice that was the moving

7    force behind a constitutional violation.

8         But explain to me why you disagree with that

9    proposition.

10        MR. EVANS:  Well, thousands of pages of depositions

11   and documents in this case show that this was exactly the

12   system that JCS operated in that city for 10 years in front of

13   everybody that worked for the City, with the City's full

14   knowledge and participation of it.

15        The Pembaur case talks about -- and I'll read that.

16   This is a quote from the Pembaur versus City of Cincinnati,

17   U.S. Supreme Court 1986.  "No one has ever doubted for

18   instance that a municipality may be liable under Section 1983

19   for a single decision by its properly constituted legislative

20   body."

21        And, of course, this was.  But the things that even

22   add more oomph to it is the fact that it continued to use,

23   cooperate with, participate in, all the details of the

24   collection process as it went along.

25        THE COURT:  And your position is they did that by

accepting the money, knowing how the money was being funded
and what the basis of it was, provided their resources like
police, city clerical, other resources, to the court in JCS to
carry this out.  What else?

MR. EVANS:  All of those things.  And crazy
documents, you have seen so many of them where the person
can -- they are picked up for FTOCO, a bogus charge, by a
police chief who doesn't have a clue and they are brought in:
Can you pay the $1,085?  Or can your aunt or uncle pay it?  If
you can, you walk.  If you can pay $500, we're sending you
back to JCS municipal court.  All of these things signed by a
police clerk knowing that that is the system, that is the
collection.  The bonds being collected at the jail and
credited to these people's account.  Money going back to JCS
from the City if they collect the fees from them.

This was a joint system, and the facts are myriad
that the City was not only relying on its court to rubber
stamp these orders, but it was participating in all of the
ancillary parts thereafter.

So I don't think you can simply parse, as the
defendants would like, each piece of this and say, oh, this is
a judge; oh, this is a police chief.

No.  We have a system that has gone on for over
10 years that the council and the mayor put in place and that
they fed from until we sued them.  And to suggest that there

1  was no control over this Larry Ward, that just ignores the

2  facts.

3        I would like to think that every judge was competent

4  and participating in his proper role, but, simply, that wasn't

5  the case here.  The City knew it, took advantage of it, and

6  the fact that you have a judicial person in the wheel at one

7  cog doesn't buy the City a buy for a process that it put in

8  place and enforced.

9        I will be happy to address the details.  I know you

10  know the details of the individual plaintiffs, but they are

11  pretty horrible.  I'll be happy to go over some of those with

12  you.

13        The causation issue is clear.  Each of these

14  individuals was put on JCS because they couldn't pay.  Of the

15  four, Ms. Ray was the only one who had any jail sentence

16  whatsoever.  She had two traffic tickets, three days suspended

17  on each.  And it didn't make any difference.  The suspended

18  sentence didn't have anything to do with probation.

19        THE COURT:  How do you deal with Mr. Cook's

20  arguments about Mr. Jews in particular with respect to the two

21  violations that may be barred by the statute of limitations

22  and the two subsequent violations that are within the statute

23  but he explains were not really violations?

24        I think I know your argument.  The main focus of

25  your argument is FTOCO was code word for probation revocation

1  and/or contempt proceedings without the proper constitutional

2  protection being put in place.

3        MR. EVANS:  I'm trying to find my pad here, Your

4  Honor.

5        THE COURT:  That's fine.  Take your time.

6        MR. EVANS:  As far as our -- here it is.

7        THE COURT:  You have already demonstrated a pretty

8  excellent mastery of the case.  So if you take three seconds

9  to find a pad, that's not a problem.

10        MR. EVANS:  He started in 2009, February of 2009,

11  Mr. Jews, and it was a charge that was dismissed and he

12  couldn't pay $166 in court costs and he says I can't pay; so

13  you've got to go to JCS.  If that doesn't say I'm

14  impoverished -- of course, he showed no income or anything of

15  the kind -- then I don't know what was.  But that's how it got

16  to JCS.  He couldn't pay the fine.

17        Within about two weeks, the probation agent/officer

18  at JCS says, well, he is not paying us; we want him revoked

19  and arrested anyway.

20        THE COURT:  I take it one of your arguments would be

21  if he is sitting in Talladega correctional facility, unhappy

22  about his circumstance and is mad, it doesn't really matter

23  how he characterizes what his attitude was about getting

24  charged fees.  You look at whether or not he should have been

25  charged fees and taken into custody in any event, right?

1          MR. EVANS:  Right.  And it was a continuing

2    violation.

3          THE COURT:  That's a softball that you can turn and

4    drive as far as you can.

5          MR. EVANS:  Well, then good, yes, I like it.  The

6    bottom line is he remained on probation, Judge, well into this

7    case.  After we pointed out so many of these problems,

8    magically the probations that were well over two years were

9    recalled.  The warrants that were issued, hundreds of warrants

10   outstanding on those, were recalled even though we can't

11   control anything.  But those were recalled.  And at that

12   point, that's when our clients got off of these probations.

13   That's well into the lawsuit.  And in fact, as far as the

14   details of it, you know --

15         THE COURT:  I remember there was some consternation

16   among the lawyers, attempts to discover the circumstances

17   behind those orders, as I recall?

18         MR. EVANS:  Consternation is probably a good term.

19         THE COURT:  Mild.

20         MR. EVANS:  Well, it was so obvious.  I mean, they

21   hired good counsel and then they tried to start cleaning up

22   the mess.  They've tried to do that, but it's a fairly obvious

23   situation that that was going on rampant and that the City was

24   sitting idly by because it was profitable for them.

25         But on Mr. Jews, if I can continue just a minute,

ultimately this fellow gets arrested for four FTOCOs.  He is arrested four times.  He spends 80 days in jail, for Heaven's sake, because he couldn't pay $166 after all of that time, after all of that time, and never had counsel, never had counsel.

After all of that time, they said he still owed over $1,000 until we got involved.  Was he angry at his deposition?  Yes, sir.  Was he knowledgeable about what had been paid by him or on behalf of him, no, he wasn't.  He had attended several meetings with JCS.  Ultimately he and his family had paid about $580 even though he was never employed during that period of time, and he was charged all these fees in addition.

So, yes, the system applied itself mechanically to him.  He was arrested and he was charged fees and never given credit for it, and probation extended from 2009 to 2012.

Now, Greg can stand up here and make an argument, oh, this is a new action because it came back before the court.  Well, the bottom line is it was all relating back to the same little misdemeanor, dismissed charge in 2009.

But, really, that two-year stuff, the fact that they did that is not all that significant anyway.  What it's significant to, it increases the damages to the plaintiff by extending the payments they have to make each month.  It shows a system really has great disregard for the legal restrictions of our statutes.

1          But that's Mr. Jews.  As far as the statute of

2    limitations, he was last arrested, February of 2012.  We filed

3    this lawsuit in August.  So it's a hard for me to say how that

4    really flies.

5          Gina Ray, again, this is a little lady who has an

6    8th grade education, works when she can.  She had a couple

7    traffic tickets initially.  She was given three days each, and

8    then we have a couple of arrests after that, both on this

9    FTOCO.  And you will see in some of the records that we

10   pointed to in our brief, often they will say three things.

11   They will say FTOCO/FTA/failure to pay.

12         The bottom line is, the system, as all have

13   described it:  You pay, you walk; you don't, you stay.  And

14   that's the system that Childersburg was feeding from.

15         But Ms. Ray in her two tickets started out with

16   court costs at a little over $1,000.  In 2011 her first arrest

17   was now up to $1300.  She was arrested -- you saw this

18   pretense that the magistrate would run down there and see

19   them.  She spent 22 days in jail for tickets that she couldn't

20   pay.  She is arrested again in February 2012 and spent another

21   10 days in jail.

22         So these are vulnerable cannon fodder for this kind

23   of system, all to benefit JCS and its City confederates.

24         As far as the Fugatts, if you need me to address

25   that, I will.  I think you know the history there very well.

1          THE COURT:  I think I've got it.  If there's

2   something you want to particularly highlight, I would be glad

3   to hear it.

4          MR. EVANS:  Well, I think some of the things that

5   are significant as you look across the causation and the

6   applicability as to all of these, you will not find any

7   finding of contempt; you won't find any allegation that these

8   people failed to pay willfully or that they failed to appear.

9          For Heaven's sake, in Gina Ray's situation, letters

10  were coming back from the post office saying not deliverable

11  and JCS was still going through with petitions to revoke,

12  requests for arrest, resulting in arrest by the City and

13  jailed.

14          So, yes, the causation is very, very clear.  It

15  applied uniformly with only the slightest pretense of any

16  legitimate judicial probation system.  And it didn't really

17  matter, because once a person was brought before the Court

18  after being arrested, they were going to simply put them back

19  on probation and see if they could squeeze some more money out

20  of them.  So it didn't matter as far as trying to -- and, of

21  course, in the Jews' situation and the Fugatts', they had no

22  sentence whatsoever.  So you can imagine if they were brought

23  before a legitimate judge on a legitimate probation

24  revocation, what are you going to do?  What time frame are you

25  going to make them serve since they never had any time to

serve to start with.

        And in Ms. Ray's case, she had 6 days but she was in jail for over 30.  So the suspended sentence, again, was just window dressing for this kind of system.

        I know you probably have other questions because you always do, but if there's something else I can address, I would be happy to do so.

        THE COURT:  I don't think so.  I might have questions for you after I talk to them.

        MR. EVANS:  Yes, sir.  Thank you, Judge.  Is there a possibility we may can take a break for just a minute?

        THE COURT:  Yes.  And on the break, you need to be thinking about footnote 16 on page 28 of document 391.

        (Recess.)

        (Back in open court.)

        THE COURT:  All right.  Footnote 16, if Childersburg can adopt extensive new procedures which address concerns, why is it not a policymaker in this case?

        MR. ANDERSON:  It was a Freudian slip.  Childersburg did not adopt those policies and procedures, and we actually have pulled that up.  There actually was cite to the wrong --
when you have KKK, however many exhibits that is, I guess we're at 60-something --

        THE COURT:  You might want to skip that.  Just like some buildings don't have a 13th floor, we don't have a KKK.

1          MR. ANDERSON:  Yes.  That's probably why it messed

2    up.  But it's up on the screen.  It's document 264-1.  This

3    was attached to our answer.  It was a standing order adopted

4    by the municipal court of the City of Childersburg that put in

5    those extensive new procedures to address all the concerns.

6          THE COURT:  Just don't tell Judge Woodruff that you

7    have referred to his standing order as the KKK order.

8          MR. ANDERSON:  But I want to talk about -- briefly

9    respond to several things that Mr. Evans spoke about, one of

10   which is actually another footnote, oddly enough, and that

11   is -- you were talking about the City could have simply

12   terminated Judge Ward for not providing the constitutional due

13   process guaranteed to the people before him, and that's

14   actually not true, and we cited this in our response -- excuse

15   me, our reply in support for the motion for summary judgment

16   on the claims of the Fugatts.  It's document 452 at page 19,

17   the ecf/Pacer number.  Footnote 27 -- this is a quote from an

18   Alabama Attorney General opinion explaining an appointing

19   municipal governing body has no authority to terminate or

20   reduce the statutory term of office of a duly-appointed

21   municipal judge.  And there's actually a statute.  It's

22   Alabama Code 12-14-33 that says only the JIC, the Judicial

23   Inquiry Commission --

24         THE COURT:  That's what allows some judicial

25   independence among municipal judges, that they won't be

1    subject to political pressure?

2         MR. ANDERSON:  Correct.  A couple of other things

3    that were mentioned, you talked about the Turner case, the

4    Fifth circuit case, and the warrant.  And Mr. Evans said,

5    well, in that case, that was a facially valid warrant.  That's

6    not accurate -- or that was a valid warrant.  That's not

7    accurate.  It was not a valid charge in that case, similar

8    to -- it's the same situation as what we have here today.

9         We talked about the fact that the City of

10   Childersburg hires the municipal judge and pays their salary

11   and pays the salary of the magistrates, and Mr. Evans was

12   trying to suggest that that can provide the causation and the

13   basis for liability because it provides control, and that's

14   simply contrary to binding authority.

15        In Woodard versus the Town of Oakman, the case we

16   talked about before, Judge Coogler specifically said -- this

17   is 885 F.Supp.2d 1216, from 2012.  Under Alabama law, the

18   municipal court administrative agency is under the supervision

19   of the municipal court, and the magistrates are designated by

20   the municipal court judges.  While a municipality appoints and

21   pays municipal judges, the jurisdiction and authority of

22   municipal judges is generally established by state law.

23        And that's consistent with the Eleventh Circuit's

24   opinion in Grech versus Clayton County where they talked about

25   payment of sheriff's salaries.  Specifically said, payment of

1    a sheriff's salary and for equipment from county funds, when

2    required by the state legislature, does not establish county

3    control over the sheriff's law enforcement conduct and

4    policies.

5            The same is true here.  The fact that judges and the

6    magistrates were paid from municipal funds does not establish

7    municipal control over their judicial functions.  And in

8    Grech, the Court went on to explain that the Court must focus

9    on control, not labels, and ultimately concluding that the

10   county was not responsible for the law enforcement activities

11   carried out by the sheriff.

12           Another thing that was discussed a lot and that I

13   didn't get to really address earlier and that's getting back

14   to the causation.  And I understand the plaintiffs' argument

15   here that the City -- this went on for 10 years and that they

16   could have terminated the contract or put a stop to it; that

17   because they acquiesced in it, that therefore they could be

18   liable.  And that's simply not the law, Your Honor.

19           The fact of the matter is when it gets to judicial

20   functions, the City does not have control over those and does

21   not have the authority, just like we said, to interpose itself

22   in between the court and the people coming before the court.

23           Mr. Evans says that this was all put in place by the

24   contract that the City entered into with JCS.

25           THE COURT:  What about the fact that this went on

1    for 10 years?  It was not a one-off, like he said.  10 years

2    this continued.  Eventually the City did recognize the problem

3    after it got sued and replaced the judge.

4            MR. ANDERSON:  Correct.

5            THE COURT:  Was that after he retired?

6            MR. ANDERSON:  He retired.

7            THE COURT:  But the new judge comes in and

8    immediately corrects the issue?

9            MR. ANDERSON:  Correct.

10          THE COURT:  At least you would say, and Danny would

11   say cleans up the mess?

12          MR. ANDERSON:  Correct.

13          THE COURT:  So what about the fact that this was

14   going on for 10 years?

15          MR. ANDERSON:  Well, what I would say is if you look

16   at the law under Monell, it's clear when you talk about the

17   causation that's required, in order to impose municipal

18   liability it has to be based on affirmative conduct.  There's

19   no case -- the only cases where they have talked about

20   potential liability for inaction under Monell are in failure

21   to train cases where it's a police force and the municipality

22   has not provided the training that's required so that they

23   know when to use deadly force and those sorts of things.

24          THE COURT:  So if we had, though, a police officer

25   who on one occasion exercised the use of excessive force in

1   detaining or arresting a person, that's not a basis for

2   holding the City liable.  There's no respondeat superior

3   liability.  But if you had a police force who was regularly

4   using excessive force, there may be a duty to impose a policy

5   under those circumstances, right?

6            MR. ANDERSON:  There may be.

7            THE COURT:  And there comes a point at which there's

8   kind of deliberate indifference?

9            MR. ANDERSON:  Correct.

10           THE COURT:  I don't know that the plaintiffs have

11  specifically put it in these terms, but can you have a

12  deliberate indifference toward a court policy?

13           MR. ANDERSON:  The answer to that is no.  And they

14  have mentioned deliberate inference and they have cited a few

15  cases, but they've had to do with police policy and they have

16  to do with -- we talked about this in your chambers at one

17  time when we were talking about prison healthcare and

18  contracting that out to someone else, and the difference there

19  is that those are municipal responsibilities imposed by law,

20  that there is an affirmative obligation on a municipality to

21  provide, if it has a police force, to provide proper police

22  force.

23           There's an affirmative obligation under the Eighth

24  Amendment to provide humane conditions of confinement to

25  people that are in jail.  And so if you know about those

1    things and do nothing to stop them, that deliberate

2    indifference can be the effective cause, the direct cause that

3    actually caused these things to happen.  And there's no cases

4    that have been cited or that I have seen that have applied

5    that to anything like a decision by the judiciary branch.

6           And, actually -- that's good Mr. Espy reminded me

7    because we were looking at this yesterday.  This was an

8    opinion from Judge Haikala actually from last year.  It's in

9    Evans versus City of Talladega, 136 F.Supp.3d 1354.  And the

10   plaintiff was trying to hold the City of Talladega responsible

11   for things that happened by the private entity that the City

12   contracted with to run this theater.  And Judge Haikala says

13   that the plaintiff, Ms. Evans, cited Buckner versus Toro,

14   arguing that Talladega First contracted with the City to

15   operate the theater effectively makes Talladega First an

16   extension of the City; thereby, making the executive director

17   of that vendor a municipal official with final policy-making

18   authority.

19          In Buckner, the Eleventh Circuit held that a private

20   entity contracting with a municipality to provide medical

21   services to inmates becomes functionally equivalent to the

22   municipality because it performs a function traditionally

23   within the exclusive prerogative of the state, but Ms. Evans'

24   reliance on Buckner is misplaced.  That principle in Buckner

25   was limited to those specific circumstances in which a private

1  entity contracts with a municipality to provide medical

2  services to inmates.  Ms. Evans provides no authority to

3  support the proposition that Buckner's holding extends broadly

4  to any situation in which a private entity contracts with a

5  municipality to perform some service.

6       And that's what we have here, is contracting as

7  explicitly authorized under the Alabama Code.  And, really,

8  that goes back, Your Honor, to the Monell and the Pembaur case

9  that Mr. Evans referenced talking about the extent to which

10  municipalities exercised control, and they were talking in

11  Pembaur about the legislative history that was addressed

12  behind 1983 in Monell where the Court recognized that while

13  Congress never questioned its power to impose civil liability

14  on municipalities for their own illegal acts, Congress did

15  doubt its constitutional power to impose such liability in

16  order to oblige municipalities to control the conduct of

17  others.

18       And that's what you would be asking the City to do

19  here, is to control the conduct of the municipal court.  And

20  to do that, the law doesn't require it.

21       So I'm still -- I still struggle to figure out -- to

22  understand what the policy or custom is that the City is

23  charged with implementing and charged with being responsible

24  for.  We talked before about how we said that it was the

25  contract, and the plaintiffs say, well, it's not just this

1   contract; it's this extortion scheme and that the City had all

2   these employees participating in this scheme.

3        And I still, frankly, don't understand what exactly

4   that means.  But ultimately I think where the plaintiffs come

5   down in saying that had the City not entered this contract

6   with JCS, none of these things would have taken place.

7        And the Supreme Court has made explicitly clear that

8   a but-for causation is not the standard, as said in Brown in

9   1997.  Every injury suffered at the hands of a municipal

10  employee can be traced to a hiring decision in a but-for

11  sense.  But for the municipality's decision to hire the

12  employee, the plaintiff would not have suffered the injury.

13  And that's what I hear them saying here.  But for the City's

14  decision to bring in JCS, as it's allowed to do under Alabama

15  law, these people's constitutional rights would not have been

16  violated.

17       And that level of causation is simply not enough to

18  say under 1983 that the City has subjected or caused to be

19  subjected people to the deprivation of their constitutional

20  rights.

21       And in Canton versus Harris in 1989, the Court went

22  even further talking about the direct causal link.  They said

23  to adopt lesser standards of fault in causation would open

24  municipalities to unprecedented liability under 1983.  In

25  virtually every instance where a person has had his or her

constitutional rights violated by a City employee, a 1983

plaintiff will be able to point to something the City, quote,

could have done to prevent the unfortunate incident.  Adopting

that standard of fault would result in a de facto respondeat

superior liability on municipalities, a result we rejected in

Monell.

          And I think, Your Honor, that speaks correctly to

the question that you asked me just a minute ago:  What about

the fact that this went on for 10 years; couldn't the City

have done something.

          And that's exactly where the Court says you will

always be able to point to something that the City could have

done.  It could have done it after 7 years.  It could have

done it after 3 years.  When does it become such that it

should have done something, and that's where the Court has

said that doesn't equal causation.

          And you also asked Mr. Evans the question about if

Judge Ward -- let's say that we have this contract in place

and Judge Ward had done everything he was supposed to do and

provided all these rights to the defendants appearing there,

would we be here today, and the answer was no.

          Well, answering that way, that illustrates that the

claim is one of vicarious liability of respondeat superior

liability, trying to say that it's nothing explicitly that we

did but for the fact that we hired JCS and had Judge Ward as a

1   judge and these things happened; therefore, we are liable.

2   That's respondeat superior by any other name.

3          There was discussion about:  But that's not what

4   happened; the City told Judge Ward what to do.  We talked

5   about whether Judge Ward had seen the contract, and he said

6   that he hadn't.  But even assuming that he had seen the

7   contract, it's simply not true that the City purported to

8   direct the contents --

9          THE COURT:  Did he say that he never knew of the

10   contract at all or he just didn't know it until it was formed?

11          MR. ANDERSON:  My understanding is he did not know

12   what the relationship was.  Obviously, he knew there was some

13   reason that JCS was there.  He didn't know that there was an

14   explicit contract in place and didn't know the terms of any

15   agreement between the City and JCS.

16          THE COURT:  So that testimony is problematic on a

17   number of levels, wouldn't you say?

18          MR. ANDERSON:  How so?

19          THE COURT:  The municipal judge doesn't know how JCS

20   suddenly appears and what the relationship is?

21          MR. ANDERSON:  I'm saying -- you correct me if I'm

22   wrong -- that that's the testimony.  But the deposition was

23   limited.  That's what's in the evidence.  Obviously, this

24   was -- how many years ago, 10 years ago, 2005, 12 years ago.

25   I'm sure he knew at one time --

1           THE COURT:  My question really goes to not the

2     formation of the contract but how the contract was carried

3     forth, how JCS provided the services and what knowledge Judge

4     Ward had of JCS's role vis-a-vis the municipal court.  Did he

5     testify anything about that?

6           MR. ANDERSON:  Well --

7           THE COURT:  Or did he just say, you know what, there

8     were these people, they might have been Martians, they might

9     have been outsiders, I don't know what they were doing there,

10    but they were like shuffling papers for me.

11          MR. ANDERSON:  Well, as you know, Judge, Judge Ward,

12    Larry Ward, was a municipal judge for lots of different

13    municipalities and lots of them used JCS for a several year

14    period.  And I suspect that you have seen that a lot of these

15    contracts are the same.  So whether he saw another contract

16    and knew what it said and assumed that it was the same here, I

17    really don't know how Judge Ward developed his intimacy or

18    familiarity with JCS and how they operate or what role he had

19    in putting those policies and procedures together.

20          What I know, though, Judge, is in this case the

21    plaintiffs have alleged that this contract and the City's

22    hiring JCS under this contract was the moving force because

23    the City directed Judge Ward what to do when people came

24    before him in the municipal court.  And I know that that is

25    simply not true.

1              If we look at the contract, it specifically says

2      that JCS is going to supervise cases sentenced by the court.

3      It's going to supervise indigent cases determined by the

4      court.  It's going to make sure probationers comply with the

5      court orders, and then it's going to return them to the court.

6      Then it will comply with the court's ruling in reference to

7      sentencing or possible revocation of probation.  They're going

8      to monitor offenders for compliance with terms and conditions

9      of probation as required by the court, whatever the court sets

10     as the terms and conditions for their probation.

11             Now, Mr. Evans just talked about these were form

12     orders and Judge Ward didn't draft these; JCS drafted these.

13     However that was done, what we do know is that the City didn't

14     draft these things and the City didn't tell JCS or the court

15     what to do in drafting these orders.

16             All throughout -- and you can read the contract.

17     I'm not going to go through the whole thing, Judge.  But even

18     the money, we've talked about the money being distributed, and

19     JCS getting its fees and how much it pays to the clerk of the

20     court.  By the way, not to the City but to the clerk of court.

21     That is going to be distributed as directed by the court.

22             So my point here, Judge, is that nowhere in here

23     does the City purport to direct Judge Ward what he needs to do

24     with the terms of the probationers coming before him.

25             THE COURT:  All right.  Thank you.

1          MR. EVANS:  Your Honor, may I respond?

2          THE COURT:  You may, very briefly.

3          MR. EVANS:  A couple things right off the bat.

4   Whether a policy or practice exists under Monell to hold the

5   City liable is a question of fact, to start with.  That is a

6   question of fact.  Obviously, we've been bantering facts back

7   and forth here before you, but ultimately that is for the

8   factfinder.

9          And I think it's compelling for the plaintiff that

10  the actual jury charge that the Eleventh Circuit has approved

11  states that you may find that an official policy or custom

12  existed if there was a practice that was so persistent,

13  widespread, or repetitious that the named government's

14  policymaker either knew or should have known of it.

15         That's what a jury would be charged if they were

16  sitting in the box listening to these facts.  And, obviously,

17  in this case, there are tons of facts that show, yes, not only

18  they knew about it; they put it in place.

19         Judge Ward's contract renewed every two years.

20  JCS's contract renewed every year.  They continued this

21  practice for 10 years.  So to suggest that this was a renegade

22  judge that the City was just simply not aware of, really flies

23  in the face of any kind of credibility.

24         One of the other facts I wanted to point out,

25  Ms. Hepp, who you met here in the courtroom that time, has

1    testified in two capacities.  She testified at some point she

2    became the magistrate after Wyers left.  But before that, she

3    was the police records clerk and regularly collected money and

4    released people from jail.  She testified that the City's

5    attorneys had drafted the actual letter recalling these

6    warrants and letters.  Again, a pretty strong indication of

7    control.

8              I want to jump around and get us out of here as

9    quickly as I can.

10             The state official argument that the City makes

11   about a judge being a state official, that does not mean that

12   the State is overseeing the actions of this judge.  In fact,

13   there's no evidence whatsoever that anyone oversaw the actions

14   or directed the actions of Larry Ward with the exception of

15   the city council that said the court is --

16             THE COURT:  Why isn't it evidence that another judge

17   was suspended for similar behavior evidence that the state

18   does oversee this type of thing?

19             MR. EVANS:  Well, the JIC -- I mean the Bar

20   Association oversees my ethical behavior, but it doesn't

21   oversee my participation in a scheme under 1983 if I were to

22   do so.  And the JIC doesn't have jurisdiction even to

23   entertain that.  But we certainly applaud their actions when

24   they do get involved, which is, as you know, very

25   infrequently.

1    He mentioned –– "he" meaning Conrad –– mentioned

2  about the term of a judge and cited to a statute.  He forgot

3  to mention that the City itself can abolish the court entirely

4  on the whim of the council.

5    He made the statement that the payment of the salary

6  does not equal the control by the City.  Well, control is not

7  what we're all here about.  Control is about whether this

8  policy existed, they knew about it, allowed it to go on.  And

9  one of the things that I think is most compelling about that

10 is the Giles case, which we've quoted to you right here from

11 Alabama, concerning the practice of a city court, which was

12 imbued as a policy of the City and was found to be problematic

13 constitutionally and resulted in a judgment against the City.

14    The Brown case stated, quote, a municipal act is not

15 limited to only decisions made by city official legislative

16 body or in written agreements.  City policy also may be

17 implicated by the acts of individual policy-making officials

18 or by pervasive city custom.

19    10 years is certainly a pervasive city custom in

20 this regard.

21    You asked a question when Conrad was up about what

22 Judge Ward said about the JCS contract and so forth.  We've

23 cited a portion in our brief that deals with this.  He has

24 testified that that was an administrative decision of the City

25 to hire JCS, that he was not aware of that.  He didn't

1   participate in that decision.

2         And interesting about that -- and this is also cited

3   in our brief -- his awareness was fairly significant because,

4   as the deponents have testified, JCS had its own docket.  So

5   he virtually abrogated anything to this collection process

6   over to JCS only after the City put the fox in the hen house

7   by hiring them under this contract.

8         At the very least, there's a question of fact that

9   it should be submitted to the jury under the charge that I

10  read a little earlier.  And I appreciate very much your

11  attention this morning.

12        THE COURT:  Thank you.  You folks have given me a

13  lot to think about and I'm going to think about it, and we

14  will get something out when we are ready to make a final call.

15        MR. EVANS:  Your Honor, my cocounsel suggested we

16  didn't speak to the causation of Fugatt and Jews.  I thought

17  we did earlier.

18        THE COURT:  I think I have your argument on that.  I

19  think we're okay there.

20        MR. EVANS:  Okay.  Thank you, sir.

21        THE COURT:  All right.  Folks, thank you for being

22  here.  Thank you for your excellent preparation, as always.

23        (End of proceedings.)

24

25

<u>C E R T I F I C A T I O N</u>

    I hereby certify that the foregoing transcript in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**