**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| GINA KAY RAY, et al., | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | **Case No.:  2:12-cv-02819-RDP** |
| | } | |
| JUDICIAL CORRECTIONS SERVICES, | } | |
| INC., et al., | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

## I.      Introduction

This case is before the court on Defendant City of Childersburg's (hereinafter "City")

Motions for Summary Judgment.   (Docs. # 390, 391, 422).   The motions are fully briefed.

(Docs. # 419, 420, 452-54, 495).   After careful review, and with the benefit of oral argument, the

court concludes that the City's summary judgment motions are due to be granted.

## II.      The Rule 56 Evidence and the Undisputed Facts[1]

### A.      Procedural History

In their Fourth Amended Complaint, Plaintiffs present five claims for monetary relief and

one claim for declaratory and injunctive relief.   First, they allege that the City violated their due

process rights by delegating certain functions of the Childersburg Municipal Court (hereinafter

"Municipal Court") to Defendant Judicial Corrections Services (hereinafter "JCS"), binding the

---

[1]   The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.   All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).   These are the "facts" for summary judgment purposes only.   They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Municipal Court to utilize JCS's private services, imposing probation in orders that did not impose suspended incarceration sentences, creating a probation system that imposed fines and fees without regard for a probationer's indigency, "routinely accept[ing]" recommendations to incarcerate or restrict probationers without conducting delinquency or probation hearings, failing to provide indigency hearings before imprisoning probationers for failure to pay, and imposing fines, court costs, and probation sentences without jurisdiction. (*See* Doc. # 305 at ¶¶ 120-57).

Second, Plaintiffs contend that the City violated their rights to be free from unreasonable seizure because it unlawfully delegated authority to JCS and "created the process by which [probationers] were incarcerated without a willfulness hearing." (*Id.* at ¶¶ 169, 172). They allege that the City's employees participated in unlawfully arresting them for failing to pay fines and fees to JCS. (*Id.* at ¶ 174).

Third, Plaintiffs claim that the City violated their constitutional right to counsel by participating in a "joint policy and practice" with JCS that "transformed" sentences of fines and fees into imprisonment sentences without granting Plaintiffs access to counsel. (*See id.* at ¶¶ 194-210).

Fourth, Plaintiffs allege that the City violated their Eighth Amendment rights by contracting with JCS to impose monthly fees against indigent probationers, imposing fees in excess of statutory limits, and jailing probationers for failing to pay fees and fines. (*See id.* at ¶¶ 227-41).

Fifth, Plaintiffs claim that the City denied them equal protection by engaging in a contractual policy that arbitrarily imposed disparate treatment on the basis of wealth. (*See id.* at ¶¶ 257, 262). According to Plaintiffs, the City's "practice and policy" treated poor people less favorably than wealthier people because Municipal Court defendants who were able to pay the

imposed fines and costs did not face the additional burden of probation under JCS's supervision, whereas defendants who were unable to pay those fines and costs were placed on probation, charged additional fees, and subjected to threats of incarceration.  (*See id.* at ¶¶ 257-59, 261).

Finally, Plaintiffs' operative complaint seeks several forms of declaratory and injunctive relief against the City.  Plaintiffs request that the court declare the probation services contract between the City and JCS (hereinafter "JCS-City Contract") void because it violates Alabama state law.  (*Id.* at ¶¶ 268-69).   And, Plaintiffs seek a declaration that the City committed unconstitutional conduct pursuant to the JCS-City Contract.  (*Id.* at ¶ 277).   Plaintiffs also request that the court enjoin the City and JCS from committing the constitutional violations identified in the Fourth Amended Complaint.  (*Id.* at ¶ 284).

This court has denied the City's motion to dismiss an earlier complaint.  (*See* Docs. # 65-66).  The City has now filed three separate motions for summary judgment.  One motion seeks summary judgment for the claims by Plaintiffs Timothy and Kristy Fugatt.  (Doc. # 390).  The second motion seeks summary judgment for the claims by Plaintiff Deunate Jews.  (Doc. # 391).  The third motion seeks summary judgment for the claims by Plaintiff Gina Kay Ray.  (Doc. # 422).  Following the submission of these summary judgment motions, the court administratively terminated Plaintiffs' motion for class certification, pending its rulings on Defendants' summary judgment motions.  (Doc. # 496).

**B.     Formation of the Relationship Between the City, the Municipal Court, and JCS**

On June 21, 2005, Childersburg's City Council approved a proposal to replace its private probation service with JCS.  (Doc. # 421-7 at 2).[2]  The City Council's minutes reported that

---

[2]  For ease of reference, this opinion refers to the page numbers of the parties' briefs, the minuscript pages in deposition transcripts, and the CM/ECF page numbers for exhibits with unnumbered pages, such as the City Council's minutes cited above.

Judge Larry Ward and the Municipal Court's clerk had recommended JCS.[3] (*Id.*). Thereafter, the City's mayor and a JCS vice president signed the JCS-City Contract. (Doc. # 392-16 at 3). The JCS-City Contract purported to include the Municipal Court as a party to that agreement. (*Id.*). Moreover, the City's mayor signed the contract on behalf of the "CITY/COURT OF CHILDERSBURG, Alabama." (*Id.*). But the Municipal Court's judge did not sign the contract. (*See id.*).

The JCS-City Contract required JCS to perform supervision for "all probated cases sentenced by the [Municipal] Court," including supervision of indigent probationers. (*Id.* at 4). This contract also directed JCS to notify the Municipal Court of non-complying probationers. (*Id.* at 5). It allowed JCS to collect fines, restitution, and court costs on behalf of the Municipal Court if directed to do so. (*Id.*). JCS agreed not to charge its standard probation fee to indigent probationers. (*Id.* at 4). Furthermore, it agreed not to charge supervision fees to probationers who paid their fines and court costs within a week of their sentencing hearing. (*Id.*).

JCS agreed not to charge the City or the Municipal Court for its services. (*Id.* at 6). Instead, the JCS-City Contract purportedly obligated the Municipal Court to include certain fees in "each Court Order." (*Id.*). These fees included a $35.00 monthly probation fee and a $10.00 probation set-up fee. (*Id.*).

It is unclear whether it was a City official or the Municipal Court's judge that initially proposed JCS as a private probation service for the Municipal Court. The mayor who signed the JCS-City Contract testified that JCS worked with the Municipal Court, not the City, even though JCS had entered into a contract with the City. (Doc. # 392-9 at 76). He claimed that Judge Ward had recommended JCS. (*Id.* at 45). In contrast, Judge Ward claimed to be unaware of the JCS-

_____

[3] The City's former mayor, B.J. Meeks, also testified that Judge Ward and the magistrate had recommended JCS. (Doc. # 392-9 at 52-53).

City Contract during his deposition and was not able to say who would be authorized to bind the Municipal Court to such a contract.  (Doc. # 392-5 at 10, 12).  He denied any involvement in the contract's formation.  (*Id.* at 12-13).  He also denied recommending JCS to the City or its mayor. (*Id.* at 18, 42).

The City Council terminated the JCS-City Contract in May 2015.  (Doc. # 392-63 at 2).

## C.      Operation of the Municipal Court

Judge Ward served as the judge for the Municipal Court from 1976 to 2013.  (Doc. # 392-5 at 7).  He claims he was unaware of the JCS-City Contract, did not know that JCS had increased its monthly probation fee, and did not understand who was authorized to bind the Municipal Court to a contract with JCS.  (*Id.* at 26, 34).  Judge Ward also provided this "illuminating" testimony during his deposition about the scope of his work for the Municipal Court:

> [Plaintiff's counsel]: . . . Am [I] understanding you to say that you go out there [to the City] two hours a month, and you don't know anything at all except what you learned as Judge and as it relates to Childersburg or its operations or its court's operations, correct?
>
> [Judge Ward]:  I think that's correct.

(*Id.* at 91).  Nonetheless, Judge Ward stated that the Municipal Court had "very little interference or communication with the City."  (*Id.* at 35).

Judge Ward only worked "a couple of hours a month" for the Municipal Court.  (*Id.* at 24).  For his services, the City paid Judge Ward $12,000 per year.  (Doc. # 392-9 at 55). According to Judge Ward, the Municipal Court's clerks -- who also served as magistrates -- were hired by the City's mayor and city council.  (Doc. # 392-5 at 22-23).  Judge Ward did not have the power to hire, fire, or discipline the Municipal Court's clerks.  (*Id.* at 23-24).  Those clerks were paid by the City "through Municipal Corrections funds."  (Doc. # 392-10 at 27).  The City's

treasurer believed that the Municipal Court's former magistrate had been a City employee.  (*Id.* at 26-27).  But she stated that the Municipal Court's current magistrate was an employee of the Court.  (*Id.* at 27).

According to JCS's Childersburg office manager, Lisha Kidd, Judge Ward signed blank court orders, and Kidd would fill them in based on the judge's instructions.  (Doc. # 392-2 at 105).  JCS only provided probation services when probation was mandated by a municipal court order.  (*Id.* at 107).  After Judge Ward had sentenced an individual to probation, Kidd informed the probationer about the terms of probation in a separate room.  (*Id.* at 122-23).  A probationer owed almost no fees to JCS if the court-ordered fines were paid within seven days of sentencing.  (*Id.* at 109, 121).  Once JCS began charging probation fees, though, a probationer could not end his or her probation sentence by merely paying off the fines originally imposed by the Municipal Court.[4]  (*Id.* at 109-10).

During Judge Ward's tenure as the Municipal Court's judge,[5] JCS employees drafted probation revocation petitions if probationers had failed to comply with the terms of probation.  (*See id.* at 123-24).  JCS informed the Municipal Court of the probationer's payment history and missed appointments.  (*Id.* at 124).   Then, JCS would select a date for a hearing and inform the probationer of the hearing by mail.  (*Id.* at 127).  A JCS employee would determine whether the Municipal Court should hold a compliance hearing or a revocation hearing, depending on whether the probationer had met his or her obligations.  (*Id.* at 129-30).

---

[4]  According to Kidd, JCS's probation fees were incorporated into the Municipal Court's probation order as JCS assessed them against the probationer.  (Doc. # 392-2 at 110).

[5]  The Municipal Court's procedures changed significantly when the City appointed a new municipal court judge.  (*See, e.g.*, Doc. # 392-2 at 126-27 (stating that the Municipal Court had begun setting probation revocation hearings itself four to six months before Kidd's deposition, whereas JCS had set the hearing dates earlier)).

JCS's form probation revocation petitions informed the Municipal Court of the appointments a probationer had missed and the amount he or she owed to the City and to JCS. (*See, e.g.*, Doc. # 392-32 at 2).  They requested an arrest warrant from the Municipal Court "if necessary." (*See, e.g.*, *id.*).  The petitions included an order setting a hearing that purportedly was signed by the Municipal Court's judge or a Court magistrate.  (*See, e.g.*, *id.*).  Some revocation-hearing orders informed the probationer that the hearing could be cancelled if a payment was made.[6]  (*See, e.g.*, *id.*).  The revocation-hearing orders suspended the probationer's sentence "until a resolution [was] decided."  (*See, e.g.*, *id.*).  According to Plaintiffs, JCS did not file the revocation petitions with the Municipal Court before the scheduled revocation hearings, even though the revocation orders indicated that they had been approved by the Municipal Court prior to the revocation hearing.  (Doc. # 392-2 at 194).

JCS did send revocation petitions and revocation-hearing orders to probationers by mail. (*Id.* at 196).  JCS also sent notices to show cause to non-compliant probationers.  (*Id.* at 197).  A notice to show cause would direct a probationer to appear at the Municipal Court and explain why he or she had failed to pay the court-imposed fines and fees.  (*See, e.g.*, Doc. # 392-34 at 2). It warned a probationer that an arrest warrant would be issued if he or she failed to appear at the hearing.  (*Id.*).  It stipulated that the hearing could be cancelled if the probationer reported to JCS and paid a certain amount.  (*Id.*).  These notices were not filed with the Municipal Court.  (Doc. # 392-2 at 206).

If a petitioner failed to appear at a revocation hearing, the Municipal Court's magistrate often would issue a capias warrant.  (*See, e.g.*, Doc. # 392-35 at 2 (capias warrant issued after Plaintiff Jews had failed to appear at a revocation hearing).  The Municipal Court issued capias

---

[6]  Some revocation-hearing orders did not include the option of cancelling the hearing by making a payment.  (*See, e.g.*, Doc. # 392-43 at 2).

warrants when a probationer had "failed to report, as ordered by the [Municipal] Court[,] on a previous court date." (Doc. # 392-2 at 312). Many of these warrants stated that a defendant had been convicted of "FTOCO", otherwise known as failure to obey court order. (*See, e.g.*, Doc. # 392-35 at 2). (*See also* Doc. # 392-2 at 312-13 (explaining the failure to obey court order charge)). The Municipal Court convicted a probationer of this charge when he or she had failed to comply with an order directing him or her to appear at a hearing. (*Id.* at 313). According to the City's attorneys, though, a City employee searched through the City's records and found no municipal ordinance criminalizing failure to obey a court order.[7] (Doc. # 402-35). The Municipal Court's arrest warrants included a cash bond that an arrestee had to pay in order to be released. (*See, e.g.*, Doc. # 392-35 at 2). The Municipal Court's magistrate set that bail amount using a written schedule. (Doc. # 392-13 at 74-75).

### D.    Probation of Plaintiffs Timothy and Kristy Fugatt

City police issued Kristy Fugatt two traffic tickets in November 2010 for driving with an expired tag and an expired license. (Doc. # 392-66 at 14-15). Fugatt renewed her license (Doc. # 392-6 at 105), and the Municipal Court only assessed court costs for each ticket, (Doc. # 392-66 at 14-15). When Kristy Fugatt informed the Municipal Court judge that she could not pay the full amount charged, he directed her to an intake area to "talk to JCS." (Doc. # 392-6 at 105-07). Fugatt signed an intake form stating that she would pay a certain amount. (*Id.* at 108-09). Fugatt was placed on probation under JCS's supervision. (*See* Doc. # 392-18 at 9 (stating that Kristy Fugatt had been sentenced to 24 months' probation in January 2011)).

Timothy Fugatt received a traffic ticket in December 2010 for driving with an expired vehicle tag. (Doc. # 392-66 at 11). The Municipal Court did not convict him of the traffic

---

[7] Moreover, the arrest reports drafted by City police officers provide no citation to the ordinance arrestees violated when failing to obey a court order, even though many of those reports cited other legal provisions that the arrestee had violated. (*See, e.g.*, Docs. # 392-36 at 2; 396-42 at 2; 392-57 at 2).

offense but ordered him to pay court costs.  (*Id.*).  Timothy Fugatt testified that he had attempted to inform the Municipal Court judge about his child's terminal illness during the hearing but did not get an opportunity to speak to the judge due to the speed of the proceedings.  (Doc. # 392-7 at 74).  Similar to his wife, the Municipal Court also sentenced Timothy Fugatt to 24 months' probation under JCS's supervision.  (Doc. # 392-19 at 7).

JCS issued revocation petitions for Kristy and Timothy Fugatt on June 28, 2011.  (Docs. # 392-18 at 7; 392-19 at 6).  The Municipal Court held revocation hearings for Kristy and Timothy Fugatt on August 11, 2011, but neither of them appeared at the hearing.  (*Id.*).  The Municipal Court issued warrants against both probationers in August 2011.  (*Id.*).  Timothy Fugatt's August 2011 arrest warrant stated that he had been convicted of failure to obey a court order.  (Doc. # 392-20 at 2).  This warrant required Timothy Fugatt to pay $540 as a cash bond in order to be released.  (*Id.*).

A City police officer arrested Timothy Fugatt on February 26, 2012.  (*Id.* at 4).  Timothy and Kristy Fugatt have testified that the officer arrested both of them on this date.  (Docs. # 402-27 at 3; 402-28 at 3).  The Fugatts were taken to the City's police station and placed in a holding cell.  (*Id.*).  City police released them on February 26th after they had paid $900 for a cash bond.  (*Id.*).  JCS's records indicate that the Municipal Court reinstated the Fugatts' probation sentences in May 2012.  (Docs. # 392-18 at 7; 392-19 at 5).  The Municipal Court issued warrants against the Fugatts in November 2012 after they failed to appear in court.  (Docs. # 392-18 at 4; 392-19 at 3).  The Municipal Court then reinstated their probation sentences in January 2013.  (*Id.*).  Ultimately, the Municipal Court terminated the Fugatts' probation sentences on November 1, 2014.  (*See* Doc. # 392-18 at 4).

### E.       Probation of Plaintiff Deunate Jews

Plaintiff Jews was charged with harassment in 2008.  (*See* Doc. # 392-27 at 2).  The Municipal Court dismissed the harassment charge against Jews in January 2009, subject to conditions that Jews (1) pay court costs to the Municipal Court and (2) avoid contact with the complainant.  (*Id.*).  During a deposition, Jews claimed that he had contested the Municipal Court's authority to impose court costs against him when the criminal charge against him had been dismissed.  (Doc. # 392-1 at 50).  Judge Ward responded that he would "lock [Jews] up" unless he signed a probation order.  (*Id.* at 50-51).  Jews did not ask Judge Ward any more questions because he believed that the judge would imprison him if he "said any little thing." (*Id.* at 51).  Jews was unable to pay the assessed court costs on the date of the hearing.  (*Id.* at 52).

After signing a probation order, Jews advised a JCS employee that he would not report to JCS's probation office because the Municipal Court had forced him to sign the probation order. (*Id.* at 56).  He informed the JCS employee that he would not pay the imposed court costs because his case had been dismissed.  (*Id.* at 59).

The Municipal Court held a revocation hearing in Jews's case on February 12, 2009, but Jews did not appear at the hearing.[8]  (Doc. # 392-33 at 6).  The Municipal Court's magistrate issued a capias warrant against Jews on February 17, 2009 for failure to obey a court order. (Doc. # 392-35 at 2).  The warrant directed Jews to pay a bond of $487 to be released.  (*Id.*).

---

[8]  The parties dispute whether JCS provided Jews prior notice of the revocation hearing.  Plaintiffs claim that the City has offered no evidence that a notice to show cause was mailed to Jews because the notice included in the record was unsigned.  (Doc. # 420 at 3).  In addition, Jews has testified that he did not receive a failure to report letter allegedly mailed to him in January 2009 or a notice to show cause allegedly mailed to him in February 2009. (Doc. # 392-1 at 59-62).    The City has averred that JCS tried to mail Jews these letters, but he did not receive them because he had provided an inaccurate address to JCS.  (Doc. # 391 at 4).  (*See also* Doc. # 392-33 at 6 (stating that a JCS employee had sent Jews a failure to report letter in January 2009 and a notice to show cause in February 2009)).  Given the parties' dispute regarding whether JCS mailed the notices to show cause to Plaintiffs, the court has not accepted the City's averments that JCS employees mailed these notices.

Jews was arrested in September 2009.  (Doc. # 392-36 at 3).  In October 2009, the Municipal Court reinstated Jews's probation sentence and charged him a $317 warrant fee.[9]  (Doc. # 392-33 at 6).  Jews was released from the Talladega County Jail on October 22, 2009.  (Doc. # 382-11 at 65).

JCS petitioned the Court to revoke Jews's probation again in December 2009.  (Doc. # 392-33 at 5).  The Municipal Court held a revocation hearing in January 2010, and Jews did not appear at the hearing.  (*Id.*).  The Municipal Court's magistrate issued another capias warrant against Jews based on a conviction for FTOCO.  (Doc. # 392-45 at 2).  This arrest warrant increased his bond amount to $935.  (*Id.*).  City police arrested Jews on August 18, 2010.  (Doc. # 392-46 at 2).  On September 9, 2010, the Municipal Court fined Jews $317 for the failure-to-obey offense and reinstated his probation.  (Doc. # 392-38 at 2).  A City employee authorized Jews's release from the Talladega County Jail on September 9th.  (Doc. # 382-11 at 67).

In November 2010, JCS filed another revocation petition against Jews.  (Doc. # 392-33 at 5).  Jews did not appear at the Municipal Court's December 2010 revocation hearing in his case.  (*Id.*).  The Municipal Court issued another capias warrant against Jews based on a conviction for FTOCO, and he was arrested on January 10, 2011.  (Doc. # 392-50 at 2-3).  A City employee, Misty Hepp, authorized Jews's release from jail on January 14, 2011, after a $500 bond had been paid on his behalf.  (Doc. # 392-51 at 2).  The Municipal Court reinstated Jews's probation sentence in March 2011 and charged him a $317 warrant fee.  (Doc. # 392-33 at 5).

In May 2011, JCS again petitioned the Municipal Court to revoke Jews's probation.  (Doc. # 392-54 at 2).  The revocation petition asserted that Jews needed to pay $773 to close his

---

[9] The Court issued a separate probation order for Jews on this date.  (Doc. # 392-37 at 2).  But JCS's records indicated that the Court merely reinstated his prior probation term.  (Doc. # 392-33 at 6).

case.  (*Id.*).  Yet again, Jews did not appear at a revocation hearing in June 2011.  (Doc. # 392-33 at 4).  On June 10, 2011, the Municipal Court's magistrate issued another warrant against Jews based on a conviction for failure to obey a court order.  (Doc. # 392-56 at 2).  This warrant required Jews to pay $1,090 in bail to be released.  (*Id.*).  A City officer arrested Jews in February 2012 after detaining him to check for outstanding warrants.  (Doc. # 392-57 at 2-3).  Jews fled from the officer and was detained for resisting arrest and failure to obey a court order.  (*Id.*).  During a March 2012 hearing, the Municipal Court reinstated Jews's probation.  (Doc. # 392-33 at 4).  The Court issued yet another probation order.  (Doc. # 392-58 at 2).  This order fined Jews $717 for resisting arrest and $1,090 for FTOCO.  (*Id.*).  The City's police department released Jews from jail on March 8, 2012.  (Doc. # 382-12 at 13).

In June 2012, JCS requested that the Municipal Court revoke Jews's probation.  (Doc. # 392-33 at 3).  The revocation petition was not signed by a JCS employee, and the order directing a hearing was not signed by the Municipal Court's judge.  (Doc. # 392-59 at 2).  The Municipal Court held a revocation hearing in August 2012; Jews did not attend that hearing.  (Doc. # 392-33 at 3).  According to JCS's probation records, the Municipal Court issued a warrant on August 10, 2012.  (*Id.* at 2).  The Municipal Court terminated Jews's probation sentence in December 2014.[10]  (Doc. # 382 at 114).

### F.    Probation of Plaintiff Gina Kay Ray

In June 2010, a City officer ticketed Ray for driving with a suspended license and without proof of insurance.  (Doc. # 423-4 at 2).  Ray pled guilty to both charges during a Municipal Court hearing on August 12, 2010.  (*Id.* at 3).  Ray testified that a public defender attended the

---

[10]   The City disputes that Jews's probation sentence was terminated, based on the probation records attached to its summary judgment filings.  (Doc. # 453 at 8).  The probation records attached to the City's summary judgment motion, however, were produced in June 2013, more than a year before Jews's probation ended.  (*See* Doc. # 392-33 (time stamped on June 21, 2013)).  Therefore, there is no genuine dispute to Plaintiffs' claim that Jews's probation sentence ended in December 2014.

hearing, but she did not believe that an attorney would assist her with a traffic ticket.  (Doc. # 423-1 at 38-39).   Judge Ward imposed a 3-day suspended imprisonment term for each conviction, along with a 24-month probationary sentence.  (Doc. # 423-4 at 3).  Ray was unable to recall whether Judge Ward mentioned the suspended imprisonment term during the hearing.  (Doc. # 423-1 at 43-44).  Judge Ward fined Ray $400 for each traffic offense, imposed $198 in court costs for the suspended license offense, and imposed $148 in court costs for the no insurance offense.  (Doc. # 423-4 at 3).

According to JCS's probation records, JCS prepared a revocation petition against Ray on September 20, 2010.  (Doc. # 423-11 at 8).  The revocation petition filed by the City was not signed by the probation officer or the Municipal Court's judge.  (*See* Doc. # 423-8 at 2).  The Municipal Court held a revocation hearing on October 14, 2010, which Ray attended.  (Doc. # 423-11 at 8).  JCS issued another revocation petition on December 30, 2010, based on Ray's failure to attend probation sessions, pay assessed court fines and fees, and pay probation fees.  (Doc. # 423-14 at 2).  The Municipal Court held a revocation hearing for Ray on January 13, 2011, but she failed to appear.  (Doc. # 423-11 at 7).  Consequently, on January 18, 2011, the Municipal Court's magistrate issued a capias warrant premised upon a FTOCO conviction.  (Doc. # 423-15 at 2).  The warrant provided for a bond of $1,353.  (*Id.*).

Ray was arrested on January 19, 2011.  (*See* Doc. # 455-5).  She remained in the Talladega County Jail until February 10, 2011.  (*See id.*).  The Municipal Court reinstated Ray's probation on February 10, 2011, and imposed a $317 warrant fee.  (Doc. # 423-17 at 2).  In June 2011, a City officer ticketed Ray for driving with an expired tag and a revoked license.  (Doc. # 423-31 at 2).  Ray pled guilty to both offenses in July 2011.  (*Id.* at 3).  The Municipal Court imposed 5-day suspended imprisonment sentences, 24 months of probation, fines totaling $500,

and court costs totaling $346 for the two convictions.  (*Id.*).  In August 2011, a City officer again charge Ray with driving with a revoked license and an expired tag.  (Doc. # 423-28 at 2).  As with her earlier tickets, the Municipal Court imposed a 5-day suspended imprisonment sentences for the expired-tag offense, 24 months of probation for the expired-tag offense, fines totaling $500, and court costs totaling $346.  (*Id.* at 3).

On January 4, 2012, a JCS employee found that Ray had violated her probation because she owed the City $1,008 and JCS $433 in fees.[11]  (Doc. # 423-11 at 4).  The Municipal Court held a revocation hearing on February 10, 2012 that Ray did not attend.  (*Id.*).  Thus, the Municipal Court's magistrate issued a capias warrant against Ray for FTOCO.  (Doc. # 423-23 at 2).  The warrant provided a bail amount of $3,173.  (*Id.*).  On April 21, 2012, City police officers detained Ray because they suspected that she had an active warrant.  (Doc. # 423-24 at 2-3).  She fled from the officers in her car until she was blocked in by traffic.  (*Id.* at 3).  The officers issued her tickets for driving with an expired tag, driving with a revoked license, and attempted escape. (Doc. # 423-27 at 2, 4).

Ray was held in jail from April 21, 2012 to May 1, 2012 on the charge of FTOCO.  (Doc. # 455-7).  On April 26, 2012, the Municipal Court reinstated Ray's probation and imposed a $317 warrant fee.  (Doc. # 423-25 at 2).  The court's probation order stated that Ray owed $3,173 in costs.  (*Id.*).  The order stated that Ray could not be released from jail until $300 had

---

[11]  The parties dispute whether JCS sought to revoke Ray's probation in January 2012 based on her failure to attend scheduled probation appointments.  Plaintiffs state that Ray "attended over 20 JCS appointments" and had paid over $3,000 towards her probation obligations.  (Doc. # 454 at 6).  The City states that a JCS employee relied on Ray's failure to attend scheduled appointments to support a revocation petition.  (Doc. # 423-19 at 2).  JCS's probation records for Ray suggested that its request to revoke her probation was based solely on the amount she owed, as the probation notes did not mention Ray's failure to appear at scheduled meetings as a rationale for revoking her probation.  (Doc. # 423-11 at 4 ("THE DEF IS IN VIOLATION OF PROBATION DUE TO OUTSTANDING [FEES AND FINES] TO THE CITY OF 1008.00/$433.00 JCS FEES, TOTALING $1441.00.").  At a minimum, there is a genuine factual basis to dispute JCS's asserted reason for seeking a revocation hearing against Ray in January 2012.

been paid on her behalf.  (*Id.*).  Ray was released from jail on May 1, 2012 after someone had paid $300 on her behalf.  (Doc. # 423-1 at 149).

In June 2012, Ray pled guilty to driving with an expired tag, driving with a revoked license, and attempting to escape.  (Doc. # 423-27 at 3, 5).  The Municipal Court sentenced Ray to a 5 day suspended incarceration sentence, along with 24 months' probation, for each conviction.  (*Id.*).  It fined her $400 for driving with a revoked license, $400 for attempting to flee, and $100 for driving with an expired tag.  (*Id.*).  It imposed a total of $444.00 in court costs against Ray.  (*Id.*).

JCS again requested that the Municipal Court revoke Ray's probation in August 2012. (Doc. # 423-11 at 3).  The Municipal Court held a revocation hearing in September 2012 and issued a warrant against Ray after she had failed to appear at the hearing.  (*Id.*).  Ray's probation sentence was terminated by court order on November 1, 2014.  (Doc. # 422 at 11).

## III.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial.

*Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."

*Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.    Analysis of Plaintiffs' Claims for Monetary Damages

The City argues that it is entitled to summary judgment on all of Plaintiffs' 42 U.S.C. § 1983 claims for two primary reasons. First, the City argues that Plaintiffs have failed to demonstrate that a municipal policy or custom is at issue in this case because Plaintiffs' claims relate to judicial acts, and the Municipal Court's officers are state officials. (*See, e.g.*, Doc. # 390 at 10-20). Second, the City argues that no municipal policy or custom presented in the operative complaint caused the alleged misconduct by JCS or the Municipal Court. (*See, e.g.*, *id.* at 21-28). In addition, two of the City's three summary judgment motions assert that the City is entitled to summary judgment on certain claims based on the relevant statute of limitations. (Docs. # 391 at 24 & n. 14; 422 at 30 n. 16). The court addresses each of these arguments below.

**A.** **Plaintiffs Have Failed to Show That Their Injuries Resulting from Probation Practices Are Attributable to Policies Instituted by the City's Final Policymakers**

The City contends that it is due to be granted summary judgment on the threshold ground that no *City* policy or custom is at issue in this case because Plaintiffs complain of judicial acts for which the Municipal Court is responsible. (*See* Doc. # 390 at 12). According to the City, the Municipal Court was responsible for making indigency determinations, appointing counsel where necessary, revoking and controlling probation, setting bail, issuing warrants, and incarcerating individuals. (*Id.* at 12-15). In addition, the City argues that the Municipal Court's officials were state employees, not municipal employees. (*Id.* at 17-20).

Plaintiffs respond that this is a factual question for a jury to decide because the JCS-City Contract, along with the practices of the Municipal Court, City police, and City employees, provide evidence of a policy or custom set in place by the City, not the Municipal Court. (*See* Doc. # 419 at 18). Plaintiffs have proposed an especially broad policy or custom for which the City should be held liable. (*Id.* at 18-19). This policy includes the following alleged constitutional or legal violations: (1) ordering probation in order to collect fines, (2) threatening arrest through form application, (3) requesting the arrest of probationers for failure to pay fines, (4) issuing warrants with bond amounts corresponding to the amount owed to the City and JCS, (5) arresting probationers based on an unlawful charge, (6) keeping defendants on probation for more than two years, (7) charging warrant fees with no basis in law, (8) failing to provide counsel to defendants, (9) failing to give jail credit to imprisoned probationers, (10) failing to provide required hearings before revoking probation, and (11) terminating probation or jail terms

when an individual paid the amount owed to the city.[12] (*Id.*).  The court concludes that the City

has the better argument.

> i.     **Legal Standards**

It is axiomatic that a municipality, such as the City, is only liable under Section 1983

when a municipal employee or agent undertakes an action in "execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

said to represent official policy."  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "[A]

municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* at 690.

A plaintiff may establish the existence of a municipal "policy" by identifying "(1) an officially

promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality]

shown through the repeated acts of a final policymaker."  *Grech v. Clayton Cnty., Ga.*, 335 F.3d

1326, 1329 (11th Cir. 2003) (*en banc*).   In both instances, a plaintiff must illustrate that the

governmental entity has "authority and responsibility over the governmental function in issue."

*Id.* at 1330.  "[L]ocal governments can never be liable under § 1983 for the acts of those whom

the local government has no authority to control."  *Turquitt v. Jefferson Cnty., Ala.*, 137 F.3d

1285, 1292 (11th Cir. 1998) (*en banc*).   In analyzing whether a municipality had control over a

policymaker, the court must determine whether the municipality controlled the policymaker with

regard to the "particular area or function" at issue.  *Grech*, 335 F.3d at 1331-32.

"[S]tate law determines whether a particular official has final policymaking authority."

*McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996).  "[S]tate law always should direct

[courts] 'to some official or body that has the responsibility for making law or setting policy'" in

---

[12]  The court shares the confusion that the City expressed at oral argument about the precise contours of the policy or custom that Plaintiffs want to hold the City accountable for.  (*See* Doc. # 559 at 82-83 (explaining the City's confusion over whether the policy or custom arose from the JCS-City Contract or a broader extortion scheme)).

a given area.  *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988)).  Federal courts must respect the allocation of policymaking authority dictated by state law and "may not assume that final policymaking authority lies in some entity other than that in which state law places it."[13]  *Id.* (citing *Praprotnik*, 485 U.S. at 126, 131).  In some cases, though, multiple officials or governmental bodies can share final policymaking authority.  *Id.* at 1578.

State law also establishes whether a particular official acts as a municipal policymaker or a state policymaker with regard to a particular issue.  *See Turquitt*, 137 F.3d at 1288.  In *Turquitt*, the Eleventh Circuit held that an Alabama sheriff acted as a state policymaker when he or she established policies for operating a county jail.  *Id.* at 1288-91.  To support its holding, the Eleventh Circuit relied on (1) the Alabama Constitution's designation of sheriffs as state officers in the executive department, (2) Alabama case law that designated a sheriff as a state executive officer, (3) the legislative history of the Alabama Constitution, (4) the lack of authorization for counties to supervise county jails, and (5) the delegation of supervision over sheriffs to state executive agencies.  *See id.* at 1288-89.  The *Turquitt* opinion recognized that Alabama law held a county responsible for funding the county jail and maintaining the physical plant of a jail and that a county was obligated to pay the county sheriff's salary.  *Id.* at 1289-90.  But the *Turquitt* court nevertheless concluded that a county lacked control over a sheriff through his or her salary because the county could not change the sheriff's salary or refuse to pay it.  *Id.* at 1290.  Finally, while the *Turquitt* opinion recognized a county's duty to pay for jail operations, it declined to adopt a theory that the county partnered with the sheriff to operate a county jail because Alabama law only authorized a county to make funds available for operating a jail, while the sheriff -- a state officer -- held the duty of allocating those funds.  *Id.*

---

[13]  Accordingly, the issue of who is the responsible policymaker for a particular policy is a question of state law, not a question of fact for a jury to decide.  *Praprotnik*, 485 U.S. at 124.

In *Grech*, an *en banc* opinion, the Eleventh Circuit addressed whether a Georgia sheriff acted as a county official or a state official when providing warrant records to a crime information center and training employees to maintain those records. *See* 335 F.3d at 1348. The *Grech* court held that Georgia sheriffs acted as state officials when conducting these duties. *Id.* at 1348. The Eleventh Circuit noted that a state agency ran the crime information center and provided training requirements for employees entering data into the warrant database. *Id.* at 1344-46. The state also published procedures for entering warrants into the database and periodically validating those warrants. *Id.* at 1346. Finally, a state agency was responsible for auditing sheriffs' warrant records and sanctioning sheriffs' offices for violating the state's standards. *Id.* at 1347. For these reasons, the Eleventh Circuit concluded that Georgia sheriffs acted for the state and were controlled by the state when providing and maintaining warrant records in the state's crime information database. *Id.*

### ii.     Alabama Law on Municipal Courts

Under Alabama law, "[t]he judicial power of the state is vested exclusively in a unified judicial system" that includes "such municipal courts as may be provided by law." Ala. Const. of 1901, Art. VI, § 139(a); Ala. Code § 12-1-2. This judicial power includes jurisdiction over criminal cases. Ala. Code § 12-1-3. The Alabama Supreme Court has been authorized to create procedural and administrative rules for municipal courts. *Id.* § 12-2-19(a). The Alabama Constitution requires municipal judges to possess law licenses and allows the state legislature to set other qualifications for municipal judges. Ala. Const. of 1901, Art. VI, § 145.

As a judge in the Alabama judicial system, a municipal court judge may be investigated by Alabama's Judicial Inquiry Commission. *See id.*, Art. VI, § 156(b) (allowing the commission to investigate "any judge of a court of the judicial system of this state"). The Judicial Inquiry

Commission may file charges against a municipal judge for violating the state's Canon of Judicial Ethics with the Court of the Judiciary. *Id.* The Court of the Judiciary may sanction a municipal judge for violating the Canons of Judicial Ethics, committing misconduct, or failing to perform his or her duties.[14] *Id.*, Art. VI, § 157(a)(1).

Municipal court judges may suspend a sentence and place a defendant on probation for up to two years. Ala. Code § 12-14-13(a). A municipal court judge also may direct a probation officer or another suitable person to investigate the probationer. *Id.* § 12-14-13(b). He or she may impose suitable conditions of probation, including an obligation for the probationer "[t]o pay the fine and costs imposed or such portions thereof as the judge may determine and in such installments as the judge may direct." *Id.* § 12-14-13(d)(7).

A municipal court judge may defer a defendant's obligation to pay court costs or fines or direct the defendant to pay them in installments. Ala. R. Crim. P. 26.11(d). Fines are to be paid to the municipal court's clerk unless the municipal court directs otherwise. *Id.* 26.11(e). "Incarceration shall not automatically follow the nonpayment of a fine or restitution. Incarceration should be employed only after the court has examined the reasons for nonpayment." *Id.* 26.11(i)(1).

Alabama municipal courts are authorized to employ magistrates. *See* Ala. R. Jud. Admin. 18(I)(B). These magistrates possess the authority to issue arrest warrants, set bail, receive guilty pleas for certain cases, accept pleas of indigency, and appoint counsel for indigent defendants, among other duties. *Id.* 18(I)(B)(2). The Alabama Rules of Judicial Administration establish qualifications for magistrates and require them to take an oath of office. *Id.* 18(II)(A), (IV). The

---

[14] Notably, the Alabama Supreme Court has instituted mandatory continuing education requirements for municipal court judges. Ala. R. Mandatory Continuing Educ. for Municipal Ct. Judges, Municipal Magistrates/Clerks, and Probate Judges, Rule II, *available at* http://judicial.alabama.gov/library/rules/ManJEd.pdf.

comments in the Alabama Rules of Judicial Administration clarify that magistrates are judicial officers authorized by the Alabama Constitution.[15]  Ala. R. Jud. Admin. 18, Comment.  *See also* Ala. Const. of 1901, Art. VI, § 139(b) (permitting the Alabama legislature to "create judicial officers with authority to issue warrants").

Alabama municipalities are directed to provide facilities and other adequate support for Alabama municipal courts.[16]  Ala. Code § 12-14-2(a); *Wilkins v. Dan Haggerty & Assocs.*, 672 So. 2d 507, 510 (Ala. 1995).  Municipalities have the power to abolish municipal courts and to reestablish municipal courts.  Ala. Code §§ 12-14-17(a); 12-14-19(a).  They are required to pay the municipal court judge's salary.  *Id.* § 12-14-33(a).  Moreover, they are allowed to provide probation services, clerks, and magistrates to municipal courts.  *Id.* § 12-14-2(a).  The Alabama Supreme Court has held that municipalities may "contract with a private firm to aid in the collection of delinquent municipal court fines" to fulfill their duties to adequately support municipal courts.[17]  *Wilkins*, 672 So. 2d at 510.

In *Wilkins*, the Alabama Supreme Court also held that a municipal court judge could impose additional fees on individuals who had failed to appear before the municipal court and individuals who had failed to completely pay fines imposed by the court.  *Id.* at 510-11.  The *Wilkins* Court noted that the fines issued by the municipal court in that action did not exceed the $500 jurisdictional limit.  *Id.* at 510.  The *Wilkins* opinion did not decide whether a municipality could impose an additional fine in such circumstances but did opine that the *Wilkins* plaintiffs might have been "correct in arguing that a mayor or city council acting alone cannot legally

---

[15]  Magistrates must complete a mandatory certification course.  Ala. R. Jud. Admin. 18(I)(A)(4).

[16]  Notably, municipal court judges are not entitled to benefits provided to state employees.  Ala. Code § 12-1-15(a).

[17]  Alabama law also grants municipalities the power to enter into contracts in furtherance of their governmental functions.  Ala. Code § 11-40-1.  Municipal court judges are not expressly granted the power to enter into contracts.  *See id.* § 12-14-31.

impose an additional fine on persons who have already been ticketed or given a misdemeanor citation." *Id.*

   iii. **The City's Municipal Court Judge was the Final Policymaker Responsible for the Terms of Plaintiffs' Probation Orders, JCS's Probation Practices, and the Procedures Used by the Municipal Court to Revoke and Reinstate Probation**

Alabama law demonstrates that the policymaker responsible for the policies that led to JCS's conduct against Plaintiffs was the Municipal Court's judge, Judge Ward.  State law granted Judge Ward the authority to sentence defendants to probation, to set probation conditions, to impose fines on defendants, and to establish payment plans for defendants when they could not immediately pay the fines imposed.  *See* Ala. Code § 12-14-13(a), (d); Ala. R. Crim. P. 26.11(d).   Likewise, Judge Ward was responsible for determining an appropriate punishment when an individual failed to pay fines imposed on him or her.  Ala. R. Crim. P. 26.11(i)(1).

Although Alabama law placed policymaking authority for probation, fine issuance, bond determinations, and indigency determinations with the Municipal Court and its judge, this court denied the City's motion to dismiss this action because Plaintiffs had plausibly alleged that the JCS-City Contract "handcuffed the autonomy of the municipal court."  (Doc. # 65 at 13). Indeed, Alabama law granted the City authority to provide probation services to the Municipal Court and to contract with a private probation service.  Ala. Code § 12-14-2(a); *Wilkins*, 672 So. 2d at 510.  Moreover, the JCS-City Contract purported to bind the Municipal Court to its terms, and the City's mayor claimed to sign the contract on behalf of the Municipal Court.  (Doc. # 392-16 at 3).  On its face, the JCS-City Contract bound the Municipal Court to include certain fees in its probation orders.  (*Id.* at 6).  But, as noted above, the Municipal Court's judge did not sign the contract.  (*See id.* at 3).  So, what effect did the contract have on the Municipal Court?

Whatever legal obligations the JCS-City Contract placed on Judge Ward, it did not (and could not) obligate Judge Ward to set certain terms of probation.  The court has found no Alabama law or authority supporting the proposition that the JCS-City Contract bound the Municipal Court to appoint JCS as the probation service for all defendants or to include JCS's probation fees in every probation order.  Indeed, the only analogous opinion from the Alabama Supreme Court suggests that an Alabama municipality *cannot* impose additional fees or fines on a municipal-court defendant.  *See Wilkins*, 672 So. 2d at 510 ("[T]he plaintiff class may be correct in arguing that a mayor or city council acting alone cannot legally impose an additional fine on persons who have already been ticketed or given a misdemeanor citation . . . .").  Plaintiffs argue that the Municipal Court's judge merely "followed the direction" of the City's mayor and City Council when he sentenced individuals to probation supervised by JCS.  (Doc. # 419 at 21).  Even if true, though, the City's mayor and the City Council did not impose unconstitutional terms and conditions of probation, unconstitutionally imprison probationers without an indigency determination or access to counsel, unlawfully impose fees and probation terms beyond the statutory maximums available, or unconstitutionally treat defendants disparately based on their wealth.  Those actions were committed either by the Municipal Court or by JCS employees *after* JCS had been assigned to supervise Plaintiffs' probation.

### iv.    The Municipal Court Judge Did Not Act as a City Policymaker

In light of Alabama's delegation of judicial authority to the state judicial system, it follows as a matter of law and logic that the Municipal Court's judge acted as a state policymaker when sentencing Plaintiffs to probation, setting terms of probation, designating JCS as the probation agency, and revoking or reinstating probation.  This state's supreme law, the

Alabama Constitution, designates municipal courts as courts under the unified judicial system.[18]
Ala. Cost. of 1901, Art. VI, § 139(a).  *See Turquitt*, 137 F.3d at 1288 (relying, in the first
instance, on the Alabama Constitution's designation of a sheriff as a state official).   The
Alabama Supreme Court, a state agency, held the authority to create procedural and
administrative rules that regulated the Municipal Court.  Ala. Code § 12-2-19(a).  *See Turquitt*,
137 F.3d at 1289 (relying on a state agency's control of rules regarding the policy at issue as
evidence that the sheriff had acted as a state policymaker).  And it is state law that provides the
Municipal Court authority to impose probation on defendants, not the City's municipal code.
*See* Ala. Code § 12-14-13(a), (d).   Finally, a state court -- the Court of the Judiciary -- is
responsible for sanctioning a municipal court's judge for misconduct or ethical violations.[19]  *See*
Ala. Const. of 1901, Art. VI, §§ 156 & 157.  *See also Grech*, 335 F.3d at 1347 (considering a
state agency's control over sanctions as evidence that a sheriff acted as a state policymaker when
maintaining warrant records).  Although the City paid Judge Ward's salary, that fact alone did
not grant the City control over him.  *Cf. Turquitt*, 137 F.3d at 1290 (recognizing that an Alabama
sheriff was not a county official even though his salary was paid by a county).  Because the
Municipal Court's judge was a member of the state's judicial system, implemented state law
when issuing and supervising probation sentences, and was subject to the disciplinary control of

---

[18]  The United States Supreme Court has acknowledged that Alabama state judges are state officials, even though many of them have limited jurisdictions.  *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 792 (1997).  And Alabama municipal courts are included in the same unified judiciary system as the Alabama circuit and district courts.  Ala. Cost. of 1901, Art. VI, § 139(a).

[19]  Indeed, the Court of the Judiciary recently suspended a municipal court judge without pay for eleven months for failing to comply with the Alabama Rules of Criminal Procedure before imprisoning offenders for failing to pay court-issued fines and costs.  *See In the Matter of Armstead Lester Hayes III*, Ct. of the Judiciary Case No. 49, Final Judgment (Ala. Ct. Judiciary Jan. 5, 2017).

a state agency, the court finds that he acted as a state policymaker, not a municipal policymaker, when implementing the probation policies at issue in this case.[20]

Plaintiffs have argued that the Municipal Court's judge was hired by the City and did not actually supervise the Municipal Court's employees.  (*See* Doc. # 419 at 19).  To the extent that supervision of the Municipal Court's clerks and magistrates is at issue, though, it is an issue of Judge Ward's dereliction of duty, not the City's implementation of its own policies and customs, because the municipal court judge held control of the judicial functions of the municipal court. Although Alabama law imposed an obligation on the City to pay for supporting personnel, *see* Ala. Code § 12-14-2(a), it did not grant the City any control over the Municipal Court's judicial functions, *see* Ala. Const. of 1901, Art. VI, § 139(a) (placing the state's judicial power in the hands of the unified judiciary branch).

The court recognizes that a plurality opinion in the *Grech* case decided that Georgia sheriffs were state officers, notwithstanding an express constitutional provision that Georgia sheriffs were county officers.  *See Grech*, 335 F.3d at 1332-44.  The *Grech* plurality readily acknowledged, though, that this section of the plurality opinion did not obtain a majority vote. *See id.* at 1347 n. 46.  In accordance with the Eleventh Circuit's *en banc* opinion in *Turquitt*, the court simply cannot look to the plurality opinion in *Grech* (*i.e.*, an opinion with no precedential effect) and deem the City's municipal court judge to be a City policymaker. Such an approach would eviscerate the provision in the Alabama Constitution that incorporates all municipal courts into the state's unified judicial system.  *See Turquitt*, 137 F.3d 1288 (beginning its analysis of

---

[20]  This conclusion is consistent with case law from the Fifth and Ninth Circuits.  *See Eggar v. City of Livingston*, 40 F.3d 312, 316 (9th Cir. 1994) (holding that a municipal court judge was not acting under a municipal policy or custom because he performed the acts at issue as a state judicial officer); *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) ("We have repeatedly held . . .  that a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker.").

state law with the Alabama Constitution and the legislative history of that Constitution).   It

would also contravene the earlier *en banc* decision in *Turquitt*.

Plaintiffs also have claimed that the Municipal Court was not a separate entity from the

City.   (Doc. # 419 at 20).   This argument cuts no ice.   The Alabama Constitution plainly

designates the municipal court as an agency under the unified judicial system, not the

municipality.   Ala. Const. of 1901, Art. VI, § 139(a).   While the municipality had an obligation

to adequately fund the municipal court, the Eleventh Circuit has held in an analogous context

that a county's duty to pay a sheriff and jail personnel does not translate to control over the

sheriff.[21]   *Turquitt*, 137 F.3d at 1290 (quoting *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781,

791-92 (1997)).   Similarly, Plaintiffs contend that the City should be held responsible for the

Municipal Court's acts because it benefitted the fines and fees collected through the alleged

constitutional violations.   (*See, e.g.*, Doc. # 419 at 19).   Although the court recognizes that the

City received payments from JCS for fines and fees imposed by the Municipal Court, that does

not resolve the question of whether it is responsible for the Municipal Court's probation policies.

This is so even if the probation policies benefitted the City by allowing it to not pay for JCS's

probation supervision services and by making it more likely that probationers would pay the full

amount of fines and fees owed.

> ### v.     To the Extent a Municipal Court Magistrate's Customs and Policies Caused Plaintiffs' Damages, the Magistrate Acted as a Policymaker for the Municipal Court, Not the City

Plaintiffs have indicated that the Municipal Court's magistrate was responsible for arrest

warrants based on "bogus charges" of failure to obey a court order.   (Doc. # 419 at 19).   The

---

[21]   The City inadvertently supported this argument by insisting that Plaintiffs' injunctive claims are moot because "Childersburg has adopted extensive new procedures which address all concerns."  (Doc. # 391 at 28 n. 16). While this footnote can be read broadly as an assertion of control over the Municipal Court by the City, the record demonstrates that the Municipal Court's judge adopted new probation and probation revocation procedures in August 2014 on behalf of the Municipal Court.  (Doc. # 423-38 at 2).

court understands this to be an argument that constitutional violations related to those warrants resulted from a policy or custom initiated by the magistrate.  And the court also recognizes that the Municipal Court's magistrate held the authority to issue warrants without the approval of the Municipal Court's judge.  *See* Ala. R. Jud. Admin. 18(I)(B)(2)(i).  But, like a municipal court judge, a municipal court magistrate is not a policymaker for the City when conducting judicial acts, such as issuing a warrant.  *Woodard v. Town of Oakman*, 885 F. Supp. 2d 1216, 1232 (N.D. Ala. 2012) (granting an Alabama municipality summary judgment on a Section 1983 claim regarding the issuance of an arrest warrant because the municipality did not control the magistrate's issuance of that warrant).  This is because he or she is controlled by the state's judiciary system.

As the Alabama Rules of Judicial Administration demonstrate, a magistrate is a judicial officer under the control of Alabama's unified judiciary.  Ala. R. Jud. Admin. 18, Comment (referring to Ala. Const. of 1901, Art. VI, § 139(b)).  Municipal court magistrates are granted authority to conduct judicial acts by rules promulgated by the Alabama Supreme Court.  *See* Ala. R. Jud. Admin. 18(I)(B)(2).  Moreover, the Alabama Supreme Court has set qualification and certification standards for magistrates.  Ala. R. Jud. Admin. 18(I)(A)(4), (II)(A).  Thus, regardless of the City's responsibility to pay the magistrate, the magistrate did not act as a municipal officer when conducting her judicial duties.  *See Woodard*, 885 F. Supp. 2d at 1232.

### vi.   Plaintiffs Have Not Shown that a Policy or Custom Enacted by the City's Police Department is at Issue in This Case

Plaintiffs have argued that the City's policy or practice included "arrests by city police on the bogus charge [of] FTOCO."  (Doc. # 419 at 18-19).  The court construes this as an argument that the City instituted a policy or custom of falsely arresting and imprisoning individuals based on unlawful warrants.  To be sure, this argument challenges conduct attributable to employees

who were controlled by the City, rather than by the state judiciary. Nevertheless, this particular Section 1983 challenge is directed at law enforcement officers' executions of court-issued arrest warrants. Therefore, it runs into two insuperable obstacles.

The first obstacle is that the City's police officers are entitled to absolute quasi-judicial immunity for executing facially valid court orders. *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994). An order can be facially valid even if it contains a legal error. *Id.* at 556. Specifically, an officer is entitled to quasi-judicial immunity for executing a court order if it is facially fair, it was issued by a court with jurisdiction over the parties and the subject matter of the suit, and it was issued in the regular course of judicial proceedings. *Id.* Here, Plaintiffs have not indicated (much less presented any substantial evidence) that the arrest warrants for FTOCO were facially invalid, nor have they questioned the Municipal Court's subject matter jurisdiction to issue arrest warrants. Indeed, Alabama law grants the Municipal Court's magistrates jurisdiction to issue arrest warrants. Ala. R. Jud. Admin. 18(I)(B)(2). Although the Rule 56 record indicates that the City never passed an ordinance outlawing failure to obey a court order (*see* Doc. # 402-35), a City police officer was not (and is not) empowered to question the validity of a conviction referenced in a Municipal Court arrest warrant when he or she had no involvement in procuring the arrest warrant. As the former Fifth Circuit stated, the law does not require a police officer to choose between a charge of dereliction of duty for failing to effectuate an arrest warrant and Section 1983 liability for acting on the warrant. *Turner v. Raynes*, 611 F.2d 92, 93 (5th Cir. 1980) (quoting *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). Therefore, it is unlikely that Plaintiffs could maintain Section 1983 claims against individual City police officers for executing facially valid arrest warrants based on an offense that did not exist.

The second obstacle -- and the more consequential one here -- is that Plaintiffs have not identified the final decisionmaker for the City who was responsible for issuing a policy or custom directing officers to arrest probationers based on invalid FTOCO charges.  If Plaintiffs' Section 1983 claims concerning these arrests are based solely on the officers' arrests, then the City cannot be held liable under Section 1983 on a *respondeat superior* basis for the conduct of employees who lacked final decisionmaking authority.  *Monell*, 436 U.S. at 690.  Moreover, if these Section 1983 claims are based on the adoption of the JCS-City Contract, then Plaintiffs have not demonstrated that the JCS-City Contract itself contained any policy or custom regarding the duties of the City's police.  (*See generally* Doc. # 392-16).  Simply put, the court cannot discern from the Rule 56 record any policy or custom by the City to have its police department effectuate a "collection practice" by arresting probationers based on warrants purportedly predicated on FTOCO charges.  (Doc. # 419 at 1).  Indeed, the undisputed facts do not support such a theory.

### vii.    Conclusion

For the reasons stated above, the probation customs and policies implemented by the City's Municipal Court judge, the Municipal Court magistrate, and JCS are not attributable to a City policymaker.  Thus, as Plaintiffs cannot show that their harms resulted from the execution of a City custom or policy, summary judgment is due to be granted to the City on Plaintiffs' Section 1983 claims.  *See Monell*, 436 U.S. at 694.

> **B.**     **Alternatively, the JCS-City Contract and Any Custom or Policy of the City was Not the Moving Force Behind Plaintiffs' Alleged Constitutional Violations**

As an alternative basis for summary judgment, the City has argued that Plaintiffs present no direct causal link between its policies and the constitutional harms they claim in this action. (Doc. # 390 at 21).  The court agrees.

To present a viable Section 1983 claim against a municipality, a plaintiff must show that a municipal policy or custom was the "moving force" behind his or her injury.  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).  This causation element of a Section 1983 claim is easier to prove when the municipality's action itself violates the Constitution.  *Id.* at 404.  But, if a plaintiff's claim relies on a facially lawful policy or custom causing a constitutional violation, a court must apply a rigorous standard of causation to avoid imposing *respondeat superior* liability on a municipality.  *Id.* at 405.

Thus, the court cannot apply a strict "but for" causation standard when reviewing whether a facially valid municipal policy or custom caused a constitutional violation by others. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004).  A plaintiff cannot hold a municipality liable for a constitutional violation merely because its custom or policy made it more likely that a constitutional violation would occur.  *Id.* (citing *Brown*, 520 U.S. at 411). Indeed, the Sixth Circuit has explained that a court must determine that a defendant's act was a proximate cause of the ultimate constitutional violation in order for it to be considered a moving force.  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007). Using this framework in *Powers*, the Sixth Circuit discussed situations where a judicial act constitutes a superseding cause that severs the chain of liability begun by another state actor's conduct.  *Id.* at 610.  A judicial act generally severs the chain of liability where a judge

misapplies the law after another state actor has informed him or her of all the material facts.  *Id.*  A judicial act generally does not sever the chain of liability, though, if the other state actor misrepresents or omits material facts.  *Id.*

In *McDowell*, the Eleventh Circuit reviewed whether a county could be held liable under Section 1983 on the ground that it had failed to properly fund and staff a jail where the plaintiff failed to identify a pattern of injuries linked to those budgetary decisions.  *See* 392 F.3d at 1291.  It then examined whether the plaintiff's injuries "were a 'plainly obvious consequence' of that [budgetary] decision."  *Id.* at 1292 (quoting *Brown*, 520 U.S. at 412).   It held that the plaintiff had failed to present the requisite causal link between the county's budgetary policy and his injuries because jail officials had been instructed to obtain an ambulance for the plaintiff to be sent to the hospital when the jail could not arrange for his transportation due to a lack of personnel.  *See id.* at 1293.

Here, the Rule 56 evidence, even when taken in the light most favorable to Plaintiffs, shows that the JCS-City Contract did not proximately cause the illegal probation terms, unlawful probation procedures, unlawful arrest warrants, or unlawful imprisonment terms described in the operative complaint.  It is true that the JCS-City Contract made JCS available to the Municipal Court for probation services.  But Alabama law permitted the City to make private probation services available to its Municipal Court.  *Wilkins*, 672 So. 2d at 510.  Nothing in the JCS-City Contract required the Municipal Court to sentence certain defendants to probation.  Nor did the JCS-City Contract prevent the Municipal Court from holding indigency hearings or directing JCS to supervise a probationer without charging fees.[22]  In addition, no evidence indicates that

---

[22]  The court recognizes the possibility of some implicit or oral agreement that the Municipal Court would not order JCS to supervise probationers without providing for compensation from probationers.  But the Rule 56 record contains no evidence of such an agreement.  Both Judge Ward and the City's former mayor have denied

33

the City or its policymakers omitted material information from the Municipal Court or misrepresented facts to the municipal court. *Cf. Powers*, 501 F.3d at 610.

Plaintiffs suggested at oral argument that the City should be held responsible for the Municipal Court's and JCS's probation policies because the JCS-City Contract was in effect for over ten years and the City did not act to stop the alleged constitutional violations by JCS and the Municipal Court.  (*See* Doc. # 559 at 68-69 ("We have a system that has gone on for over 10 years that the council and the mayor put in place and that they fed from until we sued them.  And to suggest that there was no control over [Judge] Larry Ward, that just ignores the facts.")). Obviously, JCS's "conduct" resulted in a financial benefit to the City.  But the City cannot be held liable under Section 1983 solely on the basis of a principal-agent relationship between JCS and itself, even assuming that the JCS-City Contract obligated JCS to perform any duties for the City.  *See Evans v. City of Talladega*, 136 F. Supp. 3d 1354, 1362 (N.D. Ala. 2015) (declining to impose Section 1983 liability on a municipality for conduct committed by a private agent who operated a historic theater because the service performed by the agent was not "a function traditionally within the exclusive prerogative of the state").  If the court premised the City's Section 1983 liability on that relationship alone, it would be tantamount to imposing *respondeat superior* liability.  Plaintiffs have not presented Rule 56 evidence indicating that a final policymaker for the municipality knew of the alleged unconstitutional conduct by JCS or the Municipal Court when permitting the JCS-City Contract to be renewed or when renewing Judge Ward's contract with the City.

Accordingly, Plaintiffs have not shown that the JCS-City Contract proximately caused the alleged constitutional violations in the complaint, and the City is entitled to summary

---

communicating with JCS before the City entered into the JCS-City Contract.  The City denied at oral argument that the contract allowed JCS to draft form orders for the Municipal Court.  (Doc. # 559 at 87).

judgment, even if the JCS-City Contract was considered to be the relevant municipal policy or custom.

    **C.**    **Plaintiff Jews's Due Process Claim Based on His 2009 Probation Sentence With No Underlying Suspended Sentence is Time-Barred, But the Claims of Plaintiff Ray are Not Time-Barred**

The City has raised a statute of limitations defense to various claims made by Plaintiffs Ray and Jews. (Docs. # 391 at 24 & n. 14; 422 at 30 n. 16). Specifically, the City has claimed that Jews's claims based on the Municipal Court's imposition of probation in January 2009, his September 2009 arrest, his October 2009 Municipal Court hearing, and his August 2010 arrest are time-barred because Jews was aware of the allegedly unconstitutional aspects of his probation in January 2009.[23] (Doc. # 391 at 24). The court is not impressed by the parties' sparse briefing on this issue. Nevertheless, it is appropriate for the court to consider this challenge to Plaintiffs' monetary claims because it is wholly separate from the municipal policy issues discussed above. And the court agrees with the City that some of Jews's claims are barred by the applicable two-year statute of limitations.

The statute of limitations in Alabama for Section 1983 claims is two years. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989) (holding that Section 1983 actions are governed by the residual or general personal injury statute of limitations in states with more than one statute of limitations); Ala. Code § 6-2-38(l) ("All actions for any injury to the person or rights of another not arising from contract and specifically enumerated in this section must be brought within two years). "[W]hen a Section 1983 action accrues is a question of federal law." *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (citing *Rubin v. O'Koren*, 621 F.2d 114, 116 (5th Cir. 1980)). A federal claim does not accrue until "the plaintiff knows or has reason to

---

[23] Likewise, the City contends that Plaintiffs' claims based on Ray's initial probation sentence are time-barred because the sentence was imposed on August 12, 2010, and this action was filed on August 28, 2012. (Doc. # 422 at 30 n. 16). The court addresses Plaintiff Ray's claims below.

know of the injury which is the basis of the action." *Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 588 (11th Cir. 1990).  Likewise, a federal action doesn't accrue until "the plaintiff is aware or should have been aware who has inflicted the injury." *Mullinax*, 817 F.2d at 716 (citing *Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980)).

One exception to the federal standard for accrual of a claim is the continuing violations doctrine, and the Eleventh Circuit has applied this exception to Section 1983 cases.  *See, e.g.*, *Smith v. Shorstein*, 217 F. App'x 877, 881 (11th Cir. 2007) (citing *Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003) (*per curiam*)).  "Under the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period."  *Natl. Parks & Conservation Assn., Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982)).  In other words, the doctrine "permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period."  *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007) (citing *Hipp v. Liberty Natl. Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001)).  "When the violation alleged involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases."  *Id.* (citations omitted).  "The critical distinction in the continuing violation analysis . . . is whether the plaintiff[] complain[s] of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does."  *Lovett*, 327 F.3d at 1183 (quoting *Knight v. Columbus, Ga.*, 19 F.3d 579, 580-81 (11th Cir. 1994)) (changes in original). "Where a continuing violation is found, the plaintiff[] can recover for any violations for which the statute of limitations has not expired."  *Knight*, 19 F.3d at 581.

Here, those claims that accrued on or after August 28, 2010 are not time-barred.  There is no question that the Fugatts' claims were presented to the court within the statute of limitations because the Municipal Court did not sentence them to probation until January 2011.  (Docs. # 392-18 at 3; 392-19 at 2).  Likewise, the City cannot dispute that Plaintiff Ray's claims are timely unless a claim is premised solely upon events that occurred between August 12, 2010 and August 28, 2010.  (*See* Doc. # 423-11 at 3 (noting that Plaintiff Ray's probation had commenced on August 12, 2010)).  However, all of the alleged constitutional violations against Ray that could have commenced at her original sentencing appear to be continuing violations.  At a minimum, Plaintiff Ray's due process claim presents a continuing violation because the probation order entered in her case imposed periodic probation fees for JCS with any regard for her indigency.[24]  Likewise, Plaintiff Ray's equal protection claim presents a continuing violation because her probation order charged periodic probation fees due to her inability to pay the court-imposed fines and fees in a lump sum.  Therefore, the court is unable to find that any of Plaintiff Ray's claims should be dismissed as time-barred.

The City presents a more meritorious argument that one of Plaintiff Jews's due process claims is time barred.  (Doc. # 391 at 24).  This claim is premised upon the fact that some of the Municipal Court's orders included probation sentences without imposing a jail sentence as well.  (*See* Doc. # 305 at ¶ 130).  To the extent such a claim is valid, the facts underlying the due process claim were available to Jews by examining the sentencing documents.  And, since Jews

---

[24]  Many of the alleged due process violations against Ray occurred within the two-year limitations period, as JCS sought to revoke her probation for the first time in September 2010 and the Municipal Court held its first revocation hearing in Ray's case in January 2011.  (*See* Doc. # 423-11 at 8).  Likewise, her Section 1983 unreasonable seizure and inadequate counsel claims appear timely because the Municipal Court held its first revocation hearing in her action, a magistrate issued an arrest warrant, and she was sent to Talladega County Jail in January and February 2011.  Because the Municipal Court's original judgment against Ray imposed a fine within the $500 statutory maximum and a probation sentence at the 24-month statutory maximum, (*see* Doc. # 423-4 at 3), her Eighth Amendment claim premised upon the imposition of fines and probation terms above the statutory maximum must have accrued within the limitations period.

attended the initial hearing before the Municipal Court, he was aware (or should have been aware) of who inflicted this due process injury.  *Cf. Mullinax*, 817 F.2d at 716.  This due process claim presents a one time violation, not a continuing violation.  *Cf. Lovett*, 327 F.3d at 1183. Accordingly, in the alternative, the City is entitled to summary judgment on Plaintiff Jews's due process claim for unlawfully imposing a probation sentence with no underlying jail sentence because that claim is time barred.[25]

## V.      Analysis of Claims for Declaratory and Injunctive Relief

In two footnotes, the City argues that Plaintiffs' claims for declaratory and injunctive relief are moot.  (Docs. # 390 at 29 n. 13; 391 at 28 n. 16).  The City insists that these claims are moot because (1) it has terminated the JCS-City contract, (2) it has appointed a new municipal court judge, (3) it has appointed a new municipal court magistrate, (4) it has adopted new court procedures, and (5) the Municipal Court has not issued any arrest warrants for individuals placed on probation.  (*See id.*).  Plaintiffs have responded that their declaratory and injunctive claims are not moot because "injunctive and declaratory relief is nonetheless needed to prevent reoccurrence of these events and to declare the challenged practices to be unconstitutional." (Doc. # 419 at 30 n. 10).  Frankly, there is a good argument that an argument in a footnote is no argument at all.  But, enforcement of that principle here would hurt both sides.  And, since the court has determined that the City is entitled to summary judgment for Plaintiffs' monetary damages claims, it is appropriate to also address whether the City is entitled to summary judgment for the declaratory and injunctive relief claims.

---

[25]  The City summarily argues that "all of Jews's claims based on events occurring prior to August 28, 2010 are time barred."  (Doc. # 391 at 24 n. 16).  As explained further above, this argument is too simplistic because it does not consider that some of the claims in this action present continuing violations, such as Plaintiffs' equal protection and Eighth Amendment claims.

In their complaint, Plaintiffs have requested that the court enjoin the City from placing defendants on probation for paying fines, assessing fines greater than $500 against a defendant, placing a defendant on probation for more than 24 months, or imprisoning indigent probationers for failure to pay fines or fees.  (*See* Doc. # 305 at 62-64 (listing requested injunctions in the complaint's prayer for relief)).  The fatal flaw in these requests is that it is the Municipal Court, not the City, which possesses control over a probationer's terms of probation.

The Supreme Court has held that a plaintiff must show that a constitutional violation has occurred because of a municipality's policy or custom in order to receive prospective relief against a municipality under Section 1983, such as a declaratory judgment or an injunction.  *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 34 (2010) ("We conclude that *Monell*'s holding applies to § 1983 claims against municipalities for prospective relief as well as to claims for damages.").  As explained in detail above, the Municipal Court's customs and policies relating to fines, fees, probation terms, and arrest warrants are not policies or customs of the City because the Municipal Court's judge acts as a state policymaker when establishing or applying such judicial customs or policies.  Therefore, Plaintiffs cannot receive prospective relief against the City regarding probation procedures or warrant procedures of the Municipal Court, regardless of whether the Municipal Court's judicial acts violated Plaintiffs' constitutional rights.[26]

Plaintiffs also have requested a declaration that the JCS-City Contract is void, along with other contracts between JCS and other Alabama municipalities.  (*See* Doc. # 305 at 62-63).  The

---

[26]  The court acknowledges that in another federal-court action against an Alabama municipality and the municipal court judges employed by that city, the parties entered into a settlement agreement which included declaratory and injunctive relief affecting the municipal court.  *See generally Mitchell v. City of Montgomery*, 2014 WL 11090432 (M.D. Ala. Nov. 17, 2014) (unpublished).  Notably, the settlement agreement in the *Mitchell* litigation enjoined the municipal court  judges and the municipal court from using a private probation service and required them to comply with designated judicial procedures.  *See id.* at *2-9.  It did not enjoin the city from committing judicial acts that violate the Constitution.  *See id.* at *4 (requiring the municipality to prevent its jail administrator from jailing individuals without a designated notice and to file a motion for joinder).  While this settlement agreement is not binding on the court in any sense, it illustrates that most of the issues presented in Plaintiffs' Fourth Amended Complaint are not actually controlled by the City's policies or procedures.

JCS-City Contract undoubtedly was a policy instituted by the City's final policymakers. However, Plaintiffs currently lack standing to challenge the validity of that contract in a declaratory action because it is undisputed that the City terminated it in 2015.  (Doc. # 392-63). A plaintiff seeking declaratory relief from a federal court must show "a reasonable expectation that the injury they have suffered will continue or will be repeated in the future."  *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999).  At the commencement of this suit, Plaintiffs certainly had a reasonable expectation of future injury from the JCS-City Contract because JCS still was providing probation services to the Municipal Court and Plaintiffs still were probationers under JCS's supervision.  (*See* Doc. # 65 at 23 (relying on allegations that Plaintiffs were still subject to probation)).

But it now is undisputed that the JCS-City contract has been terminated and that JCS is no longer operating in Alabama.  (*See* Doc. # 492 at 18).  None of the Plaintiffs currently are subject to a probation sentence from the Municipal Court.  The court recognizes that the City could possibly enter into a similar probation services contract or that JCS could reenter business in the state of Alabama.  But the mere possibility of similar conduct by the City does not present a controversy that the court may resolve through a declaratory judgment.  *See Malowney*, 193 F.3d at 1348 (holding that a remote chance of plaintiffs facing actions against their bank account under a Florida statute did not present a substantial likelihood of future injury).  For these reasons, the City is entitled to summary judgment for Plaintiffs' claims seeking injunctive relief, and Plaintiffs' request for a declaratory judgment is due to be dismissed for lack of standing.

## VI.   Conclusion

There is really no question that the City's Municipal Court operated in fundamental violation of Alabama law under Judge Larry Ward's tenure.  Under well-settled Alabama law,

Judge Ward was responsible for supervising the Municipal Court, its magistrates, and its probation supervision provider.  Yet, Judge Ward only appeared at the Municipal Court for a few hours a month, and claims he had no knowledge regarding the municipal court outside of his judicial responsibilities.[27]  Nothing in this opinion should be taken as an endorsement of the Municipal Court's operating procedures under Judge Ward or his "supervision" of that Court.

Having said that, this court does not function as a super-legislative body, and it cannot order the City to pay monetary relief or enjoin the City merely because it appointed and paid a judicial officer who recklessly failed to supervise the Municipal Court's private probation service.  Nor can it hold the City liable for the Municipal Court's failure to comply with Alabama law when conducting judicial functions.  It cannot issue an injunction against the City based on customs and policies of a state policymaker, even if that policymaker was paid by the City.  And it cannot declare a municipal contract illegal when the contract is no longer in effect.

For these reasons, the City's motions for summary judgment (Docs. # 390, 391, 422) are due to be granted.  The City is also due to be dismissed from this action.  A separate order will be issued along with this opinion.

**DONE** and **ORDERED** this February 17, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[27] Arguably, the City encouraged Judge Ward to spend little time on non-judicial matters by paying him merely $12,000 per year.  (*See* Doc. # 392-9 at 55).