## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GINA KAY RAY, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:12-cv-02819-RDP** |
| | } | |
| **JUDICIAL CORRECTION SERVICES,** | } | |
| **INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

In the 19th century, American drinking establishments began offering free lunches to their patrons.  Of course, the practice was designed to attract drinking customers, who, while they didn't pay for lunch, surely paid for their beer.  This led a wiser consumer to observe that "there ain't no such thing as a free lunch."  The phrase's application carries beyond restaurants and bars.  It is a core economics principle.  *See* Milton Friedman, *There's No Such Thing as a Free Lunch* (Open Court Publishing Co. 1975).  In this case, Defendant Judicial Correction Services, Inc. ("JCS") offered something much more valuable than lunch to Alabama counties and municipalities.  It offered "free" supervision of probationers and "free" collection of fines and court costs owed to courts.  Moreover, it offered municipal courts throughout the state of Alabama "free" document drafting and "free" intake services (to be provided, of course, after the municipal court ruled upon a defendant's charge and crafted a sentence that included probation supervised by JCS).  All of this, of course, at absolutely no cost to the counties, municipalities, and municipal courts which hired JCS.  Or, so they thought.  As it turns out, the services were provided without charge to the municipalities, but they were not free.  In fact, the court is

reminded of a different quote attributed to the inimitable Will Rogers: "It's not what you pay a man, but what he costs you that counts."  AZ Quotes, http://www.azquotes.com/quote/249468 (last visited July 24, 2017).

## I.  Introduction

The named Plaintiffs in this action were sentenced to probation by the City of Childersburg Municipal Court ("Municipal Court") because they did not pay fines or court costs imposed by the Municipal Court on the date of sentencing.  The Municipal Court directed Plaintiffs to remit $35 to $45 a month to JCS on top of the fines and court costs they were ordered to pay the court.  Plaintiffs claim that they were not able to pay the fines and court costs, there never was a proper indigency determination, and they are now before the court to remedy alleged constitutional violations stemming from the probation procedures implemented by JCS on behalf of the Municipal Court.

This case is before the court on: (1) Plaintiffs' Motion for Partial Summary Judgment to Declare the City of Childersburg's (the "City") "Probation" Practice with JCS Unconstitutional as a Denial of Equal Protection (Doc. # 424); (2) Plaintiffs' Motion for Partial Summary Judgment Declaring the Contract between JCS & the City of Childersburg Void *Ab Initio* (Doc. # 426); (3) Plaintiffs' Motion for Partial Summary Judgment to Declare Void Probation Based Upon Non-Adjudicated Offenses and Blank Orders (Doc. # 545); (4) Defendants' JCS and Correctional Healthcare Companies, Inc. ("Correctional Healthcare") Motion for Summary Judgment on Claims Asserted by Gina Kay Ray (Doc. # 469); (5) Defendants' JCS and Correctional Healthcare Motion for Summary Judgment on Claims Asserted by Deunate Jews (Doc. # 522); and (6) Defendants' JCS and Correctional Healthcare Motion for Summary Judgment on Claims Asserted by Plaintiffs Timothy Fugatt and Kristy Fugatt (Doc. # 535).  The

parties have fully briefed the motions, and they are under submission. (*See* Docs. # 425, 427, 470, 472-75, 500-505, 510, 523, 530, 536, 544, 546, 550, 556, 567, 573, 575, 577-78, 588, 590, 596-97). The court held oral argument regarding these motions on July 24, 2017.

After careful review, and for the reasons explained below, the court concludes that Plaintiffs' motions for partial summary judgment are due to be denied. Defendant Correctional Healthcare is due to be granted summary judgment on all claims. But, Defendant JCS is due to be granted summary judgment in part and denied summary judgment in part, as discussed in detail below.

## II.     The Rule 56 Evidence and the Undisputed Facts

The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A.     Procedural History

In their Fourth Amended and Restated Complaint, Plaintiffs allege that Defendant JCS entered into a "joint policy and practice" with Alabama municipalities, such as the City, that violated both their statutory and constitutional rights. (Doc. # 305 at ¶ 14). They state that JCS implemented a "highly systemized and uniform" approach for providing services to municipalities and municipal courts. (*Id.* at ¶ 16). Under the system described in the Fourth Amended Complaint, Defendant JCS conducted "many administrative and judicial functions of

the municipal court." (*Id.* at ¶ 18). As compensation for performing those functions, JCS received a monthly probation fee of $35 to $45 a month and a set-up fee of $10, both of which were included in the probation orders provided to the municipal court by JCS. (*Id.* at ¶¶ 21, 96).

Plaintiffs contend that the City unlawfully delegated "the collection of court fines, costs[,] and private fees" to JCS. (*Id.* at ¶ 93). In a contract signed by the mayor, the City purportedly bound the Municipal Court to establish a probation fee and a set-up fee in each probation order. (*Id.* at ¶¶ 94, 99). Thereafter, JCS designated certain employees as "probation officers" and allowed them to use a privately-issued badge to collect fees, fines, and court costs. (*Id.* at ¶ 92). Under the alleged practices of the Municipal Court, every defendant who was unable to immediately pay all fines and costs imposed by the court was placed on probation under the supervision of JCS. (*Id.* at ¶¶ 97-98). "This [was] routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs." (*Id.* at ¶ 22). Moreover, JCS's employees allegedly threatened to revoke an individual's probation, increase the fines and costs owed by a probationer, or increase the jail time a probationer faced if he or she was not able to pay JCS. (*Id.* at ¶ 110).

Plaintiffs present five claims for monetary damages against Defendants JCS, CHC Companies, Inc. ("CHC Companies"),[1] and Correct Care Solutions, LLC ("Correct Care") under 42 U.S.C. § 1983, and also seek declaratory and injunctive relief. Plaintiffs first allege that JCS, CHC Companies, and Correct Care violated their due process rights through the post-adjudication supervision system provided to the Municipal Court. (*See id.* at ¶¶ 89-119). Plaintiffs point to several features of JCS's policies and practices as violations of their due process rights, including: (1) the incarceration of individuals for failing to pay fines, fees, and

---

[1] CHC Companies was the corporation that purchased JCS in September 2011, not Correctional Healthcare. Plaintiffs have not disputed at this stage that Defendant Correctional Healthcare is due to be granted summary judgment.

costs owed (*id.* at ¶ 100); (2) the institution of charges against probationers for "failure to obey a court order" ("FTOCO") if the probationer could not pay the fines and fees owed to JCS and the Municipal Court (*id.* at ¶ 101); (3) the issuance of arrest warrants for individuals based on FTOCO charges (*id.* at ¶ 103); (4) JCS's failure to determine whether the named Plaintiffs were indigent or to determine why they could not pay the amounts owed, despite the fact that they were indigent when FTOCO charges were instituted against them (*id.* at ¶¶ 103-04); (5) the failure to conduct delinquency or probation hearings before incarceration (*id.* at ¶ 110); (6) the imposition of fines, fees, and court costs exceeding the jurisdictional maximum of $500 for municipal courts (*id.* at ¶ 111); (7) the imposition of terms of probation exceeding two years (*id.*); and (8) the failure to provide "adequate notice of the nature of any lawful charge" (*id.* at ¶ 113). Moreover, Plaintiffs contend that JCS violated Plaintiff Jews's due process rights by collecting costs and fees from him when the charges against him had been dismissed by the Municipal Court. (*Id.* at ¶ 118).

Second, Plaintiffs allege that JCS, CHC Companies, and Correct Care violated their Fourth Amendment rights against unreasonable seizure by instituting a system under which probationers were arrested and detained for failing to pay fines and fees. (*Id.* at ¶¶ 158-67). They allege that JCS's probation system deprived the Municipal Court's probationers of a judicial hearing to determine whether the probationers had willfully refused to pay fines and fees owed to JCS and the Municipal Court. (*Id.* at ¶ 161). Moreover, they claim that JCS sought arrest warrants against all named Plaintiffs when it knew that the Plaintiffs could not pay the fines and fees imposed against them. (*Id.* at ¶ 164). According to the Fourth Amended Complaint, all of the named Plaintiffs were arrested and detained pursuant to this unconstitutional process implemented by JCS. (*Id.* at ¶ 166).

Third, Plaintiffs allege that JCS, CHC Companies, and Correct Care violated their Sixth Amendment rights to counsel by implementing a policy or practice that "transformed" fines and fees into indefinite imprisonment sentences without providing access to counsel. (*Id.* at ¶¶ 179-93). They contend that JCS employees threatened the named Plaintiffs with imprisonment and incarceration if they failed to pay the amounts owed to JCS and the Municipal Court on the schedule set by JCS. (*Id.* at ¶ 186). When Plaintiffs were unable to pay the fines and fees owed, JCS instituted FTOCO charges or probation violation charges in the Municipal Court. (*Id.* at ¶ 188). Although Plaintiffs faced a potential imprisonment sentence at that point, neither JCS nor the City provided counsel to the probationers. (*Id.* at ¶ 189).

Fourth, Plaintiffs claim that JCS, CHC Companies, and Correct Care violated their Eighth Amendment rights by imposing excessive fines and cruel and unusual punishment in accordance with JCS's probation system. (*Id.* at ¶¶ 211-26). According to the Plaintiffs, JCS demanded more than the statutory maximum fine of $500 per charge from probationers. (*Id.* at ¶ 218). Moreover, JCS allegedly violated the Excessive Fines Clause of the Eighth Amendment by imposing probation fees that far exceeded the initial fines and court costs ordered by the Municipal Court. (*Id.* at ¶ 219). In some situations, JCS charged probationers six to fifteen times the initial fine imposed by the Municipal Court through monthly probation fees. (*Id.*). Plaintiffs also accuse JCS of incarcerating them for terms longer than those allowed under Alabama Code § 15-18-62. (*Id.* at ¶ 221). In addition, JCS failed to account for $15 per day jail credits that should have been applied to offset the fines owed. (*Id.* at ¶ 222).

Fifth, Plaintiffs assert that JCS, CHC Companies, and Correct Care denied them their rights to equal protection by subjecting them to disparate treatment on the basis of wealth. (*Id.* at ¶¶ 242-55). According to Plaintiffs, the probation scheme implemented by JCS and the

Municipal Court classified Municipal Court defendants on the basis of wealth because those financially able to pay all fees and court costs were not placed on probation, whereas those who could not pay the full amount owed were invariably placed on probation. (*Id.* at ¶¶ 247-48). Plaintiffs insist that there was no rational state interest for the disparate classification. (*Id.* at ¶ 251). Indeed, according to Plaintiffs, the probation scheme violated Alabama statutory law that required the Municipal Court "to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines." (*Id.* at ¶ 252). Thus, Plaintiffs contend that JCS lacked authority "to charge additional fees to those who [could not] pay." (*Id.* at ¶ 253).

In the Fourth Amended Complaint's count for declaratory and injunctive relief, Plaintiffs request that the court declare the contract between JCS and the City (hereinafter the "JCS-City Contract") void *ab initio* because (1) the City lacked authority to bind its Municipal Court, (2) the contract violated the separation of powers doctrine and other limitations on municipal authority, and (3) the contract unlawfully invaded the judiciary's authority over court administration. (*Id.* at ¶¶ 267-76). Next, Plaintiffs request that the court "declare the actions of [JCS, CHC Companies, Correct Care, and the City] under this contract to be unconstitutional under the premises discussed above." (*Id.* at ¶ 277). Plaintiffs ask the court to enter injunctions prohibiting JCS, CHC Companies, and Correct Care from (1) committing the legal violations described in the Fourth Amended Complaint, (2) "placing persons on probation for simple fines," (3) "assessing fines in excess of $500 and extending probation periods beyond 24 months," and (4) "imprisoning indigent persons for failure to pay fines and fees." (*Id.* at p. 63-64). Plaintiffs' count for declaratory and injunctive relief does not seek relief due to JCS supervising probation for individuals with non-adjudicated offenses or blank probation orders.

(*See id.* at ¶¶ 267-84).  Additionally, Plaintiffs' requests for relief do not ask the court to award restitutionary damages.  (*Id.* at p. 63-64).

### B. Formation of the Relationship Between the City, the Municipal Court, and JCS

On June 21, 2005, Childersburg's City Council approved a proposal to replace its private probation service with JCS.  (Doc. # 421-7 at 2).[2]  The City Council's minutes reported that Judge Larry Ward and the Municipal Court's clerk had recommended JCS.[3]  (*Id.*).  Thereafter, the City's mayor and a JCS vice president signed the JCS-City Contract.  (Doc. # 392-16 at 3). The JCS-City Contract purported to include the Municipal Court as a party to that agreement. (*Id.*).  Moreover, the City's mayor signed the contract on behalf of the "CITY/COURT OF CHILDERSBURG, Alabama."  (*Id.*).  But the Municipal Court's judge did not sign the contract. (*See id.*).

The JCS-City Contract required JCS to perform supervision for "all probated cases sentenced by the [Municipal] Court," including supervision of indigent probationers.  (*Id.* at 4). This contract also directed JCS to notify the Municipal Court of non-complying probationers. (*Id.* at 5).  It required JCS to maintain case files "with the terms and conditions of probation, reporting dates, field contacts as they occur and . . . the amounts and dates of monies collected." (*Id.*).  It allowed JCS to collect fines, restitution, and court costs on behalf of the Municipal Court if directed to do so.  (*Id.*).  JCS agreed not to charge its standard probation fee to indigent probationers.  (*Id.* at 4).  Furthermore, it agreed not to charge supervision fees to probationers who paid their fines and court costs within a week of their sentencing hearing.  (*Id.*).  The JCS-

---

[2] For ease of reference, this opinion refers to the page numbers of the parties' briefs, the minuscript pages in deposition transcripts, and the CM/ECF page numbers for all other exhibits, such as the City Council's minutes cited above.

[3] The City's former mayor, B.J. Meeks, also testified that Judge Ward and the magistrate had recommended JCS.  (Doc. # 392-9 at 52-53).

City Contract did not specify whether JCS was to send notice of court hearings to probationers. (*See id.* at 4-5).

JCS also agreed not to charge the City or the Municipal Court for its services. (*Id.* at 6). Instead, the JCS-City Contract purportedly obligated the Municipal Court to include certain fees in "each Court Order." (*Id.*). These fees included a $35.00 monthly probation fee and a $10.00 probation set-up fee. (*Id.*).

The mayor who signed the JCS-City Contract testified that JCS worked with the Municipal Court, not the City, even though JCS had entered into a contract with the City. (Doc. # 392-9 at 76). He claimed that Judge Ward had recommended JCS. (*Id.* at 45). But, Judge Ward testified he was unaware of the JCS-City Contract until the date of his deposition and was not able to say who would be authorized to bind the Municipal Court to such a contract.[4] (Doc. # 392-5 at 10, 12). He denied any involvement in the contract's formation. (*Id.* at 12-13). He also denied recommending JCS to the City or its mayor. (*Id.* at 18, 42). Judge Ward conceded, though, that he had worked with JCS in other municipal courts, including the municipal courts in Harpersville, Lincoln, Gurley, and Stevenson, Alabama. (*Id.* at 18).

Contrary to JCS's strenuous assertion,[5] the Rule 56 record does not establish whether Judge Ward approved the form documents produced by JCS employees, such as probation orders and failure to report letters. Judge Ward refused to testify about whether the Municipal Court had agreed to allow JCS to send threatening letters to probationers or whether he knew that JCS was sending such letters to probationers. (*See* Doc. # 392-5 at 71-74). Although Colleen Ray

---

[4]   When Judge Ward testified in a similar state-court action, he confirmed his knowledge that JCS supervised indigent probationers at no cost to the municipality or the probationer. (Doc. # 402-36 at 58). He agreed that JCS had "a financial interest in getting as much money out of [probationers] as they [could]." (*Id.* at 90).

[5]   (*See* Doc. # 470 at 5) (stating, as an undisputed fact, that "[a]ll of the probation orders, petitions for revocation, failure-to-report letters, and probation-violation letters in probation cases sentenced by the Childersburg Municipal Court were drafted and implemented by JCS pursuant to the directives of the Childersburg municipal judge")

testified that JCS sent out such orders and letters at the direction of the Municipal Court, she claimed that the Municipal Court would have approved the documents when it began to work with JCS. (*See* Doc. # 471-4 at 284-85). Colleen Ray did not work at the Childersburg JCS office in 2005, the year JCS began to supervise probationers for the Municipal Court and when the form orders would have been approved by the court. (*See* Doc. # 471-3 at 41-42) (stating that Colleen Ray was an office manager for JCS in Foley, Alabama from 2005 or 2006 to 2008). Accordingly, the Rule 56 record reveals that Ray lacks personal knowledge of whether Judge Ward approved the form documents used by JCS.[6]

In August 2014, after Judge Ward retired from the Municipal Court, the Municipal Court's judge established new policies and procedures for setting bail, ensuring defendants' right to counsel, imposing sentences when defendants failed to pay ordered fines and court costs, ordering probation, and revoking probation. (*See generally* Doc. # 128-1). The City Council terminated the JCS-City Contract in May 2015. (Doc. # 392-63 at 2).

## C. JCS's Policies

JCS's training manual indicates that JCS primarily concerned itself with enforcing the financial penalties and fees imposed by the probation orders it supervised. For example, JCS instructed its employees to schedule probationers' appointments based on whether they had paid the full monthly amount owed under the probation order. (Doc. # 402-2 at 72). The amount paid to JCS determined whether an employee scheduled monthly, bi-weekly, or weekly probation appointments. (*Id.*). Likewise, if a probationer failed to appear at a JCS appointment, JCS

---

[6] In addition, Colleen Ray recalled that the municipal court judges orally approved the form documents. (Doc. # 471-4 at 294). She could not recall whether JCS employees documented these oral approvals. (*Id.* at 294, 296).

For similar reasons to those discussed above, the court finds that Lisha Kidd lacks personal knowledge concerning Judge Ward's approval of the form documents. Kidd testified that the she used the form orders and documents when supervising probationers pursuant to the court's directions. (Doc. # 471-1 at 122). But, she was not hired to work with JCS in Childersburg until approximately 2010. (*See id.* at 40-41).

directed its employees to "[r]eview the amount the [probationer] is behind on fines and fees" and to "determine the amount to be brought to the next appointment" before trying to contact the probationer by telephone. (Doc. # 402-3 at 10). JCS also required employees to review a report of expiring probation cases so that probation did not expire before the probationer met "the court ordered conditions" (which of course included, among other things, the condition to pay JCS's monthly supervision fee). (Doc. # 402-2 at 66). JCS's Probation Tracker, a proprietary software program used by JCS, also informed each probation officer, at the start of every work day, "the amount of monies collected in fees since the beginning of the month [versus] the amount of monies that should have been collected on cases assigned for the entire month." (*Id.* at 37). Probation Tracker calculated this percentage "daily in order to help keep track of progress of fee collections during the month." (*Id.*).

JCS employees filled out the probation orders for defendants placed on probation by judges. (*Id.* at 14). JCS instructed its employees on how to calculate the monthly payments that probationers should be directed to pay as follows:

> Note that payments are not to be less than $135/$140/$145 monthly, unless a specified amount is ordered by the Judge. Company policy is to try to never make payments less than $85 per month. Add the amount of fines, court costs[,] and restitution payments, divide that number by number of months the defendant has been sentenced to probation minus one month. Take the amount derived and add the monthly probation fee. Round the amount up to the nearest $5.

(*Id.*). JCS's manual reminded its employees that a municipal court judge would determine the length of the defendant's probation. (*Id.*).

Under JCS's policies, an employee generally requested a probation revocation hearing if (1) a probationer missed three appointments, (2) a probationer missed one appointment and a failure to report letter was returned to JCS in the mail, or (3) all phone numbers provided by the probationer were disconnected or contained incorrect information. (Doc. # 402-3 at 23). JCS

instructed its employees to not request a warrant solely because a probationer owed fees. (*Id.*). Moreover, it provided special instructions to obtain the address for a probationer whose mail had been returned to JCS. (*Id.*). JCS told its employees to use Accurint to obtain a mailing address for probationers whose letters were returned to the sender.[7] (*Id.*).

JCS's training manual instructed employees to tell probationers who appeared for a revocation hearing that they needed to pay the amount owed for probation in full or the amount they were directed to pay in an earlier letter to have the revocation hearing dismissed. (Doc. # 402-3 at 36). JCS allowed its employees to "determine an amount to dismiss the hearing" if the probationer told the employee that he or she could not pay the full amount requested. (*Id.*). If the JCS employee decided to not dismiss the revocation hearing, the employee was instructed to "take the [probationer] before the Judge and let the Judge make a decision on the case." (*Id.*). JCS told its employees that they must be prepared to answer questions and make a recommendation regarding the terms of revocation. (*Id.*). The sample recommendation given in the manual included an imprisonment term and an amount to be paid before release. (*Id.*).

If a probationer supervised by JCS received another probationary sentence supervised by JCS, JCS instructed its employees to place the new probation sentence on hold "until the current [probation] case is paid in full." (Doc. # 402-2 at 41). As its training manual explained:

> If a defendant has more than one case in the same court, the second and subsequent cases are to be placed on hold. Once the first case is paid in full, the second case is to be made active the day the first case is paid in full. The probation date on the admin. screen will be changed to the date the first case is paid in full. Click on the calculate button and the [Probation Tracker] system will update the number of months the defendant will be on probation. Once the second case is paid in full, the above is to be followed for the third case, and so on.

---

[7] "Accurint is a website subscribed to by JCS that is available to use to look up a defendant and verify their last address." (Doc. # 402-4 at 44). JCS successfully found several probationers by using this service. (*Id.*). One JCS employee handled all the requests for information from Accurint. (*Id.*).

(Doc. # 402-3 at 53).  Moreover, if a probationer was sentenced to probation and supervised by JCS in two or more jurisdictions, JCS only collected supervision fees for the first case initially.  (*Id.*).  Once the individual paid off all fees in the first case, JCS began to collect supervision fees in the second case.  (*Id.*).  JCS's policies called for 70 percent of each payment to be applied to fines and 30 percent to be applied to fees.  (*Id.* at 44).

If a probation sentence expired but the probationer failed to complete the terms of probation, JCS employees usually placed the probationer in an unsuccessful termination status.  (*Id.* at 47-48).  However, if the probationer continued making payments after the expiration of his or her probation term, JCS instructed its employees to keep the probation in an active status.  (*Id.* at 48).  And, if the probationer completed the conditions of probation within a reasonable time, JCS would ask a court to successfully terminate the probation.  (*Id.*).

**D.     JCS's Services to the Municipal Court**

Under the terms of the form probation order used by the Municipal Court, a defendant sentenced to probation by the Municipal Court was obligated to report to a probation officer -- employed by JCS -- as instructed.  (*See, e.g.*, Doc. # 471-12 at 2).  A defendant was also required to notify his or her probation officer whenever the defendant changed a residence or employment.  (*Id.*).  A defendant was compelled to pay JCS $35 or $45 a month, as well as a $10 set-up fee.  (*See id.*).  Moreover, the defendant was directed to make monthly payments towards the fines and costs owed to the Municipal Court.  (*See id.*) (directing Plaintiff Ray to pay $145 a month towards the $1,146 she owed to the court in August 2012).  The Municipal Court also could order a defendant to (1) make restitution payments, (2) complete a jail sentence, (3) complete certain education programs, or (4) return to court at a later date to show completion of

an obligation.  (*See id.*).  The probation orders warned defendants about the Municipal Court's power to modify or revoke probation as follows:

> The Court may at any time modify any conditions of your probation, change or extend probation, discharge defendant[,] or revoke probation.  **You are subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly.**

(*Id.*) (emphasis in original).  When signing an order of probation, a defendant affirmed that he or she had counsel or had "waived [the] right to counsel for all proceedings to this date."  (*Id.*).

According to JCS's Childersburg office manager, Lisha Kidd, Judge Ward signed blank court orders, and Kidd would fill them in based on the judge's instructions.  (Doc. # 471-1 at 105, 446-47).  JCS only provided probation services when probation was mandated by a municipal court order.  (*Id.* at 107).  After Judge Ward had sentenced an individual to probation, Kidd informed the probationer about the terms of probation in a separate room.  (*Id.* at 122-23).  A probationer owed almost no fees to JCS if the court-ordered fines were paid within seven days of sentencing.  (*Id.* at 109, 121).  Once JCS began charging probation fees, though, a probationer could not end a probation sentence by merely paying off the fines originally imposed by the Municipal Court.  (*Id.* at 109-10).  Kidd could not recall whether she had ever supervised any probationer who had been declared indigent by the Municipal Court.  (*Id.* at 231-32).  However, she asserted that JCS did not determine whether a probationer was indigent because that was not its responsibility.[8]  (*Id.* at 232).

The parties dispute how Judge Ward instructed JCS employees on the terms to include in the pre-signed orders.  Both parties rely on testimony from Kidd regarding instructions placed on sticky notes.  (*See* Docs. # 470 at 5 & n. 13; 500 at 2).  During her deposition, Kidd explained that she would write oral instructions from Judge Ward to JCS in the written orders that had been

---

[8]  Colleen Ray also testified that JCS did not determine whether probationers it supervised were indigent, although there was an indigent status indicator in its Probation Tracker software.  (Doc. # 471-3 at 160-61).

pre-signed by him. (Doc. # 471-1 at 103-05). Additionally, when asked about discrepancies between a fine issued by the Municipal Court and the record of that fine in JCS's Probation Tracker database, Kidd testified that she obtained the fine placed in Probation Tracker from a sticky note a court magistrate attached to the court file. (*Id.* at 443-45). Although she scanned a defendant's probation order into Probation Tracker, she did not scan the Municipal Court's order on the charge or the sticky note with additional information into Probation Tracker. (*Id.* at 447). Indeed, Kidd could not recall what happened to the sticky notes she relied on to determine the fine amounts. (*Id.* at 511). Nor was she aware whether Probation Tracker had a function allowing her to scan sticky notes into the electronic probation record. (*See id.* at 511-12). She returned the sticky notes to the Municipal Court with the case file. (*Id.* at 512-13).

Kidd explained during her deposition that JCS employees sent delinquency letters to probationers "as representative[s] of the Childersburg Municipal Court." (*See id.* at 268-69). She testified that the Municipal Court hired them to be "probation agents." (*Id.* at 269). During Judge Ward's tenure with the Municipal Court, JCS employees drafted probation revocation petitions if probationers had failed to comply with the terms of probation. (*See id.* at 123-24). JCS informed the Municipal Court of the probationer's payment history and missed appointments. (*Id.* at 124). Then, JCS would select a date for a hearing and inform the probationer of the hearing by mail "pursuant to the [Municipal Court]." (*Id.* at 127). A JCS employee would determine whether the Municipal Court should hold a compliance hearing or a revocation hearing, depending on whether the probationer had met his or her obligations. (*Id.* at 129-30).

JCS's form revocation petitions informed the Municipal Court of the appointments a probationer had missed and the amount owed to the City and to JCS. (*See, e.g.*, Doc. # 537-1 at

2). JCS requested an arrest warrant from the Municipal Court "if necessary." (*See, e.g.*, *id.*). The petitions included an order setting a hearing that purportedly was signed by the Municipal Court's judge or a Court magistrate. (*See, e.g.*, *id.*). Some revocation-hearing orders informed the probationer that the hearing could be cancelled if a payment was made.[9] (*See, e.g.*, *id.*). The revocation-hearing orders suspended the probationer's sentence "until a resolution [was] decided." (*See, e.g.*, *id.*). JCS did not file the revocation petitions with the Municipal Court before the scheduled revocation hearings, even though the revocation orders indicated that they had been approved by the Municipal Court prior to the revocation hearing. (Doc. # 471-1 at 194).

JCS did send revocation petitions to probationers by mail. (*Id.* at 194). JCS also sent notices to show cause to non-compliant probationers.[10] (*Id.* at 197). A notice to show cause would direct a probationer to appear at the Municipal Court and explain why he or she had failed to pay the court-imposed fines and fees. (*See, e.g.*, Doc. # 537-32 at 2). It warned a probationer that an arrest warrant would be issued if he or she failed to appear at the hearing. (*Id.*). It stipulated that the hearing could be cancelled if the probationer reported to JCS and paid a certain amount. (*Id.*). These notices were not filed with the Municipal Court. (Doc. # 471-1 at 206). When letters or notices were returned to JCS's office, Kidd sometimes attempted to locate another address for the probationer by contacting the post office, contacting the Municipal Court, or requesting an Accurint search. (Doc. # 471-31 at 7). JCS ceased to send notices of hearings to probationers on behalf of the court four to six months before Kidd's first deposition, which

---

[9] Not all revocation-hearing orders included the option of cancelling the hearing by making a payment. (*See, e.g.*, Doc. # 524-9 at 2). In a deposition regarding the operation of another municipal court, Judge Ward affirmed that JCS's employees should not have the ability to determine how much a probationer needed to pay to avoid a hearing before the sentencing court. (Doc. # 402-36 at 81).

[10] JCS employees also prepared violation reports for the Municipal Court. (*E.g.*, Doc. # 524-25 at 2). JCS did not send these violation reports to the probationer. On at least one occasion, a JCS employee recommended jailing a probationer until they paid what they owed. (*Id.*).

occurred in June 2014. (Doc. # 471-1 at 1, 126-27). Thus, JCS sent notices of revocation hearings to probationers on behalf of the Municipal Court until after this suit commenced.

JCS did not conduct indigency determinations for probationers. (Doc. # 471-31 at 10). If a probationer could not pay the fines and fees charged to her, Kidd would schedule a hearing with the Municipal Court. (*Id.*). Kidd has stated that the Municipal Court provided "forms for determining indigency." (*Id.* at 11). Judge Ward has explained that he directed JCS to place probationers on indigency status for probation if the probationer could not pay and he expected JCS to "work with" such indigent probationers. (Doc. # 402-36 at 81). Moreover, he has testified that the municipal courts he operated would dismiss a case if the probationer "absolutely" could not pay the amounts owed. (*Id.*).

During revocation hearings, Kidd informed the judge about the probationer's payment history and the number of appointments missed. (Doc. # 471-1 at 123-24). She denies that she ever recommended a disposition on any revocation petition during a revocation hearing. (*Id.* at 124). Although the length of revocation hearings varied, the longest revocation hearing Kidd recalled at the Municipal Court lasted ten minutes. (*Id.* at 133).

If a petitioner failed to appear at a revocation hearing, the Municipal Court's magistrate often would issue a capias warrant. (*See, e.g.*, Doc. # 471-26 at 2) (capias warrant issued after Plaintiff Ray had failed to appear at a revocation hearing). The Municipal Court issued capias warrants when a probationer had "failed to report, as ordered by the [Municipal] Court[,] on a previous court date." (Doc. # 471-1 at 312). Many of these warrants stated that a defendant had been convicted of FTOCO charges. (*See, e.g.*, Doc. # 471-26 at 2). (*See also* Doc. # 471-1 at 312-13) (explaining the failure to obey court order charge). The Municipal Court convicted a probationer of this charge when the probationer failed to comply with an order directing

appearance at a hearing. (*Id.* at 313). According to the City's attorneys, though, a City employee searched through the City's records and found no municipal ordinance criminalizing failure to obey a court order.[11] (Doc. # 402-35). The Municipal Court's arrest warrants included a cash bond that an arrestee had to pay to be released.[12] (*See, e.g.*, Doc. # 471-26 at 2). The Rule 56 record does not reveal (1) how FTOCO charges were initiated, (2) whether the Municipal Court formally convicted defendants of FTOCO violations, (3) the sentences defendants received for FTOCO convictions, and (4) whether those sentences included imprisonment terms.

Once a probationer failed to appear at a revocation hearing, a JCS employee placed the probation sentence on warrant status in Probation Tracker. (Doc. # 471-1 at 272-73). JCS employees did not confirm that a warrant had been issued before they changed a probationer's status from active to warrant. (*Id.* at 273). JCS's involvement in the probationer's case ceased once the case entered warrant status. (*Id.* at 274). JCS did not charge probation supervision fees while a probationer was in warrant status. (*Id.*). The probationer's file stayed closed until a new court date was set for the probationer or the probationer paid the amounts owed "in full directly to the [Municipal] Court." (*Id.*). In one case, though, the JCS probation file remained closed in warrant status until May 2012, even though the probationer had been arrested in February 2012. (*Id.* at 274-75) (discussing Timothy Fugatt's probation sentence).

In some circumstances, a Municipal Court magistrate conducted a 72-hour hearing for a probationer after he or she was arrested by City police. (*See* Doc. # 436-6 at 13) (describing a 72-hour hearing conducted at the Talladega County Jail for Johnny Norwood, Jr.). However,

---

[11] Moreover, the arrest reports drafted by City police officers provide no citation to the ordinance arrestees purportedly violated when failing to obey a court order, even though many of those reports cited other legal provisions that the arrestee had violated. (*See, e.g.*, Docs. # 392-36 at 2; 396-42 at 2; 392-57 at 2).

[12] Misty Hepp, a magistrate for the Municipal Court, set that bail amount using a written schedule. (Doc. # 392-13 at 74-75). But, Hepp did not become a court clerk until September 2014, well after the warrants at issue in this case were issued. (*Id.* at 27).

nothing in the Rule 56 record indicates that any of the named Plaintiffs received such a 72-hour hearing, even though Plaintiffs Ray and Jews were imprisoned for more than 72 hours following their arrests.[13]

### E.    Probation of Plaintiffs Timothy and Kristy Fugatt

City police issued Kristy Fugatt two traffic tickets in November 2010 for driving with an expired tag and an expired license.  (Doc. # 392-66 at 14-15).  Fugatt renewed her license (Doc. # 392-6 at 105), and the Municipal Court only assessed court costs for each ticket, (Doc. # 392-66 at 14-15).  When Kristy Fugatt informed the Municipal Court judge that she could not pay the full amount charged, he directed her to an intake area to "talk to JCS."  (Doc. # 392-6 at 105-07).  Fugatt signed an intake form stating that she would pay a certain amount.  (*Id.* at 108-09).  Fugatt was placed on probation under JCS's supervision.  (*See* Doc. # 392-18 at 9) (stating that Kristy Fugatt had been sentenced to 24 months' probation in January 2011).

Timothy Fugatt received a traffic ticket in December 2010 for driving with an expired vehicle tag.  (Doc. # 392-66 at 11).  The Municipal Court did not convict him of the traffic offense but ordered him to pay court costs.  (*Id.*).  Timothy Fugatt testified that he had attempted to inform the Municipal Court judge about his child's terminal illness during the hearing but did not get an opportunity to speak to the judge due to the speed of the proceedings.  (Doc. # 392-7 at 74).  Similar to his wife, the Municipal Court also sentenced Timothy Fugatt to 24 months' probation under JCS's supervision.  (Doc. # 392-19 at 7).

In early 2011, JCS scheduled weekly probation appointments for the Fugatts; indeed, JCS employees sometimes scheduled multiple appointments in one week if the Fugatts failed to show

---

[13]    According to Hepp, a Municipal Court magistrate, the Municipal Court began releasing imprisoned probationers on their own recognizance in September 2014 if they had not paid bail when the 72-hour hearing occurred.  (Doc. # 392-14 at 120-21) (pages 415-16 of the deposition transcript).  Hepp did not specifically testify about the Municipal Court's policies regarding 72-hour hearings before September 2014.

up at the office. (*See* Docs. # 537-24 at 7-8; 537-25 at 10-11). Timothy Fugatt told a JCS employee in January 2011 that his child was terminally ill and that he could not make a payment to JCS until he had received a tax refund. (Doc. # 537-25 at 9). The Fugatts did not appear at 11 of the 12 probation appointments scheduled by JCS in April, May, and June 2011.[14] (*See* Docs. # 537-24 at 7-8; 537-25 at 10-11).

JCS issued revocation petitions for Kristy and Timothy Fugatt on June 28, 2011, which comported with the form revocation petitions described above. (Docs. # 537-1 at 2; 537-2 at 2). Timothy Fugatt's revocation petition explained that he had failed to report to JCS for 16 scheduled appointments and had failed to pay $223 as ordered. (Doc. # 537-1 at 2). The revocation petition explained that a payment of $223 would close his case. (*Id.*). It warned him that a warrant would be issued if he failed to appear at the Municipal Court on August 11, 2011. (*Id.*). Kristy Fugatt's revocation petition averred that she had missed 17 scheduled appointments and had failed to pay $371. (Doc. # 537-2 at 2). It explained that a payment of $371 would close her case and that a warrant would be issued if she failed to appear at the probation revocation hearing scheduled for August 11. (*Id.*). Timothy Fugatt testified that they likely

---

[14] The parties dispute whether JCS employees mailed failure to report letters or delinquency letters to the Fugatts. Defendants JCS and Correctional Healthcare assert that a JCS employee sent four failure to appear letters and two delinquency letters to Plaintiffs Kristy Fugatt and Timothy Fugatt. (Doc. # 536 at 9) (citing Docs. # 537-26, 537-27, 537-28, and 537-29). Plaintiffs assert there is no evidence that the letters were placed in the mail. (Doc. # 567 at 7). And, Timothy Fugatt testified that he did not remember whether he received the letters. (Doc. # 537-19 at 108-09). The Probation Tracker records reveal that JCS employees sometimes noted in Probation Tracker when they mailed some of the letters to the Fugatts. (*See* Doc. # 537-24 at 6) (note on April 25, 2011 that a JCS employee was sending a failure to report letter). At other times, JCS employees placed a failure to report letter in the Probation Tracker record without any notation or indication that the letter had been mailed to the probationer. (*See id.*) (describing a failure to report letter written on May 24, 2011). Ultimately, the court finds that the dispute about whether JCS mailed failure to report letters or delinquency letters does not concern a material issue of fact because such a failure is not part of any cognizable due process claim.

would not have received the revocation petitions because their house had been foreclosed upon.[15] (Doc. # 537-19 at 111).

The Municipal Court held revocation hearings for Kristy and Timothy Fugatt on August 11, 2011, but neither of them appeared at the hearings. (Docs. # 537-24 at 5-6; 537-25 at 7). The Municipal Court issued warrants against them both in August 2011. (*Id.*). Both August 2011 arrest warrants stated that the Fugatts had been convicted of failure to obey a court order. (Docs. # 537-33 at 2; 537-34 at 2). Timothy Fugatt's warrant required him to pay $540 as a cash bond in order to be released. (Doc. # 537-33 at 2). Kristy Fugatt's warrant required her to pay a cash bond of $688. (Doc. # 537-34 at 2).

A City police officer arrested the Fugatts on February 26, 2012. (Docs. # 537-36 at 2-3; 537-38 at 2-3); (Docs. # 402-27 at 3; 402-28 at 3) (Timothy and Kristy Fugatt testifying that the officer arrested both of them on that date). The Fugatts were taken to the City's police station and placed in a holding cell. (Docs. # 402-27 at 3; 402-28 at 3). City police released them on February 26th after they had paid $900 for a cash bond. (*Id.*).

JCS's records indicate that in May 2012 the Municipal Court reinstated the Fugatts' probation sentences. (Docs. # 537-24 at 5; 537-25 at 7). The Municipal Court issued a new probation order against Timothy Fugatt based upon the FTOCO offense on April 26, 2012. (Doc. # 537-3 at 2). This probation sentence ended on April 26, 2014. (*Id.*). Although the

---

[15] The parties dispute whether the revocation petitions and related notices to show cause were mailed to Plaintiffs Kristy and Timothy Fugatt. Defendants state that a JCS employee mailed the petitions to the Fugatts along with notices to show cause. (Doc. # 536 at 9). They cite a notice to show cause in the Rule 56 record, which instructed Kristy Fugatt "to appear in [the Municipal] Court on August 11, 2011 . . . to explain why you have failed to pay fine and costs as ordered by this court." (Doc. # 537-32 at 2). Plaintiffs dispute that the petitions and notices to show cause were mailed to them. (Doc. # 567 at 8). In support, they note that (1) the Fugatts do not recall receiving the documents, and (2) the notice to show cause was unsigned and undated. (Doc. # 537-32 at 2). Notably, on several occasions, JCS employees recorded in the Probation Tracker record when documents were mailed to a probationer, but they did not note on the Fugatts' probation records that the June 2011 revocation petitions had been placed in the mail. (*See, e.g.*, Doc. # 537-24 at 6). Given the parties' dispute about this issue, the court has not accepted (for purposes of Rule 56) JCS's statement that it mailed the revocation petitions and notices to show cause to the Fugatts in August 2011.

Municipal Court actually issued a new probation order for a different offense, JCS's records state that the court reinstated Timothy Fugatt's probation for the expired tag offense adjudicated in January 2011. (Doc. # 537-24 at 5). JCS also recalculated the probation date for that offense from January 2011 to May 1, 2014.[16] (*Id.*). Similarly, the Municipal Court also reinitiated Kristy Fugatt's earlier probation sentence and added a $317 warrant fee. (Doc. # 537-4 at 2). Moreover, the Municipal Court fined Kristy Fugatt $168 for a speeding offense. (*Id.*). The Rule 56 record does not indicate whether she received the speeding ticket for which she was fined. JCS placed Kristy Fugatt's May 2012 probation sentence on hold. (Doc. # 537-41 at 2). JCS prepared revocation petitions and notices to show cause against Kristy and Timothy Fugatt in August 2012. (*See* Docs. # 537-24 at 4; 537-25 at 5). Timothy Fugatt called JCS on August 28, 2012 and confirmed that he had received the paperwork that was mailed to him. (Doc. # 537-24 at 4). A JCS employee told him that he could report to JCS on August 31 or September 7, but he did not show up to JCS's office on either of those dates. (*See id.*).

The Municipal Court cancelled revocation hearings concerning the Fugatts on September 13, 2012. (Docs. # 537-24 at 4; 537-25 at 5). According to Kidd's notes in Probation Tracker, Timothy Fugatt called her and demanded a new court date because he believed the revocation hearings were set for 1:30 P.M. (Doc. # 537-24 at 4). He spoke with a Municipal Court employee before calling JCS, but the employee told him that JCS was responsible for deciding whether to set a new court date. (*Id.*). Kidd generated new revocation petitions and notices to show cause and mailed them to the Fugatts on September 19. (*See* Docs. # 537-24 at 4; 537-25 at 5).

---

[16] The Rule 56 record does not indicate whether JCS created a separate Probation Tracker entry for the probation sentence Timothy Fugatt received in April 2012.

The Fugatts appeared before the Municipal Court on October 11, 2012.  (*See* Doc. # 537-24 at 4).  They explained their financial situation to Judge Ward, who commented that they were "using [their] son as an excuse not to pay for [their] fines."  (Doc. # 537-23 at 234).  They filled out a hardship form to explain their financial situation, and JCS agreed to "waive the fees after [the Fugatts] paid $200."  (*Id.* at 235).  JCS also agreed that the Fugatts could report to a probation officer in Sylacauga, Alabama because they were being required "to drive to Childersburg every four days even if [they] couldn't pay anything."  (*Id.* at 236).  But, Timothy Fugatt called Kidd on October 31, 2012 and informed her that he could not make the payment because he had to pay approximately $1500 for other bills.  (Doc. # 537-24 at 3).  Kidd contacted a Municipal Court magistrate about the issue, and the Municipal Court mailed subpoenas for the Fugatts to appear on November 7.  (Docs. # 537-24 at 3; 537-25 at 4-5).  The Municipal Court issued warrants against the Fugatts in November 2012 after they failed to appear in court.  (Docs. # 537-24 at 3; 537-25 at 4).

Timothy Fugatt appeared at the Municipal Court in December 2012 and agreed to pay $100 towards the amounts his wife and he owed.  (Doc. # 537-24 at 3).  He told the court that he would pay the fines off with a tax refund.  (*Id.*).  The Municipal Court then reinstated the Fugatts' probation sentences in January 2013.  (Docs. # 537-24 at 3; 537-25 at 4).  JCS placed Kristy Fugatt's probation sentence on unsupervised status in January 2013, after JCS and the Municipal Court had been informed of the present lawsuit.  (Doc. # 537-25 at 4).  It placed Timothy Fugatt's probation sentence on hold in February 2013 after consulting with a magistrate at the Municipal Court.  (Doc. # 537-24 at 3).  Ultimately, the Municipal Court terminated the Fugatts' probation sentences on November 1, 2014, during the pendency of this action.  (*See* Doc. # 537-25 at 4).

## F.     Probation of Plaintiff Deunate Jews

Plaintiff Jews was charged with harassment in 2008. (*See* Doc. # 392-27 at 2). The Municipal Court dismissed the harassment charge against Jews in January 2009, subject to conditions that Jews (1) pay court costs to the Municipal Court and (2) avoid contact with the complainant. (*Id.*). During a deposition, Jews claimed that he had contested the Municipal Court's authority to impose court costs against him when the criminal charge against him had been dismissed. (Doc. # 524-5 at 50). Judge Ward responded that he would "lock [Jews] up" unless he signed a probation order. (*Id.* at 50-51). Jews did not ask Judge Ward any more questions because he believed that the judge would imprison him if he "said any little thing." (*Id.* at 51). Jews was unable to pay the assessed court costs on the date of the hearing. (*Id.* at 52).

After signing a probation order, Jews advised a JCS employee that he would not report to JCS's probation office because the Municipal Court had forced him to sign the probation order. (*Id.* at 56). He informed the JCS employee that he would not pay the imposed court costs because his case had been dismissed. (*Id.* at 59). Moreover, he provided JCS the address for his uncle's residence, rather than his own address. (*Id.* at 60). He submitted this address to JCS because he did not plan to pay what the Municipal Court had directed him to pay. (*Id.* at 60-61). Consequently, Jews did not receive a letter that JCS sent to him on January 27, 2009. (*Id.* at 59-60).

The Municipal Court held a revocation hearing in Jews's case on February 12, 2009, but Jews did not appear at the hearing.[17] (Doc. # 524-22 at 6). The Municipal Court's magistrate

---

[17] The parties dispute whether JCS provided Jews prior notice of the revocation hearings scheduled with the Municipal Court. Jews's Probation Tracker record does not indicate whether JCS employees sent the revocation petitions and notices to show cause to him. (*See* Doc. # 524-22 at 6). In contrast, as discussed above, Kidd occasionally noted in Probation Tracker when she mailed documents to the Fugatts. Given the parties' dispute

issued a capias warrant against Jews on February 17, 2009 for failure to obey a court order. (Doc. # 392-35 at 2). The warrant directed Jews to pay a bond of $487 to be released. (*Id.*). Jews was arrested in September 2009. (Doc. # 392-36 at 3). In October 2009, the Municipal Court reinstated Jews's probation sentence and charged him a $317 warrant fee.[18] (Doc. # 524-22 at 6). The Court's probation order sentenced Jews to probation for FTOCO. (Doc. # 524-6 at 2). Jews was released from the Talladega County Jail on October 22, 2009. (Doc. # 382-11 at 65).

JCS petitioned the Municipal Court to revoke Jews's probation again in December 2009. (Doc. # 524-22 at 5). The Municipal Court held a revocation hearing in January 2010, and Jews did not appear at the hearing. (*Id.*). A magistrate issued another capias warrant against Jews based on a conviction for FTOCO. (Doc. # 392-45 at 2). This arrest warrant increased his bond amount to $935. (*Id.*). City police arrested Jews on August 18, 2010. (Doc. # 392-46 at 2). On September 9, 2010, the Municipal Court fined Jews $317 for the failure-to-obey offense and reinstated his probation. (Doc. # 392-38 at 2). Hepp again authorized Jews's release from the Talladega County Jail on September 9th. (Doc. # 382-11 at 67).

In November 2010, JCS filed another revocation petition against Jews. (Doc. # 524-22 at 5). Jews did not appear at the Municipal Court's December 2010 revocation hearing in his case. (*Id.*). The Municipal Court issued another capias warrant against Jews based on a conviction for FTOCO, and he was arrested on January 10, 2011. (Doc. # 392-50 at 2-3). A City employee, Misty Hepp, authorized Jews's release from jail on January 14, 2011, after a

---

regarding whether JCS mailed the revocation petitions and notices to show cause to Plaintiffs, the court has not accepted Defendants' averments (for purposes of Rule 56) that JCS employees mailed these notices.

[18] The Municipal Court issued a separate probation order for Jews on this date. (Doc. # 392-37 at 2). But JCS's records indicate that the court merely reinstated his prior probation term. (Doc. # 524-22 at 6).

$500 bond had been paid on his behalf. (Doc. # 392-51 at 2). The Municipal Court reinstated Jews's probation sentence in March 2011 and charged him a $317 warrant fee. (Doc. # 524-22 at 5).

In May 2011, JCS again petitioned the Municipal Court to revoke Jews's probation. (Doc. # 392-54 at 2). The revocation petition asserted that Jews owed $773 to close his case. (*Id.*). A JCS employee and Judge Ward signed the petition, but the City's prosecutor did not sign it. (*Id.*). Yet again, Jews did not appear at a revocation hearing in June 2011. (Doc. # 524-22 at 4). On June 10, 2011, the Municipal Court's magistrate issued another warrant against Jews based on a conviction for failure to obey a court order. (Doc. # 392-56 at 2). This warrant required Jews to pay $1,090 in bail to be released. (*Id.*). A City officer arrested Jews in February 2012 after detaining him to check for outstanding warrants. (Doc. # 392-57 at 2-3). Jews fled from the officer and was detained for resisting arrest and failure to obey a court order. (*Id.*).

According to Jews's Probation Tracker records, during a March 2012 hearing, the Municipal Court reinstated Jews's probation. (Doc. # 524-22 at 4). The Court issued another probation order for the resisting arrest and FTOCO charges. (Doc. # 392-58 at 2). This order recounted fines of $717 for resisting arrest and $1,090 for FTOCO. (*Id.*). And, it placed Jews on probation until March 8, 2014. (*Id.*). The City's police department released Jews from jail on March 8, 2012. (Doc. # 382-12 at 13). In May 2012, JCS recalculated Jews's probation expiration date for the 2009 probation order stemming from the harassment charges. (Doc. # 524-22 at 4). It stated that his probation on that charge actually was due to end on March 9, 2014. (*Id.*).

In June 2012, JCS requested that the Municipal Court revoke Jews's probation. (Doc. # 524-22 at 3). The revocation petition was not signed by a JCS employee, and the order directing a hearing was not signed by the Municipal Court's judge. (Doc. # 392-59 at 2). The Municipal Court held a revocation hearing in August 2012; again, Jews did not attend that hearing. (Doc. # 524-22 at 3). According to JCS's probation records, the probation sentence entered warrant status on August 10, 2012. (*Id.* at 2). The Municipal Court ultimately terminated Jews's probation sentence in December 2014, during the pendency of this action. (Doc. # 382 at 114).

## G.     Probation of Plaintiff Gina Kay Ray

In June 2010, a City officer ticketed Ray for driving with a suspended license and without proof of insurance. (Doc. # 423-4 at 2). Ray pled guilty to both charges during a Municipal Court hearing on August 12, 2010. (*Id.* at 3). Ray testified that a public defender attended the hearing, but she (Ray) did not believe that an attorney would assist her with a traffic ticket. (Doc. # 471-7 at 38-39). Ray does not think that Judge Ward identified the public defender during the hearing. (*Id.* at 39). Judge Ward imposed a three-day suspended imprisonment term for each conviction, along with a 24-month probationary sentence. (Doc. # 423-4 at 3). Ray was unable to recall whether Judge Ward mentioned the suspended imprisonment term during the hearing. (Doc. # 471-7 at 43-44). Judge Ward fined Ray $400 for each traffic offense, imposed $198 in court costs for the suspended license offense, and imposed $148 in court costs for the no insurance offense. (Doc. # 423-4 at 3).

According to JCS's probation records, JCS prepared a revocation petition against Ray on September 20, 2010.[19] (Doc. # 423-11 at 8). The revocation petition contained in the Rule 56 record was not signed by the probation officer or the Municipal Court's judge. (*See* Doc. # 423-

---

[19] As with Plaintiff Jews, Plaintiff Ray's Probation Tracker records do not indicate whether JCS mailed the September 2010 revocation petition to her. (*See* Doc. # 423-11 at 8). But, her Probation Tracker records state that Kidd mailed petitions and notices to Ray in January 2012 and August 2012. (*Id.* at 3-4).

8 at 2). The Municipal Court held a revocation hearing on October 14, 2010, which Ray attended. (Doc. # 423-11 at 8). JCS issued another revocation petition on December 30, 2010, based on Ray's failure to attend probation sessions, pay assessed court fines and fees, and pay probation fees. (Doc. # 423-14 at 2). The Municipal Court held a revocation hearing for Ray on January 13, 2011, but she failed to appear. (Doc. # 423-11 at 7). Consequently, on January 18, 2011, the Municipal Court's magistrate issued a capias warrant premised upon a FTOCO conviction. (Doc. # 423-15 at 2). The warrant provided for a bond of $1,353. (*Id.*).

Ray was arrested on January 19, 2011. (*See* Doc. # 455-5). She remained in the Talladega County Jail until February 10, 2011. (*See id.*). The Municipal Court reinstated Ray's probation on February 10, 2011, and imposed a $317 warrant fee. (Doc. # 423-17 at 2). In June 2011, a City officer ticketed Ray for driving with an expired tag and a revoked license. (Doc. # 423-31 at 2). Ray pled guilty to both offenses in July 2011. (*Id.* at 3). The Municipal Court imposed 5-day suspended imprisonment sentences, 24 months of probation, fines totaling $500, and court costs totaling $346 for the two convictions. (*Id.*). In August 2011, Ray was again charged with driving with a revoked license and an expired tag. (Doc. # 423-28 at 2). As with her earlier tickets, the Municipal Court imposed a 5-day suspended imprisonment sentence for the expired-tag offense, 24 months of probation for the expired-tag offense, fines totaling $500, and court costs totaling $346. (*Id.* at 3).

On January 4, 2012, a JCS employee found that Ray had violated her probation because she owed the City $1,008 in fines and costs and JCS $433 in fees.[20] (Doc. # 423-11 at 4). The

---

[20] The parties dispute whether JCS sought to revoke Ray's probation in January 2012 based on her failure to attend scheduled probation appointments. Plaintiffs state that Ray "attended over 20 JCS appointments" and had paid over $3,000 towards her probation obligations. (Doc. # 454 at 6). Defendants state that a JCS employee relied on Ray's failure to attend scheduled appointments to support a revocation petition. (Doc. # 470 at 14). JCS's probation records for Ray suggest that its request to revoke her probation was based solely on the amount she owed, as the probation notes did not mention Ray's failure to appear at scheduled meetings as a rationale for revoking her probation. (Doc. # 423-11 at 4) ("THE DEF IS IN VIOLATION OF PROBATION DUE TO OUTSTANDING

Municipal Court held a revocation hearing on February 9, 2012 that Ray did not attend. (*Id.*). Thus, the Municipal Court's magistrate issued a capias warrant against Ray for FTOCO. (Doc. # 423-23 at 2). The warrant provided a bail amount of $3,173. (*Id.*). On April 21, 2012, City police officers detained Ray because they suspected that she had an active warrant. (Doc. # 423-24 at 2-3). She fled from the officers in her car until she was blocked in by traffic. (*Id.* at 3). The officers issued her tickets for driving with an expired tag, driving with a revoked license, and attempted escape. (Doc. # 423-27 at 2, 4).

Ray was held in jail from April 21, 2012 to May 1, 2012 on the charge of FTOCO. (Doc. # 455-7). On April 26, 2012, the Municipal Court reinstated Ray's probation and imposed a $317 warrant fee. (Doc. # 423-25 at 2). The court's probation order stated that Ray owed $3,173 in costs. (*Id.*). The order stated that Ray could not be released from jail until $300 had been paid on her behalf. (*Id.*). Ray was released from jail on May 1, 2012 after someone paid the $300. (Doc. # 471-7 at 149).

In June 2012, Ray pled guilty to driving with an expired tag, driving with a revoked license, and attempting to escape. (Doc. # 423-27 at 3, 5). The Municipal Court sentenced Ray to a 5 day suspended incarceration sentence, along with 24 months' probation, for each conviction. (*Id.*). It fined her $400 for driving with a revoked license, $400 for attempting to flee, and $100 for driving with an expired tag. (*Id.*). It also imposed a total of $444.00 in court costs against Ray. (*Id.*).

JCS again requested that the Municipal Court revoke Ray's probation in August 2012 due to the outstanding fines and fees she owed to JCS and the City. (Doc. # 423-11 at 3). The Municipal Court held a revocation hearing in September 2012 and issued a warrant against Ray

---

[FEES AND FINES] TO THE CITY OF 1008.00/$433.00 JCS FEES, TOTALING $1441.00."). At a minimum, there is a genuine factual dispute as to JCS's asserted reason for seeking a revocation hearing against Ray in January 2012.

after she had failed to appear at the hearing. (*Id.*). Ray's probation sentence was terminated by court order on November 1, 2014. (Doc. # 422 at 11).

## III.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*").  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.    Analysis

The court addresses the parties' summary judgment arguments below.

### A.    Plaintiffs' Claims for Declaratory and Injunctive Relief

Defendants initially argue that Plaintiffs lack standing to seek the declaratory and injunctive relief requested in the Fourth Amended Complaint. (Doc. # 470 at 44). They claim that standing no longer exists for the declaratory and injunctive relief sought because (1) the JCS-City Contract has been terminated, (2) JCS no longer operates in the state of Alabama, (3) the Municipal Court has adopted new policies and procedures addressing the alleged procedural deficiencies in this action, and (4) the Municipal Court has appointed new personnel. (*Id.*). Thus, according to Defendants, Plaintiffs cannot show that the conduct of which they complain will occur in the future. (*Id.* at 45).

Plaintiffs respond that the court should adopt its ruling on the requests for declaratory and injunctive relief in a case related to this one. (Doc. # 500 at 45) (referencing *Woods, et al. v. City of Columbiana, et al.*, Case No. 2:15-cv-00493-RDP, Docs. # 88 & 89). In *Woods*, the court dismissed the plaintiffs' requests for declaratory and injunctive relief "based upon future harm" without prejudice, "subject to repleading if [JCS] reenters business in the state of Alabama." (Case No. 2:15-cv-00493-RDP, Doc. # 88). The court explained during a hearing in that case that the plaintiffs could seek a ruling on whether a contract between JCS and a municipal defendant was void from its inception, to the extent that such a ruling was relevant to a legal claim. (*Id.*, Doc. # 89 at 18). But, the court declined to allow plaintiffs to seek a declaratory judgment that the contract was void and unenforceable because the parties had agreed that the contract at issue was no longer in place and that JCS no longer operated in the state of Alabama. (*Id.*).

To establish standing for injunctive relief, a plaintiff must show "a real and immediate— as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013) (emphasis in original) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001), and *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001)). A plaintiff seeking declaratory relief from a federal court also must show "a reasonable expectation that the injury they have suffered will continue or will be repeated in the future." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999). A party's Article III standing to bring suit is determined by whether it had standing at the time of filing. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003). In this case, the court has already concluded that Plaintiffs had standing to seek prospective injunctive relief at the time this suit was filed in 2012. (*See* Doc. # 67 at 25-26). Thus, Defendants' request to dismiss the declaratory and injunctive counts for lack of standing is due to be denied.

Mootness addresses justiciability concerns arising from factual changes that occur after a case's filing. "[M]ootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Strickland v. Alexander*, 772 F.3d 876, 887 (11th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Defendants JCS and Correctional Healthcare appear to rely on JCS's voluntary cessation of operation in Alabama to justify mooting the claims for declaratory and injunctive relief.[21] "It is well settled that 'a defendant's voluntary cessation of a challenged practice does

---

[21] The Rule 56 record does not conclusively demonstrate whether JCS's decision to stop operations in the state of Alabama was voluntary or involuntary. JCS involuntarily ceased operations in Childersburg because the city council terminated the JCS-City Contract. (Doc. # 392-63 at 2). But, JCS has not explained why it ceased operations in other Alabama jurisdictions.

not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Nevertheless, a case may be moot due to a private defendant's voluntary cessation of conduct "if subsequent events [make] it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

Here, Plaintiffs have asked the court to extend the mootness decision rendered in a related case to the present case. The court concludes that this request is appropriate. Accordingly, the court concludes that the requests for declaratory and injunctive relief in Plaintiffs' Fourth Amended Complaint are due to be dismissed without prejudice as moot, subject to repleading if Defendant JCS reenters business in the state of Alabama. To be clear, this ruling does not prevent Plaintiffs from seeking to support a damages claim by asking the court to rule that particular conduct was illegal. Indeed, the court addresses all three of Plaintiffs' partial summary judgment motions, which request such rulings, below.

**B.    Analysis of Plaintiffs' Damages Claims**

Plaintiffs present three issues on which they believe they are entitled to summary judgment. First, they argue that the court should summarily declare JCS's probation supervision practices for the Municipal Court as unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. (*See generally* Doc. # 425). Second, they argue that the court should declare the JCS-City Contract to be void from its inception. (*See generally* Doc. # 427). Third, they claim that the court should declare void any probation sentence initiated by a blank order or premised upon an offense that was not adjudicated by the Municipal Court's judge. (*See generally* Doc. # 545).

Defendants JCS and Correctional Healthcare present a number of reasons why they contend they are entitled to summary judgment. The court begins its analysis by discussing the general defenses presented to the § 1983 claims at the core of this case. Because none of those defenses resolve all of the § 1983 claims, the court will also discuss whether Plaintiffs have presented a triable § 1983 claim based on a due process, Fourth Amendment, Sixth Amendment, Eighth Amendment, or equal protection violation. Next, the court will address whether Plaintiffs have presented a triable § 1983 conspiracy claim. Finally, the court will discuss Plaintiffs' partial summary judgment motion, which seeks to declare the JCS-City Contract void.

### 1.    Quasi-Judicial Immunity

Defendant JCS argues that it is entitled to "absolute quasi-judicial immunity" because it followed orders and directives from the Municipal Court when it performed functions relating to Plaintiffs' judicial proceedings. (Doc. # 470 at 28). JCS insists that the Municipal Court directed JCS employees to draft and promulgate all of the documents at issue in this case, including probation orders, petitions for revocation, failure-to-report letters, and probation-violation letters. (*Id.* at 30-31). Moreover, it claims that the Municipal Court instructed or requested its employees to enforce the conditions of probation mandated by the court. (*Id.* at 33). It emphasizes that Alabama law permitted JCS employees to seek reports from probationers, issue written reports to the Municipal Court, use suitable methods to improve probationers' conduct, and initiate probation revocation proceedings. (*Id.* at 33-34).

Plaintiffs contend that JCS has mischaracterized the debt collection functions it performed for the City as "probation services." (Doc. # 500 at 36). They argue that JCS performed administrative functions, rather than judicial functions, because (1) its employees operated a "highly systemic post-adjudication collection system," (2) the documents sent to

probationers were form documents provided by JCS, (3) none of the documents sent by JCS were filed in court records, and (4) JCS marketed its services to municipalities as fine collection services. (*Id.* at 37-38). Plaintiffs further emphasize that the Municipal Court's judge signed blank probation orders prior to any adjudication, JCS employees filled in those probation orders, and JCS employees often included fines levied years earlier against the probationer in later probation orders. (*Id.* at 38). And, they insist that JCS employees exceeded the authority provided to probation officers because they threatened to imprison probationers who failed to pay on time and manipulated payments made by probationers to prolong probation terms. (*Id.* at 39-40).

As outlined above, the parties' briefs have focused on whether JCS's employees committed or assisted in adjudicative acts. But, the quasi-judicial immunity question ultimately turns on a more fundamental inquiry: whether a private corporation can seek quasi-judicial immunity from § 1983 claims premised upon policies or customs that caused its employees to violate individuals' constitutional rights.

"Absolute quasi-judicial immunity derives from absolute immunity." *Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994). Under this immunity doctrine, "[n]onjudicial officials are encompassed by a judge's absolute immunity when their official duties 'have an integral relationship with the judicial process.'" *Id.* (quoting *Ashbrook v. Hoffman*, 617 F.2d 474, 476 (7th Cir. 1980)). To receive quasi-judicial immunity, an official must act within the scope of his or her authority. *Id.* Courts review whether a nonjudicial official receives quasi-judicial immunity "through a *functional* analysis of the action taken by the official in relation to the judicial process." *Id.* (emphasis in original).

As several courts have explained, quasi-judicial immunity is a defense to individual capacity § 1983 suits, but not official capacity suits. *VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007) (holding that commissioners for the Nebraska State Racing Commission could not receive quasi-judicial immunity in their official capacities); *Alkire v. Irving*, 330 F.3d 802, 810-11 (6th Cir. 2003) (explaining that a sheriff and county judge could not claim quasi-judicial or qualified immunity for official-capacity § 1983 claims); *Dotzel v. Ashbridge*, 438 F.3d 320, 327 & n. 5 (3d Cir. 2006) (explaining, in a footnote, that official capacity claims against members of a township's board of supervisors are not subject to quasi-judicial immunity, even though the board members were entitled to quasi-judicial immunity in their individual capacities). When a private corporate entity contracts with a public entity to offer functions "traditionally within the exclusive prerogative of the state[,] . . . it becomes the functional equivalent of [a] municipality." *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). In other words, a suit against such a corporate entity is an official capacity suit. *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985) (explaining that an official capacity § 1983 suit is one "against an entity of which an officer is an agent" and that personal immunity defenses are unavailable in such suits). Because Plaintiffs are not suing Defendants JCS or Correctional Healthcare in an individual capacity, Defendants cannot seek quasi-judicial immunity.[22] *Cf. Swann v. S. Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004) (explaining that the rationale against immunity for municipalities "is applicable in § 1983 suits against non-governmental entities not

---

[22]    The Middle District of Tennessee recently concluded -- in an analogous action against a for-profit probation servicer and other defendants -- that for-profit corporations are not entitled to claim the defense of quasi-judicial immunity because (1) courts generally have declined to extend immunity to private contractors, (2) the public interest is not served by extending immunity to for-profit entities, and (3) the corporation is not equivalent to the employee of the corporation who performs a task integral to the judicial process. *Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758, 767-68 (M.D. Tenn. 2016).

entitled to qualified immunity"), *overruled on other grounds as explained in Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010).[23]

Indeed, both the Fourth Amended Complaint and the summary judgment briefs demonstrate that this action is an official capacity suit. Plaintiffs allege in their Fourth Amended Complaint that JCS established a "highly systemized and uniform" policy for collecting court fines, costs, and fees during their performance of delegated administrative and judicial functions. (*See* Doc. # 305 at ¶¶ 16, 18). Moreover, Plaintiffs' operative complaint explains that JCS's uniform system (*i.e.*, its policy or practice) caused Municipal Court defendants and probationers to suffer the constitutional violations at issue in this action. (*Id.* at ¶¶ 97, 161, 181, 218, 223, 246-48). Additionally, Defendants JCS and Correctional Healthcare rely on *Buckner* and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), to argue that Plaintiffs need to prove that a custom or policy caused the constitutional violations. In response, Plaintiffs have pointed to evidence that JCS instituted a system that was such a custom or policy. (Doc. # 500 at 43-45). From these allegations and arguments, the court concludes that this is an official capacity suit against JCS and Correctional Healthcare, subject to the elements for such suits identified in *Monell*.

By way of their pleadings, which have joined the issues in this case, the parties have picked the rules of this game, and quasi-judicial immunity appears nowhere in those rules. Therefore, Defendants' request for quasi-judicial immunity is due to be denied.

---

[23]  In *Swann*, the parties agreed that a private corporate defendant was not eligible to receive qualified immunity. 388 F.3d at 837.

## 2. Qualified Immunity

Defendants JCS and Correctional Healthcare have requested qualified immunity from Plaintiffs' § 1983 claims. (Doc. # 523 at 28-30). They claim that JCS's employees conducted court-appointed tasks as part of their discretionary functions. (*Id.* at 28-29). Additionally, they assert that JCS's employees acted within their lawful powers as probation officers. (*Id.* at 29). Finally, they claim that the named Plaintiffs, such as Plaintiff Jews, have not presented a violation of any clearly established constitutional right. (*Id.*). For example, JCS and Correctional Healthcare state that no clearly established law required JCS to provide an indigency hearing to a probationer under its supervision. (*Id.*). Nor was it clearly established that JCS violated Plaintiff Jews's rights by sending him notice of a revocation hearing through first-class mail. (*Id.*). In a footnote, JCS and Correctional Healthcare summarily aver that private entities are eligible to receive qualified immunity. (*Id.* at 28 n. 171).

Plaintiffs respond that JCS is not entitled to claim qualified immunity because it was operating as a private, for-profit company under a contract with the City. (Doc. # 530 at 37-38). Moreover, Plaintiffs insist that JCS and its employees violated Plaintiffs' clearly established constitutional rights. (*Id.* at 38). For example, they contend that JCS violated Plaintiff Jews's clearly established rights by providing no notice at all before initiating probation revocation proceedings in the Municipal Court. (*Id.*).

As with Defendants' quasi-judicial immunity claim, a threshold issue is whether JCS and Correctional Healthcare are entitled to even assert a qualified immunity defense. The Eleventh Circuit has provided a clear answer to this question: Private corporations that enter contracts to provide traditionally public services are functionally equivalent to municipalities for purposes of § 1983 suits, *Buckner*, 116 F.3d at 452, and, like municipalities, they are not entitled to claim

qualified immunity. *See Swann*, 388 F.3d at 837. Therefore, Defendants' claim that they are entitled to qualified immunity is due to be denied.

### 3. *Rooker-Feldman* Doctrine

JCS and Correctional Healthcare argue that the court should grant summary judgment on the basis of the *Rooker-Feldman* doctrine because Plaintiffs are attacking the validity of the Municipal Court's orders and judgments. (Doc. # 470 at 37-38). According to Defendants, Plaintiffs' claims center on the obligations directed in the probation orders and the arrest warrants issued by the Municipal Court. (*Id.*).

Plaintiffs respond that they are not challenging the Municipal Court's adjudication of the charges against them. (Doc. # 500 at 41-42). Rather, they contest the unconstitutional conduct resulting from the probation sentences they received because of their "inability to pay immediately." (*Id.* at 42).

"The *Rooker-Feldman* doctrine places limits on the subject-matter jurisdiction of federal district courts and courts of appeal over certain matters related to previous state court litigation." *Cormier v. Horkan*, 397 F. App'x 550, 552 (11th Cir. 2010) (quoting *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1332 (11th Cir. 2001)). The *Rooker-Feldman* doctrine provides that federal district courts lack authority to review "final judgments of a state court." *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1072 (11th Cir. 2013) (quoting *Nicholson v. Shafe*, 558 F.3d 1266, 1271 (11th Cir. 2009)). This narrow doctrine forecloses federal review of "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). *See also id.* at 293 (describing the "paradigm situation" for *Rooker-Feldman* preclusion as one

where a plaintiff seeks "to undo the [state-court] judgment in its favor"). According to the Supreme Court, *Rooker-Feldman* does not prevent a party from litigating a matter previously litigated in a state court proceeding. *Id.* at 293. Indeed, the Supreme Court has expressly recognized that state-law preclusion, rather than *Rooker-Feldman* preclusion, should be considered when analyzing an independent claim from that raised in a state court that "denies a legal conclusion that a state court has reached in a case to which [the plaintiff] was a party." *Id.* (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

Nevertheless, after *Exxon Mobil*, the *Rooker-Feldman* doctrine continues to bar "federal court jurisdiction where the issue before the federal court [is] 'inextricably intertwined' with the state court judgment so that (1) the success of the federal claim would 'effectively nullify' the state court judgment, or that (2) the federal claim would succeed 'only to the extent that the state court wrongly decided the issues.'" *Alvarez v. Att'y Gen. of Fla.*, 679 F.3d 1257, 1262-63 (11th Cir. 2012) (explaining that the inextricably intertwined standard continues to apply after the Supreme Court's narrowing of the *Rooker-Feldman* doctrine in *Exxon Mobil* and *Lance v. Dennis*, 546 U.S. 459 (2006)) (quoting *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009)). In *Alvarez*, the Eleventh Circuit held that the *Rooker-Feldman* doctrine barred a state prisoner from challenging a state court's denial of post-trial DNA testing through a § 1983 claim. *Alvarez*, 679 F.3d at 1263. It distinguished Alvarez's as-applied challenge to the state court's handling of his particular motion for post-trial testing from a § 1983 challenge to a state's DNA access statute, which would not be barred by the *Rooker-Feldman* doctrine. *Id.* (distinguishing Alvarez's case from the § 1983 action considered by the Supreme Court in *Skinner v. Switzer*, 562 U.S. 521 (2011)).

The *Rooker-Feldman* doctrine does not apply in situations where the plaintiff lacked a "reasonable opportunity to raise his federal claim in state proceedings." *Powell v. Powell*, 80 F.3d 464, 467 (11th Cir. 1996). For example, a plaintiff's Takings Clause claim against a government entity for a regulatory taking is not barred by *Rooker-Feldman* due to the plaintiff's appeal of the initial regulatory decision because the plaintiff cannot raise a Takings Clause claim until the regulatory decision denying the property interest is final. *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1233 (11th Cir. 1999).

Here, by and large, Plaintiffs' § 1983 claims do not challenge the probation orders or sentences imposed by the Municipal Court. Rather, they are challenging the policies and practices of JCS that reportedly caused constitutional violations to occur during JCS's supervision of them. Properly understood, Plaintiffs' § 1983 claims in the Fourth Amended Complaint do not ask the court to undo the orders or sentences issued by the Municipal Court. Rather, they request that JCS and other Defendants be required to pay damages for constitutional violations allegedly caused by the administration of those orders and judgments. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606 (6th Cir. 2007) (explaining that "[a]ssertions of injury that do not implicate state-court judgments are beyond the purview of the *Rooker-Feldman* doctrine"); *Figueroa v. Merscorp, Inc.*, 766 F. Supp. 2d 1305, 1317 (S.D. Fla. 2011) (explaining that the Supreme Court in *Feldman* dismissed the plaintiffs' action because "the plaintiffs' waiver petitions were judicial in nature and not legislative, ministerial, or administrative").

For purposes of the *Rooker-Feldman* issue, this case is similar to *Powers*, where the plaintiffs sued a public defender's office for violating their constitutional rights by instituting a custom or policy of not asking for indigency hearings. 501 F.3d at 597. The *Powers* court did

not apply *Rooker-Feldman* even though the claims at issue implicitly criticized a state trial court's failure to conduct indigency hearings not requested by public defense attorneys. Likewise, Plaintiffs claim here that JCS and its employees violated their constitutional rights by instituting customs or policies that caused constitutional violations. *Cf. Arthur v. JP Morgan Chase Bank, NA*, 569 F. App'x 669, 675 (11th Cir. 2014) (holding that the *Rooker-Feldman* doctrine did not bar plaintiffs from seeking money damages for fraud related to the generation of foreclosure-related documents). And, those claims are not foreclosed merely because Plaintiffs implicitly criticize the Municipal Court for failing to prevent certain constitutional violations. *Cf. Exxon Mobil*, 544 U.S. at 293 (affirming that a state-court loser may file an independent claim asking a federal court to reach a different legal conclusion from that reached in the state-court action). For these reasons, Defendants' request to dismiss all § 1983 claims on the basis of *Rooker-Feldman* preclusion is due to be denied.

Defendants insist that Plaintiffs' claims are inextricably intertwined with the Municipal Court judgments entered against them. But, many of Plaintiffs' claims, such as the due process, Fourth Amendment, and Sixth Amendment claims, concern either JCS's administration (or, more accurately, maladministration) of the probation orders or the Municipal Court's actions committed before issuing probation orders or arrest warrants. These claims do not ask the court to find that the Municipal Court made an incorrect legal ruling. Rather, they ask the court to find either that JCS administrated the orders in violation of Plaintiffs' constitutional rights or that the Municipal Court used unconstitutional procedures. Simply put, a claim challenging actions taken in the course of obtaining a judgment or order or in execution of that judgment or order can be distinct from a challenge to the judgment or order. *See Brokaw v. Weaver*, 305 F.3d 660, 665-66 (7th Cir. 2002) (quoting *Holloway v. Brush*, 220 F.3d 767, 779 (6th Cir. 2000)).

Plaintiffs' Eighth Amendment and equal protection claims present a more plausible *Rooker-Feldman* issue. Plaintiffs allege in their Fourth Amended Complaint that JCS violated their Eighth Amendment rights by charging probation supervision fees far in excess of the $500 maximum that should have applied. (*See* Doc. # 305 at ¶¶ 211-26). The Municipal Court, however, imposed the indefinite monthly supervision fees on Plaintiffs when it sentenced them to probation. Thus, Plaintiffs' Eighth Amendment challenge to the fees exceeding $500 is inextricably intertwined with the Municipal Court's orders. Likewise, Plaintiffs' equal protection challenge, which alleges that JCS participated in a joint practice whereby the Municipal Court improperly sentenced individuals who were too poor to pay their fines to probation, inextricably contests the probation sentences themselves, rather than the Municipal Court's procedures. Plaintiffs allege that Defendants violated their equal protection rights by placing them on probation once they could not immediately pay the amounts owed to the Municipal Court. (*See* Doc. # 425 at 10) ("JCS and Childersburg violated the doctrine of equal protection by requiring individuals who could not immediately pay their fines and court costs to be placed on JCS probation and forced to pay additional money to JCS."). Clearly, Plaintiffs were "placed" on probation by the court's probation orders. Consequently, their equal protection claims are inextricably intertwined with the orders themselves, as Plaintiffs could only succeed on the equal protection claims to the extent that the Municipal Court unconstitutionally sentenced them to probation.

Having said that, the court is uncertain whether Plaintiffs' Eighth Amendment and equal protection claims are barred by the *Rooker-Feldman* doctrine because it is unclear whether Plaintiffs had an opportunity to raise Eighth Amendment or equal protection challenges to their probation sentences. Alabama law grants a defendant a right to appeal a municipal court's

decision if the defendant is convicted of an offense.  Ala. R. Crim. P. 30.1(a).  But, three of the four Plaintiffs -- Kristy Fugatt, Timothy Fugatt, and Jews -- were not convicted of an offense before the Municipal Court initially sentenced them to probation.  (*See* Docs. # 392-27 at 2; 392-66 at 11, 14-15).  Thus, it appears that these three Plaintiffs lacked any ability to directly appeal the initial probation orders.  And, because they were not convicted of criminal offenses during their initial Municipal Court proceedings, they could not have sought post-conviction review in an Alabama state court.  Ala. R. Crim. P. 32.1.  Accordingly, the court finds that Plaintiffs Timothy Fugatt, Kristy Fugatt, and Jews lacked a reasonable opportunity to raise these constitutional claims in their state proceedings.  As such, the *Rooker-Feldman* doctrine does not bar these Plaintiffs' Eighth Amendment or equal protection claims.[24]  *Powell*, 80 F.3d at 467.

One of Plaintiffs' motions for partial summary judgment necessarily falls within the scope of *Rooker-Feldman* preclusion.  Plaintiffs have asked the court to declare certain Municipal Court orders void, including probation orders that lack an underlying offense adjudication and unsigned probation orders.[25]  (*See* Doc. # 546 at 17-19, 21-22).  Defendants respond that this motion is barred by the *Rooker-Feldman* doctrine.  (Docs. # 573 at 14-16; 575 at 9-11).  The court agrees.  To the extent Plaintiffs ask the court to declare Municipal Court probation orders void, Plaintiffs' motion for partial summary judgment is barred by the *Rooker-Feldman* doctrine.  *See Arthur*, 569 F. App'x at 677 (holding that plaintiffs' request to declare a

---

[24]   The *Rooker-Feldman* doctrine does appear to bar Plaintiff Ray's Eighth Amendment and equal protection claims against all Defendants because those claims are inextricably intertwined with her probation order, and she had an opportunity to contest the constitutionality of her probation order in her state proceedings through a direct appeal to the circuit court.  Having said that, and in any event, Plaintiff Ray's Eighth Amendment and equal protection claims fail on the merits, for the reasons explained below.

[25]   Specifically, Plaintiffs' motion for partial summary judgment asks the court to declare "that all blank orders showing no adjudication of an offense to be void and that all JCS probations based thereon or on those without probation orders to be without effect and therefore void."  (Doc. # 545 at 1).  Although the court finds that the motion is not barred to the extent it challenges JCS's administration of probation cases unsupported by any court order, the named Plaintiffs lack standing to present that particular claim because the Municipal Court issued probation orders with respect to each of them.

45

state-court judgment "null and void" was barred by the *Rooker-Feldman* doctrine); *Drees v. Ferguson*, 396 F. App'x 656, 657-58 (11th Cir. 2010) (holding that a plaintiff's request for a district court to declare a state-court judgment void due to "corruption of the judicial process" was barred by *Rooker-Feldman*).  Plaintiffs insist that the court should consider their request because *Rooker-Feldman* does not apply to situations where no judgment, conviction, or adjudication occurred.  (*See* Doc. # 597 at 4-5).  But this argument misses the mark in the context of Plaintiffs' summary judgment motion: If there is no actual state-court judgment, what exactly is the court being asked to declare void?  Thus, Plaintiffs' partial motion for summary judgment (Doc. # 545) is due to be denied to the extent it seeks to void Municipal Court probation orders.

### 4.     *Heck v. Humphrey* and the Availability of Habeas Relief

In their motion for summary judgment, Defendants JCS and Correctional Healthcare reiterate that Plaintiffs' claims are barred by the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477 (1994).  (Doc. # 470 at 39-41).  According to Defendants, Plaintiff Ray was in custody during her term of probation because the Municipal Court had sentenced her to a suspended term of imprisonment.  (*Id.* at 39-40).  Moreover, they insist that Plaintiff Ray alleges she was subjected to significant restraints on her liberty because she reportedly was "hounded" by JCS employees and sometimes required to report weekly to the JCS office.  (*Id.* at 40).

Plaintiffs respond by simply noting that Ray was not in custody during her probation stint with JCS (Doc. # 500 at 43), and Defendants have not cited Alabama law to support the argument that Ray was in custody during her probationary sentence.  (*Id.*).  They also reiterate their argument that the JCS policies and practices should be classified as a "collection service" rather than a private probation service.  (*Id.*).  Finally, they contend that a writ of habeas corpus

is not the sole relief available to Ray (and the other named Plaintiffs) in this action because their claims would not necessarily demonstrate the invalidity of the Municipal Court's orders. (*See id.*).

In *Heck v. Humphrey*, the Supreme Court held that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 487. Indeed, a "state prisoner may not maintain an action under [ ] § 1983 if the direct or indirect effect of granting relief would be to invalidate the state sentence he is serving." *Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Ginsburg, J., concurring). *Heck*'s so-called "favorable-termination" rule is intended to promote "finality and consistency," upholding "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Heck*, 512 U.S. at 485-86. The favorable-termination rule ensures that "state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody."[26] *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005) (emphasis in original).

---

[26] As already noted, three of the named Plaintiffs (Jews, Kristy Fugatt, and Timothy Fugatt) would have been unable to obtain state court review of constitutional issues related to their initial probation orders and sentences because they were not convicted of any particular offense. A municipal court defendant only has the right to appeal to a circuit court if "convicted of an offense." Ala. R. Crim. P. 30.1(a). Likewise, a defendant must be convicted of a criminal offense to file a post-conviction motion in Alabama courts. Ala. R. Crim. P. 32.1 (limiting the post-conviction motion to "any defendant who has been convicted of a criminal offense"). Plaintiffs Jews, Kristy Fugatt, and Timothy Fugatt were not convicted of criminal offenses when the Municipal Court placed them on probation for failure to pay fines and/or court costs. Thus, by asserting that these Plaintiffs were in custody and thus should have sought habeas review, Defendants JCS and Correctional Healthcare essentially argue that they should have filed a 28 U.S.C. § 2254 petition without obtaining any state court review whatsoever. The court harbors substantial doubts that the Eleventh Circuit would look favorably upon such an expansion of the habeas remedy under § 2254. *See*

The Eleventh Circuit has limited *Heck*'s rule from applying to actions where (1) a plaintiff is not in custody and (2) that plaintiff does not seek relief that implies the invalidity of his conviction. *Morrow v. Fed. Bureau of Prisons*, 610 F.3d 1271, 1272 (11th Cir. 2010). Moreover, the *Morrow* opinion recognized that *Heck* does not bar cases where a plaintiff was not in custody for a sufficient period of time to obtain habeas relief. *Id.* ("This case is one in which the alleged length of unlawful imprisonment—10 days—is obviously of a duration that a petition for habeas relief could not have been filed and granted while Plaintiff was unlawfully in custody."). A concurrence in *Morrow* noted that several courts have discerned an exception to *Heck* where a plaintiff is no longer in custody and is precluded from obtaining habeas relief. *Id.* at 1273 (Anderson, J., concurring specially) (citing *Powers*, 501 F.3d at 603; *Nonnette v. Small*, 316 F.3d 872, 878 (9th Cir. 2002); and *Leather v. Eyck*, 180 F.3d 420, 423-24 (2d Cir. 1999)).

Here, for reasons similar to those explained in the court's Memorandum Opinion denying JCS's motion to dismiss (Doc. # 67 at 13-14), *Heck* continues to be inapplicable to this case. This suit challenges the procedures used by JCS to supervise Plaintiffs' probation, not the substantive correctness of the criminal judgments or sentences. As such, it is within the category of "purely procedural" actions not barred by *Heck*. *See Harden v. Pataki*, 320 F.3d 1289, 1295 (11th Cir. 2003). With the exception of the partial summary judgment motion seeking to declare unsigned probation orders void and some requests for declaratory and injunctive relief (that are now moot), Plaintiffs have not asked the court to invalidate any Municipal Court order, reduce the length of their custody, or address the substantive validity of any criminal judgment. Nor have they filed a type of § 1983 claim that implicitly challenges their guilt for a substantive offense (such as a false arrest claim). As the named Plaintiffs are no longer in custody and do

_____

*Duvallon v. Florida*, 691 F.2d 483 (11th Cir. 1982) (holding that the imposition of a fine was insufficient to place a petitioner in custody for purposes of § 2254).

not seek to invalidate -- explicitly or implicitly -- any convictions or sentences, the claims in this suit are not barred by *Heck*.

### 5. Plaintiffs' Due Process Claims

Before turning to the specific due process claims asserted by Plaintiffs, the court notes that throughout their summary judgment briefs, Defendants JCS and Correctional Healthcare insist that they did not commit the conduct underlying Plaintiffs' due process claims. With regard to Plaintiff Ray, they argue that the Municipal Court imposed a suspended imprisonment sentence along with each of Ray's probation sentences. (Doc. # 470 at 18). With regard to all Plaintiffs, these Defendants insist that JCS did not issue arrest warrants based on FTOCO charges; rather, it was the Municipal Court's magistrate that issued the warrants. (*E.g.*, *id.* at 19). And, Defendants JCS and Correctional Healthcare claim that the Municipal Court determined the amount that a probationer had to pay to be released from jail. (*Id.*). They contend that the Municipal Court ordered all of the fines and fees the named Plaintiffs were required to pay. (*Id.* at 20-21). Likewise, they insist that the Municipal Court tolled the Plaintiffs' probation sentences for significant periods of time. (Docs. # 470 at 21; 523 at 20; 536 at 18). They also claim that the Municipal Court changed Jews's, Kristy Fugatt's, and Timothy Fugatt's initial probation sentences through later orders. (Docs. # 523 at 20; 536 at 18).

JCS and Correctional Healthcare deny that JCS's threats to Jews, Kristy Fugatt, or Timothy Fugatt violated any due process rights because those communications accurately informed them of the risks they faced by not complying with the terms of probation.[27] (Docs. # 523 at 21; 536 at 19). They assert that the probation supervision fees which benefitted JCS did not exceed any statutory cap because the statutory cap in Alabama Code § 13A-5-12(a)(3) only

---

[27] These Defendants further deny violating Plaintiff Jews's due process rights through any threat because Jews "testified unequivocally that he never received those letters and documents." (Doc. # 523 at 21).

concerns fines. (*E.g.*, Doc. # 470 at 22-23). JCS and Correctional Healthcare further contend that, even if the probation fees were considered fines, they did not violate any due process right because (1) the violation of a state statute does not automatically qualify as a constitutional violation, and (2) the supervision fees were not grossly excessive. (*Id.* at 23-24). JCS and Correctional Healthcare argue that the Municipal Court was responsible for making any indigency determination. (*Id.* at 24-25). Moreover, they insist that Plaintiffs received revocation hearings and notice of the charges against them before they were incarcerated. (*Id.* at 25).

Plaintiffs respond that the Rule 56 record supports a finding that constitutional violations occurred as alleged in the Fourth Amended Complaint. For example, they assert that JCS submitted a revocation petition against Plaintiff Ray in which it represented that she needed to pay $1,036 to have her probation closed. (Doc. # 500 at 19). Although JCS claimed to have provided notice to her, there is an issue of fact regarding whether she received notice of the revocation hearing scheduled by JCS. (*Id.* at 19, 22). Then, after JCS had requested an arrest warrant, the City issued an arrest warrant -- based upon a reported FTOCO conviction -- that obligated Plaintiff Ray to pay over $1,300 to be released from jail. (*Id.* at 19).

Plaintiffs contend that JCS's policies should not be considered probation services because it actually operated as a "collection system." (*Id.* at 22). According to Plaintiffs, "[t]he undisputed evidence shows that, pursuant to the joint scheme of JCS and the City, [Plaintiff] Ray was repeatedly jailed when she did not pay and was then kept in jail until the sooner of 1) a court date or 2) defendants getting paid." (*Id.* at 23). Moreover, they contend that JCS drafted and supplied orders that charged Plaintiffs fees unauthorized by Alabama law. (*Id.* at 25). And, they insist that JCS cooperated with the City to extend probationers' sentences beyond two years' probation. (*Id.* at 25-26). They contend that JCS's failure to provide notice of hearings to them

violated their due process rights. (*Id.* at 26-27). Finally, they insist that JCS deprived them of due process by instituting a scheme that failed to provide them revocation hearings or contempt hearings. (*Id.* at 27).

As discussed in further detail above, the Fourth Amended Complaint alleged that several features of JCS's probation practices violated Plaintiffs' due process rights. The court will discuss each of them separately below after outlining the basic legal principles governing Plaintiffs' *Monell* claims under § 1983.

### a.    Legal Principles of § 1983 Claims Pursuant to *Monell*

As already noted, when a private entity contracts to perform a traditional function exclusively within the state's prerogative, "it becomes the functional equivalent of the municipality." *Buckner*, 116 F.3d at 452. A municipality is liable under § 1983 when a municipal employee or agent undertakes an action in "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. A plaintiff may establish the existence of a municipal "policy" by identifying "(1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*).

To present a viable § 1983 claim against a municipality (or private entity), a plaintiff must show that a municipal policy or custom was the "moving force" behind an injury. *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). This causation element of a Section 1983 claim is easier to prove when the entity's action itself violates the Constitution.

*Id.* at 404. But, when a plaintiff's claim relies on a facially lawful policy or custom causing a constitutional violation, a court must apply a rigorous standard of causation to avoid imposing *respondeat superior* liability on a municipality. *Id.* at 405.

For these and other reasons, the court cannot apply a strict "but for" causation standard when reviewing whether a facially valid municipal policy or custom caused a constitutional violation by others. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004). A plaintiff cannot hold a municipality liable for a constitutional violation merely because its custom or policy made it more likely that a constitutional violation would occur. *Id.* (citing *Brown*, 520 U.S. at 411). Indeed, as the Sixth Circuit has explained, a court must determine that a defendant's act was a proximate cause of the ultimate constitutional violation in order for it to be considered a moving force. *Powers*, 501 F.3d at 608. Applying this framework in *Powers*, the Sixth Circuit discussed situations where a judicial act constitutes a superseding cause that severs the chain of liability begun by another state actor's conduct. *Id.* at 610. A judicial act generally severs the chain of liability where a judge misapplies the law after another state actor has informed the judge of all the material facts. *Id.* A judicial act generally does not sever the chain of liability, though, if the other state actor misrepresents or omits material facts. *Id.*

> **b.** **Incarcerating Probationers for Mere Failure to Pay Amounts Owed to JCS and the Municipal Court and Failure to Conduct Indigency Determinations**

"The Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limits on the revocation of the conditional liberty created by probation." *Black v. Romano*, 471 U.S. 606, 610 (1985). In *Bearden v. Georgia*, 461 U.S. 660 (1983), the Supreme Court established a substantive limit on when courts may revoke probation for a probationer's failure to pay fines or restitution. *Black*, 471 U.S. at 611. The *Bearden* opinion requires a court

conducting a revocation hearing to ask a probationer why he or she failed to pay a fine or restitution ordered as a condition of probation. *Bearden*, 461 U.S. at 672. On the one hand,"[i]f the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority." *Id.* On the other hand, "[i]f the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment." *Id.*

Here, the court finds no custom or policy *attributable to JCS* that was a moving force behind the named Plaintiffs' failure to receive a full revocation hearing before arrest warrants were issued on FTOCO charges. Indeed, JCS directed its employees to request probation revocation hearings when a probationer's mail was returned to the JCS office, a probationer missed three appointments, or a probationer failed to respond to all communications. (Doc. # 402-3 at 23). The Rule 56 record shows that JCS employees in Childersburg sought probation revocation hearings when Plaintiffs failed to show up for probation appointments. Plaintiffs claim that JCS employees (rather than Municipal Court employees) were responsible for seeking warrants based on FTOCO charges, thereby bypassing the revocation hearing required under *Bearden*. However, Plaintiffs have not pointed to any evidence in the Rule 56 record showing that JCS employees were responsible for this chicanery. Nor have Plaintiffs pointed to a JCS custom or policy of using non-existent legal charges to avoid *Bearden* hearings. Therefore, Plaintiffs have not presented a triable § 1983 claim against JCS based on this alleged due process violation.

Similarly, Plaintiffs have not presented a JCS custom or policy that was a moving force behind the Municipal Court's failures to determine Plaintiffs' indigency. Alabama law directs a

court to consider a defendant's financial resources and ability to pay a fine when determining whether to impose a fine. Ala. R. Crim. P. 26.11(b). And, if a probationer breaches the terms of probation by not paying fines, costs, restitution, or other assessments, it is a court, not a probation officer, that "must inquire into the probationer's financial status and determine whether the probationer is indigent." Ala. R. Crim. P. 27.5(a). Plaintiff Timothy Fugatt's testimony indicates that the Municipal Court often did not offer defendants an opportunity to explain their indigency during the fast-paced court proceedings. (*See* Doc. # 537-19 at 74). JCS's employees understood, though, that indigency determinations were to be conducted by the Municipal Court. (*See* Doc. # 471-31 at 10-11) (testimony by Kidd that indigency determinations were to be conducted by the Municipal Court). JCS's training manual also explained that a court would determine whether a defendant was indigent at sentencing. (Doc. # 402-3 at 47). To be sure, JCS stood to benefit financially if the Municipal Court declared fewer probationers to be indigent, as it would not be obligated to supervise those indigent probationers without payment of fees or costs – by the probationers themselves. But, Plaintiffs have not shown that JCS instituted a policy or custom that prevented the Municipal Court from performing indigency determinations (or that made such determinations less likely to occur, for that matter). Therefore, Defendants are due to be granted summary judgment on Plaintiffs' claim that they violated Plaintiffs' due process rights by preventing Plaintiffs from receiving indigency hearings at the sentencing stage or the revocation stage.

### c. Instituting FTOCO Charges Against Probationers and Issuing Arrest Warrants Purportedly Based on FTOCO Charges

After careful review, the court concludes that this due process claim is more properly analyzed as a Fourth Amendment claim as it challenges the arrest and pretrial detention of Plaintiffs pursuant to arrest warrants. The Supreme Court recently held that the standards and

procedures governing arrest and pretrial detention arise from the Fourth Amendment. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 914-15, 919 (2017). Indeed, the Supreme Court has declined to extend substantive due process rights to address the right "to be free from criminal prosecution except upon probable cause," which is protected by the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994). The court will address this claim in the Fourth Amendment discussion below.

### d. Failure to Provide Adequate Notice of Probation Revocation Hearings

The Supreme Court has mandated that, before a defendant subject to probation has his probation revoked, the defendant must receive a preliminary and final revocation hearing. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973). "At the preliminary hearing, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Id.* The Eleventh Circuit has clarified that "a person facing revocation of supervised release is entitled to written notice of the alleged violation or violations and disclosure of the evidence against him." *United States v. Jackson*, 568 F. App'x 655, 658 (11th Cir. 2014) (citing Fed. R. Crim. P. 32.1(b)(2)). Alabama's criminal procedure rules provide that a defendant should receive notice of hearings "by delivering or by mailing copies to their last known addresses, or, if no address is known, by leaving copies with the clerk of the court." Ala. R. Crim. P. 34.4.

Here, with regard to many of the revocation petitions, Plaintiffs have presented a genuine factual question concerning whether JCS mailed the notices to them in accordance with Alabama Rule of Criminal Procedure 34.4. Plaintiffs have denied that they received written notice of the revocation hearings by mail. (*See* Docs. # 500 at 9-10; 530 at 4-6; 567 at 7-8). And, JCS

employees failed to note in the Probation Tracker system whether they mailed most of the revocation petitions at issue in this case (even though they noted in Probation Tracker that revocation petitions had been sent in other situations, including twice involving the Fugatts). Moreover, while Plaintiff Ray's Probation Tracker records show that letters mailed to her in September 2010 and November 2010 were returned to JCS, the Probation Tracker does not state whether the December 2010 revocation petition was mailed to Plaintiff Ray or whether it was returned to JCS. (*See* Doc. # 423-11 at 7-8). From this evidence, a reasonable jury could conclude that JCS failed to provide written notice of the alleged probation violations and the revocation hearings to Plaintiffs Ray, Jews, Kristy Fugatt, and Timothy Fugatt unless its employees noted in Probation Tracker that the documents were mailed.

Having said that, the court concludes that no reasonable jury could find that JCS instituted a policy or custom that was the moving force behind any due process violation concerning the failures to provide notice. Indeed, JCS's training manual instructed employees to mail probation revocation petitions, along with probation violation letters, to the probationer. (Doc. # 402-3 at 31). Moreover, the manual directed that if mail sent to a probationer by JCS was returned, JCS employees were to "run Accurint and mail the revocation information to the address obtained through Accurint." (*Id.* at 23). Plaintiffs have not pointed to another official custom or policy that could be considered a moving factor for any of these particular due process violations. Nor have they claimed that a final policymaker was responsible for failing to send written notice of the revocation hearings. Because Plaintiffs have failed to provide evidence from which a reasonable jury could find a JCS custom or policy to be the moving force behind their failure to receive written notice of probation revocation hearings, Defendants are due to be granted summary judgment on this claim.

### e. Imposing Fines and/or Fees Exceeding the Statutory Maximum

Plaintiffs have not clearly argued whether their due process claim concerning fines and fees exceeding the statutory maximum is a procedural due process claim or substantive due process claim. Regardless, Plaintiffs' due process claim regarding the fines and fees enforced by the Municipal Court rests on the premise that those fines and fees exceeded the applicable statutory maximum. (*See* Doc. # 305 at ¶ 111) (complaining that JCS's customs and policies resulted in "court costs, fines and fees which exceed the jurisdictional maximum of $500 for municipal courts). Contrary to Plaintiffs' assertions, the court finds this issue of state law far from clear.

An Alabama municipal court may require a probationer to pay "the fine and costs imposed or such portions thereof as the judge may determine." Ala. Code § 12-14-13(d)(7). The Alabama Rules of Criminal Procedure explain that a sentencing court has broad discretion to determine the conditions of probation. Ala. R. Crim. P. 27.1, Editors' Notes, Committee Comments. Those conditions must be included in the written probation order. Ala. R. Crim. P. 27.1. Alabama law mandates that a probationer supervised by the Board of Pardons and Paroles pay $40 per month toward the cost of supervision if he or she has an income. Ala. Code. § 15-22-2(a)(1). For a violation of municipal ordinances, the maximum fine is $500. Ala. Code § 11-45-9(b).

Plaintiffs have not identified -- and the court's independent research has not found -- a statutory limit on probation supervision fees to private corporations under Alabama law. Indeed, Alabama law allows a court wide discretion to determine the conditions of probation, and those conditions may include costs imposed on the probationer. Ala. Code § 12-14-13(d)(7); Ala. R. Crim. P. 27.1, Editors' Notes, Committee Comments. Indeed, if supervised by the Board of

Pardons and Paroles, a probationer must pay $40 a month, which is in effect similar to the supervision fee that was charged by JCS. Ala. Code. § 15-22-2(a)(1). Although the court has not found an Alabama statute expressly permitting state courts to order probation fees paid to private corporations, it also has not found a statute expressly limiting a municipal court's wide discretion to determine probation conditions.

Plaintiffs' due process challenge to the fines and fees enforced by JCS heavily relies on the fine limitation in Alabama Code § 11-45-9(b). This argument finds some support in *Wilkins v. Dan Haggerty & Associates, Inc.*, 672 So. 2d 507 (Ala. 1995). There, the Alabama Supreme Court considered whether a municipal court could impose delinquent fees on defendants who had failed to answer the charges against them. *Id.* at 510. The Alabama Supreme Court held that a municipal court could impose the delinquent fees as increases to the scheduled fines for the offense. *Id.* In doing so, it expressly recognized that the delinquent fees did not exceed the jurisdictional limit for municipal court fines. *Id.* Although the court recognizes a plausible analogy between the delinquent fees in *Wilkins* and the supervision fees at issue in this case, this case is nevertheless distinguishable from *Wilkins* because the fines in *Wilkins* were added to the defendants' sentences long after adjudication. *See id.* (concluding that the judge was authorized to increase the fines after giving many defendants years to respond to the charges against them in municipal court). Thus, *Wilkins* does not foreclose a municipal court from exercising the authority to impose supervision fees in addition to a fine, pursuant to its wide discretion to determine conditions of probation.

Ultimately, the court is not convinced that Plaintiffs can present a triable procedural or substantive due process claim premised on the fines and fees enforced by JCS. To show a violation of procedural due process, a plaintiff must present "(1) a deprivation of a

constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). Here, Plaintiffs have not explained how the state provided constitutionally-inadequate process to them as a remedy for any statutory violations stemming from the excessive probation fees. Although neither JCS nor the Municipal Court provided pre-deprivation hearings before charging the monthly probation fees, the state can satisfy due process by providing adequate post-deprivation remedies when pre-deprivation hearings are not feasible. *Watkins v. Israel*, 661 F. App'x 608, 610 (11th Cir. 2016). "A post-deprivation remedy is adequate when it is capable of fully compensating the deprived individual." *Id.*

Plaintiffs have not addressed whether post-deprivation remedies were available to them under Alabama law to obtain refunds, restitution, or disgorgement from JCS. Moreover, the government's interest in sharing supervision costs with probationers would be undermined by requiring pre-deprivation hearings before collection of small probation fees. *See id* at 610-11 (holding that a plaintiff failed to allege constitutionally-inadequate process for seizing uniform and subsistence fees because his prison provided a post-deprivation grievance process, the prison's policy was a ministerial charge that posed a small risk of erroneous deprivation, and pre-deprivation hearings would have harmed the government's interest). Because Plaintiffs have failed to show that they received constitutionally-inadequate process when JCS charged them monthly probation supervision fees, they have not presented a triable procedural due process claim regarding the supervision fees.[28]

---

[28] To the extent that Plaintiffs' due process claim challenges the Municipal Court's imposition of warrant fees for FTOCO charges, the court finds no triable procedural due process claim because Plaintiffs received pre-deprivation hearings before the Municipal Court imposed the warrant fees. The Municipal Court imposed the warrant fees when the Plaintiffs appeared before the court and were placed back on probation following an arrest. (*See, e.g.*, Doc. # 537-4 at 2). Although it appears that the Municipal Court deducted the warrant fees from the cash bonds paid by incarcerated probationers, it also appears that the court provided Plaintiffs an opportunity to be heard before formally imposing the warrant fees.

Plaintiffs cannot present a triable substantive due process claim based on the imposition of fines and fees because this claim rests on executive acts that do not shock the conscience.[29] Plaintiffs' claimed right to be free from fines or fees above the statutory maximum created by Alabama law plainly asserts a state-created right, rather than a federally-created right. "Where a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279-80 (11th Cir. 2014). Legislative acts, such as laws and broad executive regulations, generally apply to a larger segment of society and involve policymaking rather than administrative applications. *Id.* at 1280. In contrast, "[e]xecutive acts typically arise from the ministerial or administrative activities of the executive branch and characteristically apply to a limited number of people, often to only one." *Id.* Such executive acts only present a substantive due process violation if they shock the conscience. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). "Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious—that is, shock the conscience—at the time the government actor made the decision." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003) (emphasis omitted).

Here, Plaintiffs argue that the imposition of the aggregate fines and fees against them violated their due process rights because the fines and fees exceeded the applicable statutory maximum. But, this conduct cannot be said to shock the conscience when it was unclear at the time whether the probation supervision fees violated Alabama state law. Even if the probation

---

[29] Of course, the Fourteenth Amendment's Due Process Clause protects certain fundamental rights created by the Constitution. *Cf. Kentner v. City of Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014). Plaintiffs have not pointed to any fundamental right infringed by JCS's and the Municipal Court's conduct concerning monetary fines and fees.

supervision fees violated Alabama law (a particularly uncertain proposition for the reasons explained above), the Supreme Court has clearly held that "errors of state law do not automatically become violations of due process." *Rivera v. Illinois*, 556 U.S. 148, 160 (2009). Moreover, the Municipal Court imposed the indeterminate probation supervision fees in its probation orders, and Plaintiffs offer no authority whatsoever to support the proposition that a court's mistake of law on an undecided issue can be enough to shock the conscience. This court cannot say that the fees ordered by the Municipal Court and charged by JCS shocked the conscience when Alabama law requires probationers to pay a substantially similar fee to the Board of Pardons and Paroles. Ala. Code. § 15-22-2(a)(1). Therefore, Plaintiffs' due process claim based on the imposition of fines and fees allegedly exceeding the statutory maximum cannot proceed under a procedural due process theory or a substantive due process theory.

<blockquote>

**f. Imposing Probation Sentences Exceeding the Statutory Maximum**

</blockquote>

As with Plaintiffs' due process challenge to the fines and fees administered by JCS, it is unclear whether they challenge JCS's administration of the probation sentences as a violation of procedural or substantive due process. With regard to substantive due process, Plaintiffs would have to show that the administration of their probation sentences shocked the conscience in order to establish a triable due process claim, since the imposition and administration of those sentences is an executive act. *Cf. Lewis*, 523 U.S. at 846-47. As this claim ultimately rests on violations of state law, and Plaintiffs have not identified analogous authority where a court found the administration of sentences to constitute conduct that shocks the conscience, the court concludes that Defendants are entitled to summary judgment on any substantive due process claim arising from the allegedly unlawful extension of probation sentences past the two year statutory maximum.

The procedural due process issues presented by this claim are more interesting. In binding precedent, the former Fifth Circuit held that the "extension of a non-custodial period of supervision to a term within the statutory limits (does not) implicate a liberty interest sufficient to require a preextension hearing as a constitutionally commanded right." *United States v. Cornwell*, 625 F.2d 686, 688 (5th Cir. 1980) (internal quotation omitted). Plaintiffs' due process claim, though, does not rest on an extension of probation sentences to the statutory maximum. Rather, it rests on extending probation sentences beyond the statutory maximum. In the analogous context of parole, the Second Circuit has held that "[u]nder both the due-process clause and state law, an inmate has a liberty interest in being released upon the expiration of his maximum term of imprisonment." *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 653 (2d Cir. 1993). Likewise, a defendant sentenced to probation has a liberty interest in being released at the end of his or her probation sentence, which is a significant imposition on his or her liberty. In *Calhoun*, the Second Circuit explained that a defendant's liberty interest in release from confinement meant that he could not be deprived of such release without due process. *Calhoun*, 999 F.2d at 653.

Here, a reasonable jury could find that JCS unconstitutionally extended Plaintiffs Timothy Fugatt's and Deunate Jews's probation sentences beyond the statutory maximum without providing any notice to Plaintiffs of the extension or any opportunity for a hearing. JCS's own records reflect that it extended these two Plaintiffs' probation sentences for earlier charges by 24 months when the Municipal Court actually issued probation orders in different cases. (*See* Docs. # 524-22 at 4; 537-24 at 5). Nothing in the Rule 56 record indicates that JCS employees informed Timothy Fugatt or Jews of these modifications to their 2009 and 2011 probation sentences. Nor does the record reflect that the Municipal Court agreed to these

modifications.  Indeed, JCS extended the probation term for Timothy Fugatt's 2011 sentence five days beyond the probation term approved by the Municipal Court in the April 26, 2012 order. (*Compare* Doc. # 537-24 at 5 *with* Doc. # 537-3 at 2).

Defendants' arguments that, as a matter of law, they did not violate these Plaintiffs' due process rights are unavailing.  JCS contends that Plaintiffs' probation terms were "changed by the later probation orders of the Childersburg Municipal Court," but a jury could reach a different finding regarding the Municipal Court's orders.  (Doc. # 523 at 20).  The Municipal Court issued *new* probation orders for distinct charges.  And, JCS justified its recalculation of the probation dates by asserting that the Municipal Court had reinstated its earlier probation sentences, not based on the new and distinct probation orders.

JCS also argues that Plaintiffs suffered no constitutional harm because the Municipal Court tolled the probation sentences when the revocation petitions were initiated, such that their probation terms were not in effect for more than two years.  (*See* Doc. # 523 at 20) (asserting that these orders from the Municipal Court tolled Jews's probation sentence for 28 months).  This argument would be more compelling if the Rule 56 record showed that JCS employees in Childersburg tried to calculate how much time elapsed between the initiation of probation and the revocation order(s) tolling probation.  But, a reasonable jury could find from the summary judgment record that JCS invariably recalculated probation following purported reinstatements by extending the sentence 24 months from the reinstatement date.  Because Timothy Fugatt and Jews had served time toward those probation sentences, the invariable 24 month extensions caused their probation sentences to exceed the applicable two year statutory maximum.  Ala. Code § 12-14-13(a).  A probationer is entitled to due process protections for such an extension, and JCS granted Timothy Fugatt and Jews no due process in its administrative recalculations.

Finally, a reasonable jury could find that JCS's customs and policies were the moving force behind the constitutional harm Plaintiffs Timothy Fugatt and Deunate Jews suffered. JCS directed its employees that, if a court imposed multiple probation sentences on a particular defendant, the employee should place the later probation sentence on hold until the defendant completed paying all amounts owed on the first case. (Doc. # 402-3 at 53). If a defendant completed payments for one case, then JCS would activate the second probation sentence and calculate the number of months that the probationer would be supervised. (*Id.*). Moreover, JCS's probation reinstatement policies let employees choose the amount of time left on a probationer's sentence. (*See* Doc. # 402-3 at 43) (instructing employees to enter a reinstatement into Probation Tracker by changing the probation date, entering the number of months and days left on probation, and calculating the new date). These JCS policies instructed employees to extend the length of probation cases until all amounts owed were paid, prevented probation terms from running consecutively, and granted considerable discretion to JCS employees to determine the amount of time left on a reinstated probation case. Accordingly, a reasonable jury could find that JCS's case handling customs and policies -- rather than the conduct of its employees -- was the moving force behind the procedural due process violations Timothy Fugatt and Deunate Jews suffered.[30] Defendants' motion to dismiss this due process claim is due to be denied.

### 6. Plaintiffs' Fourth Amendment Claims

Defendants JCS and Correctional Healthcare deny that they violated Plaintiffs' Fourth Amendment rights. They note that Plaintiff Ray received a suspended imprisonment sentence when she initially was placed on probation. (Doc. # 470 at 18). They insist that no record evidence supports Plaintiffs' claims that JCS issued their arrest warrants. (*See id.* at 19).

---

[30]  Neither of these due process claims is barred by the two year statute of limitations for § 1983 claims. JCS unlawfully extended Jews's probation sentence in March 2012 and Fugatt's probation sentence in May 2012.

Moreover, the Municipal Court controlled the calculation of bail amounts that Plaintiffs needed to pay to be released from custody. (*See id.* at 19-20) (explaining that a JCS employee attempted to assist Plaintiff Ray and have her released from jail, but a Municipal Court employee insisted on payment of the bond).

Plaintiffs respond that JCS requested that the City issue arrest warrants for FTOCO charges, even though no formal FTOCO charges were filed with the Municipal Court, no hearings were held on the charges, and no convictions were entered for the charges. (*E.g.*, Doc. # 500 at 22). They further argue that FTOCO charges were "concocted . . . by the City under the JCS system to enforce the extortion threats of JCS." (*Id.* at 23). Because of these arrest warrants, Plaintiffs claim that they were arrested and held until they paid the cash bail or until the Municipal Court held its once-monthly court date. (*Id.*).

Properly read, Plaintiffs' Fourth Amendment claims either present a false arrest or malicious prosecution action against JCS. The court will begin its analysis of the Fourth Amendment claims by discussing false arrest claims based on unlawful procurement of an arrest warrant. "In *Malley v. Briggs*, the Supreme Court established that even if a magistrate approves an arrest warrant, the officer who applied for the warrant may be liable for violating the Constitution if the evidence presented to the magistrate was insufficient to establish probable cause." *Carter v. Gore*, 557 F. App'x 904, 908 (11th Cir. 2014) (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)). For example, an officer may be held liable for violating the Fourth Amendment if he or she proffers an affidavit for a warrant that lacks a basis for a belief that the suspect violated the law and an affirmative statement that the officer has personal knowledge of

the circumstances of the alleged crime.[31]  *Id.* at 908-09 (discussing *Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994), and *Garmon v. Lumpkin Cty.*, 878 F.2d 1406, 1408-09 (11th Cir. 1989)).

The flaw in Plaintiffs' Fourth Amendment false arrest claims is that the JCS employees responsible for issuing the revocation petitions had probable cause to believe Plaintiffs committed the probation violations reported to the Court.  The record reveals that Municipal Court magistrates issued arrest warrants against the named Plaintiffs after they had failed to appear before the Municipal Court at scheduled revocation hearings.  Before those hearings, JCS employees drafted probation revocation petitions against the Plaintiffs, which were submitted to the Municipal Court on the date of the hearings.  When viewed in the light most favorable to Plaintiffs, these revocation petitions can be analogized to applications for arrest warrants because JCS asked the Municipal Court to issue an arrest warrant, if necessary.  (*See, e.g.*, Doc. # 537-1 at 2).  Having said that, JCS employees had probable cause to believe that Plaintiffs had failed to appear to scheduled appointments and had failed to keep up with their monetary probation conditions.  And, JCS employees affirmed in the revocation petitions that they had investigated the named Plaintiffs.  (*See, e.g.*, Doc. # 537-1 at 2) ("Based on the investigation of the undersigned and the information received therefrom, your Petitioner verily believes that the Defendant has violated one or more of the written conditions of probation . . . .").  Therefore, JCS employees did not violate Plaintiffs' Fourth Amendment rights by submitting revocation petitions that asked the Municipal Court to issue arrest warrants if necessary.

The Rule 56 record does not reveal whether any JCS employee requested issuance of the arrest warrants on FTOCO charges.  There is no arrest warrant application from a JCS employee

---

[31]  The court understands that generally when a plaintiff brings such a false arrest claim against an individual officer, the plaintiff must show that the officer lacked *arguable* probable cause because an officer sued in his or her individual capacity is entitled to assert qualified immunity.  *See Carter*, 557 F. App'x at 908-09.  But, here, Defendants are not entitled to seek qualified immunity because they are being sued in their official capacities.

seeking an arrest warrant on FTOCO charges. Nor is there a transcript of the Municipal Court hearings indicating whether JCS asked for the arrest warrants, a prosecutor asked for the arrest warrants, or the Municipal Court decided to issue the warrants *sua sponte*. Thus, the court cannot say that JCS or its employees applied for the FTOCO arrest warrants issued by the Municipal Court. Accordingly, Plaintiffs' false arrest claims premised on those warrants fail, and Defendants are entitled to summary judgment on any false arrest claim in the Fourth Amended Complaint.

Likewise, Plaintiffs have not established any triable issue related to their malicious prosecution claims. "To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures." *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004). The elements for a malicious prosecution claim include: (1) "a criminal prosecution instituted or continued by the present defendant"; (2) "with malice and without probable cause"; (3) "that terminated in the plaintiff accused's favor"; and (4) "caused damage to the plaintiff accused." *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003). Plaintiffs have not established the third element: that the FTOCO charges instituted against them were terminated in their favor. Indeed, the FTOCO charges against Plaintiffs Timothy Fugatt and Jews were not terminated in their favor, as these Plaintiffs were sentenced by the Municipal Court to probation for FTOCO. (*See, e.g.*, Docs. # 524-6 at 2; 537-3 at 2). As for Plaintiffs Ray and Kristy Fugatt, nothing in the Rule 56 record shows that the FTOCO charges were terminated in their favor. Because a reasonable jury could not find from the Rule 56 record that the allegedly unlawful FTOCO charges were terminated in Plaintiffs' favor,

Defendants are also entitled to summary judgment for any Fourth Amendment malicious prosecution claim in the Fourth Amended Complaint.

### 7. Plaintiffs' Sixth Amendment Claims

Defendants JCS and Correctional Healthcare argue that JCS did not deny the named Plaintiffs any right to counsel. (*E.g.*, Doc. # 470 at 27-28). They assert they are entitled to summary judgment for this claim for two reasons. First, they claim that the Municipal Court was solely responsible for appointing counsel if necessary. (*Id.* at 27). Second, they contend that Plaintiffs were not entitled to counsel during their revocation proceedings because they did not request counsel and their revocation proceedings did not present complex, difficult, or disputed probation violations. (*Id.* at 27-28).

Plaintiffs respond that JCS participated in a joint system with the City that violated their constitutional rights. (*E.g.*, Doc. # 500 at 21). Pursuant to this scheme, JCS provided pre-printed probation orders that stated a petitioner had waived his or her right to counsel. (*Id.* at 23). Because of this statement in the form probation orders, Plaintiffs insist that JCS endeavored "to avoid the intrusion of legal counsel." (*Id.*). Plaintiffs also argue that the Supreme Court's ruling in *Alabama v. Shelton*, 535 U.S. 654 (2002), required that they receive assistance from appointed counsel before being incarcerated. (*Id.* at 24). Moreover, they contend that the identity of the party formally responsible for conducting indigency hearings is irrelevant because the financial relationship created by the JCS-City Contract relied on directing probationers to pay for JCS's supervision services. (*See id.* at 24-25).

In circumstances similar to those presented by Plaintiff Ray, the Supreme Court has held that a defendant's Sixth Amendment right to appointed counsel is applicable when she is sentenced to a suspended term of imprisonment and a probationary sentence. *Alabama v.*

*Shelton*, 535 U.S. 654, 662 (2002). The Supreme Court observed that a defendant imprisoned for a probation violation in such a circumstance is incarcerated for the underlying crime, not for the probation violation. *Id.* The Supreme Court declined to consider whether a probationer with a suspended imprisonment sentence imposed without the assistance of counsel could be sent to jail following a contempt proceeding where the probationer received the assistance of counsel. *See id.* at 672-74. It also declined to review whether such a probationer could be sent to jail following a probation revocation hearing where the probationer was represented by counsel because revocation hearings in Alabama at that time did not afford the probationer a right to counsel and did not allow a probationer to contest the underlying conviction. *Id.* at 666-67.

A defendant may waive the Sixth Amendment right to counsel if the waiver is voluntary, knowing, and intelligent. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* In the context of a post-arrest interrogation, a defendant may knowingly and intelligently waive the right to counsel after he receives a *Miranda* warning. *Id.* at 786-87. But, when a defendant seeks to waive the right to counsel closer to a trial, a court should conduct a more rigorous, searching, and formal examination to ensure that the waiver is voluntary, knowing, and intelligent. *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002). Such an examination -- commonly called a *Faretta* hearing -- should inform the defendant about the nature of the charges, the possible punishments, basic trial procedure, and the risks of representing himself or herself. *Id.*

Here, the record indicates that Plaintiff Ray's Sixth Amendment rights might have been violated when the Municipal Court imposed her suspended imprisonment sentences. Ray's testimony indicates that she did not receive a warning about her right to counsel from Judge

Ward before being sentenced to suspended imprisonment terms (*see* Doc. # 471-7 at 39), much less the detailed disclosures provided in a *Faretta* hearing. Defendants JCS and Correctional Healthcare argue that she affirmed her waiver of the right to counsel when she signed a probation order, but her probation order does not contain any explanation of her right to counsel. Therefore, under *Shelton*, Plaintiff Ray's Sixth Amendment rights might have been violated.

Likewise, Plaintiff Timothy Fugatt's, Kristy Fugatt's, and Jews's Sixth Amendment rights might have been violated by the Municipal Court because they were imprisoned without being afforded counsel. These Plaintiffs did not receive any suspended imprisonment sentence during their initial hearings before the Municipal Court, so they would not have been entitled to the appointment of counsel at that stage. But, these Plaintiffs were entitled to representation by counsel before being imprisoned for a criminal offense – whether that offense was contempt or a "failure to obey a court order." *Argersinger v. Hamlin*, 407 U.S. 25, 38 (1972). Alternatively, to the extent it could be said that the Municipal Court deferred imposing an imprisonment sentence against Plaintiffs Jews, Kristy Fugatt, and Timothy Fugatt subject to probation, these Plaintiffs were entitled to counsel at the revocation hearing where the imprisonment sentence was imposed. *See Mempa v. Ray*, 389 U.S. 128, 137 (1967).

Having said that, the court cannot find in the Rule 56 record a custom or practice by JCS that was a moving force behind the Sixth Amendment violations presented in Plaintiffs' Fourth Amended Complaint. First, the JCS-City Contract did not foreclose the Municipal Court from providing counsel to individuals it sentenced to suspended or actual imprisonment. (*See generally* Doc. # 392-16). Indeed, the JCS-City Contract says nothing at all regarding a defendant's or probationer's right to counsel. (*See generally id.*). Likewise, the training manual in the Rule 56 record contains no JCS custom or policy regarding a probationer's right to

counsel. (*See generally* Docs. # 402-2, 402-3, & 402-4). This omission is not surprising because it is the duty of a court imposing a term of imprisonment -- not a probation officer supervising the defendant -- to appoint counsel for the defendant. *Cf.* Ala. R. Crim. P. 6.1, Editors' Notes, Committee Comments ("Of necessity, this [the right to counsel] will require that the judge determine before trial that, regardless of the evidence presented, the maximum punishment will not include incarceration."). Accordingly, if Plaintiffs suffered a violation of their Sixth Amendment rights, the Municipal Court -- not JCS -- committed the violation.

Plaintiffs point to the form probation orders as proof that JCS had a policy or custom of avoiding the appointment of counsel. (*E.g.*, Doc. # 500 at 23). That argument misses the mark. The pre-printed probation orders asserted that a probationer had counsel or had waived counsel "for all proceedings to this date." (*E.g.*, Doc. # 471-21 at 2). The court interprets this as an acknowledgment of the prior conduct of the Municipal Court, not as a statement of JCS's intent to shut out counsel. Significantly, the probation orders are silent about whether a probationer waived her right to counsel for future proceedings. As such, the court cannot conclude that these provisions in the probation orders evince a JCS custom or policy of denying probationers the right to counsel. Because the court cannot identify any policy or custom from JCS that was a moving force behind the Sixth Amendment violations discussed in the Fourth Amended Complaint, Defendants JCS and Correctional Healthcare are due to be granted summary judgment on this claim.

### 8.      Plaintiffs' Eighth Amendment Claims

In their motions for summary judgment, Defendants JCS and Correctional Healthcare argue that the Municipal Court did not impose any fine or fee that exceeded a statutory maximum. (Doc. # 470 at 22). In particular, they claim that probation supervision fees, like

court costs, were not a part of any fine imposed by the Municipal Court.  (*Id.* at 23).  Moreover, they argue that in advancing these claims Plaintiffs conflate a violation of state law with a violation of the Eighth Amendment.  (*See id.* at 23 & n. 154).  Indeed, according to Defendants, the probation fees were not excessive fines under the Eighth Amendment because (1) they were not financial penalties for a criminal offense and (2) they were not grossly disproportionate to the offenses at issue.  (*Id.* at 23-24).

Plaintiffs respond that, to the extent JCS's probation fees are considered fines, they exceeded the $500 statutory limit.  (Doc. # 500 at 29).  They note that probation supervision fees are not addressed in the Alabama statute authorizing municipal courts to sentence defendants to probation.  (*Id.* at 30) (discussing Alabama Code § 12-14-13).  Moreover, they claim that JCS should not have been entitled to obtain probation supervision fees because its employees were not qualified to serve as probation officers.  (*See id.* at 31-32).

The Eighth Amendment prohibits courts from imposing "excessive fines."  U.S. Const. amend. VIII.  Its Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"  *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (emphasis omitted) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)).  In an opinion addressing whether civil punitive damages awards are subject to the Excessive Fines Clause, the Supreme Court explained that "the Excessive Fines Clause was intended to limit only those fines directly imposed by, *and payable to*, the government."  *Browning-Ferris*, 492 U.S. at 268 (emphasis added).  *See also Coleman v. Watt*, 40 F.3d 255, 263 (8th Cir. 1994) (defining a "fine" as "a payment extracted by the government and payable to the government").  The Supreme Court's statement of law in *Browning-Ferris* conclusively resolves Plaintiffs' Excessive Fines Clause claim.  Because the

probation supervision fees were paid to a private corporation, not the government, they are not subject to the Excessive Fines Clause. Therefore, Defendants are entitled to summary judgment on Plaintiffs' excessive fines claim.

Likewise, Plaintiffs' challenge to the length of their incarceration terms under the Cruel and Unusual Punishments Clause of the Eighth Amendment is a non-starter. The Cruel and Unusual Punishments Clause "[']encompasses a narrow proportionality principle' that applies to non-capital sentences." *United States v. Farley*, 607 F.3d 1294, 1340 (11th Cir. 2010) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring)). "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1341 (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring)). Unless a defendant's sentence is grossly disproportionate to his or her offense, the court need not compare the sentence to those received in other jurisdictions for similar offenses. *Id.* at 1342 ("Without an initial judgment that a sentence is grossly disproportionate to a crime, comparative analysis of sentences has no role to play."). Here, the named Plaintiffs were incarcerated between one day and eighty days[32] for not appearing before the Municipal Court at scheduled hearings. Although the Plaintiffs were incarcerated for non-violent and relatively harmless conduct, the relatively short duration of the incarceration terms Plaintiffs suffered through were not grossly disproportionate to the conduct at issue. Accordingly, Defendants are due to be granted summary judgment for Plaintiffs' Eighth Amendment claims.

---

[32] Plaintiffs Kristy and Timothy Fugatt were released from custody when they paid cash bonds on the date of their arrests. (Docs. # 402-27 at 3; 402-28 at 3). Plaintiff Jews spent eighty days in jail during four separate stints. (*See* Doc. # 530 at 22).

### 9.    Plaintiffs' Equal Protection Claims

Both Plaintiffs and Defendants seek summary judgment for the equal protection claims. In one of their motions for partial summary judgment, Plaintiffs assert that JCS's probation practices violated their equal protection rights because poor defendants in the City's Municipal Court were forced to pay more in fines and fees simply because they were poor.  (Doc. # 425 at 10).  Plaintiffs claim that the Municipal Court's probation procedure, as implemented by JCS, determined the punishment a defendant received by his or her wealth status.  (*Id.* at 11).

Defendant JCS contends that the Municipal Court did not violate the Equal Protection Clause by placing Plaintiffs on probation when they needed to pay assessed fines and fees over time.  (Doc. # 473 at 8-9).  JCS insists that Plaintiffs have not pointed to the JCS custom or policy that violated their equal protection rights.  (*See id.* at 9-10).  JCS also questions whether Plaintiffs actually were in fact indigent.  (*Id.* at 10-11).  Moreover, according to JCS, Plaintiffs were incarcerated for failing to appear before the Municipal Court, not for failing to pay amounts owed to the Municipal Court.  (*Id.* at 11-12).  In opposing Plaintiffs' Rule 56 motion, JCS argues that Plaintiffs have conceded the existence of factual disputes about JCS's custom or policy.  (*Id.* at 15-16).  Finally, according to JCS, Plaintiffs have not addressed the rational basis standard that applies to wealth-based disparities.  (*Id.* at 16-17).

In their motions for summary judgment, Defendants JCS and Correctional Healthcare argue that the named Plaintiffs did not suffer the constitutional harms alleged in the Fourth Amended Complaint.  They reiterate that the named Plaintiffs were incarcerated for failing to appear as ordered by the Municipal Court, not for failing to pay fines due to indigency.  (*E.g.*, Doc. # 470 at 19).  Moreover, they claim that the named Plaintiffs received revocation hearings and that their probation sentences were never formally revoked.  (*Id.* at 25).  Plaintiffs also

reiterate in their opposition briefs that the imposition of monthly probation fees violated their equal protection rights. (*E.g.*, Doc. # 500 at 17).

A court violates a defendant's equal protection rights if it incarcerates that defendant solely because he or she lacks the resources to pay a fine or restitution. *United States v. Plate*, 839 F.3d 950, 955-56 (11th Cir. 2016). In *Williams v. Illinois*, 399 U.S. 235, 243 (1970), the Supreme Court held that a court "may not constitutionally imprison beyond the maximum duration fixed by statute a defendant who is financially unable to pay a fine." The *Williams* opinion vacated a judgment that required a defendant sentenced to the maximum imprisonment term to remain in jail "to 'work off' the monetary obligations [from a $500 fine] at the rate of $5 per day." *Id.* at 236, 245. The *Williams* Court explained, though, that a state "is not powerless to enforce judgments against those financially unable to pay a fine." *Id.* at 244. In a footnote, it referred to the appellant's argument that a state could, consistent with the Equal Protection Clause, "impose a parole requirement on an indigent that he do specified work during the day to satisfy the fine." *Id.* at 244 n. 21.

In *Tate v. Short*, 401 U.S. 395, 398 (1971), the Supreme Court held that a court may not subject a defendant to imprisonment "solely because of his indigency." There, the Supreme Court addressed whether a court could subject an indigent defendant to imprisonment for unpaid traffic fines where the state law did not allow an imprisonment sentence for the traffic offenses. *See id.* at 396-97. The Court indicated in a footnote that a state could, consistent with the Equal Protection Clause, direct a defendant to pay a fine in installments. *See id.* at 400 n. 5. Ultimately, the *Tate* opinion reversed the state court's judgment that the imprisonment sentence was constitutional. *Id.* at 397, 401.

Here, the court concludes that Plaintiffs have not presented a triable equal protection violation. Plaintiffs' equal protection claim does not fall within the scope of *Williams* or *Tate* because the Municipal Court did not sentence Plaintiffs to imprisonment due to their inability to pay fines or court costs.[33] Rather, the Municipal Court sentenced them to probation. Neither *Williams* nor *Tate* prohibit a court from imposing a different form of sentence on a defendant unable to pay a fine than one able to pay a fine. Indeed, the *Williams* opinion indicated in a footnote that a court could constitutionally direct an indigent defendant to perform community service in lieu of paying a fine, whereas it presumably would not sentence a defendant able to pay a fine to community service. *See* 399 U.S. at 244 n. 21. The court finds that the Equal Protection Clause, as interpreted by the Supreme Court in *Williams* and *Tate*, did not prohibit the Municipal Court from sentencing the named Plaintiffs to probation because they were unable to pay fines.

Moreover, Plaintiffs have not shown a basis for a reasonable jury to find that the Municipal Court sentenced them to imprisonment following the revocation hearings solely because of their wealth. The Rule 56 record shows that JCS also relied on Plaintiffs' non-attendance at scheduled probation appointments to justify the revocation petitions. And, the Rule 56 record provides little, if any, indication of what the Municipal Court considered during the revocation hearings that Plaintiffs did not attend. The record only shows that the Municipal

---

[33] This case is also distinguishable from *United States v. Flowers*, 946 F. Supp. 2d 1295 (M.D. Ala. 2013), which Plaintiffs rely upon in their partial summary judgment motion. In *Flowers*, the government requested that the district court imprison a convicted defendant, instead of placing her in home confinement, because the defendant's indigency prevented her from paying for the cost of monitoring. *Id.* at 1296. The district court in *Flowers* concluded that sentencing the defendant to imprisonment because she was unable to pay for monitoring raised "serious constitutional concerns." *See id.* at 1300-01. This conclusion is fully in line with *Williams* and *Tate* because the defendant essentially faced imprisonment solely due to her inability to pay a particular fee. Here, in contrast, Plaintiffs complain that the Municipal Court placed them in a collection scheme (or probation system) because of their wealth, not that the Municipal Court sentenced them to imprisonment because of their wealth. The Rule 56 record shows that the Municipal Court subjected Plaintiffs to imprisonment after they had failed to show up at probation appointments, in addition to not paying amounts owed to JCS and the Municipal Court.

Court's magistrate issued arrest warrants for FTOCO after such revocation hearings, and Plaintiffs have not demonstrated a relationship between FTOCO charges and their wealth. While the FTOCO charges might well have lacked a basis in law, they suggest that the Municipal Court imprisoned Plaintiffs for their perceived failure to appear, rather than their poverty. In any event, as discussed above, there is insufficient Rule 56 evidence to show that JCS played a significant enough role in procuring warrants on FTOCO charges. For these reasons, Plaintiffs' motion for partial summary judgment on their equal protection claim is due to be denied, and all Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

### 10. Plaintiffs' § 1983 Conspiracy Claim

Plaintiffs asserted during oral argument that they could obtain relief under § 1983 based on a conspiracy claim directed at JCS and the Municipal Court. (*See* Doc. # 620 at 79-82, 86-87). Defendants responded that a § 1983 conspiracy claim could be viable "if the judge and the private party get together and say -- you know, violate these people's rights and so I can profit off of them." (*Id.* at 40). But, Defendants insisted that the record lacks evidence demonstrating "any relationship there between Judge Ward and JCS." (*Id.*).

"Conspiracy is not itself a constitutional tort under § 1983." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012) (*en banc*). "It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation. Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired." *Id.*

A plaintiff can present a § 1983 conspiracy claim "by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn,*

*Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). To establish such a conspiracy, a plaintiff must show that (1) the parties "reached an understanding" to deny a plaintiff his or her federal rights, and (2) the actions committed by the parties pursuant to the conspiracy actually impinged upon a plaintiff's federal rights. *Id.* (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990)). Importantly, a plaintiff may prove the existence of a § 1983 conspiracy through circumstantial evidence. *Id.* Such an agreement may be inferred from the parties' relationship, their overt acts, their concert of action, and the totality of their conduct. *Am. Fed. of Labor & Congress of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1192 (11th Cir. 2011). Indeed, a jury may infer the existence of an agreement from evidence that the conspirators committed acts that are unlikely to have been taken in the absence of such an agreement. *Mendocino Environmental Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999).

For example, in *Newsome v. Lee County, Alabama*, 431 F. Supp. 2d 1189, 1202-03 (M.D. Ala. 2006), the plaintiff claimed that a prison official and inmates had conspired to deprive her of her Fourteenth Amendment rights by committing a sexual assault against her. The court found an agreement between the official and the inmates to violate the plaintiff's rights because (1) the officer placed the victim in the jail cell with the inmates, (2) the officer provided condoms to the inmates, and (3) the officer observed the resulting sexual assault without intervening. *Id.*

### a.    Existence of an Agreement to Infringe Constitutional Rights

Here, Plaintiffs have shown that a reasonable jury could find a conspiracy entered into by Defendant JCS and the Municipal Court to violate their constitutional rights, in violation of § 1983. Plaintiffs have presented the following circumstantial evidence from which an agreement to violate their constitutional rights may be inferred. First, the City's former mayor, who signed the JCS-City Contract, testified that Judge Ward recommended JCS to the City. (Doc. # 392-9 at

45).  The City Council's minutes also reflect Judge Ward's recommendation.  (Doc. # 421-7 at 2).  Judge Ward has confirmed that he worked with JCS employees in other cities.  (*See* Doc. # 392-5 at 18).  From this evidence, a juror could find that a relationship existed between Judge Ward and JCS and that the relationship existed before JCS commenced operations for the Municipal Court in 2005.[34]  Moreover, a juror could find that Judge Ward advocated for the City to hire JCS.

Second, the Municipal Court's judge consistently placed defendants on probation supervised by JCS -- which required the individuals to pay additional fees -- when those defendants could not pay the fines and costs owed to the Municipal Court.  Moreover, the Municipal Court's judge consistently failed to consider defendants' indigency when they complained to the court that they could not pay the imposed fines and fees.  According to Plaintiffs Timothy and Kristy Fugatt, they informed the court of their inability to pay, but the Municipal Court judge placed them on probation without further discussion.  (*See* Docs. # 392-6 at 105-07; 392-7 at 74).  Judge Ward has acknowledged JCS's financial interest in supervising an increasing number of paid probationers.  (Doc. # 402-36 at 90).  And, under the JCS-City Contract, JCS's financial interests would be harmed by the Municipal Court declaring a probationer indigent, as JCS would be obligated to supervise the defendant's probation for free. (*See* Doc. # 392-16 at 4).  In light of the financial incentive to not declare defendants indigent, a juror could view Judge Ward's consistent failure to conduct indigency determinations as circumstantial evidence of an agreement between his court and JCS to not address probationers' indigency before imposing additional probation supervision fees.

---

[34]  Indeed, JCS's counsel claimed at oral argument that the Municipal Court's judge should be considered JCS's ultimate decisionmaker with regard to conduct JCS conducted pursuant to the Municipal Court's orders. (Doc. # 620 at 25).  The Municipal Court's judge may not be considered JCS's final decisionmaker, but this argument nevertheless underlines the close working association between JCS's employees and the Municipal Court's judge.

Third, the Municipal Court consistently issued arrest warrants for failure-to-appear or FTOCO "convictions" after JCS reported probationers to the court. Defendant JCS has insisted that the Municipal Court was solely responsible for these FTOCO warrants. However, JCS employees requested the issuance of arrest warrants in the probation revocation petitions submitted to the Municipal Court on the date of the hearings. And, the magistrate's reported statement to Timothy Fugatt -- that JCS decided the schedule for probation revocations -- belies JCS's argument that it merely followed the Municipal Court's orders with regard to probation issues.[35] (Doc. # 537-24 at 4). It is not disputed that JCS employees were present at the revocation hearings where the named Plaintiffs failed to appear. Nor is it disputed that JCS asked the Municipal Court to issue arrest warrants -- if necessary -- in the revocation petitions. There is sufficient Rule 56 evidence that this conduct was concerted (*i.e.*, conduct agreed upon between JCS employees and Municipal Court employees, including the Municipal Court's judge). Therefore, a reasonable juror could infer an agreement to issue arrest warrants for FTOCO charges -- unsupported by any statutory authority -- in lieu of conducting the indigency hearings required by both *Bearden* and Alabama law.

### b. Constitutional Violations Caused by Agreement between JCS and the Municipal Court

Plaintiffs have presented at least two kinds of constitutional violations that reasonably could have been caused by an unlawful conspiracy between JCS and the Municipal Court. First, the named Plaintiffs suffered constitutional violations caused by the purported agreement when the Municipal Court effectively revoked their probation sentences and issued arrest warrants against them without conducting any indigency determination. Second, the named Plaintiffs'

---

[35] Similarly, JCS's "following orders" defense is also belied by its independent recalculation of the probation sentences issued by the Municipal Court following arrests.

Sixth Amendment rights were violated when they were denied the assistance of counsel before being imprisoned for criminal offenses.

The Rule 56 record indicates that the Municipal Court denied Plaintiffs any opportunity to explain their indigency or their inability to pay the fines and fees imposed by the Municipal Court before effectively revoking Plaintiffs' probation sentences. JCS issued revocation petitions against all of the named Plaintiffs based, in part, on their failures to pay amounts owed to JCS and the Municipal Court. (*See, e.g.*, Doc. # 471-15 at 2). From Timothy Fugatt's testimony, a jury could find that the Municipal Court failed to consider indigency before placing Plaintiffs and others on probation following the adjudication of criminal charges. (Doc. # 392-7 at 74). And, the record contains no evidence showing that the Municipal Court considered the reasons for Plaintiffs' failures to pay before issuing the arrest warrants at issue in this case. Since FTOCO charges were not based on an actual municipal ordinance and the warrants were issued after revocation hearings, a jury could reasonably find the FTOCO warrants to be, in practical effect, probation revocations. Accordingly, Plaintiffs have presented triable *Bearden* due process violations that arguably were caused by the agreement between JCS and the Municipal Court described above.

Defendants argue that the Municipal Court issued the arrest warrants because the named Plaintiffs failed to appear at the relevant revocation hearings. (*See, e.g.*, Doc. # 620 at 24). And, certainly, based upon the Rule 56 record, a fact-finder could reasonably find that the Municipal Court issued the arrest warrants because of Plaintiffs' failures to appear, rather than their failures to pay. But, in light of the evidence that JCS sought revocation due to Plaintiffs' failures to pay and that the Municipal Court failed to consider Plaintiffs' indigency before

effectively revoking their probationary sentences, this is an issue for trial, not summary judgment.

Moreover, the Rule 56 record reasonably indicates that the Municipal Court denied all of the named Plaintiffs appointed counsel before imprisoning them for criminal offenses. According to Plaintiff Ray's testimony, the Municipal Court did not inform her of the right to counsel before imposing her suspended imprisonment sentences. (*See* Doc. # 471-7 at 38-39). No evidence available to the court suggests that Plaintiff Ray made a knowing and voluntary waiver of her right to counsel before receiving the suspended imprisonment sentences. Thus, under *Alabama v. Shelton*, the Municipal Court violated Ray's right to counsel before imposing the suspended imprisonment sentences. *See Shelton*, 535 U.S. at 662. Moreover, in light of the printed acknowledgment of waiver of counsel in the probation forms used by JCS, a reasonable juror could find that an agreement between the Municipal Court and JCS was in place and caused the Municipal Court's constitutional violation. Accordingly, Plaintiff Ray has presented a triable § 1983 conspiracy claim for the Municipal Court's denial of her right to counsel during the proceedings where she received suspended imprisonment sentences.[36]

Likewise, Plaintiffs Jews, Timothy Fugatt, and Kristy Fugatt have presented a triable § 1983 conspiracy claim based on the Municipal Court's failures to appoint them counsel or obtain valid waivers. As discussed above, a reasonable jury could find that the FTOCO warrants constituted effective revocations of probation. And, although the Municipal Court did not formally sentence Jews, Timothy Fugatt, or Kristy Fugatt to a suspended imprisonment sentence,

---

[36] Plaintiff Ray's Sixth Amendment claim is not barred by the two-year statute of limitations. At a minimum, Plaintiff suffered a Sixth Amendment violation in June 2011 when the Municipal Court imposed suspended imprisonment sentences following her 2011 arrest without appointing counsel or obtaining a valid waiver of the right to counsel. (*See* Doc. # 423-31 at 2). City officers arrested and detained Ray following the issuance of this suspended imprisonment sentence. (Doc. # 423-24 at 2-3).

the Municipal Court effectively sentenced them to imprisonment based upon its revocation of the probationary sentences they had received. Alabama law states that probation suspends execution of a sentence, *see* Ala. Code § 12-14-13(a), and it defies logic, fact, and law to revoke probation if there is no underlying imprisonment sentence to execute. The court concludes that, at a minimum, Plaintiffs Jews, Timothy Fugatt, and Kristy Fugatt should have received the assistance of appointed counsel or validly waived their right to counsel before the Municipal Court revoked their probation sentences through the FTOCO warrants. *Cf. Shelton*, 535 U.S. at 662. The Municipal Court denied them this constitutional right, and a jury could find that the denial was caused by the agreement it entered with JCS. Accordingly, Plaintiffs are entitled to proceed to trial on these § 1983 conspiracy claims.[37]

### c. The City is Not a Party to the § 1983 Conspiracy

Plaintiffs have argued at length that they have put forth substantial evidence that the City is a part of the joint scheme involving JCS and the Municipal Court. (*See, e.g.*, Doc. # 500 at 27). The court disagrees. While the City's mayor signed the JCS-City Contract, the Rule 56 record does not show any continuing involvement of the City's decisionmakers in the Municipal Court's actions or the private probation services that are at issue. Indeed, the City's former mayor testified that JCS worked with the Municipal Court, not the City. (Doc. # 392-9 at 76). The court does not dispute Plaintiffs' argument that the City financially benefited from JCS's avaricious conduct. But, there is insufficient evidence in the summary judgment record to suggest that the City agreed with JCS (or anyone else) to violate probationers' constitutional rights. Therefore, the court maintains its view that the City is entitled to summary judgment on all claims.

---

[37] Plaintiff Jews's Sixth Amendment § 1983 conspiracy claim is not barred by the statute of limitations, either. The Municipal Court arguably violated Jews's Sixth Amendment rights when it revoked his probation in December 2010. (Doc. # 392-50 at 2-3). That revocation occurred within the two year limitations period.

### 11. Plaintiffs' Partial Motion for Summary Judgment to Declare the JCS-City Contract Void *Ab Initio*

Plaintiffs claim that the JCS-City Contract is due to be declared void for four reasons. First, they argue that the contract unlawfully bound the Municipal Court. (Doc. # 427 at 8-13). Second, they argue that the contract is void for illegal consideration because it relied on probation supervision fees imposed in violation of due process and equal protection to obtain JCS's services. (*Id.* at 13). Third, they argue that the contract violates the Alabama Constitution because the City did not solicit competitive bids. (*Id.* at 14-18). Finally, they argue that the JCS-City Contract unlawfully required probationers to pay fees unauthorized by state statute and caused poor defendants to not be treated uniformly. (*Id.* at 18-22). Plaintiffs further contend that, because the JCS-City Contract was void *ab initio*, JCS should be directed to pay restitution to the innocent probationers required to pay fees. (*Id.* at 22).

Defendant JCS responds, in relevant part, that the court should not consider this summary judgment motion because it denied Plaintiffs leave to add the theory to their Third Amended Complaint. (Doc. # 472 at 6-7). Before it was dismissed as a Defendant from this action, the City argued that Plaintiffs' summary judgment motion raised claims concerning the JCS-City Contract found nowhere in the Fourth Amended Complaint. (Doc. # 475 at 8). And, the City observed that the Fourth Amended Complaint lacked a claim for restitutionary relief. (*Id.* at 8-9). The court agrees with the City.

A plaintiff may not raise a claim for the first time through an argument in a summary judgment brief. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004). A plaintiff wishing to assert a new claim must amend the complaint pursuant to Federal Rule of Civil Procedure 15(a). *Id.* at 1315. In *Gilmour*, the Eleventh Circuit held that a plaintiff could not argue a contractual breach of duty claim for the first time at the summary judgment stage

where her complaint had raised claims of negligent misrepresentation, promissory estoppel, bad faith, infliction of emotional distress, and tortious interference with a contract. *See id.* at 1314-15.

Here, Plaintiffs' summary judgment motion seeking to declare the JCS-City Contract void *ab initio* is either moot or an improper addendum to the Fourth Amended Complaint. That is, to the extent Plaintiffs seek a declaratory judgment that the JCS-City Contract was void *ab initio*, their summary judgment motion is due to be denied as moot because the JCS-City Contract has been terminated by the City Council.[38] (Doc. # 392-63 at 2). And, to the extent Plaintiffs seek restitution from JCS, their summary judgment motion is due to be denied because they did not allege in the Fourth Amended Complaint that they were entitled to restitution for monies paid pursuant to a void contract. Plaintiffs have not argued in their summary judgment motion that a decision on the legality of the JCS-City Contract would advance any of their other claims against the remaining Defendants. For these reasons, Plaintiffs' partial motion for summary judgment to declare the JCS-City contract void is due to be denied.

## VI. Conclusion

For the reasons explained above, the court concludes that:

1. Plaintiffs' motion for partial summary judgment to declare JCS's probation practice a denial of equal protection (Doc. # 424) is due to be denied.

2. Plaintiffs' motion for partial summary judgment to declare the JCS-City Contract void *ab initio* (Doc. # 426) is due to be denied.

3. Plaintiffs' motion for partial summary judgment to declare probation based upon non-adjudicated offenses and blank orders void (Doc. # 545) is due to be denied.

4. Defendant Correctional Healthcare is due to be granted summary judgment.

---

[38] As explained earlier in this case, Plaintiffs have not (and cannot) show that the conduct authorized by the JCS-City Contract is likely to recur. The Municipal Court has adopted new probation and probation revocation policies, the City has terminated its contract with JCS, and JCS no longer operates in the state of Alabama.

5.    Plaintiffs' requests for declaratory and injunctive relief are due to be dismissed without prejudice as moot, subject to repleading if Defendant JCS reenters business in the state of Alabama.

6.    Defendant JCS's motions for summary judgment (Docs. # 469, 522, 535) are due to be granted in part and denied in part. Defendant JCS is due to be granted summary judgment on Counts Three, Seven, and Nine of the Fourth Amended Complaint. Defendant JCS is also due to be granted summary judgment for Plaintiffs' due process claim, except for the claim that it violated Plaintiffs' procedural due process rights by extending their probation sentences beyond the statutory maximum without affording due process. Defendant JCS is due to be denied summary judgment for Plaintiffs' § 1983 conspiracy claims in part, as described above.

An order consistent with this memorandum opinion will be entered.

    **DONE** and **ORDERED** this September 12, 2017.

 

 

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE