FILED

2018 Feb-13  PM 10:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

EXHIBIT 1

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| GINA KAY RAY, KRISTY FUGATT, TIMOTHY FUGATT and DEUNATE T. JEWS, Individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs;<br><br>v.<br><br>JUDICIAL CORRECTION SERVICES, INC., a corporation; CORRECTIONAL HEALTHCARE COMPANIES, INC., now known as CHC COMPANIES INC., d.b.a. CORRECTIONAL HEALTHCARE COMPANIES, INC., a corporation; CORRECT CARE SOLUTIONS, LLC, a limited liability company; THE CITY OF CHILDERSBURG,<br><br>Defendants. | Civil Action No.: 2:12-cv-02819-RDP<br><br><br>**FIFTH AMENDED CLASS ACTION COMPLAINT**<br><br><br>JURY TRIAL REQUESTED |

**INTRODUCTION**

Plaintiffs Gina Ray Kay, Kristy Fugatt, Timothy Fugatt, and Deunate T. Jews bring this civil rights action pursuant to 42 U.S.C. § 1983 alleging that Defendant Judicial Corrections Services ("JCS"), a for-profit probation company acting under color of law, and various Alabama municipalities, violated Plaintiffs' constitutional and statutory rights and the rights of persons similarly situated.

**JURISDICTION AND VENUE**

1.     The Court has jurisdiction over this matter because it concerns a controversy arising under the Constitution of the United States.  28 U.S.C. § 1331.  This is a civil rights action brought under 42 U.S.C. §§ 1983 and 1988.

2.     This Court also has jurisdiction of this action by virtue of 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims brought under 42 U.S.C. § 1983 to enforce civil rights guaranteed by the United States Constitution.

3.     This action also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2022.

4.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES TO THE COMPLAINT[1]

5.     Plaintiff Gina Kay Ray is an individual resident of Bonaire, Alabama.

6.     Plaintiff Kristy Fugatt is an individual resident of Sylacauga, Alabama.

7.     Plaintiff Timothy Fugatt is an individual resident of Sylacauga, Alabama.

8.     Plaintiff Deunate T. Jews is an individual resident of Childersburg, Alabama.

9.     Defendant Judicial Correction Services, Inc. (hereinafter "JCS") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama and in this District which markets itself as "not a social service agency," but a "for profit" company which offers services to governmental entities "free of charge" to the cities as "an offender paid system."   At all times, JCS has operated under the color of state law.

10.     Defendant CHC Companies Inc., formerly known as Correctional Healthcare Companies, Inc. (also hereinafter "CHC") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama.  In their initial complaint, filed August 28, 2012, plaintiffs described Correctional Healthcare

---

[1] Plaintiffs will refer to Defendants JCS, CHC, and CCS collectively as "JCS/CHC/CCS" due to the

*cont'd on next page*

Companies, Inc. stating:

> Correctional Healthcare Companies, Inc. (hereinafter listed as "JCS" also) is a Delaware corporation, maintaining its principal place of business in Greenwood Village, Colorado, but shares the same corporate officers at the same address as JCS. It appears to be the successor of JCS, having purchased or otherwise acquired it, continuing to do business with plaintiffs as JCS and operating the same. (Doc. 1 ¶6)

This description can only apply to the entity Correctional Healthcare Companies, Inc., which had undergone a name change hereinafter described before the initial complaint was filed.  That action changed the name to CHC Companies, Inc., but the entity still continued doing business as Correctional Healthcare Companies, Inc.  This is the only entity that meets the description of the entity identified in the initial complaint as:

1. A Delaware Corporation. (Exhibit 2, pg. 2)
2. Maintains its principal place of business in Greenwood Village, Colorado.  (Exhibit 2, pg. 2)
3. Is the successor of JCS acquiring and merging it into itself on September 30, 2011. (Doc. 292 - Exhibit 1 - filed under seal - recitals and Section 2.1, signature page pg. 59)

Correctional Healthcare Companies, Inc. was incorporated on June 26, 2006 with the State of Delaware's Secretary of State under file number 4181381.  This is the entity which the Plaintiffs named and described in the initial complaint.  However, on July 11, 2011, a Second Amendment to the Second Amended and Restated Certificate of Incorporation signed by its CEO, Douglas D. Goetz, was filed changing the name of Correctional Healthcare Companies, Inc. to CHC Companies, Inc. (Exhibit 2 - pg. 51).

The initial complaint was served on CHC's Chief Executive Officer, Doug Goetz, on September 7, 2012. (Doc. 5 pg. 2).  At the time Mr. Goetz was served with the initial complaint, he was the CEO of both Correctional Healthcare Companies, Inc. and CHC

---

mergers, combinations and name changes described herein.

Companies, Inc.  Despite the correct identification of the intended party defendant and proper service, the CHC entities have attempted to blur their true identity through simultaneous name changes involving another wholly owned entity which is not related to this controversy.[2]

CHC Companies, Inc. (f/k/a Correctional Healthcare Companies, Inc.) continues to do business as Correctional Healthcare Companies, Inc. On September 30, 2011, CHC Companies, Inc. merged Judicial Correction Services, Inc. into its operations pursuant to a merger agreement. Through this merger, CHC Companies, Inc. d/b/a Correctional Healthcare Companies, Inc. assumed the "assets, rights, privileges, powers and franchises of, and be subject to all the liabilities, restrictions, disabilities and duties" of JCS. Doug Goetz, CHC Companies, Inc.'s CEO, executed this agreement on behalf of CHC. (Doc. 292 - Exhibit 1 - filed under seal - recitals and Section 2.1, signature page pg. 59)

11.     Defendant Correct Care Solutions, LLC (hereinafter "CCS") is a Kansas limited liability corporation, registered as a foreign limited liability company and doing business in the State of Alabama. On June 24, 2014, CCS purchased CHC Companies, Inc. and has merged CHC's operations, its subsidiaries and its headquarters with its own. The CCS home office and headquarters is now in Nashville, Tennessee,[3] from

---

[2] On July 11, 2011, Doug Goetz as CEO of all entities involved, simultaneously changed names of two corporations. The corporate name of Correctional Healthcare Companies, Inc. was changed to CHC Companies, Inc., while the corporate name of another wholly owned company unrelated to this controversy—CHC Companies, **Ltd.**—was simultaneously changed to Correctional Healthcare Companies, Inc.  (Exhibit 3) This purposeful ambiguity between identical names was further promoted by CHC Companies, Inc. signing legal documents in the name of CHC Companies, Inc. while continuing to do business as Correctional Healthcare Companies, Inc. ("CHC").

Correctional Healthcare Companies, Inc. (f/k/a CHC Companies, **Ltd**.) merged six (6) corporations into itself on December 22, 2011, but none of the companies was JCS. (Exhibit 4).

[3] CHC Companies, Inc. (f/k/a Correctional Healthcare Companies, Inc. and continuing to do business as Correctional Healthcare Companies, Inc.) filed its annual report with Colorado's Secretary of State on July

*cont'd on next page*

which it now directs and controls the operations of all its merged corporations including CHC Companies, Inc. The JCS operations have been fully integrated with the operations of other CHC companies - HPL, PNA, CHC, and JCS. JCS is part of a division known as CCS's State and Federal Division, which is managed by Don Houston. (Exhibit 6) CCS controls the accounting, litigation and other operational aspects of the JCS operations contained within this division and employs all the personnel within the JCS operations and that division.

12.     Defendant the City of Childersburg, Alabama, ("Childersburg") is a municipal corporation located within Shelby County, Alabama.  The City Council and Mayor B.J. Meeks controlled the policy making for Childersburg and also hired the municipal court judge and contracted for services of JCS at the municipal court.

## FACTUAL ALLEGATIONS

13.     JCS/CHC/CCS operated a for profit enterprise that marketed its services to various municipal and county governments and contracted with over 100 cities and towns throughout Alabama to collect unpaid fines and court costs from people brought before municipal courts in traffic and other misdemeanor cases.   JCS/CHC/CCS' marketing approach to these cities emphasized that its fees would be paid by the "offender" before the municipal court and that its efforts would improve collection of court fines and costs at no cost to the city.

14.     JCS/CHC/CCS routinely used a form contract to establish its relationship with its customer cities and similarly trained its employees using a training manual replete with forms for courts to use during proceedings, and for courts and

---

8, 2015 listing its principal office and street address as: 1283 Murfreesboro Rd. Suite 500, Nashville, TN 37217. The same address as CCS's principal office. (Exhibit 5)

JCS/CHC/CCS to use to contact the "offenders" from whom they are collecting.  As a result, the JCS/CHC/CCS approach is highly systemized and uniform across municipalities.

15.     Under the system established and implemented by JCS/CHC/CCS, its employees were not required to have criminal justice or legal training, have any social work education, or meet any minimum law enforcement standards, as is required of state probation officers.  Instead, JCS/CHC/CCS required only that its employees be at least 21 years old, have no felony convictions, have at least two years of college, and complete 40 hours of training by JCS/CHC/CCS on its processes.  On satisfying those requirements, JCS/CHC/CCS employees were then labeled "Probation Officers,"[4] permitted to carry a JCS issued badge in some municipalities, and collect  fees, court fines and costs.

16.     Under this system and by agreement with municipalities such as Childersburg, many administrative and judicial functions of the municipal court were unlawfully delegated to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

17.     The agreement drafted by JCS and agreed to by the mayor of Childersburg is substantially the same contract form used throughout Alabama and stated that the municipal "*court agrees that each court order shall provide* for the following:

    a probation fee of $35.00 per month flat fee

    One time probationer set up fee of $10.00. . . . " (emphasis added).

---

[4] In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC').  See Ala. Rule of Judicial Administration Rule 42.

JCS's contracts with other cities sometimes set the monthly fee at $45.

18.     Childersburg, through its mayor and council, approved the agreement with JCS and approved the employment of Larry Ward as judge of its municipal court. Ward, a bond salesman at Morgan Keegan, also served as municipal judge for Harpersville and at other cities also under contract with JCS. Similarly, the current judge, Chad Woodruff, was appointed in a similar manner.  The Childersburg Municipal Court meets once a month for a few hours on the second Thursday of the month.

19.     The JCS/CHC/CCS system provided "Order of Probation" forms to the municipal court with the printed requirement on each form that the "offender" pay JCS $35 per month plus $10 for a file set up charge.  *See* Exhibit A.  The monthly fee of $35 was later increased to $45 per month for each "offender" at Childersburg. In Childersburg, Municipal Court Judge Larry Ward pre-signed blank probation orders printed by JCS.

20.     At municipal courts operating under the JCS contract, a person unable to fully pay fines and costs when levied would be placed on probation using the JCS orders and forms, even when the underlying offense is not punishable by a jail sentence or when no suspended sentence is imposed.  This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs.  The order forms supplied by JCS then required the individual to make payment to JCS of the fines, costs and additional monthly fees as required under its contract with the city.

21.     The JCS/CHC/CCS system and its "Probation Tracker" software is highly systemized and focuses on collections of fines, costs, and its fees—not traditional

probation services. That system was used in every municipal court in which JCS operated in Alabama. For example, "offenders" were allowed to mail in payments if they lived 30 miles from the JCS office.  *See* Exhibit B.  In fact, the daily tasks of the JCS/CHC/CCS employees were heavily directed to collecting, counting and depositing the money collected.  *See* Exhibit C.

22.    The training manual used by JCS/CHC/CCS instructed its employees on the use of its computer systems in tracking the payments made by the "offenders" and provided court forms to order probation and payment to JCS.  The payments to JCS were ordered under these forms even when there was no adjudication of whether the individual was responsible for committing an underlying offense or adjudication was withheld.  *See* Exhibit D.

23.    The JCS training system was used in every municipal court in which JCS operated in Alabama and also  provided sample letters for use after probation was ordered, threatening the "offender" that "a warrant will be issued for your arrest" and that their "court date cannot and will not be reset."  *See* Exhibits E and F.  Similar JCS forms instructed the "offender" that they could avoid the court date if they pay an amount determined by JCS.  *See* Exhibit G.

24.    The JCS/CHC/CCS training manual instructed its employees on the issuance of warrants of arrest and provided forms for that purpose.  *See* Exhibit H. After the arrest warrant was issued, JCS also provided forms for warrant dismissal if JCS determines that the "offender" was in compliance.  *See* Exhibit I.  Once a person was arrested, JCS monitored those "offenders" placed in jail.  *See* Exhibit J.

25.    The city council and its mayor control the policymaking for Childersburg, hired the municipal court judge, contracted for JCS to provide "probation services" at

the municipal court starting in 2005, and continued to use JCS until they voted to terminate the contract on May 19, 2015. *See* Exhibit N. The decision to use JCS was an administrative decision of Childersburg, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC'). The city did not issue a request for proposal ('RFP') prior to signing the contract, and the city did not competitively bid this exclusive contract.

26.     Alabama municipalities, through their contracts with JCS and operations, clothed JCS with the appearance of state authority and many allowed JCS employees to carry badges.  The JCS/CHC/CCS employees attended each municipal court session and were referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.  Under this system, "offenders" were not permitted to pay fines at the city clerk's office, but were instead required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office.

27.     This public ruse was maintained by Alabama municipalities and JCS in order to impose and collect fines and costs from citizens such as the Plaintiffs, and was accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much would be credited for each payment to the collection "services" of JCS each month and how much of it would rebate to the municipalities toward the fines adjudged.

28.     This system, as a matter of routine, violated the rights of persons such as the Plaintiffs and the classes they seek to represent by imposing fines, costs, and fees on indigent persons with no hearing or consideration of their indigency.

29.     Despite the lack of authority to do so, JCS, at its discretion, used threats of revoking probation, increased fines and costs and jail time for purposes of collection. Under this system, should an individual fail to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked. Under the system operated jointly by Alabama municipal courts and JCS, JCS's determination to incarcerate an individual was routinely accepted by city and court personnel without conducting delinquency or probation hearings and without making any findings, much less any ability-to-pay determination or appointment of counsel before taking such punitive action. In fact, JCS' Contract with many cities/cities' court explicitly agreed that JCS, a financially interested party, will provide testimony stating: "the [probation] 'officer' will testify as to the circumstances of the case."[5]

30.     The collective actions of JCS/CHC/CCS and the Alabama municipalities with which it contracted were inextricably interwoven with each other under an agreement and understanding and routinely resulted in court costs, fines, and fees which exceeded the statutory maximum of $500 for municipal courts, and in some cases also imposed additional "jail fees" for the costs of any incarceration.  Similarly,

_____

[5] The following contracts include this provision: Albertville p. 1 section G, Arab p. 4 section G,  Bay Minette p. 8 Exhibit A ¶6,Brookwood p. 29 section G, Calera p. 33 Exhibit A ¶6, Childersburg p. 37 Exhibit A ¶6, Citronelle p. 41 Exhibit A ¶6, Clanton p. 46 Exhibit A ¶6, Dauphin Island p. 54 Exhibit A ¶6, Dora p. 58 Exhibit A ¶6, East Brewton p. 63 Exhibit A ¶6, Fairhope p. 67 Exhibit A ¶6, Falkville p. 70 Section G, Fort Payne p. 74 Exhibit A ¶6, Haleyville p. 87 Exhibit A ¶6, Hartselle p. 91 Exhibit A ¶6, Hollywood p. 95 Exhibit A ¶6, Homewood p. 99 Section G, Hueytown p. 104 Section G, Jackson p. 108 Exhibit A ¶6, Jacksonville pp. 112, 316 Exhibit A ¶6, Jemison p. 116 Exhibit A ¶6, Kinston p. 125 Exhibit A ¶6, Lake View p. 127 Exhibit A ¶6, Leeds pp. 131, 143 Exhibit A ¶6, Town of Level Plains p. 147 Exhibit A ¶6, Loxely p. 153 Section G, Millbrook p. 157 Exhibit A ¶6, Montevallo p. 161 Exhibit A ¶6, Montgomery p. 165 Exhibit A ¶6, Mount Vernon p. 170 Exhibit A ¶6, Northport p. 177 Exhibit A ¶6, Orange Beach p. 180 Section G, Owens Crossroads p. 183 Section G, Ozark p. 187 Section G, Pleasant Grove p. 192 Exhibit A ¶6, Priceville p. 196 Exhibit A ¶6 (signed by Mayor and City Judge), Rainbow City p. 200 Section G, Rainsville p. 204 Exhibit A ¶6, Robertsdale p. 211 Section G, Saraland p. 215 Exhibit A ¶6, Scottsboro p. 219 Exhibit A ¶6, Somerville p. 226 Section G, Southside p. 229 Section G, Sylacauga p. 235 Exhibit A ¶6 (signed by Mayor and City Judge), Talladega p. 243 Section G, Tallassee p. 247 Exhibit A ¶6, Troy p. 259 Section G, Warrior p. 269 Exhibit A ¶6, Ashford p. 273 Exhibit A ¶6, Attalla p. 276 Section G, Blountsville p. 279 Section G, Bridgeport p. 283 Exhibit A ¶6, Brighton p. 287 Exhibit A ¶6, Dauphin Island pp. 300, 303 Exhibit A ¶6, Notasulga pp. 320, 325 Exhibit A ¶6.

the periods of "probation" imposed for purposes of collecting fines and fees for JCS routinely exceeded the two-year statutory maximum, all of which resulted in JCS/CHC/CCS and the municipalities taking joint action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

31. Although probation was routinely imposed on individuals who were not convicted of any underlying offense—or who were charged with an offense for which no jail sentence could lawfully be imposed, individuals were arrested and incarcerated if the fine, together with the fees added by JCS, were not paid as dictated by JCS.

32. Despite directing the municipal courts such as Childersburg that incarceration of an individual "offender" is needed when payment is not made, JCS/CHC/CCS undertakes no determination of the reasons for nonpayment, and does not consider such things as the Plaintiffs' disability, unemployment, or assets, in regard to the nonpayment of the fines.

33. JCS/CHC/CCS denies any responsibility and took no action under its operations with Alabama municipalities to determine ability to pay, and provides no instruction in its employee manual for the consideration of indigency.  The municipal court judge employed by Childersburg, however, contended that under its contract it is JCS that should determine if an "offender" is unable to pay due to indigency and if so, to abate any fees in the probation order.

34. Under this system jointly implemented by JCS/CHC/CCS and municipalities such as Childersburg, after simple fines were converted to "probation" for payment, jail often resulted for any "offender" who did not meet the payment scheduled set by JCS.  Based on JCS's allegation of a "probation violation," warrants were issued for "failure to obey court order" or failure to pay, and individuals whose original penalty

11

had only been a fine—or even who were not found guilty of any offense and were only assessed court costs—ended up being imprisoned.

## THE NAMED PLAINTIFFS' EXPERIENCES

### A.    Gina Kay Ray

35.    Gina Kay Ray is an individual resident of Bonaire, Alabama, who was brought before the Childersburg Municipal Court on August 12, 2010 on charges of "no insurance" and "driving while license suspended."  She was fined $398 and $498 for these charges and received a suspended jail sentence, but was not sentenced to serve any jail time.  Ms. Ray was not financially able to pay the fines when levied and was ordered to be on probation with JCS. Ms. Ray did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered her to do so. Pursuant to the JCS form probation order, Ms. Ray was required to pay JCS an additional $45 per month and a $10 charge to set up her file.  Her monthly payment on these amounts was set by JCS at $145 per month.

36.    On July 14, 2011, Ms. Ray was brought before the Childersburg Municipal Court on charges of "expired tag" and "driving while license suspended."  For these charges she was fined $168 and $498 respectively, and received a suspended jail sentence.  Since she could not pay these fines either, she was again ordered to "probation" with JCS and ordered to pay JCS $45 per month and $10 file set fee. Ms. Ray did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered her to do so. Her monthly payment on these amounts was also set by JCS at $145 per month.  Though the "probation" period for her 2010 and 2011 cases overlap in time, JCS treated these as "consecutive cases" so that the period would then extend well beyond 24 months and result in monthly fees to JCS for

both cases.

37.     Ms. Ray was and has been indigent and was not able to pay for her insurance, tag or license, much less the JCS fees, but, in accordance with the policy and practice of Childersburg which was established in its contract with JCS, neither the Childersburg Municipal Court nor JCS ever made any inquiry into her inability to pay at the time of levying the fine or thereafter.

38.     Due to her inability to pay as directed by JCS, Ms. Ray was arrested and jailed at the request of JCS for "failure to obey a court order." Ms. Ray was placed in the Talladega County jail for a period of four days in 2010 and then an additional 21 days in 2011, and further time in April and May of 2012.

39.     Due to her inability to pay and her indigency, she remained in jail throughout these periods of time.  On or about April 26, 2012, a friend of Ms. Ray was able to acquire $300.00 which was the amount determined and demanded by JCS/CHC to secure her release from jail.

40.      At the point of Ms. Ray's release on or about April 26, 2012, an employee of CHC completed a pre-printed, pre-signed probation order stating, "Val Jews reporting w/300 before Def can be released," The probation order listed a $317 fine and an offense of "Reinstate w/warrant fee."  After the $300 was paid, Ms. Ray was directed to appear in "Judicial Corrections Municipal Court."

41.     On June 14, 2012, Ms. Ray was again brought before the Municipal Court in Childersburg on charges of "attempt to evade," "expired tag" and "driving while revoked."  She was fined $248, $248, and $598 on these charges and again received a suspended jail sentence but was not sentenced to serve any jail time.  She could not pay these fines and once again placed on "probation" with JCS/CHC and ordered to

pay JCS $45 per month for 24 months and $10 file setup fee.

42.    While Ms. Ray has made some small payments, she at all times has been indigent and unable to pay the full amounts and the additional probation fees charged by JCS/CHC/CCS and Childersburg.   At the time this lawsuit was filed, remaining balances were still demanded by JCS/CHC/CCS and Childersburg.

43.    Ms. Ray was also subjected to JCS probation in the Town of Harpersville. JCS demanded payments and compliance with its demands without any probation orders. Despite the fact that no probation orders were issued by the municipal court, JCS demanded money from Ms. Ray. When she was unable to pay the amounts JCS demanded, JCS changed her status in ProbationTracker to "warrant;" and she was arrested and jailed for eight days.

44.    Throughout this period of time, JCS/CHC/CCS provided no services to Ms. Ray and acted merely as a collection agency charging additional fees and, despite knowledge that Ms. Ray was unable to pay these fines and indigent, JCS/CHC/CCS has sought to collect and has taken actions to incarcerate Ms. Ray without any due process and kept on probation beyond the statutory maximum of two (2) years.

45.    On each of her adjudications and incarcerations, Ms. Ray was denied the benefit of legal counsel, without any formal probation revocation hearing, or any hearing on the issue of her indigency. Despite no legal counsel, Ms. Ray was incarcerated and, on some occasions, later released based upon the determination of JCS/CHC/CCS. These actions were taken with the approval and participation of the Childersburg and Harpersville city courts pursuant to their policy and contract with JCS.

**B.    Kristy And Timothy Fugatt**

46.    The Fugatts have twin children and had a third child who was born with

serious medical conditions which required constant medical care in Birmingham for two years until his death in June 2011.  As a result, both parents had extended stays at the hospital with their child and made numerous trips to and from Birmingham to their home in Sylacauga.

47.     On one trip on November 13, 2010, Kristy Fugatt was stopped and ticketed by the Childersburg Police Department for having an expired license tag and an expired driver's license.

48.     Timothy Fugatt was stopped and ticketed on or about December 3, 2010 by Childersburg Police for having an expired license tag on the same vehicle.  Both of the Fugatts were set for court on January 13, 2011 at the Childersburg Municipal Court.

49.     The Childersburg court records reflect that the Fugatts' cases were *nol prossed* upon payment of the court costs of $198.00 for the expired driver's license and $148.00 each for the expired tag charges. They were not sentenced to a suspended jail sentence or to serve any jail time.

50.     Due to these financial burdens, the Fugatts were unable to immediately pay the court costs and were ordered to "probation" under JCS.  The Fugatts did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered them to do so. Under the mandated terms of the probation, they were each charged a $10 set up fee and an additional $45.00 per month for JCS's probation "service."

51.     The Fugatts paid as best they could, but when they were unable to make payments as were ordered by JCS employees, they were required to drive to Childersburg and explain why they could not pay.  JCS set the dates upon which the Fugatts were to report to the JCS office and were told that they would be jailed if they

did not come.  Many times the Fugatts were not able to make phone contact due to limited phone access of JCS.  Nevertheless, they were repeatedly threatened with jail for any nonappearance at the JCS office.

52.     The Fugatts told JCS employees about their inability to pay as demanded and even provided medical records.  Instead of assistance from JCS, the Fugatts were called liars and continually threatened with arrest and incarceration for nonpayment.

53.     Although the City of Childersburg's accounting records show that Mr. Fugatt had paid his court costs in full as of May 18, 2011, JCS claimed that he still owed money, kept him on probation, and continued to demand payment. JCS then sought an arrest warrant for Mr. and Mrs. Fugatt based on their alleged failure to pay.

54.     When the Fugatts did not appear in court on August 11, 2011- the date set by JCS for its 'petition for revocation' - each of the Fugatts was assessed $317.00 for "Failure to Obey Court Order" on September 26, 2011, and a warrant of arrest was issued.

55.     Despite their inability to pay the initial court costs, the amounts JCS/CHC claimed the Fugatts owed kept increasing, with added as "fines," "restitution," "other" and "probation fees."

56.     On Sunday afternoon, February 26, 2012, a Childersburg officer came to their home in Sylacauga, threatened them with a taser and arrested them, taking them from their young children to the jail at Childersburg and instructing them that DHR would be called for care of their kids. This was avoided only by relatives arriving in time to take care of the young children.

57.     Only after relatives collectively brought $900.00 to the Childersburg jail were the Fugatts released from jail. (Exhibit K)

58.     On February 26, 2012, the date of their arrest, each of the Fugatts was charged an additional $317 for "Failure to Appear," though there was no judge present that Sunday and no judicial order was signed.  These additional charges totaled $1,268, plus the $90 monthly JCS/CHC fee, all resulting from the expired tag and expired driver's license.

59.     In July 2012, JCS charged Mr. Fugatt an additional $234 in "restitution." Although no restitution was ordered by the municipal court or assessed for his nol prossed ticket, and although the City of Childersburg's records showed that he had paid off the court costs he owed over a year earlier, neither the City nor its municipal court challenged these added charges.

60.     After their arrests, JCS continued to demand payments from Mr. and Mrs. Fugatt in excess of the balance recorded by the City. In addition, although Mrs. Fugatt was never charged with speeding, she was ordered to JCS probation for someone else's speeding ticket using a pre-printed JCS probation order that Judge Ward pre-signed. Although the person who had actually gotten the speeding ticket was also put on JCS probation for the offense, JCS sought to collect the balance owed for that ticket from Mrs. Fugatt.

61.     On October 11, 2012 the Fugatts were again required to appear at Childersburg Municipal Court by CHC employees.  While there, a CHC employee working in its JCS division told the Fugatts that they now owed over $1,000 in court costs, fines and probation fees with Mrs. Fugatt owing $557 and Mr. Fugatt owing $517.

62.     On December 13, 2012, Mr. Fugatt was once again ordered to JCS probation for a "Proof of Insurance" violation. The probation order was not signed by the judge and did not include any jail sentence. JCS set up this term of probation to run

17

consecutive to Mr. Fugatt's previous probation for the initial expired tag (which he had paid in full eighteen (18) months earlier on May 18, 2011), demanding that he pay another $10 setup fee and $135 per month, including a monthly JCS fee of $35.

63.     While Mr. Fugatt maintained some employment, the hours he was able to work were quite limited by these serious medical issues and family responsibilities.  As a result, the Fugatts were very poor.

64.     Though the Fugatts had repeatedly informed JCS/CHC of their situation, no relief was granted.  The Fugatts were not afforded due process of law, in that they were continually punished with increased amounts due and owing, threats of incarceration for not paying, and ultimately incarceration.

65.     In addition, the Fugatts, like all the Plaintiffs, were treated differently than persons able to pay the court costs when first imposed, merely because of their economic status.

66.     Throughout this period of time, JCS/CHC/CCS has provided no services to the Fugatts and has acted merely as a collection agency charging additional fees, and despite knowledge that the Fugatts were unable to pay and indigent, JCS/CHC/CCS has sought to collect and take actions to incarcerate the Fugatts without any due process and kept them on probation after their city court costs had been paid in full and beyond the statutory maximum of two (2) years.

67.     The Fugatts were jailed without the benefit of legal counsel, without any notice of charges, without formal probation revocation hearing, and without any hearing on the issue of their indigency, but simply incarcerated and, later released based upon the determination of JCS/CHC/CCS.  These actions were taken with the approval and participation of Childersburg personnel and pursuant to its policy and contract with JCS.

**Deunate T. Jews**

68.     Deunate T. Jews is a resident of Childersburg, Alabama, and brought before the Childersburg Municipal Court in 2008 on the charge of harassment.  Mr. Jews was never tried, and the alleged victim placing this charge went to prison.  As a result, the charges against Mr. Jews were dismissed but, on October 22, 2009, he was nonetheless charged court costs of $166. Since he could not pay this amount, he was ordered to probation with JCS for 24 months for payment with the additional requirement that he also pay JCS $45 per month and a $10 file set up fee. Mr. Jews did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered him to do so.  Mr. Jews was not sentenced to serve any jail time.

69.     When Mr. Jews did not pay the amounts demanded by JCS, an arrest warrant was issued at the request of JCS for "failure to obey a court order." Because this warrant to arrest Mr. Jews was issued, an additional $317 was added to his bill with JCS listed as "restitution" on the JCS and court records, even though no restitution was involved.

70.     On September 11, 2009, Mr. Jews was arrested and placed in the Talladega jail forty-one (41) days for "failure to appear."

71.     Based on these unlawful charges, Mr. Jews was incarcerated at the request of JCS.  At his release, he was ordered to appear in "Judicial Corrections" Municipal Court.

72.     When Mr. Jews was unable to pay the ever growing JCS fees, JCS sought another warrant for his arrest. Mr. Jews was arrested on August 18, 2010, by Childersburg police officer Mark Holmes for the charge of "FTOCO" and a $935 cash bond was demanded for his release. Mr. Jews was again taken to the Talladega County

19

Jail where he stayed until September 9, 2010.

73.    JCS charged Mr. Jews "restitution," "probation fees," and "court money" fees, which, because of his indigency, he was unable to pay. On January 13, 2011, Childersburg police officer Luke Benefield arrested Mr. Jews on the FTOCO charge. Although the arrest warrant lists a $1,035 cash only bond, Childersburg released Mr. Jews when family members paid $500 the next day. Upon his release, Mr. Jews was notified that he had to appear in the Childersburg court on March 10, 2010.

74.    When Mr. Jews was again unable to pay the continuing, escalating JCS/CHC fees, JCS/CHC issued another warrant for his arrest and Mr. Jews was arrested and jailed on February 21, 2012. Childersburg police booked Mr. Jews and he was transported to the Talladega County Jail. Childersburg demanded a $1,000 cash bond for his release.

75.    On March 8, 2012, Mr. Jews was released from the Talladega County Jail when he appeared in court and a family member paid JCS/CHC $200.

76.    On May 25, 2012, Mr. Jews paid JCS/CHC $25; JCS/CHC applied $15 to "restitution" though there was none, and $10 to "Probation Fee."   JCS/CHC gave Mr. Jews a receipt acknowledging his payment in which it listed: Fees in arrears = $295.00; Pay off not including Probation fees: $343.00; Monthly Probation Fees: $45: Court Money Due from other Probations: Fines: $1,807.  This JCS/CHC receipt stated a probation start date of March 9, 2012, which was the date Mr. Jews was released from his most recent incarceration, and a probation end date of March 9, 2014 which is nearly six years after the charges against him were dismissed.  *See* Exhibit L.

77.    Though the "probation" originally ordered on October 22, 2009 was for 24 months, it continued—with charges accruing each month—until this lawsuit was filed

and lawyers for the City of Childersburg wrote, and the City magistrate to sign and sent, a letter to JCS requesting that JCS terminate hundreds of probations that exceeded the statutory two year maximum.

78.    While Mr. Jews has made payments throughout the period of time, he was indigent and unable to pay the full amount of the probation fees and other charges imposed by JCS/CHC/CCS.   JCS/CHC/CCS closed out Mr. Jews on December 17, 2014 with an entry of "Pre-Payment/Bond in the amount of $166."

79.    Throughout this period of time, JCS/CHC/CCS has provided no services to Mr. Jews and has acted merely as a collection agency charging additional fees, and despite knowledge that Mr. Jews was unable to pay these fines and indigent, JCS/CHC/CCS has sought to collect and take actions to incarcerate Mr. Jews without any due process.

80.    Each time Mr. Jews was incarcerated, it was without the benefit of legal counsel, without notice of charges, and without any formal probation revocation hearing or any hearing on the issue of his indigency. On some occasions, he was later released based upon the determination of JCS/CHC/CCS. These actions were taken with the approval and participation of Childersburg pursuant to its policy and contract with JCS.

### FACTUAL ALLEGATIONS REGARDING CONSPIRACY BETWEEN JCS/CHC/CCS AND ALBAMA MUNICIPAL COURTS

81.    JCS/CHC/CCS entered into an agreement and/or reached an understanding with the Alabama Municipal Courts with which it contracted to deny the Plaintiffs' and class members' constitutional rights protected by 42 U.S.C. § 1983.

82.    Over the years JCS/CHC/CCS contracted with over one hundred Alabama cities for the collection of court fines and costs using substantially the same contract

form and provisions and thereafter operating in each court under the same automated software and with personnel assigned to each court being trained under the same manual and processes.

After being hired at a city court, JCS/CHC/CCS and the municipal courts operated in a concerted and consistent fashion showing evidence of their agreement and understanding to deny the Plaintiffs' and class members' constitutional rights.

83.     Each JCS/CHC/CCS contract provided that the municipal judge would include in his/her orders sending people to JCS that those people would be required to pay JCS a set-up fee and monthly fee.

84.     Many of these agreements also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.' (See Paragraph 29 above)

85.     In furtherance of the conspiratorial understanding and agreement between JCS/CHC/CCS and the Alabama Municipal Courts under contract with JCS/CHC/CCS, the city judges consistently placed persons appearing before the city court on "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

86.     In ordering people to JCS "probation" for collection of fines and court costs, the city judges consistently failed to consider any aspects of the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed.  Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, the city judges placed the class members on probation without further inquiry.

87.     The actions of the city judges in furtherance of the conspiratorial understanding and agreement with JCS/CHC/CCS, were done with full understanding and acknowledgment that JCS/CHC/CCS had financial interests in expanding the number of individuals placed with it for "probation."  Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent as JCS agreed to not charge indigent people probation fees.

88.     This conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts is further shown by the consistent failure of the city judges to make any indigency determinations and by JCS/CHC/CCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

89.     This conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts is further shown by the consistent failure of the city judges to appoint counsel to those ordered to JCS 'probation' and by JCS' pre-printed probation order form which includes language above the offender's signature line purporting to "waive" right to counsel.

90.     In furtherance of this understanding and agreement between JCS/CHC/CCS and the Alabama municipal courts, the courts routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS provided to the court its petition for revocation as the tool to acquire the warrant.

91.     In furtherance of this conspiratorial agreement and understanding, after JCS petitioned for revocation beginning the process to acquire a warrant, neither JCS nor the Alabama municipal courts took steps to provide counsel for the persons

pursued or to inform them of this right.

92.     The petitions for revocation sought by JCS/CHC/CCS under its agreement and understanding with Alabama municipal courts were predicated on failure of the individual to pay the fines and fees demanded and those were discharged when such payment was forthcoming and with "probation" itself promptly terminated when the fees, fines and costs were fully paid. These petitions used under this agreement and understanding in turn were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

93.     In furtherance of the conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts, JCS was allowed to determine the monthly payments required and to allocate of any such payment between JCS or the City without any audit by the City as to the correctness or its accounting before the City complied with the request of JCS for warrants.

94.     This conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts to violate the constitutional rights of the plaintiffs is further shown by the hundreds of people throughout the state who were kept on JCS probation beyond the statutory maximum of two (2) years; the absence of counsel for those arrested; the explicit language of the JCS forms and petitions presented to the Court; JCS data showing disability and unemployment of those assigned for collection; the absence of any investigation of poverty as reasons for non payment by either JCS or the Court, and the Court's participation in conformity with the JCS contract by assigning persons for collection of fines and costs to a party with a known financial interest in expanding and extending fee payments.

95.     To further the conspiratorial agreement and understanding between JCS/CHC/CCS and the municipalities with which it contracted, JCS/CHC/CCS also hired as its paid lobbyist Susan Fuqua, while she was serving as the magistrate for the City of Hoover as well as the President of the Alabama Municipal Court Clerks and Magistrates Association ('AMCCMA') for which she was one of the initial board members. Ms. Furqua did not register as a lobbyist or publicly disclose her payments from JCS, but organized or participated in numerous continuing education seminars for city magistrates and city judges during which she promoted JCS's collection system to other city court personnel.

96.     These concerted efforts between the Alabama municipal courts and JCS/CHC/CCS, including the city judges and the other employees of the court, show a conspiratorial agreement and understanding that warrants would be issued if money was not paid by the person sent to JCS/CHC/CCS for collection, all while ignoring the requirement of consideration of poverty as required under the constitution, *Bearden v. Georgia*, and Alabama law.

### FACTUAL ALLEGATIONS REGARDING CONSPIRACY BETWEEN JCS/CHC/CCS AND THE CITY OF CHILDERSBURG

97.     JCS/CHC/CCS entered into an agreement and/or reached an understanding with the Childersburg Municipal Court to deny the Plaintiffs' and class members' constitutional rights protected by 42 U.S.C. § 1983.

98.     The parties' relationship was established by a contract between JCS/CHC/CCS and the City and its court.  Following the date of this contract in 2005, there was concerted consistent action between JCS/CHC/CCS and the municipal court showing evidence of their agreement and understanding, to deny the Plaintiffs' and

class members' constitutional rights.

99.    The relationship between these parties was established by the City's former mayor signing a contract with JCS/CHC/CCS, which was recommended by the municipal judge for the City of Childersburg.  JCS/CHC/CCS was hired for the collection of city court fines and costs.

100.    This agreement provided that the municipal judge, Larry Ward, would include in his orders sending people to JCS/CHC/CCS that those people would be required to pay JCS a set-up fee and monthly fee.

101.    This agreement also stated that JCS/CHC/CCS would provide testimony "as to the circumstances of the case" as a 'probation officer.'

102.    The same municipal judge, Larry Ward, also worked for other Alabama municipal courts where JCS had been hired for the same services.

103.    In furtherance of the understanding and agreement between JCS/CHC/CCS and the Childersburg Municipal Court, Judge Ward consistently placed persons appearing before him on "probation" with JCS/CHC/CCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

104.    In ordering people to JCS "probation" for collection of fines and court costs, Judge Ward consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed.  Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS/CHC/CCS, Judge Ward placed

the named Plaintiffs and class members on probation without further inquiry.

105.   The actions of Judge Ward in furtherance of the conspiratorial understanding and agreement with JCS/CHC/CCS, were done with full understanding and acknowledgment that JCS/CHC/CCS had financial interests in extending the paid supervision of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS/CHC/CCS was formally declared to be indigent as JCS/CHC/CCS agreed to not charge indigent people probation fees.

106.   This conspiratorial agreement and understanding between JCS/CHC/CCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to make any indigency determinations and by JCS/CHC/CCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

107.   This conspiratorial agreement and understanding between JCS/CHC/CCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to appoint counsel to those he ordered to JCS 'probation' and JCS' pre-printed probation order, which Judge Ward pre-signed, including the following language above the offender's signature line. "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

108.    In furtherance of this understanding between JCS/CHC/CCS and the City of Childersburg Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS/CHC/CCS requested a petition to revoke probation.  The warrants issued by the city court, in fact, showed these charges as convictions and were based upon JCS' institution of the

27

petition for revocation. The agreement and understanding between JCS/CHC/CCS and the city municipal court in Childersburg was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant from the City.

109.   In furtherance of this conspiratorial agreement and understanding, after JCS/CHC/CCS petitioned for revocation beginning the process to acquire a warrant, neither JCS/CHC/CCS nor the municipal court took steps to provide counsel for the persons pursued or to inform them of this right and any notice about these proceedings was allowed to be given by JCS/CHC/CCS - not the city court.

110.   The petitions for revocation sought by JCS under its agreement and understanding with Childersburg Municipal Court were all predicated on failure of the individual to pay the fines and fees demanded and which were discharged when such payment was forthcoming and with "probation" itself promptly terminated when the fees, fines and costs were fully paid. These petitions used under this agreement and understanding in turn were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

111.   In furtherance of the conspiratorial agreement and understanding between JCS/CHC/CCS and the city court of Childersburg, JCS was allowed to determine the monthly payments required and to allocate of any such payment between JCS/CHC/CCS or the City without any audit by the City as to the correctness or its accounting before the City complied with the request of JCS for warrants.

112.   This conspiratorial agreement and understanding between JCS/CHC/CCS and the municipal court of Childersburg is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during

which time JCS continued to demand monthly fees.

113.   These concerted efforts between the city court and JCS/CHC/CCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid by the person sent to JCS/CHC/CCS for collection, all while ignoring the requirement of consideration of poverty as required under constitutional law,   *Bearden v. Georgia*, and Alabama law.

## CLASS ACTION ALLEGATIONS

114.   The named Plaintiffs seek to represent two main classes and two subclasses:

**Fees class:** All individuals who, as of August 28, 2010 or thereafter, were assigned by Alabama municipal courts to JCS for the collection of fines, fees and costs, and who paid fees to JCS.

**Childersburg Fees Subclass:** All individuals in the Fees Class who were assigned to JCS probation by the Childersburg Municipal Court.

AND

**Arrest and Jail Class:** All individuals who, as of August 28, 2010 or thereafter, were assigned by Alabama municipal courts to JCS probation and who were arrested and/or incarcerated without an ability-to-pay determination after failing to pay fees, fines, or court costs to JCS.

**Childersburg Arrest and Jail Subclass:** All individuals in the Arrest and Jail class who were assigned to JCS probation by the Childersburg Municipal Court.

115.   The members of the Classes and Subclasses are so numerous that joinder of all members is impracticable.

116.   As of this time, the exact number in the Classes is unknown but would be more than one thousand.

117.   Plaintiffs' treatment by the Defendants is typical of the members of the Classes and subclasses and is ongoing.

118.   Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel who are competent and experienced in class litigation.  Plaintiffs have no interests that are adverse or antagonistic to the Classes.

119.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by many class members may be small, the expense and burden of individual litigation makes it virtually impossible for the class members individually to seek redress for the wrongful conduct alleged.

120.   Common questions of law and fact exist as to all members of the Classes, and predominate over any questions affecting solely members of the Classes. Among the questions of law and fact common to the Classes are:

a.    Whether policy and practice of automatically placing on probation all municipal offenders who cannot immediately pay fines and costs but who are not, or could not be, sentenced to jail is legal;

b.    Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability, to pay is legal;

c.    Whether the policy and practice of requiring every order of the municipal court to require probation fees for JCS/CHC/CCS is legal;

d.    Whether the policy and practice of arresting and incarcerating individuals for failure to pay fines and costs with no finding of willfulness is legal.

e.    Whether the policy and practice of failing to appoint counsel for indigent defendants when a jail sentence is involved is legal;

f.    Whether the policy and practice of failing to make any inquiry into indigency before imposing fines and costs is legal;

g.    Whether the policy and practice of failing to give adequate notice of the charge and nature of a probation revocation hearing, failing to provide a probation revocation hearing, failing to make written findings concerning the reasons for revoking probation and the evidence relied upon, failing to hold a hearing to determine indigency before revoking probation and otherwise imposing incarceration, failing to make written findings concerning an individual's willful nonpayment of fines and costs before imposing incarceration for nonpayment are legal;

h.    Whether JCS/CHC/CCS can raise its monthly probation fee charge to $45 without proper municipal action;

i.    Whether the policy and practice of charging incarcerated municipal defendants a daily fee for each day the person is incarcerated is legal;

j.    Whether the policy and practice of imposing fines and court costs that exceed that statutory maximum for municipal is legal;

      k.     Whether the policy and practice of extending "probation" for municipal offenses beyond 24 months is legal;

      l.     Whether the policy and practice which fails to give any credit for time spent incarcerated is legal;

      m.    Whether a municipality can legally enter a contract binding upon its municipal court.

121.   JCS/CHC/CCS and Alabama municipalities including Childersburg have acted on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

122.   Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action. The data concerning the class members and the transaction details and amounts on each charge is largely computerized by the municipalities and by JCS/CHC/CCS.

123.   The names and addresses of the class members are a matter of public record and are also kept by JCS/CHC/CCS and notice can be provided to the class members via First Class U.S. Mail or other appropriate means as may be directed by the Court.

**COUNT ONE**
**DENIAL OF DUE PROCESS BY JCS/CHC/CCS,**
**BOTH THROUGH ITS OWN INDEPENDENT ACTS**
**AND IN CONSPIRACY WITH MUNICIPAL COURTS**
(on behalf of all Classes and Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

124.   Plaintiffs aver that JCS/CHC/CCS, acting under color of state law in violation of 42 U.S.C. § 1983, denied them, and all class members, their right to due process.

125.   JCS/CHC/CCS operated a for profit enterprise that marketed its services to various municipal and county governments and contracted with over 100 cities and towns throughout Alabama including Childersburg to collect unpaid fines and court costs from people brought before municipal courts in traffic and other misdemeanor cases.   JCS/CHC/CCS' marketing approach to these cities emphasized that its fees would be paid by the "offender" before the municipal court and that its efforts would improve collection of court fines and costs at no cost to the city.

126.   JCS/CHC/CCS routinely used a form contract to establish its relationship with its customer cities and similarly trained its employees using a training manual replete with forms for courts to use during proceedings, and for courts and JCS/CHC/CCS to use to contact the "offenders" from whom they were collecting.   As a result, the JCS/CHC/CCS approach is highly systemized and uniform across municipalities in Alabama.

127.   Under the system established by JCS/CHC/CCS, its employees were not required to have criminal justice or legal training, have any social work education, or meet any minimum law enforcement standards, as is required of state probation officers.   Instead, JCS/CHC/CCS required only that its employees be at least 21 years old, have no felony convictions, have at least two years of college, and complete 40 hours of training by JCS/CHC/CCS on its processes.   Upon satisfying those requirements, JCS/CHC/CCS employees were then labeled "Probation Officers," permitted to carry a JCS issued badge in some municipalities, and collect  fees, court

fines, and costs.

128.   Under this system and by agreement with cities such as Childersburg, many administrative and judicial functions of the municipal court were unlawfully delegated to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

129.   The agreement drafted by JCS and agreed to by mayor of Childersburg stated that the municipal "*court agrees that each court order shall provide* for the following:

a probation fee of $35.00 per month flat fee

One time probationer set up fee of $10.00. . . . " (emphasis added).

JCS used similar contracts with other cities and sometimes set the monthly fee at $45.

130.   JCS/CHC/CCS is, by virtue of its contracts with municipalities such as Childersburg, clothed with the appearance of a state actor and its actions were interwoven with those of the municipalities.  Under JCS's contracts and its operations, JCS/CHC/CCS employees were represented to the Plaintiffs and class members to be "probation officers" acting "on behalf of" the municipalities.  Exhibit M.

131.   In accord with the contract language, the JCS/CHC/CCS system provided "Order of Probation" forms to municipal courts with the printed requirement on each form that the "offender" pay JCS/CHC/CCS $35 per month plus $10 for a file setup charge.  *See* Exhibit A.  The monthly fee of $35 was since the agreement increased to $45 per month for each "offender" at Childersburg. The orders supplied by JCS required the individual to pay JCS/CHC/CCS the fines, costs, and additional monthly fees as required under its contract.

132.   Under the JCS contract, policy, and procedures, municipal courts such as

Childersburg's automatically required "probation" for any person who was unable to immediately pay in full the fine and/or costs when levied by the municipal court. JCS probation is imposed even in cases where the debtor does not receive any jail sentence, was never convicted of a jailable offense, or where probationers were assessed court costs but were not convicted of anything at all.

133.   Some of the named Plaintiffs and class members were each initially placed on "probation" with JCS/CHC/CCS under this practice even though they had not been sentenced to serve any jail time.   Likewise, some named Plaintiffs and class members were put on JCS probation without any court order adjudicating their guilt for any offense, and in some cases based on a blank or unsigned probation order.

134.   That "probation" requirement, under agreement between JCS and the cities , was required to be part of every printed order at the municipal courts such as Childersburg which also required payment of monthly fees to JCS. In fact, JCS' Contract with many cities/cities' court explicitly agreed that JCS, a financially interested party, will provide testimony stating: "the [probation] 'officer' will testify as to the circumstances of the case."[6]

---

[6] The following contracts include this provision: Albertville p. 1 section G, Arab p. 4 section G,  Bay Minette p. 8 Exhibit A ¶6,Brookwood p. 29 section G, Calera p. 33 Exhibit A ¶6, Childersburg p. 37 Exhibit A ¶6, Citronelle p. 41 Exhibit A ¶6, Clanton p. 46 Exhibit A ¶6, Dauphin Island p. 54 Exhibit A ¶6, Dora p. 58 Exhibit A ¶6, East Brewton p. 63 Exhibit A ¶6, Fairhope p. 67 Exhibit A ¶6, Falkville p. 70 Section G, Fort Payne p. 74 Exhibit A ¶6, Haleyville p. 87 Exhibit A ¶6, Hartselle p. 91 Exhibit A ¶6, Hollywood p. 95 Exhibit A ¶6, Homewood p. 99 Section G, Hueytown p. 104 Section G, Jackson p. 108 Exhibit A ¶6, Jacksonville pp. 112, 316 Exhibit A ¶6, Jemison p. 116 Exhibit A ¶6, Kinston p. 125 Exhibit A ¶6, Lake View p. 127 Exhibit A ¶6, Leeds pp. 131, 143 Exhibit A ¶6, Town of Level Plains p. 147 Exhibit A ¶6, Loxely p. 153 Section G, Millbrook p. 157 Exhibit A ¶6, Montevallo p. 161 Exhibit A ¶6, Montgomery p. 165 Exhibit A ¶6, Mount Vernon p. 170 Exhibit A ¶6, Northport p. 177 Exhibit A ¶6, Orange Beach p. 180 Section G, Owens Crossroads p. 183 Section G, Ozark p. 187 Section G, Pleasant Grove p. 192 Exhibit A ¶6, Priceville p. 196 Exhibit A ¶6 (signed by Mayor and City Judge), Rainbow City p. 200 Section G, Rainsville p. 204 Exhibit A ¶6, Robertsdale p. 211 Section G, Saraland p. 215 Exhibit A ¶6, Scottsboro p. 219 Exhibit A ¶6, Somerville p. 226 Section G, Southside p. 229 Section G, Sylacauga p. 235 Exhibit A ¶6 (signed by Mayor and City Judge), Talladega p. 243 Section G, Tallassee p. 247 Exhibit A ¶6, Troy p. 259 Section G, Warrior p. 269 Exhibit A ¶6, Ashford p. 273 Exhibit A ¶6, Attalla p. 276 Section G, Blountsville p. 279 Section G, Bridgeport p. 283 Exhibit A ¶6, Brighton p. 287 Exhibit A ¶6, Dauphin Island pp. 300, 303 Exhibit A ¶6, Notasulga pp. 320, 325 Exhibit A ¶6.

135.   As a result of JCS/CHC/CCS, policy and practice, people who failed to pay fines, fees and costs were subject to arrest, detention, and incarceration.

136.   Incarceration of individuals who could not pay their fines, costs, and added fees, such as the Plaintiffs and class members, was accomplished by JCS/CHC/CCS seeking warrants against them for charges of failure to pay or "failure to obey court order," though there is no such state statute or city ordinance which defines this as a criminal act.

137.   Though a determination of willful refusal to obey a court order as required by Ala. Code § 15-18-62 can lawfully lead to incarceration, no such determinations were made under the JCS/CHC/CCS system and methods.

138.   JCS/CHC/CCS expressly denies that it had any responsibility to inquire or determine why people did not make their payments or whether they were able pay to. Therefore, when an "offender" was unable to pay the fine and additional fees required by JCS/CHC/CCS, JCS/CHC/CCS and the municipalities such as Childersburg cooperated with each other to issue arrest warrants initiated by JCS/CHC/CCS.

139.   All the named Plaintiffs were indigent at the time of the charges levied against them in Childersburg and at the times of their incarcerations.  Each was unable to pay the fines and/or costs and fees demanded by JCS/CHC/CCS due to their indigency and each was incarcerated based on JCS's recommendation.

140.   Under the policy and practice of JCS/CHC/CCS and the municipalities with which they contract, unpaid fines and costs were unlawfully converted to undetermined days in jail for which the "offenders" were sometimes charged by the day for their time in jail and were often given no credit for time spent in jail against the fines levied.

141.    The JCS/CHC/CCS system and its "Probation Tracker" software was used in all of the Alabama cities where JCS/CHC/CCS operated and was highly systemized and focused on collections of fines, costs, and its fees—not traditional probation services.  For example, "offenders" were allowed to mail in payments if they lived 30 miles from the JCS office.  *See* Exhibit B.  In fact, the daily tasks of the JCS/CHC/CCS employees were heavily directed to collecting, counting and depositing the money collected.  *See* Exhibit C.

142.    The training manual used by JCS/CHC/CCS instructed its employees on the use of its computer systems in tracking the payments made by the "offenders" and provided court forms to order probation and payment to JCS/CHC/CCS.  The payments to JCS/CHC/CCS were ordered under these forms even when there was no adjudication of whether the individual was responsible for committing an underlying offense or adjudication is withheld.  *See* Exhibit D.

143.    The JCS/CHC/CCS training system also provided sample letters for use after probation is ordered, threatening the "offender" that "a warrant will be issued for your arrest" and that their "court date cannot and will not be reset."  *See* Exhibits E and F.  Similar JCS/CHC/CCS forms instructed the "offender" that they could avoid the court date if they paid an amount determined by JCS/CHC/CCS.  *See* Exhibit G.

144.    The JCS/CHC/CCS training manual instructed its employees on the issuance of warrants of arrest and provided forms for that purpose.  *See* Exhibit H.  After an arrest warrant was issued, JCS/CHC/CCS also provided forms for warrant dismissal if JCS/CHC/CCS determined that the "offender" was now in compliance.  *See* Exhibit I.  Once a person was arrested, JCS/CHC/CCS monitored those "offenders" placed in jail.  *See* Exhibit J.

145.   The agreement and forms drafted by JCS/CHC/CCS are uniformly used by it.

146.   JCS/CHC/CCS controlled the money collected from debtors, the required payment amounts and schedules, and the location where the money must be paid. Furthermore, it controlled how much of each payment was credited to its own collection "services" each month, and how much of it was forwarded to the towns such as Childersburg toward the underlying fines and/or costs.

147.   Despite the lack of authority to do so, JCS/CHC/CCS, at its discretion, used threats of revoking probation, increased fines and costs, and jail time for purposes of collection.  Under this system, should an individual fail to pay to the satisfaction of JCS/CHC/CCS, JCS/CHC/CCS would determine that the individual's "probation" should be revoked.  Under the system operated jointly by JCS/CHC/CCS and municipal courts such as Childersburg's, JCS/CHC/CCS' recommendation of incarcerating an individual and/or imposing unreasonable bond requirements was routinely accepted without conducting delinquency or probation hearings and without making any findings, much less any determination of ability to pay or appointment of counsel before taking such punitive action.

148.   JCS/CHC/CCS's practices routinely resulted in the charging of court costs, fines and fees which exceeded the jurisdictional maximum of $500 for municipal courts.  Similarly, the periods of "probation" imposed for purposes of collecting fines, costs, and fees for JCS/CHC/CCS routinely exceed the two-year statutory maximum, all of which results in JCS/CHC/CCS and the municipalities taking joint action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

149.   Based on JCS/CHC/CCS' allegation of a "probation violation," warrants

were issued for "failure to obey court order" or failure to pay, and individuals whose original penalty had only been a fine—or even who not found guilty of any offense and was only assessed court costs—ended up being imprisoned.

150.    In this process of converting fines and/or costs to jail time, JCS/CHC/CCS and municipal courts did not give adequate notice of the nature of any lawful charge, failed to conduct hearings, failed to make written findings concerning the reasons for revoking probation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

151.    Under this joint policy and practice of JCS/CHC/CCS and municipal courts, when a simple fine was transformed into a jail sentence of an undetermined time, JCS/CHC/CCS and the courts also failed to provide counsel for the "offenders."

152.    Under the practice and policy of JCS/CHC/CCS, after an adjudication under which a fine is levied, additional fees, costs and other charges are added to the "offender's" bill with JCS/CHC/CCS for each new arrest, alleged probation violation, or contempt proceeding including, in some cases, those relating to charges years earlier.

153.    In some cases, under the practice and policy of JCS/CHC/CCS, even where there has been a deferred adjudication in anticipation of future dismissal, the accused is nonetheless required to pay JCS/CHC/CCS fees.  *See* Exhibit D.

154.    Even in cases where a charge is dismissed as with the Plaintiff Deunate T. Jews discussed above, costs and fees for JCS/CHC/CCS can be levied and collection pursued through threats and repeated incarceration.

155.    JCS/CHC/CCS's policy and practice of imposing onerous fees on debtors who were unable to promptly pay in full municipal fines or costs, and threatening them

with arrest if they failed to make payments, deprived Plaintiffs and the class members of their rights under the Due Process Clause.

156.   JCS/CHC/CCS's policy and practice of seeking the arrest and imprisonment of debtors for failure to pay without any determination that the nonpayment was willful or any other inquiry into indigency or ability to pay likewise deprived Plaintiffs and the class members of their rights under the Due Process Clause.

157.   These Due Process violations were also the result of an agreement or understanding between JCS/CHC/CCS and Alabama municipal courts to impose JCS probation on debtors who were unable to pay municipal fines or costs all at once, implement JCS's terms of probation, and execute JCS's requests to arrest and imprison debtors for nonpayment without any determination that the nonpayment was willful or any other inquiry into indigency or ability to pay. Municipal courts throughout Alabama conspired with JCS to deprive Plaintiffs and the class members of their rights under the Due Process Clause, and JCS conspired with those courts to do the same.

158.   As a proximate consequence of these deprivations of due process, Plaintiffs and Class Members suffered injuries, to their liberty and dignity, such as having fines, costs, and fees far in excess of their initial penalties levied against them, facing the constant threat of arrest for nonpayment even when never convicted of a jailable offense or any offense at all, having fines and/or costs converted to jail sentences, being unlawfully incarcerated for indefinite periods of time, and having their probation extended for longer than the court-imposed 24-month maximum.

**COUNT TWO**
**DENIAL OF DUE PROCESS BY CHILDERSBURG**[7]
(on behalf of Childersburg Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

159.   The Plaintiffs aver that Childersburg, acting under color of state law in violation of 42 U.S.C. § 1983, has denied their right to due process and the rights of the class members.

160.   By contract, Childersburg has delegated many administrative and judicial functions of its municipal court to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

161.   That agreement was signed by the city mayor and bound Childersburg in specific municipal court areas requiring that its municipal "*court agrees that each court order shall provide* for the following:

a probation fee of $35.00 per month flat fee

One time probationer set up fee of $10.00. . . . " (***emphasis added***).

162.   Childersburg, through its mayor and council, approved the agreement with JCS.

163.   Childersburg, through its mayor and council, also approved the employment of Larry Ward as judge of its municipal court.  Ward, a bond salesman at Morgan Keegan, also served as municipal judge for Harpersville and at other cities which have agreed to similar contracts.

164.   Municipalities are prohibited from laws, ordinances and policies which are

---

[7] On February 17, 2017, the Court granted the City of Childersburg's motions for summary judgment and dismissed the City as a party from this action. Doc. 569 at 41. Accordingly, the claims against the City are

*cont'd on next page*

in conflict with state law.  *See Ala Code* Section 11-45-1.  *Also see, Ala. Const.* Article 4 Section 89.

165.    State law also dictates a separation of the branches of government.  *Ala Const.* Article 3, Section 43.[8]  Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, *Ala. Code,* Section 11-43-43, while the mayor of the city is responsible for executive duties.  *Ala. Code,* Section 11-43-83.  If the town establishes a municipal court, its administration is supervised by The Chief Justice of Alabama.  *Ala. Code,* Section 12-2-7 *et. seq.*; *Ala Const.,* Art. 6, Section 139.

166.    Childersburg's mayor has the executive power to execute and enforce contracts[9] and the Childersburg city council has the legislative power to enact regulations and ordinances,[10] but neither the mayor nor the council has the power to invade the administration of its judiciary.

167.    Childersburg exceeded its statutory  authority and acted in conflict with state  statute and constitutional limitations when, acting through its mayor, it agreed with JCS to bind its municipal court to include probation and fees for JCS in every court

kept in the Complaint, exactly as they were when the City was dismissed, only for purposes of a potential appeal of that ruling.

[8] Ala. Const. Art. III, Section 43 states:
In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.

[9] Ala. Code Section 11-43-83 - The mayor shall see that all contracts with the town or city are faithfully kept or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf or performed. He shall execute all deeds and contracts and bonds required in judicial proceedings for and on behalf of the city or town and no sureties shall be required on such bond. He shall perform such other executive duties, in addition to those prescribed in this article, as may be required of him by the council.

[10] Ala. Code Section 11-43-43 - All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance. The council shall perform the duties required by this title and other applicable provisions of law.

order entered by its hired judge. That action essentially sold the court process for purposes of increasing income to the city.

168. The illegal agreement and policy of Childersburg invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

169. Probation is only appropriate when an individual has been sentenced to jail time and not when only a fine has been assessed as is the case with the Plaintiffs and Class members. As a result, the Childersburg policy and contract to include probation in every court order mandates a judicial practice that continually deprives indigent misdemeanants of their constitutional rights.

170. The policy and contract of Childersburg are also in violation of the Alabama Constitution. Article I, Section 20, *Ala. Const.* specifically prohibits imprisonment for the payment of debts, yet the policy enforced at Childersburg regularly jails misdemeanants upon the recommendation of JCS/CHC/CCS for failure to pay fines, fees and costs. Article I, Section 16, *Ala. Const.* requires that all persons shall before conviction be bailable by sufficient surety, but despite this prohibition, misdemeanants are regularly jailed without lawful conviction under any contempt proceedings or probation violation and with no bail being set.

171. Each of the Plaintiffs was imprisoned, and some repeatedly, under these policies of Childersburg for their failure to pay fines, costs and the added fees mandated by the illegal contract between Childersburg and JCS/CHC/CCS. None of the Plaintiffs were accorded any hearing or consideration of their indigency before being jailed nor were any provided notice of charges, a hearing on charges levied that might result in imprisonment, or provided assistance of counsel before being imprisoned.

172.   At the Childersburg Municipal Court operating under the contract and policy adopted by the City, a person unable to fully pay fines and costs when levied was automatically placed on probation. This process used the JCS/CHC/CCS orders and forms even when there was no jail sentence adjudicated. This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs.  The orders supplied by JCS/CHC/CCS under the agreement with Childersburg then require the individual to make payments to JCS/CHC/CCS, rather than the city clerk, of the fines, costs and additional monthly fees.

173.   The Childersburg city clerk actively enforced these requirements as part of the policy and procedures established under this contract and refused to accept payments of fines and costs referring those payers such as the Plaintiffs instead to the JCS offices.

174.   Childersburg, through its contract and operation, clothed JCS/CHC/CCS with the appearance of state authority and has allowed JCS employees to carry badges.  Childersburg, as a matter of its agreement and policy, allowed the JCS/CHC/CCS employees to attend each municipal court session and referred to JCS/CHC/CCS employees as "parole officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.

175.   Under this system implemented by Childersburg, "offenders" were not permitted to pay fines at the city clerk's office, but were instead directed by Childersburg to make all payments including those for fines, restitution, probation fees and court costs to JCS/CHC/CCS at the JCS office at hours and locations set by JCS/CHC/CCS.

176.   The policy adopted and implemented by Childersburg was to comply with

its contract with JCS.

177.    Childersburg allowed JCS/CHC/CCS to control the money collected from persons such as Plaintiffs, and to determine how much each such municipal court "offender" must pay each month.

178.    Childersburg also allowed JCS/CHC/CCS to determine how much of the collected sums would be credited to the collection "services" of JCS/CHC/CCS each month and how much of it would rebate to the towns such as Childersburg toward the municipal court fines adjudged.

179.    This system, as a matter of routine, violates the rights of persons such as the Plaintiffs and the classes they seek to represent by imposing fines and charging fees to indigent persons with no hearing or consideration of their indigency.

180.    Despite the lack of authority to do so, Childersburg permitted JCS/CHC/CCS, at its discretion, to use threats of revoking probation, increased fines and costs and jail time for purposes of collection.

181.    Under this system, should an individual fail to pay to the satisfaction of JCS/CHC/CCS, Childersburg permitted JCS/CHC/CCS to determine that the individual's "probation" should be revoked, or impose additional fines and costs.

182.    Under the system operated at Childersburg, JCS/CHC/CCS' determination to incarcerate an individual and/or impose unreasonable release requirements was routinely accepted by Childersburg personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency or appointment of counsel before taking such punitive action.

183.    Childersburg permitted JCS/CHC/CCS to control and dictate these

functions and, as a consequence, this routinely resulted in court costs and fines which exceed the statutory maximum of $500 for municipal courts and impose additional "jail fees" determined by the city clerk for the costs of any incarceration.  Similarly, the periods of "probation" imposed for purposes of collecting fines and fees at Childersburg routinely exceeded the two-year statutory maximum, all of which resulted in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

184.   The municipal court judge employed by Childersburg contended that under the Childersburg  contract, it was JCS/CHC/CCS that should determine if an "offender" is unable to pay due to indigency and if so, to abate any fees in the probation order and therefore no investigation of indigency was undertaken by Childersburg as a matter of policy.

185.   Under this system implemented at Childersburg, after simple fines were illegally converted to "probation" for payment, jail often resulted for the "offender" who did not meet the payment scheduled set by JCS/CHC/CCS and enforced by Childersburg.   This system used and accepted JCS/CHC/CCS' conclusion of a "probation violation" or "failure to obey court order" and employed JCS/CHC/CCS forms for the issuance of warrants to incarcerate individuals whose original case had only been a fine.

186.   Under this system at Childersburg, each of the Plaintiffs was first only fined, but then automatically placed on "probation" though no jail sentence was adjudicated.   Though each of the Plaintiffs was indigent, Childersburg made no investigation of that matter.  When the Plaintiffs were unable to pay the fines, costs and additional JCS/CHC/CCS fees that Childersburg agreed to levy, recommendations from JCS/CHC/CCS were made and followed by Childersburg to incarcerate each of them

46

for undetermined times.

187.    Incarceration of individuals who cannot pay their fines and added fees, such as the Plaintiffs and class members, was also accomplished by bringing charges against them for "failure to obey court order," though there is no such state statute or city ordinance which defines this as a criminal act.

188.    Though a determination of willful refusal to obey a court order as required by *Ala. Code* §15-18-62 can lawfully lead to incarceration, no such determinations are made under the system at Childersburg.

189.    Childersburg adopted and implemented JCS/CHC/CCS' conclusion of a "probation violation" or "failure to obey court order" and employed JCS/CHC/CCS forms for the issuance of warrants to incarcerate individuals whose original case had only been a fine.

190.    In this process of converting fines to jail time, Childersburg did not give adequate notice to the "offender" of the nature of any lawful charge, it failed to conduct hearings, failed to make written findings concerning the reasons for any probation revocation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

191.    Under this policy and practice at Childersburg when a simple fine was transformed into a jail sentence of an undetermined time, Childersburg also failed to provide counsel for the "offenders."

192.    After jailing an "offender," Childersburg acted to further violate the Plaintiffs' constitutional rights by arbitrarily granting early release to some individuals while denying it to others under similar circumstances without any rational basis based

47

upon the whim of JCS/CHC/CCS and payments it secured.  As a result, there was no consistent standard of review or logical system under which those incarcerated were granted release.

193.   Under the practice and policy used at Childersburg, after an adjudication under which a fine was levied, additional fees, costs, and other charges were added to the "offender" bill for each new arrest, alleged probation violation, or contempt proceeding including, in some cases, those relating to charges years earlier.

194.   In some cases, under the practice and policy adopted and implemented at Childersburg, even where there has been a deferred adjudication, the accused was nonetheless required to pay JCS/CHC/CCS fees.  *See* Exhibit D.

195.   Even in cases where a charge is dismissed as with the Plaintiff Deunate T. Jews, whose specific facts are included above, the costs and fees at Childersburg can be levied and collection pursued through threats and repeated incarceration, all with the knowledge and participation of Childersburg.

196.   As a proximate consequence of this deprivation of due process, the Plaintiffs and class members suffered injuries including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS/CHC/CCS fees, costs and restitution levied all while being indigent.

**COUNT THREE**
**VIOLATION OF THE FOURTH AMENDMENT BY JCS/CHC/CCS,**
**BOTH THROUGH ITS OWN INDEPENDENT ACTS**
**AND IN CONSPIRACY WITH MUNICIPAL COURTS**
(on behalf of Jail and Arrest Class and Childersburg Jail and Arrest Subclass)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

197.    The Plaintiffs aver that JCS/CHC/CCS, acting under color of state law in violation of 42 U.S.C. § 1983, violated their Fourth Amendment rights and the rights of the class members to be free from unreasonable seizure.

198.    In addition to a denial of due process and equal protection guaranteed the Plaintiffs under the Fourteenth Amendment, the arrest and detainment of these "offenders" who could not pay the fines and/or costs imposed under this system constituted a "seizure" in violation of the Fourth Amendment as well.

199.    Under Alabama law, a fine can only be converted into jail time if the court makes findings under Ala. Code § 15-18-62 that a defendant has willfully failed to pay the fines and/or costs.  Even there, the statute provides specifics as to potential jail time.

200.    Under the system created and implemented by JCS/CHC/CCS, there was no hearing to determine whether an "offender" had willfully refused to pay or was unable to pay, nor any consideration of indigency or possible factors preventing payment.

201.    Under the system created and implemented by JCS/CHC/CCS and Alabama municipalities, every  person who was unable to pay a simple fine and costs in full was placed on "probation."  Though their inability to pay the fine provided immediate notice of the "offenders'" financial limitations, the JCS/CHC/CCS system added further

costs and fees each month to these "offenders" who were already unable to pay the fines levied.   This resulted in an increased financial burden on people who were accused of no more than traffic violations or misdemeanors.

202.   Unless prompt payment of its fees and fines and/or costs was made as determined by JCS/CHC/CCS, JCS/CHC/CCS would submit a petition for revocation of probation and seeks an arrest warrant, thus beginning the process of incarcerating an individual who otherwise would never have seen jail under the original adjudication.

203.   When debtors failed to make payments, JCS/CHC/CCS's policy and practice was to submit petitions for revocation of probation alleging that those debtors violated their probation by failing to pay. JCS/CHC/CCS knew arrest warrants would be issued based on these documents it submitted to courts. JCS/CHC/CCS sought those warrants with no inquiry into the debtor's ability to pay, even in cases where JCS/CHC/CCS had actual knowledge that the debtor was unable to pay. Indeed, JCS/CHC/CCS routinely sought arrest warrants for Plaintiffs and class members without probable cause that they had committed the elements of any offense.

204.   Furthermore, as a result of a conspiratorial agreement or understanding between JCS/CHC/CCS and Alabama municipal courts under contract with JCS/CHC/CCS to violate Plaintiffs' constitutional rights, the municipal courts issued arrest warrants for Plaintiffs without probable cause, based on information JCS/CHC/CCS provided and processes JCS/CHC/CCS controlled. Municipal courts under contract with JCS/CHC/CCS throughout Alabama conspired with JCS/CHC/CCS to violate Plaintiffs' Fourth Amendment Rights, and JCS/CHC/CCS conspired with those courts to do the same.

205.   Under Alabama case law, the Alabama Constitution and the U.S.

50

Constitution, an indigent defendant cannot be required to serve jail time for nonpayment of fines and costs.

206.   Despite the longstanding law prohibiting incarceration for one's inability to pay a fine/debt, JCS/CHC/CCS sought arrest warrants for the Plaintiffs and class members when JCS/CHC/CCS knew these Plaintiffs could not pay the fines, costs, and fees JCS/CHC/CCS ordered and regardless of whether they had been initially given any jail time .

207.   Each of the named Plaintiffs was unlawfully arrested and detained under the JCS/CHC/CCS process and conspiracy as described and under the specific facts as stated above all of which constitute unlawful seizures in violation of the Fourth Amendment.

208.   As a proximate consequence of this unlawful seizure, the Plaintiffs and Class Members suffered injuries including having fines and/or costs converted to jail sentences, suffering losses of their liberty and injuries to their dignity as a result of being arrested, and being unlawfully incarcerated for undetermined periods of time.

## COUNT FOUR
## VIOLATION OF THE FOURTH AMENDMENT BY CHILDERSBURG
(on behalf of Childersburg Jail and Arrest Subclass)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

209.   The Plaintiffs aver that Childersburg, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Fourth Amendment rights and the rights of the Class members to be free from unreasonable seizure.

210.   By contract as discussed in detail above, Childersburg has illegally

delegated many administrative and judicial functions of its municipal court to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

211.   In addition to a denial of due process guaranteed the Plaintiffs under the Fourteenth Amendment, the arrest and detainment of these "offenders" who cannot pay the fine imposed under this system constitutes a "seizure" in violation of the Fourth Amendment as well.

212.   Under Alabama law, a simple fine can only be converted into jail time if the court makes findings under *Ala. Code,* Section 15-18-62 (1975) that a defendant has willfully failed to pay the fines.

213.   Childersburg's policy of including probation with JCS/CHC/CCS in every municipal court order created the process by which misdemeanants were incarcerated without a willfulness hearing as required by *Ala. Code,* Section 15-18-62 and in violation of Alabama case law, the Alabama Constitution and the U.S. Constitution.

214.   Under Alabama case law, the Alabama Constitution and the U.S. Constitution, an indigent defendant cannot be required to serve jail time for nonpayment of fines or costs.[11]

---

[11] It is clear as a matter of constitutional law that an indigent defendant cannot be required to serve jail time for nonpayment of fine and costs. *Tate v. Short*, 401 U.S. 395 (1971); *Lingle v. State*, 51 Ala.App. 210, 283 So.2d 660 (1973); Smith v. State 51 Ala.App. 212, 283 So.2d 662 (1973). "To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws." *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir.1977). This is not a case of a defendant who, though capable of paying a fine, refuses or neglects to do so.

Although Section 15-22-52, *Alabama Code* 1975, states that payment of fine and costs may be made a condition of suspension of sentence or probation, in *State v. Esdale*, 253 Ala. 550, 45 So.2d 865 (1950), our Supreme Court indicated that such a condition was contrary to our constitution.

> "These benefits (probation and suspension of sentence) are not the subject of bargain and sale to be conditioned on the payment of costs and fees assessed as an incident to the prosecution and trial and to condition these benefits on the payment of such costs and fees violate the letter and spirit of Section 13 of the Constitution of 1901 which provides that 'justice shall be administered without sale, denial or delay.'" *Esdale*, 253 Ala. at 553.

*cont'd on next page*

215.    Despite longstanding legal precedent prohibiting incarceration for one's inability to pay a fine/debt, Childersburg's policy and personnel working in conjunction with JCS/CHC/CCS unlawfully arrested and jailed Ms. Ray, Mr. Jews, Ms. Fugatt, and Mr. Fugatt for their inability to pay simple fines and the added fees and costs dictated by the Childersburg contract with JCS.

216.    Childersburg police, municipal court processes and jail all became tools of collection under forms and processes issued by JCS/CHC/CCS and which were routinely followed by Childersburg.   Childersburg's policy and practice, after clothing JCS/CHC/CCS with the appearance of a state actor acting on its behalf, allowed JCS/CHC/CCS to threaten arrest or revocation of probation and/or incarceration in order to coerce these indigents to pay Childersburg fines and JCS/CHC/CCS fees for misdemeanor offenses not otherwise subject to jail time under the original adjudication.

217.    When these threats failed to produce sufficiently, Childersburg police, clerks and other personnel cooperated with JCS/CHC/CCS to arrest and jail the Plaintiffs.

218.    Each of the named Plaintiffs was unlawfully jailed by Childersburg under the JCS/CHC/CCS process as described and under the specific facts stated above all of which constitute unlawful seizures in violation of the Fourth Amendment.[12]

219.    As a proximate consequence of this unlawful seizure, the Plaintiffs and Class members suffered injuries including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their

---

*Crutcher v. State,* 439 So. 2d 725; 726 (Ala. Crim. App. 1983).

[12] "Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it.").

liberty and injury to their dignity all while being indigent.

**COUNT FIVE**
**VIOLATION OF THE SIXTH AMENDMENT BY JCS/CHC/CCS,**
**IN CONSPIRACY WITH MUNICIPAL COURTS**
(on behalf of all Classes and Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

220.   The Plaintiffs aver that JCS/CHC/CCS, acting under color of state law in violation of 42 U.S.C. § 1983, violated their Sixth Amendment rights and the rights of the class members.

221.   Under the joint policy and practice of JCS/CHC/CCS and Alabama municipal courts, when a simple fine was transformed into a jail sentence, counsel was not provided for the indigent "offenders."

222.   Some named Plaintiffs and many class members were initially ordered to pay only a fine or costs in municipal court, but due to their inability to pay, each was placed on "probation" under JCS/CHC/CCS pursuant to JCS/CHC/CCS form orders and its contract with the municipality.

223.   JCS/CHC/CCS denies that it had any responsibility to investigate the indigency of the "offenders" and took no action to determine or consider disabilities, employment status or other reasons justifying nonpayment.

224.   In the JCS/CHC/CCS system used in Alabama municipalities, simple fines and/or costs including those without jail sentences were automatically and illegally converted to "probation" if the offender could not promptly pay the entire fine and costs.

225.   After their fines were converted to probation, debtors were threatened with jail and actually imprisoned if the fines, fees, and costs were not paid as scheduled by

JCS/CHC/CCS.

226.   For Plaintiffs and class members who were not convicted of any underlying offense, or who were convicted of an offense that is punishable by a fine only, there would have been no risk of jail time  would but for the JCS/CHC/CCS collection system illegally requiring "probation" for simple fines and costs.

227.   Because debtors on probation were often wholly unable to pay, JCS frequently submitted petitions for revocation of probation charging debtors with "probation violations."  Arrest warrants would then be issued for "failure to obey court order," failure to appear, or failure to pay, all  without any inquiry into debtors' ability to pay.

228.   Each of the named Plaintiffs while indigent was unlawfully jailed under this JCS/CHC/CCS system at Childersburg and without any assistance of counsel

229.   Plaintiffs and class members did not have the benefit of counsel—and did not knowingly, intelligently, and voluntarily waive counsel—during crucial legal proceedings, including when they were first sentenced to JCS probation (and were first saddled with the risk of being jailed for failure to comply with its terms); when petitions for revocation of probation were submitted; or when they were in fact jailed. Furthermore, no ability-to-pay determinations were made for them, and they were not informed that counsel would be provided for them if they were indigent. These failures to provide counsel violated their Sixth Amendment rights.

230.   These Sixth Amendment deprivations are the result of a conspiratorial agreement or understanding between JCS and Alabama municipal courts under contract with JCS to deny debtors their right to counsel, as evidenced by the uniformity of the denials across multiple jurisdictions where JCS was active, as well as preprinted

JCS forms stating, with respect to each probationer, that the probationer had already waived the right to counsel.

231.   As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiffs and Class Members suffered injuries, including having fines and/or costs converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines and costs in excess of statutory limits levied against them and by having other illegal charges for JCS/CHC/CCS fees, costs and restitution levied all while being indigent.

**COUNT SIX**
**VIOLATION OF THE SIXTH AMENDMENT BY CHILDERSBURG**
(on behalf of Childersburg Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

232.   The Plaintiffs aver that Childersburg, acting under color of state law in violation of 42 U.S.C. § 1983, has violated their Sixth Amendment rights and the rights of the Class members.

233.   By contract as discussed in detail above, Childersburg has illegally delegated many administrative and judicial functions of its municipal court to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

234.   Under this joint policy and practice of JCS/CHC/CCS at Childersburg, when a simple fine was transformed into a jail sentence of an undetermined time, counsel was not provided for the indigent "offenders."

235.   Each of the named Plaintiffs was initially ordered to pay only a fine at the Childersburg municipal court, but due to their inability to pay, each was placed on

"probation" under JCS/CHC/CCS pursuant to JCS/CHC/CCS form orders and the contract approved by Childersburg.

236.   The contract signed by Childersburg approved a "probation" process as essentially a collection vehicle for the city to collect its fines. That agreement, as discussed above, conflicts with state statutes, violates state constitutional requirements for separation of power in the branches of government and exceeds the authority of the mayor and council.

237.   Under that agreement, Childersburg allowed JCS/CHC/CCS to add monthly fees to the "offender" who has already disclosed an inability to pay the fine when adjudicated, even though JCS/CHC/CCS provides no services to them.

238.   Under the agreement and with the knowledge and approval of Childersburg, JCS/CHC/CCS represented itself as acting on behalf of the City which clothes it with that appearance.  *See* Exhibit M.

239.   Under this agreement, Childersburg has unlawfully invaded the province of the municipal court and mandated that each order there contain provisions for fees to JCS/CHC/CCS.

240.   By its agreement, at Childersburg, simple fines without jail sentences were automatically and illegally converted to probation under the JCS/CHC/CCS system used at Childersburg if the offender could not promptly pay the entire fine and costs.

241.   After this conversion from a fine to probation, threats of jail were used by JCS/CHC/CCS with the approval of Childersburg and actual incarceration then took place by police and other City personnel at Childersburg if the fines, fees and costs were not paid as scheduled by JCS/CHC/CCS.

242.   The jeopardy of jail time was not present when the simple fines were

adjudicated against the Plaintiffs and would not have been present but for the Childersburg agreement to adopt and use the JCS/CHC/CCS collection system in the administration of its court system illegally requiring "probation" for simple fines.

243.   With the Plaintiffs' inability to pay and the JCS/CHC/CCS focus on collections, charges were routinely initiated claiming "probation violation" or "failure to obey court order."  These were initiated by JCS/CHC/CCS under its system and then approved by Childersburg personnel.

244.   At that point, jail sentences become potential jeopardy for the "offenders" such as the Plaintiffs on charges that have never before been subjected to meaningful adversarial testing.   Nevertheless, neither JCS/CHC/CCS nor Childersburg provide counsel for those "offenders."

245.   At the point when jail sentences become potential, Childersburg presented charges of alleged "probation violation," but did not provide notice of charges, nor were findings made as required for conviction.   Similarly, though JCS/CHC/CCS also regularly proposed a charge of "failure to obey court order" which Childersburg then pursued, that is not a valid charge.  If willful failure to pay under state statutes such as *Ala. Code* Section 15-18-62 is used as the basis, under the Childersburg system with JCS/CHC/CCS, there is no finding or hearing on the issue of willfulness.

246.   Each of the named Plaintiffs while indigent was unlawfully jailed by Childersburg under this JCS/CHC/CCS system and none were provided any assistance of counsel in the process leading to their incarceration.

247.   These actions constitute a denial of the Plaintiffs' rights secured by the Sixth Amendment.

248.    As a proximate consequence of this violation of their Sixth Amendment rights, the Plaintiffs and Class members suffered injuries including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS/CHC/CCS fees, costs and restitution levied all while being indigent.

**COUNT SEVEN**
**VIOLATION OF THE EIGHTH AMENDMENT BY JCS/CHC/CCS,**
**BOTH THROUGH ITS OWN INDEPENDENT ACTS**
**AND IN CONSPIRACY WITH MUNICIPAL COURTS**
(on behalf of all Classes and Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

249.    Plaintiffs aver that JCS/CHC/CCS, acting under color of state law in violation of 42 U.S.C. § 1983, violated the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment in its actions with the Plaintiffs and Class Members.

250.    The Eighth Amendment prohibits excessive fines and cruel and unusual punishment. As such, it limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime, and imposes substantive limits on what can be made criminal and punished as such.

251.    Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500.00, Ala. Code § 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period.  *See* Ala. Code § 15-22-54(a).

252.    As mentioned above, § 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

253.    Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500.00 shall result in no more than 20 days.  *See* Ala. Code § 15-18-62(2).

254.    Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution, and the failure to pay under a variety of circumstances, none of which were followed by JCS/CHC/CCS.

255.    Under these facts, after substantial fines were levied against indigent persons such as the Plaintiffs, JCS/CHC/CCS, operating under an illegal contract with Childersburg and other municipalities, then increased that burden with additional monthly fees and costs charged by JCS/CHC/CCS.  For the named Plaintiffs, the total amounts demanded by JCS/CHC/CCS exceeded the $500 limitation on the municipal court authority.

256.    Under the system JCS/CHC/CCS implemented in Alabama municipal courts, though JCS/CHC/CCS made no inquiry into "offenders'" ability to pay or the reason for their failure to make payments, JCS/CHC/CCS increased the amount demanded from the Plaintiffs to the point that even partial payments could not be made.

For example, Timothy Fugatt was assessed court costs of $148 and paid over $450, and JCS continued to demand money from him even after he had paid until the court costs he owed the city.  These charges were is excessive, disproportionate to the violation, and violated the excessive fines clause of the Eighth Amendment.

Similarly, Deunate Jews was assessed court costs of $166 for a dismissed

charge and paid over $800.  These charges were excessive and violated the excessive

fines clause of the Eighth Amendment.

257.   The Named Plaintiffs were all indigent, and their failure to pay

JCS/CHC/CCS as demanded resulted in threats of arrests on charges of "failure to

obey a court order," failure to appear, or failure to pay, and ultimately incarceration

based upon JCS/CHC/CCS' recommendation that the offender had "violated

"probation."

258.   The fines, costs, and fees levied against Plaintiffs and Members of the

Fees Class and Childersburg Fees Subclass exceeded the statutory limits of the court

and the incarceration periods imposed for the failure to pay exceeded those in Ala.

Code §15-18-62.

259.   JCS/CHC/CCS also failed to give credit to jailed Plaintiffs and class

members for the time they served as required under statute at the rate of $15 per day

against the fine.

260.   JCS/CHC/CCS's practice and policy of instituting charges resulting in jail

time for inability to pay its fees, fines, and costs violates the Eight Amendment

prohibition against excessive fines and cruel and unusual punishment.

261.   Each of the named Plaintiffs was, at all pertinent times, indigent and each

was incarcerated at the behest of JCS/CHC/CCS for their inability to pay fines, fees,

and costs on the schedule determined by JCS/CHC/CCS, though all had initially only

received fines and/or costs by the Childersburg Municipal Court.

262.   Furthermore, Plaintiffs' Eighth Amendment rights were violated as a result

of a conspiratorial agreement or understanding reached between JCS/CHC/CCS and

the municipal courts under contract with JCS to violate the constitutional rights of

Plaintiffs. This understanding is shown by placing debtors on JCS/CHC/CCS probation solely because they could not pay municipal fines and/or costs, implementing JCS/CHC/CCS's terms of probation, and executing JCS/CHC/CCS's requests to arrest and imprison debtors. Municipal courts throughout Alabama conspired with JCS/CHC/CCS to violate debtors' rights to be free of excessive fines and cruel and unusual punishment under the Eighth Amendment, and JCS conspired with those courts to do the same.

263.   As a result of the violation of the Eighth Amendment, each of the Plaintiffs and Members of the Fees Class and Childersburg Fees Subclass was subjected to excessive fines, fees, and costs in violation of the prohibition against excessive fines.

264.   As a proximate consequence of this violation of their Eighth Amendment rights, the Plaintiffs and class members suffered injuries including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS/CHC/CCS fees, costs and restitution levied all while being indigent.

**COUNT EIGHT**
**VIOLATION OF THE EIGHTH AMENDMENT BY CHILDERSBURG**
(on behalf of Childersburg Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

265.   The Plaintiffs aver that Childersburg, acting under color of state law in violation of 42 U.S.C. § 1983, has violated the Eighth Amendment prohibition against excessive fines and cruel and unusual punishment in its actions with the Plaintiffs and Class members.

266.   By contract as discussed in detail above, Childersburg has illegally delegated many administrative and judicial functions of its municipal court to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

267.   The Eighth Amendment prohibits cruel and unusual punishment and, as such, limits the kinds of punishment that can be imposed on those convicted of crimes, proscribes punishment grossly disproportionate to the severity of the crime and imposes substantive limits on what can be made criminal and punished as such.

268.   Under Alabama law, a municipal court has no authority to award a fine on any particular charge over $500.00, *Ala. Code §* 13A-5-12(a)(3), and even lawful probation for misdemeanors cannot, by statute, extend beyond a two-year period.  *See Ala. Code §* 15-22-54(a).

269.   As mentioned above, *Ala. Code,* § 15-18-62 is the only statutory method under which a fine levied by a court on adjudication can be converted to imprisonment, but that can legally occur **only** where the court finds willful nonpayment of the fine and cost.

270.   Even upon proper notice and a finding of willful nonpayment under § 15-18-62, the conversion of fine to imprisonment has a specific ratio such that a fine not to exceed $500.00 shall result in no more than 20 days.  *See  Ala. Code* § 15-18-62(2).

271.   Rule 26.11 of the Alabama Rules of Criminal Procedure provides the method for dealing with fines, restitution and the failure to pay under a variety of circumstances, none of which were followed by JCS/CHC/CCS nor required by Childersburg.

272.   Under these facts, Childersburg illegally contracted with JCS to add

monthly fees and costs to each municipal court order.  This agreement increased the substantial fines levied against indigent persons such as the Plaintiffs.

273.   Neither Childersburg nor JCS/CHC/CCS made inquiry into the indigency of the "offenders" in the system.   As a result, only the Plaintiffs' failure to make payments as dictated by JCS/CHC/CCS under the agreement with Childersburg resulted in threats of arrests.  If threats failed to produce the demanded payments, arrest and incarceration followed under process at Childersburg based upon JCS/CHC/CCS' recommendation that the offender had "failed to obey a court order" or had violated "probation."

274.   These fines exceeded the statutory limits of the municipal court and the incarceration periods imposed for the failure to pay exceeded those in *Ala. Code* §15-18-62.

275.   Once in jail, Childersburg failed to give credit to the jailed Plaintiffs for the time they served as required under statute at the rate of $15 per day against the fine.

276.   The practice and policy at Childersburg of imposing jail time for inability to pay its fees, fines and costs violates the Eight Amendment prohibition against excessive fines and cruel and unusual punishment.

277.   Each of the named Plaintiffs was at all pertinent times indigent and each was incarcerated by Childersburg personnel at the behest of JCS/CHC/CCS for their inability to pay fines, fees and costs on the schedule determined by JCS/CHC/CCS.

278.   As a result of the violation of the Eighth Amendment, each of the Plaintiffs was subjected to excessive fines, fees, and costs beyond the jurisdictional limits of the municipality and violation of the prohibition against excessive fines and cruel and unusual punishment.

279.   As a proximate consequence of this violation of their Eighth Amendment rights, the Plaintiffs suffered injuries including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS/CHC/CCS fees, costs and restitution levied all while being indigent.

**COUNT NINE**
**DENIAL OF EQUAL PROTECTION BY JCS/CHC/CCS,**
**BOTH THROUGH ITS OWN INDEPENDENT ACTS**
**AND IN CONSPIRACY WITH MUNICIPAL COURTS**
(on behalf of all Classes and Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

280.   JCS/CHC/CCS and Alabama municipal courts have acted jointly under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiffs' and class members' rights to equal protection secured by the Fourteenth Amendment.

281.   As referenced above, by agreement, JCS/CHC/CCS employees attended municipal court sessions, collected city fines and costs, were labeled as "probation officers," some carried badges, and regularly represented themselves as acting "on behalf of" the municipalities. Additionally, the JCS/CHC/CCS forms were used at the municipal court and fees for JCS/CHC/CCS were included in every city court order referring debtors to JCS. In the system established by an illegal agreement between JCS/CHC/CCS and Alabama cities such as Childersburg, the actions of JCS/CHC/CCS are inextricably intertwined with those of the government.

282.   The practice and policy under this agreement requires "probation" for any person who, regardless of jail time, is financially unable to fully pay the fine and costs

when levied by the municipal court. That probation requirement is part of the agreement between JCS and Alabama cities like Childersburg, and required payment of monthly fees to JCS/CHC/CCS.

283. Persons who were financially able to fully pay the levied fine and costs in Alabama municipal courts were not placed on "probation." As a result, those persons were not charged any fees for JCS/CHC/CCS and are not subjected to threats of arrest and incarceration in the collection process.

284. Once on "probation" for purposes of paying fines and costs, this policy and practice implemented by JCS and municipal courts routinely imposed incarceration and additional costs on individuals who were unable to pay fines and costs, without any determination of willfulness as lawfully required under Alabama statutes. See *Ala Code,* Section 15-18-62.

285. This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate basis.

286. This inequality of treatment is also beyond the authority of the municipal courts which are required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. *See* Ala. Code § 12-14-8. JCS/CHC/CCS policy is not in accord with the procedures established by the Alabama Administrative Office of Courts because it imposes fees only on "offenders" cannot pay immediately and creates its own rules for penalizing individuals who cannot pay as directed.

287. These additional JCS/CHC/CCS fees result in disparate treatment of those who can immediately pay compared to those cannot. Furthermore, those

"offenders" within jurisdictions that contract with JCS/CHC/CCS are processed and fined differently than "offenders" in jurisdictions that do not contract with JCS/CHC/CCS.

288.   Each of the Plaintiffs was required to pay the additional costs and fees under this disparate system and each of the named Plaintiffs was unlawfully jailed for their inability to pay as demanded.

289.   JCS's policy and practice of imposing onerous fees on debtors who were unable to pay municipal fines or costs all at once, and threatening them with arrest if they failed to make payments, while imposing none of these harsh conditions on debtors with sufficient resources to pay their court fines or costs right away deprived Plaintiffs and the class members of their rights under the Equal Protection Clause.

290.   JCS's policy and practice of seeking the arrest and imprisonment of Plaintiffs and the class members for failure to pay without any determination that the nonpayment was willful, any other inquiry into indigency or their ability to pay, likewise deprived Plaintiffs and the class members of their rights under the Equal Protection Clause.

291.   Furthermore, Plaintiffs and the class members were deprived of Equal Protection as a result of a conspiratorial agreement or understanding between JCS and Alabama municipal courts to deprive Plaintiffs of their constitutional rights. This is shown by placing debtors on JCS probation solely because they could not pay municipal fines and/or costs, implementing JCS's terms of probation, and executing JCS's requests to arrest and imprison debtors without an ability-to-pay determination. Municipal courts throughout Alabama conspired with JCS to deprive Plaintiffs and the class members of their rights under the Equal Protection Clause, and JCS conspired

with those courts to do the same.

292.   As a proximate consequence of this denial of the right to Equal Protection under the Fourteenth Amendment, Plaintiffs and class members suffered injuries to their liberty and dignity, such as having fines, costs, and fees far in excess of their initial penalties levied against them, facing the constant threat of arrest for nonpayment even when never convicted of a jailable offense or any offense at all, having fines and costs converted to jail sentences, and being unlawfully incarcerated.

**COUNT TEN**
**DENIAL OF EQUAL PROTECTION BY CHILDERSBURG**
(on behalf of Childersburg Subclasses)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

293.   JCS/CHC/CCS and Childersburg have acted jointly under color of state law in violation of 42 U.S.C. § 1983 to deny the Plaintiffs' and Class members' rights to equal protection secured by the Fourteenth Amendment.

294.   This was accomplished by the illegal contractual agreement between JCS/CHC/CCS and Childersburg whereby their actions are inextricably intertwined in a practice and policy which automatically requires "probation" for any person who, despite having no jail sentence, is financially unable to fully pay the fine and costs when levied by the municipal court.  That probation requirement is part of the agreement between JCS/CHC/CCS and Childersburg and was part of every printed order at the municipal court and required payment of monthly fees to JCS/CHC/CCS.

295.   Persons who were financially able to fully pay the levied fine and costs at Childersburg were not placed on "probation."  As a result, those persons were not charged any fees for JCS/CHC/CCS and were not subjected to threats of arrest and

incarceration in the collection process.

296.   For those such as the Plaintiffs who were unable to fully pay the fine and costs when levied by the municipal court, "probation" with JCS/CHC/CCS was required on every order.

297.   This requirement is part of the City contract with JCS/CHC/CCS.  That contract, as mentioned above, exceeds the statutory and constitutional authority of municipalities and imposes on the municipal court an agreement in violation of the separation of powers doctrine between the branches of government.

298.   Once on "probation" for purposes of paying a fines and costs, this policy and practice at Childersburg routinely imposed incarceration and additional costs on individuals who were unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes.   See *Ala Code* Section 15-18-62.

299.   This disparate treatment based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

300.   This inequality of treatment is also beyond the authority of the municipal court which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.   *See Ala. Code* Section 12-14-8.  The JCS/CHC/CCS policy at Childersburg was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately and created its own "rules" for penalizing individuals who could not pay as directed.

301.   These additional JCS/CHC/CCS fines resulted in disparate treatment

between those who could immediately pay the fine from those who were unable to immediately pay the fine. Furthermore, those "offenders" within the Childersburg/ JCS/CHC/CCS arrangement were processed and fined differently than "offenders" in jurisdictions that have not allowed JCS/CHC/CCS to charge additional fees to those who cannot pay.  There is no state authority for such disparate treatment.

302.   Each of the Plaintiffs was required to pay the additional costs and fees under this disparate system and each of the named Plaintiffs was unlawfully jailed for their inability to pay as demanded.

303.   As a proximate consequence of this denial of the right to Equal Protection under the Fourteenth Amendment, the Plaintiffs and Class members suffered injuries, including having fines converted to jail sentences, being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, by having fines in excess of statutory limits levied against them and by having other illegal charges for JCS/CHC/CCS fees, costs and restitution levied all while being indigent.

**COUNT ELEVEN**
**DECLARATORY RELIEF: THE CONTRACT BETWEEN JCS**
**AND THE CITY OF CHILDERSBURG IS VOID**
(on behalf of all Childersburg Subclasses against
JCS/CHC/CCS and the City of Childersburg)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

304.   A real controversy exists between these parties the validity of the JCS contract with Childersburg and the legality of the actions taken under that contract such that declaratory relief is appropriate. Plaintiffs seek declaratory relief voiding the contract between JCS and the City of Childersburg as contrary to the U.S. Constitution, Alabama Constitution, and Alabama law.

305.    First, Plaintiffs request the Court to declare that the JCS contract with Childersburg was void *ab initio* because the agreement exceeded the statutory and constitutional limitations on municipalities Childersburg had no authority to contractually bind its municipal court.

306.    The agreement between JCS and Childersburg violated the separation of powers doctrine embodied in the Alabama Constitution.  *See* ALA. CONST*.,* Art. III, § 43. As a result, that agreement is void and due to be declared a nullity.

307.    Alabama state law also dictates a separation of the branches of government.   Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, Ala. Code § 11-43-43, while the mayor of the city is responsible for executive duties.   Ala. Code § 11-43-83.   If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama. Ala. Code § 12-2-7 *et. seq.*; ALA. CONST*.,* Art. VI, § 139.

308.    Municipalities are prohibited from adopting laws, ordinances and policies that conflict with state law.  Ala. Code § 11-45-1.  *See also* ALA. CONST. Art. IV § 89.

309.    Childersburg's mayor has the executive power to execute and enforce contracts and the Childersburg city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

310.    Childersburg exceeded its statutory  authority and acted in conflict with state  statute and constitutional limitations when, acting through its mayor, it agreed with JCS to bind its municipal court to include probation and fees for JCS in every court order entered by its hired judge.   That action essentially sold the court process for purposes of increasing income to the city.

311.   The illegal agreement and policy of Childersburg invades and overrides the judicial authority and court administration reserved to the municipal judge and The Chief Justice.

312.   Second, the contract between JCS and Childersburg violated the uniformity requirements of Alabama law.

313.   Alabama Code § 12-14-8 requires uniformity in processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  But under the JCS contract, people who could not immediately pay a fine or court costs were charged fees, while those who could immediately pay were not. Also, "offenders" within the Childersburg/JCS/CHC/CCS arrangement were processed and fined differently than "offenders" in municipal jurisdictions that did not contract with JCS. This violates the uniformity requirements of Alabama Code § 12-14-8.

314.   The JCS-Childersburg contract also violates the procedures established by the Alabama Administrative Office of Courts by imposing fees only on "offenders" who cannot pay immediately and creating other "rules" for further penalizing individuals who cannot pay as directed.  "Offenders" who are able to immediately pay are charged one rate, but those who are unable to immediately and required to pay monthly fees to JCS/CHC/CCS.

315.   Third, the contracts between JCS and Alabama cities, including Childersburg, granted an exclusive franchise for provision of private "probation" services. The contract was not competitively bid, as required by ALA. CONST. Art. I, § 22 and Ala. Code § 41-16-50. Because the contract was not bid, it is void and unenforceable.

**COUNT TWELVE**
**DECLARATORY AND INJUNCTIVE RELIEF**[13]
(on behalf of all Classes and Subclasses
against JCS/CHC/CCS and the City of Childersburg)

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

316.   A real controversy exists between these parties concerning several issues such that declaratory relief is appropriate.

317.   Plaintiffs also request the Court to declare the actions of JCS/CHC/CCS and Childersburg under this contract to be unconstitutional under the premises discussed above.   Under this void agreement, JCS/CHC/CCS and Childersburg have implemented joint policies and practices to prosecute persons such as the Plaintiffs where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to coerce payment of fines and costs from indigent people. These efforts have resulted in the illegal prosecution and incarceration of Plaintiffs and their Class beyond the limited jurisdiction of the municipal courts.

318.   Further, JCS/CHC/CCS and Childersburg have added increased punishment, fines and costs after adjudication and even where there has been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.

319.   JCS/CHC/CCS and Childersburg, through their joint action, have systematically applied *Ala. Code* § 15-18-62 in an unconstitutional fashion denying the Plaintiffs and the Class they seek to represent constitutionally protected rights.

320.   Section 15-18-62 provides for the imprisonment for the failure to pay fines

---

[13] On September 12, 2017, the Court dismissed Plaintiffs' claims for declaratory and injunctive relief without prejudice as moot, subject to repleading if JCS reenters business in Alabama.  Doc. 626 at 34. Accordingly, the declaratory and injunctive relief claims in this Count have been kept in the Complaint only for purposes of a potential appeal of that ruling or for future repleading.

and costs in limited circumstances and only upon the finding of a willful nonpayment.[14]

321.   Under JCS/CHC/CCS and Childersburg policies and practices, and through their joint and consistent action, "offenders" before the Childersburg Municipal Court such as the Plaintiffs and the Class they seek to represent are systematically imprisoned for nonpayment with no determination of willfulness and with no consideration of their indigency or ability to pay.

322.   Furthermore, once imprisoned, the requirements of time to be served under § 15-18-62 are ignored by the practice and policy of JCS/CHC/CCS and Childersburg.

323.   The result of this consistent systematic policy and practice of JCS/CHC/CCS and Childersburg is essentially a debtor's prison for fines and charges levied by JCS/CHC/CCS under a void contract with the various municipalities for which it works.

324.   Plaintiffs request the Court to enjoin the actions of JCS/CHC/CCS and Childersburg identified herein to prevent the continuation of these violations of statutory and constitutional prohibitions.

## PRAYER FOR RELIEF

Wherefore**,** Plaintiffs respectfully pray that the Court will assume

---

[14] **Section 15-18-62.** Imprisonment for failure to pay fines and costs.

In cases of willful nonpayment of the fine and costs, the defendant shall either be imprisoned in the county jail or, at the discretion of the court, sentenced to hard labor for the county as follows:

(1) If the fine and costs do not exceed two hundred fifty dollars ($250), no more than 10 days;

(2) If the fine and costs exceed two hundred fifty dollars ($250) but do not exceed five hundred dollars ($500), no more than 20 days;

(3) If the fine and costs exceed five hundred dollars ($500), but do not exceed one thousand dollars ($1,000), no more than 30 days; and

(4) For every additional one hundred dollars ($100) or fractional part thereof, 4 days.

jurisdiction of this cause and upon the final hearing:

a.   Certify this matter as a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

b.   Declare the Defendants' conduct described in the above counts are unconstitutional;

c.   Declare that the contract between JCS and the City of Childersburg is void;

d.   Award the Plaintiffs such damages as this Court shall find the Plaintiffs have sustained, together with punitive, or exemplary damages as the law shall permit;

e.   Enter an injunction and other declaratory relief which declares the JCS contract with municipalities such as Childersburg to be void and in violation of the statutory and constitutional limitations on municipalities;

f.   Enter an injunction and other declaratory relief which enjoins JCS/CHC/CCS and Childersburg from engaging in the violations of law set forth hereinabove;

g.   Enter an injunction and other declaratory relief which prohibits JCS/CHC/CCS and Childersburg in the future from placing persons on probation for simple fines and declares that any current probation and fees for simple fines is void;

h.   Enter an injunction and other declaratory relief which prohibits JCS/CHC/CCS and Childersburg in the future from assessing fines in excess of $500 and extending probation periods beyond 24 months and declare that any previously assessed fines and probationary periods in

excess of these limits to be void;

i. Enter an injunction and other declaratory relief which prohibits JCS/CHC/CCS and Childersburg in the future from imprisoning indigent persons for failure to pay fines and fees and ordering the release of any currently incarcerated indigent persons who were jailed for these reasons;

j. Award to the Plaintiffs and class members damages under 42 U.S.C. § 1983;

k. Award Plaintiffs and the class members restitution equal to any amounts paid on fines and all fees levied by JCS/CHC/CCS and Childersburg that are found unconstitutional and/or unlawful (along with interest), and the annulment of any remaining unpaid fines that are found unconstitutional and/or unlawful;

l. Award to the Plaintiffs and Class the cost of this matter, including a reasonable attorneys' fee;

m. Award to the Plaintiffs and the class members such other, further and more general relief as the Court may deem appropriate under these circumstances including cost of these proceedings.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the classes, request trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED,


s/ G. Daniel Evans
G. Daniel Evans
ASB-1661-N76G

Alexandria Parrish
ASB-2477-D66P
D. Patrick Evans
ASB-3209-R67G
Maurine C. Evans
ASB-4168-P16T
Attorneys for the Plaintiffs
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
Telephone: (205) 870-1970
Fax: (205) 870-7763
E-Mail: gdevans@evanslawpc.com
E-Mail: ap@evanslawpc.com
E-Mail: dpevans@evanslawpc.com
E-Mail: mevans@evanslawpc.com

Erwin Chemerinsky
Berkeley Law, University of California
215 Boalt Hall
Berkeley, CA 94720
E-Mail: echemerinsky@berkeley.edu

Leslie A. Bailey
Brian Hardingham
Public Justice
555 12th Street, Suite 1230 Oakland,
CA 94607
E-Mail: bailey@publicjustice.net
E-Mail: bhardingham@publicjustice.net

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13th day of February, 2018, I electronically filed the foregoing Plaintiffs' Fifth Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Will Hill Tankersley, Esquire
Gregory C. Cook, Esquire
L. Conrad Anderson, IV, Esquire
Ginny Willcox Leavens, Esquire
Ed R. Haden, Esquire
Chase T. Espy, Esquire
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203

Timothy P. Donahue, Esquire

DONAHUE & ASSOCIATES, LLC
1020 22nd Street South
Birmingham, Alabama 35205

Michael L. Jackson, Esquire
Larry S. Logsdon, Esquire
Wesley K. Winborn, Esquire
WALLACE, JORDAN, RATLIFF & BRANDT, L.L.C.
P.O. Box 530910
Birmingham, Alabama 35253

F. Lane Finch, Jr., Esquire
Brian Richardson, Esquire
Swift Currie McGhee and Hiers, LLP
2 North 20th Street, Suite 1405
Birmingham, AL 35203

Wilson F. Green, Esquire
Fleenor & Green LLP
1657 McFarland Blvd. N., Ste. G2A
Tuscaloosa, Alabama 35406

s/ G. Daniel Evans
G. Daniel Evans

John H. Merrill
Secretary of State

P. O. Box 5616
Montgomery, AL 36103-5616

EXHIBIT 2

# STATE OF ALABAMA

**I, John H. Merrill, Secretary of State of Alabama, having custody of the Great and Principal Seal of said State, do hereby certify that**

as appears on file and of record in this office, the pages hereto attached, contain a true, accurate, and literal copy of the Articles of Formation filed on behalf of CHC Companies, Inc., as received and filed in the Office of the Secretary of State on 10/18/2012.



20160106000019154

In Testimony Whereof, I have hereunto set my hand and affixed the Great Seal of the State, at the Capitol, in the city of Montgomery, on this day.

01/06/2016

Date

John H. Merrill          Secretary of State

**STATE OF ALABAMA**

**FOREIGN CORPORATION (BUSINESS OR NON-PROFIT) APPLICATION FOR REGISTRATION**

**PURPOSE:** In order to register a foreign entity (any entity formed outside of Alabama) to transact business in Alabama, the entity must deliver to the Secretary of State for filing a Application for Registration along with articles of incorporation or formation duly certified by the official having custody of corporate records in the jurisdiction where the entity was formed pursuant to Section 10A-1-7.04, Code of Alabama 1975.

**INSTRUCTIONS:** Mail or fax two (2) signed originals of this completed Application for Registration, the documentation referred to in items 3 and 11 below, and the filing fee of $150.00 (credit card, check, or money order) to the Secretary of State, Business Services, P.O. Box 5616, Montgomery, Alabama, 36103-5616 or fax to 334-240-3138. The entity will not be registered if the credit card does not authorize and will be removed from the index if the check is dishonored.

```
Alabama
Sec. Of State

New Entity  F/C
048-676  10/18/2012
Date  17:00
Time  52 Pg
121023

File     $150.00
Ackn       $.00
Exp     $100.00

Total  $250.00
02/013
```

(For SOS Office Use Only)

---

**This form must be typed or laser printed.**

⊙ Business/For-Profit Corporation        ◯ Non-Profit Corporation

1. The legal name of the foreign entity as recorded in the jurisdiction in which it was formed/incorporated:

   CHC Companies, Inc.

2. The name of the foreign entity for use in Alabama, if the legal name above is not available in Alabama or the name does not comply with Article 5 of Title 10A. The name must contain the word "corporation" or "incorporated" or an abbreviation of one of the words and satisfy the requirements of 10A-1-7.07:

3. A copy of the name registration letter from the Office of the Alabama Secretary of State is attached.

4. Entity's jurisdiction of formation: __Delaware__

5. Date of the entity's formation in state/country of jurisdiction: __06__ / __26__ / __2006__ (MM/DD/YYYY)

6. The undersigned certifies that the foreign entity exists as a valid entity of the type stated above under the laws of the entity's jurisdiction of formation.

7. The date the foreign entity began or will begin transacting business in Alabama: __12__ / __01__ / __2012__
   (MM/DD/YYYY)

8. Street (No PO Boxes) Address of principal office: 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111

   Mailing Address (if different) _____

---

Foreign Corporation Registration - 2/2011                          Page 1 of 2

**FOREIGN CORPORATION  (BUSINESS OR NON-PROFIT)**
**APPLICATION FOR REGISTRATION**

9.  Name of registered agent for service of process (**MUST** be physically located in Alabama): ___C T Corporation System___

_____

10. Street (**No PO Boxes**) Address of initial registered office (**MUST** be physically located in Alabama):_____

2 North Jackson Street, Suite 605, Montgomery, AL 36104

_____

Mailing Address in Alabama (if different)_____

_____

11. A copy of the foreign entity's articles or certificate of  incorporation or association, or other certificate of formation
    and all amendments thereto duly certified by the Secretary of State or other official having custody of corporate
    records in the state or other jurisdiction under whose law the entity is incorporated is attached.

10 / 18 / 2012
_____                              Shelton Frey, Secretary
Date                                            _____
                                                Typed or Printed Name and Title of Signature Below


                                                S. H
                                                _____
                                                Signature of Person Authorized to Sign per 10A-1-4.01, _Alabama Code_


In order to review the sections of the _Code of Alabama 1975_ referred to in this filing form you may access
www.sos.alabama.gov and click the Government Records tab.  Choose the Code of Alabama link to review.

```
Total  02/013                Alabama
02/013  Exp  Ackn  File  New Entity  Date  Time  Sec. Of State
             Exp  Ackn  File  048-676  10/18/2012  121023
$250.00  $100.00  $0.00  $150.00  52 Pm  17:00  F/C
```

Foreign Corporation Registration - 2/2011                                Page 2 of 2

AL015 - 02/25/2011 C T System Online

Beth Chapman
Secretary of State

P. O. Box 5616
Montgomery, AL 36103-5616

# STATE OF ALABAMA

**I, Beth Chapman, Secretary of State of Alabama, having custody of the Great and Principal Seal of said State, do hereby certify that**

pursuant to the provisions of Title 10A, Chapter 1, Article 5, *Code of Alabama 1975*, and upon an examination of the entity records on file in this office, the following entity name is registered as available:

**CHC Companies, Inc.**

This foreign business corporation was formed in Delaware as CHC Companies, Inc. and is for the exclusive use of CHC Companies, Inc., 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111 for a period of one year beginning October 18, 2012 and expiring October 18, 2013.

**In Testimony Whereof, I have hereunto set my hand and affixed the Great Seal of the State, at the Capitol, in the city of Montgomery, on this day.**



10/18/2012
**Date**

*Beth Chapman*

143-216

**Beth Chapman**               **Secretary of State**

# Delaware

**PAGE 1**

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "CHC COMPANIES, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-SIXTH DAY OF JUNE, A.D. 2006, AT 5:21 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE TWENTY-SIXTH DAY OF MARCH, A.D. 2007, AT 12:38 O'CLOCK P.M.

RESTATED CERTIFICATE, FILED THE EIGHTH DAY OF JUNE, A.D. 2010, AT 2:54 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE SEVENTEENTH DAY OF DECEMBER, A.D. 2010, AT 3:15 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "CORRECTIONAL HEALTHCARE COMPANIES, INC." TO "CHC COMPANIES, INC.", FILED THE ELEVENTH DAY OF JULY, A.D. 2011, AT 4:30 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, FILED THE THIRTIETH DAY OF SEPTEMBER, A.D. 2011, AT 8:35 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID

4181381  8100H

121142700

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

**AUTHENTICATION: 9926159**

**DATE: 10-18-12**

# Delaware

**PAGE 2**

## The First State

CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

AFORESAID CORPORATION, "CHC COMPANIES, INC.".

```
Alabama
Sec. Of State
New Entity
048-676        F/C
Date 10/18/2012
Time        17:00
121023        52 Pg
File          $150.00
Ackn          $ .00
Exp           $100.00
Total         ---------
02/013        $250.00

4181381   8100H

121142700
```

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

**AUTHENTICATION: 9926159**

**DATE: 10-18-12**

FROM CORPORATION TRUST WILM. TEAM #2          (THU) 6.29' 06 10:54/ST. 10:53/NO. 4863796289 P. 2

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:15 PM 06/26/2006
FILED 05:21 PM 06/26/2006
SRV 060613178 - 4181381 FILE

## CERTIFICATE OF INCORPORATION OF

## CORRECTIONAL HEALTHCARE COMPANIES, INC.

### ARTICLE I

The name of the Corporation is Correctional Healthcare Companies, Inc.

### ARTICLE II

The purpose of this corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

### ARTICLE III

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE IV

The total number of shares of stock that the corporation shall have authority to issue is 14,000,000, consisting of 10,000,000 shares of Common Stock, $0.001 par value per share, and 4,000,000 shares of Preferred Stock, $0.001 par value per share. The first Series of Preferred Stock shall be designated "Series A Preferred Stock" and shall consist of 4,000,000 shares.

### ARTICLE V

The terms and provisions of the Common Stock and Preferred Stock are as follows:

1.     Definitions.  For purposes of this ARTICLE V, the following definitions shall apply:

        (a)     "Affiliate Transaction" shall mean any transaction that it is reasonably likely would be required to be disclosed pursuant to Item 404(a) of Regulation S-K promulgated under the Securities Act and the Exchange Act (or any successor rule thereto, and as 404(a) is amended from time to time), assuming the Corporation were at such time subject to the periodic reporting obligations of Section 13 or Section 15(d) of the Exchange Act (even if the Corporation is not in fact at such time subject to such requirements), but excluding any compensation arrangements approved by the Corporation's Board of Directors, including at least one Preferred Director (as defined in Section 5(d)).

        (b)     "Conversion Price" shall mean $1.00 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

        (c)     "Convertible Securities" shall mean any evidences of indebtedness, shares or other securities convertible into or exchangeable for Common Stock.

1

(d)      "Corporation" shall mean Correctional Healthcare Companies, Inc.

(e)      "Distribution" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of shares of the Corporation for cash or property other than: (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) repurchase of capital stock of the Corporation in connection with the settlement of disputes with any stockholder, or (iv) any other repurchase or redemption of capital stock of the Corporation approved by the holders of the Common and Preferred Stock of the Corporation voting as separate classes.

(f)      "Dividend Rate" shall mean an annual rate of $0.06 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(g)      "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

(h)      "Liquidation Preference" shall mean $1.00 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(i)      "Options" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(j)      "Original Issue Date" shall mean the date that the first share of Series A Preferred Stock is issued.

(k)      "Original Issue Price" shall mean $1.00 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(l)      "Preferred Stock" shall mean the Series A Preferred Stock.

(m)      "Preferred Director" shall have the meaning set forth in Section 5 of Article V.

(n)      "Recapitalization" shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

(o)      "Securities Act" shall mean the Securities Act of 1933, as amended.

2.   Dividends.

(a)   Preferred Stock.  From and after the date of the issuance of any shares of Preferred Stock, dividends at the Dividend Rate shall accrue on such shares of Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares) (the "Accruing Dividends").  Accruing Dividends shall accrue from day to day, whether or not declared, and shall be cumulative.  The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Corporation unless (in addition to the obtaining of any consents required elsewhere in this Certificate) the holders of the Preferred Stock then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Preferred Stock in an amount at least equal to the amount of the aggregate Accruing Dividends then accrued on such share of Preferred Stock and not previously paid.

(b)   Non-Cash Distributions.  Whenever a Distribution provided for in this Section 2 shall be payable in property other than cash, the value of such Distribution shall be deemed to be the fair market value of such property as determined in good faith by the Board of Directors.

3.   Liquidation Rights.

(a)   Liquidation Preference.  In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of the Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Common Stock by reason of their ownership of such stock, an amount per share for each share of Preferred Stock held by them equal to the greater of (i) the Liquidation Preference specified for such share of Preferred Stock plus any Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had each share of Preferred Stock been converted into Common Stock pursuant to Section 4 immediately prior to such liquidation, dissolution or winding up of the Corporation.  If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this Section 3(a), then the entire assets of the Corporation legally available for distribution shall be distributed with equal priority and pro rata among the holders of the Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this Section 3(a). For purposes of this Section 3, a liquidation, dissolution or winding up of the Corporation shall be deemed to be occasioned by, or to include, (a) the acquisition of the Corporation by another entity, person or group of affiliated entities or persons by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving entity), as a result of shares in the Corporation held by such holders prior to such transaction, at least fifty percent (50%) of the total voting power of such surviving entity

3

outstanding immediately after such transaction or series of transactions, and (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation, of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to one or more of the Corporation or any wholly owned subsidiary of the Corporation (a "Deemed Liquidation").

      (b)    Remaining Assets. After the payment to the holders of Preferred Stock of the full preferential amounts specified above, the entire remaining assets of the Corporation legally available for distribution by the Corporation shall be distributed with equal priority and pro rata among the holders of the Common Stock in proportion to the number of shares of Common Stock held by them.

      (c)    Valuation of Non-Cash Consideration. If any assets of the Corporation distributed to stockholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board of Directors, except that any publicly-traded securities to be distributed to stockholders in a liquidation, dissolution, or winding up of the Corporation shall be valued as follows:

      (i)    If the securities are then traded on a national securities exchange or the Nasdaq Stock Market (or a similar national quotation system), then the value of the securities shall be deemed to be the average of the closing prices of the securities on such exchange or system over the ten (10) trading day period ending five (5) trading days prior to the Distribution;

      (ii)    if the securities are actively traded over-the-counter, then the value of the securities shall be deemed to be the average of the closing bid prices of the securities over the ten (10) trading day period ending five (5) trading days prior to the Distribution.

      In the event of a merger or other acquisition of the Corporation by another entity, the Distribution date shall be deemed to be the date such transaction closes.

For the purposes of this Section 3(c), "trading day" shall mean any day which the exchange or system on which the securities to be distributed are traded is open and "closing prices" or "closing bid prices" shall be deemed to be: (i) for securities traded primarily on the New York Stock Exchange, the American Stock Exchange or Nasdaq, the last reported trade price or sale price, as the case may be, at 4:00 p.m., New York time, on that day and (ii) for securities listed or traded on other exchanges, markets and systems, the market price as of the end of the regular hours trading period that is generally accepted as such for such exchange, market or system. If, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a stock as of a given trading day shall change from those set forth above, the fair market value shall be determined as of such other generally accepted benchmark times.

4

(d)     In the event the requirements of this Section 3 are not complied with, the Corporation shall forthwith either:

(i)     cause such closing to be postponed until such time as the requirements of this Section 3 have been complied with; or

(ii)    cancel such transaction, in which event the rights, preferences and privileges of the holders of the Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section 4(i) hereof related to such transaction.

4.      Conversion.  The holders of the Preferred Stock shall have conversion rights as follows:

(a)     Right to Convert.  Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into that number of fully-paid, nonassessable shares of Common Stock determined by dividing the Original Issue Price for the relevant series by the Conversion Price for such series.  (The number of shares of Common Stock into which each share of Preferred Stock of a series may be converted is hereinafter referred to as the "Conversion Rate" for each such series.)  Upon any decrease or increase in the Conversion Price for any series of Preferred Stock, as described in this Section 4, the Conversion Rate for such series shall be appropriately increased or decreased.

(b)     Mechanics of Conversion.  No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Common Stock as determined by the Board of Directors. For such purpose, all shares of Preferred Stock held by each holder of Preferred Stock shall be aggregated, and any resulting fractional share of Common Stock shall be paid in cash.  Before any holder of Preferred Stock shall be entitled to convert the same into full shares of Common Stock, and to receive certificates therefor, he shall either (A) surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Preferred Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement reasonably satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to convert the same.  The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock, plus any declared and unpaid dividends (but not any Accruing Dividends) on the converted Preferred Stock.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted (or on such later date requested by such holder or such earlier date agreed to by such holder and the Corporation), and the person or persons entitled to receive the shares of Common Stock issuable upon such

conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; provided, however, that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Preferred Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Common Stock issuable upon such conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(c)     Adjustments to Conversion Price for Diluting Issues.

(i)     Special Definition. For purposes of this Section 4(c), "Additional Shares of Common" shall mean all shares of Common Stock issued (or, pursuant to Section 4(c)(iii), deemed to be issued) by the Corporation after the Original Issue Date, other than issuances or deemed issuances of:

(1)     shares of Common Stock and options, warrants or other rights to purchase Common Stock issued to employees, officers or directors of the Corporation or any subsidiary pursuant to restricted stock purchase agreements, stock option plans or similar arrangements;

(2)     shares of Common Stock issued upon the exercise or conversion of Options or Convertible Securities described in Section 4(c)(i)(1); or

(3)     shares of Common Stock issued or issuable as a Distribution on Preferred Stock or pursuant to any event for which adjustment is made pursuant to Section 4(e), 4(f) or 4(g) hereof.

(ii)     No Adjustment of Conversion Price. No adjustment in the Conversion Price of a particular series of Preferred Stock shall be made in respect of the issuance of Additional Shares of Common unless the consideration per share (as determined pursuant to Section 4(c)(v)) for an Additional Share of Common issued or deemed to be issued by the Corporation is less than the Conversion Price in effect on the date of, and immediately prior to such issuance or deemed issuance, for such series of Preferred Stock.

(iii)     Deemed Issue of Additional Shares of Common. In the event the Corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities, the conversion or exchange of such Convertible Securities or, in the case of Options for Convertible Securities, the exercise of such Options and the conversion or exchange of the underlying securities, shall be deemed to have been issued as of the time of such issue or, in case such a record date shall have been fixed,

6

016155.00010:963158.09

as of the close of business on such record date, provided that in any such case in which shares are deemed to be issued:

(1) if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Corporation or in the number of shares of Common Stock issuable upon the exercise, conversion or exchange thereof (other than a change pursuant to the anti-dilution provisions of such Options or Convertible Securities such as this Section 4(c) or pursuant to Recapitalization provisions of such Options or Convertible Securities such as Sections 4(d), 4(e) and 4(f) hereof), the Conversion Price of each series of Preferred Stock and any subsequent adjustments based thereon shall be recomputed to reflect such change as if such change had been in effect as of the original issue thereof (or upon the occurrence of the record date with respect thereto);

(2) upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price of each Series of Preferred Stock computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon such expiration, be recomputed as if:

(a) in the case of Convertible Securities or Options for Common Stock, the only Additional Shares of Common issued were the shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the Corporation for the issue of such exercised Options plus the consideration actually received by the Corporation upon such exercise or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Corporation upon such conversion or exchange, and

(b) in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the Corporation for the Additional Shares of Common deemed to have been then issued was the consideration actually received by the Corporation for the issue of such exercised Options, plus the consideration deemed to have been received by the Corporation (determined pursuant to Section 4(c)(v)) upon the issue of the Convertible Securities with respect to which such Options were actually exercised;

(3) in the event of any change (by amendment or otherwise, other than a change identified in Section 4(c)(iii)(1) or a change pursuant to anti-dilution provisions of such as this Section 4(c) or pursuant to Recapitalization provisions of such Options or Convertible Securities such as Sections 4(d), 6(e) and 6(f) hereof) in the number of shares of Common Stock deliverable or in the consideration payable to the Corporation upon the exercise of such Options or upon the conversion of or in exchange for such Convertible Securities, the applicable Conversion Price of each such series of Preferred Stock (to the extent said applicable Conversion Price is in any way affected by or computed using such Options or Convertible Securities), shall be recomputed to reflect such change; and

7

(4)     if such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefor, the adjustment previously made in the Conversion Price which became effective on such record date shall be canceled as of the close of business on such record date, and thereafter the Conversion Price shall be adjusted pursuant to this Section 4(c)(iii) as of the actual date of their issuance.

(iv)     Adjustment of Conversion Price Upon Issuance of Additional Shares of Common. In the event this Corporation shall issue Additional Shares of Common (including Additional Shares of Common deemed to be issued pursuant to Section 4(c)(iii)) without consideration or for a consideration per share less than the applicable Conversion Price of a series of Preferred Stock in effect on the date of and immediately prior to such issuance or deemed issuance, then, the Conversion Price of the affected series of Preferred Stock shall be reduced to equal the per share consideration received by the Corporation for the issuance of such Additional Shares of Common.

(v)     Determination of Consideration. For purposes of this Section 4(c), the value of any non-cash consideration received by the Corporation for the issue (or deemed issuance) of any Additional Shares of Common shall be the fair market value thereof at the time of such issuance or deemed issuance, as determined in good faith by the Board of Directors.

(d)     Adjustments for Subdivisions or Combinations of Common Stock. In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, the Conversion Price of each series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, the Conversion Prices in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(e)     Adjustments for Subdivisions or Combinations of Preferred Stock. In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(f)     Adjustments for Reclassification, Exchange and Substitution. Subject to Section 3 above ("Liquidation Rights"), if the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the

8

number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Preferred Stock shall have the right thereafter to convert such shares of Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such series of Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(g)   Certificate as to Adjustments.  The Corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a certificate setting forth (i) all adjustments and readjustments to the Conversion Price that have occurred since the Original Issue Date, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

(h)   Waiver of Adjustment of Conversion Price.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of any series of Preferred Stock may be waived by the consent or vote of the holders of the majority of the outstanding shares of such series either before or after the issuance causing the adjustment.

(i)   Notices of Record Date.  In the event that this Corporation shall propose at any time:

(i)   to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(ii)   to effect any reclassification or Recapitalization of its Common Stock; or

(iii)   to voluntarily liquidate, dissolve, wind up or to enter into any Deemed Liquidation;

then, in connection with each such event, this Corporation shall send to the holders of the Preferred Stock at least 10 days' prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (ii) and (iii) above.

Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed.

The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the vote or written consent of the holders of a majority of the Preferred Stock.

9

016155.00010.963158.09

      (j)    Reservation of Stock Issuable Upon Conversion. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

5.    Voting.

      (a)    Restricted Class Voting. Except as otherwise expressly provided herein or as required by law, the holders of Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

      (b)    No Series Voting. Other than as provided herein or required by law, there shall be no series voting.

      (c)    Preferred Stock. Each holder of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which the shares of Preferred Stock held by such holder could be converted as of the record date. The holders of shares of the Preferred Stock shall be entitled to vote on all matters on which the Common Stock shall be entitled to vote. Holders of Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation. Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted), shall be disregarded.

      (d)    Approval of Certain Actions. As long as shares of Preferred Stock shall be issued and outstanding, the Corporation shall not (either directly or indirectly through merger, consolidation or otherwise), without first obtaining the approval (by vote or written consent as provided by law) of the holders of more than 50% of the outstanding shares of the Preferred Stock:

      (i)    amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Corporation, or take any other action, if such action would adversely affect the rights, preferences, privileges or powers of, or restrictions provided for the benefit of the Preferred Stock or any series thereof;

      (ii)    increase or decrease (other than for decreases resulting from conversion of the Preferred Stock) the authorized number of shares of Preferred Stock or any series thereof;

      (iii)    authorize, create or issue any new class or series of shares having rights, preferences or privileges with respect to redemption, dividends, or payments upon liquidation senior to or on a parity with any series of Preferred Stock or having voting rights other than those granted to the Preferred Stock generally;

016155.00010:963158.09

(iv)   enter into any transaction or series of related transactions deemed to be a liquidation, dissolution or winding up of the Corporation pursuant to Section 3(a) above;

(v)   authorize a merger, acquisition or sale of substantially all of the assets of the Corporation or any of its subsidiaries (other than a merger exclusively to effect a change of domicile of the Corporation);

(vi)   voluntarily liquidate or dissolve;

(vii)   increase the size of the Board of Directors;

(viii)   declare or pay any Distribution with respect to the Preferred Stock other than as set forth in Section 6 hereof or the Common Stock of the Corporation; or

(ix)   increase the number of shares authorized for issuance under any existing stock or option plan or create any new stock or option plan;

(x)   enter into or permit any subsidiary to enter into any Affiliate Transaction, or amend or alter any existing agreement that constitutes an Affiliate Transaction;

(xi)   reclassify any class or series of shares into Preferred Stock;

(xii)   change the Corporation's auditor;

(xiii)   at any time cause or permit the Corporation's debt to exceed one-half of the Corporation's earnings before interest, taxes, depreciation, and amortization for the twelve-month trailing period (calculated in accordance with generally accepted accounting principles);

(xiv)   make capital expenditures in excess of $50,000 in any one transaction or series of related transactions; or

(xv)   effect a public offering of any of its equity securities.

(e)   **Election of Directors.**   Prior to the effectiveness of that certain Voting Agreement, dated on or around the Original Issue Date, by and among Enhanced Equity Fund, L.P., a Delaware limited partnership, Andrew M. Paul, David Y. Howe, Malcolm T. Kostuchenko, Jon Kaiden, Blair Tikker and the holders of the Corporation's Common Stock (as amended from time to time in accordance with its terms, the "Voting Agreement"), the Board of Directors shall consist of two members who initially shall be Cristina Capoot and Chris Capoot. Following effectiveness of the Voting Agreement, the Board of Directors shall consist of four members unless otherwise required by the Voting Agreement.   Pursuant to the Voting Agreement (until the applicable provisions thereof are amended or terminated, and subject to any waivers consistent with the terms thereof):

(1)   The holders of Preferred Stock, voting as a separate class, shall be entitled to elect two members of the Corporation's Board of Directors (each, a "Preferred Director") at each meeting or pursuant to each consent of the Corporation's

stockholders for the election of directors (subject to increase in accordance with the terms of the Voting Agreement); and

(2)     The holders of Common Stock, voting as a separate class, shall be entitled to elect two (or three if required by the Voting Agreement) members of the Corporation's Board of Directors at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors; and

(f)     Adjustment in Authorized Common Stock.  The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding) by an affirmative vote of the holders of a majority of the stock of the Corporation.

(g)     Common Stock.  Each holder of shares of Common Stock shall be entitled to one vote for each share thereof held.

6.     Redemption.

(a)     At any time after the fifth anniversary of the Original Issue Date, the holders of at least a majority of the then outstanding shares of Preferred Stock may cause, by delivery of written notice (a "Redemption Notice") the Corporation to redeem, out of funds legally available therefor, all (but not less than all) outstanding shares of Preferred Stock which have not been converted into Common Stock pursuant to Section 4 hereof.  The Redemption Notice shall specify the date upon which such redemption will occur ("Redemption Date") which date must be no less than forty-five (45) days following the date of the Redemption Notice.  The Corporation shall redeem the shares of Preferred Stock by paying in cash an amount per share equal to the Original Issue Price for such Preferred Stock, plus an amount equal to all Accruing Dividends accrued but unpaid thereon, whether or not declared, together with all other dividends declared but unpaid thereon (the "Redemption Price").  If the funds legally available for redemption of the Preferred Stock shall be insufficient to permit the payment to such holders of the full respective Redemption Price Stock, the Corporation shall effect such redemption pro rata among the holders of the Preferred Stock so that each holder of Preferred Stock shall receive a redemption payment equal to a fraction of the aggregate amount available for redemption, the numerator of which is the number of shares of Preferred Stock held by such holder with each number multiplied by the Redemption Price of each share of Preferred Stock held by such holder, and the denominator of which is the number of shares of Preferred Stock outstanding multiplied by the Redemption Price of each such outstanding share of Preferred Stock.

(b)     Any redemption effected pursuant to Section 6(a) shall be made on a pro rata basis among the holders of the Preferred Stock in proportion to the shares of Preferred Stock then held by them.

7.     Reissuance of Preferred Stock.  In the event that any shares of Preferred Stock shall be converted pursuant to Section 4, redeemed pursuant to Section 6, or otherwise repurchased by the Corporation, the shares so converted, redeemed or repurchased shall be cancelled and shall not be issuable by this Corporation.

12

8.    Notices.  Any notice required by the provisions of this ARTICLE V to be given to the holders of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

## ARTICLE VI

The Corporation is to have perpetual existence.

## ARTICLE VII

Elections of directors need not be by written ballot unless a stockholder demands election by written ballot at the meeting and before voting begins or unless the Bylaws of the Corporation shall so provide.

## ARTICLE VIII

Except as otherwise set forth herein, the number of directors which constitute the Board of Directors of the Corporation shall be designated in the Bylaws of the Corporation.

## ARTICLE IX

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to make, alter, amend or repeal the Bylaws of the Corporation.

## ARTICLE X

1.    To the fullest extent permitted by the Delaware General Corporation Law as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director.

2.    The Corporation may indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director, officer or employee of the Corporation or any predecessor of the Corporation or serves or served at any other enterprise as a director, officer or employee at the request of the Corporation or any predecessor to the Corporation.

3.    Neither any amendment nor repeal of this ARTICLE X, nor the adoption of any provision of this Corporation's Certificate of Incorporation inconsistent with this ARTICLE X, shall eliminate or reduce the effect of this ARTICLE X, in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this ARTICLE X, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

13

## ARTICLE XI

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside of the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

/s/ Jody Ellis

Jody Ellis, Incorporator
555 17ᵗʰ Street
Suite 3200
Denver, CO. 80202

Alabama
Sec. Of State
New Entity        F/C
048-676
Date 10/18/2012
Time      17:00
121023      52 Pg
File          $150.00
Ackn          $.00
Exp          $100.00
          ----------
Total      $250.00
02/013

14

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:39 PM 03/26/2007*
*FILED 12:38 PM 03/26/2007*
*SRV 070358826 - 4181381 FILE*

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF

## CORRECTIONAL HEALTHCARE COMPANIES, INC.

Douglas D. Goetz, under the provisions and subject to the requirements of the laws of the State of Delaware, hereby certifies that:

**ONE:** The name of this corporation is Correctional Healthcare Companies, Inc., and the date of filing of the original Certificate of Incorporation of this corporation with the Secretary of State of the State of Delaware was June 26, 2006.

**TWO:** He is the duly elected and acting Chief Executive Officer of Correctional Healthcare Companies, Inc., a Delaware corporation.

**THREE:** The Certificate of Incorporation of this corporation is hereby amended and restated to read as follows:

### ARTICLE I

The name of the Corporation is Correctional Healthcare Companies, Inc.

### ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

### ARTICLE III

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE IV

The total number of shares of stock that the Corporation shall have authority to issue is 50,000,000, consisting of 34,000,000 shares of Common Stock, $0.001 par value per share, and 16,000,000 shares of Preferred Stock, $0.001 par value per share. The first Series of Preferred Stock shall be designated *"Series A Preferred Stock"* and shall consist of 16,000,000 shares.

### ARTICLE V

The terms and provisions of the Common Stock and Preferred Stock are as follows:

1. *Definitions.* For purposes of this ARTICLE V, the following definitions shall apply:

(a) *"Affiliate Transaction"* shall mean any transaction that it is reasonably likely would be required to be disclosed pursuant to Item 404(a) of Regulation S-K promulgated under the Securities Act and the Exchange Act (or any successor rule thereto, and as 404(a) is

amended from time to time), assuming the Corporation were at such time subject to the periodic reporting obligations of Section 13 or Section 15(d) of the Exchange Act (even if the Corporation is not in fact at such time subject to such requirements), but excluding any compensation arrangements approved by the Corporation's Board of Directors, including at least one Preferred Director (as defined in **Section 5(d)**).

(b)      "*Conversion Price*" shall mean $1.00 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

(c)      "*Corporation*" shall mean Correctional Healthcare Companies, Inc.

(d)      "*Deemed Liquidation*" shall have the meaning set forth in **Section 3(a)** of Article V.

(e)      "*Distribution*" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of shares of the Corporation for cash or property other than: (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) repurchase of capital stock of the Corporation in connection with the settlement of disputes with any stockholder, or (iv) any other repurchase or redemption of capital stock of the Corporation approved by the holders of the Common and Preferred Stock of the Corporation voting as separate classes.

(f)      "*Dividend Rate*" shall mean an annual rate of $0.06 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(g)      "*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended.

(h)      "*Liquidation Preference*" shall mean $1.00 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(i)      "*Original Issue Date*" shall mean June 30, 2006.

(j)      "*Original Issue Price*" shall mean $1.00 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(k)      "*Preferred Stock*" shall mean the Series A Preferred Stock.

   (l)  "*Preferred Director*" shall have the meaning set forth in **Section 5** of **Article V**.

   (m)  "*Recapitalization*" shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

   (n)  "*Securities Act*" shall mean the Securities Act of 1933, as amended.

  2.  *Dividends.*

   (a)  <u>Preferred Stock</u>. From and after the date of the issuance of any shares of Preferred Stock, dividends at the Dividend Rate shall accrue on such shares of Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares) (the "*Accruing Dividends*"). Accruing Dividends shall accrue from day to day, whether or not declared, and shall be cumulative. The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Corporation unless (in addition to the obtaining of any consents required elsewhere in this Certificate) the holders of the Preferred Stock then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Preferred Stock in an amount at least equal to the amount of the aggregate Accruing Dividends then accrued on such share of Preferred Stock and not previously paid. Except as set forth in **Section 4(b)**, no Accruing Dividends shall be paid on any Preferred Stock unless and until the occurrence of a Deemed Liquidation (as defined below), at which time all Accruing Dividends shall be paid in cash.

   (b)  <u>Non-Cash Distributions</u>. Whenever a Distribution provided for in this **Section 2** shall be payable in property other than cash, the value of such Distribution shall be deemed to be the fair market value of such property as determined in good faith by the Board of Directors.

  3.  *Liquidation Rights.*

   (a)  <u>Liquidation Preference</u>. In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of the Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Common Stock by reason of their ownership of such stock, an amount per share for each share of Preferred Stock held by them equal to the greater of (i) the Liquidation Preference specified for such share of Preferred Stock plus any Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had each share of Preferred Stock been converted into Common Stock pursuant to **Section 4** immediately prior to such liquidation, dissolution or winding up of the Corporation. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this **Section 3(a)**, then the entire assets of the Corporation legally available for distribution shall be distributed with equal priority and pro rata among the holders of the Preferred Stock in proportion to the full amounts they would otherwise

be entitled to receive pursuant to this **Section 3(a)**. For purposes of this **Section 3**, a liquidation, dissolution or winding up of the Corporation shall be deemed to be occasioned by, or to include, (a) the acquisition of the Corporation by another entity, person or group of affiliated entities or persons by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving entity), as a result of shares in the Corporation held by such holders prior to such transaction, at least fifty percent (50%) of the total voting power of such surviving entity outstanding immediately after such transaction or series of transactions, and (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation, of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to one or more of the Corporation or any wholly owned subsidiary of the Corporation (a *"Deemed Liquidation"*).

(b)     Remaining Assets.  After the payment to the holders of Preferred Stock of the full preferential amounts specified above, the entire remaining assets of the Corporation legally available for distribution by the Corporation shall be distributed with equal priority and pro rata among the holders of the Common Stock in proportion to the number of shares of Common Stock held by them.

(c)     Valuation of Non-Cash Consideration.  If any assets of the Corporation distributed to stockholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board of Directors, except that any publicly-traded securities to be distributed to stockholders in a liquidation, dissolution, or winding up of the Corporation shall be valued as follows:

(i)     If the securities are then traded on a national securities exchange or the Nasdaq Stock Market (or a similar national quotation system), then the value of the securities shall be deemed to be the average of the closing prices of the securities on such exchange or system over the ten (10) trading day period ending five (5) trading days prior to the Distribution;

(ii)     if the securities are actively traded over-the-counter, then the value of the securities shall be deemed to be the average of the closing bid prices of the securities over the ten (10) trading day period ending five (5) trading days prior to the Distribution.

In the event of a merger or other acquisition of the Corporation by another entity, the Distribution date shall be deemed to be the date such transaction closes.

For the purposes of this **Section 3(c)**, *"trading day"* shall mean any day which the exchange or system on which the securities to be distributed are traded is open and *"closing prices"* or

4

"*closing bid prices*" shall be deemed to be: (i) for securities traded primarily on the New York Stock Exchange, the American Stock Exchange or Nasdaq, the last reported trade price or sale price, as the case may be, at 4:00 p.m., New York time, on that day and (ii) for securities listed or traded on other exchanges, markets and systems, the market price as of the end of the regular hours trading period that is generally accepted as such for such exchange, market or system. If, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a stock as of a given trading day shall change from those set forth above, the fair market value shall be determined as of such other generally accepted benchmark times.

(d)      In the event the requirements of this **Section 3** are not complied with, the Corporation shall forthwith either:

(i)      cause such closing to be postponed until such time as the requirements of this **Section 3** have been complied with; or

(ii)      cancel such transaction, in which event the rights, preferences and privileges of the holders of the Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in **Section 4(h)** hereof related to such transaction.

4.      *Conversion.*   The holders of the Preferred Stock shall have conversion rights as follows:

(a)      Right to Convert.   Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into that number of fully-paid, nonassessable shares of Common Stock determined by dividing the Original Issue Price for the relevant series by the Conversion Price for such series.  (The number of shares of Common Stock into which each share of Preferred Stock of a series may be converted is hereinafter referred to as the "*Conversion Rate*" for each such series.)  Upon any decrease or increase in the Conversion Price for any series of Preferred Stock, as described in this **Section 4**, the Conversion Rate for such series shall be appropriately increased or decreased.

(b)      Mechanics of Conversion.   No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Common Stock as determined by the Board of Directors. For such purpose, all shares of Preferred Stock held by each holder of Preferred Stock shall be aggregated, and any resulting fractional share of Common Stock shall be paid in cash.  Before any holder of Preferred Stock shall be entitled to convert the same into full shares of Common Stock, and to receive certificates therefor, he shall either (A) surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Preferred Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement reasonably satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to

5

convert the same.  The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock, plus any declared and unpaid dividends and all Accruing Dividends, whether or not declared, on the converted Preferred Stock.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted (or on such later date requested by such holder or such earlier date agreed to by such holder and the Corporation), and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; provided, however, that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Preferred Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Common Stock issuable upon such conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(c)     Adjustments for Subdivisions or Combinations of Common Stock.  In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, the Conversion Price of each series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.   In the event the outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, the Conversion Prices in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(d)     Adjustments for Subdivisions or Combinations of Preferred Stock.  In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(e)     Adjustments for Reclassification, Exchange and Substitution.  Subject to Section 3 above (*"Liquidation Rights"*), if the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the

6

number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Preferred Stock shall have the right thereafter to convert such shares of Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such series of Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(f) <u>Certificate as to Adjustments</u>. The Corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a certificate setting forth (i) all adjustments and readjustments to the Conversion Price that have occurred since the Original Issue Date, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

(g) <u>Waiver of Adjustment of Conversion Price</u>. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of any series of Preferred Stock may be waived by the consent or vote of the holders of the majority of the outstanding shares of such series either before or after the issuance causing the adjustment.

(h) <u>Notices of Record Date</u>. In the event that this Corporation shall propose at any time:

(i) to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(ii) to effect any reclassification or Recapitalization of its Common Stock; or

(iii) to voluntarily liquidate, dissolve, wind up or to enter into any Deemed Liquidation;

then, in connection with each such event, this Corporation shall send to the holders of the Preferred Stock at least 10 days' prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (ii) and (iii) above.

Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed.

The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the vote or written consent of the holders of a majority of the Preferred Stock.

7

(i)     Reservation of Stock Issuable Upon Conversion. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

.5.     *Voting.*

(a)     Restricted Class Voting. Except as otherwise expressly provided herein or as required by law, the holders of Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

(b)     No Series Voting. Other than as provided herein or required by law, there shall be no series voting.

(c)     Preferred Stock. Each holder of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which the shares of Preferred Stock held by such holder could be converted as of the record date. The holders of shares of the Preferred Stock shall be entitled to vote on all matters on which the Common Stock shall be entitled to vote. Holders of Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation. Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted), shall be disregarded.

(d)     Approval of Certain Actions. As long as shares of Preferred Stock shall be issued and outstanding, the Corporation shall not (either directly or indirectly through merger, consolidation or otherwise), without first obtaining the approval (by vote or written consent as provided by law) of the holders of more than 50% of the outstanding shares of the Preferred Stock:

(i)     amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Corporation, or take any other action, if such action would adversely affect the rights, preferences, privileges or powers of, or restrictions provided for the benefit of the Preferred Stock or any series thereof;

(ii)     increase or decrease (other than for decreases resulting from conversion of the Preferred Stock) the authorized number of shares of Preferred Stock or any series thereof;

(iii)     authorize, create or issue any new class or series of shares having rights, preferences or privileges with respect to redemption, dividends, or payments upon liquidation senior to or on a parity with any series of Preferred Stock or having voting rights other than those granted to the Preferred Stock generally;

8

(iv)    enter into any transaction or series of related transactions deemed to be a liquidation, dissolution or winding up of the Corporation pursuant to **Section 3(a)** above;

(v)    authorize a merger, acquisition or sale of substantially all of the assets of the Corporation or any of its subsidiaries (other than a merger exclusively to effect a change of domicile of the Corporation);

(vi)    voluntarily liquidate or dissolve;

(vii)    increase the size of the Board of Directors;

(viii)    declare or pay any Distribution with respect to the Preferred Stock other than as set forth in **Section 6** hereof or the Common Stock of the Corporation; or

(ix)    increase the number of shares authorized for issuance under any existing stock or option plan or create any new stock or option plan;

(x)    enter into or permit any subsidiary to enter into any Affiliate Transaction, or amend or alter any existing agreement that constitutes an Affiliate Transaction;

(xi)    reclassify any class or series of shares into Preferred Stock;

(xii)    at any time cause or permit the Corporation's debt to exceed one-half of the Corporation's earnings before interest, taxes, depreciation, and amortization for the twelve-month trailing period (calculated in accordance with generally accepted accounting principles);

(xiii)    make capital expenditures in excess of $50,000 in any one transaction or series of related transactions; or

(xiv)    effect a public offering of any of its equity securities.

(e)    <u>Election of Directors</u>.  The Board of Directors of the Company shall consist of seven (7) members and shall be elected as follows:

(1)    The holders of Preferred Stock, voting as a separate class, shall be entitled to elect four members of the Board (the "***Preferred Directors***") at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director; and

(2)    The holders of Common Stock, voting as a separate class, shall be entitled to elect two members of the Board at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director; and

(3)    The holders of Common Stock and Preferred Stock, voting together as a single class on an as converted basis, shall be entitled to elect all remaining

9

members of the Board at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors.

(f)     Adjustment in Authorized Common Stock.    The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding) by an affirmative vote of the holders of a majority of the stock of the Corporation.

(g)     Common Stock.    Each holder of shares of Common Stock shall be entitled to one vote for each share thereof held.

6.     Redemption.

(a)     At any time after the fifth anniversary of the Original Issue Date, the holders of at least a majority of the then outstanding shares of Preferred Stock may cause, by delivery of written notice (a *"Redemption Notice"*) the Corporation to redeem, out of funds legally available therefor, all (but not less than all) outstanding shares of Preferred Stock which have not been converted into Common Stock pursuant to **Section 4** hereof. The Redemption Notice shall specify the date upon which such redemption will occur *("Redemption Date")* which date must be no less than forty-five (45) days following the date of the Redemption Notice. The Corporation shall redeem the shares of Preferred Stock by paying in cash an amount per share equal to the Original Issue Price for such Preferred Stock, plus an amount equal to all Accruing Dividends accrued but unpaid thereon, whether or not declared, together with all other dividends declared but unpaid thereon (the *"Redemption Price"*). If the funds legally available for redemption of the Preferred Stock shall be insufficient to permit the payment to such holders of the full respective Redemption Price Stock, the Corporation shall effect such redemption pro rata among the holders of the Preferred Stock so that each holder of Preferred Stock shall receive a redemption payment equal to a fraction of the aggregate amount available for redemption, the numerator of which is the number of shares of Preferred Stock held by such holder with each number multiplied by the Redemption Price of each share of Preferred Stock held by such holder, and the denominator of which is the number of shares of Preferred Stock outstanding multiplied by the Redemption Price of each such outstanding share of Preferred Stock.

(b)     Any redemption effected pursuant to **Section 6(a)** shall be made on a pro rata basis among the holders of the Preferred Stock in proportion to the shares of Preferred Stock then held by them.

7.     Reissuance of Preferred Stock.    In the event that any shares of Preferred Stock shall be converted pursuant to **Section 4**, redeemed pursuant to **Section 6**, or otherwise repurchased by the Corporation, the shares so converted, redeemed or repurchased shall be cancelled and shall not be issuable by this Corporation.

8.     Notices.    Any notice required by the provisions of this ARTICLE V to be given to the holders of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

## ARTICLE VI

The Corporation is to have perpetual existence.

## ARTICLE VII

Elections of directors need not be by written ballot unless a stockholder demands election by written ballot at the meeting and before voting begins or unless the Bylaws of the Corporation shall so provide.

## ARTICLE VIII

The management of the business and the conduct of the affairs of the Corporation shall be vested in its Board of Directors, subject to **Article V, Section 5(d)**. Except as otherwise set forth herein, the number of directors which constitute the Board of Directors of the Corporation shall be designated in the Bylaws of the Corporation.

## ARTICLE IX

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to make, alter, amend or repeal the Bylaws of the Corporation.

## ARTICLE X

1.     To the fullest extent permitted by the Delaware General Corporation Law as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director.

2.     The Corporation may indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director, officer or employee of the Corporation or any predecessor of the Corporation or serves or served at any other enterprise as a director, officer or employee at the request of the Corporation or any predecessor to the Corporation.

3.     Neither any amendment nor repeal of this ARTICLE X, nor the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this ARTICLE X, shall eliminate or reduce the effect of this ARTICLE X, in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this ARTICLE X, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

4.     In the event that a member of the Board of Directors of the Corporation who is also a partner or employee of an entity that is a holder of Preferred Stock and that is in the business of investing and reinvesting in other entities, or an employee of an entity that manages such an entity (each, a *"Fund"*) acquires knowledge of a potential transaction or other matter in such individual's capacity as a partner or employee of the Fund or the manager or general partner

11

of the Fund (and other than directly in connection with such individual's service as a member of the Board of Directors of the Corporation) and that may be an opportunity of interest for both the Corporation and such Fund (a "*Corporate Opportunity*"), then the Corporation (i) renounces any expectancy that such director or Fund offer an opportunity to participate in such Corporate Opportunity to the Corporation, and (ii) to the fullest extent permitted by law, waives any claim that such opportunity constituted a Corporate Opportunity that should have been presented by such director or Fund to the Corporation or any of its affiliates.

### ARTICLE XI

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside of the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**\* \* \* \***

**FOUR:**     This Amended and Restated Certificate of Incorporation has been duly approved by the Board of Directors of the Corporation.

**FIVE:**     This Amended and Restated Certificate of Incorporation was approved by the holders of the requisite number of shares of said Corporation in accordance with Section 228 of the.  This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with the provisions of Sections 242 and 245 of the General Corporation Law of Delaware by the stockholders of the Company.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, Correctional Healthcare Companies, Inc. has caused this Amended and Restated Certificate of Incorporation to be signed by its Chief Executive Officer this 26th day of March, 2007.

CORRECTIONAL HEALTHCARE COMPANIES, INC.

By: _____/s/ Douglas D. Goetz_____

Douglas D. Goetz, Chief Executive Officer

[SIGNATURE PAGE TO AMENDED AND RESTATED CERTIFICATE OF INCORPORATION]

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:59 PM 06/08/2010*
*FILED 02:54 PM 06/08/2010*
*SRV 100638573 - 4181381 FILE*

## SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF

## CORRECTIONAL HEALTHCARE COMPANIES, INC.

Correctional Healthcare Companies, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "DGCL"), does certify that:

**ONE:**    The name of this corporation is Correctional Healthcare Companies, Inc., the date of filing of the original Certificate of Incorporation of this corporation with the Secretary of State of the State of Delaware was June 26, 2006, and the date of the filing of the Amended and Restated Certificate of Incorporation of this corporation with the Secretary of State of the State of Delaware was March 26, 2007.

**TWO:**    Pursuant to Sections 228, 242 and 245 of the DGCL, this Second Amended and Restated Certificate of Incorporation has been duly adopted by the Board of Directors and stockholders of Correctional Healthcare Companies, Inc. and amends and restates the provisions of the Amended and Restated Certificate of Incorporation.

**THREE:**    The Amended and Restated Certificate of Incorporation of this corporation is hereby amended and restated to read as follows:

### ARTICLE I

The name of the Corporation is Correctional Healthcare Companies, Inc. (the "Corporation").

### ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

### ARTICLE III

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE IV

1.    The total number of shares of stock that the Corporation shall have authority to issue is 52,600,000, consisting of 34,250,000 shares of Common Stock, $0.001 par value per share, and 18,350,000 shares of Preferred Stock, $0.001 par value per share. The first Series of Preferred Stock shall be designated *"Series A Preferred Stock"* and shall consist of 16,000,000 shares. The second Series of Preferred Stock shall be designated *"Series A-1 Preferred Stock"* and shall consist of 2,350,000 shares.

2.      The number of authorized shares of any class of capital stock of the Corporation may be increased or decreased (but not below the number of shares thereof then outstanding plus a number of shares of Common Stock necessary to allow for the conversion of the then outstanding shares thereof) by the affirmative vote of the holders of at least a majority of the outstanding shares of capital stock of the Corporation entitled to vote on matters submitted to a vote of the stockholders (voting together as a single class on an as-if-converted basis), irrespective of the provisions of Section 242(b)(2) of the DGCL, and no class vote shall be required in connection therewith.

**ARTICLE V**

The terms and provisions of the Common Stock and Preferred Stock are as follows:

1.      DEFINITIONS. For purposes of this ARTICLE V, the following definitions shall apply:

(a)      "Affiliate Transaction" shall mean any transaction that it is reasonably likely would be required to be disclosed pursuant to Item 404(a) of Regulation S-K promulgated under the Securities Act and the Exchange Act (or any successor rule thereto, and as 404(a) is amended from time to time), assuming the Corporation were at such time subject to the periodic reporting obligations of Section 13 or Section 15(d) of the Exchange Act (even if the Corporation is not in fact at such time subject to such requirements), but excluding any compensation arrangements approved by the Corporation's Board of Directors, including at least one Preferred Director (as defined in Section 5(d)).

(b)      "Certificate" shall mean this Second Amended and Restated Certificate of Incorporation of the Corporation, as amended.

(c)      "Conversion Price" shall mean (i) $1.00 per share for the Series A Preferred Stock, and (ii) $2.82 per share for the Series A-1 Preferred Stock (in each case, subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

(d)      "Corporation" shall mean Correctional Healthcare Companies, Inc.

(e)      "Deemed Liquidation" shall have the meaning set forth in Section 3(a) of Article V.

(f)      "Distribution" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of shares of the Corporation for cash or property other than: (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) repurchase of capital stock of the Corporation in connection with the settlement of disputes with any stockholder, or (iv) any other repurchase or redemption of

capital stock of the Corporation approved by the holders of the Common and Preferred Stock of the Corporation voting as separate classes.

(g)  "Dividend Rate" shall mean an annual rate of 6% of the Original Issue Price per share for each share of the Preferred Stock.

(h)  "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

(i)  "Liquidation Preference" shall mean (i) $1.00 per share for the Series A Preferred Stock, and (ii) $2.82 per share for the Series A-1 Preferred Stock (in each case, subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(j)  "Original Issue Date" shall mean (i) June 30, 2006 for the Series A Preferred Stock, and (ii) June 8, 2010 for the Series A-1 Preferred Stock.

(k)  "Original Issue Price" shall mean (i) $1.00 per share for the Series A Preferred Stock, and (ii) $2.82 per share for the Series A-1 Preferred Stock (in each case, subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(l)  "Preferred Stock" shall mean the Series A Preferred Stock and the Series A-1 Preferred Stock.

(m)  "Preferred Director" shall have the meaning set forth in Section 5 of Article V.

(n)  "Recapitalization" shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

(o)  "Securities Act" shall mean the Securities Act of 1933, as amended.

(p)  "Series A Original Issue Date" shall mean June 30, 2006.

2.  DIVIDENDS.

(a)  Preferred Stock.  From and after the date of the issuance of any shares of Preferred Stock, dividends at the Dividend Rate shall accrue on such shares of Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares) (the "Accruing Dividends").  Accruing Dividends shall accrue from day to day, whether or not declared, and shall be cumulative. The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Corporation unless (in addition to the obtaining of any consents required elsewhere in this Certificate) the holders of the Preferred Stock then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Preferred Stock in an amount at least equal to the amount of the aggregate Accruing Dividends then accrued on such share of Preferred Stock and not previously paid. Except as set forth in Section 4(b), no Accruing Dividends shall be paid on any Preferred Stock unless and until the occurrence of a

Deemed Liquidation (as defined below), at which time all Accruing Dividends shall be paid in cash.

      (b)    <u>Non-Cash Distributions</u>.  Whenever a Distribution provided for in this <u>Section 2</u> shall be payable in property other than cash, the value of such Distribution shall be deemed to be the fair market value of such property as determined in good faith by the Board of Directors.

     3.    <u>LIQUIDATION RIGHTS</u>.

      (a)    <u>Liquidation Preference</u>.  In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of the Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Common Stock by reason of their ownership of such stock, an amount per share for each share of Preferred Stock held by them equal to the greater of (i) the Liquidation Preference specified for such share of Preferred Stock plus any Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had each share of Preferred Stock been converted into Common Stock pursuant to <u>Section 4</u> immediately prior to such liquidation, dissolution or winding up of the Corporation.   If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this <u>Section 3(a)</u>, then the entire assets of the Corporation legally available for distribution shall be distributed with equal priority and pro rata among the holders of the Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this <u>Section 3(a)</u>. For purposes of this <u>Section 3</u>, a liquidation, dissolution or winding up of the Corporation shall be deemed to be occasioned by, or to include, (a) the acquisition of the Corporation by another entity, person or group of affiliated entities or persons by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation) other than a transaction or series of transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving entity), as a result of shares in the Corporation held by such holders prior to such transaction, at least fifty percent (50%) of the total voting power of such surviving entity outstanding immediately after such transaction or series of transactions, and (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation, of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to one or more of the Corporation or any wholly owned subsidiary of the Corporation (a "<u>Deemed Liquidation</u>"); <u>provided</u>, <u>however</u>, that a Deemed Liquidation shall not include (1) any consolidation or merger effected exclusively to change the domicile of the Corporation (so long as the relative rights of stockholders in the new domicile are substantially no less favorable than the laws of the domicile under which the Corporation was originally formed), (2) any conversion of the Corporation to

another form of entity, or (3) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Corporation or any successor or indebtedness of the Corporation is cancelled or converted or a combination thereof.

(b)   Remaining Assets. After the payment to the holders of Preferred Stock of the full preferential amounts specified above, the entire remaining assets of the Corporation legally available for distribution by the Corporation shall be distributed with equal priority and pro rata among the holders of the Common Stock in proportion to the number of shares of Common Stock held by them.

(c)   Valuation of Non-Cash Consideration. If any assets of the Corporation distributed to stockholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board of Directors, except that any publicly-traded securities to be distributed to stockholders in a liquidation, dissolution, or winding up of the Corporation shall be valued as follows:

(i)   If the securities are then traded on a national securities exchange, then the value of the securities shall be deemed to be the average of the closing prices of the securities on such exchange over the ten (10) trading day period ending five (5) trading days prior to the Distribution;

(ii)   if the securities are actively traded over-the-counter, then the value of the securities shall be deemed to be the average of the closing bid prices of the securities over the ten (10) trading day period ending five (5) trading days prior to the Distribution.

In the event of a merger or other acquisition of the Corporation by another entity, the Distribution date shall be deemed to be the date such transaction closes.

For the purposes of this Section 3(c), "trading day" shall mean any day which the exchange or system on which the securities to be distributed are traded is open and "closing prices" or "closing bid prices" shall be deemed to be: (i) for securities traded primarily on the New York Stock Exchange, the American Stock Exchange or Nasdaq, the last reported trade price or sale price, as the case may be, at 4:00 p.m., New York time, on that day and (ii) for securities listed or traded on other exchanges, markets and systems, the market price as of the end of the regular hours trading period that is generally accepted as such for such exchange, market or system. If, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a stock as of a given trading day shall change from those set forth above, the fair market value shall be determined as of such other generally accepted benchmark times.

(d)   In the event the requirements of this Section 3 are not complied with, the Corporation shall forthwith either:

(i)   cause such closing to be postponed until such time as the requirements of this Section 3 have been complied with; or

(ii)     cancel such transaction, in which event the rights, preferences and privileges of the holders of the Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section 4(h) hereof related to such transaction.

4.     CONVERSION.   The holders of the Preferred Stock shall have conversion rights as follows:

(a)     Automatic Conversion.

(i)     Each share of Preferred Stock shall automatically be converted into shares of Common Stock, based on the then-effective applicable Conversion Price, immediately upon the closing of a firmly underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock for the account of the Corporation in which (A) the per share price is at least three (3) times the Original Issue Price with respect to the Series A Preferred Stock (as adjusted for stock splits, dividends, recapitalizations and the like after the filing date hereof), and (B) the gross cash proceeds to the Corporation (before underwriting discounts, commissions and fees) are at least $25,000,000 ("Qualified Public Offering").   Each share of Series A Preferred Stock shall automatically be converted into shares of Common Stock, based on the then-effective applicable Conversion Price, at any time upon the affirmative election of the holders of at least a majority of the then outstanding shares of the Series A Preferred Stock.   Each share of Series A-1 Preferred Stock shall automatically be converted into shares of Common Stock, based on the then-effective applicable Conversion Price, at any time upon the affirmative election of the holders of at least a majority of the then outstanding shares of the Series A-1 Preferred Stock.

(ii)     Upon the occurrence of any of the events specified in Section 4(a)(i) above, the outstanding shares of the applicable Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent and the holder thereof shall have all rights with respect to the Common Stock to be received regardless of the timing of the delivery of new stock certificates; provided, however, that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless the certificates evidencing such shares of Preferred Stock are either delivered to the Corporation or its transfer agent as provided below, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement reasonably satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates.   Upon the occurrence of such automatic conversion of any Preferred Stock, the holders of such Preferred Stock shall surrender the certificates representing such shares at the office of the Corporation or any transfer agent for the Preferred Stock.   Thereupon, there shall be issued and delivered to each such holder promptly at such office and in its name as shown on such surrendered certificate or certificates, a certificate or certificates for the number of shares of Common Stock into which the shares of such Preferred Stock surrendered were convertible on the date on which such automatic conversion occurred, and any accrued and unpaid dividends shall be paid in accordance with the provisions of Section 4(c).

(b)   <u>Right to Convert.</u> Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into that number of fully-paid, nonassessable shares of Common Stock determined by dividing the Original Issue Price for the relevant series by the Conversion Price for such series. (The number of shares of Common Stock into which each share of Preferred Stock of a series may be converted is hereinafter referred to as the "*Conversion Rate*" for each such series.) Upon any decrease or increase in the Conversion Price for any series of Preferred Stock, as described in this <u>Section 4</u>, the Conversion Rate for such series shall be appropriately increased or decreased.

(c)   <u>Mechanics of Conversion.</u> No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Common Stock as determined by the Board of Directors. For such purpose, all shares of Preferred Stock held by each holder of Preferred Stock shall be aggregated, and any resulting fractional share of Common Stock shall be paid in cash. Before any holder of Preferred Stock shall be entitled to convert the same into full shares of Common Stock, and to receive certificates therefor, he shall either (A) surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Preferred Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement reasonably satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to convert the same. The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock, plus any declared and unpaid dividends and all Accruing Dividends, whether or not declared, on the converted Preferred Stock. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted (or on such later date requested by such holder or such earlier date agreed to by such holder and the Corporation), and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; provided, however, that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Preferred Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Common Stock issuable upon such conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(d)   <u>Adjustments for Subdivisions or Combinations of Common Stock.</u> In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, the Conversion Price of each series of Preferred Stock in effect immediately prior to such

subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, the Conversion Prices in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(e)     Adjustments for Subdivisions or Combinations of Preferred Stock. In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(f)     Adjustments for Reclassification, Exchange and Substitution. Subject to Section 3 above ("Liquidation Rights"), if the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Preferred Stock shall have the right thereafter to convert such shares of Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such series of Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(g)     Certificate as to Adjustments. The Corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a certificate setting forth (i) all adjustments and readjustments to the Conversion Price that have occurred since the Original Issue Date, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

(h)     Waiver of Adjustment of Conversion Price. Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of any series of Preferred Stock may be waived by the consent or vote of the holders of the majority of the outstanding shares of such series either before or after the issuance causing the adjustment.

Alabama
Sec. Of State

New Entity
048-676        F/C
Date   10/18/2012
Time        17:00
121023      52 Pg

File     $150.00
Ackn       $.00
Exp      $100.00
----------
Total    $250.00
02/013

(i) **Notices of Record Date.** In the event that this Corporation shall propose at any time:

(i) to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(ii) to effect any reclassification or Recapitalization of its Common Stock; or

(iii) to voluntarily liquidate, dissolve, wind up or to enter into any Deemed Liquidation;

then, in connection with each such event, this Corporation shall send to the holders of the Preferred Stock at least 10 days' prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (ii) and (iii) above.

Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed.

The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the vote or written consent of the holders of a majority of the Preferred Stock.

(j) **Reservation of Stock Issuable Upon Conversion.** The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

5. **VOTING.**

(a) **Restricted Class Voting.** Except as otherwise expressly provided herein or as required by law, the holders of Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

(b) **No Series Voting.** Other than as provided herein or required by law, there shall be no series voting.

(c) **Preferred Stock.** Each holder of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which the shares of

Preferred Stock held by such holder could be converted as of the record date. The holders of shares of the Preferred Stock shall be entitled to vote on all matters on which the Common Stock shall be entitled to vote. Holders of Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation. Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted), shall be disregarded.

(d)     Approval of Certain Actions. As long as shares of Preferred Stock shall be issued and outstanding, the Corporation shall not (either directly or indirectly through merger, consolidation or otherwise), without first obtaining the approval (by vote or written consent as provided by law) of the holders of more than 50% of the outstanding shares of the Preferred Stock:

(i)     amend, alter or repeal any provision of the Certificate or Bylaws of the Corporation, or take any other action, if such action would adversely affect the rights, preferences, privileges or powers of, or restrictions provided for the benefit of the Preferred Stock or any series thereof; provided, that, any such action shall also require the approval of the holders of more than 50% of the outstanding shares of each series of Preferred Stock, voting as a separate class, that is so adversely affected;

(ii)     authorize, create or issue any new class or series of shares having rights, preferences or privileges with respect to redemption, dividends, or payments upon liquidation senior to or on a parity with any series of Preferred Stock or having voting rights other than those granted to the Preferred Stock generally;

(iii)     enter into any transaction or series of related transactions deemed to be a liquidation, dissolution or winding up of the Corporation pursuant to Section 3(a) above;

(iv)     authorize a merger, acquisition or sale of substantially all of the assets of the Corporation or any of its subsidiaries (other than a merger exclusively to effect a change of domicile of the Corporation);

(v)     voluntarily liquidate or dissolve;

(vi)     increase the size of the Board of Directors;

(vii)     declare or pay any Distribution with respect to the Preferred Stock other than as set forth in Section 6 hereof or the Common Stock of the Corporation; or

(viii)     increase the number of shares authorized for issuance under any existing stock or option plan or create any new stock or option plan;

(ix)     enter into or permit any subsidiary to enter into any Affiliate Transaction, or amend or alter any existing agreement that constitutes an Affiliate Transaction;

(x)     reclassify any class or series of shares into Preferred Stock;

(xi)   at any time cause or permit the Corporation's debt to exceed one-half of the Corporation's earnings before interest, taxes, depreciation, and amortization for the twelve-month trailing period (calculated in accordance with generally accepted accounting principles);

(xii)   make capital expenditures in excess of $50,000 in any one transaction or series of related transactions;

(xiii)   effect a public offering of any of its equity securities; or

(xiv)   or increase the number of shares of Preferred Stock authorized for issuance by the Corporation, provided, that, any increase in the number of shares of any particular series of Preferred Stock shall also require the approval of the holders of more than 50% of the outstanding shares of such series of Preferred Stock, voting as a separate class.

(e)   Election of Directors.  The Board of Directors of the Corporation shall consist of members elected as follows:

(1)   The holders of Preferred Stock, voting as a separate class, shall be entitled to elect four members of the Board (the "Preferred Directors") at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director; and

(2)   The holders of Common Stock, voting as a separate class, shall be entitled to elect two members of the Board at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director; and

(3)   The holders of Common Stock and Preferred Stock, voting together as a single class on an as converted basis, shall be entitled to elect all remaining members of the Board at each meeting or pursuant to each consent of the Corporation's stockholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors.

(f)   Common Stock.  Each holder of shares of Common Stock shall be entitled to one vote for each share thereof held.

6.   Redemption.

(a)   At any time after the fifth anniversary of the Series A Original Issue Date, the holders of at least a majority of the then outstanding shares of Preferred Stock (the "Noticing Holders") may cause, by delivery of written notice to the Corporation and all holders of Preferred Stock (a "Redemption Notice"), the Corporation to redeem, out of funds legally available therefor, all (but not less than all) of the shares of Preferred Stock held by such Noticing Holders which have not been converted into Common Stock pursuant to Section 4 hereof.  The Redemption Notice shall specify the date upon which such redemption will occur

("Redemption Date") which date must be no less than forty-five (45) days following the date of the Redemption Notice.

(b)     Within thirty (30) days following the Redemption Notice, any other holder of Preferred Stock that is not a Noticing Holder (each, an "Electing Holder" and collectively with the Noticing Holders, the "Redeeming Holders") may elect to cause, by delivery of written notice to the Corporation and the Electing Holders, the Corporation to redeem, out of funds legally available therefor, all (but not less than all) of the shares of Preferred Stock held by such Electing Holders which have not been converted into Common Stock pursuant to Section 4 hereof.

(c)     The Corporation shall redeem the shares of Preferred Stock held by the Redeeming Holders by paying in cash an amount per share equal to the Original Issue Price for each such share of Preferred Stock, plus an amount equal to all Accruing Dividends accrued but unpaid thereon, whether or not declared, together with all other dividends declared but unpaid thereon (the "Redemption Price"). If the funds legally available for redemption of the Preferred Stock shall be insufficient to permit the payment to the Redeeming Holders of the full respective Redemption Price, the Corporation shall effect such redemption pro rata among the Redeeming Holders so that each such holder shall receive a redemption payment equal to a fraction of the aggregate amount available for redemption, the numerator of which is the number of shares of Preferred Stock held by such holder with each number multiplied by the Redemption Price of each share of Preferred Stock held by such holder, and the denominator of which is the number of shares of Preferred Stock held by all Redeeming Holders to be  multiplied by the Redemption Price of each share of Preferred Stock held by the Redeeming Holders.

(d)     Any redemption effected pursuant to Section 6(a) shall be made on a pro rata basis among the Redeeming Holders in proportion to the shares of Preferred Stock then held by them.

7.     Reissuance of Preferred Stock.  In the event that any shares of Preferred Stock shall be converted pursuant to Section 4, redeemed pursuant to Section 6, or otherwise repurchased by the Corporation, the shares so converted, redeemed or repurchased shall be cancelled and shall not be issuable by this Corporation.

8.     Notices.  Any notice required by the provisions of this ARTICLE V to be given to the holders of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

### ARTICLE VI

The Corporation is to have perpetual existence.

### ARTICLE VII

Elections of directors need not be by written ballot unless a stockholder demands election by written ballot at the meeting and before voting begins or unless the Bylaws of the Corporation shall so provide.