FILED
2018 Feb-13 PM 10:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

Summary
2/13/2018 9:51:12 PM

EXHIBIT 2

Differences exist between documents.

| **New Document:** | **Old Document:** |
|---|---|
| Fifth Amended Complaint | 305 - Fourth Amended and Restated Complaint_Redacted |
| 78 pages (318 KB) | 66 pages (194 KB) |
| 2/13/2018 9:50:56 PM | 2/13/2018 9:50:56 PM |
| Used to display results. | |

Get started: first change is on page 1.

No pages were deleted

**How to read this report**

**Highlight** indicates a change.
~~**Deleted**~~ indicates deleted content.
indicates pages were changed.
indicates pages were moved.

EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| GINA KAY RAY, KRISTY FUGATT, TIMOTHY FUGATT and DEUNATE T. JEWS, Individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs;<br><br>v.<br><br>JUDICIAL CORRECTION SERVICES, INC., a corporation; CORRECTIONAL HEALTHCARE COMPANIES, INC., now known as CHC COMPANIES INC., d.b.a. CORRECTIONAL HEALTHCARE COMPANIES, INC., a corporation; CORRECT CARE SOLUTIONS, LLC, a limited liability company; THE CITY OF CHILDERSBURG,<br><br>Defendants. | Civil Action No.: 2:12-cv-02819-RDP<br><br>**FIFTH AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL REQUESTED |

## INTRODUCTION

Plaintiffs Gina Ray Kay, Kristy Fugatt, Timothy Fugatt, and Deunate T. Jews bring this civil rights action pursuant to 42 U.S.C. § 1983 alleging that Defendant Judicial Corrections Services ("JCS"), a for-profit probation company acting under color of law, and various Alabama municipalities, violated Plaintiffs' constitutional and statutory rights and the rights of persons similarly situated.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter because it concerns a controversy arising under the Constitution of the United States. 28 U.S.C. § 1331. This is a civil rights action brought under 42 U.S.C. §§ 1983 and 1988.

2. This Court also has jurisdiction of this action by virtue of 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), authorizing jurisdiction of claims brought under 42 U.S.C. § 1983 to enforce civil rights guaranteed by the United States Constitution.

3. This action also seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2022.

4. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

**PARTIES TO THE COMPLAINT**[1]

5. Plaintiff Gina Kay Ray is an individual resident of Bonaire, Alabama.

6. Plaintiff Kristy Fugatt is an individual resident of Sylacauga, Alabama.

7. Plaintiff Timothy Fugatt is an individual resident of Sylacauga, Alabama.

8. Plaintiff Deunate T. Jews is an individual resident of Childersburg, Alabama.

9. Defendant Judicial Correction Services, Inc. (hereinafter "JCS") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama and in this District which markets itself as "not a social service agency," but a "for profit" company which offers services to governmental entities "free of charge" to the cities as "an offender paid system." At all times, JCS has operated under the color of state law.

10. Defendant CHC Companies Inc., formerly known as Correctional Healthcare Companies, Inc. (also hereinafter "CHC") is a Delaware corporation, registered as a foreign corporation and doing business in the State of Alabama. In their initial complaint, filed August 28, 2012, plaintiffs described Correctional Healthcare

---

[1] Plaintiffs will refer to Defendants JCS, CHC, and CCS collectively as "JCS/CHC/CCS" due to the

*cont'd on next page*

Companies, Inc. stating:

> Correctional Healthcare Companies, Inc. (hereinafter listed as "JCS" also) is a Delaware corporation, maintaining its principal place of business in Greenwood Village, Colorado, but shares the same corporate officers at the same address as JCS. It appears to be the successor of JCS, having purchased or otherwise acquired it, continuing to do business with plaintiffs as JCS and operating the same. (Doc. 1 ¶6)

This description can only apply to the entity Correctional Healthcare Companies, Inc., which had undergone a name change hereinafter described before the initial complaint was filed. That action changed the name to CHC Companies, Inc., but the entity still continued doing business as Correctional Healthcare Companies, Inc. This is the only entity that meets the description of the entity identified in the initial complaint as:

1. A Delaware Corporation. (Exhibit 2, pg. 2)
2. Maintains its principal place of business in Greenwood Village, Colorado. (Exhibit 2, pg. 2)
3. Is the successor of JCS acquiring and merging it into itself on September 30, 2011. (Doc. 292 - Exhibit 1 - filed under seal - recitals and Section 2.1, signature page pg. 59)

Correctional Healthcare Companies, Inc. was incorporated on June 26, 2006 with the State of Delaware's Secretary of State under file number 4181381. This is the entity which the Plaintiffs named and described in the initial complaint. However, on July 11, 2011, a Second Amendment to the Second Amended and Restated Certificate of Incorporation signed by its CEO, Douglas D. Goetz, was filed changing the name of Correctional Healthcare Companies, Inc. to CHC Companies, Inc. (Exhibit 2 - pg. 51).

The initial complaint was served on CHC's Chief Executive Officer, Doug Goetz, on September 7, 2012. (Doc. 5 pg. 2). At the time Mr. Goetz was served with the initial complaint, he was the CEO of both Correctional Healthcare Companies, Inc. and CHC

---

mergers, combinations and name changes described herein.

Companies, Inc. Despite the correct identification of the intended party defendant and proper service, the CHC entities have attempted to blur their true identity through simultaneous name changes involving another wholly owned entity which is not related to this controversy.[2]

CHC Companies, Inc. (f/k/a Correctional Healthcare Companies, Inc.) continues to do business as Correctional Healthcare Companies, Inc. On September 30, 2011, CHC Companies, Inc. merged Judicial Correction Services, Inc. into its operations pursuant to a merger agreement. Through this merger, CHC Companies, Inc. d/b/a Correctional Healthcare Companies, Inc. assumed the "assets, rights, privileges, powers and franchises of, and be subject to all the liabilities, restrictions, disabilities and duties" of JCS. Doug Goetz, CHC Companies, Inc.'s CEO, executed this agreement on behalf of CHC. (Doc. 292 - Exhibit 1 - filed under seal - recitals and Section 2.1, signature page pg. 59)

11. Defendant Correct Care Solutions, LLC (hereinafter "CCS") is a Kansas limited liability corporation, registered as a foreign limited liability company and doing business in the State of Alabama. On June 24, 2014, CCS purchased CHC Companies, Inc. and has merged CHC's operations, its subsidiaries and its headquarters with its own. The CCS home office and headquarters is now in Nashville, Tennessee,[3] from

---

[2] On July 11, 2011, Doug Goetz as CEO of all entities involved, simultaneously changed names of two corporations. The corporate name of Correctional Healthcare Companies, Inc. was changed to CHC Companies, Inc., while the corporate name of another wholly owned company unrelated to this controversy—CHC Companies, **Ltd.**—was simultaneously changed to Correctional Healthcare Companies, Inc. (Exhibit 3) This purposeful ambiguity between identical names was further promoted by CHC Companies, Inc. signing legal documents in the name of CHC Companies, Inc. while continuing to do business as Correctional Healthcare Companies, Inc. ("CHC").

Correctional Healthcare Companies, Inc. (f/k/a CHC Companies, **Ltd**.) merged six (6) corporations into itself on December 22, 2011, but none of the companies was JCS. (Exhibit 4).

[3] CHC Companies, Inc. (f/k/a Correctional Healthcare Companies, Inc. and continuing to do business as Correctional Healthcare Companies, Inc.) filed its annual report with Colorado's Secretary of State on July

*cont'd on next page*

which it now directs and controls the operations of all its merged corporations including CHC Companies, Inc. The JCS operations have been fully integrated with the operations of other CHC companies - HPL, PNA, CHC, and JCS. JCS is part of a division known as CCS's State and Federal Division, which is managed by Don Houston. (Exhibit 6) CCS controls the accounting, litigation and other operational aspects of the JCS operations contained within this division and employs all the personnel within the JCS operations and that division.

12. Defendant the City of Childersburg, Alabama, ("Childersburg") is a municipal corporation located within Shelby County, Alabama. The City Council and Mayor B.J. Meeks controlled the policy making for Childersburg and also hired the municipal court judge and contracted for services of JCS at the municipal court.

**FACTUAL ALLEGATIONS**

13. JCS/CHC/CCS operated a for profit enterprise that marketed its services to various municipal and county governments and contracted with over 100 cities and towns throughout Alabama to collect unpaid fines and court costs from people brought before municipal courts in traffic and other misdemeanor cases. JCS/CHC/CCS' marketing approach to these cities emphasized that its fees would be paid by the "offender" before the municipal court and that its efforts would improve collection of court fines and costs at no cost to the city.

14. JCS/CHC/CCS routinely used a form contract to establish its relationship with its customer cities and similarly trained its employees using a training manual replete with forms for courts to use during proceedings, and for courts and

---

8, 2015 listing its principal office and street address as: 1283 Murfreesboro Rd. Suite 500, Nashville, TN 37217. The same address as CCS's principal office. (Exhibit 5)

JCS/CHC/CCS to use to contact the "offenders" from whom they are collecting. As a result, the JCS/CHC/CCS approach is highly systemized and uniform across municipalities.

15. Under the system established and implemented by JCS/CHC/CCS, its employees were not required to have criminal justice or legal training, have any social work education, or meet any minimum law enforcement standards, as is required of state probation officers. Instead, JCS/CHC/CCS required only that its employees be at least 21 years old, have no felony convictions, have at least two years of college, and complete 40 hours of training by JCS/CHC/CCS on its processes. On satisfying those requirements, JCS/CHC/CCS employees were then labeled "Probation Officers,"[4] permitted to carry a JCS issued badge in some municipalities, and collect fees, court fines and costs.

16. Under this system and by agreement with municipalities such as Childersburg, many administrative and judicial functions of the municipal court were unlawfully delegated to JCS/CHC/CCS, clothing it with the color of state law for the collection of court fines, costs and private fees.

17. The agreement drafted by JCS and agreed to by the mayor of Childersburg is substantially the same contract form used throughout Alabama and stated that the municipal "*court agrees that each court order shall provide* for the following:

a probation fee of $35.00 per month flat fee

One time probationer set up fee of $10.00. . . . " (emphasis added).

[4] In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC'). See Ala. Rule of Judicial Administration Rule 42.

JCS's contracts with other cities sometimes set the monthly fee at $45.

18. Childersburg, through its mayor and council, approved the agreement with JCS and approved the employment of Larry Ward as judge of its municipal court. Ward, a bond salesman at Morgan Keegan, also served as municipal judge for Harpersville and at other cities also under contract with JCS. Similarly, the current judge, Chad Woodruff, was appointed in a similar manner. The Childersburg Municipal Court meets once a month for a few hours on the second Thursday of the month.

19. The JCS/CHC/CCS system provided "Order of Probation" forms to the municipal court with the printed requirement on each form that the "offender" pay JCS $35 per month plus $10 for a file set up charge. *See* Exhibit A. The monthly fee of $35 was later increased to $45 per month for each "offender" at Childersburg. In Childersburg, Municipal Court Judge Larry Ward pre-signed blank probation orders printed by JCS.

20. At municipal courts operating under the JCS contract, a person unable to fully pay fines and costs when levied would be placed on probation using the JCS orders and forms, even when the underlying offense is not punishable by a jail sentence or when no suspended sentence is imposed. This was routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs. The order forms supplied by JCS then required the individual to make payment to JCS of the fines, costs and additional monthly fees as required under its contract with the city.

21. The JCS/CHC/CCS system and its "Probation Tracker" software is highly systemized and focuses on collections of fines, costs, and its fees—not traditional

probation services. That system was used in every municipal court in which JCS operated in Alabama. For example, "offenders" were allowed to mail in payments if they lived 30 miles from the JCS office. *See* Exhibit B. In fact, the daily tasks of the JCS/CHC/CCS employees were heavily directed to collecting, counting and depositing the money collected. *See* Exhibit C.

22. The training manual used by JCS/CHC/CCS instructed its employees on the use of its computer systems in tracking the payments made by the "offenders" and provided court forms to order probation and payment to JCS. The payments to JCS were ordered under these forms even when there was no adjudication of whether the individual was responsible for committing an underlying offense or adjudication was withheld. *See* Exhibit D.

23. The JCS training system was used in every municipal court in which JCS operated in Alabama and also provided sample letters for use after probation was ordered, threatening the "offender" that "a warrant will be issued for your arrest" and that their "court date cannot and will not be reset." *See* Exhibits E and F. Similar JCS forms instructed the "offender" that they could avoid the court date if they pay an amount determined by JCS. *See* Exhibit G.

24. The JCS/CHC/CCS training manual instructed its employees on the issuance of warrants of arrest and provided forms for that purpose. *See* Exhibit H. After the arrest warrant was issued, JCS also provided forms for warrant dismissal if JCS determines that the "offender" was in compliance. *See* Exhibit I. Once a person was arrested, JCS monitored those "offenders" placed in jail. *See* Exhibit J.

25. The city council and its mayor control the policymaking for Childersburg, hired the municipal court judge, contracted for JCS to provide "probation services" at

the municipal court starting in 2005, and continued to use JCS until they voted to terminate the contract on May 19, 2015. *See* Exhibit N. The decision to use JCS was an administrative decision of Childersburg, by and through its mayor, and not a decision of the municipal court judge or the Chief Justice, or any other employee of the Administrative Office of Courts ('AOC'). The city did not issue a request for proposal ('RFP') prior to signing the contract, and the city did not competitively bid this exclusive contract.

26. Alabama municipalities, through their contracts with JCS and operations, clothed JCS with the appearance of state authority and many allowed JCS employees to carry badges. The JCS/CHC/CCS employees attended each municipal court session and were referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes. Under this system, "offenders" were not permitted to pay fines at the city clerk's office, but were instead required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS at the JCS office.

27. This public ruse was maintained by Alabama municipalities and JCS in order to impose and collect fines and costs from citizens such as the Plaintiffs, and was accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much would be credited for each payment to the collection "services" of JCS each month and how much of it would rebate to the municipalities toward the fines adjudged.

28. This system, as a matter of routine, violated the rights of persons such as the Plaintiffs and the classes they seek to represent by imposing fines, costs, and fees on indigent persons with no hearing or consideration of their indigency.

29. Despite the lack of authority to do so, JCS, at its discretion, used threats of revoking probation, increased fines and costs and jail time for purposes of collection. Under this system, should an individual fail to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked. Under the system operated jointly by Alabama municipal courts and JCS, JCS's determination to incarcerate an individual was routinely accepted by city and court personnel without conducting delinquency or probation hearings and without making any findings, much less any ability-to-pay determination or appointment of counsel before taking such punitive action. In fact, JCS' Contract with many cities/cities' court explicitly agreed that JCS, a financially interested party, will provide testimony stating: "the [probation] 'officer' will testify as to the circumstances of the case."[5]

30. The collective actions of JCS/CHC/CCS and the Alabama municipalities with which it contracted were inextricably interwoven with each other under an agreement and understanding and routinely resulted in court costs, fines, and fees which exceeded the statutory maximum of $500 for municipal courts, and in some cases also imposed additional "jail fees" for the costs of any incarceration. Similarly,

---

[5] The following contracts include this provision: Albertville p. 1 section G, Arab p. 4 section G, Bay Minette p. 8 Exhibit A ¶6,Brookwood p. 29 section G, Calera p. 33 Exhibit A ¶6, Childersburg p. 37 Exhibit A ¶6, Citronelle p. 41 Exhibit A ¶6, Clanton p. 46 Exhibit A ¶6, Dauphin Island p. 54 Exhibit A ¶6, Dora p. 58 Exhibit A ¶6, East Brewton p. 63 Exhibit A ¶6, Fairhope p. 67 Exhibit A ¶6, Falkville p. 70 Section G, Fort Payne p. 74 Exhibit A ¶6, Haleyville p. 87 Exhibit A ¶6, Hartselle p. 91 Exhibit A ¶6, Hollywood p. 95 Exhibit A ¶6, Homewood p. 99 Section G, Hueytown p. 104 Section G, Jackson p. 108 Exhibit A ¶6, Jacksonville pp. 112, 316 Exhibit A ¶6, Jemison p. 116 Exhibit A ¶6, Kinston p. 125 Exhibit A ¶6, Lake View p. 127 Exhibit A ¶6, Leeds pp. 131, 143 Exhibit A ¶6, Town of Level Plains p. 147 Exhibit A ¶6, Loxely p. 153 Section G, Millbrook p. 157 Exhibit A ¶6, Montevallo p. 161 Exhibit A ¶6, Montgomery p. 165 Exhibit A ¶6, Mount Vernon p. 170 Exhibit A ¶6, Northport p. 177 Exhibit A ¶6, Orange Beach p. 180 Section G, Owens Crossroads p. 183 Section G, Ozark p. 187 Section G, Pleasant Grove p. 192 Exhibit A ¶6, Priceville p. 196 Exhibit A ¶6 (signed by Mayor and City Judge), Rainbow City p. 200 Section G, Rainsville p. 204 Exhibit A ¶6, Robertsdale p. 211 Section G, Saraland p. 215 Exhibit A ¶6, Scottsboro p. 219 Exhibit A ¶6, Somerville p. 226 Section G, Southside p. 229 Section G, Sylacauga p. 235 Exhibit A ¶6 (signed by Mayor and City Judge), Talladega p. 243 Section G, Tallassee p. 247 Exhibit A ¶6, Troy p. 259 Section G, Warrior p. 269 Exhibit A ¶6, Ashford p. 273 Exhibit A ¶6, Attalla p. 276 Section G, Blountsville p. 279 Section G, Bridgeport p. 283 Exhibit A ¶6, Brighton p. 287 Exhibit A ¶6, Dauphin Island pp. 300, 303 Exhibit A ¶6, Notasulga pp. 320, 325 Exhibit A ¶6.

the periods of "probation" imposed for purposes of collecting fines and fees for JCS routinely exceeded the two-year statutory maximum, all of which resulted in JCS/CHC/CCS and the municipalities taking joint action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

31. Although probation was routinely imposed on individuals who were not convicted of any underlying offense—or who were charged with an offense for which no jail sentence could lawfully be imposed, individuals were arrested and incarcerated if the fine, together with the fees added by JCS, were not paid as dictated by JCS.

32. Despite directing the municipal courts such as Childersburg that incarceration of an individual "offender" is needed when payment is not made, JCS/CHC/CCS undertakes no determination of the reasons for nonpayment, and does not consider such things as the Plaintiffs' disability, unemployment, or assets, in regard to the nonpayment of the fines.

33. JCS/CHC/CCS denies any responsibility and took no action under its operations with Alabama municipalities to determine ability to pay, and provides no instruction in its employee manual for the consideration of indigency. The municipal court judge employed by Childersburg, however, contended that under its contract it is JCS that should determine if an "offender" is unable to pay due to indigency and if so, to abate any fees in the probation order.

34. Under this system jointly implemented by JCS/CHC/CCS and municipalities such as Childersburg, after simple fines were converted to "probation" for payment, jail often resulted for any "offender" who did not meet the payment scheduled set by JCS. Based on JCS's allegation of a "probation violation," warrants were issued for "failure to obey court order" or failure to pay, and individuals whose original penalty

had only been a fine—or even who were not found guilty of any offense and were only assessed court costs—ended up being imprisoned.

## THE NAMED PLAINTIFFS' EXPERIENCES

### A. Gina Kay Ray

35. Gina Kay Ray is an individual resident of Bonaire, Alabama, who was brought before the Childersburg Municipal Court on August 12, 2010 on charges of "no insurance" and "driving while license suspended." She was fined $398 and $498 for these charges and received a suspended jail sentence, but was not sentenced to serve any jail time. Ms. Ray was not financially able to pay the fines when levied and was ordered to be on probation with JCS. Ms. Ray did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered her to do so. Pursuant to the JCS form probation order, Ms. Ray was required to pay JCS an additional $45 per month and a $10 charge to set up her file. Her monthly payment on these amounts was set by JCS at $145 per month.

36. On July 14, 2011, Ms. Ray was brought before the Childersburg Municipal Court on charges of "expired tag" and "driving while license suspended." For these charges she was fined $168 and $498 respectively, and received a suspended jail sentence. Since she could not pay these fines either, she was again ordered to "probation" with JCS and ordered to pay JCS $45 per month and $10 file set fee. Ms. Ray did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered her to do so. Her monthly payment on these amounts was also set by JCS at $145 per month. Though the "probation" period for her 2010 and 2011 cases overlap in time, JCS treated these as "consecutive cases" so that the period would then extend well beyond 24 months and result in monthly fees to JCS for

both cases.

37. Ms. Ray was and has been indigent and was not able to pay for her insurance, tag or license, much less the JCS fees, but, in accordance with the policy and practice of Childersburg which was established in its contract with JCS, neither the Childersburg Municipal Court nor JCS ever made any inquiry into her inability to pay at the time of levying the fine or thereafter.

38. Due to her inability to pay as directed by JCS, Ms. Ray was arrested and jailed at the request of JCS for "failure to obey a court order." Ms. Ray was placed in the Talladega County jail for a period of four days in 2010 and then an additional 21 days in 2011, and further time in April and May of 2012.

39. Due to her inability to pay and her indigency, she remained in jail throughout these periods of time. On or about April 26, 2012, a friend of Ms. Ray was able to acquire $300.00 which was the amount determined and demanded by JCS/CHC to secure her release from jail.

40. At the point of Ms. Ray's release on or about April 26, 2012, an employee of CHC completed a pre-printed, pre-signed probation order stating, "Val Jews reporting w/300 before Def can be released," The probation order listed a $317 fine and an offense of "Reinstate w/warrant fee." After the $300 was paid, Ms. Ray was directed to appear in "Judicial Corrections Municipal Court."

41. On June 14, 2012, Ms. Ray was again brought before the Municipal Court in Childersburg on charges of "attempt to evade," "expired tag" and "driving while revoked." She was fined $248, $248, and $598 on these charges and again received a suspended jail sentence but was not sentenced to serve any jail time. She could not pay these fines and once again placed on "probation" with JCS/CHC and ordered to

pay JCS $45 per month for 24 months and $10 file setup fee.

42. While Ms. Ray has made some small payments, she at all times has been indigent and unable to pay the full amounts and the additional probation fees charged by JCS/CHC/CCS and Childersburg. At the time this lawsuit was filed, remaining balances were still demanded by JCS/CHC/CCS and Childersburg.

43. Ms. Ray was also subjected to JCS probation in the Town of Harpersville. JCS demanded payments and compliance with its demands without any probation orders. Despite the fact that no probation orders were issued by the municipal court, JCS demanded money from Ms. Ray. When she was unable to pay the amounts JCS demanded, JCS changed her status in ProbationTracker to "warrant;" and she was arrested and jailed for eight days.

44. Throughout this period of time, JCS/CHC/CCS provided no services to Ms. Ray and acted merely as a collection agency charging additional fees and, despite knowledge that Ms. Ray was unable to pay these fines and indigent, JCS/CHC/CCS has sought to collect and has taken actions to incarcerate Ms. Ray without any due process and kept on probation beyond the statutory maximum of two (2) years.

45. On each of her adjudications and incarcerations, Ms. Ray was denied the benefit of legal counsel, without any formal probation revocation hearing, or any hearing on the issue of her indigency. Despite no legal counsel, Ms. Ray was incarcerated and, on some occasions, later released based upon the determination of JCS/CHC/CCS. These actions were taken with the approval and participation of the Childersburg and Harpersville city courts pursuant to their policy and contract with JCS.

**B. Kristy And Timothy Fugatt**

46. The Fugatts have twin children and had a third child who was born with

serious medical conditions which required constant medical care in Birmingham for two years until his death in June 2011. As a result, both parents had extended stays at the hospital with their child and made numerous trips to and from Birmingham to their home in Sylacauga.

47. On one trip on November 13, 2010, Kristy Fugatt was stopped and ticketed by the Childersburg Police Department for having an expired license tag and an expired driver's license.

48. Timothy Fugatt was stopped and ticketed on or about December 3, 2010 by Childersburg Police for having an expired license tag on the same vehicle. Both of the Fugatts were set for court on January 13, 2011 at the Childersburg Municipal Court.

49. The Childersburg court records reflect that the Fugatts' cases were *nol prossed* upon payment of the court costs of $198.00 for the expired driver's license and $148.00 each for the expired tag charges. They were not sentenced to a suspended jail sentence or to serve any jail time.

50. Due to these financial burdens, the Fugatts were unable to immediately pay the court costs and were ordered to "probation" under JCS. The Fugatts did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered them to do so. Under the mandated terms of the probation, they were each charged a $10 set up fee and an additional $45.00 per month for JCS's probation "service."

51. The Fugatts paid as best they could, but when they were unable to make payments as were ordered by JCS employees, they were required to drive to Childersburg and explain why they could not pay. JCS set the dates upon which the Fugatts were to report to the JCS office and were told that they would be jailed if they

did not come. Many times the Fugatts were not able to make phone contact due to limited phone access of JCS. Nevertheless, they were repeatedly threatened with jail for any nonappearance at the JCS office.

52. The Fugatts told JCS employees about their inability to pay as demanded and even provided medical records. Instead of assistance from JCS, the Fugatts were called liars and continually threatened with arrest and incarceration for nonpayment.

53. Although the City of Childersburg's accounting records show that Mr. Fugatt had paid his court costs in full as of May 18, 2011, JCS claimed that he still owed money, kept him on probation, and continued to demand payment. JCS then sought an arrest warrant for Mr. and Mrs. Fugatt based on their alleged failure to pay.

54. When the Fugatts did not appear in court on August 11, 2011- the date set by JCS for its 'petition for revocation' - each of the Fugatts was assessed $317.00 for "Failure to Obey Court Order" on September 26, 2011, and a warrant of arrest was issued.

55. Despite their inability to pay the initial court costs, the amounts JCS/CHC claimed the Fugatts owed kept increasing, with added as "fines," "restitution," "other" and "probation fees."

56. On Sunday afternoon, February 26, 2012, a Childersburg officer came to their home in Sylacauga, threatened them with a taser and arrested them, taking them from their young children to the jail at Childersburg and instructing them that DHR would be called for care of their kids. This was avoided only by relatives arriving in time to take care of the young children.

57. Only after relatives collectively brought $900.00 to the Childersburg jail were the Fugatts released from jail. (Exhibit K)

58. On February 26, 2012, the date of their arrest, each of the Fugatts was charged an additional $317 for "Failure to Appear," though there was no judge present that Sunday and no judicial order was signed. These additional charges totaled $1,268, plus the $90 monthly JCS/CHC fee, all resulting from the expired tag and expired driver's license.

59. In July 2012, JCS charged Mr. Fugatt an additional $234 in "restitution." Although no restitution was ordered by the municipal court or assessed for his nol prossed ticket, and although the City of Childersburg's records showed that he had paid off the court costs he owed over a year earlier, neither the City nor its municipal court challenged these added charges.

60. After their arrests, JCS continued to demand payments from Mr. and Mrs. Fugatt in excess of the balance recorded by the City. In addition, although Mrs. Fugatt was never charged with speeding, she was ordered to JCS probation for someone else's speeding ticket using a pre-printed JCS probation order that Judge Ward pre-signed. Although the person who had actually gotten the speeding ticket was also put on JCS probation for the offense, JCS sought to collect the balance owed for that ticket from Mrs. Fugatt.

61. On October 11, 2012 the Fugatts were again required to appear at Childersburg Municipal Court by CHC employees. While there, a CHC employee working in its JCS division told the Fugatts that they now owed over $1,000 in court costs, fines and probation fees with Mrs. Fugatt owing $557 and Mr. Fugatt owing $517.

62. On December 13, 2012, Mr. Fugatt was once again ordered to JCS probation for a "Proof of Insurance" violation. The probation order was not signed by the judge and did not include any jail sentence. JCS set up this term of probation to run

consecutive to Mr. Fugatt's previous probation for the initial expired tag (which he had paid in full eighteen (18) months earlier on May 18, 2011), demanding that he pay another $10 setup fee and $135 per month, including a monthly JCS fee of $35.

63. While Mr. Fugatt maintained some employment, the hours he was able to work were quite limited by these serious medical issues and family responsibilities. As a result, the Fugatts were very poor.

64. Though the Fugatts had repeatedly informed JCS/CHC of their situation, no relief was granted. The Fugatts were not afforded due process of law, in that they were continually punished with increased amounts due and owing, threats of incarceration for not paying, and ultimately incarceration.

65. In addition, the Fugatts, like all the Plaintiffs, were treated differently than persons able to pay the court costs when first imposed, merely because of their economic status.

66. Throughout this period of time, JCS/CHC/CCS has provided no services to the Fugatts and has acted merely as a collection agency charging additional fees, and despite knowledge that the Fugatts were unable to pay and indigent, JCS/CHC/CCS has sought to collect and take actions to incarcerate the Fugatts without any due process and kept them on probation after their city court costs had been paid in full and beyond the statutory maximum of two (2) years.

67. The Fugatts were jailed without the benefit of legal counsel, without any notice of charges, without formal probation revocation hearing, and without any hearing on the issue of their indigency, but simply incarcerated and, later released based upon the determination of JCS/CHC/CCS. These actions were taken with the approval and participation of Childersburg personnel and pursuant to its policy and contract with JCS.

**Deunate T. Jews**

68. Deunate T. Jews is a resident of Childersburg, Alabama, and brought before the Childersburg Municipal Court in 2008 on the charge of harassment. Mr. Jews was never tried, and the alleged victim placing this charge went to prison. As a result, the charges against Mr. Jews were dismissed but, on October 22, 2009, he was nonetheless charged court costs of $166. Since he could not pay this amount, he was ordered to probation with JCS for 24 months for payment with the additional requirement that he also pay JCS $45 per month and a $10 file set up fee. Mr. Jews did not voluntarily agree to be put on JCS probation, but signed the JCS papers because the judge ordered him to do so. Mr. Jews was not sentenced to serve any jail time.

69. When Mr. Jews did not pay the amounts demanded by JCS, an arrest warrant was issued at the request of JCS for "failure to obey a court order." Because this warrant to arrest Mr. Jews was issued, an additional $317 was added to his bill with JCS listed as "restitution" on the JCS and court records, even though no restitution was involved.

70. On September 11, 2009, Mr. Jews was arrested and placed in the Talladega jail forty-one (41) days for "failure to appear."

71. Based on these unlawful charges, Mr. Jews was incarcerated at the request of JCS. At his release, he was ordered to appear in "Judicial Corrections" Municipal Court.

72. When Mr. Jews was unable to pay the ever growing JCS fees, JCS sought another warrant for his arrest. Mr. Jews was arrested on August 18, 2010, by Childersburg police officer Mark Holmes for the charge of "FTOCO" and a $935 cash bond was demanded for his release. Mr. Jews was again taken to the Talladega County

Jail where he stayed until September 9, 2010.

73. JCS charged Mr. Jews "restitution," "probation fees," and "court money" fees, which, because of his indigency, he was unable to pay. On January 13, 2011, Childersburg police officer Luke Benefield arrested Mr. Jews on the FTOCO charge. Although the arrest warrant lists a $1,035 cash only bond, Childersburg released Mr. Jews when family members paid $500 the next day. Upon his release, Mr. Jews was notified that he had to appear in the Childersburg court on March 10, 2010.

74. When Mr. Jews was again unable to pay the continuing, escalating JCS/CHC fees, JCS/CHC issued another warrant for his arrest and Mr. Jews was arrested and jailed on February 21, 2012. Childersburg police booked Mr. Jews and he was transported to the Talladega County Jail. Childersburg demanded a $1,000 cash bond for his release.

75. On March 8, 2012, Mr. Jews was released from the Talladega County Jail when he appeared in court and a family member paid JCS/CHC $200.

76. On May 25, 2012, Mr. Jews paid JCS/CHC $25; JCS/CHC applied $15 to "restitution" though there was none, and $10 to "Probation Fee." JCS/CHC gave Mr. Jews a receipt acknowledging his payment in which it listed: Fees in arrears = $295.00; Pay off not including Probation fees: $343.00; Monthly Probation Fees: $45: Court Money Due from other Probations: Fines: $1,807. This JCS/CHC receipt stated a probation start date of March 9, 2012, which was the date Mr. Jews was released from his most recent incarceration, and a probation end date of March 9, 2014 which is nearly six years after the charges against him were dismissed. *See* Exhibit L.

77. Though the "probation" originally ordered on October 22, 2009 was for 24 months, it continued—with charges accruing each month—until this lawsuit was filed

and lawyers for the City of Childersburg wrote, and the City magistrate to sign and sent, a letter to JCS requesting that JCS terminate hundreds of probations that exceeded the statutory two year maximum.

78. While Mr. Jews has made payments throughout the period of time, he was indigent and unable to pay the full amount of the probation fees and other charges imposed by JCS/CHC/CCS. JCS/CHC/CCS closed out Mr. Jews on December 17, 2014 with an entry of "Pre-Payment/Bond in the amount of $166."

79. Throughout this period of time, JCS/CHC/CCS has provided no services to Mr. Jews and has acted merely as a collection agency charging additional fees, and despite knowledge that Mr. Jews was unable to pay these fines and indigent, JCS/CHC/CCS has sought to collect and take actions to incarcerate Mr. Jews without any due process.

80. Each time Mr. Jews was incarcerated, it was without the benefit of legal counsel, without notice of charges, and without any formal probation revocation hearing or any hearing on the issue of his indigency. On some occasions, he was later released based upon the determination of JCS/CHC/CCS. These actions were taken with the approval and participation of Childersburg pursuant to its policy and contract with JCS.

**FACTUAL ALLEGATIONS REGARDING CONSPIRACY BETWEEN JCS/CHC/CCS AND ALBAMA MUNICIPAL COURTS**

81. JCS/CHC/CCS entered into an agreement and/or reached an understanding with the Alabama Municipal Courts with which it contracted to deny the Plaintiffs' and class members' constitutional rights protected by 42 U.S.C. § 1983.

82. Over the years JCS/CHC/CCS contracted with over one hundred Alabama cities for the collection of court fines and costs using substantially the same contract

form and provisions and thereafter operating in each court under the same automated software and with personnel assigned to each court being trained under the same manual and processes.

After being hired at a city court, JCS/CHC/CCS and the municipal courts operated in a concerted and consistent fashion showing evidence of their agreement and understanding to deny the Plaintiffs' and class members' constitutional rights.

83. Each JCS/CHC/CCS contract provided that the municipal judge would include in his/her orders sending people to JCS that those people would be required to pay JCS a set-up fee and monthly fee.

84. Many of these agreements also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.' (See Paragraph 29 above)

85. In furtherance of the conspiratorial understanding and agreement between JCS/CHC/CCS and the Alabama Municipal Courts under contract with JCS/CHC/CCS, the city judges consistently placed persons appearing before the city court on "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

86. In ordering people to JCS "probation" for collection of fines and court costs, the city judges consistently failed to consider any aspects of the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, the city judges placed the class members on probation without further inquiry.

87. The actions of the city judges in furtherance of the conspiratorial understanding and agreement with JCS/CHC/CCS, were done with full understanding and acknowledgment that JCS/CHC/CCS had financial interests in expanding the number of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent as JCS agreed to not charge indigent people probation fees.

88. This conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts is further shown by the consistent failure of the city judges to make any indigency determinations and by JCS/CHC/CCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

89. This conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts is further shown by the consistent failure of the city judges to appoint counsel to those ordered to JCS 'probation' and by JCS' pre-printed probation order form which includes language above the offender's signature line purporting to "waive" right to counsel.

90. In furtherance of this understanding and agreement between JCS/CHC/CCS and the Alabama municipal courts, the courts routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS provided to the court its petition for revocation as the tool to acquire the warrant.

91. In furtherance of this conspiratorial agreement and understanding, after JCS petitioned for revocation beginning the process to acquire a warrant, neither JCS nor the Alabama municipal courts took steps to provide counsel for the persons

pursued or to inform them of this right.

92. The petitions for revocation sought by JCS/CHC/CCS under its agreement and understanding with Alabama municipal courts were predicated on failure of the individual to pay the fines and fees demanded and those were discharged when such payment was forthcoming and with "probation" itself promptly terminated when the fees, fines and costs were fully paid. These petitions used under this agreement and understanding in turn were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

93. In furtherance of the conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts, JCS was allowed to determine the monthly payments required and to allocate of any such payment between JCS or the City without any audit by the City as to the correctness or its accounting before the City complied with the request of JCS for warrants.

94. This conspiratorial agreement and understanding between JCS/CHC/CCS and the Alabama municipal courts to violate the constitutional rights of the plaintiffs is further shown by the hundreds of people throughout the state who were kept on JCS probation beyond the statutory maximum of two (2) years; the absence of counsel for those arrested; the explicit language of the JCS forms and petitions presented to the Court; JCS data showing disability and unemployment of those assigned for collection; the absence of any investigation of poverty as reasons for non payment by either JCS or the Court, and the Court's participation in conformity with the JCS contract by assigning persons for collection of fines and costs to a party with a known financial interest in expanding and extending fee payments.

95. To further the conspiratorial agreement and understanding between JCS/CHC/CCS and the municipalities with which it contracted, JCS/CHC/CCS also hired as its paid lobbyist Susan Fuqua, while she was serving as the magistrate for the City of Hoover as well as the President of the Alabama Municipal Court Clerks and Magistrates Association ('AMCCMA') for which she was one of the initial board members. Ms. Furqua did not register as a lobbyist or publicly disclose her payments from JCS, but organized or participated in numerous continuing education seminars for city magistrates and city judges during which she promoted JCS's collection system to other city court personnel.

96. These concerted efforts between the Alabama municipal courts and JCS/CHC/CCS, including the city judges and the other employees of the court, show a conspiratorial agreement and understanding that warrants would be issued if money was not paid by the person sent to JCS/CHC/CCS for collection, all while ignoring the requirement of consideration of poverty as required under the constitution, *Bearden v. Georgia*, and Alabama law.

**FACTUAL ALLEGATIONS REGARDING CONSPIRACY BETWEEN JCS/CHC/CCS AND THE CITY OF CHILDERSBURG**

97. JCS/CHC/CCS entered into an agreement and/or reached an understanding with the Childersburg Municipal Court to deny the Plaintiffs' and class members' constitutional rights protected by 42 U.S.C. § 1983.

98. The parties' relationship was established by a contract between JCS/CHC/CCS and the City and its court. Following the date of this contract in 2005, there was concerted consistent action between JCS/CHC/CCS and the municipal court showing evidence of their agreement and understanding, to deny the Plaintiffs' and

class members' constitutional rights.

99. The relationship between these parties was established by the City's former mayor signing a contract with JCS/CHC/CCS, which was recommended by the municipal judge for the City of Childersburg. JCS/CHC/CCS was hired for the collection of city court fines and costs.

100. This agreement provided that the municipal judge, Larry Ward, would include in his orders sending people to JCS/CHC/CCS that those people would be required to pay JCS a set-up fee and monthly fee.

101. This agreement also stated that JCS/CHC/CCS would provide testimony "as to the circumstances of the case" as a 'probation officer.'

102. The same municipal judge, Larry Ward, also worked for other Alabama municipal courts where JCS had been hired for the same services.

103. In furtherance of the understanding and agreement between JCS/CHC/CCS and the Childersburg Municipal Court, Judge Ward consistently placed persons appearing before him on "probation" with JCS/CHC/CCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

104. In ordering people to JCS "probation" for collection of fines and court costs, Judge Ward consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS/CHC/CCS, Judge Ward placed

the named Plaintiffs and class members on probation without further inquiry.

105. The actions of Judge Ward in furtherance of the conspiratorial understanding and agreement with JCS/CHC/CCS, were done with full understanding and acknowledgment that JCS/CHC/CCS had financial interests in extending the paid supervision of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS/CHC/CCS was formally declared to be indigent as JCS/CHC/CCS agreed to not charge indigent people probation fees.

106. This conspiratorial agreement and understanding between JCS/CHC/CCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to make any indigency determinations and by JCS/CHC/CCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

107. This conspiratorial agreement and understanding between JCS/CHC/CCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to appoint counsel to those he ordered to JCS 'probation' and JCS' pre-printed probation order, which Judge Ward pre-signed, including the following language above the offender's signature line. "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

108. In furtherance of this understanding between JCS/CHC/CCS and the City of Childersburg Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS/CHC/CCS requested a petition to revoke probation. The warrants issued by the city court, in fact, showed these charges as convictions and were based upon JCS' institution of the

petition for revocation. The agreement and understanding between JCS/CHC/CCS and the city municipal court in Childersburg was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant from the City.

109. In furtherance of this conspiratorial agreement and understanding, after JCS/CHC/CCS petitioned for revocation beginning the process to acquire a warrant, neither JCS/CHC/CCS nor the municipal court took steps to provide counsel for the persons pursued or to inform them of this right and any notice about these proceedings was allowed to be given by JCS/CHC/CCS - not the city court.

110. The petitions for revocation sought by JCS under its agreement and understanding with Childersburg Municipal Court were all predicated on failure of the individual to pay the fines and fees demanded and which were discharged when such payment was forthcoming and with “probation” itself promptly terminated when the fees, fines and costs were fully paid. These petitions used under this agreement and understanding in turn were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

111. In furtherance of the conspiratorial agreement and understanding between JCS/CHC/CCS and the city court of Childersburg, JCS was allowed to determine the monthly payments required and to allocate of any such payment between JCS/CHC/CCS or the City without any audit by the City as to the correctness or its accounting before the City complied with the request of JCS for warrants.

112. This conspiratorial agreement and understanding between JCS/CHC/CCS and the municipal court of Childersburg is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during

which time JCS continued to demand monthly fees.

113. These concerted efforts between the city court and JCS/CHC/CCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid by the person sent to JCS/CHC/CCS for collection, all while ignoring the requirement of consideration of poverty as required under constitutional law, *Bearden v. Georgia*, and Alabama law.

**CLASS ACTION ALLEGATIONS**

114. The named Plaintiffs seek to represent two main classes and two subclasses:

> **Fees class:** All individuals who, as of August 28, 2010 or thereafter, were assigned by Alabama municipal courts to JCS for the collection of fines, fees and costs, and who paid fees to JCS.
>
> > **Childersburg Fees Subclass:** All individuals in the Fees Class who were assigned to JCS probation by the Childersburg Municipal Court.
>
> AND
>
> **Arrest and Jail Class:** All individuals who, as of August 28, 2010 or thereafter, were assigned by Alabama municipal courts to JCS probation and who were arrested and/or incarcerated without an ability-to-pay determination after failing to pay fees, fines, or court costs to JCS.
>
> > **Childersburg Arrest and Jail Subclass:** All individuals in the Arrest and Jail class who were assigned to JCS probation by the Childersburg Municipal Court.

115. The members of the Classes and Subclasses are so numerous that joinder of all members is impracticable.

116. As of this time, the exact number in the Classes is unknown but would be more than one thousand.

117. Plaintiffs' treatment by the Defendants is typical of the members of the Classes and subclasses and is ongoing.

118. Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel who are competent and experienced in class litigation. Plaintiffs have no interests that are adverse or antagonistic to the Classes.

119. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by many class members may be small, the expense and burden of individual litigation makes it virtually impossible for the class members individually to seek redress for the wrongful conduct alleged.

120. Common questions of law and fact exist as to all members of the Classes, and predominate over any questions affecting solely members of the Classes. Among the questions of law and fact common to the Classes are:

a. Whether policy and practice of automatically placing on probation all municipal offenders who cannot immediately pay fines and costs but who are not, or could not be, sentenced to jail is legal;

b. Whether the policy and practice of converting unpaid fines and costs to days of incarceration, without any determination concerning an individual's ability, to pay is legal;

c. Whether the policy and practice of requiring every order of the municipal court to require probation fees for JCS/CHC/CCS is legal;