FILED
2018 May-09 AM 11:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GINA KAY RAY, et al., | } |
| Plaintiffs, | } |
| v. | } Case No.: 2:12-cv-02819-RDP |
| JUDICIAL CORRECTION SERVICES, INC., et al., | } |
| Defendants. | } |

## MEMORANDUM OPINION

This case is before the court on Defendant CHC Companies, Inc.'s ("CHC Companies") Motion for Summary Judgment (Doc. # 636), Defendant Correct Care Solutions, LLC's ("CCS") Motion for Summary Judgment (Doc. # 639), and Defendants CHC Companies' and CCS's Motion to Strike Plaintiffs' Supplemental Exhibits and Supplemental Briefing (Doc. # 648). The parties have fully briefed the motions (*see* Docs. # 637, 640, 642-43, 645-46, 648-49, 651, 653-54, 661-62), and they are ripe for decision.

In an earlier order, the court addressed whether Defendant Judicial Correction Services, Inc. ("JCS") was entitled to summary judgment on Plaintiffs' claims against it. (Docs. # 626 & 627). The court concluded that JCS was entitled to summary judgement on some, but not all, of those claims. Now, the court turns from questions of primary liability to whether Defendants CHC Companies and CCS, both of whom purchased ownership interest in JCS during the pendency of the probation services contract between JCS and the City of Childersburg, are liable for any of the § 1983 claims asserted by Plaintiffs against JCS. For the reasons explained below, the court concludes that they are not.

## I. Factual Background

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A. JCS's Merger with CHC Companies

On September 30, 2011, Defendant CHC Companies purchased all of JCS's stock through a reverse subsidiary merger.[1] (Doc. # 647-1 at 8-9). Under this agreement, Judicial Merger Sub, Inc. merged with JCS, designated as the "Surviving Corporation."[2] (*Id.*). JCS held

---

[1] A reverse subsidiary merger, or reverse triangular merger, occurs where "a parent corporation [acquires] a target corporation by setting up a subsidiary to merge with the target." *In re Inergy L.P.*, No. 5816-VCP, 2010 WL 4273197, at *11 (Del. Ct. Chancery Oct. 29, 2010). "The subsidiary usually has no assets other than the merger consideration to be paid to the target. The effect of this arrangement is that the parent does not become a constituent to the merger between the target and the subsidiary." *Id.* Reverse triangular mergers are a "recognized, accepted, and fairly routine" form of purchase agreement. *Baldwin Enters., Inc. v. Retail Ventures, Inc.*, No. 09-cv-0159-MJR-PMF, 2010 WL 624261, at *5-6 (S.D. Ill. Feb. 18, 2010) (citing and quoting *Giovanini v. United States*, 9 F.3d 783, 784 n. 6 (9th Cir. 1993); *Saginaw Property, LLC v. Value City Dep't Stores, LLC*, No. 08-13782-BC, 2009 WL 3536616, at *8 (E.D. Mich. Oct. 30, 2009); and *Morgan v. Powe Timber Co.*, 367 F. Supp. 2d 1032, 1037-38 (S.D. Miss. 2005)). Triangular mergers are used in situations where a target corporation has franchises or licenses that cannot easily be transferred or where certain tax benefits are sought. *Id.* at *6 (citing 14 Fletcher Cyc. Corp. § 7011.30 (2009)). Notably, though, they also are used sometimes "to avoid direct exposure to the liabilities of the target corporation." 14 Fletcher Cyc. Corp. § 7011 (2009).

[2] In their latest statement of additional undisputed facts, Plaintiffs continue to assert that the Judicial Merger Sub was the Surviving Corporation described in the merger agreement. (*See* Doc. # 645 at 5) (describing the Surviving Corporation as "JCS 2.0"). This factual averment is unsupported by the Rule 56 record and directly refuted by Section 2.1 of the merger agreement, which specifies that "the Company shall be the surviving corporation." (Doc. # 647-1 at 9). The merger agreement's preamble clearly identifies JCS as the "Company" and the Judicial Merger Sub as the "Merger Sub." (*Id.* at 8). Plaintiffs' factual averment also is refuted by the proposed merger certificate appended to the merger agreement. (Doc. # 647-3 at 9-11). The merger certificate states, "The name of the surviving corporation in the merger herein certified is Judicial Correction Services, Inc. (the "<u>Surviving Corporation</u>"), which will continue its existence as said surviving corporation under its present name upon the effective date of said merger . . . ." (*Id.* at 10). Nothing in the Rule 56 record indicates that a different merger certificate was filed in Delaware. Plaintiffs offer a citation to support their position that the Judicial Merger Sub was the Surviving Corporation (Doc. # 645 at 5), but the court has not found a page with Bates number "CHC CCS 002251" in the cited exhibit. (*See generally* Docs. # 647-1, 647-2, 647-3, & 647-4) (containing pages with Bates numbers "CHC CCS 002049" through "CHC CCS 002184").

2

"all the assets, rights, privileges, powers and franchises of" itself and the Judicial Merger Sub, along with all of their "liabilities, restrictions, disabilities, and duties." (*Id.* at 9). JCS's equity holders received payouts for their interests in JCS. (*See id.* at 11, 14). In the merger agreement, JCS agreed to help fund the "Indemnification Escrow Fund." (*Id.* at 12). JCS disclosed all pending litigation matters against JCS, its officers, its directors, and its affiliates at the time of the merger. (*See id.* at 26-27; Doc. # 647-3 at 55). Of course, this action was not listed in the litigation schedule because this action had not commenced when the merger occurred. (*See* Doc. # 647-3 at 55). The merger agreement contained an indemnification agreement. (Doc. # 647-2 at 13-18).

The merger agreement required JCS's executives to resign from JCS. (*See* Doc. # 647-1 at 16). Also, it required those executives to enter into an employment agreement and a non-compete agreement with CHC Companies. (*See* Docs. # 647-2 at 10; 647-3 at 7). Following the merger, JCS's executives reported to CHC Companies, rather than a board of directors. (Doc. # 641-4 at 80). Jarrett Gorlin, one of JCS's prior owners, served as JCS's president and reported to CHC Companies' chief executive officer ("CEO"), Doug Goetz. (Doc. # 641-4 at 34-35, 270). Goetz and other CHC executives helped review Gorlin's letter to JCS employees about the sale. (*See* Doc. # 428-3 at 21-22) (email from Goetz to other executives asking for suggestions for the letter). Dennis Moon, JCS's chief operating officer ("COO") at the time of the merger, continued to work for JCS after the merger for a period of time. (Doc. # 641-4 at 99).

Don Houston, the COO for CHC Companies at the time of the merger, testified that the entity changed its name from Correctional Healthcare Companies to CHC Companies "for tax

purposes and other things."[3] (*Id.* at 24-26). He asserted that when the transaction occurred CHC Companies and JCS intended to provide a "one-stop shop for the provision of probation and healthcare services to the criminal justice system." (*Id.* at 79-80).

### B. JCS's Operations Following the 2011 Merger

In October 2011, JCS identified Goetz as its CEO, Charlie Farrahar as its chief financial officer ("CFO"), and Larry Wolk as its secretary. (Doc. # 647-6). At the time, Goetz also served as CHC Companies' CEO. (*See* Doc. # 641-4 at 34-35). Goetz acted as JCS's CEO in 2012 and 2013 as well. (*Id.* at 269-70). In 2014, Dirk Allison became CEO of JCS. (*Id.* at 268). At that time, Allison also served as CEO and president of CHC Companies. (*Id.* at 163-64, 265).

In December 2011, Houston wrote to Goetz stating that he intended "to make sure JCS truly becomes part of CHC, especially from an operational and financial perspective." (Doc. # 428-3 at 106). Houston explained during his deposition that CHC Companies tried to integrate some of JCS's functions into CHC Companies, but he described the attempt as "more of . . . an aspirational integration than an actual integration." (Doc. # 641-4 at 35-36). Following the merger, JCS employees were transferred from JCS's payroll to CHC Companies' payroll.[4] (*Id.* at 36). Houston was responsible for ensuring JCS's financial performance, but he played "no part in the day-to-day operations." (*Id.* at 58-59).

In 2012, Goetz oversaw JCS's operations. (*Id.* at 90). In 2013, after Allison replaced Goetz as CEO of CHC Companies, Houston began overseeing its operations. (*Id.* at 90-91). At some point, Houston began signing certain contracts on behalf of JCS. (*Id.* at 92). And, in 2013,

---

[3] On July 11, 2011, CHC Companies, Ltd. changed its name to Correctional Healthcare Companies, Inc., and then changed its name again to CHC Companies, Inc. (Doc. # 641-7 at 57-58).

[4] CHC Companies asserts that it transferred JCS's employees to its payroll in 2013. (Doc. # 649 at 8). An email in the Rule 56 record states that JCS employees transferred to CHC Companies' payroll by January 2013, but it does not reflect the precise date of the transfer. (*See* Doc. # 650-1 at 2).

4

Houston selected a new COO for JCS. (*Id.* at 124). Colleen Ray, JCS's Alabama manager, testified that officers in Colorado had to approve marketing and political contribution decisions. (Doc. # 392-11 at 191-92).

> C.    **CHC Companies' Merger with CCS**

The parties strongly dispute the nature of the business relationship between CCS and CHC Companies. Plaintiffs characterize the transaction as a merger. (*See* Doc. # 642 at 21-22). In June 2014, JCS's CEO wrote, "On June 12, 2014, Correctional HealthCare Companies (CHC) announced that their owners have entered into a merger with Correct Care Solutions (CCS), which is currently the 2nd largest company in the industry, based out of Nashville, Tn." (Doc. # 641-6 at 2). The CEO stated that "[f]or JCS, business will remain primarily unaffected." (*Id.*). And, he asserted that "JCS [would] remain an industry leader in the southeast, by continuing to provide quality services to our courts." (*Id.*).

In contrast, David Perry, CCS's chief legal officer, has explained that CCS Group Holdings, LLC and Jessamine Healthcare Holdings[5] "were placed under common ownership." (Doc. # 641-7 at 60-61). According to Perry, the owners of CCS Group Holdings and Jessamine exchanged their ownership interests in the respective companies "for ownership interest in the new entity on a proportional basis." (*Id.* at 61). Houston recalled that employees of CHC Companies were paid by CCS following the merger, but "still referred to themselves as CHC employees." (Doc. # 641-4 at 165). The Securities Exchange Agreement submitted by Defendant CCS reflects that CCS Group Holdings and Jessamine transferred their individual stock for stock shares in CCS-CHC Holdings, LLC. (Doc. # 641-8 at 8, 77).

As of January 2015, CCS handled all of the in-house payroll, accounting, and legal services for CHC Companies and JCS. (Doc. # 641-4 at 49-50). CCS also handled most of the

---

[5] Jessamine purchased CHC Companies in December 2012. (*See* Doc. # 641-7 at 63).

compliance and human resources issues. (*Id.* at 50, 53). In late 2015, when JCS closed its offices in the state of Alabama, Houston participated in that decision, along with Ray and Karen Lloyd. (*Id.* at 122-23, 171-72). By that time, Houston served as CCS's president of state and federal affairs. (*Id.* at 48). CCS's legal department handled the transactions necessary to cease JCS's operations in Alabama. (*Id.* at 123).

## II.     Procedural Background

During an October 2016 discovery conference, Plaintiffs' counsel notified the court of discovery disputes regarding redactions made to purchase agreements between JCS, CHC Companies, and CCS and exclusions of certain schedules from those agreements. (Doc. # 492 at 25-27). Plaintiffs' counsel also discussed redactions made to certain emails. (*Id.* at 36-37). The court ordered Plaintiffs and Defendant City of Childersburg to prepare a joint request for production of documents related to the purchase agreements. (Doc. # 490 at 1). It also ordered Plaintiffs, CHC Companies, and CCS to prepare a joint report about which redacted emails were still in dispute. (*Id.* at 2). Because the redacted and withheld documents at issue contained sensitive information, the court referred this discovery dispute to a Magistrate Judge. In November 2016, the Magistrate Judge ordered Defendants to produce the disputed documents for an *in camera* review. (Doc. # 509).

In January 2017, Defendants CHC Companies and CCS filed their initial motions for summary judgment. (Docs. # 543, 549). In May 2017, the court set those motions, along with other motions, for oral argument on July 24, 2017. (Docs. # 609 & 610). On July 17, 2017, the Magistrate Judge concluded that Plaintiffs were entitled to an unredacted version of the merger agreement between JCS and CHC Companies and that Defendants needed to remove some redactions from emails pertaining to operations in Alabama. (*See* Doc. # 612). At oral

6

argument, Plaintiffs' counsel disclosed to the court that they had received additional relevant documents following the Magistrate Judge's order. (Doc. # 620 at 101). The court concluded that the Rule 56 record should be supplemented before ruling on Defendants' summary judgment motions. (*Id.* at 107-08). Defendants' counsel did not oppose supplementing the record, although he believed that it would make no difference. (*Id.* at 108). Accordingly, the court administratively terminated the initial summary judgment motions. (Doc. # 616).

In September 2017, the parties resolved the remaining discovery disputes. (*See* Doc. # 635). The court directed Defendants to re-submit their summary judgment motions. (*Id.*). And, the court granted the parties leave to "file supplemental briefs of up to fifteen (15) pages with their response and reply submissions." (*Id.*).

## III. Standard of Review for Summary Judgment Motions

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV. Analysis

The court has carefully considered Plaintiffs' arguments for imposing liability on CHC Companies and CCS, but concludes that those arguments miss the mark.

### A. Successor Liability

Under Alabama law, "[a]s a general rule, a purchasing corporation is not liable for the debts and liabilities of the selling corporation." *Asher v. KCS Int'l, Inc.*, 659 So. 2d 598, 599 (Ala. 1995). *See also Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir. 1985). Four exceptions to this general rule permit a plaintiff to hold the purchasing corporation accountable for the liabilities of the selling corporation: "(1) there is an express agreement to assume the obligations of the transferor[;] (2) the transaction amounts to a de facto merger or consolidation of the two companies[;] (3) the transaction is a fraudulent attempt to escape liability[;] or (4) the transferee corporation is a mere continuation of the transferor."[6] *Asher*, 659

---

[6] The parties do not raise a choice-of-law issue when discussing successor liability, and all parties have applied Alabama law in their briefs. (*See* Docs. # 642 at 31-32; 643 at 34; 649 at 18; 651 at 15-16). Because the parties have applied Alabama law to the successor liability issues, the court will do the same.

The Alabama Supreme Court has recognized a separate body of successor liability law in products liability suits. *See Rivers v. Stihl, Inc.*, 434 So. 2d 766, 771-72 (Ala. 1983). The parties have not asked the court to apply this body of successor liability law, and the court finds it inapplicable to the claims before it in any event.

So. 2d at 599 (quoting *Andrews v. John E. Smith's Sons Co.*, 369 So. 2d 781, 785 (Ala. 1979)). *See also Bud Antle*, 758 F.2d at 1456 (describing the same four exceptions, while stating that a buyer also can impliedly agree to assume obligations). "If the original entity still exists, however, there is no successor, and therefore, no successor liability." *Norfolk S. Ry. Co. v. Pittsburgh & W.V. R.R.*, 153 F. Supp. 3d 778, 807 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017). Moreover, a reverse triangular merger, such as the one between JCS and CHC Companies, is "specifically designed to preclude the imposition of successor liability" because its result is a stock purchase, not a purchase of assets. *Id.* at 808.

Plaintiffs seek to apply successor liability against CHC Companies and CCS under the *de facto* merger and mere continuation exceptions. (Docs. # 642 at 32; 643 at 34). To show that a successor corporation is liable as a mere continuation of the prior corporation, a plaintiff must present substantial evidence that: (1) "[t]here was a basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the seller's name"; (2) "[t]he seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation"; (3) "[t]he purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation"; and (4) "the purchasing corporation held itself out to the world as the effective continuation of the seller corporation." *Asher*, 659 So. 2d at 599-600. To show that a successor corporation conducted a *de facto* merger with a prior corporation, among other elements, a plaintiff generally must show "a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a

constituent part of the purchasing corporation." *Bud Antle*, 758 F.2d at 1457-58 (quoting *Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983)).

i. **Successor Liability of CHC Companies**

Plaintiffs have not shown that CHC Companies is subject to successor liability for JCS's tortious conduct under a *de facto* merger or mere continuation theory. First, the merger agreement indicates that CHC Companies did not pay for JCS with CHC Companies' stock, such that the stockholders of JCS became stockholders and constituents of CHC Companies. *Cf. Bud Antle*, 758 F.2d at 1457-58. Rather, JCS stockholders received money for their equity interests in the corporation. (Doc. # 647-1 at 11). Thus, the *de facto* merger doctrine is inapplicable.

Second, the Rule 56 record demonstrates that JCS remained a separate business entity from CHC Companies after the merger. It did not cease operations and liquidate after the merger. *Cf. Asher*, 659 So. 2d at 599; *Bud Antle*, 758 F.2d at 1458. Nor did CHC Companies hold itself out as an effective continuation of JCS. Indeed, JCS maintained its separate operations after September 2011. When CHC Companies and CCS merged in June 2014, JCS's CEO asserted that its probation operations would continue. (Doc. # 641-6 at 2). The reverse subsidiary merger model used by CHC Companies is designed to avoid successor liability. *See Norfolk S. Ry. Co.*, 153 F. Supp. 3d at 808.[7] Although CHC Companies purchased JCS's stock through the reverse subsidiary merger, the Rule 56 evidence shows that CHC Companies did not operate as a mere continuation of JCS because JCS continued to operate as a separate subsidiary after the September 2011 transaction. For this same reason, the court cannot conclude that CHC

---

[7] As several district courts have explained, reverse triangular mergers are designed to not change the subsidiary's corporate status, and, thus, foreclose a transfer or assumption of the subsidiary's rights and obligations. *See, e.g.*, *Morgan v. Powe Timber Co.*, 367 F. Supp. 2d 1032, 1037-40 (S.D. Miss. 2005); *Binder v. Bristol-Myers Squibb, Co.*, 184 F. Supp. 2d 762, 772 (N.D. Ill. 2001). *See also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1277 (N.D. Ca. 2000) ("However, a 'reverse triangular merger' of the sort performed here . . . does not effect a 'de facto' merger unless the transaction has been structured to disadvantage creditors or shareholders.").

Companies entered into a *de facto* merger with JCS. *Cf. Bud Antle*, 758 F.2d at 1458; *Matrix-Churchill v. Springsteen*, 461 So. 2d 782, 787 (Ala. 1984) (holding that a corporation that purchased 99.7 percent of the prior corporation's stock had not effectuated a *de facto* merger, in part, because the prior corporation continued its separate operations after the purchase). Therefore, Plaintiffs cannot maintain successor liability against Defendant CHC Companies under these circumstances.

        ii.        **Successor Liability of CCS**

Plaintiffs also have not shown that Defendant CCS is subject to successor liability for JCS's tortious conduct. Even if Plaintiffs could show a *de facto* merger between CCS and CHC Companies (and, to be clear, they have not), they have not established a *de facto* merger between CCS and JCS. Indeed, to the court's knowledge, JCS continued to conduct ordinary business functions under its own name, rather than that of CCS or CHC Companies, after June 2014. Since JCS remains a separately operating entity separate and distinct from CCS and CHC Companies (*see* Doc. # 641-6 at 2) and never ceased its own ordinary business operations, Plaintiffs cannot establish that CCS is subject to successor liability under a *de facto* merger or mere continuation theory. *Cf. Asher*, 659 So. 2d at 599; *Bud Antle*, 758 F.2d at 1458. Therefore, the court concludes that Defendant CCS cannot be held liable under a successor liability theory.

    **C.**    **Plaintiff Has Failed to Show that Defendant CHC Companies is Liable for JCS's Conduct Under the Single Employer Doctrine**

The single employer doctrine is a creation of the National Labor Relations Board that, when applicable, treats related enterprises as a single entity under the National Labor Relations Act. *Int'l Bhd. of Elec. Workers, Local 613 v. Fowler Indus., Inc.*, 884 F.2d 551, 553 n. 3 (11th Cir. 1989). It has also been used to determine whether two or more employers are a single employer under Title VII of the Civil Rights Act. *See Phillips v. Bd. of Trs. of Univ. of Ala.*, 218

F. Supp. 3d 1297, 1304-05 (N.D. Ala. 2016). Here, however, Plaintiffs have not cited (and the court has not found) any authority to support the argument that the single employer doctrine extends liability under § 1983 to a subsidiary corporation's parent corporation in an action that is not brought by an employee of the subsidiary.[8] Nor can the court envision any policy reason for such an extension of the doctrine. Accordingly, Plaintiffs cannot hold Defendant CHC Companies liable for any § 1983 violation through an application of the single employer doctrine.

Moreover, and in any event, Plaintiffs have failed to present a triable case that the single employer doctrine applies here. A plaintiff must show a high level of integration with respect to ownership and control between entities 645 to conclude that they are a single employer. *See Long v. Aronov Realty Mgmt., Inc.*, 645 F. Supp. 2d 1008, 1030 (M.D. Ala. 2009). The relevant factors courts are to consider are: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). A review of the Rule 56 evidence related to these factors reveals that JCS and CHC Companies did not act as a single employer.

---

[8] In one persuasive opinion, the Second Circuit affirmed a judgment against a parent corporation for a 42 U.S.C. § 1981 claim based upon the single employer doctrine. *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 155-57 & n. 13 (2d Cir. 2014). Importantly, though, the plaintiff in that § 1981 case was an employee of the parent corporation's subsidiary who suffered harassment on a worksite. *See id.* at 148-49. And, the Second Circuit noted in *Turley* that the parent corporation failed to raise the issue in its briefing. *Id.* at 155 n. 13. In any event, the Second Circuit's application of the single employer doctrine in *Turley* is consistent with its use in Title VII and other labor and employment contexts. *See also Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 343-44 (5th Cir. 2003) (assuming, without deciding, that the single employer doctrine applied to a § 1981 claim arising from a subsidiary's termination of the plaintiff, an independent contractor). At best, the *Turley* court's analysis would apply to the question of whether the single employer doctrine would apply to a § 1983 claim brought by an employee against entities whom he or she claims constitute a single employer. That is not the question before the court here so the court need not answer it.

### i. Interrelation of Operations

"Courts are to consider several indicia of interrelatedness: '(1) combined accounting records; (2) combined bank accounts; (3) combined lines of credits; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices.'" *Klein v. L-3 Commc'ns Corp.*, No. 1:12-cv-956-MEF, 2013 WL 5913776, at *7 (M.D. Ala. Nov. 1, 2013) (quoting *Walker v. Boys & Girls Club of Am.*, 38 F. Supp. 2d 1326, 1331 (M.D. Ala. 1999)).

Plaintiffs have presented no evidence to suggest that JCS and CHC Companies combined accounting records, lines of credit, bank accounts, switchboards, telephone records, or offices. To be sure, CHC Companies performed payroll functions for JCS employees after the merger occurred. (*See* Doc. # 428-3 at 36). Nevertheless, despite the combined payroll functions, the Rule 56 record shows that JCS and CHC Companies remained separate and distinct entities in other respects. Therefore, this factor does not support a finding that JCS and CHC Companies were a single employer.

### ii. Centralized Control of Labor Relations

"To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir. 1993). The court may consider several "indicia of control" in analyzing the parent corporation's control of labor relations, including "the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments, and the obligation to pay or the duty to train the charging party." *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1345 (11th Cir. 1999) (*en banc*) (alteration adopted and internal quotation marks omitted) (quoting *Oaks v. City of Fairhope, Ala.*, 515 F. Supp. 1004, 1035 (S.D. Ala. 1981)). Generally, a subsidiary's use of a

parent's human resources services, standing alone, is not sufficient to satisfy this factor. *See Cruz-Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1254 (S.D. Fla.) (finding that a subsidiary's use of a parent's human resources department did not demonstrate control where the subsidiary retained authority to hire, fire, and supervise employees), *aff'd*, 88 F. App'x 381 (11th Cir. 2003).

Plaintiffs have not shown that CHC Companies exercised control over JCS's day-to-day employment decisions. Plaintiffs have not argued that CHC Companies controlled JCS's day-to-day hiring, firing, transfer, and work assignment decisions. *See Lyes*, 166 F.3d at 1345. Plaintiffs argue that CHC Companies defined JCS's employment policies and controlled its employee reviews, but no Rule 56 evidence supports that argument. (*See* Doc. # 642 at 34-35). While Plaintiffs contend that Ray testified to CHC Companies' control over "all operating decisions" (Doc. # 642 at 35), Ray actually testified that she needed approval from CHC employees in the context of discussing marketing and political contributions. (*See* Doc. # 392-11 at 191-92). At most, CHC Companies handled JCS's payroll, provided human resources and legal assistance, and controlled executive-level employment decisions. This evidence simply does not support the conclusion that CHC Companies and JCS had centralized control over labor relations. Therefore, this factor does not support a finding that they were a single employer.

### iii. Common Management

"Cases treating two separate corporate entities as a single employer have placed heavy emphasis on the existence of common directors and officers." *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 727 (N.D. Ala.), *aff'd*, 664 F.2d 295 (11th Cir. 1981) (citing *Baker v. Stuart Broad. Co.*, 505 F.2d 181 (8th Cir. 1974)). Here, Plaintiffs have shown some degree of commonality between JCS's officers and CHC Companies' officers. For example, Goetz served as both JCS's

CEO and CHC Companies' CEO. (Docs. # 641-4 at 34-35, 269-70; 647-6). Houston oversaw JCS and hired JCS's COO while acting as CHC Companies' COO. (Doc. # 641-4 at 124). This factor supports a finding of single employer status.

### iv. Common Ownership or Financial Control

Under this factor, courts look to who owns the companies. *See Cruz-Lovo*, 298 F. Supp. 2d at 1254. It cannot be disputed that CHC Companies owned JCS during the relevant time periods. This factor weighs in Plaintiffs' favor.

### v. Conclusion

In conclusion, the interrelatedness and control factors weigh in Defendant CHC Companies' favor, and the common management and common ownership factors weigh in favor of Plaintiffs. But, it is not surprising that JCS and CHC Companies had common management and common ownership because JCS clearly operated as a subsidiary of CHC Companies. "Common management and ownership are ordinary aspects of a parent-subsidiary relationship." *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997). Common management and ownership is not enough to treat a parent corporation and a subsidiary corporation as a single employer. *Id.* "Some nexus to the subsidiary's daily employment decisions must be shown." *Id.* Plaintiffs fail to present evidence of any such nexus here, beyond CHC Companies' control of payroll functions.

On balance, the court concludes that Plaintiffs cannot rely on the single employer doctrine to establish liability against Defendant CHC Companies for two reasons. First, the single employer doctrine is inapplicable to the § 1983 claims in this case. Second, Plaintiffs have failed to show a basis for finding CHC Companies and JCS to be a single employer.

### C. Plaintiffs Have Abandoned Any Claim that CHC Companies and JCS Were Joint Employers

Plaintiffs previously indicated to the court that they would seek to establish liability against Defendants CHC Companies and CCS under a joint employer theory. But, Plaintiffs have not presented argument on a joint employer theory in their opposition briefs or their supplemental briefs. (*See generally* Docs. # 642 at 27-51; 643 at 33-40; 645 at 6-11; 646 at 5-6). Therefore, Plaintiffs have abandoned any argument for joint employer liability. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325-26 (11th Cir. 2000) (holding that a state-law claim was effectively abandoned when a party failed to brief and argue the issue before the district court).

### D. Plaintiffs Have Not Presented a *Monell* Policy or Custom Instituted by CHC Companies or CCS that Caused the Constitutional Violations They Arguably Suffered

Plaintiffs argue that CHC Companies is responsible for violating their constitutional rights because it directed and controlled JCS from September 2011 to June 2014. (Doc. # 642 at 37). They insist that CHC Companies had a policy or custom of violating probationers' constitutional rights because they continued to operate the probation system initiated by JCS with "substantially similar forms and processes." (*Id.* at 49). They note that JCS employees informed Houston, a CHC Companies' executive, about certain probation practices, and he allowed them to continue. (*Id.* at 49-50). With regard to Defendant CCS, Plaintiffs argue that it was responsible for § 1983 violations that continued until JCS ceased operations in Alabama. (Doc. # 643 at 36). Despite Plaintiffs' arguments to the contrary, the court finds no basis for extending § 1983 liability to CHC Companies or CCS.

When a private entity contracts to perform a traditional function exclusively within the state's prerogative, "it becomes the functional equivalent of the municipality." *Buckner*, 116

F.3d at 452. A municipality is liable under § 1983 when a municipal employee or agent undertakes an action in "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. A plaintiff may establish the existence of a municipal "policy" by identifying "(1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*). Plaintiffs argue that the present cases are distinguishable from § 1983 actions applying the *Monell* standard to private entities providing health care services because CHC Companies (and JCS) implemented an extortion scheme. (Doc. # 642 at 39). Plaintiffs offer no authority for the suggested distinction, and the court is unaware of any "extortion" exception to the *Monell* standard that the Eleventh Circuit applies to § 1983 claims against corporations.

Plaintiffs assert that CHC Companies should be held liable under § 1983 for continuing the operation of JCS's probation scheme. This argument cuts no ice, though, because it is tantamount to a *respondeat superior* argument. That is, Plaintiffs seek to hold the parent corporation (CHC Companies) liable because the subsidiary corporation (JCS) continued to act within the scope of its prior practice after the acquisition date. Plaintiffs offer no Rule 56 evidence that CHC's decisionmakers reviewed JCS's practices in Childersburg or modified them in any fashion after the September 2011 acquisition. Moreover, while Plaintiffs suggest that CHC Companies should be considered a member of a conspiracy to violate their constitutional rights (Doc. # 642 at 51), they fail to point to evidence showing that employees of CHC Companies participated in a conspiracy with municipal court or Childersburg officials. (*See id.*).

18

Indeed, there is no Rule 56 evidence that any CHC employee ever contacted an employee of Childersburg or its municipal court.[9] Thus, Plaintiffs have failed to present a triable claim against CHC Companies under *Monell* or a conspiracy theory.

Similarly, Plaintiffs fail to show any policy or practice implemented by *CCS decisionmakers* that caused a violation of their constitutional rights. Plaintiffs present a *respondeat superior* argument to attribute JCS's policies to CCS, based solely upon the continuing probation practices that occurred in Childersburg. (Doc. # 643 at 36-40). Their argument that CCS can be held liable for allowing JCS to continue its probation practices is even less convincing than their argument regarding CHC Companies.

## V.    Conclusion

For the reasons explained above, Plaintiffs have failed to present any basis for holding CHC Companies or CCS liable for the remaining § 1983 claims against JCS; accordingly, their Motions for Summary Judgment (Docs. # 636, 639) are due to be granted. Defendants' Motion to Strike (Doc. # 648) is due to be denied as moot because Defendants are entitled to summary judgment even after consideration of the additional arguments and evidence. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this May 9, 2018.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[9] Again, Plaintiffs have failed to demonstrate that CHC Companies acted as a single employer with JCS, and they have abandoned any joint employer argument.