## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GINA KAY RAY, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:12-cv-02819-RDP** |
| | } | |
| **JUDICIAL CORRECTION SERVICES,** | } | |
| **INC.,** | } | |
| | } | |
| **Defendants.** | } | |

### <u>MEMORANDUM OPINION</u>

This matter is before the court on Plaintiffs' Motion for Class Certification. (Doc. # 707). The Motion has been fully briefed. (Docs. # 708, 709, 714, 715 and 719). After careful review, and for the reasons discussed below, the court concludes the Motion is due to be denied.

### I.    Background

The named Plaintiffs in this action were ticketed for various traffic offenses and sentenced to probation by the City of Childersburg Municipal Court because they did not pay the fines or court costs imposed by the Municipal Court on the date of their sentencings. Individuals who were unable to immediately pay all fines and costs imposed by the court were placed on probation under the supervision of Judicial Correction Services ("JCS" or "Defendant"). (Doc. # 305 at ¶¶ 97-98). While on probation, Plaintiffs were required to pay an additional $35 to $45 a month to JCS (on top of their fines and court costs). Plaintiffs assert that "[t]his [was] routinely done with no investigation into the indigency of the individual or the reasons for their inability to pay the fine and costs." (*Id.* at ¶ 22). Plaintiffs further allege that these practices violated their constitutional rights. (Doc. # 305 at ¶ 14).

## A.     JCS Operations

JCS marketed its private probation services to cities and towns throughout Alabama and, in doing so, presented them as "offender paid" services. (Doc. # 392-11 at 192-93). JCS did not charge a City or Municipal Court for its services, but instead collected a "$35.00 per month flat fee" and an additional "[o]ne time probationer set-up fee of $10.00" from "probationers." (Doc. # 392-16 at 6). Once JCS started charging its monthly fees, a person on probation could not end her sentence by simply paying off the amount of the original debt. (Doc. 195-1 at 109-10).

Childersburg began contracting with JCS in 2005. (Doc. # 421-7 at 2). The contract provided that JCS would collect fines, restitution, and court costs on behalf of a Municipal Court. (Doc. # 392-16 at 4). JCS's standard contract required JCS to perform supervision for "all probated cases sentenced by the [Municipal] Court," including indigent probationers. (*Id.*). However, JCS agreed not to charge its standard probation fees to indigent probationers or to probationers who paid their fines and court costs within a week of their sentencing hearing. (*Id.* at 4). The contract required JCS to maintain case files "with the terms and conditions of probation, reporting dates, field contacts as they occur and . . . the amounts and dates of monies collected." (*Id.*).

JCS's policies and procedures were set forth in three main sources: (1) the JCS contract; (2) the JCS Probation Tracker software program, which was used to manage probation cases; and (3) the JCS Training Manual. JCS employees were trained using the JCS Training Manual, a copy was kept at every office, and every employee had access to Probation Tracker. (Doc. # 392-11 at 65-66, 77, 107-108). The JCS Training Manual provides a flow chart for "Working a Typical Case," and describes how to perform tasks in Probation Tracker, including the use of various codes to indicate each probationer's status and associated actions taken by JCS. (Doc. # 392-11 at 65-66, 77, 107-108).

Once a city contracted with JCS, JCS provided form Probation Orders. (Docs. # 392-11 at 170-72; 195-1 at 232). The pre-printed form orders included the standard "conditions of probation," and were filled out by JCS employees. (Doc. # 708-2 at 27). The form Order contained a single line printed at the bottom of the page stating, "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER." (Doc. # 708-2 at 27). The form contains no explanation regarding the right to counsel. (*Id.*).

Probation Tracker also contains a case file for each person on probation, and each file has a page where JCS employees can chronicle collection efforts and information gathered. Documents generated by the Municipal Court were generally scanned into Probation Tracker and linked to the individual's case file. (Docs. # 392-11 at 170-72; 195-1 at 232). JCS's records indicate a large number of people sentenced to JCS probation by the Childersburg Municipal Court were collecting SSI or unemployed. (Docs. # 708-1 at ¶ 59; 708-7 at 801-805). Nonetheless, the record contains evidence that neither JCS nor the Childersburg Municipal Court had a practice of inquiring into whether people had the ability to pay the court debt or fees at any point. (Docs. # 392-11 at 161; 195-1 at 232).

When probationers could not make a scheduled payment, JCS threatened to have them arrested. (Docs. # 195-1 at 304; 641-46 at 131). And when they could only make a partial payment, JCS often allocated as much of the payment (or, in some instances, even more) to its own fees as it did to the court's fine, thereby prolonging the amount of time it took for debtors to satisfy their underlying debts to the city. (Docs. # 697 at 73-75, 88, 104; 697-7 at 1; 697-1).

If a debtor repeatedly failed to make payments, JCS generated a petition for revocation, which requested the Municipal Court to revoke the debtor's probation and issue an arrest warrant. (Docs. # 697-11 at 46; 626 at 15-16, 66, 80). Neither JCS nor the Childersburg Municipal Court

informed probationers that they could only lawfully be jailed if they willfully refused to pay even though they were able to pay. (Doc. # 195-1 at 134; 708-2 at 76).

When arrested, probationers who could not make payments were jailed overnight, and some were detained for days or even weeks until a payment was made on their behalf. (Doc. # Docs. 697-7 at 1; 697-1 at 1). JCS submitted payments to the Municipal Courts each month, but it was JCS which determined how the probationers' payments were allocated between court fines and JCS's fees. (Doc. # 194-1 at 288). A significant portion of the payments made to secure release of probationers from jail was allocated by JCS for its fees, not just for court fines. (*Id.*).

JCS did not inform the Municipal Courts the total amount collected from probationers or how much the company kept for itself in fees. (*Id.* at 69-70, 180-94). Cities typically did not monitor or audit JCS's activities and often did not keep records as to who was assigned to JCS, let alone how long each person had been on JCS probation. (*Id.;* Doc. # 195-1 at 92-93). As a result of these and other factors, individuals on probation occasionally ended up paying more than the amount of their original court debt. (Docs. # 194-1 at 69-70, 180-94).

Under Alabama law, a municipal court may not sentence a defendant to a term of probation that exceeds two years. Ala. Code § 12-14-13(a). JCS frequently extended probationers' sentences beyond the two-year statutory limit. (Docs. # 187-3, 183-4, 708-11 at 11-12). They did this in a number of ways, including extending the sentence 24 months from the reinstatement date when marking a person's probation sentence as reinstated, even if the person had served time toward those probation sentences; extending sentences for existing charges by 24 months when the municipal court issued probation orders in a different case; placing probation sentences on hold and then starting them long after the sentence date; and entering a longer sentence in Probation Tracker than the sentence ordered by the Municipal Court. (Doc. # 626 at 12-13, 63-64). JCS's

Training Manual provided instructions to modify the term of probation, and this included extension of the probation. (Doc. # 708-3 at 44). JCS's Training Manual specifically addresses the subject of continuing to collect fees from debtors after their probation terms ended. (*Id.*).

The Training Manual also has a section related to procedures that "will be followed when a defendant has more than one case." (Doc. # 708-3 at 43). Those procedures specify that:

> If a defendant has more than one case in the same court, the second and subsequent cases are to be placed on hold. Once the first case is paid in full, the second case is to be made active the day the first case is paid in full. The probation date on the admin. screen will be changed to the date the first case is paid in full. [] Once the second case is paid in full, the above is to be followed for the third case, and so on.

(Doc. # 708-3 at 43). However, the Manual's Ethical & Professional Behavior Do's and Don'ts section explicitly provides that a JCS employee must not "[m]odify a court sentence without approval from that court." (Doc. # 708-3 at 81).

Plaintiffs assert that JCS records show that over 20,000 people in the state of Alabama, including three of the four named Plaintiffs, were kept on probation for longer than two years for one probation sentence. (Docs. # 708-1 at ¶¶ 38-39, 708-11 at 27, 33-450).

## B. Probation of Plaintiffs Timothy and Kristy Fugatt

Childersburg police issued Kristy Fugatt two traffic tickets in November 2010 for driving with an expired tag and an expired license. (Doc. # 392-66 at 14-15). Kristy Fugatt renewed her license (Doc. # 392-6 at 105), and the Municipal Court only assessed court costs for each ticket, (Doc. # 392-66 at 14-15). When Kristy Fugatt informed the Municipal Judge that she could not pay the full amount charged, he directed her to an intake area in order to "talk to JCS." (Doc. # 392-6 at 105-07). Kristy Fugatt signed a form stating that she would pay a certain amount. (*Id.* at 108-09). She was placed on probation under JCS's supervision. (*See* Doc. # 392-18 at 9) (stating that Kristy Fugatt had been sentenced to 24 months' probation in January 2011).

Timothy Fugatt received a traffic ticket in December 2010 for driving with an expired vehicle tag. (Doc. # 392-66 at 11). He was not convicted of the traffic offense but was ordered to pay court costs. (*Id.*). Timothy Fugatt testified that he had attempted to inform the Municipal Judge about his child's terminal illness during the hearing, but he did not get an opportunity to speak to the judge due to the rapid pace of the proceedings. (Doc. # 392-7 at 74). Similar to his wife, the Municipal Court also sentenced Timothy Fugatt to 24 months' probation under JCS's supervision. (Doc. # 392-19 at 7).

In early 2011, JCS scheduled weekly probation appointments for both the Fugatts. (*See* Docs. # 537-24 at 7-8; 537-25 at 10-11). Timothy Fugatt told a JCS employee in January 2011 that his child was terminally ill and that he could not make a payment to JCS until he had received a tax refund. (Doc. # 537-25 at 9). In April, May, and June 2011, the Fugatts did not appear at 11 of the 12 probation appointments scheduled by JCS. (*See* Docs. # 537-24 at 7-8; 537-25 at 10-11). The parties dispute whether JCS employees mailed failure to report letters or delinquency letters to the Fugatts. Timothy Fugatt testified that he did not remember whether he received the letters. (Doc. # 537-19 at 108-09). Probation Tracker records reveal that JCS employees sometimes noted in Probation Tracker when they mailed some of the letters to the Fugatts. (*See* Doc. # 537-24 at 6). At other times, JCS employees placed a failure to report letter in the Probation Tracker record without any notation or indication that the letter had been mailed to the probationer. (*See id.*)

JCS prepared revocation petitions for Kristy and Timothy Fugatt on June 28, 2011. (Docs. # 537-1 at 2; 537-2 at 2). Timothy Fugatt's revocation petition explained that he had failed to report to JCS for 16 scheduled appointments and had failed to pay $223 as ordered. (Doc. # 537-1 at 2). The revocation petition explained that a payment of $223 would close his case. (*Id.*). It warned him that a warrant would be issued if he failed to appear at the Municipal Court on August

11, 2011. (*Id.*). Kristy Fugatt's revocation petition averred that she had missed 17 scheduled appointments and had failed to pay $371. (Doc. # 537-2 at 2). It explained that a payment of $371 would close her case and that a warrant would be issued if she failed to appear at the probation revocation hearing scheduled for August 11. (*Id.*). Timothy Fugatt testified that they likely would not have received copies of the revocation petitions because their house had been foreclosed upon. (Doc. # 537-19 at 111).

The Municipal Court held revocation hearings for Kristy and Timothy Fugatt on August 11, 2011, but neither of them appeared at the hearings. (Docs. # 537-24 at 5-6; 537-25 at 7). The Municipal Court issued arrest warrants for both in August 2011. (*Id.*). Both warrants stated that the Fugatts had been convicted of failure to obey a court order ("FTOCO"). (Docs. # 537-33 at 2; 537-34 at 2). Timothy Fugatt's warrant required him to pay $540 as a cash bond in order to be released. (Doc. # 537-33 at 2). Kristy Fugatt's warrant required her to pay a cash bond of $688. (Doc. # 537-34 at 2).

A Childersburg police officer arrested the Fugatts on February 26, 2012. (Docs. # 537-36 at 2-3, 537-38 at 2-3, 402-27 at 3, 402-28 at 3). They were taken to the police station and placed in a holding cell. (Docs. # 402-27 at 3; 402-28 at 3). They were released the same day after they had paid $900 for a cash bond. (*Id.*).

In May 2012, the Municipal Court reinstated the Fugatts' probation sentences. (Docs. # 537-24 at 5, 537-25 at 7). On April 26, 2012, the Municipal Court issued Timothy Fugatt a new Probation Order regarding the FTOCO offense. (Doc. # 537-3 at 2). This probation sentence ended on April 26, 2014. (*Id.*). Although the Municipal Court actually issued a new probation order for a different offense, JCS's records state that the court reinstated Timothy Fugatt's probation for the expired tag offense adjudicated in January 2011. (Doc. # 537-24 at 5). JCS also recalculated the

probation date for that offense - from January 2011 to May 1, 2014.[1] (*Id.*). Similarly, the Municipal Court also reinitiated Kristy Fugatt's earlier probation sentence and added a $317 warrant fee. (Doc. # 537-4 at 2). Moreover, the Municipal Court fined Kristy Fugatt $168 for a speeding offense. (*Id.*). The record does not indicate whether she received the speeding ticket for which she was fined. JCS placed Kristy Fugatt's May 2012 probation sentence on hold. (Doc. # 537-41 at 2). In August 2012, JCS prepared revocation petitions and draft notices to show cause against Kristy and Timothy Fugatt. (*See* Docs. # 537-24 at 4; 537-25 at 5). Timothy Fugatt called JCS on August 28, 2012 and confirmed that he had received the paperwork that was mailed to him. (Doc. # 537-24 at 4). A JCS employee told him that he could report to JCS on August 31 or September 7, but he did not show up to JCS's office on either of those dates. (*See id.*).

The Municipal Court cancelled revocation hearings concerning the Fugatts on September 13, 2012. (Docs. # 537-24 at 4; 537-25 at 5). According to Kidd's notes in Probation Tracker, Timothy Fugatt called her and demanded a new court date because he believed the revocation hearings were set for 1:30 P.M. (Doc. # 537-24 at 4). He spoke with a Municipal Court employee before calling JCS, but the employee told him that JCS was responsible for deciding whether to set a new court date. (*Id.*). Kidd generated new revocation petitions and notices to show cause and mailed them to the Fugatts on September 19. (*See* Docs. # 537-24 at 4; 537-25 at 5).

The Fugatts appeared before the Municipal Court on October 11, 2012. (*See* Doc. # 537-24 at 4). They explained their financial situation to Judge Ward, who commented from the bench that they were "using [their] son as an excuse not to pay for [their] fines." (Doc. # 537-23 at 234). They filled out a hardship form to explain their financial situation, and JCS agreed to "waive the fees after [the Fugatts] paid $200." (*Id.* at 235). JCS also agreed that the Fugatts could report to a

---

[1]  The record does not indicate whether JCS created a separate Probation Tracker entry for the probation sentence Timothy Fugatt received in April 2012.

probation officer in Sylacauga, Alabama because they were being required "to drive to Childersburg every four days even if [they] couldn't pay anything." (*Id.* at 236). But, Timothy Fugatt called Kidd on October 31, 2012 and informed her that he could not make the payment because he had to pay approximately $1500 for other bills. (Doc. # 537-24 at 3). Kidd contacted a Municipal Court magistrate about the issue, and the Municipal Court mailed subpoenas for the Fugatts to appear on November 7. (Docs. # 537-24 at 3; 537-25 at 4-5). After they failed to appear in court at that hearing, the Municipal Court issued warrants for the Fugatts. (Docs. # 537-24 at 3; 537-25 at 4).

Timothy Fugatt appeared at the Municipal Court in December 2012 and agreed to pay $100 towards the amounts his wife and he owed. (Doc. # 537-24 at 3). He told the court that he would pay the fines off with a tax refund. (*Id.*). The Municipal Court then reinstated the Fugatts' probation sentences in January 2013. (Docs. # 537-24 at 3; 537-25 at 4). JCS placed Kristy Fugatt's probation sentence on unsupervised status in January 2013, after JCS and the Municipal Court had been informed of the present lawsuit. (Doc. # 537-25 at 4). It placed Timothy Fugatt's probation sentence on hold in February 2013 after consulting with a magistrate at the Municipal Court. (Doc. # 537-24 at 3). Ultimately, the Municipal Court terminated the Fugatts' probation sentences on November 1, 2014, which was during the pendency of this action. (*See* Doc. # 537-25 at 4).

### C.     Probation of Plaintiff Deunate Jews

Plaintiff Jews was charged with harassment in 2008. (*See* Doc. # 392-27 at 2). The Municipal Court dismissed the harassment charge against Jews in January 2009, subject to two conditions: that Jews (1) pay court costs to the Municipal Court and (2) avoid contact with the complainant. (*Id.*). During a deposition, Jews claimed that he had contested the Municipal Court's authority to impose court costs against him when the criminal charge against him had been dismissed. (Doc. # 524-5 at 50). Judge Ward responded that he would "lock [Jews] up" unless he

signed a probation order. (*Id.* at 50-51). Jews did not ask Judge Ward any more questions because he believed that the judge would imprison him if he "said any little thing." (*Id.* at 51). Jews was unable to pay the assessed court costs on the date of the hearing. (*Id.* at 52).

After signing a probation order, Jews advised a JCS employee that he would not report to JCS's probation office because the Municipal Court had forced him to sign the probation order. (*Id.* at 56). He informed the JCS employee that he would not pay the imposed court costs because his case had been dismissed. (*Id.* at 59). Moreover, he provided JCS the address for his uncle's residence, rather than his own address. (*Id.* at 60). He submitted this address to JCS because he did not plan to pay what the Municipal Court had directed him to pay. (*Id.* at 60-61). Consequently, Jews did not actually receive a letter that JCS sent to him on January 27, 2009. (*Id.* at 59-60).

The Municipal Court held a revocation hearing in Jews's case on February 12, 2009, but Jews did not appear at the hearing.[2] (Doc. # 524-22 at 6). The Municipal Court's magistrate issued a capias warrant against Jews on February 17, 2009 for failure to obey a court order. (Doc. # 392-35 at 2). The warrant directed Jews to pay a bond of $487 to be released. (*Id.*). Jews was arrested in September 2009. (Doc. # 392-36 at 3). In October 2009, the Municipal Court reinstated Jews's probation sentence and charged him a $317 warrant fee.[3] (Doc. # 524-22 at 6). The court's probation order sentenced Jews to probation for FTOCO. (Doc. # 524-6 at 2). Jews was released from the Talladega County Jail on October 22, 2009. (Doc. # 382-11 at 65).

---

[2] The parties dispute whether JCS provided Jews prior notice of the revocation hearings scheduled with the Municipal Court. Jews's Probation Tracker record does not indicate whether JCS employees sent the revocation petitions and notices to show cause to him. (*See* Doc. # 524-22 at 6). In contrast, as discussed above, Kidd occasionally noted in Probation Tracker when she mailed documents to the Fugatts. Given the parties' dispute regarding whether JCS mailed the revocation petitions and notices to show cause to Plaintiffs, on this record, the court has not accepted JCS's averments that JCS employees mailed these notices.

[3] The Municipal Court issued a separate probation order for Jews on this date. (Doc. # 392-37 at 2). But JCS's records indicate that the court merely reinstated his prior probation term. (Doc. # 524-22 at 6).

JCS petitioned the Municipal Court to revoke Jews's probation again in December 2009. (Doc. # 524-22 at 5). The Municipal Court held a revocation hearing in January 2010, and Jews did not appear at the hearing. (*Id.*). A magistrate issued another capias warrant against Jews based on a conviction for FTOCO. (Doc. # 392-45 at 2). This arrest warrant increased his bond amount to $935. (*Id.*). City police arrested Jews on August 18, 2010. (Doc. # 392-46 at 2). On September 9, 2010, the Municipal Court fined Jews $317 for the failure-to-obey offense and reinstated his probation. (Doc. # 392-38 at 2). A City employee, Misty Hepp, authorized Jews's release from the Talladega County Jail on September 9. (Doc. # 382-11 at 67).

In November 2010, JCS filed another revocation petition against Jews. (Doc. # 524-22 at 5). Jews did not appear at the Municipal Court's December 2010 revocation hearing in his case. (*Id.*). The Municipal Court issued another capias warrant against Jews based on his conviction for FTOCO, and he was thereafter arrested on January 10, 2011. (Doc. # 392-50 at 2-3). Hepp again authorized Jews's release from jail on January 14, 2011, after a $500 bond had been paid on his behalf. (Doc. # 392-51 at 2). The Municipal Court reinstated Jews's probation sentence in March 2011 and charged him a $317 warrant fee. (Doc. # 524-22 at 5).

In May 2011, JCS again petitioned the Municipal Court to revoke Jews's probation. (Doc. # 392-54 at 2). The revocation petition asserted that Jews owed $773 to close his case. (*Id.*). A JCS employee and Judge Ward signed the petition, but the City's prosecutor did not sign it. (*Id.*). Yet again, Jews did not appear at a revocation hearing in June 2011. (Doc. # 524-22 at 4). On June 10, 2011, the Municipal Court's magistrate issued another warrant against Jews based on a conviction for FTOCO. (Doc. # 392-56 at 2). This warrant required Jews to pay $1,090 in bail to be released. (*Id.*). A City police officer arrested Jews in February 2012 after detaining him to check for

outstanding warrants. (Doc. # 392-57 at 2-3). Jews fled from the officer and was detained for resisting arrest and FTOCO. (*Id.*).

According to Jews's Probation Tracker records, during a March 2012 hearing, the Municipal Court reinstated Jews's probation. (Doc. # 524-22 at 4). The court issued another probation order for the resisting arrest charge and FTOCO charge. (Doc. # 392-58 at 2). This order recounted fines of $717 for resisting arrest and $1,090 for FTOCO. (*Id.*). And, it placed Jews on probation until March 8, 2014. (*Id.*). The City's police department released Jews from jail on March 8, 2012. (Doc. # 382-12 at 13). In May 2012, JCS recalculated Jews's probation expiration date for the 2009 probation order stemming from the harassment charges. (Doc. # 524-22 at 4). It stated that his probation on that charge actually was due to end on March 9, 2014. (*Id.*).

In June 2012, JCS requested that the Municipal Court revoke Jews's probation. (Doc. # 524-22 at 3). The revocation petition was not signed by a JCS employee, and the order scheduling a hearing was not signed by the Municipal Court's judge. (Doc. # 392-59 at 2). The Municipal Court held a revocation hearing in August 2012; again, Jews did not attend that hearing. (Doc. # 524-22 at 3). According to JCS's probation records, the probation sentence entered warrant status on August 10, 2012. (*Id.* at 2). The Municipal Court ultimately terminated Jews's probation sentence in December 2014, which was during the pendency of this action. (Doc. # 382 at 114).

In 2015, Jews was sentenced to four years in prison for making a terroristic threat, after having been convicted of another felony in 2014. (Doc. # 431-19).

### D.     Probation of Plaintiff Gina Kay Ray

In June 2010, a City officer ticketed Ray for driving with a suspended license and without proof of insurance. (Doc. # 423-4 at 2). Ray pled guilty to both charges during a Municipal Court hearing on August 12, 2010. (*Id.* at 3). Ray testified that a public defender attended the hearing, but she (Ray) did not believe that an attorney would assist her with a traffic ticket. (Doc. # 471-7

at 38-39). Ray does not believe that Judge Ward identified the public defender during the hearing. (*Id.* at 39). Judge Ward imposed a three-day suspended imprisonment term for each conviction, along with a 24-month probationary sentence. (Doc. # 423-4 at 3). Ray could not recall whether Judge Ward mentioned the suspended imprisonment term during the hearing. (Doc. # 471-7 at 43-44). Judge Ward fined Ray $400 for each traffic offense, imposed $198 in court costs for the suspended license offense, and imposed $148 in court costs for the no insurance offense. (Doc. # 423-4 at 3).

According to JCS's probation records, JCS prepared a revocation petition against Ray on September 20, 2010.[4] (Doc. # 423-11 at 8). The revocation petition contained in the record was not signed by the probation officer or the Municipal Court's judge. (*See* Doc. # 423-8 at 2). The Municipal Court held a revocation hearing on October 14, 2010, which Ray attended. (Doc. # 423-11 at 8). JCS issued another revocation petition on December 30, 2010, based on Ray's failure to attend probation sessions, pay assessed court fines and fees, and pay probation fees. (Doc. # 423-14 at 2). The Municipal Court held a revocation hearing for Ray on January 13, 2011, but she failed to appear. (Doc. # 423-11 at 7). Consequently, on January 18, 2011, the Municipal Court's magistrate issued a capias warrant premised upon a FTOCO conviction. (Doc. # 423-15 at 2). The warrant provided for a bond of $1,353. (*Id.*).

Ray was arrested on January 19, 2011. (*See* Doc. # 455-5). She remained in the Talladega County Jail until February 10, 2011. (*See id.*). The Municipal Court reinstated Ray's probation on February 10, 2011, and imposed a $317 warrant fee. (Doc. # 423-17 at 2). In June 2011, a City officer ticketed Ray for driving with an expired tag and a revoked license. (Doc. # 423-31 at 2).

---

[4] As with Plaintiff Jews, Plaintiff Ray's Probation Tracker records do not indicate whether JCS mailed the September 2010 revocation petition to her. (*See* Doc. # 423-11 at 8). But, her Probation Tracker records state that Kidd mailed petitions and notices to Ray in January 2012 and in August 2012. (*Id.* at 3-4).

Ray pled guilty to both offenses in July 2011. (*Id.* at 3). The Municipal Court imposed 5-day suspended imprisonment sentences, 24 months of probation, fines totaling $500, and court costs totaling $346 for the two convictions. (*Id.*). In August 2011, Ray was again charged with driving with a revoked license and an expired tag. (Doc. # 423-28 at 2). As with her earlier tickets, the Municipal Court imposed a 5-day suspended imprisonment sentence for the expired-tag offense, 24 months of probation for the expired-tag offense, fines totaling $500, and court costs totaling $346. (*Id.* at 3).

On January 4, 2012, a JCS employee found that Ray had violated her probation because she owed the City $1,008 in fines and costs and JCS $433 in fees. (Doc. # 423-11 at 4). The Municipal Court held a revocation hearing on February 9, 2012. (*Id.*). Ray did not attend. (*Id.*). Thus, the Municipal Court's magistrate issued a capias warrant against Ray for FTOCO. (Doc. # 423-23 at 2). The warrant provided a bail amount of $3,173. (*Id.*). On April 21, 2012, City police officers detained Ray because they suspected that she had an active warrant. (Doc. # 423-24 at 2-3). She fled from the officers in her car until she was blocked in by traffic. (*Id.* at 3). The officers issued her tickets for driving with an expired tag, driving with a revoked license, and attempted escape. (Doc. # 423-27 at 2, 4).

Ray was held in jail from April 21, 2012 to May 1, 2012 on the charge of FTOCO. (Doc. # 455-7). On April 26, 2012, the Municipal Court reinstated Ray's probation and imposed a $317 warrant fee. (Doc. # 423-25 at 2). The court's probation order stated that Ray owed $3,173 in costs. (*Id.*). The court ruled that Ray could not be released from jail until $300 had been paid on her behalf. (*Id.*). Ray was released from jail on May 1, 2012 after someone paid the $300. (Doc. # 471-7 at 149).

In June 2012, Ray pled guilty to driving with an expired tag, driving with a revoked license, and attempting to escape. (Doc. # 423-27 at 3, 5). The Municipal Court sentenced Ray to a 5-day suspended incarceration sentence, along with 24 months' probation, for each conviction. (*Id.*). It fined her $400 for driving with a revoked license, $400 for attempting to flee, and $100 for driving with an expired tag. (*Id.*). It also imposed a total of $444.00 in court costs against Ray. (*Id.*).

JCS again requested that the Municipal Court revoke Ray's probation in August 2012 due to the outstanding fines and fees she owed to JCS and the City. (Doc. # 423-11 at 3). The Municipal Court held a revocation hearing in September 2012 and issued a warrant against Ray after she had failed to appear at the hearing. (*Id.*). Ray's probation sentence was terminated by court order on November 1, 2014. (Doc. # 422 at 11).

### E.    The Different Municipal Courts at Issue in this Action

JCS provided services to a number of different municipal courts, and its managers worked in multiple municipal courts. (Docs. # 431-1 at ¶ 22, 431-2 at ¶ 28 431-3, 431-4 at ¶ 12, 30). The procedures and preferences of those courts varied. For instance, some courts accepted payments directly. Others did not. (Docs. # 431-1 at ¶ 50, 431-4 at ¶ 21). Courts also covered different topics at their hearings. (Doc. # 431-1 at ¶ 46). At the initial appearance, Judge Hutchinson of Geraldine, Alabama required probationers to return to the courtroom after filling out probation paperwork to ensure they understood the requirements of probation. (Doc. # 431-4 at ¶ 12). Other courts were not as helpful or compliant. Of course, a court's procedures and preferences necessarily overrode any provisions of the JCS Training Manual. (*Id.*).

Indigence cannot reliably be determined from Probation Tracker. (Doc. # 431-1 at ¶ 61, 431-2 at ¶ 33, 431-4 at ¶ 40). At some revocation hearings, some courts covered the reasons for non-payment. (Doc. # 431-4 at ¶ 12). April Mims provided declaration testimony that, the

Albertville, Alabama Municipal Court performed indigency evaluations and utilized a community service program for probationers unable to pay fines. (Docs. # 431-3, 431-1 at ¶ 66). Between 2009 and 2015, many probationers in Albertville performed community service instead of paying fines. (*Id.*). There is evidence that other courts did not properly consider indigency. (Docs. # 708-13 – 708-16).

Probation Tracker was designed as a tool for JCS, but it does not contain all of the information pertinent to an individual's probation. (Docs. # 431-2 at ¶ 20, 431-4 at ¶ 29). Several cities did not use the Probation Tracker "Jail" status code. (Doc. # 431-1 at ¶ 22). In fact, JCS was not normally notified if a probationer was jailed. (Docs. # 431-1 at ¶ 22, 431-2 at ¶ 16). If JCS was notified, it was sporadic and when it occurred it was often communicated by family members; therefore, incarcerations could not be accurately tracked in that system. (Docs. # 431-1 at ¶¶ 22, 57, 431-2 at ¶¶ 16, 23, 431-4 at ¶¶ 25, 31). When the code was used, it was most often the case that a probationer was jailed on an offense unrelated to his or her probation with JCS. (Docs. # 431-2 at ¶ 16, 431-4 at ¶ 25). When a probationer was jailed for non-compliance, some courts gave probationers credit of $15-30 per day against fines for jail time served. (Doc. # 431-4 at ¶¶ 14, 53). Other courts did not give any financial credit. (*Id.*). Nor was JCS reliably informed when warrants were issued. (Docs. # 431-1 at ¶ 34, 431-4 at ¶ 20).

The Municipal Courts also took different approaches to setting hearings. For example, in Childersburg, Alabama, a probationer only came before the judge if his or her individual circumstances warranted court review. By contrast, in Columbiana, the Columbiana Municipal Court immediately scheduled a compliance hearing for each probationer to occur ninety days after the initial order of probation. (Doc. # 431-1 at ¶ 14). There were other differences.

Judge Ward of the Childersburg Municipal Court did not engage in any dialogue to ensure probationers understood the charges against them and the risks of self-representation, nor was there any colloquy to ensure they freely chose to waive their right to counsel. (Docs. # 708-13 – 708-10). Instead, each probationer was simply required to sign a probation order with form language regarding waiver of counsel. (*Id.*). When JCS presented petitions for revocation of probation and the Childersburg Municipal court issued them, Plaintiffs were arrested and jailed without any inquiry to determine whether any failure to pay was willful or due to indigence. (*Id.*).

In August 2014, after Judge Ward retired from the Childersburg Municipal Court, the Municipal Court established new policies and procedures for setting bail, ensuring defendants' right to counsel, imposing sentences when defendants failed to pay ordered fines and court costs, ordering probation, and revoking probation. (*See generally* Doc. # 128-1). Childersburg terminated its relationship with JCS effective June 20, 2015. (Doc. # 392-63 at 2).

In the Columbiana Municipal Court, at the beginning of each court session, Judge Atchison read prepared remarks. (Case No. 2:15-cv-00493-RDP, Doc. # 183-26 at 1, 5-6).[5] Those remarks informed defendants, among other things, that they had a right to be represented by counsel and that, if jail was a possible punishment and they were unable to pay for an attorney, one may be appointed. (*Id.* at 2, 5-6). During court, defendants were given a copy of Unified Judicial System form C-44B, Explanation of Rights Plea of Guilty. (*Id.* at 3, 8-9). Form C-44B provides that "[e]xcept in minor misdemeanors (a misdemeanor offense or municipal ordinance violation for which the defendant will not be punished by sentence of imprisonment), the court will go over these rights …." (Doc. # 183-26).

---

[5] Although Plaintiffs' counsel has disputed this fact, the cited testimony does not establish that Judge Atchison failed to follow this procedure. Rather, the record evidence cited by Plaintiffs shows only that Plaintiffs did not recall his remarks and did not receive a written copy of them. (Docs. # 183-8 at 101-02, 105, # 183-27 at 268-69).

Magistrate Seale gave defendants an affidavit of substantial hardship (which was another state form) when (1) Judge Atchison told her to do so, or (2) when an attorney was appointed at a bond hearing. (Doc. # 183-1 at 96). Judge Atchison occasionally referred a defendant who submitted a substantial hardship affidavit to probation with JCS, but he instructed JCS to waive their fees for that individual. (Doc. # 160 at 28-29).

## II.     Class Certification Standard

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp*., 959 F.2d 1566, 1569 (11th Cir. 1992). "Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (internal quotation marks omitted).

A plaintiff must also "establish [each of] the four requirements listed in Federal Rule of Civil Procedure 23(a)." *Id*. That rule requires a class plaintiff to show:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as 'the prerequisites of numerosity, commonality, typicality, and adequacy of representation,' and they are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc*., 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 156 (1982)).

Once the party seeking certification shows that the Rule 23(a) requirements have been satisfied, the party must still show that the putative class meets at least one of Rule 23(b)'s requirements. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997). Plaintiffs filed the instant motion seeking certification of a class under Rule 23(b)(3), and alternatively seek to certify an "issue" class under Rule 23(c)(4). Rule 23(b)(3) provides that certification is appropriate if the "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of showing by a preponderance of the evidence that the proposed class meets Rule 23's requirements. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id.* And to determine whether class treatment is appropriate, a court must undertake a "rigorous analysis" of the elements of Rule 23(a) and (b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). While a district court's class certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) (citations omitted). Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Alternatively, Plaintiffs also seek certification under Rule 23(c)(4). (Docs. # 707 at 2, 709 at 56-57). Under Rule 23(c)(4), "an action may be brought or maintained as a class action with

respect to particular issues." Fed.R.Civ.P. 23(c)(4). However, courts "have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement." *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630 (S.D. Fla. 2010) (quoting *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 481 (S.D. Fla. 2006)).

### III.   Analysis

Plaintiffs seek to certify certain Rule 23(b)(3) damages classes. They define a statewide class as follows:

> **1. Statewide Due Process Class:** All individuals who, as of August 28, 2010 or thereafter, were assigned by Alabama municipal courts to JCS probation for the collection of court debt and who served more than 24 months on any single probation sentence.

(Doc. # 707). They also seek to certify a narrower class, which advances two different claims:

> **2. Childersburg Jail Class:** All individuals who, as of August 28, 2010 or thereafter, were assigned by the Childersburg Municipal Court to JCS probation for the collection of court debt and jailed after an alleged probation violation.
>
> AND
>
> All individuals who, after being assigned to JCS by August 28, 2010 or thereafter, were incarcerated, or may be subject to incarceration, without consideration of their indigency for failure to pay fines, fees and costs. A subclass of this class which would include those individuals within the above class who received such treatment in Childersburg.

(Doc. # 707).

In seeking to certify these classes under Rule 23, Plaintiffs have placed at issue three separate alleged constitutional violations, which they contend occurred during the "class period" – *i.e.*, between August 28, 2010 (two years prior to the filing of the original complaint) and November 2015 (when JCS ceased doing business in Alabama). (Doc. # 709 at 8). One claim is on behalf of the Statewide Due Process Class, and two claims are on behalf of the Childersburg Jail Class. (*Id.*). In advancing their Statewide Due Process class claim, Plaintiffs seek to pursue

their "direct" § 1983 claim against JCS, asserting that JCS unilaterally extended the probation sentences of class members beyond the 24-month statutory maximum, without court intervention. (Doc. # 709 at 9).

As part of their the Childersburg Jail class, Plaintiffs seek to pursue (1) a *Bearden* claim, asserting that JCS conspired with the Childersburg Municipal Court to revoke probations and issue arrest warrants without a determination of indigency, thereby violating their due process rights; and (2) a Sixth Amendment claim, asserting that JCS conspired with the Childersburg Municipal Court to fail to appoint counsel and/or obtain valid waivers of counsel. (Doc. # 709 at 8-9).

JCS opposes class certification. It argues that neither the Statewide Due Process Class, nor the Childersburg Jail Class, is ascertainable. It further argues that predominance is not satisfied for many of the same reasons the class is not ascertainable: individualized inquiries and evidence will be required. JCS also questions whether all named Plaintiffs are adequate to represent the class. (Doc. # 714).

## A.     Standing

"It is well-settled in the Eleventh Circuit that prior to the certification of a class, and before undertaking an analysis under Rule 23, the district court must determine that at least one named class representative has Article III standing to raise each class claim." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 679 (S.D. Fla. 2004) (citing *Wolf Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing.")). Indeed, "[o]nly after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482. "To have standing, a plaintiff

must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003).

JCS does not appear to challenge Plaintiffs' standing in this case, and perhaps with good reason – Plaintiffs appear to satisfy the necessary elements of standing. All four named plaintiffs were sentenced to JCS probation by the Childersburg Municipal Court, and all were subsequently jailed for failure to pay court debt, without counsel or determination regarding indigency. The court has already determined that two Plaintiffs were kept on probation by JCS for longer than two years. Accordingly, the court is satisfied the named Plaintiffs have standing.

### B.     Ascertainability

In addition to standing, a class plaintiff must show that the proposed class is adequately defined and clearly ascertainable. *Little*, 691 F.3d at 1304. The threshold issue of "ascertainability," relates to whether the putative class can be identified: "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x. 782, 787 (11th Cir. 2014) (citing *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y. 2009)). These "objective criteria" should be "administratively feasible," meaning that the identification of class members should be "a manageable process that does not require much, if any, individual inquiries." *Bussey*, 562 F. App'x. at 787 (citation omitted) (reversing district court decision finding ascertainability satisfied where class could not be identified by reference to objective information in the defendant's records). The district court must be satisfied that this requirement can be met even before delving into the rigorous analysis of the Rule 23 elements. *See id*. If a plaintiff fails to demonstrate that the putative class is clearly

ascertainable, then class certification is properly denied. *See Walewski v. Zenimax Media, Inc.*, 502 F. App'x. 857, 861 (11th Cir. 2012) (holding that district court denying class certification because the class was not adequately defined or clearly ascertainable did not abuse its discretion and commit a clear error of judgment).

A plaintiff can rely upon a defendant's records to identify class members. *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015). But, in doing so, the plaintiff must "establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Id*. Plaintiffs argue that all of the proposed classes are sufficiently ascertainable. The court disagrees and addresses the ascertainability issues raised in this case below.

### 1.      Whether the Statewide Due Process Class is Ascertainable

As to the statewide class, Plaintiffs argue that "[u]sing the extensive data collected in Probation Tracker, the underlying database, and JCS's own codes, it is possible to identify [] people throughout Alabama who remained on probation for a single sentence longer than two years—as well as who among that group was subsequently jailed or charged JCS fees." (Doc. # 709 at 29). They further note that "JCS provided a list of everyone it had kept on probation longer than 24 months as of April 2014." (*Id.*).

In their initial brief, Plaintiffs devoted little time to the issue of ascertainability.[6] (Doc. # 709 at 29-30). They argued that the class can be ascertained by searching data collected in Probation Tracker to determine who was on probation for longer than twenty-four months for a single offense. (*Id.*). And they rely on the policies set forth in JCS's Training Manual for what should be contained in Probation Tracker. (*Id.*).

---

[6] It is not clear if that was an oversight or intentional (the latter owing to the difficulty in showing ascertainability in this case).

JCS points out that Plaintiffs' proposed statewide class is actually defined more broadly than their individual claims. (Doc. # 714 at 10). The direct Due Process claim against JCS (Doc. # 626 at pp. 62-64) alleges that JCS unilaterally -- without any involvement of the municipal court -- extended a single probation beyond the 24 months. The proposed class definition, however, is broader than that; it includes both probationers who (purportedly) had probations unilaterally extended by JCS, as well as those whose probations were extended via court intervention. (*See* Doc. # 707 at 1 ("[A]ll individuals who, as of August 28, 2010 or thereafter, were assigned by Alabama municipal courts to JCS probation for the collection of court debt and who served more than 24 months on any single probation sentence."); Doc. 709 at 2)). Plaintiffs' definition also fails to account for tolling.

Plaintiffs' expert Peter Coons developed a list of Plaintiffs' proposed Statewide Due Process Class by running SQL searches in Probation Tracker. In particular, Coons searched for probationers who, according to Probation Tracker records, had a probation period that exceeded twenty-four months between the Sentence Date and the status being changed to "Terminated" or "Terminated Modified." (Doc. # 708-1 at 19-20). Coons admitted that he had not accounted for tolling. (Doc. # 715-1 at 174-75).

As an initial matter, there is a substantial question as to whether, fundamentally, the proposed class definition is flawed because it looks simply at whether probation sentences exceeded twenty-four months. Under Alabama law, there is not a blanket prohibition of any sentence exceeding twenty-four months. *See Owens v. State*, 728 So. 2d 673, 679-680 (Ala. Crim. App. 1998) ("[w]e overrule our holding in *Miller*, and the cases cited therein, to the extent that it implies that the maximum probation period can never exceed two years from the date of sentencing"). Another judge of this court has relied on *Owens* in making tolling calculations in

another private probation case. *Hunter v. Etowah Cty. Court Referral Program, LLC*, 309 F. Supp. 3d 1154, 1182 (N.D. Ala. 2018) ("As *Owens* reveals, however, Plaintiffs' calculation of the maximum probation period [] is substantively wrong because it fails to account for return to court orders, arrest warrants, and other events that support tolling.").

Tolling of probation sentences is triggered under Alabama law by two types of events: revocation-related activity and time spent in jail. *Owens*, 728 So.2d at 679-80 ("there are several alternative methods by which probation revocation proceedings can be initiated that will toll the running of the probation period."); *Johnson v. State*, 161 So. 3d 1229, 1231 (Ala. Crim. App. 2013) ("Johnson's probation was tolled while he served his sentence in Walker County, and his term of probation did not begin until he was released from incarceration on June 15, 2009.").

To remedy this issue, Plaintiffs propose an improved methodology to identify the class. (Doc. # 719 at 6-7). Plaintiffs propose to search for activity codes more than twenty-four months after the sentence date, and then exclude from that list any probationer whose Probation Tracker file contains an Order of Probation, thereby excluding probationers whose probation was extended by court order. (*Id.*). However, even if this revised methodology could potentially address tolling related to revocation-related activity and probations extended by court order, it does not even attempt to account for tolling based on incarceration.

Plaintiffs protest that they are not required to perfectly exclude everyone who was not injured from the class. (Doc. # 719 at 10). They also argue that JCS should not be able to rely on the unreliability of its own records to defeat class certification. (*Id.* at 12). Plaintiffs focus on those probationers who are properly with the class – such as those placed on consecutive probation holds by JCS. (*Id.* at 18). They contend that consecutive sentences that exceed the statutory maximum are unlawful. (*Id.*) (citing *Ex. Parte Jackson,* 415 So.2d 1169, 1170 (Ala. 1982).

But, crucially, Plaintiffs have not proposed a solution to account for tolling based on a probationer's imprisonment. As is readily apparent based on the named Plaintiffs' probations, incarceration was not an infrequent event. Moreover, Probation Tracker was not designed to replace court records; rather, it was intended to be a tool for JCS's employees. (Docs. # 431-2 at ¶ 20, 431-4 at ¶ 29). JCS's employees did not always consistently record events in the database.[7] Moreover, JCS employees were not systematically (or even reliably) notified when probationers were jailed. (Docs. # 431-1 at ¶ 22, 431-2 at ¶ 16). Therefore, incarcerations could not be accurately tracked using Probation Tracker. (Docs. # 431-1 at ¶¶ 22, 57, 431-2 at ¶¶ 16, 23, 431-4 at ¶¶ 25, 31). This deficiency is not due to any fault of JCS.

It would appear that to account for tolling due to incarceration, an individualized statewide criminal records check would be required on each of the thousands of probationers whose probations exceeded twenty-four months, something not proposed by Plaintiffs. Even if such a search had been proposed, it is not an administratively feasible basis for identifying membership in the class. *See Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 950 (11th Cir. 2015) (plaintiff establishes Rule 23's implicit ascertainability requirement by proposing an administratively feasible method by which class members can be identified); *Bussey*, 562 F. App'x. at 787 (identification of class members should be "a manageable process that does not require much, if any, individual inquiries").

The court is not requiring Plaintiffs to perfectly exclude from the class everyone who was not injured. What it is requiring at this advanced stage of this seven-year-old case is that Plaintiffs

---

[7] For example, Plaintiff Jews's Probation Tracker record does not indicate whether JCS employees sent revocation petitions and notices to show cause to him. (*See* Doc. # 524-22 at 6). Kidd occasionally noted in Probation Tracker when she mailed documents to the Fugatts. Plaintiff Ray's Probation Tracker records do not indicate whether JCS mailed the September 2010 revocation petition to her. (*See* Doc. # 423-11 at 8). But, her Probation Tracker records state that Kidd mailed petitions and notices to Ray in January 2012 and August 2012. (*Id.* at 3-4).

point to an administratively feasible basis for identifying membership in the statewide class. Because they have not done so (and by all indications cannot), they have not established that the class is adequately ascertainable. For this reason alone, certification of Plaintiffs' proposed Statewide Due Process class should be denied.

### 2.    Whether the Childersburg Jail Class is Ascertainable

Plaintiffs seek to pursue their conspiracy-based claims on behalf of a Childersburg Jail Class. But, JCS argues that this class, too, is not properly ascertainable. (Doc. # 714 at 34).

Plaintiffs' proposed Class List includes 275 probationers. (Docs. # 709 at 9, 708-7 at 717). This list was generated by querying Probation Tracker for probationers who were placed on warrant status during the relevant time period. (Doc. # 709-1 at ¶ 55). The warrant list was compared to a Talladega County Jail spreadsheet recording those admitted to its jail. (*Id.*) Plaintiffs' expert, Peter Coons, then "filter[ed] the results further by offense type[, by] "exclud[ing] all offenses that appeared to be legitimate arrests such as a DUI and includ[ing] offenses that appeared to be post adjudication, such as failure to obey a court order (FTOCO)." (*Id.*). In this manner, Coons was able to identify: (a) 275 individuals who were jailed in the Talladega Jail, (b) 309 individuals who were arrested, and (c) 405 individuals who had warrants. (*Id.*). Then, Coons screened for people for whom JCS had recorded certain indicators that are correlated to poverty (such as unemployment, disability, or receiving Social Security) and identified ninety-two people. (*Id.*).

JCS argues that Coons's proposed class list is over-inclusive on its face. (Doc. # 714 at 35). It points out that "what Coons isolated were probationers apprehended by Childersburg and then 'jailed,' for any length of time, on any offense which Coons deemed not to be 'legitimate.'" (*Id.*; *see also* Doc. # 708-1 at ¶ 56 (the list included all probationers who "were arrested and jailed, and

then released and put back on JCS probation.")). At his deposition, Coons could not articulate what standard he used to determine what offenses were deemed "legitimate" except to state that "they were related to a JCS incident." (Doc. # 715-1 at 69). He included "FTA public intox" but excluded cocaine possession, murder and burglary. (*Id.*) He testified that those offenses "potentially could be JCS-related" and that one "would have to do further potential possible research on them." (Doc. # 715-1 at 70).

Of course, this list may still be overly inclusive because it could include probationers who were not jailed on probation-revocation related offenses. *See Walewski v. Zenimax Media, Inc.*, 502 F. App'x. 857, 861 (11th Cir. 2012) (affirming district court's denial of certification where the proposed class definition "impermissibly includes members who have no cause of action"). Further, according to Coons, to narrow the list, additional research would be required, including an examination of individual files not maintained by JCS. (Docs. # 708-1 at ¶ 56, 715-1 at 82-90).

Plaintiffs argue that some level of individual review is acceptable. *Karhu*, 621 F. App'x at 947. But the process described by Coons is outside of that safe zone. It is not administratively feasible. Any such process must be able to construct a proper list of class membership (which still has not been identified with any particularity). The Coons process does not do that. It is also plainly individualized. Worse, it is unmanageable. *See Karhu*, 621 F. App'x. at 946 ("Identifying class members is administratively feasible when it is a 'manageable process that does not require *much, if any,* individual inquiry.'" (quoting *Bussey*, 562 F. App'x. at 787) (emphasis added)).

Because Plaintiffs have not proposed an administratively feasible basis for identifying membership in the Childersburg class, they have not established that the class is adequately ascertainable. For this reason alone, certification of Plaintiffs' proposed Childersburg Jail class should be denied.

### C.    The Rule 23(a) Requirements

Although the classes are not properly ascertainable, for completeness, the court examines the Rule 23(a) requirements for class certification. Rule 23(a) requires the proposed classes to meet the requirements of numerosity, commonality, typicality, and adequacy of representation. In examining whether the party seeking certification has satisfied the requirements of Rule 23, the Eleventh Circuit has counseled that "[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co. v. Geneva Pharms., Inc*., 350 F.3d 1181, 1188 n.15 (11th Cir. 2003) (citation omitted).

#### 1.    Numerosity

Under Rule 23(a)(1), the plaintiff must show that the settlement class is so numerous that joinder is impracticable. *See* Rule 23(a)(1). The Eleventh Circuit has held that the numerosity requirement is "a generally low hurdle" and "less than twenty-one is inadequate [and] more than forty [is] adequate...." *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1267 (11th Cir. 2009).

Here, JCS does not challenge numerosity. (Doc. # 714). The proposed statewide class is estimated to number in the thousands. Even the Childersburg class is estimated to be in the hundreds. Therefore, the proposed classes easily meet the numerosity requirement of Rule 23(a)(1).

#### 2.    Commonality

Rule 23(a)(2) requires a plaintiff to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury ....'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

350, (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The claims must depend on a common contention the "truth or falsity [of which] will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. The Supreme Court has found that, for the purposes of Rule 23(a)(2), even a single common question of law or fact is sufficient. *Id.* at 359. The analysis of this Rule 23(a) requirement (and all of the other Rule 23(a) requirements) must be a rigorous one. In *Dukes*, the Supreme Court unquestionably raised the bar on what a plaintiff must show to establish commonality. As the Court instructed, "[w]hat matters [in the commonality analysis] is not the raising of common 'questions' -- even in droves -- but, rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U Law Rev. 97, 132 (2009)) (emphasis added).

JCS does not challenge Plaintiffs' compliance with the commonality requirement. (Doc. # 714). Plaintiffs have identified common questions of law and fact for both proposed classes that are common to all potential class members. Members of the proposed Childersburg Jail Class have two claims in common: the *Bearden* claim and the Sixth Amendment claim. They argue that both claims will be proven through common evidence. (Doc. # 709 at 32). More specifically, with regard to their *Bearden* claim, Plaintiffs assert that common evidence will show that, before submitting petitions for revocation, before issuing arrest warrants, or before jailing proposed class members, JCS and the Childersburg Municipal Court took no steps whatsoever to ensure that only those who were able to pay and willfully refused were imprisoned. (Doc. # 709 at 32). With regard to their Sixth Amendment Claim, Plaintiffs assert that common proof will show that JCS and the

court used the same JCS form probation order for every class member which contained a one-line acknowledgement waiving their right to counsel. (Doc. # 709 at 34). The proposed Childersburg Jail class, therefore, meets the commonality requirement because these issues to be tried are common to all potential class members.

Members of the proposed Statewide Due Process class all claim that JCS unilaterally extended their probation for more than two years without court intervention. Plaintiffs assert that common evidence in this regard includes the following: (1) JCS had a policy of running probation terms consecutively; and (2) JCS policies granted JCS employees discretion to extend probation after the terms of probation had expired; and (3) JCS regularly extended probation sentences for two years following a reinstatement to probation. (Doc. # 709 at 37-38). Without delving into the merits of these claims, the court finds that there are common issues to be tried as to all proposed Statewide Due Process class members therefore this class, too, satisfies the commonality requirement.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is permissive; representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical*." In re Checking Account Overdraft*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (citing *Brown v. SCI Funeral Servs. of Fla., Inc*., 212 F.R.D. 602, 605 (S.D. Fla. 2003)). While commonality looks at whether *class members*' claims are common to each other, typicality is satisfied where the named *plaintiffs'* claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class.

*Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985).

"Like commonality, the test for typicality is not demanding." *In re Checking Account Overdraft Litig*., 286 F.R.D. 645, 653 (S.D. Fla. 2012) (citing *In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 532 (M.D. Fla. 1996)). "'Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.'" *In re Checking Account Overdraft Litig*., 286 F.R.D. at 653 (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir.1994) (citation omitted)).

JCS does not strenuously argue that Plaintiffs cannot satisfy the typicality requirement. (Doc. # 714 at 23). However, JCS highlights some factual differences between two of the named Plaintiffs (Timothy Fugatt and Deuante Jews) and putative class members. For example, those two named Plaintiffs each had multiple probations. (*Id.*). However, the named Plaintiffs and class members share the same core constitutional claims based on the same legal theories. Those claims challenge the same pattern or practice of conduct, generally based on JCS's policies, that allegedly caused Plaintiffs' injuries. Because at least some of Plaintiffs' claims can be established by common proof of JCS's uniform application of its policies related to probation, the court finds that typicality is satisfied.

### 4. Adequacy of Representation

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy-of-representation requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v.*

*Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

JCS only addresses the adequacy of the named Plaintiffs in a footnote, and only with respect to Deuante Jews. No argument is made that the other named Plaintiffs are inadequate representatives.[8] JCS argues that "Jews is clearly inadequate as a putative representative" because his credibility is "uniquely assailable." (Doc. # 714 at 8, n.3 (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) ("named plaintiffs might not qualify as adequate class representatives because they do not possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative"); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 n.22 (11th Cir. 2009) (noting that credibility attacks on a representative are "inherently fact-dependent")). JCS points out that Jews testified that he had no intention of paying his fines and gave JCS an incorrect address so that he could not be located. (Doc. # 714 at 8, n.3 (citing Doc. # 524-5 at 60-61)). JCS also notes that Jews either is (or was) in prison serving a multi-year sentence for making terroristic threats (Doc. # 431-19), and argues that "[n]o rational class member would want their claims being adjudicated in reliance upon a factfinder's assessment of Mr. Jews's credibility." (Doc. # 714 at 8, n.3).

Nonetheless, the court finds that neither the named Plaintiffs, nor their counsel, have any interests that are antagonistic to those of the absent class members. The central issues in this case relate to JCS's handling of probation for the Childersburg, and other Municipal Courts where Plaintiffs were each sentenced to probation. Each named Plaintiff, like each absent class member, has a strong interest in proving that JCS's policies and procedures were unlawful and in

---

[8] As to the 24-month claim, the court previously determined that Timothy Fugatt and Jews have standing to pursue that claim. (Doc. # 626). Under that ruling, even if Jews is inadequate, Timothy Fugatt can serve as the class representative.

demonstrating the impact of the illegal conduct and obtaining redress. Plaintiffs thus share the interests of the class and will properly and adequately represent the class.

The law firms and attorneys seeking to represent the class here include qualified and experienced lawyers who will prosecute the claims on behalf of the proposed class with diligence and vigor. The court is familiar with the lawyers seeking to represent the class, as they have appeared before the court numerous times. The court is satisfied that the named Plaintiffs and the lawyers seeking appointment as class counsel will properly and adequately prosecute this case.

### D.     Rule 23(b)(3)

When a party seeking certification has met the requirements of Rule 23(a), that does not end the court's Rule 23 inquiry. A named Plaintiff must also show that the putative class meets at least one of the three requirements of Rule 23(b). Here, Plaintiffs seek certification by Rule 23(b)(3), which requires, among other things, that (1) common questions "predominate over any questions affecting only individual members" and (2) class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Thus, Rule 23(b)(3) imposes two additional requirements: a plaintiff must show "predominance" and "superiority." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Here, JCS contests only predominance. (Doc. # 714).

### 1.     Predominance

The Supreme Court has described the "predominance" requirement in Rule 23(b)(3) as "even more demanding than Rule 23(a)," and noted that the court has a duty to "take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp*, 569 U.S. at 34 (citations omitted) (holding that proposed class of cable subscribers alleging antitrust conduct did not meet Rule 23(b)(3) "predominance" requirement, where damages from specifically alleged

conduct were not capable of measurement on classwide basis). The predominance standard is similar to the commonality requirement of Rule 23(a), but is far more demanding, and mandates particular caution where "individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 623; *see Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) ("The predominance requirement in Rule 23(b)(3) is 'far more demanding' than the commonality requirement found in Rule 23(a)(2)."). The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by [class] representation.'" *Carriuolo*, 823 F.3d at 985 (quoting *Amchem*, 521 U.S. at 623-24). A plaintiff cannot satisfy the predominance requirement if, as a practical matter, resolution of common issues will "break [] down into an unmanageable variety of individual legal and factual issues." *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996).

The predominance inquiry begins with consideration of the elements of the underlying cause of action, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810-11 (2011), and requires the court to consider "how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). Judge Pryor recently put it this way:

> To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements. *See Klay*, 382 F.3d at 1254 & n. 7. The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. *See id.* at 1255. Common questions are ones where "the same evidence will suffice for each member," and individual questions are ones where the evidence will "var[y] from member to member." *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir. 2005).

*Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016).

### a. Statewide Due Process Class

Plaintiffs assert that the predominance prong is met for their statewide 24-month claim because the key factual and legal issues can be resolved through common evidence and focus on JCS's routine practices. But Plaintiffs' arguments are superficial, and they fail to drill down into the elements of the claim. (Doc. # 709 at 44).

On the other hand, JCS has dug deep into the elements of the 24-month claim and argues that proof of the claim requires individualized evidence destroying predominance. (Doc. # 714 at 20). JCS identifies potential predominance-related problems with each of the elements of the 24-month claim. (Doc. # 714 at 21-32). JCS has the better end of the argument.

To establish their 24-month claim, Plaintiffs must show: (1) that a probationer's single probation term exceeded twenty-four months, after accounting for tolling, (2) that the extension was pursuant to JCS policy and there was no court involvement, (3) the probationer did not receive notice of the extension and thus was without an opportunity to contest the extension, and (4) the probationer suffered the loss of a liberty interest or suffered other damages by remaining on probation for over twenty-four months. (Doc. # 626 at 62-64). That is, Plaintiffs must show that JCS unilaterally extended each class member's probation beyond twenty-four months, without court intervention. But class members, including two of the currently named Plaintiffs for this claim, Timothy Fugatt and Deunate Jews, were placed on multiple probations. The evidence in the record shows that the municipal court entered both Orders of Modification, and well as Superseding Probation Orders with regard to these two named Plaintiffs. Plaintiffs' expert, Peter Coons, has proposed to exclude probationers with Orders of Modification from the class. But that solution does not remedy the problem of Superseding Probation Orders. Where such an order is in

place, an individualized fact-finding inquiry would be required to determine whether subsequent Probation Orders were Superseding Orders.

The court has already found that there is a genuine issue of material fact as to whether Mr. Fugatt's and Jews's subsequent orders of probation were Superseding Orders. That is, there is an issue as to whether the court intended to encompass prior and subsequent offenses under one unified probation (thus causing any sentence in excess of twenty-four months to be the result of a court action, not JCS), or such orders were simply new orders of probation confined solely to the subsequent charges (where a 24-month excess was attributable to JCS). (Doc. # 626 at 63) ("JCS contends that Plaintiffs' probation terms were 'changed by the later probation orders of the Childersburg Municipal Court,' but *a jury could reach a different finding* regarding the Municipal Court's orders.")(emphasis added). It follows therefore that there are individualized factual issues with regard to the intent of the Municipal Court about the later probation order for Mr. Fugatt and Jews. This illustrates that such an individual examination of the probation orders will have to be undertaken for each probationer in a multiple-probation situation for Plaintiffs to establish the first two elements of their 24-month claim.[9]

Plaintiffs rely heavily on the JCS Training Manual as evidence that it was JCS's policies and practices that extended probations beyond twenty-four months. But individual probationers were not always on a consistent path. There is evidence that the procedures and preferences of the different municipal courts varied, and that those preferences overrode anything in the Training Manual. (Doc. # 431-2 at ¶ 28). For example, Marcy Freeman, a probation officer in JCS's

---

[9] For example, Timothy Fugatt was in court on December 18, 2013 and agreed to pay off certain fines by February 2013. There are two Orders of Modification of Probation listed on his case-action summary dated November 8, 2012 and January 14, 2013. (Doc. # 537-24 at 3). There is also an order on the case-action summary dated October 12, 2012, ordering that JCS must "waive[] all future supervision fees." (Docs. # 537-24 at 4, 537-58). Thus, for one of the named Plaintiffs with multiple probations, there is evidence that different types of court orders intervened to extend the original probation term.

Montgomery office, testified that it was the Montgomery Municipal Court's practice to set a hearing for all probationers' whose 24-month probation periods were about to expire. (Doc. # 715-7 at 64-68). JCS would then follow whatever instructions the judge gave after those hearings. (*Id.* at 68). Further, the JCS Training Manual itself provides that JCS employees were not to "[m]odify a court sentence without approval from that court." (Docs. # 708-3 at 81; 715-5 at ¶ 29).

Plaintiffs also propose to use certain probation tracker codes to identify those class members with appropriate 24-month claims. But not all cities use the same (or even all of the) available codes. (*Id.*). Furthermore, not all events relating to a probation are necessarily reflected in a code. (Doc. # 431-2 at ¶ 23). Sometimes, orders regarding how to handle various probation issues or statuses were issued orally.[10] (Docs. # 715-4 at ¶ 15, 715-5 at ¶ 19). Municipal Courts are not like United States District Courts. They do not enjoy the same resources (courtroom personnel, law clerks, and support staff) and often have crushing caseloads. Municipal judges work part-time, and usually maintain law practices. Oral orders are more frequent and necessary. In a perfect world, everything would be documented. But Municipal Courts do not live in that world. Oral orders happen, and there is evidence of them in this case. To say the least, individual issues abound with respect to the first two elements of the Statewide Class claim.

The third element of the 24-month claim is that Plaintiffs did not receive notice of the extension of probation and an opportunity to contest it. Proof in this regard, too, will require individualized determinations. What was communicated to the probationers (and what notice they received) are not simply matters that can be discerned by examining Probation Tracker. The

---

[10] Plaintiffs protest the consideration of a municipal court's "oral orders" as an explanation as to why certain sentences were extended. (Doc. # 719 at 7) ("This is absurd."). They point to the JCS Manual, which instructs, "If it is not documented, it did not happen." (*Id.*). But, that argument misses this point: if JCS failed to document an oral order of a municipal court, that does not mean the court's order "did not happen." Rather, that provision of the manual counsels JCS's employees to document their actions on a file. The key takeaway is that there were oral orders, and an individual inquiry would be necessary to see if each class member's sentence was affected by an oral order.

evidence shows that sometimes notices were logged in Probation Tracker and sometimes they were not. Some of the named Plaintiffs have raised issues about receiving notices from JCS. Jews provided the wrong address to JCS, so to the extent he did not receive notice of an extension, that was at least partially of his own making. And, JCS's employees also had oral communications with probationers. These individualized communications would have to be examined to eliminate them as a possible basis or reason for an extension, or to determine notice about the potential for an extension.

The fourth element of the 24-month claim requires proof that class members suffered damages from the extension of their probation. Proof on this element would require an examination of jail time ordered by the court and the amount of money paid to JCS by probationers after the expiration of the twenty-four month period, after accounting for tolling. This would quite plainly require individualized proof. Moreover, as noted with regard to the Fugatts, there is evidence that courts occasionally waived JCS fees. Thus, there is not a reliable model, formula, or body of common proof which could be used to calculate damages on a class-wide basis. To the contrary, those determinations will be dependent upon individual proof.

Furthermore, Eleventh Circuit precedent "plainly require[s] that compensatory damages in a § 1983 suit be based on actual injury caused by the defendant rather than on the 'abstract value' of the constitutional rights that may have been violated." *Slicker v. Jackson*, 215 F.3d 1225, 1230 (11th Cir. 2000). Such an "actual injury" can include monetary loss, physical pain and suffering, mental and emotional distress, impairment of reputation, and personal humiliation. *Id*. at 1231. All of these types of damages would have to be shown individually.

Although individualized damages do not always defeat predominance, "individual damages defeat predominance if computing them 'will be so complex, fact-specific, and difficult

that the burden on the court system would be simply intolerable.'" *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004)). Furthermore, individual damages defeat predominance when they are accompanied by "significant individualized questions going to liability." *Brown*, 817 F.3d at 1240 (quoting *Klay*, 382 F.3d at 1260). Here, the individualized nature of the damages inquiry is accompanied by individualized inquiries going to the other elements of the 24-month claim.

Common issues will not predominate over individual questions if "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). That is exactly the situation presented here. The individualized inquiries necessary to accommodate for variations in probations, tolling, notice, variation in court operations, and damages render resolution of this 24-month claim on a class-wide basis unmanageable, thus destroying predominance.

### b. The Childersburg Jail Class *Bearden* Claims

Under *Bearden v. Georgia*, a court may not jail a probationer for nonpayment of court debt without first inquiring into whether she had the means to pay. *Bearden v. Georgia*, 471 U.S. 606, 6 (1985). Nonpayment must be willful before a probationer can lawfully be jailed. *See United States v. Mojica-Leguizamo*, 447 F. App'x 992, 996 (11th Cir. 2011) (reversing revocation of probationer's supervised release based in part on the government's failure to prove willful failure to pay).

Plaintiffs assert that these claims require proof of three elements: "(1) the members of the Childersburg Jail Class were arrested and jailed for failure to pay court debt; (2) they were jailed without the required *Bearden* determination; and (3) the moving force behind these constitutional

violations was an agreement between JCS and the Childersburg Municipal Court." (Doc. # 709 at 25). Plaintiffs must also prove that the deprivation of a *Bearden* hearing caused them to suffer damages, and they must offer an administratively feasible method of proving damages in a class context.

To prove the first element of the claim, Plaintiffs must show not just that the probationer was jailed, but that he or she was jailed because of a failure to pay. This will require an individualized inquiry. Evidence in the record shows that revocation proceedings were initiated, warrants were issued, and probationers were jailed for a variety of reasons other than a failure to pay. For example, another reason for the initiation of revocation proceedings was a failure to attend probation appointments. As the court has already noted, "JCS directed its employees to request probation revocation hearings when a probationer's mail was returned to the JCS office, a probationer missed three appointments, or a probationer failed to respond to all communications" and that "JCS employees in Childersburg sought probation-revocation hearings when Plaintiffs failed to show up for probation appointments." (Doc. # 626 at 53, 76). Therefore, an individualized inquiry into the reason a probationer was jailed is required in order to establish the first element of this claim.

The second element presents two problems for Plaintiffs. First (and again), analysis of it will require an individualized inquiry. Second, establishing this element is complicated by the fact that Plaintiffs must prove both an affirmative and a negative. Plaintiffs must affirmatively prove indigency. They must also show absence of an appropriate *Bearden* hearing. And, they must make such a showing on a class wide basis. The Rule 23 record before the court contains evidence that each of the named Plaintiffs failed to attend a hearing on a petition to revoke their probation at which the court might have addressed indigency. (Doc. # 626 at 23-28). Moreover, the Plaintiffs'

indigency claim involves their assertion that on a class wide basis, probationers were jailed for not paying the fines (and fees). But to succeed, Plaintiffs are required to show that the class members were unable to pay (which, itself will require individualized proof) and steer around the issue of whether any failure to pay was willful. Here, one of the named Plaintiffs (Jews) testified that he never intended to pay his fines. (Doc. # 524-5 at 60-61). That suggests a willful failure to pay. It also illustrates the key point here: willfulness will have to be examined on a case-by-case basis for each probationer. To the extent that Kristy Fugatt is indigent, there is evidence that she made no effort to find a job. (Doc. # 431-8 at 20-21). Furthermore, Judge Ward testified that he routinely provided *Bearden* hearings to probationers. (Doc. # 402-36 at 46–48, 97). Therefore, this claim will require individualized examinations of the reason for each revocation hearing, what topics were covered at a plethora of hearings, and whether the facts of each hearing amounted to a *Bearden* violation. This level of detailed, individualized proof demonstrates that common issues do not predominate here.

Finally (and again), it does not appear that the issue of damages can be appropriately addressed on a class wide basis with use of common proof. Plaintiffs argue that they seek compensatory damages, for arrests, days spent in jail, and days spent on probation. (Doc. # 709). But these types of damages require inherently individualized assessments. Plaintiffs argue that general damages are also appropriate, but they cite *no* Eleventh Circuit authority for that proposition. (*See* Doc. # 709 at 48-49). There is a reason for that. Our circuit precedent establishes that individual damages defeat predominance when, as here related to Plaintiffs' *Bearden* claim, they are accompanied by "significant individualized questions going to liability." *Brown*, 817 F.3d at 1240 (quoting *Klay*, 382 F.3d at 1260). Therefore, Plaintiffs have failed to establish the predominance requirement for the Childersburg Jail Class *Bearden* claim.

### c.   The Childersburg Jail Class Sixth Amendment Claim

"'The Sixth Amendment right to counsel at all critical stages applies in all cases where an indigent defendant faces incarceration, regardless whether the offense was a misdemeanor or felony.'" *Pittman v. United States*, 2011 WL 1085107, at *2 (S.D. Ga. Mar. 2, 2011*), report and recommendation adopted*, 2011 WL 997018 (S.D. Ga. Mar. 21, 2011) (quoting *United States v. Rubio*, 629 F.3d 490, 493 (5th Cir. 2010)). A defendant may waive the Sixth Amendment right to counsel if the waiver is voluntary, knowing, and intelligent. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

To establish this claim, Plaintiffs must establish indigency and a deprivation of the right to counsel. As this court has already determined, proof of indigency is inherently individualized. Furthermore, named Plaintiffs Ray and Jews were able to have themselves declared indigent and were appointed counsel. Ray filled out an Affidavit of Substantial Hardship and had Patrick Evans appointed to represent her. (Doc. # 471-7 at 180). Jews used hardship forms in Talledega and was appointed counsel more than once. (Doc. # 524-5 at 139–41, 147–49).

But whether a probationer received court-appointed counsel is not the only case-by-case inquiry required on this motion. For those who did not have counsel, there is still another question: whether the probationer at issue validly waived counsel? This requires another individualized inquiry. The JCS form Probation Order contained a single line waiver pre-printed at the bottom of the page stating, "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER." (Doc. # 708-2 at 27). To be clear, the form contains no explanation regarding the right to counsel. (*Id.*). But that does not dispense with the necessary inquiry (and proof) as to whether the waiver was voluntary, knowing, and intelligent. In the class

context, that inquiry would require an examination of what was discussed with each class member at each sentencing.

As with Plaintiffs' *Bearden* claim, proof of damages will be required on Plaintiffs' Sixth Amendment claim. That will require an individualized assessment of actual compensatory damages. Again, when such an individualized inquiry is combined with "significant individualized questions going to liability," that combination tends to defeat predominance. *Brown*, 817 F.3d at 1240 (quoting *Klay*, 382 F.3d at 1260). Therefore, the court cannot say that common questions of fact and law predominate in relation to the Childersburg Jail Class Sixth Amendment claim. *Id.*

### d.      Conclusion as to Predominance

After careful review, the court is satisfied that Plaintiffs cannot establish that any of their claims satisfies the predominance requirement. Each class member's claims would require distinctly case-specific inquiries into the facts surrounding those claims. Regarding their statewide 24-month claim, each class member will be required to go beyond the general allegations of the class claim and present evidence that their probation terms exceeded twenty-four months. For each class member who can do so, s/he will also have to establish (1) the extension was pursuant to JCS policy, (2) s/he did not receive notice of the extension and an opportunity to contest the extension, and (3) s/he was harmed (*i.e.*, damaged) by the violation. Similarly, to establish a *Bearden* claim, each class member will be required to show that (1) s/he was arrested and jailed for failing to pay a court debt, (2) s/he was jailed without the required *Bearden* hearing, and (3) JCS was the moving force behind the deprivation of the *Bearden* hearing. Finally, to prove a Sixth Amendment claim, each class member would be required to show that s/he was indigent but was denied the right to counsel. The trier of fact would also have to consider whether s/he knowingly and voluntarily waived the right to counsel.

No matter how the issues in this case are framed, it is clear that while each class member's claims may start off under the "class umbrella," ultimately those claims will rise or fall depending on individual proof which is specific to that class member's circumstances. When there is a requirement of such individualized, distinct proof to allow class members to succeed on their claims, the proponents of a class cannot establish the predominance requirement. This is neither a novel nor ground-breaking observation.

That individualized proof defeats predominance has been the law in this circuit for over twenty years. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir. 1997). In *Jackson*, the plaintiffs alleged that the defendant had "a nationwide practice or policy of discriminating against its customers and its employees on the basis of race." *Jackson*, 130 F.3d at 1001. The district court certified a customer class who claimed that Motel 6 facilities had a policy of denying rooms or renting less desirable rooms to African Americans. The defendant sought a writ of mandamus directing the district court to decertify that customer class. The  Eleventh Circuit granted the writ and held that putative class was "not certifiable because it fails the predominance requirement of Federal Rule of Civil Procedure 23(b)(3)." *Id.* at 1004–05. Rejecting the plaintiffs' argument that the defendant's evidence of a pattern and practice of discrimination satisfied Rule 23(b)(3)'s predominance requirement, the court explained that the plaintiffs' claims would "require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination." *Id.* at 1006. ("The issues that must be addressed include not only whether a particular plaintiff was denied a room or was rented a substandard room, but also whether there were any rooms vacant when that plaintiff inquired; whether the plaintiff had reservations; whether unclean rooms were rented to the plaintiff for reasons having nothing to do with the plaintiff's race; whether the plaintiff, at the time that he requested a room, exhibited any non-racial characteristics

legitimately counseling against renting him a room; and so on.") In granting the requested relief, the court expressed its expectation that "most, if not all, of the plaintiffs' claims [would] stand or fall, not on the answer to the question whether [the defendant] ha[d] a practice or policy of racial discrimination, but on the resolution of these highly case-specific factual issues." *Id*. It therefore determined that the district court had abused its discretion in certifying the customer class.

For these reasons, Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3) as to all claims.

### E.     Rule 23(c)(4) Issue Class Certification

Plaintiffs alternatively request that an "issues class" be certified under Rule 23(c)(4) to address a limited set of operative liability issues. (Doc. # 709 at 56-57). Plaintiffs propose that the court certify a liability-only class for trial and focus on the monetary relief in a second phase. (Doc. # 709 at 56) (citing *Navelski v. Int'l Paper Co*., 244 F. Supp. 3d 1275, 1310 (N.D. Fla.), *recons. denied*, 261 F. Supp. 3d 1212 (N.D. Fla. 2017) (exercising "discretion under Rule 23(c)(4) to certify a liability-only class and bifurcate damages from liability")). Alternatively, Plaintiffs assert that the court could certify subclasses to resolve specific limited issues.

Courts are split as to whether issue classes under Rule 23(c)(4) may be certified unless the cause of action as a whole first satisfies Rule 23(b)(3)'s predominance requirement. *Compare Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) (Rule 23(c)(4)(A) certification as to a specific issue is available only if common questions predominate in the claim as a whole) *with In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (Rule 23(c)(4)(A) is available to certify particular issues "regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement). The Eleventh Circuit has yet to provide clear guidance as to which rule applies. But, courts have been wary of certifying classes under Rule 23(c)(4) without

any showing that common issues predominate over the case. *See Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 (S.D. Ala. 2006) (citing authority and stating that "courts have emphatically rejected attempts to use the (c)(4) process for certifying individual issues as a means for achieving an end run around the (b)(3) predominance requirement."). As the *Fisher* court concluded, "the proper interplay between Rules 23(b)(3) and 23(c)(4) is that a class action as a whole must satisfy the Rule 23(b)(3) predominance requirement. If, and only if, it does so, then Rule 23(c)(4) may apply as simply a housekeeping rule that allows courts to sever the common issues for a class trial." *Fisher*, 238 F.R.D. at 316.

Here, there is another problem. Plaintiffs have not provided any specific reasons in support of their request for issue certification, other than the fact that Rule 23(b)(3) may not be available to them. (Doc. # 709 at 56-57). The court also notes that, even if it certified an issue class, each class member's claim would still need to be separately tried to determine issues such as indigency, tolling, and damages. It is these individualized issues that would predominate, even in a Rule 23(c)(4) liability trial. Therefore, certifying an issues class would not promote judicial efficiency. Certification of a common issues class will not dispose of a single case or eliminate the need for a single trial. All of this leads the court to conclude that certification of a Rule 23(c)(4) class under these unique facts would be an end run around Rule 23(b)(3), and in any event, would not be a superior method of addressing Plaintiffs' claims.

## IV.  Conclusion

For all of these reasons, the court concludes that Plaintiffs have failed to show that the classes they propose are clearly ascertainable. In addition, they have not shown that common questions predominate over individual issues with respect to any of the proposed classes. Finally, they have not established this as an appropriate case to certify a Rule 23(c)(4) issue class.

Plaintiffs' Motion for Class Certification (Doc. # 707) is due to be denied. A separate order will be entered.

DONE and ORDERED this September 26, 2019.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE